**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE BAXTER INTERNATIONAL INC. SECURITIES LITIGATION. | Case No. 1:19-cv-07786 |
| | District Judge Sara L. Ellis |
| | Magistrate Judge Jeffrey I. Cummings |
| | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | JURISDICTION AND VENUE | 8 |
| III. | PARTIES | 8 |

| | | |
|---|---|---|
| | A. | Lead Plaintiffs | 8 |
| | B. | Defendants | 9 |

| | | |
|---|---|---|
| IV. | SUMMARY OF DEFENDANTS' FRAUD | 10 |

A.   Baxter's Operations Are Global and a Majority of its Revenue Is Generated from Sales Outside the United States ................................................................... 10

B.   GAAP Required Defendants to Properly Account for Baxter's Foreign Exchange Transactions ........................................................................................... 12

     1.   GAAP Required Defendants to Provide Materially Complete and Accurate Information to Investors in Baxter's Class Period Financial Reports .................................................................................................... 12

     2.   GAAP Required Defendants to Measure and Record Foreign Currency Transactions Using Rates at the Time of the Transactions and, Subsequently, at the Close of Reporting Periods .............................. 15

C.   Baxter's Policies Violated GAAP and the Company Repeatedly Misled Investors Regarding Foreign Currency Transactions ........................................... 17

     1.   Prior to and Throughout the Class Period, Defendants Repeatedly Focused Investors' Attention on and Made False Representations Regarding the Purportedly Positive Impact of Foreign Exchange on Baxter's Financial Results ....................................................................... 21

     2.   Defendants' Fraud Enabled Them to Falsely Report Adjusted EPS Results Exceeding Guidance and Expectations, Which Defendants Would Not Have Done Otherwise ............................................................. 24

     3.   Defendants Falsely Represented Baxter's Internal Controls ..................... 26

     4.   Defendants Violated GAAP and Misled Investors by Failing to Properly Measure and Record Foreign Currency Transactions ............... 28

D.   The Truth Emerges ............................................................................................... 31

|   |   |   |   |   |
|---|---|---|---|---|
| | E. | | Post-Class Period Company Admissions and Events ........................................... 33 | |
| V. | | ADDITIONAL SCIENTER ALLEGATIONS.................................................................. 39 | | |
| VI. | | MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT...................................................................................................... 49 | | |
| | A. | | Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Income Related to Foreign Exchange Fluctuations and Other Key Financial Metrics ...................................................... 49 | |
| | | 1. | False Statements In Baxter's 2018 Annual Report on Form 10-K and Fiscal Year 2018 Earnings Press Release .................................................. 49 | |
| | | 2. | False Statements Concerning Baxter's First Quarter of 2019 .................. 52 | |
| | | 3. | False Statements Concerning Baxter's Second Quarter of 2019 ............. 53 | |
| | B. | | Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Compliance with GAAP .................................... 55 | |
| | C. | | Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Internal Controls over Financial Reporting ................................................................................................................... 57 | |
| VII. | | LOSS CAUSATION......................................................................................................... 61 | | |
| VIII. | | THE PRESUMPTION OF RELIANCE ............................................................................ 63 | | |
| IX. | | THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR............................. 65 | | |
| X. | | CLASS ACTION ALLEGATIONS .................................................................................. 65 | | |
| XI. | | CAUSES OF ACTION...................................................................................................... 67 | | |
| | | | COUNT I - VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5........................................................................................................... 67 | |
| | | | COUNT II - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT ............... 69 | |
| XII. | | PRAYER FOR RELIEF ................................................................................................... 71 | | |
| XIII. | | JURY DEMAND .............................................................................................................. 71 | | |

Lead Plaintiffs Louisiana Municipal Policy Employees' Retirement System ("LAMPERS") and Varma Mutual Pension Insurance Company ("Varma") (collectively "Lead Plaintiffs"), by and through their undersigned counsel, hereby bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the common stock of Baxter International, Inc. ("Baxter" or the "Company") during the period from February 21, 2019 to October 23, 2019, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Excluded from the Class are Defendants (as set forth herein), present or former executive officers of Baxter, their immediate family members (as defined in 17 C.F.R. § 229.404, Instructions 1(a)(iii) and 1(b)(ii)), and any affiliates of Baxter. As explained further below, Lead Plaintiffs seek to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, the independent investigation of the undersigned counsel. This investigation included, but was not limited to, a review and analysis of: (i) Baxter's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Baxter's earnings conference calls and industry conferences; (iv) other publicly available material and data identified herein; (v) economic analyses of Baxter's securities movement and pricing data; and (vi) consultations with relevant subject matter experts (including concerning accounting rules and the application of generally accepted accounting principles ("GAAP")). Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I.    INTRODUCTION

1.     This is a simple and straightforward fraud.  Defendants Baxter, its CEO Jose Almeida ("Almeida"), and CFO James Saccaro ("Saccaro"), reported strong financial results for 2017, 2018, and the first half of 2019 that exceeded investors' expectations.  In Baxter's SEC filings, Almeida and Saccaro repeatedly certified that the Company's financial statements complied with GAAP and that its internal controls were adequate.

2.     Baxter has now admitted that those financial statements reported nearly $200 million in intentionally inflated profits based on illusory transactions undertaken "***solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses.***"[1]  In other words, the foreign exchange ("FX") "gains" discussed in more detail below were financial manipulations that had no purpose other than to inflate the Company's reported results.

3.     When Defendants' fraudulent manipulations were revealed, Baxter's share price cratered—immediately wiping out $4 billion of the Company's market capitalization.  Ultimately, Baxter was forced to issue a restatement (the "Restatement"), admitting that its financial statements from fiscal year 2015 through the second quarter of 2019 were materially misstated in violation of GAAP and that the Company's internal controls had suffered from an undisclosed "material weakness."

4.     Prior to those startling and unequivocal admissions, the undisclosed reality at Baxter was very different from what Defendants represented to the market.  For many years,

---

[1] Unless otherwise noted, all emphasis in quotations is added.

unbeknownst to investors, the Company had exploited the foreign currency conversion incidental to its global operations as a means to inflate its reported financial results.

5.     Throughout 2017 and up to and including 2019, ***over 57%*** of Baxter's revenue was generated in foreign markets.  As a result of the global footprint of Baxter's operations, foreign currency conversion was a critical and routine function for the Company, to both fund its operations and to manage currency risk.  And because Baxter's "functional currency"—the currency in which it reports its earnings on a consolidated basis—was U.S. dollars, its consolidated financial reporting required the translation of its books from various foreign currencies into U.S. dollars on a periodic basis.  Those various foreign currency conversion functions were overseen by the Company's senior financial executives, including directly by Defendant Saccaro and Baxter's Class Period Treasurer, Scott Bohaboy.

6.     The methods of accounting for foreign currency conversions and translations are prescribed by GAAP and create a clear, objective framework that Baxter could have easily applied. In order to avoid the potential for manipulation, where a transaction requires a foreign currency conversion, GAAP requires that the FX rate assigned to the transaction is the spot rate at the time the transaction is entered into—e.g., a sale in euros is valued in U.S. dollars based on the euro-dollar exchange rate on the date the transaction occurs.  Any balance associated with that transaction, such as a receivable recorded for that sale, should then be "remeasured" at the end of the reporting period based on the then-current spot FX rate (i.e., quarterly) and recorded on the Company's financial statements.  Any gain or loss on the difference in currency value between the initial measurement date and the value on the date at the end of reporting period is recorded and reported on the "other (income) expense, net" line of the entity's income statement.  The same rules apply to intra-company transactions between and among Baxter's domestic and international

corporate entities. GAAP requires that current FX rates must be assigned at the time those intra-company transactions occur and should be re-measured at the close of the reporting period, and any gains and losses associated with any difference in those FX rates must then be reported as a gain or loss to income.

7.      On October 24, 2019, Baxter disclosed an internal investigation into its accounting for foreign currency conversions. Specifically, the Company said that it had used "a foreign exchange rate convention historically applied by the Company that *was not in accordance with generally accepted accounting principles and enabled intra-Company transactions to be undertaken after the related exchange rates were already known*." In effect, Baxter admitted that it was conjuring up fake currency conversions by booking transactions after the fact to exploit known historic, favorable FX rates. Those "intra-Company transactions" generated fictitious FX gains. Investors were shocked by this news, and Baxter's share price declined by over 10% on October 24, 2019.

8.      Ultimately, Baxter filed its Form 10-K annual report for fiscal year 2019, which included the Company's Restatement of its previously released financial results for the Class Period, including the results for fiscal years 2017 and 2018, and for the first and second quarters of fiscal year 2019. In Baxter's Restatement, the Company materially reduced the amount of profit earned during the Restatement time period. For example, the "other income" item that included the effect of Baxter's foreign currency conversions was cut by *44%* for 2018 (from $139 million to $78 million). As noted above, the total effect of the reductions to the "Other (income) expense" line item for 2017 through the second quarter of 2019 totaled nearly $200 million. In addition, the Restatement revealed that at the outset of the Class Period, Baxter's reported "retained earnings" *were inflated by $551 million*.

9.    Critically, a restatement constitutes an admission that the restated financial statements were materially misstated based on information known to the issuer of the financial statements at the time they were originally issued.  To that end, Baxter described in the Restatement Defendants' manipulation of the Company's accounting for foreign currency conversions in violation of GAAP.  Specifically, Baxter acknowledged that "GAAP requires that foreign currency transactions be initially measured and recorded in an entity's functional currency *using the exchange rate on the date of the transaction* and it requires that foreign currency denominated monetary assets and liabilities *be remeasured at the end of each reporting period using the exchange rate at that date*."  Baxter admitted, however, that the Company violated both of those requirements, and did so intentionally.

10.    To that end, rather than follow this straightforward, objective process, Defendants have now admitted that after both of the above-described "measurement" dates had passed, the Company would hand-pick exchange rates to use that either generated FX gains or avoided losses (which have the same effect—increasing income).  This is a pure form of financial manipulation— Baxter admitted as much in its own description explaining the reasons for the Restatement:

> Under our historical exchange rate convention, all foreign currency transactions in a given month were initially measured using exchange rates *from a specified date near the middle of the previous month*.

11.    As mentioned above, this practice violated the GAAP requirement for the initial measurement to be based on the exchange rate on *the date of the transaction*.  Baxter further admitted that:

> Additionally, all foreign currency denominated monetary assets and liabilities were subsequently remeasured at the *end of each month using exchange rates from a specified date near the middle of the then current month*.

12.    This also violated GAAP, which requires the second measurement to be fixed at the date of the *end of the applicable reporting period*.

13.     Worse still, Baxter admitted that rather than being just a benign or negligent mistake, during the Class Period the Company specifically and repeatedly used this broken methodology *for the singular purpose of manipulating its financial results to generate false income*:

> *Beginning years after the adoption of our historical exchange rate convention, certain intra-company transactions were undertaken, after the related exchange rates were already known, <u>solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses</u>.*

14.     There is no plausible innocent explanation for these improper accounting methods and their results, particularly when they are considered in the full context of their effect: without the manipulations and false gains revealed in the Restatement, Baxter would have failed to meet or exceed both its own guidance and securities analysts' "consensus" expectations for Baxter's critical "earnings per share" ("EPS") in 2016, 2017, and 2018. For example, in 2017 and 2018, the Company's guidance for adjusted EPS was $2.42 and $2.99, respectively. As originally reported, Baxter "beat" both target numbers. In 2017 it originally reported adjusted EPS of $2.48; in 2018 it originally reported adjusted EPS of $3.05. However, when the as-restated earnings results are used, Baxter's adjusted EPS would have been $2.28 for 2017 and $2.90 for 2018. *These are significant "misses" that Defendants masked only through their manipulations of Baxter's foreign exchange accounting*. Defendants' financial manipulations were thus critical to the assessment of the Individual Defendants' performance in the eyes of perhaps their most important audience—Wall Street analysts.

15.     Importantly, at all times during the Class Period, Defendants Almeida and Saccaro knew about the Company's accounting and controls. Both *personally signed* certifications attesting—based on their own purported personal knowledge and investigation into such matters—

6

that Baxter's financial statements were accurate and complied with GAAP, and that the Company had adequate internal controls.

16.     In addition, Saccaro previously served as Baxter's Treasurer and in that function *was personally responsible* for the conduct implicated in this case, including the non-GAAP accounting methodologies and currency conversion practices Baxter had in place during his tenure. Equally telling, Saccaro's successor as Treasurer, Scott Bohaboy, left Baxter without any explanation shortly after the fraud was revealed and, in the Restatement, Baxter acknowledged the inadequacy of controls in its Treasury function, indicating it was adding resources "to improve our financial reporting controls related to treasury activities."  Saccaro's prior service as Treasurer and Bohaboy's dismissal are thus further illustrations of the centrality of Baxter's Treasurers in the use of foreign currency conversion accounting to inflate the Company's financial results.

17.     Defendants also had ample motive to engage in, and clearly benefited from, these financial manipulations.  Both Almeida and Saccaro earned massive incentive bonuses, collectively valued at over $55 million from 2017 through 2019.  Those bonuses were directly inflated as a result of the returns generated by Baxter's inflated results.  Acknowledging their role in the alleged fraud, in 2020, following the Restatement, Baxter's Board of Directors "clawed back" portions of those bonuses and cut both Almeida's and Saccaros's cash bonuses for 2019.

18.     The admissions in the Restatement unambiguously contradict Defendants' prior representations concerning Baxter's financial results, compliance with GAAP, and the adequacy of the Company's internal controls.  Baxter's Class Period financial statements were inflated and violated GAAP.   The Company's internal controls suffered from "material weaknesses." Defendants' misrepresentations on these points cannot be disputed.  The allegations against the Defendants clearly demonstrate their knowledge or reckless disregard for the truth.  As a result of

the Defendants' actions detailed below, Lead Plaintiffs and the Class have suffered massive damages, and by this action seek to recover those losses.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Baxter maintains its executive offices in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in or were issued from this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

21.    Lead Plaintiff LAMPERS is a statewide retirement system that provides retirement, disability, and survivor benefits to full-time police officers in Louisiana and their families and has done so for over 46 years. LAMPERS oversees more than $2.2 billion in assets on behalf of over 12,000 active participants. As reflected in the certification attached hereto as Exhibit A, LAMPERS purchased shares of Baxter stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

22.    Lead Plaintiff Varma, based in Helsinki, Finland, manages the pension savings for approximately 900,000 Finns. As of March 31, 2020, Varma had roughly $50 billion in assets

8

under management.  As reflected in the certification attached hereto as Exhibit B, Varma purchased shares of Baxter stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

      **B.**    **Defendants**

23.      Defendant Baxter develops, manufactures, markets, and sells renal and hospital products globally, manufacturing products in over 20 countries and selling them in over 100 countries.  Baxter is a Delaware corporation that maintains its principal executive offices at One Baxter Parkway, Deerfield, Illinois, 60015.  The Company's common stock trades on the NYSE under the ticker symbol "BAX."  As of April 21, 2020, Baxter had 508,836,225 shares of common stock outstanding.

24.      Defendant Almeida was Baxter's Chairman and CEO throughout the Class Period. In those roles, he reviewed, approved, and signed Baxter's filings with the SEC that contained false and misleading statements, as detailed herein.  Almeida also participated in Class Period conference calls and industry conferences with securities analysts during which Almeida made additional false and misleading statements.

25.      Defendant Saccaro was Baxter's Corporate Vice President and CFO throughout the Class Period.  Previously, from 2011 to 2013, Saccaro served as Corporate Vice President and Treasurer of Baxter.  During the Class Period, Saccaro reviewed, approved, and signed Baxter's filings with the SEC that contained false and misleading statements, as detailed herein.  Saccaro also participated in Class Period conference calls and industry conferences with securities analysts during which Saccaro made additional false and misleading statements.

26.      Defendants Almeida and Saccaro are collectively referred to as the "Individual Defendants," and together with Baxter, as the "Defendants."  The Individual Defendants, because of their positions with Baxter, possessed the power and authority to, and did, control the contents

9

of Baxter's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports alleged herein to be misleading before their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and unfettered access to material nonpublic information, each of the Individual Defendants knew (or recklessly disregarded) that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the financial results and positive representations that were being reported or made were materially false and misleading when made.

## IV.    SUMMARY OF DEFENDANTS' FRAUD

### A.    Baxter's Operations Are Global and a Majority of its Revenue Is Generated from Sales Outside the United States

27.    Baxter, incorporated in 1931, provides products and services used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices, and patients at home under physician supervision.

28.    The Company manufactures and distributes products and provides services under two lines of business: its Hospital Products and Renal segments of business. Its Hospital Products business manufactures sterile intravenous products, premixed drugs and drug-reconstitution systems, pre-filled vials and syringes for injectable drugs, intravenous nutrition products, parenteral nutrition therapies, infusion pumps, inhalation anesthetics, and biosurgery products. Through its Hospital Products segment Baxter also provides products and services related to pharmacy compounding and drug formulation, sterile intravenous solutions, infusion systems and devices, parenteral nutrition therapies, premixed and oncolytic injectables, biosurgery products and anesthetics, drug reconstitution systems, and pharmacy automation software and services.

10

Baxter's Renal business offers products and services to serve patients with end-stage renal disease, as well as irreversible kidney disease and acute kidney injuries.

29.     Baxter is a multinational corporation with substantial operations in and revenues derived from locations outside of the United States.  As Defendants represented, "[t]he majority of the company's revenues are generated outside of the United States and geographic expansion remains a component of the company's strategy.  Baxter's international presence includes operations in Europe (including Eastern and Central Europe), the Middle East, Africa, Asia-Pacific, Latin America and Canada."  Over 2017, 2018, and 2019, Baxter generated $33.045 billion in total sales, with 42.5% (or $14.059 billion) of those sales from the United States, and 57.5% (or $18.986 billion) of those sales from outside the United States.  Defendants represented in Baxter's 2018 annual report filed on Form 10-K on February 21, 2019 (the "2018 10-K") that the Company generates revenues denominated in currencies including "the Euro, British Pound, Chinese Yuan, Korean Won, Australian Dollar, Canadian Dollar, Japanese Yen, Colombian Peso, Brazilian Real, Mexican Peso, and Swedish Krona."  Defendants made identical or substantially similar statements in each of the Company's Class Period periodic financial reports filed with the SEC on Forms 10-K and 10-Q and in the same Forms filed throughout the time period covered by the Restatement.[2]

30.     At all relevant times, including in the 2018 10-K, Defendants similarly stressed "[t]he company's global footprint" and its "key role in expanding access to healthcare in emerging and developed countries," including that, "[a]s of December 31, 2018, Baxter manufactured

---

[2] In the 2019 10-K, Baxter defines the scope of the Restatement as covering the Company's "previously issued audited financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 and selected previously reported financial information as of December 31, 2017, 2016 and 2015 and for the years ended December 31, 2016 and 2015."

products in over 20 countries and sold them in over 100 countries." Baxter also operates over 100 distribution facilities and 50 manufacturing facilities around the world.

31.     Notwithstanding its global operations and revenue and income streams, Defendants consistently acknowledged that Baxter's central corporate management, rather than any geographic or operational segment, was responsible for accounting for and reporting financial results concerning Baxter's transactions in foreign currencies. In each of the Company's periodic filings during the Class Period up to and including Baxter's Form 10-Q for the first quarter of 2019 (filed May 8, 2019), Defendants represented: "Certain items are maintained at Corporate and are not allocated to a segment," which items "primarily include . . . *foreign exchange rate fluctuations (principally relating to intercompany receivables, payables and loans denominated in a foreign currency)*."

**B.     GAAP Required Defendants to Properly Account for Baxter's Foreign Exchange Transactions**

**1.     GAAP Required Defendants to Provide Materially Complete and Accurate Information to Investors in Baxter's Class Period Financial Reports**

32.     GAAP constitutes the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board ("FASB"). SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

33.     During the Class Period, Defendants represented that Baxter's financial statements were presented in conformity with GAAP. For example, in each of Baxter's Class Period Forms 10-K and 10-Q, Defendants Almeida and Saccaro each certified that they "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be

designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***."

34.     Statement of Financial Accounting Concepts ("FASCON") 8, "Conceptual Framework for Financial Reporting," governs the general purpose of financial reporting, including an entity such as Baxter's obligation to present financial information in a way that is "relevant" and that "faithfully represent[s] what it purports to represent."

35.     Specifically, FASCON 8 provides that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity," including "buying, selling, or holding equity and debt instruments."  Among other things, investors "need information about the resources of the entity" and "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources," including "ensuring that the entity complies with applicable laws, regulations, and contractual provisions."  FASCON 8 explains that because "[m]any existing and potential investors, lenders, and other creditors cannot require reporting entities to provide information directly to them," they "must rely on general purpose financial reports for much of the financial information they need.  Consequently, they are the primary users to whom general purpose financial reports are directed."

36.     FASCON 8 further explains that information is material to investors, and should accordingly be truthfully and completely disclosed, "if omitting it or misstating it could influence decisions that users make on the basis of the financial information about a specific reporting

entity."[3]    The SEC has promulgated a substantially similar materiality standard in the Commission's Staff Accounting Bulletin ("SAB") 99, which provides that "[a] matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important," and acknowledges that the materiality standard "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."

37.    As noted, FASCON 8 then states that, for financial information to be useful, "it must be relevant and faithfully represent what it purports to represent. The usefulness of financial information is enhanced if it is comparable, verifiable, timely, and understandable." Indeed,

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be *complete, neutral, and free from error.*

(Emphasis in original.)

38.    Similarly, as FASCON 8 discusses, for financial information to be faithfully represented, it must be "free from error," meaning that "there are no errors or omissions in the description" of the relevant information, and "the process used to produce the reported information has been selected and applied with no errors in the process."

39.    FASCON 2, "Qualitative Characteristics of Accounting Information," likewise provides that reliable disclosure must have representational faithfulness, verifiability, and neutrality. Reliability is "[t]he quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent." Accordingly,

---

[3] In August 2018, FASCON 8 was amended, although the substance of the relevant language concerning the definition of did not change. FASCON 8, as amended, provides that "The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

reliability implies "completeness" of information, such that "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions."

40.     Moreover, governing law and applicable authorities squarely place responsibility for a company's financial statements on the company's management.  As the Public Company Accounting Oversight Board ("PCAOB")—the agency created by the Sarbanes-Oxley Act of 2002 ("SOX") to protect investors by overseeing audits of public companies—explains in Auditing Standard ("AS") 3101, "financial statements are the responsibility of the company's management."

41.     Section 302 of SOX, "Corporate Responsibility for Financial Reports," requires that the principal executive and financial officers of a company like Baxter filing periodic reports with the SEC—here, Defendants Almeida and Saccaro—sign those reports and certify, among other things, that

> (1) the signing officer has reviewed the report; (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading; [and] (3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer . . . .

### 2.     GAAP Required Defendants to Measure and Record Foreign Currency Transactions Using Rates at the Time of the Transactions and, Subsequently, at the Close of Reporting Periods

42.     At all relevant times, when Baxter entered into transactions with its foreign subsidiaries, Defendants were required to apply FX rates to those transactions in accordance with GAAP.

43.     The governing GAAP provisions relating to the appropriate foreign rates that must be applied are clear and unambiguous.  The FASB has codified GAAP in its Accounting Standards Codification ("ASC").  ASC 830-20, titled "Foreign Currency Transactions," requires that FX

rates used to record foreign exchange transactions be the current rates for both initial and subsequent measurement. Specifically, under ASC 830-20-30, titled "Initial Measurement," "[a]t the date a foreign currency transaction is recognized, each asset, liability, revenue, expense, gain, or loss arising from the transaction shall be measured initially in the functional currency of the recording entity by use of the exchange rate in effect at that date." ASC 830-20-35, titled "Subsequent Measurement," requires that "[a]t each balance sheet date, recorded balances that are denominated in a currency other than the functional currency of the recording entity shall be adjusted to reflect the current exchange rate." ASC 830-20-35 also provides that the "increase or decrease in expected functional currency cash flows is a foreign currency transaction gain or loss," which a company must use to "determin[e] net income for the period in which the exchange rate changes."

44. Baxter's outside auditor, PricewaterhouseCoopers ("PwC"), expressly recognizes GAAP's requirements for measuring and recording intercompany foreign exchange transactions, and instructs its auditors and clients to account for those transactions consistent with those obligations. In Chapter 7 of PwC's 2019 Foreign Currency Guide, titled "Intercompany transactions," the auditor discusses "the functional currency principle in ASC 830," and includes a detailed example illustrating the requirement to measure and record foreign currency transactions using current rates at the time of the transaction and subsequently at the close of the reporting period.

45. Because Baxter operates globally and generates most of its revenue in foreign markets, and a large portion of its assets and liabilities are denominated in foreign currency, changes in the FX rates can have an adverse effect on the Company's operating results. This is referred to as "translation risk"—the risk arising as a result of changes in FX rates between the

time funds are received from third parties or exchanged among subsidiaries to the time the corporation makes its quarterly or annual financial reporting. When changes in FX rates occur, the translated value of foreign-denominated assets and liabilities of a corporation could change drastically and thus significantly affect the financial metrics reported in the corporation's quarterly and annual SEC filings.

46.      Corporate treasurers typically utilize several different tools to control for translation risk, including entering into currency swaps or hedging through futures contracts. As discussed in ¶ 43 above, however, there are specific accounting rules designed to ensure that such transactions are properly conducted and recorded—to avoid disguising financial manipulations as transactions to conduct currency translation or hedge related risks.

47.      Generally, a stronger U.S. dollar has the effect of driving down Baxter's foreign currency denominated revenues. Reason being, the Company's transactions that initially occur in foreign currencies are converted into U.S. dollars in order to be included in the Company's public financial statements and reported to investors. If the U.S. dollar strengthens between the time the transaction initially occurs (and, as discussed in ¶ 43 above, should be initially measured and recorded) and the end of the reporting period (when, as discussed in ¶ 43, it should be subsequently measured and recorded), the U.S.-dollar value of the foreign-currency-denominated transaction correspondingly declines, resulting in lower reported operating results.

## C.      Baxter's Policies Violated GAAP and the Company Repeatedly Misled Investors Regarding Foreign Currency Transactions

48.      Throughout the period covered by the Restatement,[4] including the Class Period, Defendants repeatedly and falsely represented that income derived from FX rate fluctuations was

---

[4] As noted above, the Restatement covers the "previously issued audited financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 and selected previously

a key driver of Baxter's positive financial results.  Defendants have since admitted, however, that Baxter's Class Period reported financial results that purportedly flowed from those currency fluctuations were false.  In truth, Baxter concocted transactions *solely* in order to take advantage of known historical FX rates that, using admittedly improper measurement and recording conventions in violation of GAAP, enabled Defendants to ***artificially generate gains and avoid losses***.

49.    Indeed, Defendants belatedly explained how they violated GAAP related to Baxter's foreign exchange practices in the Company's 2019 10-K:

> We previously had applied a longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP.  ***U.S. GAAP requires that foreign currency transactions be initially measured and recorded in an entity's functional currency using the exchange rate on the date of the transaction and it requires that foreign currency denominated monetary assets and liabilities be remeasured at the end of each reporting period using the exchange rate at that date.***  Under our historical exchange rate convention, all foreign currency transactions in a given month were initially measured using exchange rates from a specified date near the middle of the previous month. Additionally, all foreign currency denominated monetary assets and liabilities were subsequently remeasured at the end of each month using exchange rates from a specified date near the middle of the then current month.  ***Beginning years after the adoption of our historical exchange rate convention, certain intra-company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses.***

50.    GAAP requires that for any foreign exchange transactions, the transaction should be measured using the current foreign exchange rate at the time the transaction is entered into, and then measured again at the close of the financial reporting period using the current rate on that date.  As a result of changes between the rates on those dates, gains or losses are incurred by the

---

reported financial information as of December 31, 2017, 2016 and 2015 and for the years ended December 31, 2016 and 2015."

entity due to its exposure to risk associated with assets or liabilities denominated in a foreign currency—i.e., the value of the entity's assets or liabilities associated with the foreign exchange transaction fluctuate when measured in its functional currency because such items' value is fixed in the foreign currency. Any gain or loss resulting from the difference between those rates should be reflected on the financial statements of the company.

51.     Baxter violated GAAP by implementing and applying a policy for all foreign exchange transactions in which it used non-current foreign exchange rates for the initial and subsequent measurements of foreign currency transactions. As admitted by Baxter, "all foreign currency transactions in a given month were initially measured using exchange rates from a specified date near the middle of the previous month. Additionally, all foreign currency denominated monetary assets and liabilities were subsequently remeasured at the end of each month using exchange rates from a specified date near the middle of the then current month."

52.     Thus, rather than use the prevailing spot exchange rate as GAAP required for these foreign exchange transactions, Baxter applied a historical rate regardless of when the transaction occurred or was remeasured. This created an opportunity for fraud, and, as Defendants have admitted, fraud ensued—Baxter repeatedly engaged in intra-company transactions "after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses."

53.     As discussed in Section IV(A) above, Baxter has manufacturing subsidiaries in over 20 countries and sells its products in over 100 countries. In the course of operating its business, Baxter must in any given month enter into numerous transactions between and among its various foreign subsidiaries to supply product for sales and provide operating cash, as well as other transactions incidental to its operations. Consider this hypothetical:

19

(a)   Baxter's U.S. corporate entity decides on December 20, 2017 to create an intercompany foreign exchange transaction for the purpose of creating gains necessary to meet certain year-end earnings-per-share expectations. At this date, it knows that this foreign exchange transaction will be initially measured using the rates from a "date near the middle of the previous month" (let's call that November 15, 2017), and the transaction will be subsequently remeasured using the rates from a "date near the middle of the then current month" (let's call that December 15, 2017). The differences between these two rates, already known to Baxter when crafting the transaction, will determine the foreign exchange transaction gains/losses.

(b)   Baxter's U.S. corporate entity selects its Halle/Westfalen, Germany drug manufacturing subsidiary, which uses the euro, and creates a transaction in which the U.S. entity will enter an agreement to lend the German subsidiary $10,000,000 to be repaid in U.S. dollars. Baxter selects the German subsidiary because the euro substantially strengthened against the dollar between November 15, 2017 and December 15, 2017, going from $1/€1 to $1/€0.9.

(c)   On December 20, 2017, when the transaction is entered into, the German subsidiary records a liability related to the loan as €10,000,000 (the equivalent $10,000,000 using the November 15, 2017 $1/€1 rate).

(d)   At December 31, 2017, the subsidiary remeasures the liability as €9,000,000 (the equivalent of $10,000,000 using the December 15, 2017 $1/€0.9 rate). ***The reduction in the liability by €1,000,000 is recorded by the subsidiary as a foreign currency transaction gain.***

(e)   When the subsidiary's financial statements are translated from euros into U.S. dollars and consolidated into the financial statements of Baxter's U.S. corporate entity, this gain will remain and be included in that entity's reported income.

(f)   If the same transaction were measured and remeasured using GAAP methods, the initial transaction would be measured at December 20, 2017 rates and the year-end remeasurement would use December 31, 2017 rates. Most critically, that remeasurement rate, whatever it might be, and whether it would produce gains/losses, would not be known to Baxter at the time of entering into the transaction, eliminating the ability to reliably manufacture artificial, fraudulent gains.

54.   The GAAP violation, in this example, would have resulted in a gain of €1,000,000 on the German subsidiary's balance sheet and an equivalent gain on the consolidated balance sheet of the parent entity. Because in the example transaction the initial and subsequent measurement

dates are only days apart, the difference between the FX rates on those dates would likely have been much smaller (absent significant and anomalous volatility) and the actual, true gain or loss would have been a materially smaller amount, resulting in a material misstatement on the parent's consolidated balance sheet.

55.     The utility of this scheme to Defendants, and capacity for fraudulent misconduct, is further reflected by the fact that Defendants could choose from the many different currencies in which Baxter operated to take advantage of changes in foreign exchange rates. This would normally require either a time machine or clairvoyance. Baxter's executives, however, needed neither, as they were able to exploit Baxter's non-GAAP FX rate convention to manufacture income. Given the massive amounts of cash flowing between Baxter and its foreign subsidiaries, it is easy to comprehend how Baxter's executives were able to conjure up hundreds of millions of gap-filling non-operating revenues through those fraudulent transactions.

        **1.**    **Prior to and Throughout the Class Period, Defendants Repeatedly Focused Investors' Attention on and Made False Representations Regarding the Purportedly Positive Impact of Foreign Exchange on Baxter's Financial Results**

56.     At the outset of the Class Period, Baxter's balance sheet reflected a "retained earnings" balance and shareholders' equity that were inflated by $551 million, and the Company's income statements, reflected in the 2018 10-K, reported net income for 2017 and 2018 that was inflated by $115 million and $78 million respectively. Accordingly, investors relied on false, ostensibly positive financial reporting that did not reflect Baxter's true economic position.

57.     At all relevant times leading up to the Class Period, Defendants touted the Company's foreign exchange gains as a driver of Baxter's future performance and improperly reported financial results that included artificially inflated revenues derived from transactions,

initially denominated in foreign currencies, without any purpose other than to improperly generate those artificial revenues.

58.     For example, in Baxter's April 26, 2016 Current Report filed with the SEC on Form 8-K announcing the Company's financial results for the first quarter of 2016, Defendants announced that "Baxter [wa]s raising its financial outlook for full-year 2016" based on "the company's strong first quarter performance."  The same day, on an earnings conference call with securities analysts, Defendant Saccaro represented that Defendants were "pleased with our first-quarter results" which "compared favorably to our expectations, and w[ere] driven by . . . a lower negative impact from foreign exchange."

59.     On the same April 26, 2016 earnings call, Defendant Almeida specifically tied "favorability from foreign exchange versus previous guidance" to reported quarterly "adjusted earnings of $0.36 per diluted share, exceeding our guidance range" by between 20% and 32%. Regarding full-year earnings per share, analyst Leerink Partners asked "if [Defendants] could talk about full-year guidance and the drivers of improvement there," as Defendants were "raising the midpoint of the range even higher than the beat."  Defendant Saccaro responded:

> As we pointed out, at the beginning of the year our guidance range was $1.46 to $1.54, implying the midpoint of $1.50 per share.  And we updated it to $1.59 to $1.67, with the midpoint being $1.64, so it's essentially a $0.14 improvement in terms of EPS.  Contributing—there are a number of factors that contribute to that. ***One is foreign exchange.  There's approximately $0.06 of benefit from foreign exchange that we expect to see in the late—in the remaining part or over the course of the year***.

60.     Defendants similarly focused on the purported benefits of foreign exchange to the Company's reported financial results in Class Period communications to investors.  For example, at the start of the Class Period, in Baxter's 2018 Form 10-K, Defendants reported that "Other (income) expense, net was income of $139 million, expense of $19 million and income of $4,275 million in 2018, 2017, and 2016, respectively. ***The current year [2018] results included $73***

*million of income related to foreign currency fluctuations principally relating to intercompany receivables, payables and monetary assets denominated in a foreign currency*."

61.     In Baxter's quarterly and annual financial reports throughout the period covered by the Restatement, including the Class Period, Defendants similarly attributed the Company's reported financial results to "income related to foreign currency fluctuations."  In Baxter's third-quarter 2016 quarterly report, for example, Defendants highlighted that the "first nine months of 2016 included . . . $12 million . . . of income related to foreign currency fluctuations principally relating to intercompany receivables, payables and monetary assets denominated in a foreign currency."  Defendants made similar false statements in the Company's 2016 annual report (reporting "[c]urrent year results" including "$28 million of income related to foreign currency fluctuations"), third-quarter 2017 financial report ("Higher income in the third quarter of 2017 was the result of foreign currency fluctuations"), 2017 annual report (discussing "$50 million of income related to foreign currency fluctuations"), second-quarter 2018 quarterly report ("in the second quarter and first half of 2018, the company recognized higher income from foreign currency fluctuations"), and third-quarter 2018 quarterly report (same).

62.     Defendants likewise falsely represented throughout the period covered by the Restatement, including the Class Period, that Baxter was reporting positive growth and earnings per share derived in substantial part from foreign currency fluctuations.  For example, on the Company's October 25, 2017 earnings call with investors to discuss Baxter's third-quarter 2017 financial results, Defendant Saccaro stressed that the Company's "[t]op line growth exceeded our expectations," driven in substantial part by "a favorable foreign exchange benefit."  During Defendants' earnings call with investors to discuss fourth-quarter 2017 results, Saccaro highlighted that "adjusted earnings increased 12% to $0.64 per diluted share," which "exceeded

our previous guidance of $0.56 to $0.59 per share driven by . . . a modest benefit from foreign exchange gains on balance sheet positions."

63.     Further, on numerous earnings calls, Defendant Saccaro expressly attributed positive "adjusted other income" that the Company reported to "a foreign exchange gain on balance sheet positions," including conference calls with analysts in connection with earnings announcements for, among others, the second quarter of 2016 (discussing a purported "foreign exchange gain on balance sheet positions of approximately $3 million"), fourth quarter of 2016 ("Adjusted other income totaled $19 million in the quarter, primarily resulting from . . . a foreign exchange benefit on balance sheet positions"), fourth quarter of 2017 (same, concerning adjusted other income of $24 million), first quarter of 2018 (same, concerning adjusted other income of $18 million), and second quarter of 2018 (same, concerning adjusted other income of $31 million).

64.     These representations, too, continued into the Class Period.  During the January 31, 2019 earnings call discussing the Company's fourth-quarter 2018 results, Saccaro again stressed that "adjusted other income totaled $34 million in the quarter, primarily reflecting a benefit from changes in our U.S. pension plan and *foreign exchange gains on balance sheet positions***."** Saccaro made a substantially similar statement during Baxter's first-quarter 2019 earnings call on April 25, 2019, attributing $25 million of adjusted other income for that quarter to "a gain on an equity investment as well as *foreign exchange gains on balance sheet positions*."

### 2.     Defendants' Fraud Enabled Them to Falsely Report Adjusted EPS Results Exceeding Guidance and Expectations, Which Defendants Would Not Have Done Otherwise

65.     Earnings per share was a key metric that investors focused on and that the Company falsely represented throughout the period covered by the Restatement, including in Baxter's Class Period periodic filings and other communications.

66. Notably, because Defendants' Class Period disclosures and securities analysts' reports focused on Defendants' reported non-GAAP "adjusted" EPS figures—including whether reported results met, exceeded, or fell short of Baxter's guidance and analysts' estimates—the impact of Defendants' fraud on this key financial metric is best demonstrated by the difference between Defendants' false Class Period adjusted EPS figures as reported and the true adjusted EPS figures in light of the Restatement.

67. As discussed in ¶ 59 above, in direct response to an analyst's question on the Company's April 26, 2016 earnings call, Defendant Saccaro expressly pointed to "$0.06 of benefit from foreign exchange" as a key driver for "a $0.14 improvement in terms of EPS" reflected in the Company's guidance to investors for 2016. The Company's EPS guidance continued to increase throughout 2016, ultimately reaching $1.90 per share. Defendants ultimately reported adjusted EPS of $1.96 for 2016, which Defendant Saccaro told investors during a March 7, 2017 conference "compare[d] very favorably . . . to our original guidance, which was . . . $1.46 to $1.54 per share."

68. However, Defendants' representations about the gains they enjoyed on their foreign exchange transactions, and their financial performance, were blatantly false and misleading. Indeed, for each year during the period covered by the Restatement, including during the Class Period, Defendants' fraudulent misconduct enabled them to report EPS that exceeded the Company's guidance and analysts' consensus estimates when, in fact, Defendants could not have otherwise met such guidance and analyst estimates.

69. The following chart compares, for each year between 2016 and 2018, (1) Baxter's EPS guidance (which the Company represented as an adjustment to its GAAP EPS guidance), (2) analysts' consensus adjusted EPS estimates, (3) the adjusted EPS figure that Defendants initially

reported, and (4) the Company's true adjusted EPS after accounting for earnings figures revised in the Restatement:

|  | (1) Company Guidance | (2) Consensus Estimates | (3) Reported EPS | (4) EPS As Restated[5] |
|---|---|---|---|---|
| 2016 | ~1.90 | 1.91 | 1.96 | 1.91 |
| 2017 | ~2.42 | 2.43 | 2.48 | 2.28 |
| 2018 | ~2.99 | 3.00 | 3.05 | 2.90 |

70.     The EPS as Restated figures included in the table above are derived from the Company's reported financial results.  Although Defendants provided both GAAP and non-GAAP adjusted EPS guidance and results during the Class Period, the Restatement corrected only the GAAP EPS figures. The restated GAAP figures leave no genuine question that Defendants' fraudulent misconduct enabled Baxter to beat EPS guidance and consensus estimates for each year from 2016 to 2018, which it would not have done absent the fraud.

### 3.     Defendants Falsely Represented Baxter's Internal Controls

71.     In addition to the Company's numerous false statements attributing positive financial performance to foreign currency fluctuations and declaring that their financials complied

---

[5] This column includes estimates of the Company's adjusted, diluted EPS based on the restated GAAP diluted EPS results reported in the Restatement.  In the Company's earnings press releases dated January 30, 2017; February 1, 2018; and February 1, 2019; Baxter reported adjusted, diluted EPS of $1.96, $2.48, and $3.05 for the fiscal years 2016, 2017, and 2018 respectively.  As disclosed in these press releases and the Company's Forms 10-K dated February 23, 2017; February 23, 2018; and February 21, 2019; the adjusted, diluted EPS amounts were derived by excluding "special items," which were a $3.9 billion net increase to income from continuing operations (or $7.05 per diluted share), a $652 million net decrease to income from continuing operations (or $1.18 per diluted share), and a $36 million net decrease to income from continuing operations (or $0.06 per diluted share) for the fiscal years 2016, 2017, and 2018, respectively.  According to Baxter's Form 8-K dated February 1, 2017, "[s]pecial items are excluded because they are highly variable, difficult to predict or unusual and of a size that may substantially impact the Company's reported operations for a period."  The estimates provided in the chart estimate the impact of the Restatement on the Company's originally reported adjusted, diluted EPS results by removing the "special item" amounts that were excluded from Baxter's originally reported adjusted EPS results from the restated EPS figures provided in the Restatement.

with GAAP, Defendants repeatedly and consistently misrepresented throughout the Class Period that Baxter had adequate and effective internal controls over financial reporting.

72.     Under Section 302 of SOX, Saccaro and Almeida "are responsible for establishing and maintaining internal controls," including that they "have designed such internal controls to ensure that material information relating to the issuer . . . is made known to such officers," "have evaluated the effectiveness of the issuer's internal controls . . . within 90 days prior to the report," and "have presented . . . their conclusions about the effectiveness of their internal controls based on their evaluation."

73.     In Baxter's Class Period Forms 10-K and 10-Q, Defendants Almeida and Saccaro each certified that they (1) were "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))," and (2) had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

74.     Almeida and Saccaro additionally certified that they had:

Disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

75.     As discussed herein, however, Defendants' certifications concerning Baxter's internal controls were materially false and misleading—Defendants have admitted Baxter improperly manipulated its measuring and recording of foreign currency transactions and the impact of those measured and recorded amounts on the Company's financial reports.

### 4.     Defendants Violated GAAP and Misled Investors by Failing to Properly Measure and Record Foreign Currency Transactions

76.     As Defendants have now admitted, their reported financial results and repeated Class Period representations attributing positive financial results to foreign currency fluctuations and certifying the soundness of the Company's internal controls were false.

77.     As discussed in Section IV(C) above, as part of Baxter's Restatement, in SEC filings on March 17, 2020, Defendants admitted that they violated GAAP by recording foreign currency-denominated transactions "after the related exchange rates were already known"—i.e., they used exchange rates in effect in the middle *of the prior month* and subsequently re-measured and re-recorded the transactions using exchange rates set *in the middle of the current month*.  By Defendants own admission, they did so "*solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses*."

78.     As a result of and in connection with the Restatement, Defendants admitted that the following figures, among others, were materially misstated due to their improper measuring and accounting of foreign currency transactions:

28

| Baxter Restatement Summary (All amounts in millions of U.S. dollars) | | | | | | |
|---|---|---|---|---|---|---|
| | Other (income) expense, net[6] | | Net Income | | Retained Earnings | |
| Time Period | Originally reported | Restated | Originally reported | Restated | Originally reported | Restated |
| FY 2017 | 19 | 133 | 717 | 602 | 14,483 | 14,014 |
| FY 2018 | (139) | (78) | 1,624 | 1,546 | 15,626 | 15,075 |
| Q1 2019 | (25) | (21) | 347 | 342 | 15,970 | 15,414 |
| Q2 2019 | (28) | 4 | 343 | 313 | 16,184 | 15,598 |

As demonstrated in the above chart, the foreign exchange transactions that are the principle subject of the Restatement were recorded in the "Other (income) expense, net" line item in Baxter's Consolidated Statements of Income (the "income statement"), and those changes flowed through to reduce Baxter's previously reported net income in each period reflected in the chart. The impact of the Restatement reduced Baxter's reported "Other (income)" by over $200 million during the financial statements covering the Class Period. Related adjustments to the "Retained Earnings" line item in Baxter's Consolidated Balance Sheet resulted in reductions to the valuation of Shareholders' Equity totaling well over $1 billion.

79. The vast majority—$191 million—of the $200 million net income reduction revealed in the Restatement on the "Other (income) expense, net" line item was attributable to what the Company admitted were its misstatements concerning "Foreign Currency Denominated Monetary Assets and Liabilities," as reflected in the following chart:

---

[6] This line item expresses income as a negative number (e.g., ($4 million)) and expense as a positive number. Reductions to income in the Restatement have the same effect as increases in expense—both decrease the Company's net income during that reporting period. In 2017, Baxter originally reported a $19 million expense, but that expense was corrected in the Restatement to $133 million, reducing Baxter's income by $114 million in 2017.

| Time Period | Other (income) expense, net | | Total Negative Impact on Income from Restatement | Amount of Adjustment Owing to Restatement Category A |
|---|---|---|---|---|
| | Originally reported | Restated | | |
| FY 2017 | 19 | 133 | 114 | 96 |
| FY 2018 | (139) | (78) | 61 | 64[8] |
| Q1 2019 | (25) | (21) | 4 | 5[9] |
| Q2 2019 | (28) | 4 | 32 | 26 |

*Table title (above): Baxter Restatement — Attribution of Changes to "Other (Income) Expense, Net" For "Foreign Currency Denominated Monetary Assets and Liabilities" (Restatement Category "A")[7] (All amounts in millions of U.S. dollars)*

80.     In light of Defendants' admissions and disclosures in connection with its internal investigation and the Restatement, the Company's accounting for intra-company foreign currency transactions was materially false and misleading. Defendants were obligated by GAAP to measure and record foreign currency transactions using then-current exchange rates at the time of the transaction and subsequently at the close of the reporting period, but instead used other, more favorable spot rates that they already knew—along with the positive financial impact using those

[7] Defendants disclosed seven categories of misstatements, identified as categories "A" through "G" in the Restatement. Defendants represented that Category "A," "Foreign Currency Denominated Monetary Assets and Liabilities," includes "adjustments to correct foreign exchange gains and losses on monetary assets and liabilities denominated in a foreign currency to reflect the gains and losses resulting from application of the exchange rates required by U.S. GAAP." In addition, Defendants have represented that "[i]n addition to the misstatements . . . relating to foreign exchange gains and losses, we corrected additional misstatements that were not material, individually or in the aggregate, to our previously issued consolidated financial statements." Accordingly, this table includes both the total amount of the restated figures (i.e., Categories "A" through "G" in the aggregate), as well as the Category "A" figures—which are the subject of Defendants' fraud and constitute the vast majority of the restated amounts—but does not break out each of the other categories (B through G) of misstated figures.

[8] Offsetting corrections attributed to other misstatements, netting $3 million, were also recorded in this line item as part of the Restatement, reflecting a net reduction in income of $61 million to "Other (income) expense, net."

[9] An offsetting $1 million reduction in expense was also recorded as part of the Restatement, reflecting a net reduction in income of $4 million.

rates would have on Baxter's financial reports—for no reason other than manufacturing those results on paper. Accordingly, Baxter's Class Period financial reports, in addition to Defendants' internal control certifications and representations of GAAP compliance, were materially false and misleading.

### D.     The Truth Emerges

81.     On October 24, 2019, investors first learned the truth—that Baxter had artificially boosted its financial results by utilizing a convention for measuring and remeasuring foreign currency denominated assets and liabilities that violated GAAP and exploiting that convention by entering intra-company foreign currency transactions solely for the purpose of generating foreign exchange gains or avoiding losses.

82.     On that day, before the open of the market, through a press release attached to a Form 8-K, Baxter announced:

> [The Company] recently began an investigation into certain intra-Company transactions undertaken for the purpose of generating foreign exchange gains or losses. These transactions used a foreign exchange rate convention historically applied by the Company that was not in accordance with generally accepted accounting principles and enabled intra-Company transactions to be undertaken after the related exchange rates were already known.

The press release also disclosed that the "intra-Company transactions resulted in certain misstatements in the Company's previously reported non-operating income related to net foreign exchange gains."

83.     Further, Baxter's press release squarely called into question its reported income from foreign exchange gains. As stated in the announcement:

> [T]he Company previously reported net foreign exchange gains of $8 million, $113 million, $28 million, $50 million, $73 million, and $22 million, for the years 2014, 2015, 2016, 2017, 2018, and the first half of 2019, respectively. The investigation is not limited to these periods and any subsequent adjustments to previously reported foreign exchange gains and losses may alter those non-operating income results.

84.     The October 24, 2019 press release indicated that Baxter's internal controls needed to be "strengthened" and "enhanced."  Specifically, the October 24 disclosure said that the Company was considering "the extent to which these matters impact the effectiveness of its internal control over financial reporting," with Defendant Almeida concluding that Baxter was "taking steps to strengthen and enhance its internal controls."  The press release further disclosed that Baxter was being assisted in the investigation by "experienced external counsel and consultants," had voluntarily informed the SEC of its investigation, and that it did not expect to file its quarterly report on Form 10-Q for the period ended September 30, 2019 on a timely basis. Baxter advised that, upon the completion of its investigation, it would be amending its periodic reports previously filed with the SEC to include restated financial statements to correct the misstatements.

85.     The market reacted swiftly and negatively to Baxter's disclosures.  On this news, the price of Baxter common stock declined $8.87 per share, or 10.1%, from a close of $87.95 per share on October 23, 2019, to close at $79.08 per share on October 24, 2019.

86.     Analysts expressed surprise at Defendants' October 24, 2019 disclosures.  The same day, Evercore ISI published an analyst report stating, "[t]he issue seems serious—the allegation is that intra-company transactions were undertaken 'after the related exchange rates were already known,'" and lowered its price target on Baxter by over 9% from $88 to $80. Analysts for Barclays noted, "[i]n our view, it was a surprisingly messy quarter.  Sales came in just shy of our estimate and the Street but quite mixed . . . but the more surprising news was in the internal investigation on intra-company transactions around FX gains/losses."  Similarly, analysts for RBC Capital Markets noted "[s]urprise internal accounting investigation will likely overshadow BAX's solid 3Q19 results[,]" and in a report dated October 25, 2019, analysts for

32

Morgan Stanley wrote, "[r]evelations of today's nature are rare, and the impacts of Baxter's FX gains on the P&L have not been immaterial."

### E.     Post-Class Period Company Admissions and Events

87.     On February 13, 2020, after the close of the market, in a Form 8-K filed with the SEC, Baxter announced the results of its internal investigation into its use of intra-Company transactions to generate foreign exchange gains and avoid losses. In the February 13, 2020 8-K, Baxter reiterated, first, that as disclosed in the October 24, 2019 press release announcing the internal investigation:

> The Company previously had applied a longstanding convention for the initial measurement of foreign exchange transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities that was not consistent with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). Beginning years after the adoption of that convention, certain intra-Company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses.

88.     Second, the Company disclosed that its internal investigation was now "substantially complete," and announced that

> [T]he Company concluded, in consultation with the Audit Committee of its Board of Directors (the "Audit Committee") and its independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC"), that the Company's consolidated financial statements as of December 31, 2018 and 2017, for the years ended December 31, 2018, 2017 and 2016, as of and for the interim periods within the years ended December 31, 2018 and 2017 and the interim periods ended June 30 and March 31, 2019, and the related audit and interim review reports of PwC should no longer be relied upon because of misstatements to the Company's previously reported foreign exchange gains and losses.

89.     The filing also provided "preliminary, unaudited estimates of misstatements of the Company's non-operating foreign exchange gains and losses." As a result of the foreign exchange gain and loss misstatements, Baxter disclosed that the "Income from Continuing Operations Before

33

Income Taxes" item of its financial statement was reduced by $42 million, $113 million, $60 million, and $36 million for the fiscal years 2016, 2017, 2018, and first half of 2019, respectively.

90.     The Company also admitted that "in light of the misstatements" it "has determined that one or more material weaknesses in the Company's internal control over financial reporting existed, including a material weakness related to foreign exchange gains and losses." Accordingly, the Company concluded, "[a]s a result of the material weakness or material weaknesses, the Company's disclosure controls and procedures were not effective as of December 31, 2018, March 31, 2019 and June 30, 2019."

91.     Lastly, Baxter disclosed that it expected to file restated financial statements "as soon as reasonably practicable, but no later than March 31, 2020."

92.     About five weeks later, on March 17, 2020, Baxter filed a Form 10-K for the fiscal year ended December 31, 2019, in which Baxter announced that its internal investigation was "complete," and "restated . . . [its] consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017." In Note 19, the Restatement provided restated financial information for the quarterly periods ended June 30, 2019, March 31, 2019, June 30, 2018, and March 31, 2018, for the quarterly period ended December 31, 2018, for the six months ended June 30, 2019 and 2018.

93.     As described above in Section IV(C)(4), in the Restatement, Baxter admitted that it had violated GAAP by using an incorrect method for translation of foreign currency transactions, which it then admitted was used solely to generate gains (or avoid losses).

94.     In the Restatement, Baxter also reiterated its admission that "[w]e believe that the use of our historical exchange rate convention to generate non-operating foreign exchange gains and avoid losses *had occurred for at least ten years*."

34

95.     As noted in Section IV(C)(4) above, the effect of the Restatement on the Company's consolidated financial statements principally involved the restatement of the "other (income) expense" line item on Baxter's income statements.  For each of fiscal-years 2017 and 2018, and the first and second quarters of 2019, the effect of the Restatement was to reduce the Company's net income—the "bottom line"—which decreases were also reflected in negative revisions to Baxter's reported retained earnings and EPS.  Those revisions wiped out over $200 million in aggregate previously reported net income, and over $1 billion in retained earnings, as depicted in the following charts:

| Baxter's Restatement – FY 2017 and 2018 | | | | | | |
|---|---|---|---|---|---|---|
| (All U.S. dollar amounts in millions, except EPS) | | | | | | |
| | FY 2017 | | | FY 2018 | | |
| Financial Statement Item | As Originally Reported | As Restated | % change | As Originally Reported | As Restated | % change |
| Other (income) expense, net | $19 | $133 | 600% increase in expense | ($139) | ($78) | 44% decrease in income |
| Net Income | $717 | $602 | 16% decrease | $1,624 | $1,546 | 5% decrease |
| Retained Earnings | $14,483 | $14,014 | 3.2% decrease in assets | $15,626 | $15,075 | 3.5% decrease in assets |

| Baxter's Restatement Q1 and Q2 2019 | | | | | | |
|---|---|---|---|---|---|---|
| (All U.S. dollar amounts in millions, except EPS) | | | | | | |
| | Q1 2019 | | | Q2 2019 | | |
| Financial Statement Item | As Originally Reported | As Restated | % change | As Originally Reported | As Restated | % change |
| Other (income) expense, net | ($25) | ($21) | 16% decrease in income | ($28) | $4 | 114% decrease in income |
| Net Income | $347 | $342 | 1.4% decrease | $343 | $313 | 9% decrease |
| Retained Earnings | $15,970 | $15,414 | 3.4% decrease in assets | $16,184 | $15,598 | 3.6% decrease in assets |

96.    With regard to fiscal years prior to 2017, the Restatement reported that "opening retained earnings as of January 1, 2017" was $13.846 billion as compared to the previously reported $14.200 billion—a downward restatement of retained earnings and shareholders' equity wiping out *$354 million* as of January 1, 2017.

97.    In the Restatement, Baxter also disclosed that it had a "material weakness" in its controls over financial reporting; the Company revealed that "[a]s a result of the material weakness, our disclosure controls and procedures were not effective as of December 31, 2018 and throughout 2019." Specifically, under Item 9A of the Restatement, Baxter disclosed that:

> *We did not maintain effective controls over the accounting for certain foreign exchange gains and losses*. Specifically, we did not have controls in place to monitor and quantify the difference between the foreign exchange gains and losses that we reported and the foreign exchange gains and losses that we would have reported using exchange rates determined in accordance with U.S. GAAP. *Additionally, our policies and controls related to approvals and monitoring of intracompany transactions were insufficient to prevent or detect intra-company transactions undertaken solely for the purpose of generating foreign exchange gains or avoiding losses under our historical exchange rate convention.* This material weakness resulted in the restatement of our consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 and each of the quarterly and year-to-date periods in the year ended December 31, 2018 and the first two quarters and related year-to-date interim period in the year ended December 31, 2019. Additionally, this material weakness

could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

98. Baxter also announced a number of measures it was taking to remediate its material weakness in controls over financial reporting. Among the changes it announced, Baxter confirmed that it was discontinuing the use of its historical FX rate convention that did not comply with GAAP and would instead use FX rates determined in accordance with GAAP, and updating its policy "to require additional approvals of intra-company transactions and implement[ing] a requirement that such transactions be supported by a documented business purpose."

99. Confirming that the treasury function within Baxter was responsible for the fraudulent activity, the Restatement also announced changes to its treasury personnel:

> Personnel – We have made personnel changes including hiring a new treasurer from outside Baxter with more than thirty years of treasury experience and responsibility, including at four publicly traded companies. We have also hired another experienced treasury professional in a newly created director role responsible for treasury governance and controls. Additionally, we have created a treasury controller role within our accounting function and are continuing to add resources as appropriate to improve our financial reporting controls related to treasury activities.

100. In Defendants' disclosures, including the announcement of their internal investigation and the Restatement and related filings, Defendants have admitted both that they made materially false and misleading statements and omissions to investors and did so with the intention to mislead.

101. A restatement is an extraordinarily negative event for a public company. Under GAAP, a "restatement" is a term of art used only when a company's previously issued financial statements were materially false as of the time of issuance and the misstatements were false based on "facts that existed at the time the financial statements were prepared":

> The process of revising previously issued financial statements to reflect the correction of . . . [a]n error in recognition, measurement, presentation, or disclosure

37

in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or *misuse of facts that existed at the time the financial statements were prepared*.

ASC 250-10-20. For a restatement, GAAP requires that:

a. The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented[;]

b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[; and]

c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

ASC 250-10-45-23.

102.    Further,

[t]hose items that are reported as error corrections shall, in single period statements, be reflected as adjustments of the opening balance of retained earnings. When comparative statements are presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, to reflect the retroactive application of the error corrections.

ASC 250-10-45-24.

103.    Given the foregoing, and notwithstanding Defendants' unequivocal admissions as to the extent and purpose of their methods of accounting for Baxter's foreign currency conversions, the Restatement itself constitutes an admission by Defendants of materially false and misleading statements and omissions in Baxter's financial statements. Indeed, only materially misstated information will trigger a restatement. As PwC explains in Section 30.7.1 of its October 2019 "Financial statement presentation" guide, titled "Restatements," prompt restatement is required "[u]pon determination that the previously issued financial statements are *materially misstated*." The company is then required to (1) file a Form 8-K "to indicate that the previously issued financial

statements should no longer be relied upon," and (2) "[a]mend[] prior filings" to correct the previously misstated information.

## V.     ADDITIONAL SCIENTER ALLEGATIONS

104.    In addition to the facts alleged above, the facts set forth in this section give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that Baxter used a convention for measuring and re-measuring foreign currency denominated assets and liabilities that did not comply with GAAP, and exploited the aforementioned GAAP violation by executing intra-company transactions after the FX rates were already known solely for the purpose of generating foreign exchange gains or avoiding foreign exchange losses.

105.    First, the alleged fraud concerned the measurement and remeasurement of foreign currency denominated assets and liabilities and involved engaging in intra-company transactions *solely* to generate foreign exchange gains or avoid losses.  The majority of the Company's earnings and cash flows are generated outside the United States, and the fraudulent scheme involved manipulation of the Company's foreign currency denominated assets that were generated by those business activities.  Specifically, Baxter's businesses bring in approximately 57% of its revenues from outside the United States, and Baxter sells its products and services in over 100 countries around the world.  Furthermore, Baxter considers geographic expansion a component of its growth strategy, and touts that its "global footprint and critical nature of its products and services play a key role in expanding access to healthcare in emerging and developed countries."  The fact the fraud concerns business core to Baxter's financial performance and arises from intentional acts performed, repeatedly, to inflate that performance raises a strong inference of scienter.

106.    Second, Baxter would have missed its adjusted EPS targets but for Defendants' fraud.   Baxter's previously reported EPS results were achieved only through the fraudulent manipulations of foreign exchange gains and, without the benefit of Baxter's admittedly fraudulent

inflation of foreign exchange gains and avoided losses, Baxter would not have been able to meet the Company's own guidance and analysts' expectations regarding Baxter's earnings growth, as detailed in the chart in ¶ 69 above. This raises a strong inference that the manipulations, which were the difference between "making" or "missing" the Company's expected EPS "number," were intentional and not the product of simple negligence or error.

107. Similarly, Baxter's GAAP violations and fraudulent intra-company transactions had the uniform effect of increasing its income for years, unlike what one would expect from a random series of innocent mistakes. As discussed in Section IV(C)(2) above, the fraud's effect on the Company's originally reported (and inflated EPS) was the only way that Baxter was able to fulfill Almeida's promise of turning around Baxter's lagging growth.

108. Third, the Individual Defendants—Baxter's senior-most executives—regularly and repeatedly spoke to investors on the precise topics at issue here and signed the Company's SEC filings reporting the admittedly false financial results, demonstrating that Defendants were knowledgeable about and actively involved in Baxter's accounting practices. Defendants Almeida's and Saccaro's public statements to a shareholder in Baxter's Annual Shareholders Meeting on May 7, 2019 regarding the accuracy and purported rigor of the Company's reporting of GAAP financial metrics and reporting of non-GAAP-compliant metrics is a prime example. Specifically, the shareholder asked Almeida and Saccaro whether shareholders could trust Baxter's reporting of its financial condition through the use of both GAAP financial metrics and non-GAAP metrics, i.e., metrics that deviated from the reported GAAP metrics. In response, Almeida assured the shareholder about the accuracy of Baxter's GAAP and non-GAAP numbers and represented that they followed "specific rules" when reporting these metrics:

> I'd like to correct you. Our auditors who are sitting beside you there, they audit our books, which are -- and we represent GAAP and non-GAAP. ***There's specific rules***

*that allow you to exclude some numbers from your GAAP number, but both of them are available to you. We're reporting both of them.* As a matter of fact, we would not have gotten the most transparent company in S&P 500, if we did not provide the investors with significant amount of information about the numbers.

109. Defendant Saccaro followed Almeida's answer by stating to the shareholder, "Joe. You are exactly right. *We have a very rigorous practice by which we assess what adjustments are made to GAAP numbers*."

110. Defendants' statements touting the strength and transparency of Baxter's financial results support the strong inference that Defendants knew, or were severely reckless in not knowing, (1) that Baxter's Class Period financial statements contained material misstatements because, in violation of GAAP, Baxter manipulated its measurement and recording of transactions in foreign currencies *solely to generate gains and avoid losses*, and (2) that the Company had a material weakness in its internal controls that allowed Defendants fraud to perpetrate their fraud.

111. Fourth, Defendant Saccaro's prior experience as the Treasurer of Baxter from 2011 to 2013, in which role he was responsible for measuring foreign currency denominated assets and liabilities, supports a strong inference of scienter. As Defendants admitted in the Restatement, "[w]e believe that the use of our historical exchange rate convention to generate non-operating foreign exchange gains and avoid losses had occurred for at least ten years." Accordingly, the non-GAAP-compliant translation of foreign currency denominated assets and liabilities and the fraudulent intra-company transactions to exploit such practices had occurred since at least 2009.

112. Saccaro served as Baxter's Treasurer from 2011 to 2013 and, thus, had a thorough understanding of how Baxter's foreign-denominated assets were measured and recorded in U.S. dollars—the precise process through which Defendants manipulated the Company's financial statements as revealed in the Restatement. Indeed, Saccaro was personally responsible for certain of the transactions undertaken for the purpose of "generat[ing] non-operating foreign exchange

41

gains and avoid[ing] losses" that occurred under his watch. Further, when Saccaro assumed the role of CFO in 2015, after previously serving as the Company's Treasurer, Saccaro was responsible for, and certified the accuracy of, Baxter's financial reporting.

113. Having been personally responsible for the fraudulent intra-company transactions used to generate foreign exchange gains and avoid losses during his prior tenure as Baxter's Treasurer, as well as the fact that Baxter continued to employ the same fraudulent practice in violation of GAAP throughout Saccaro's tenure as CFO, including during the Class Period, Saccaro knew of such practices and had a duty to disclose them when serving as Baxter's CFO.

114. Fifth, Defendants' scienter is supported by the abrupt termination of Scott Bohaboy. The Treasurer of Baxter since 2015, Bohaboy was terminated from the Company unexpectedly and without explanation in October of 2019 right before the Company's October 24, 2019 announcement of an internal investigation into its accounting practices involving the use of "intra-Company transactions undertaken for the purpose of generating foreign exchange gains or losses." As Treasurer, like Saccaro before him, Bohaboy was the Baxter executive personally responsible for ensuring the accurate measurement and translation of foreign currency denominated assets and liabilities into U.S. dollars during the duration of the scheme described above, through which it manipulated the Company's financial statements as revealed in the Restatement.

115. Shortly after the announcement of the internal investigation into Baxter's accounting, on October 28, 2019, in a Form 8-K filed with the SEC, the Company announced the appointment of Karen L. Leets to replace Bohaboy as Treasurer of Baxter and to "assist[] the Company with its ongoing evaluation of internal controls, among other things." Around that time, Baxter removed the biography page for Scott Bohaboy from its website.

116.    Following the conclusion of the internal investigation, in the Restatement, Baxter disclosed that among the measures taken to remediate its material weakness in internal controls over financial reporting, the Company "hired a new treasurer from outside Baxter with more than thirty years of treasury experience and responsibility," created a "director role responsible for treasury governance and controls," and "created a treasury controller role within our accounting function and [was] continuing to add resources as appropriate to improve our financial reporting controls related to treasury activities."

117.    That Baxter terminated Bohaboy without explanation at the time the Company began its internal investigation, the remediation of Baxter's internal controls over financial reporting required the hiring of a new treasurer "from outside Baxter," and the manipulations revealed in the Restatement were in the area for which Bohaboy was personally responsible, further support a strong inference that Bohaboy, a senior corporate officer, and Baxter had knowledge of Defendants' fraud.

118.    <u>Sixth</u>, Almeida was installed as CEO at the insistence of an insurgent activist investor with a mandate to improve Baxter's short-term performance and boost the Company's share price after a period of lagging sales and growth.  Almeida was placed in his position as CEO for the explicit purpose of boosting shareholder returns—something that could only be achieved through growth and the Company's success in meeting or exceeding investors' expectations—as measured by metrics such as EPS.

119.    In 2015, after several years of Baxter's slow revenue growth, stagnation in the Company's share price, and underperformance relative to industry peers, hedge fund Third Point LLC, led by activist investor Daniel Loeb, invested over $2 billion in Baxter and acquired nearly 10% of Baxter's common shares, making it the Company's largest shareholder.  Third Point's

express goal was to increase shareholder returns and, looking to remedy the Company's underperformance, Third Point pushed Baxter to install Defendant Almeida—who had a reputation for cutting costs and increasing short-term shareholder returns at other health products companies—as the Company's CEO and President. Almeida assumed the CEO and President positions effective January 1, 2016.

120. Defendants represented that Almeida's appointment was a key opportunity to turnaround the slow-growing business. For example, in a conference call with investors on November 17, 2015, Defendant Saccaro represented that, under Almeida, Defendants expected the Company "to grow operating income and earnings significantly faster than sales," and that Almeida "has a great track record in terms of executing on these kinds of initiatives." Further, following Almeida's first quarter as CEO, in a press release dated May 6, 2016, Baxter told analysts that it could earn between $2.75 and $3.00 per share in adjusted EPS by 2020. However, honestly increasing the Company's earnings to those levels faced substantial challenges, including because 60% of Baxter's revenues were generated in foreign currencies, which—given the strengthening U.S. dollar at the time—increased risks associated with foreign currency devaluation.

121. Thus, from the very outset of his tenure, Almeida's mission was clear: increase profits and earnings to ensure that the Company's stock price goes up. Under Almeida's supervision, Baxter met those goals by engaging in improper foreign exchange accounting throughout the Class Period "solely" for the purpose of generating additional reported income in an effort to satisfy the earnings goals established at the start of his tenure.

122. <u>Seventh</u>, Defendants Almeida's and Saccaro's substantial personal financial benefits from the financial manipulations supports a strong inference of scienter. From 2017

through 2019, Defendant Almeida received awards of Baxter stock worth $18,749,847 and awards of Baxter stock options worth $15,231,927 under Baxter's "Long Term Incentive Program." During the same period, and under the same "Long Term Incentive Program," Defendant Saccaro received awards of Baxter stock worth $9,208,895 and awards of Baxter stock options worth $3,752,901. The value of the stock and stock option awards under the "Long Term Incentive Program" was based equally on the Company's adjusted operating margin and the "total shareholder return," which is a measure of the change in Baxter's stock price over a three-year period as compared to the change in stock prices of the company's peer group (i.e., the Dow Jones Medical Equipment Index) over the same three-year period. Regarding the "total shareholder return" metric, Baxter's stock and stock option awards were based on what percentile rank the Company achieved relative to other companies in the Dow Jones Medical Equipment Index over a three-year period. Because Baxter's stock price was artificially inflated as a result of Defendants' fraudulent use of intra-company transactions to manufacture foreign exchange gains and avoid losses, which in turn gave the illusion that Baxter was exceeding analysts' EPS expectations when in fact it was not, *see* Section IV(C)(2) above, Defendants were able to achieve a higher percentile rank against the Dow Jones Medical Equipment Index, resulting in higher awards of stock and stock options.

123.    Also, from 2017 through 2019, under the Company's "Annual Incentive Program," Defendant Almeida received cash bonus payments totaling $7,181,200, and Defendant Saccaro received cash bonus payments totaling $2,494,380. The size of the cash bonuses awarded under the "Annual Incentive Plan" was based on the Company's reported diluted earnings per share, adjusted net sales, and free cash flow for the fiscal year. For the purpose of determining the amount awarded under the "Annual Incentive Plan," the diluted earnings per share metric carried a relative

45

weight of 50%, and adjusted net sales and free cash flow metrics carried relative weights of 30% and 20% respectively. As Defendants admitted in the Restatement, which resulted in downward revisions to Baxter's previously reported EPS, Defendants Almeida and Saccaro received larger cash bonus payments as a result of the scheme. Having admitted to engaging in intra-company transactions solely to manufacture income from foreign exchange gains and avoidance of losses, and having knowingly exploited a non-GAAP FX rate convention in order to do so, Defendants Almeida and Saccaro, by virtue of their incentive compensation structure, were motivated to and knowingly made the false and misleading statements to investors detailed in Section VI below, which, *inter alia*, misrepresented Baxter's income, compliance with GAAP, and adequacy of Baxter's internal controls over financial reporting.

124. <u>Eighth</u>, that the Company's Board of Directors reduced Almeida's and Saccaro's respective 2019 cash bonuses after considering their responsibility for the Restatement further supports the inference of scienter. Baxter's Board of Directors clawed back incentive compensation awarded to Almeida and Saccaro in light of Defendants' admitted fraudulent misconduct. In Baxter's Proxy Statement filed with the SEC on March 17, 2020, Baxter disclosed these reductions:

> In connection with the restatement, the Board, among other measures, took action under the Executive Compensation Recoupment Policy to recoup amounts (via reductions in 2019 cash bonuses) from the Chief Executive Officer, the Chief Financial Officer and other officers covered by the policy in an aggregate amount of $1,793,911, including a reduction to Mr. Almeida's 2019 cash bonus in the amount of $1,100,000 and a reduction in Mr. Saccaro's 2019 cash bonus in the amount of $501,930. ***These 2019 cash bonus reductions reflect the aggregate amount necessary to conform these officers' cash bonuses paid for the years 2015 to 2018 to performance actually achieved***.

125. The Proxy Statement explicitly cited the material weakness in Baxter's internal controls over financial reporting as the basis on which it reduced Defendant Saccaro's cash bonus, stating that "[f]or 2019, to take into account the restatement and the material weakness referenced

in the 2019 Form 10-K, the Board reduced Mr. Saccaro's 2019 cash bonus award by $164,970. Mr. Saccaro received no 2019 cash bonus as a result of this reduction and the reduction referenced in '—Executive Compensation Recoupment Policy.'" The fact that the Board of Directors reduced Defendants Almeida's and Saccaro's respective cash bonuses because of the Restatement and the material weakness in Baxter's internal controls supports the strong inference that Defendants Almeida and Saccaro knew, or were severely reckless in not knowing, that Baxter's Class Period financial statements contained material misstatements and violated GAAP. Specifically, Baxter manipulated its measurement and recording of transactions in foreign currencies and engaged in manufactured transactions *solely to generate gains and avoid losses*, and the Company had a material weakness in its internal controls that allowed Defendants to perpetrate their fraud.

126. Ninth, that the Company's utilization of an FX rate convention that was not compliant with GAAP lasted for such a substantial period of time demonstrates that the fraud alleged herein, in which the GAAP-noncompliant convention was exploited to increase reported income, was not a temporary lapse in otherwise rigorous management oversight. Rather, Defendants engaged in an intentional and sustained course of misconduct facilitated by senior executives—which further demonstrates scienter. As alleged above, Baxter has admitted that it utilized an FX rate convention that did not comply with GAAP for at least ten years. Further, Baxter admitted that "years after the adoption of our historical exchange rate convention [that was not compliant with GAAP], certain intra-company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses."

127. Tenth, the certifications that Almeida and Saccaro executed under Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as Amended, and SOX section 906, are a

47

particularly strong indicator of scienter because the malfeasance at issue directly implicates the adequacy of the Company's internal controls. Pursuant to Rules 13a-14(a) and 15d-14(a), Defendants Almeida and Saccaro each certified that they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Defendants Almeida and Saccaro also certified that they "[d]esigned [Baxter's] disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us," and that they had each "[e]valuated the effectiveness of the [Baxter]'s disclosure controls and procedures."

128.   Further, under SOX Section 906, Defendants Almeida and Saccaro each certified that Baxter's 2018 10-K and Forms 10-Q for the first and second quarter of 2019 "fully complie[d] with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

129.   Contrary to Defendants Almeida's and Saccaro's representations, in the Restatement, the Company admitted that "[i]n connection with the restatement, management has reassessed its conclusions regarding the effectiveness of our internal control over financial reporting as of December 31, 2018 and has determined that a material weakness in our internal control over financial reporting existed as of that date. As a result of the material weakness, our disclosure controls and procedures were not effective as of December 31, 2018 and throughout 2019."

130.    Had Defendants Almeida and Saccaro actually designed or caused to be designed under their supervision adequate internal controls over financial reporting, or conducted the requisite assessments and evaluations, they would have discovered Baxter's fraudulent foreign currency practices and the material misrepresentations and omissions related thereto in Baxter's financial statements filed with the SEC, as well as the facts that the Company had a material weakness in its internal control over financial reporting and its disclosure controls and procedures were therefore not effective as of December 31, 2018 or throughout 2019.    Accordingly, Defendants Almeida and Saccaro knew, or at the very least were severely reckless in not knowing, facts that rendered Baxter's Class Period financial statements materially false and misleading.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.    Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Income Related to Foreign Exchange Fluctuations and Other Key Financial Metrics

131.    Throughout the Class Period, in Baxter's annual and quarterly financial reports filed with the SEC on Forms 10-K and 10-Q, and in communications with investors in connection with those financial reports, including earnings conference calls, Defendants made materially false and misleading statements and omissions concerning Baxter's income related to foreign exchange fluctuations, as well as other key financial metrics reflecting that income item.

#### 1.    False Statements In Baxter's 2018 Annual Report on Form 10-K and Fiscal Year 2018 Earnings Press Release

132.    On February 21, 2019, after the close of the market, the Company filed its 2018 10-K, which Defendants Almeida and Saccaro signed.  In the 2018 10-K, the Company announced that *"[t]he current year results included $73 million of income related to foreign currency fluctuations principally relating to intercompany receivables, payables and monetary assets denominated in a foreign currency*."   Defendants also reported: (i) $*50 million of income*

49

*ostensibly derived from foreign currency fluctuations for fiscal year 2017, and $28 million of such income for fiscal year 2016*; and (ii) *that the Company had $14.2 billion and $14.483 billion retained earnings to begin the fiscal years of 2017 and 2018, respectively*.

133.    Defendants likewise reported that *"[o]ther (income) expense, net was income of $139 million, expense of $19 million and income of $4,275 million in 2018, 2017 and 2016, respectively*." As the accompanying chart in Note 3 of the 2018 10-K shows, those "other income" figures directly flowed from the false reported income figures attributed to foreign currency fluctuations:

**Baxter International, Inc.**

**Note 3**

**Supplemental Financial Information**

**Other (Income) Expense, net**

| years ended December 31 (in millions) | 2018 | | 2017 | | 2016 | |
|---|---|---|---|---|---|---|
| Foreign exchange | $ | (73) | $ | (50) | $ | (28) |
| Net loss on debt extinguishment | | — | | — | | 153 |
| Net realized gains on Retained Shares transaction | | — | | — | | (4,387) |
| Gain on sale of investments and other assets | | (6) | | (3) | | (3) |
| Saudi Arabia joint venture gain | | (24) | | — | | — |
| Venezuela deconsolidation | | — | | 33 | | — |
| Pension and other postemployment benefit plans | | (48) | | 33 | | 21 |
| All other | | 12 | | 6 | | (31) |
| Other (income) expense, net | $ | (139) | $ | 19 | $ | (4,275) |

134.    In addition, in the 2018 10-K, Defendants reported *GAAP EPS of $2.99 for the year ended December 31, 2018, $1.30 per share for the year ended December 31, 2017, and $9.01 for the year ended December 31, 2016*, and in the Company's February 1, 2019 earnings press release, Defendants reported *adjusted EPS of $3.05 for the year ended December 31, 2017*.

135.    Defendants' statements set forth in ¶¶ 132-134 above were materially false and misleading, and omitted material facts necessary to make those statements not misleading. As Defendants admitted in the Restatement, for years, "certain intra-company transactions were

undertaken, after the related exchange rates were already known, ***solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses***." Defendants also admitted that, for at least ten years, "[w]e previously had applied a longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP."

136.    Thus, as Defendants admitted in the Restatement, the true "impacts of the foreign currency gain or loss misstatements" to the "other (income) expense, net" line item were $78 million income (a decrease of $64 million in income) and $133 million expense (an increase of $96 million in expense) for fiscal years 2018 and 2017, respectively.  With regard to fiscal years prior to 2017, in the Restatement, Defendants also restated the "opening retained earnings as of January 1, 2017" as $13.846 million, an admission that for all fiscal years prior to 2017, the Company overstated its income by a total of $354 million.  With regard to fiscal year 2018, in the Restatement, Defendants restated the "opening retained earnings as of January 1, 2018" as $14.014 billion, an admission that for all fiscal years prior to 2018, the Company overstated its income by a total of $469 million.  Further, in the Restatement, Defendants restated the Company's GAAP EPS figures, reporting restated GAAP EPS of $2.84 for fiscal year 2018, $1.10 for fiscal year 2017, and $8.96 for fiscal year 2016.  The adjusted EPS figure for fiscal year 2018 reported in Defendants' February 1, 2019 earnings press release was also materially overstated, as discussed in Section IV(C)(2) above.

137.    The following table summarizes Defendants' false statements admitted in the Restatement (all amounts in millions of U.S. dollars unless otherwise stated):

| Year | "Other (income) expense, net" as Originally Reported | "Other (income) expense, net" as Restated | Impact of Restatement on "Other (income) expense, net" Attributable to Foreign Currency Gain or Loss Misstatements | Percentage Change of "Other (income) expense, net" caused by the Restatement | Retained Earnings as Originally Reported | Retained Earnings as Restated | GAAP EPS as Originally Reported | GAAP EPS as Restated and Impact of Restatement |
|---|---|---|---|---|---|---|---|---|
| Years prior to 2017 | -- | -- | -- | -- | $14.2 billion (as of Jan. 1, 2017) | $13.846 billion (as of Jan. 1, 2017) | $9.01 (for 2016) | $8.96 (-$0.05) |
| 2017 | $19 | $133 | $96 million increase in expense | 600% Increase in Other Expense | $14.483 billion (as of Jan. 1, 2018) | $14.014 billion (as of Jan. 1, 2018) | $1.30 | $1.10 (-$0.20) |
| 2018 | ($139) | ($78) | $64 million decrease in income | 43.9% Decrease in Other Income | $15.626 billion (as of Jan. 1, 2019) | $15.075 billion (as of Jan. 1, 2019) | $2.99 | $2.84 (-$0.15) |

## 2. False Statements Concerning Baxter's First Quarter of 2019

138. On May 8, 2019, after the close of the market, the Company filed its quarterly report on Form 10-Q for the first quarter of the fiscal year ended December 31, 2019, signed by Defendants Almeida and Saccaro (the "2019 Q1 10-Q"). In the quarterly report, the Company reported *"[f]oreign exchange gains, net" of $5 million for the three months ended March 31, 2019*. The 2019 Q1 10-Q also stated,

> *Other income, net was $25 million and $18 million in the first quarters of 2019 and 2018, respectively*. The increase was primarily due to a benefit in the current-year period from fair value adjustments in marketable equity securities, an impairment of an investment in the prior-year period, and higher pension benefits in the current-year period. Partially offsetting the benefits were lower foreign exchange gains in the current-year period.

139. On April 25, 2019, in Baxter's earnings call with analysts discussing the financial results of the first quarter of 2019, Defendant Saccaro stated, "*[a]djusted other income totaled $25*

*million in the quarter* driven by pension benefits and a gain on an equity investment as well as *foreign exchange gains on balance sheet positions*."

140.    Defendants Baxter, Almeida, and Saccaro's statements set forth in ¶¶ 138-139 above were materially false and misleading, and omitted to disclose material facts.  As Defendants admitted in the Restatement, for years, "certain intra-company transactions were undertaken, after the related exchange rates were already known, *solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses*."  Defendants also admitted that, for at least ten years, "[w]e previously had applied a longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP."

141.    As Defendants admitted in the Restatement, the statements discussed in ¶¶ 138-139 were also materially false and misleading, and omitted to state material facts necessary to make those statements not misleading, because the true "impacts of the foreign currency gain or loss misstatements" to the "other (income) expense, net" line item were a decrease of $5 million and $9 million in income for the three months ended March 31, 2019 and March 31, 2018, respectively.  Furthermore, in the Restatement, "[o]ther (income) expense, net" was restated as $21 million and $6 million for the three months ended March 31, 2019 and March 31, 2018, respectively.

### 3.    False Statements Concerning Baxter's Second Quarter of 2019

142.    On July 30, 2019, after the close of the market, the Company filed its quarterly report on Form 10-Q for the second quarter of the fiscal year ended December 31, 2019, signed by Defendants Almeida and Saccaro (the "2019 Q2 10-Q").  In the quarterly report, the Company reported *"[f]oreign exchange gains, net" of $17 million for the three months ended June 30, 2019*.  The 2019 Q2 10-Q also stated

*Other income, net was $28 million and $53 million in the second quarter and first half of 2019, respectively, and $31 million and $49 million in the second quarter and first half of 2018, respectively*. The decrease in the second quarter of 2019 compared to the prior year was primarily due to fair value declines in marketable equity securities in the current year. The increase in the first half of 2019 compared to the prior year was primarily due to the impairment of an investment in the prior-year period and higher pension benefits in the current-year period, partially offset by lower foreign exchange gains in the current-year period.

143.    On July 25, 2019, in Baxter's earnings call with analysts discussing the financial results of the second quarter of 2019, Defendant Saccaro stated, *"[o]ther income totaled $28 million in the quarter driven by pension benefits and foreign exchange gains on balance sheet positions."*

144.    Defendants Baxter, Almeida, and Saccaro's statements set forth in ¶¶ 142-43 above were materially false and misleading, and omitted to disclose material facts. As Defendants admitted in the Restatement, for years, "certain intra-company transactions were undertaken, after the related FX rates were already known, *solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses*." Defendants also admitted that, for at least ten years, "[w]e previously had applied a longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP."

145.    As Defendants admitted in the Restatement, the statements discussed in ¶¶ 142-143 were also materially false and misleading, and omitted to state material facts necessary to make those statements not misleading, because the true "impacts of the foreign currency gain or loss misstatements" to the "other (income) expense, net" line item were a decrease of $26 million, $31 million, and $9 million in income for the three months ended June 30, 2019 and six months ended June 30, 2019 and June 30, 2018, respectively. Furthermore, in the Restatement, "[o]ther (income)

54

expense, net" was restated as $4 million in expense, $17 million in income, and $44 million in income for the three months ended June 30, 2019 and the six months ended June 30, 2019 and June 30, 2018, respectively.

146. The following table summarizes the impact of Defendants' false statements admitted in the Restatement on the Company's income for the first and second quarters of 2019:

| Quarter | "Other (income) expense, net" as Originally Reported | "Other (income) expense, net" as Restated | Impact of Restatement on "Other (income) expense, net" Attributable to Foreign Currency Gain or Loss Misstatements |
|---|---|---|---|
| 1Q 2019 | ($25) | ($21) | $5 million decrease in income |
| 2Q 2019 | ($28) | $4 | $26 million decrease in income |

## B. Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Compliance with GAAP

147. Throughout the Class Period, in Baxter's annual and quarterly financial reports filed with the SEC on Forms 10-K and 10-Q and in Baxter's Annual Shareholders Meeting, Defendants made materially false and misleading statements and omissions concerning Baxter's purported compliance with GAAP.

148. Indeed, in each of Baxter's Class Period periodic reports filed with the SEC on Forms 10-K and 10-Q, Defendants Almeida and Saccaro each certified that they *"[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."*

149. In the 2018 10-K, Defendants represented that Baxter *"prepar[ed] . . . the financial statements in conformity with generally accepted accounting principles (GAAP)."*

55

150. The 2018 10-K further represented that Baxter's outside auditor had concluded that *"the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America."*

151. Relatedly, during Baxter's Annual Shareholders Meeting on May 7, 2019, a shareholder asked Defendants Almeida and Saccaro whether shareholders could rely on Baxter's reporting of its financial condition through the use of both GAAP financial metrics and non-GAAP metrics, i.e., metrics that deviate from the reported GAAP metrics. In response, Almeida assured the shareholder about the accuracy and reliability of Baxter's GAAP and non-GAAP financial metrics, and represented that Defendants followed "specific rules" when reporting those metrics. In making those assurances, Defendant Almeida represented to Baxter's shareholders that Baxter's financial reporting complied with GAAP:

> I'd like to correct you. Our auditors who are sitting beside you there, they audit our books, which are -- and we represent GAAP and non-GAAP. There's specific rules that allow you to exclude some numbers from your GAAP number, but both of them are available to you. We're reporting both of them. *As a matter of fact, we would not have gotten the most transparent company in S&P 500, if we did not provide the investors with significant amount of information about the numbers*.

152. Defendant Saccaro followed Almeida's answer by stating to the shareholder, "Joe. You are exactly right. *We have a very rigorous practice by which we assess what adjustments are made to GAAP numbers*."

153. The statements discussed in ¶¶ 148-152 were materially false and misleading, and omitted material information necessary to make those statements not misleading. Although Defendants represented Baxter's purported GAAP compliance throughout the Class Period, Defendants admitted in the Restatement that, for at least ten years, "[w]e previously had applied a

longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP." Further, in the annual report, the Company admitted that "certain intra-company transactions were undertaken, after the related exchange rates were already known, ***solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses***."

154.    Moreover, SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Defendants have admitted their failures to comply with GAAP and, accordingly, that their financial statements containing the materially false and misleading statements and omissions alleged herein were misleading when made.

## C.    Defendants Made Materially False and Misleading Statements and Omissions Concerning Baxter's Internal Controls over Financial Reporting

155.    Throughout the Class Period, in each of Baxter's annual and quarterly financial reports filed with the SEC on Forms 10-K and 10-Q, Defendants made materially false and misleading statements and omissions concerning the adequacy and effectiveness of Baxter's internal controls over financial reporting.

156.    The 2018 10-K stated as follows with respect to Baxter's internal control over financial reporting:

**Evaluation of Disclosure Controls and Procedures**

Baxter carried out an evaluation, under the supervision and with the participation of its Disclosure Committee and management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of Baxter's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1394, as amended (the Exchange Act)) as of December 31, 2018.  Baxter's disclosure controls and procedures are designed to ensure that information required to be disclosed by Baxter in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported on a

57

timely basis and that such information is communicated to management, including the Chief Executive Officer, Chief Financial Officer and its Board of Directors, to allow timely decisions regarding required disclosure.

***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the company's disclosure controls and procedures were effective as of December 31, 2018.***

### Management's Assessment of Internal Control Over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The company's internal control over financial reporting is a process designed under the supervision of the principal executive and financial officers, and effected by the Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

Management performed an assessment of the effectiveness of the company's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the framework in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on that assessment under the framework in*** **Internal Control-Integrated Framework (2013)***, management concluded that the company's internal control over financial reporting was effective as of December 31, 2018.***

The effectiveness of the company's internal control over financial reporting as of December 31, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

157. In Exhibit 31.1 of the 2018 10-K, 2019 Q1 10-Q, and 2019 Q2 10-Q, Defendant

Almeida certified, pursuant to Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of

1934, as amended:

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

(c)     ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

(b)     ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

158.     In Exhibit 31.2 of the 2018 10-K, 2019 Q1 10-Q, and 2019 Q2 10-Q, Defendant Saccaro made the same certifications pursuant to Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as amended, as set forth in ¶ 157 above.

159.    In Exhibit 32.1 of the 2018 10-K, 2019 Q1 10-Q, and 2019 Q2 10-Q, Defendant

Almeida certified, pursuant to 18 U.S.C. § 1350, as adopted pursuant to SOX Section 906, that:

(1)    *The Company's Annual Report on Form 10-K for the year ended December 31, 2018 [or, for the 2019 Q1 and Q2 10-Q, those reports] as filed with the Securities and Exchange Commission on the date hereof (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934*; and

(2)    *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*.

160.    In Exhibit 32.2 of the 2018 10-K, 2019 Q1 10-Q, and 2019 Q2 10-Q, Defendant

Saccaro made the same certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to SOX

Section 906, as set forth in ¶ 159 above.

161.    The statements in ¶¶ 156-160 were materially false and misleading, and omitted

material information necessary to make those statements not misleading.  As Defendants admitted

in the Restatement, "[i]n connection with the restatement, management has reassessed its

conclusions regarding the effectiveness of our internal control over financial reporting as of

December 31, 2018 and has determined that a material weakness in our internal control over

financial reporting existed as of that date.  As a result of the material weakness, our disclosure

controls and procedures were not effective as of December 31, 2018 and throughout 2019."

162.    In addition, it was misleading for Defendants to state that "Baxter carried out an

evaluation . . . of the effectiveness of Baxter's disclosure controls and procedures" and that

"[b]ased on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded

that the company's disclosure controls and procedures were effective as of December 31, 2018"

when, in reality, Baxter's internal controls were already deficient, and Defendants, rather than

"carr[y] out an evaluation," took advantage of the deficiencies by intentionally undertaking

"certain intra-company transactions . . . after the related exchange rates were already known, solely

for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses." Defendants' admission in the Restatement that Baxter undertook such transactions "to generate non-operating foreign exchange gains and avoid losses" indicates unequivocally that Defendants knew they disregarded Baxter's internal controls, rendering their statements regarding such controls materially false and misleading. Had Baxter's controls been effective, those intra-company transactions would not have occurred, and any improper transactions would have been disclosed to investors.

## VII.  LOSS CAUSATION

163.    The market price of Baxter's publicly traded common stock was artificially inflated or maintained by the material misstatements and omissions complained of herein, including misstatements and omissions about Baxter's use of a convention for the measurement and re-measurement of foreign currency denominated assets that was not in compliance with GAAP, its adherence to internal controls over financial reporting, and its entering into improper intra-company transactions after the related exchange rates were already known to generate non-operating foreign exchange gains or avoid foreign exchange losses, which enabled the Company to beat the market's consensus growth expectations and the Company's own guidance regarding such growth.

164.    The artificial inflation in Baxter's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market. The corrective information was disseminated through Baxter's disclosure on October 24, 2019, which revealed (1) that the Company had begun an investigation into intra-Company transactions undertaken for the purpose of generating foreign exchange gains or avoiding foreign exchange losses, (2) that the Company used a foreign exchange rate convention to measure foreign currency denominated monetary assets and liabilities that did not comply with GAAP, and (3) that Baxter's internal

controls needed to be "strengthened" and "enhanced." That disclosure reduced the price of Baxter's publicly traded stock, causing economic injury to Lead Plaintiffs and other members of the Class.

165. When Baxter reported its preliminary third-quarter 2019 financial results, the truth emerged that Defendants had been exploiting a GAAP-noncompliant method for measuring foreign currency denominated monetary assets and liabilities in order to execute intra-Company transactions for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses in order to mislead investors into believing Baxter was exceeding the Company's own guidance and the market's expectations for income growth. On October 24, 2019, before the start of the trading day, Baxter announced that it "began an investigation into certain intra-Company transactions undertaken for the purpose of generating foreign exchange gains or losses" and that "[t]hese transactions used a foreign exchange rate convention historically applied by the Company that was not in accordance with [GAAP] and enabled intra-Company transactions to be undertaken after the related exchange rates were already known." Further, Baxter disclosed that the "intra-Company transactions resulted in certain misstatements in the Company's previously reported non-operating income related to net foreign exchange gains" and acknowledged that "[u]pon completion of the investigation and the Company's evaluation of the materiality of the misstatements, the Company expects to either amend its periodic reports previously filed with the SEC to include restated financial statements that correct those misstatements, or include in reports for future periods restated comparative financial statements that correct those misstatements." Finally, the October 24 disclosure said that the Company was considering "the extent to which these matters impact the effectiveness of its internal control over

financial reporting," with Defendant Almeida concluding that Baxter was "taking steps to strengthen and enhance its internal controls."

166. As discussed in Section IV(D) above, securities analysts covering Baxter were surprised by Defendants' October 24, 2019 disclosure, indicating that the information was not expected and revealed previously misrepresented or undisclosed information. For example, Evercore ISI reported that "[t]he issue seems serious," and lowered its price target on Baxter by over 9%, while Barclays reported that "the more surprising news was in the internal investigation on intra-company transactions around FX gains/losses," RBC Capital Markets reported that Baxter's "[s]urprise internal accounting investigation will likely overshadow BAX's solid 3Q19 results," and Morgan Stanley reported that "[r]evelations of today's nature are rare, and the impacts of Baxter's FX gains on the P&L have not been immaterial."

167. Baxter's October 24, 2019 disclosure about its use of a foreign exchange rate convention that was not compliant with GAAP and its exploitation of that GAAP violation in order to undertake intra-company transactions for the purpose of generating foreign exchange gains or avoiding foreign exchange losses caused the price of Baxter's stock to drop significantly, from a closing price of $87.95 per share on October 23, 2019 to a closing price of $79.08 on October 24, 2019—a decline of nearly 10.1%.

168. Accordingly, the decline in Baxter's stock price was a direct and proximate result of Defendants' fraudulent scheme being revealed to investors and to the market.

## VIII. THE PRESUMPTION OF RELIANCE

169. Lead Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Baxter's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

170.     Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because during the Class Period:

(a)     Baxter stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a registered issuer, Baxter filed periodic public reports with the SEC and the NYSE;

(c)     Baxter regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     The market reacted promptly to public information disseminated by Baxter;

(e)     Baxter securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective firms, including, but not limited to: Piper Sandler & Co.; RBC Capital Markets LLC; Credit Suisse; Raymond James & Associates; Stifel Nicolaus; Morgan Stanley; J.P. Morgan; KeyBanc Capital Markets; SVB Leerink; Evercore ISI; Barclays; Wells Fargo Securities; Argus Research Corp.; Cowen; Morningstar, Inc.; Deutsche Bank; ISS-EVA; Edward Jones; and Zacks Investment Research. Each of those reports was publicly available and entered the public marketplace;

(f)     The material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Baxter common stock; and

(g)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased or acquired Baxter common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

171.     In the alternative, Lead Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts which Defendants had a duty to disclose.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

172.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

173.     Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Baxter who knew that the statement was materially false or misleading when made.

## X. CLASS ACTION ALLEGATIONS

174.     Lead Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased the common stock of Baxter during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors and officers of Baxter, and their families and affiliates.

175.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 21, 2020, Baxter had 508,836,225 shares of common stock outstanding, owned by hundreds or thousands of investors.

176.    There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions affecting individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted or misrepresented material facts, including in Baxter's reported financial results, and concerning Baxter's internal controls and foreign exchange gains and losses;

(c)    Whether Defendants knew or recklessly disregarded that their alleged misstatements and omissions were false and misleading;

(d)    Whether the price of Baxter common stock was artificially inflated as a result of Defendants' false and misleading statements and omissions;

(e)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

177.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages caused by Defendants' wrongful conduct.

178.    Lead Plaintiffs will adequately protect the interests of the Class, and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with the interests of the Class.

179.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.  Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

180.     The names and addresses of those persons and entities that purchased or acquired Baxter's common stock during the Class Period are available from the Company's transfer agent(s).  Notice may be provided to such purchasers and record owners via first-class mail and publication using techniques and a form of notice similar to those customarily used in securities class actions.

## XI.     CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (Against All Defendants)

181.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

182.     This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

183.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) cause the price of Baxter common stock to be artificially inflated or maintain artificial inflation in the price of Baxter common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or acquire Baxter common stock at artificially inflated prices.

184.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock

67

in an effort to maintain artificially high market prices for Baxter common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

185.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial wellbeing, operations, and prospects.

186.    During the Class Period, Defendants made the false statements specified above in Section VI, which they knew or recklessly disregarded to be false and misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.    Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in that misconduct to conceal Baxter's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

188.    As a result of the dissemination of Defendants' materially false or misleading information or failure to disclose material facts, as set forth above in Section VI, the market price of Baxter's common stock was artificially inflated throughout the Class Period.  In ignorance of the fact that market prices of Baxter's common stock were artificially inflated, and relying directly or indirectly on the false or misleading statements made by Defendants or upon the integrity of the market in which the securities traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, Lead Plaintiffs and the other members of

the Class purchased or otherwise acquired Baxter's common stock during the Class Period at artificially inflated prices and were damaged thereby.

189.     At the time of the material misrepresentations alleged herein, Lead Plaintiffs and the other members of the Class were ignorant of their falsity and believed them to be true.  Lead Plaintiffs and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for Baxter common stock or acquired Baxter common stock at artificially inflated prices.  Lead Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Baxter common stock had been artificially inflated by Defendants' fraudulent course of conduct.

190.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases or acquisitions of the Company's common stock during the Class Period.

### COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
(Against The Individual Defendants)

191.     Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

192.     This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

193.     During the Class Period, each of the Individual Defendants was a controlling person of Baxter within the meaning of Section 20(a) of the Exchange Act.  By reason of their high-level positions at Baxter and their participation in and/or awareness of the Company's operations and/or

knowledge of the materially false and misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiffs contend were materially false and misleading.

194.    Each of the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause Baxter to engage in the wrongful conduct complained of herein.  In that regard, each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, public filings, and other statements alleged by Lead Plaintiffs to be materially misleading prior to or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

195.    Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and misleading representations and omissions during the Class Period, as alleged herein.  Accordingly, each Individual Defendant was a culpable participant in the underlying violations of Section 10(b) alleged herein.

196.    As set forth above, Baxter violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged in this Complaint.  By virtue of their positions as controlling persons of Baxter and, as a result of their own aforementioned conduct, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with Baxter, and to the same extent as Baxter is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired Baxter common stock during the Class Period at artificially inflated prices.

197.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of Baxter common stock during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XIII.    JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: June 25, 2020                Respectfully Submitted,

/s/ *James A. Harrod*
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60611
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
avi@blbglaw.com

-and-

James A. Harrod (admitted *pro hac vice*)
Adam D. Hollander (admitted *pro hac vice*)
Alexander T. Payne (admitted *pro hac vice*)
1251 Avenue of the Americas

71

New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Jim.Harrod@blbglaw.com
Adam.Hollander@blbglaw.com
Alex.Payne@blbglaw.com

**KESSLER TOPAZ MELTZER &**
**CHECK, LLP**
Sharan Nirmul (#90751)
Joshua A. Materese (#314844)
Evan R. Hoey (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com

*Lead Counsel for Plaintiffs and the Class*