# Exhibit 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**(Mark One)**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**OR**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 1-4448**

**Baxter**

# Baxter International Inc.
**(Exact Name of Registrant as Specified in its Charter)**

| **Delaware** | **36-0781620** |
|---|---|
| **(State or Other Jurisdiction of Incorporation or Organization)** | **(I.R.S. Employer Identification No.)** |
| **One Baxter Parkway, Deerfield,   Illinois** | **60015** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code 224.948.2000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on Which Registered |
|---|---|---|
| Common stock, $1.00 par value | BAX (NYSE) | New York Stock Exchange |
| | | Chicago Stock Exchange |
| 0.4% Global Notes due 2024 | BAX 24 | New York Stock Exchange |
| 1.3% Global Notes due 2025 | BAX 25 | New York Stock Exchange |
| 1.3% Global Notes due 2029 | BAX 29 | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes        No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.    Yes        No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes        No

Indicate by check mark whether registrant has submitted electronically every Interactive Data File required to be submitted and pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files)    Yes        No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer                                                                                    Accelerated filer

Non-accelerated filer                                                                                    Smaller reporting company

Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes        No

The aggregate market value of the voting common equity held by non-affiliates of the registrant as of June 28, 2019 (the last business day of the registrant's most recently completed second fiscal quarter), based on the per share closing sale price of $81.90 on that date and the assumption for the purpose of this computation only that all of the registrant's directors and executive officers are affiliates, was approximately $42 billion. The number of shares of the registrant's common stock, $1.00 par value, outstanding as of February 29, 2020 was 507,263,731.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive 2020 proxy statement for use in connection with its Annual Meeting of Stockholders expected to be held on May 5, 2020 are incorporated by reference into Part III of this report.

**TABLE OF CONTENTS**

|  |  | Page Number |
|---|---|---|
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 18 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Mine Safety Disclosures | 20 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 22 |
| Item 6. | Selected Financial Data | 23 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8. | Financial Statements and Supplementary Data | 49 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 177 |
| Item 9A. | Controls and Procedures | 177 |
| Item 9B. | Other Information | 178 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 179 |
| Item 11. | Executive Compensation | 179 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 179 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 180 |
| Item 14. | Principal Accountant Fees and Services | 180 |
| Item 15. | Exhibits and Financial Statement Schedules | 180 |
| Item 16. | Form 10-K Summary | 181 |

**Explanatory Note**

**General**

On February 13, 2020, we concluded, in consultation with the Audit Committee of our Board of Directors, that our consolidated financial statements as of December 31, 2018 and 2017, for the years ended December 31, 2018, 2017 and 2016, as of and for the interim periods within the years ended December 31, 2018 and 2017 and the interim periods ended June 30 and March 31, 2019 should no longer be relied upon because of misstatements to our previously reported foreign exchange gains and losses as described below.

**Restatement**

This Annual Report on Form 10-K for the year ended December 31, 2019 includes the following restated financial information:

- audited consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017;
- unaudited interim financial information as of and for the quarterly periods ended June 30, 2019, March 31, 2019, June 30, 2018, and March 31, 2018, for the quarterly period ended December 31, 2018, for the six months ended June 30, 2019 and 2018, and as of September 30, 2018; and
- unaudited selected financial data as of December 31, 2017 and as of and for the years ended December 31, 2016 and 2015. Selected financial data as of December 31, 2018 and for the years ended December 31, 2018 and 2017 is derived from our audited consolidated financial statements included in this Annual Report on Form 10-K.

Refer to our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2019, filed on March 17, 2020, for our unaudited restated interim financial statements for the three and nine months ended September 30, 2018 and related information.

*Restatement Background*

On October 24, 2019, we reported that we had commenced an internal investigation into certain intra-company transactions that impacted our previously reported non-operating foreign exchange gains and losses. Our internal investigation, as it pertains to the evaluation of related financial statement impacts, is complete.

We previously had applied a longstanding convention for the initial measurement of foreign exchange transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities that was not consistent with U.S. Generally Accepted Accounting Principles (U.S. GAAP). Beginning years after the adoption of that convention, certain intra-company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses. We believe that the use of our previous exchange rate convention to generate non-operating foreign exchange gains and avoid losses had occurred for at least ten years. The cumulative impact of correcting misstatements of non-operating foreign exchange gains and losses in periods prior to 2017 has been recorded as a reduction to our opening retained earnings in the consolidated financial statements included herein.

As previously disclosed, we voluntarily advised the staff of the Securities and Exchange Commission (SEC) of our internal investigation and are continuing to cooperate with the staff of the SEC.

*Restatement of Previously Issued Consolidated Financial Statements*

As described above, this Annual Report on Form 10-K includes audited restated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017. In addition to the correction of misstatements related to non-operating foreign exchange gains and losses, we corrected additional misstatements that were immaterial, individually and in the aggregate, to our previously issued financial statements. Those other immaterial misstatements relate to (i) equipment leased to customers under operating leases, (ii) classification of foreign exchange gains and losses on cash balances and intra-company receivables and payables in our consolidated statements of cash flows, (iii) translation of the financial position and results of operations of our foreign operations into U.S. dollars, (iv) statement of income classification of transition services income related to the separation of Baxalta Incorporated in 2015 and (v) other miscellaneous adjustments. See Note 2, Restatement of Previously Issued Consolidated Financial Statements, in Item 8, Financial Statements and Supplementary Data, for additional information.

Unaudited interim financial information as of and for the quarterly periods ended June 30, 2019, March 31, 2019, June 30, 2018, and March 31, 2018, for the quarterly period ended December 31, 2018, for the six months ended June 30, 2019 and 2018, and as of September 30, 2018 has also been restated. See Note 19, Quarterly Financial Data (Unaudited), in Item 8, Financial Statements and Supplementary Data, for additional information.

1

The restatement resulted in the following decreases to our previously reported income from continuing operations and diluted earnings per share from continuing operations (in millions, except per share data):

| | Six months ended June 30, 2019 | Year ended December 31, 2018 | Year ended December 31, 2017 |
|---|---|---|---|
| Income from continuing operations | $ (35) | $ (78) | $ (115) |
| Diluted earnings per share from continuing operations | $ (0.07) | $ (0.15) | $ (0.20) |

### *Control Considerations*

In connection with the restatement, management has reassessed its conclusions regarding the effectiveness of our internal control over financial reporting as of December 31, 2018 and has determined that a material weakness in our internal control over financial reporting existed as of that date. As a result of the material weakness, our disclosure controls and procedures were not effective as of December 31, 2018 and throughout 2019. Management has been implementing changes to strengthen our internal controls and remediate the material weakness, which continued to exist as of December 31, 2019. See Item 9A, Controls and Procedures, for additional information related to the material weakness in internal control over financial reporting and our related remediation activities.

<div align="center">

**PART I**

</div>

### Item 1. *Business.*

### Company Overview

Baxter International Inc., through its subsidiaries, provides a broad portfolio of essential healthcare products, including acute and chronic dialysis therapies; sterile intravenous (IV) solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products. Our global footprint and the critical nature of our products and services play a key role in expanding access to healthcare in emerging and developed countries. These products are used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices and by patients at home under physician supervision. As of December 31, 2019, we manufactured products in over 20 countries and sold them in over 100 countries.

Baxter International Inc. was incorporated under Delaware law in 1931. As used in this report, "Baxter International" means Baxter International Inc. and "we", "our" or "us" means Baxter International and its consolidated subsidiaries (after giving effect to the separation and distribution of Baxalta Incorporated (Baxalta), as further described below), unless the context otherwise requires.

### Business Segments and Products

We manage our business based on three geographic segments: Americas (North and South America), EMEA (Europe, Middle East and Africa) and APAC (Asia-Pacific).

Each of our segments provides a broad portfolio of essential healthcare products, including acute and chronic dialysis therapies; sterile IV solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products.

For financial information about our segments, see Note 18 in Item 8 of this Annual Report on Form 10-K.

### Sales and Distribution

We have our own direct sales force and also make sales to and through independent distributors, drug wholesalers acting as sales agents and specialty pharmacy or other alternate site providers. In the United States, third parties, such as Cardinal Health, Inc., warehouse and ship a significant portion of our products through their distribution centers. These centers are generally stocked with adequate inventories to facilitate prompt customer service. Sales and distribution methods include frequent contact by sales and customer service representatives, automated communications via various electronic purchasing systems, circulation of catalogs and merchandising bulletins, direct-mail campaigns, trade publication presence and advertising.

Sales are made and products are distributed on a direct basis or through independent distributors or sales agents in more than 100 countries as of December 31, 2019.

## International Operations

The majority of our revenues are generated outside of the United States and geographic expansion remains a component of our strategy. Our presence includes operations in Europe, the Middle East, Africa, Asia-Pacific, Latin America and Canada. We are subject to certain risks inherent in conducting business outside the United States. For more information on these risks, see the information under the captions "Risks Related to Baxter's Business —We are subject to risks associated with doing business globally" and "— Changes in foreign currency exchange rates and interest rates could have a material adverse effect on our operating results and liquidity" in Item 1A of this Annual Report on Form 10-K.

For financial information about foreign and domestic operations and geographic information, see Note 18 in Item 8 of this Annual Report on Form 10-K. For more information regarding foreign currency exchange risk, refer to the discussion under the caption entitled "Financial Instrument Market Risk" in Item 7 of this Annual Report on Form 10-K.

## Contractual Arrangements

Our products are sold through contracts with customers, both within and outside the United States. Some of these contracts have terms of more than one year and place limits on our ability to increase prices. In the case of hospitals, governments and other facilities, these contracts may specify minimum quantities of a particular product or categories of products to be purchased by the customer.

In keeping with the increased emphasis on cost-effectiveness in healthcare delivery, many hospitals and other customers of medical products in the United States have joined group purchasing organizations (GPOs), or formed integrated delivery networks (IDNs), to enhance purchasing power. GPOs and IDNs negotiate pricing arrangements with manufacturers and distributors and the negotiated prices are made available to members. We have purchasing agreements with several of the major GPOs in the United States. GPOs may have agreements with more than one supplier for certain products. Accordingly, in these cases, we face competition from other suppliers even where a customer is a member of a GPO under contract with us. Purchasing power is similarly consolidated in many other countries. For example, public contracting authorities act as the purchasing entities for the hospitals and other customers of medical products in their region and many hospitals and other customers have joined joint procurement entities and buying consortia. The result is that demand for healthcare products is increasingly concentrated across our markets globally.

## Raw Materials

Raw materials essential to our business are purchased from numerous suppliers worldwide in the ordinary course of business. Although most of these materials are generally available, we at times may experience shortages of supply. In an effort to manage risk associated with raw materials supply, we work closely with our suppliers to help ensure availability and continuity of supply while maintaining high quality and reliability. We also seek to develop new and alternative sources of supply where beneficial to our overall raw materials procurement strategy.

We are not always able to recover cost increases for raw materials through customer pricing due to contractual limits and market forces. Accordingly, we utilize long-term supply contracts with some suppliers to help maintain continuity of supply and manage the risk of price increases.

In connection with the separation and distribution of Baxalta, we entered into a long-term manufacturing and supply agreement with Baxalta. Baxalta manufactures and supplies us with ARTISS, TISSEEL, FLOSEAL and stand-alone thrombin, on a cost-plus basis, under that manufacturing and supply agreement.

## Competition and Healthcare Cost Containment

Our businesses benefit from a number of competitive advantages, including the breadth and depth of our product offerings, our strong relationships with customers, including hospitals and clinics, GPOs, physicians, and patients, many of whom self-administer home-based therapies that we supply. We also benefit from efficiencies and cost advantages resulting from shared manufacturing facilities and the technological advantages of our products.

3

Case: 1:19-cv-07786 Document #: 41-4 Filed: 08/24/20 Page 8 of 586 PageID #:829

4

Although no single company competes with us in all of our businesses, we face substantial competition in each of our segments from international and domestic healthcare and pharmaceutical companies and providers of all sizes, and these competitors often differ across our businesses. In addition, global and regional competitors continue to expand their manufacturing capacity and sales and marketing channels. Competition is primarily focused on cost-effectiveness, price, service, product performance, and technological innovation. There has been increasing consolidation in our customer base and by our competitors, which continues to result in pricing and market pressures.

Global efforts toward healthcare cost containment continue to exert pressure on product pricing. Governments around the world use various mechanisms to control healthcare expenditures, such as price controls, the formation of public contracting authorities, product formularies (lists of recommended or approved products), and competitive tenders which require the submission of a bid to sell products. Sales of our products are dependent, in part, on the availability of reimbursement by government agencies and healthcare programs, as well as insurance companies and other private payers. In the United States, the federal and many state governments have adopted or proposed initiatives relating to Medicaid and other health programs that may limit reimbursement or increase rebates that we and other providers are required to pay to the state. In addition to government regulation, managed care organizations in the United States, which include medical insurance companies, medical plan administrators, health-maintenance organizations, hospital and physician alliances and pharmacy benefit managers, continue to put pressure on the price and usage of healthcare products. Managed care organizations seek to contain healthcare expenditures, and their purchasing strength has been increasing due to their consolidation into fewer, larger organizations and a growing number of enrolled patients. We face similar issues outside of the United States. In Europe and Latin America, for example, the government provides healthcare at low cost to patients, and controls its expenditures by purchasing products through public tenders, collective purchasing, regulating prices, setting reference prices in public tenders or limiting reimbursement or patient access to certain products.

## Intellectual Property

Patents and other proprietary rights are essential to our business. We rely on patents, trademarks, copyrights, trade secrets, know-how and confidentiality agreements to develop, maintain and strengthen our competitive position. We own a number of patents and trademarks throughout the world and have entered into license arrangements relating to various third-party patents and technologies. Products manufactured by us are sold primarily under our own trademarks and trade names. Some products distributed by us are sold under our trade names, while others are sold under trade names owned by our suppliers or partners. Trade secret protection of unpatented confidential and proprietary information is also important to us. We maintain certain details about our processes, products and technology as trade secrets and generally require employees, consultants, and business partners to enter into confidentiality agreements. These agreements may be breached and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, and business partners use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions.

Our policy is to protect our products and technology through patents and trademarks on a worldwide basis. This protection is sought in a manner that balances the cost of such protection against obtaining the greatest value for us. We also recognize the need to promote the enforcement of our patents and trademarks and take commercially reasonable steps to enforce our patents and trademarks around the world against potential infringers, including judicial or administrative action where appropriate.

We operate in an industry susceptible to significant patent litigation. At any given time, we are involved as either a plaintiff or defendant in a number of patent infringement and other intellectual property-related actions. Such litigation can result in significant royalty or other payments or result in injunctions that can prevent the sale of products. For more information on patent and other litigation, see Note 9 in Item 8 of this Annual Report on Form 10-K.

## Research and Development

Our investment in research and development (R&D), consistent with our portfolio optimization and capital allocation strategies, helps fuel our future growth and our ability to remain competitive in each of our product categories. Accordingly, we continue to focus our investment on select R&D programs to enhance future growth through clinical differentiation. Expenditures for our R&D activities were $595 million in 2019, $654 million in 2018, and $615 million in 2017. These expenditures include costs associated with R&D activities performed at our R&D centers located

around the world, which include facilities in Belgium, Sweden, India, Italy, Germany, China, Japan and the United States, as well as in-licensing, milestone and reimbursement payments made to partners for R&D work performed at non-Baxter locations.

For more information on our R&D activities, refer to the discussion under the caption entitled "Strategic Objectives" in Item 7 of this Annual Report on Form 10-K.

## Quality Management

Our continued success depends upon the quality of our products. Quality management plays an essential role in determining and meeting customer requirements, preventing defects, facilitating continuous improvement of our processes, products and services, and assuring the safety and efficacy of our products. Our quality system enables the design, development, manufacturing, packaging, sterilization, handling, distribution and labeling of our products to ensure that they conform to customer requirements. In order to continually improve the effectiveness and efficiency of our quality system, various measurement, monitoring and analysis methods, such as management reviews and internal, external and vendor audits, are employed at local and central levels.

Each product that we market is required to meet specific quality standards, both in packaging and in product integrity and quality. If any of those is determined to be compromised at any time, we endeavor to take corrective and preventive actions designed to ensure compliance with regulatory requirements and to meet customer expectations. For more information on corrective actions taken by us, refer to the discussion under the caption entitled "Certain Regulatory Matters" in Item 7 of this Annual Report on Form 10-K.

## Government Regulation

Our operations and many of the products manufactured or sold by us are subject to extensive regulation by numerous government agencies, both within and outside the United States. The Food and Drug Administration (FDA) in the United States, the European Medicines Agency (EMA) in Europe, the China Food and Drug Administration (CFDA) in China and other government agencies, inside and outside of the United States, administer requirements covering the testing, safety, effectiveness, manufacturing, labeling, promotion and advertising, distribution and post-market surveillance of our products. We must obtain specific approval from FDA and non-U.S. regulatory authorities before we can market and sell most of our products in a particular country. Even after we obtain regulatory approval to market a product, the product and our manufacturing processes and quality systems are subject to continued review by FDA and other regulatory authorities globally, including additional 510(k) and other regulatory submissions, and approvals or the time needed to secure approvals are not certain. State agencies in the United States also regulate our facilities, operations, employees, products and services within their respective states. We, along with our facilities, are subject to periodic inspections and possible administrative and legal actions by FDA and other regulatory agencies inside and outside the United States. Such actions may include warning letters, product recalls or seizures, monetary sanctions, injunctions to halt the manufacture and distribution of products, civil or criminal sanctions, refusal of a government to grant approvals or licenses, restrictions on operations or withdrawal of existing approvals and licenses. As situations require, we take steps to ensure safety and efficacy of our products, such as removing products found not to meet applicable requirements from the market and improving the effectiveness of quality systems. For more information on compliance actions taken by us, refer to the discussion under the caption entitled "Certain Regulatory Matters" in Item 7 of this Annual Report on Form 10-K.

We are also subject to various laws inside and outside the United States concerning our relationships with healthcare professionals and government officials, price reporting and regulation, the promotion, sales and marketing of our products and services, the importation and exportation of products, the operation of our facilities and distribution of products. In the United States, we are subject to the oversight of FDA, Office of the Inspector General within the Department of Health and Human Services (OIG), the Center for Medicare/Medicaid Services (CMS), the Department of Justice (DOJ), Environmental Protection Agency, Department of Defense and Customs and Border Protection in addition to others. We supply products and services to healthcare providers that are reimbursed by federally funded programs such as Medicare. As a result, our activities are subject to regulation by CMS and enforcement by OIG and DOJ. In each jurisdiction outside the United States, our activities are subject to regulation by government agencies including the EMA in Europe, CFDA in China and other agencies in other jurisdictions. Many of the agencies enforcing these laws have increased their enforcement activities with respect to healthcare companies in recent years. These actions appear to be part of a general trend toward increased enforcement activity globally.

5

Our operations involve the use of substances regulated under environmental laws, primarily in manufacturing and sterilization processes. Our environmental policies require compliance with all applicable environmental regulations and contemplate, among other things, appropriate capital expenditures for environmental protection.

## Separation of Baxalta

On July 1, 2015, we completed the distribution of approximately 80.5% of the outstanding common stock of Baxalta to our stockholders (the Distribution). The Distribution was made to our stockholders of record as of the close of business on June 17, 2015 (the Record Date), who received one share of Baxalta common stock for each of our shares held as of the Record Date. As a result of the distribution, Baxalta became an independent public company.

In 2016, we disposed of our remaining 19.5% interest in Baxalta through a series of transactions, including debt-for-equity exchanges, an equity-for-equity exchange and a contribution to our U.S. pension plan. As a result of these transactions, we extinguished approximately $3.65 billion of our indebtedness, repurchased 11,526,638 of our shares and contributed 17,145,570 Baxalta shares to our U.S. pension plan. On June 3, 2016, Baxalta became a wholly-owned subsidiary of Shire plc (Shire). In January 2019, Takeda Pharmaceutical Company Limited (Takeda) acquired Shire.

As a result of the separation, the consolidated statements of income, consolidated balance sheets, consolidated statements of cash flow, and related financial information reflect Baxalta's operations, assets and liabilities, and cash flows as discontinued operations for all periods presented.

Refer to Note 3 in Item 8 of this Annual Report on Form 10-K for additional information regarding the separation of Baxalta.

## Employees

As of December 31, 2019, Baxter employed approximately 50,000 people.

## Available Information

We make available free of charge on our website at www.baxter.com our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (Exchange Act), as soon as reasonably practicable after electronically filing or furnishing such material with the Securities and Exchange Commission. These reports are also available free of charge via EDGAR through the Securities and Exchange Commission website (www.sec.gov). In addition, our Corporate Governance Guidelines, Code of Conduct, and the charters for the committees of our Board of Directors are available on our website at www.baxter.com under "About Baxter—About us — Governance." All the foregoing materials will be made available to stockholders in print upon request by writing to: Corporate Secretary, Baxter International Inc., One Baxter Parkway, Deerfield, Illinois 60015. Information contained on our website shall not be deemed incorporated into, or to be a part of, this Annual Report on Form 10-K.

## Item 1A. Risk *Factors.*

In addition to the other information in this Annual Report on Form 10-K, stockholders or prospective investors should carefully consider the following risk factors. If any of the events described below occurs, our business, financial condition, results of operations, future growth prospects and stock price could suffer.

***If we are unable to successfully introduce new products or fail to keep pace with advances in technology, our business, financial condition and results of operations could be adversely affected.***

We need to successfully introduce new products to achieve our strategic business objectives. Product development requires substantial investment and there is inherent risk in the R&D process. A successful product development process depends on many factors, including our ability to properly anticipate and satisfy customer needs, adapt to new technologies, obtain regulatory approvals on a timely basis, demonstrate satisfactory clinical results, manufacture products in an economical and timely manner and differentiate our products from those of our competitors. If we cannot successfully introduce new products or adapt to changing technologies, our products may become obsolete and our revenue and profitability could suffer.

***Issues with product supply or quality could have an adverse effect on our business, subject us to regulatory actions, or cause a loss of customer confidence in us or our products, among other negative consequences.***

Our success depends upon the availability and quality of our products. The pharmaceutical and medical products industries are competitive and subject to complex market dynamics and varying demand levels. These levels vary in response to macro-economic conditions, regulatory requirements (including the availability of private or public reimbursement), seasonality, natural disasters, epidemics and other matters. Additionally, the development of new or enhanced products involves a lengthy regulatory process and is capital intensive. As a result, our ability to match our production levels and capacity to market demand is imprecise and may result in a failure to meet market demand or satisfy customer requirements for our products or, alternatively, an oversupply of inventory. Failure to meet market demand may result in customers transitioning to available competitive products, loss of market share, negative publicity, reputational damage, loss of customer confidence or other negative consequences (including a decline in stock price). In the event of an oversupply, we may be forced to lower our prices, record asset impairment charges or take other actions, which may adversely affect our business, financial condition and results of operations.

Additionally, quality management plays an essential role in determining and meeting customer requirements, preventing defects, improving our products and services and assuring the safety and efficacy of our products. Our future success depends on our ability to maintain and continuously improve our quality management program. While we have a quality system that covers the lifecycle of our products, quality and safety issues have and may in the future occur with respect to our products. A quality or safety issue may result in adverse inspection reports, voluntary or official action indicated, warning letters, import bans, product recalls (either voluntary or required by FDA or similar governmental authorities in other countries) or seizures, monetary sanctions, injunctions to halt manufacture and distribution of products, civil or criminal sanctions, costly litigation, refusal of a government to grant approvals and licenses, restrictions on operations or withdrawal of existing approvals and licenses. An inability to address a quality or safety issue in an effective and timely manner may also cause negative publicity, a loss of customer confidence in us or our current or future products, which may result in the loss of sales and difficulty in successfully launching new products. Additionally, Baxter has made and continues to make significant investments in assets, including inventory and property, plant and equipment, which relate to potential new products or modifications to existing products. Product quality or safety issues may restrict us from being able to realize the expected returns from these investments, potentially resulting in asset impairments in the future.

Unaffiliated third party suppliers provide a number of goods and services to our R&D, clinical and manufacturing organizations. Third party suppliers are required to comply with our quality standards. Failure of a third party supplier to provide compliant raw materials or supplies could result in delays, service interruptions or other quality related issues that may negatively impact our business results.

For more information on regulatory matters currently affecting us, including quality-related matters, refer to the discussion under the caption entitled "Certain Regulatory Matters" in Item 7 of this Annual Report on Form 10-K.

***If we are unable to obtain sufficient components or raw materials on a timely basis or for a cost-effective price or if we experience other manufacturing, sterilization or supply difficulties, our business and results of operations may be adversely affected.***

The manufacture of our products requires, among other things, the timely supply or delivery of sufficient amounts of quality components and materials. We manufacture our products in approximately 50 manufacturing facilities around the world. We acquire our components, materials and other requirements for manufacturing from many suppliers and vendors in various countries, including sometimes from ourselves for self-supplied requirements. We endeavor, either alone or working closely with our suppliers, to ensure the continuity of our inputs and supplies but we cannot guarantee these efforts will always be successful. Further, while efforts are made to diversify certain of our sources of components and materials, in certain instances there is only a sole source or supplier with no alternatives yet identified. For most of our components and materials for which a single source or supplier is used, alternative sources or suppliers may exist, but we have made a strategic determination to use the single source or supplier. Although we do carry strategic inventory and maintain insurance to help mitigate the potential risk related to any related supply disruption, there can be no assurance that such measures will be sufficient or effective. A reduction or interruption in supply and an inability to quickly develop acceptable alternative sources for such supply, could adversely affect our ability to manufacture and distribute our products in a timely or cost-effective manner, and our ability to make product sales. Additionally, volatility in our costs of energy, transportation/freight, components, raw materials and other supply, manufacturing and distribution costs could adversely affect our results of operations. Climate change (including laws or regulations passed in response thereto) could increase our costs, in particular our

7

costs of supply, energy and transportation/freight. Material or sustained increases in the price of oil could have an adverse impact on the cost of many of the plastic materials we use to make and package our products, as well as our transportation/freight costs. These outcomes may in turn result in customers transitioning to available competitive products, loss of market share, negative publicity, reputational damage, loss of customer confidence or other negative consequences (including a decline in stock price).

Many of our products are difficult to manufacture. This is due to the complex nature of manufacturing pharmaceuticals, including biologics, and devices, as well as the strict regulatory regime governing our manufacturing operations. Variations in the manufacturing process may result in production failures which could lead to launch delays, product shortage, unanticipated costs, lost revenues and damage to our reputation. A failure to identify and address manufacturing problems prior to the release of products to our customers may also result in a quality or safety issue of the type discussed above.

Some of our products are manufactured at a single manufacturing facility or stored at a single storage site. Loss or damage to a manufacturing facility or storage site due to a natural disaster, such as we experienced as a result of Hurricane Maria, or otherwise could adversely affect our ability to manufacture sufficient quantities of key products or deliver products to meet customer demand or contractual requirements which may result in a loss of revenue and other adverse business consequences (including those identified in the paragraphs above). Our manufacturing capacity may also be adversely affected by public health crises and epidemics/pandemics, such as the novel strain of coronavirus (COVID-19), as a result of which we may be unable to obtain sufficient components or raw materials on a timely basis or at a cost-effective price. Although we have not experienced significant manufacturing or supply difficulties as a result of COVID-19, the degree and duration of disruptions to business activity are unknown at this time. In addition, several of our manufacturing facilities are leased and we may not be able to renew leases on favorable terms or at all. Because of the time required to approve and license a manufacturing facility, a third party manufacturer may not be available on a timely basis (if at all) to replace production capacity in the event we lose manufacturing capacity or products are otherwise unavailable. Any of the foregoing could adversely affect our business, financial condition and results of operations.

Some of our products require sterilization prior to sale or distribution, and we utilize both Baxter-owned and third-party facilities for this process. If an event occurs that results in damage to or closure, whether temporarily or permanent, of one or more of these facilities, we may be unable to manufacture or sterilize the relevant products at prior levels or at all, and a third party may not be available on a timely basis (if at all) to replace sterilization capacity. For example, in February 2020, certain air emission control technology used to reduce ethylene oxide emissions from sterilization equipment at our facility in Mountain Home, Arkansas, was tested and determined not to operate in accordance with applicable emission limitations in our state-issued air permit. Although we received a temporary variance and have recommenced operations, these events or other disruptions of manufacturing or sterilization processes that we or third parties may experience, whether due to lack of capacity, environmental, regulatory or compliance issues or otherwise, could result in product shortage, unanticipated costs, loss of revenues, litigation and damage to our reputation, all of which could have a material adverse effect on our business, financial condition and results of operations.

***We are increasingly dependent on information technology systems and subject to privacy and security laws, and our systems and infrastructure face certain risks, including from cyber security breaches and data leakage.***

We increasingly rely upon technology systems and infrastructure, including support provided by our partners and third parties, to support our business, our products and our customers. For example, we routinely rely on our technology systems and infrastructure to aid us in the collection, use, storage and transfer, disclosure and other processing of voluminous amounts of data including confidential, business, financial, personal, patient and other sensitive information (collectively, Confidential Information). We also rely on systems for manufacturing, customer orders, shipping, regulatory compliance and various other matters. Certain of our products and systems collect data regarding patients and their therapy and some are internet enabled or connect to our systems for maintenance and other purposes.

Additionally, the legal and regulatory environment surrounding information security and privacy is increasingly demanding, with the imposition of new and changing requirements across businesses. We are required to comply with increasingly complex and changing legal and regulatory requirements that govern the collection, use, storage, security, transfer, disclosure and other processing of personal data in the United States and in other countries, including, but not limited to, The Health Insurance Portability and Accountability Act, as amended, The Health Information Technology for Economic and Clinical Health Act (HIPAA), the California Consumer Privacy Act (CCPA), and the European Union's General Data Protection Regulation (GDPR). The GDPR imposes stringent European Union data protection requirements and provides for significant penalties for noncompliance. HIPAA also imposes

8

stringent data privacy and security requirements and the regulatory authority has imposed significant fines and penalties on organizations found to be out of compliance. CCPA provides consumers with a private right of action against companies who have a security breach due to lack of appropriate security measures. We or our third-party providers and business partners may also be subjected to audits or investigations by one or more domestic or foreign government agencies relating to compliance with information security and privacy laws and regulations, and noncompliance with the laws and regulations could result in substantial and material fines or class action litigation. The increasing use and evolution of technology, including cloud-based computing, and reliance on third parties creates additional opportunities for the unintentional, intentional and/or unauthorized exposure, dissemination and/or destruction of Confidential Information stored in our devices, systems, servers, infrastructure and products (collectively, Technology). Security threats, including cyber and other attacks, are becoming increasingly sophisticated, frequent, and adaptive. Our Technology (and that of third parties that we use) is vulnerable to breakdown, interruption, cyber and other security attacks, system malfunction, unauthorized access, inadvertent exposure or disclosure of information, theft and other events. Any such vulnerability could compromise our Technology and could expose Confidential Information to unauthorized third parties and/or cause permanent loss of such data. In addition to loss of Confidential Information, unauthorized access to or interference with our Technology may cause product functionality issues that may result in risk to patient safety, field actions and/or product recalls. We have, like other large multi-national companies, experienced cyber incidents in the past and may experience them in the future. Although the prior incidents have not had a material effect on our business and we have invested and continue to invest in the protection of data and Technology, there can be no assurance that our efforts will prevent breakdowns, attacks, breaches in our Technology, cyber incidents or other incidents or ensure compliance with all applicable security and privacy laws, regulations and standards, including with respect to third party service providers that host or process Confidential Information on our behalf. Such incidents could result in unauthorized access to patient data and other Confidential Information and could pose a risk to patient safety. Any failure to protect against such incidents can lead to substantial and material regulatory fines and penalties, business disruption, reputational harm, financial loss, litigation as well as other damages. Misappropriation or other loss of our intellectual property from any of the foregoing may have an adverse effect on our competitive position and may cause us to incur substantial litigation costs. We could also suffer strained relationships with customers and business partners, increased costs (for security measures, remediation or otherwise), litigation (including class actions and stockholder derivative actions) or other negative consequences (including a decline in stock price) from breaches, cyber and other security attacks, industrial espionage, ransomware, email or phishing scams, malware or other cyber incidents, which may compromise our system infrastructure or lead to data leakage, either internally or at our third-party providers or other business partners.

In addition, significant implementation issues may arise as we continue to consolidate and outsource certain computer operations and application support activities. We also face all of the same risks listed above and other heightened risks when acquiring a company, in particular if we need to transition or implement certain processes or controls with the acquired company.

***We identified certain misstatements to our previously issued financial statements and have restated the financial statements described below, which has exposed us to a number of additional risks and uncertainties.***

As discussed in the Explanatory Note, in Note 2, Restatement of Previously Issued Consolidated Financial Statements, and in Note 19, Quarterly Financial Data (Unaudited) in this Annual Report on Form 10-K, we restated our previously issued audited consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017, unaudited interim financial information as of and for the quarterly periods ended June 30, 2019, March 31, 2019, December 31, 2018, June 30, 2018 and March 31, 2018, for the six months ended June 30, 2019 and 2018, and as of September 30, 2018 within the notes to the financial statements, and unaudited selected financial data as of December 31, 2017 and as of and for the years ended December 31, 2016 and 2015 within Item 6, Selected Financial Data. In our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2019, we also restated our unaudited financial statements for the quarterly and year-to-date periods ended September 30, 2018. We concluded that these previous periods should be restated to correct misstatements of certain foreign exchange gains and losses from foreign currency denominated intra-company loan receivables and payables, cash balances and gains and losses from foreign currency derivative contracts, which we determined were material to these periods. The restatement also included corrections for certain items, including items that affect operating income and operating cash flows, that were immaterial, individually and in the aggregate, to our previously issued financial statements.

As a result of the misstatements and the restatement, we have become subject to a number of additional risks and uncertainties and unanticipated costs for accounting, legal and other fees and expenses, including as a result of a

9

pending class-action lawsuit and a stockholder request for inspection of our books and records. As initially disclosed on October 24, 2019, we also voluntarily advised the staff of the SEC of our previously disclosed internal investigation and we are continuing to cooperate with the staff of the SEC. We may become subject to enforcement proceedings brought by the SEC or other regulatory or governmental authorities, or subject to other legal proceedings, as a result of the events leading to our internal investigation, the misstatements or the related restatement, and actions and proceedings could also be brought against our current and former employees, officers, or directors. These actions, lawsuits or other legal proceedings related to the misstatements or the restatement could result in reputational harm, additional defense and other costs, regardless of the outcome of the lawsuit or proceeding. If we do not prevail in any such lawsuit or proceeding, we could be subject to substantial damages or settlement costs, criminal and civil penalties and other remedial measures, including, but not limited to, injunctive relief, disgorgement, civil and criminal fines and penalties. In addition, we continue to be at risk for loss of investor confidence, loss of key employees, changes in management or our board of directors and other reputational issues, all of which could have a material adverse effect on our business, financial position and results of operations.

***We identified a material weakness in our internal control over financial reporting. If we are unable to remediate the material weakness, or if we experience additional material weaknesses in the future, our business may be harmed.***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on the effectiveness of our system of internal control. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. As a public company, we are required to comply with the Sarbanes-Oxley Act and other rules that govern public companies. In particular, we are required to certify our compliance with Section 404 of the Sarbanes-Oxley Act, which requires us to furnish annually a report by management on the effectiveness of our internal control over financial reporting. In addition, our independent registered public accounting firm is required to report on the effectiveness of our internal control over financial reporting.

Management performed an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2019 and concluded that our internal control over financial reporting was not effective as of December 31, 2019 due to the material weakness related to the accounting for certain foreign exchange gains and losses. Specifically, we did not have controls in place to monitor and quantify the difference between the foreign exchange gains and losses that we reported and the foreign exchange gains and losses that we would have reported using exchange rates determined in accordance with U.S. GAAP. Additionally, our policies and controls related to approvals and monitoring of intra-company transactions were insufficient to prevent or detect intra-company transactions undertaken solely for the purpose of generating foreign exchange gains or avoiding losses under our historical exchange rate convention. We have taken and continue to take remedial steps to improve our internal control over financial reporting. For further discussion of the material weakness identified and our remedial efforts, see Item 9A, Controls and Procedures.

Remediation efforts place a significant burden on management and add increased pressure to our financial resources and processes. If we are unable to successfully remediate our existing material weakness or any additional material weaknesses in our internal control over financial reporting that may be identified in the future in a timely manner, the accuracy and timing of our financial reporting may be adversely affected; our liquidity, our access to capital markets, the perceptions of our creditworthiness and our ability to complete acquisitions may be adversely affected; we may be unable to maintain or regain compliance with applicable securities laws, the listing requirements of the New York Stock Exchange and the covenants under our debt instruments or derivative arrangements regarding the timely filing of periodic reports; we may be subject to regulatory investigations and penalties; investors may lose confidence in our financial reporting; our reputation may be harmed; we may suffer defaults, accelerations or cross-accelerations under our debt instruments or derivative arrangements to the extent we are unable to obtain additional waivers from the required creditors or counterparties or are unable to cure any breaches; and our stock price may decline.

***Our failure to prepare and timely file our periodic reports with the SEC limits our access to the public markets to raise debt or equity capital.***

We did not file our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2019 within the timeframe required by the SEC; thus, we have not remained current in our reporting requirements with the SEC. Although we regained status as a current filer on March 17, 2020 by filing this Annual Report on Form 10-K (within

10

the extended time period provided for by Rule 12b-25) and our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2019, we are not currently eligible to use a registration statement on Form S-3 that would allow us to continuously incorporate by reference our SEC reports into the registration statement, or to use "shelf" registration statements to conduct offerings, until approximately one year from the date we regained and maintain status as a current filer. If we wish to pursue an offering now, we would be required to conduct the offering on an exempt basis, such as in accordance with Rule 144A, or file a registration statement on Form S-1. Using a Form S-1 registration statement for a public offering would likely take significantly longer than using a registration statement on Form S-3 and increase our transaction costs, and could, to the extent we are not able to conduct offerings using alternative methods, adversely impact our ability to raise capital or complete acquisitions of other companies in a timely manner.

***We are subject to a number of existing laws and regulations, non-compliance with which could adversely affect our business, financial condition and results of operations, and we are susceptible to a changing regulatory environment.***

As a participant in the healthcare industry, our operations and products, and those of our customers, are regulated by numerous government agencies, both inside and outside the United States. The impact of this on us is direct to the extent we are subject to these laws and regulations, and indirect in that in a number of situations, even though we may not be directly regulated by specific healthcare laws and regulations, our products must be capable of being used by our customers in a manner that complies with those laws and regulations.

The manufacture, distribution, marketing and use of our products are subject to extensive regulation and scrutiny by FDA and other regulatory authorities globally. Any new product must undergo lengthy and rigorous testing and other extensive, costly and time-consuming procedures mandated by FDA and foreign regulatory authorities. The same testing and procedures sometimes apply to current products that are up for authorization or renewal or are subject to changes in laws or regulations (for example certain of our medical devices will have to comply with the new European Union Medical Device Regulation). Changes to current products may be subject to vigorous review, including additional 510(k) and other regulatory submissions, and approvals or the time needed to secure approvals are not certain. Our facilities must be approved and licensed prior to production and remain subject to inspection from time to time thereafter. Failure to comply with the requirements of FDA or other regulatory authorities, including a failed inspection or a failure in our adverse event reporting system, could result in adverse inspection reports, voluntary or official action indicated, warning letters, import bans, product recalls or seizures, monetary sanctions, reputational damage, injunctions to halt the manufacture and distribution of products, civil or criminal sanctions, refusal of a government to grant approvals or licenses, restrictions on operations or withdrawal of existing approvals and licenses. Any of these actions could cause a loss of customer confidence in us and our products, which could adversely affect our sales. The requirements of regulatory authorities, including interpretative guidance, are subject to change and compliance with additional or changing requirements or interpretative guidance may subject us to further review, result in product launch delays or otherwise increase our costs. For information on current regulatory issues affecting us, please refer to the caption entitled "Certain Regulatory Matters" in Item 7 of this Annual Report on Form 10-K. In connection with these issues, there can be no assurance that additional costs or civil and criminal penalties will not be incurred, that additional regulatory actions with respect to us will not occur, that we will not face civil claims for damages from purchasers or users, that substantial additional charges or significant asset impairments may not be required, that sales of other products may not be adversely affected, or that additional regulation will not be introduced that may adversely affect our operations and consolidated financial statements.

The sales, marketing and pricing of products and relationships that pharmaceutical and medical device companies have with healthcare providers are under increased scrutiny by federal, state and foreign government agencies. Compliance with the Anti-Kickback Statute, False Claims Act, Food, Drug and Cosmetic Act (including as these laws relate to off-label promotion of products) and other healthcare related laws, as well as competition, data and patient privacy and export and import laws, is under increased focus by the agencies charged with overseeing such activities, including FDA, OIG, DOJ and the Federal Trade Commission. The DOJ and the Securities and Exchange Commission have also increased their focus on the enforcement of the U.S. Foreign Corrupt Practices Act (FCPA), particularly as it relates to the conduct of pharmaceutical and medical product companies. The FCPA and similar anti-bribery laws generally prohibit companies and their employees, contractors or agents from making improper payments to government officials for the purpose of obtaining or retaining business. Healthcare professionals in many countries are employed by the government and consequently may be considered government officials. Foreign governments have also increased their scrutiny of pharmaceutical and medical product companies' sales and marketing activities and relationships with healthcare providers and competitive practices generally. The laws and standards governing the promotion, pricing, sale and reimbursement of our products and those governing our relationships with healthcare providers and governments, including the Sunshine Act enacted under the Patient

11

Protection and Affordable Care Act (as amended, the PPACA), can be complicated, are subject to frequent change and may be violated unknowingly.

Additionally, the U.S. Department of the Treasury's Office of Foreign Control and the Bureau of Industry and Security at the U.S. Department of Commerce administer laws and regulations that restrict U.S. persons and, in some instances, non-U.S. persons, in conducting activities, transacting business or making investments in certain countries, or with governments, entities and individuals subject to U.S. economic sanctions. From time to time, certain of our subsidiaries have limited business dealings with countries subject to these sanctions, including Iran, Sudan, Syria, Russia and Cuba. These dealings represent an insignificant amount of our consolidated revenues and income but expose us to an increased risk of operating in these countries, including foreign exchange risks or restrictions or limitations on our ability to access funds generated in these jurisdictions, or the risk of violating applicable sanctions or regulations, which are complex and subject to frequent change. Additional restrictions may be enacted, enforced or interpreted in a way that may adversely affect our operations.

We have compliance programs in place, including policies, training and various forms of monitoring, designed to address the risks discussed above. Nonetheless, these programs and policies may not always protect us from conduct by individual employees that violate these laws. Violations or allegations of violations of these laws may result in large civil and criminal penalties, debarment from participating in government programs, diversion of management time, attention and resources and may otherwise have an adverse effect on our business, financial condition and results of operations. For more information related to our ongoing government investigations, please refer to Note 9 in Item 8 of this Annual Report on Form 10-K.

The laws and regulations discussed above are broad in scope and subject to evolving interpretations, which could require us to incur substantial cost associated with compliance or to alter one or more of our sales and marketing practices and may subject us to enforcement actions or litigation which could adversely affect our business, financial condition and results of operations.

***If reimbursement or other payment for our current or future products is reduced or modified in the United States or in foreign countries, including through the implementation or repeal of government-sponsored healthcare reform or other similar actions, cost containment measures, or changes to policies with respect to pricing, taxation or rebates, our business could suffer.***

Sales of our products depend, in part, on the extent to which the costs of our products are paid by both public and private payers. These payers include Medicare, Medicaid, and private healthcare insurers in the United States and foreign governments and third-party payers outside the United States. Our work with government payers carries various risks inherent in working with government entities and agencies, including government reporting and auditing, additional regulatory oversight, mandated contractual terms, failure of government appropriations or other complex procedural requirements.

Public and private payers are increasingly challenging the prices charged for medical products and services. We may continue to experience downward pricing pressures from any or all of these payers which could result in an adverse effect on our business, financial condition and operational results.

Global efforts toward healthcare cost containment continue to exert pressure on product pricing. Governments around the world use various mechanisms to control healthcare expenditures, such as price controls, the formation of public contracting authorities, product formularies, which are lists of recommended or approved products, and competitive tenders which require the submission of a bid to sell products. Sales of our products are dependent, in part, on the availability of reimbursement by government agencies and healthcare programs, as well as insurance companies and other private payers. In much of Europe, Latin America, Asia and Australia, for example, the government provides healthcare at low cost to patients, and controls its expenditures by purchasing products through public tenders, collective purchasing, regulating prices, setting reference prices in public tenders or limiting reimbursement or patient access to certain products. Additionally, austerity measures or other reforms by foreign governments may limit, reduce or eliminate payments for our products and adversely affect both pricing flexibility and demand for our products.

The PPACA includes several provisions which impact our businesses in the United States, including increased Medicaid rebates and an expansion of the 340B Drug Pricing Program which provides certain qualified entities, such as hospitals serving disadvantaged populations, with discounts on the purchase of drugs for outpatient use and an excise tax on the sale of certain drugs. The PPACA reduces Medicare and Medicaid payments to hospitals and other providers, which may cause us to experience downward pricing pressure. Certain portions of the PPACA could negatively impact the demand for our products, and therefore our results of operations and financial position.

12

The eventual impact of the current U.S. presidential administration on coverage, reimbursement and other matters related to the PPACA and/or healthcare reform in general, remains uncertain. Following an executive order from President Donald Trump, the U.S. Department of Health and Human Services announced the launch of a new kidney health initiative. Proposed regulatory changes in kidney health policy and reimbursement may substantially change the U.S. end stage renal disease market and could impact demand for our peritoneal dialysis products, necessitating significant multi-year capital expenditures. Any such changes and the corresponding impact and related expenses are difficult to estimate in advance.

In addition, a substantial portion of our revenues is dependent on federal healthcare program reimbursement, and any disruptions in federal government operations, including a federal government shutdown or failure of the U.S. government to enact annual appropriations, could have a material adverse effect on our business, financial condition and results of operations. Additionally, disruptions in federal government operations may negatively impact regulatory approvals and guidance that are important to our operations, and create uncertainty about the pace of upcoming healthcare regulatory developments or approvals.

As a result of these and other measures, including future measures or reforms that cannot be predicted, reimbursement may not be available or sufficient to allow us to sell our products on a competitive basis. Legislation and regulations affecting reimbursement for our products may change at any time and in ways that may be adverse to us. We cannot predict the impact of these pressures and initiatives, or any negative effects of any additional regulations that may affect our business.

***There is substantial competition in the product markets in which we operate.***

Although no single company competes with us in all of our businesses, we face substantial competition in all of our markets from international and domestic healthcare and pharmaceutical companies and providers of all sizes, and these competitors often differ across our businesses. Competition is primarily focused on cost-effectiveness, price, service, product performance, and technological innovation.

Competition may increase further as additional companies begin to enter our markets or modify their existing products to compete directly with ours. If our competitors respond more quickly to new or emerging technologies and changes in customer requirements or we do not introduce new versions or upgrades to our product portfolio in response to those requirements, our products may be rendered obsolete or non-competitive. If our competitors develop more effective or affordable products, or achieve earlier patent protection or product commercialization than we do, our business, financial condition and operations will likely be negatively affected. If we are forced to reduce our prices due to increased competition, our business could become less profitable. Our sales could be adversely affected if any of our contracts with GPOs, IDNs or other customers are terminated due to increased competition or otherwise.

In addition, many health care industry companies, including health care systems, distributors, manufacturers, providers, and insurers, are consolidating or have formed strategic alliances. As the health care industry consolidates, competition to provide goods and services to industry participants will become more intense. Further, this consolidation creates larger enterprises with greater negotiating power, which they can use to negotiate price concessions. If we face an increase in costs or must reduce our prices because of industry consolidation, or if we lose customers as a result of consolidation, our business, financial condition and results of operations could be adversely affected.

***If our business development activities are unsuccessful, we may not realize the intended benefits.***

We expect to continue to engage in business development activities, including evaluating acquisitions, joint development opportunities, technology licensing arrangements and other opportunities. These activities may result in substantial investment of our resources. Our success developing products or expanding into new markets from such activities will depend on a number of factors, including our ability to find suitable opportunities for acquisition, investment or alliance; competition from other companies in the industries in which we operate that are seeking similar opportunities; whether we are able to complete an acquisition, investment or alliance on terms that are satisfactory to us; the strength of the other company's underlying technology, products and ability to execute its business strategies; any intellectual property and litigation related to the other company's products or technology; and our ability to successfully integrate the acquired company, business, product, technology or research into our existing operations, including the ability to adequately fund acquired in-process R&D projects and to maintain adequate controls over the combined operations. Certain of these activities are subject to antitrust and competition laws, which laws could impact our ability to pursue strategic transactions and could result in mandated divestitures

in the context of proposed acquisitions. If we are unsuccessful in our business development activities, we may not realize the intended benefits of such activities, including that acquisition and integration costs may be greater than expected or the possibility that expected return on investment, synergies and accretion will not be realized or will not be realized within the expected timeframes.

For more information on recent business development activities, see Note 4 in Item 8 of this Annual Report on Form 10-K.

***If we are unable to protect our patents or other proprietary rights, or if we infringe the patents or other proprietary rights of others, our competitiveness and business prospects may be materially damaged.***

Patent and other proprietary rights are essential to our business. Our success depends to a significant degree on our ability to obtain and enforce patents and licenses to patent rights, both in the United States and in other countries. We cannot guarantee that pending patent applications will result in issued patents, that patents issued or licensed will not be challenged or circumvented by competitors, that our patents will not be found to be invalid or that the intellectual property rights of others will not prevent us from selling certain products or including key features in our products.

The patent position of a healthcare company is often uncertain and involves complex legal and factual questions. Significant litigation concerning patents and products is pervasive in our industry. Patent claims include challenges to the coverage and validity of our patents on products or processes as well as allegations that our products infringe patents held by competitors or other third parties. An unfavorable litigation outcome in any of these types of cases could result in a loss of patent protection or the ability to market products, which could lead to a significant loss of sales, or otherwise materially affect future results of operations. We also rely on trademarks, copyrights, trade secrets and know-how to develop, maintain and strengthen our competitive positions. Third parties may know, discover or independently develop equivalent proprietary information or techniques, or they may gain access to our trade secrets or disclose our trade secrets to the public.

Although our employees, consultants, parties to collaboration agreements and other business partners are generally subject to confidentiality or similar agreements to protect our confidential and proprietary information, these agreements may be breached, and we may not have adequate remedies for any breach. To the extent that our employees, consultants, parties to collaboration agreements and other business partners use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions.

Furthermore, our intellectual property, other proprietary technology and other sensitive company data is potentially vulnerable to loss, damage or misappropriation from system malfunction, computer viruses, unauthorized access to our data or misappropriation or misuse thereof by those with permitted access and other events. While we have invested to protect our intellectual property, confidential information and other data, and continue to work diligently in this area, there can be no assurance that our precautionary measures will prevent breakdowns, breaches, cyber incidents or other events. Such events could have a material adverse effect on our reputation, business, financial condition or results of operations.

Misappropriation or other loss of our intellectual property from any of the foregoing would have an adverse effect on our competitive position and may cause us to incur substantial litigation costs.

***We are subject to risks associated with doing business globally.***

Our operations are subject to risks inherent in conducting business globally and under the laws, regulations and customs of various jurisdictions and geographies. These risks include changes in exchange controls and other governmental actions, loss of business in government and public tenders that are held annually in many cases, increasingly complex labor environments, availability of raw materials, changes in taxation, tariffs, export control restrictions, changes in or violations of U.S. or local laws, including the FCPA, the United Kingdom Bribery Act, GDPR and other data privacy laws, dependence on a few government entities as customers, pricing restrictions, economic and political instability, monetary or currency volatility or instability (including as it relates to the U.S. dollar, the Euro, the Yuan and currencies in emerging market countries), disputes between countries, trade relationships and conflicts, diminished or insufficient protection of intellectual property, and disruption or destruction of operations in a significant geographic region regardless of cause, including natural disaster, pandemic, power loss, cyber-attack, data breach, war, terrorism, riot, labor disruption, civil insurrection or social unrest. Failure to comply with, or material changes to, the laws and regulations that affect our global operations could have an adverse effect on our business, financial condition or results of operations.

The United Kingdom's (UK) withdrawal from the European Union (EU) (commonly known as Brexit) effective January 31, 2020 and subsequent transition period through December 31, 2020 continues to create uncertainties affecting business operations in the EU. The withdrawal by the UK from the EU, particularly if the transition period expires without a trade agreement between the UK and the EU, could result in the deterioration of economic conditions, volatility in currency exchange rates, and increased regulatory complexities, as well as the potential for product shortages, increased costs or other similar effects. These outcomes could have an adverse effect on our business, financial condition or results of operations.

***We are subject to risks associated with public health crises and epidemics/pandemics, such as the novel strain of coronavirus that recently originated in China.***

Our global operations expose us to risks associated with public health crises and epidemics/pandemics, such as the novel strain of coronavirus that recently originated in China (COVID-19). COVID-19 may have an adverse impact on our operations, supply chains and distribution systems and increase our expenses, including as a result of impacts associated with preventive and precautionary measures that we, other businesses and governments are taking. Due to these impacts and measures, we may experience significant and unpredictable reductions or increases in demand for certain of our products as health care customers re-prioritize the treatment of patients. For example, elective surgeries are being de-prioritized which will negatively impact the usage of certain of our products, while other of our products are experiencing an increase in demand which we may not be able to meet in accordance with the customer's desired timing. In addition to existing travel restrictions, countries may close borders, impose prolonged quarantines, and further restrict travel, which may significantly impact the ability of our employees to get to their places of work to produce products, or may significantly hamper our products from moving through the supply chain. As a result, while the financial impact on us has not been significant to date, given the rapid and evolving nature of the virus, COVID-19 could negatively affect our sales, and it is uncertain how COVID-19 will affect our global operations generally if these impacts persist or exacerbate over an extended period of time. Any of these impacts could have a material adverse effect on our business, financial condition and results of operations. For further discussion, see the risk factor entitled "—If we are unable to obtain sufficient components or raw materials on a timely basis or for a cost-effective price or if we experience other manufacturing, sterilization or supply difficulties, our business and results of operations may be adversely affected."

***Changes in foreign currency exchange rates and interest rates could have a material adverse effect on our operating results and liquidity.***

We generate the majority of our revenue and profit outside the United States. As a result, our financial results have been and may in the future be adversely affected by fluctuations in foreign currency exchange rates. We cannot predict with any certainty changes in foreign currency exchange rates or our ability to mitigate these risks. We may experience additional volatility as a result of inflationary pressures and other macroeconomic factors, including in emerging market countries. We are also exposed to changes in interest rates, and our ability to access the money markets and capital markets could be impeded if market conditions are not favorable. A discussion of the financial impact of foreign exchange rate and interest rate fluctuations, and the ways and extent to which we attempt to mitigate such impact is contained under the caption "Financial Instrument Market Risk" in Item 7 of this Annual Report on Form 10-K.

***Changes in tax laws or exposure to additional income tax liabilities may have a negative impact on our operating results.***

Changes to the tax laws in the United States or other countries in which we operate could have an adverse effect on our operating results. In particular, the Tax Cuts and Jobs Act of 2017 and the regulations issued thereunder (collectively, 2017 Tax Act), including, among other things, certain changes in tax rates, deductibility of interest, deductibility of executive compensation expense, expensing of capital expenditures, the ability to use certain tax credits, taxation on earnings from international business operations, and the treatment of deductible payments made by our U.S. affiliates to our foreign affiliates could adversely affect our financial condition and results of operations. In certain instances, the 2017 Tax Act could have a negative effect on our tax rate and the carrying value of tax balances. Any of these changes could adversely affect our financial performance. There remains some uncertainty regarding the implementation of the 2017 Tax Act and its impact on us. We cannot currently predict the full impact that the 2017 Tax Act may have over time on our business, including revenues, profit margins, profitability, operating cash flows and results of operations. For more information regarding the impact of the 2017 Tax Act, see Note 14 in Item 8 of this Annual Report on Form 10-K. Similarly, the outcome of various initiatives currently being undertaken by the Organization of Economic Cooperation and Development could significantly impact how we allocate profits across multiple jurisdictions, which could adversely impact our global tax obligations.

15

Taxing authorities may audit us from time to time and disagree with certain positions we have taken in respect of our tax liabilities. Our tax liabilities are affected by many factors, including the amounts we charge in intra-company transactions for inventory, services, licenses, funding and other items, which are subject to the use of assumptions and judgment. Because we operate in multiple income tax jurisdictions both inside and outside the United States, cross border transactions among our affiliates are a significant part of the manner in which we operate. Although we believe that we transact intra-company business in accordance with arm's-length principles, tax authorities may disagree with our intra-company charges, cross-jurisdictional transfer pricing or other matters, and may assess additional taxes as a result, including in connection with their review of the restated financial statements we have filed as part of this Annual Report on Form 10-K.

We regularly assess the likely outcomes of these audits in order to determine the appropriateness of our tax provision. However, we may not accurately predict the outcome of these audits and, as a result, the actual outcome of these audits may have an adverse impact on our financial results. For more information on ongoing audits, see Note 14 in Item 8 of this Annual Report on Form 10-K.

### *If we fail to attract and retain key employees our business may suffer.*

Our ability to compete effectively depends on our ability to attract and retain key employees, including people in senior management, sales, marketing, information technology and R&D positions. Competition for top talent in the healthcare industry can be intense. Our ability to recruit and retain such talent will depend on a number of factors, including hiring practices of our competitors, compensation and benefits, work location, work environment and industry economic conditions. If we cannot effectively recruit and retain qualified employees, our business could suffer.

### *We are party to a number of pending lawsuits and other disputes which may have an adverse impact on our business, operations or financial condition.*

We are party to a number of pending lawsuits, settlement discussions, mediations, arbitrations and other disputes. In addition, in the future we may be party to such disputes, including patent, product liability or other lawsuits. These current and future matters may result in a loss of patent protection, reduced revenue, incurrence of significant liabilities and diversion of our management's time, attention and resources. Given the uncertain nature of litigation and other disputes generally, we are not able in all cases to estimate the amount or range of loss that could result from an unfavorable outcome in these current matters. In view of these uncertainties, the outcome of these matters may result in charges in excess of any established reserves, and, to the extent available, liability insurance. We also continue to be self-insured with respect to product liability claims. The absence of third-party insurance coverage for current or future claims increases our potential exposure to unanticipated claims and adverse decisions. Protracted litigation and other disputes, including any adverse outcomes, may have an adverse impact on our business, operations or financial condition. Even claims without merit could subject us to adverse publicity and require us to incur significant legal fees. See Note 9 in Item 8 of this Annual Report on Form 10-K for more information regarding current lawsuits.

### *Our operating results and financial condition may fluctuate.*

Our operating results and financial condition may fluctuate from quarter to quarter and year to year for a number of reasons. Events, such as a delay in product development, changes to our expectations or strategy or even a relatively small revenue shortfall may cause financial results for a period to be below our expectations or projections. As a result, we believe that period-to-period comparisons of our results of operations are not necessarily meaningful, and these comparisons should not be relied upon as an indication of future performance. Our operating results and financial condition are also subject to fluctuation from all of the risks described throughout this section. These fluctuations may adversely affect our results of operations and financial condition and our stock price.

### *We may not achieve our financial goals.*

Since the spin-off of Baxalta, we have been executing on plans to enhance profitability and returns for our stockholders. We continue to evaluate and refine both our short-term and long-term financial objectives. Our strategy to achieve these objectives is focused on strengthening our portfolio and extending our impact through transformative innovation that spans prevention to recovery. As part of this strategy, we will be investing in portfolio innovation and market development and entering adjacencies while continuing to drive operational excellence through ongoing business transformation efforts and organization optimization. We will also look to unlock additional

16

value through strategic capital deployment. We may fail to achieve our targeted financial results if we are unsuccessful in implementing our strategies, our estimates or assumptions change or for any other reason. Our failure to achieve our financial goals could have a material adverse effect on our business, financial condition and results of operations.

***Future material impairments in the value of our long-lived assets, including goodwill, could negatively affect our operating results.***

We regularly review our long-lived assets, including identifiable intangible assets, goodwill (which results from our acquisition activity) and property, plant and equipment, for impairment. Goodwill and acquired indefinite life intangible assets are subject to impairment review on an annual basis and whenever potential impairment indicators are present. Other long-lived assets are reviewed when there is an indication that impairment may have occurred. Changes in market conditions or other changes in the future outlook of value may lead to impairment charges in the future. In addition, we may from time to time sell assets that we determine are not critical to our strategy, including in connection with certain strategic exits. Future events or decisions may lead to asset impairments and/or related charges. Certain non-cash impairments may result from a change in our strategic goals, business direction or other factors relating to the overall business environment. Material impairment charges could negatively affect our results of operations. For more information on the valuation and impairment of long-lived assets, refer to the discussion under the caption entitled "Critical Accounting Policies" in Item 7 of this Annual Report on Form 10-K.

***Current or worsening economic conditions may adversely affect our business and financial condition.***

Our ability to generate cash flows from operations could be affected if there is a material decline in the demand for our products, in the solvency of our customers or suppliers, or deterioration in our key financial ratios or credit ratings. Current or worsening economic conditions may adversely affect the ability of our customers (including governments) to pay for our products and services, and the amount spent on healthcare generally. This could result in a decrease in the demand for our products and services, declining cash flows, longer sales cycles, slower adoption of new technologies and increased price competition. These conditions may also adversely affect certain of our suppliers, which could cause a disruption in our ability to produce our products. We continue to do business with foreign governments in certain countries, including Greece, Spain, Portugal, and Italy, which have experienced deterioration in credit and economic conditions. While global economic conditions have not significantly impacted our ability to collect receivables, liquidity issues in certain countries have resulted, and may continue to result, in delays in the collection of receivables and credit losses. These conditions may also impact the stability of the U.S. dollar, Euro or Yuan.

***We may incur operational difficulties or be exposed to claims and liabilities as a result of the separation and distribution of Baxalta.***

On July 1, 2015, we distributed approximately 80.5% of the outstanding shares of Baxalta common stock to Baxter stockholders in connection with the separation of our biopharmaceuticals business. We disposed of our remaining 19.5% stake in Baxalta (Retained Shares) in 2016, in connection with a series of transactions, including debt-for-equity exchanges, an equity-for-equity exchange and a contribution to our U.S. pension plan (Retained Shares Transactions). Shire plc (Shire) acquired Baxalta in June 2016, after completion of the last Retained Shares Transaction, and in January 2019, Takeda Pharmaceutical Company Limited (Takeda) acquired Shire. In connection with the July 2015 distribution, we entered into a separation and distribution agreement and various other agreements (including a tax matters agreement, a long-term services agreement, a manufacturing and supply agreement, a trademark license agreement, a Galaxy license agreement, an international commercial operations agreement and certain other commercial agreements) with Baxalta. These agreements govern the separation and distribution and the relationship between the companies going forward, including with respect to potential tax-related losses associated with the separation and distribution and the Retained Shares Transactions. They also provide for the performance of services by each company for the benefit of the other for a period of time (including under the manufacturing and supply agreement pursuant to which Shire now manufactures and sells certain products and materials to us).

The separation and distribution agreement provides for indemnification obligations designed to make Baxalta financially responsible for many liabilities that may exist relating to its business activities, whether incurred prior to or after the distribution, including any pending or future litigation. In addition, the separation and distribution agreement provides for certain indemnification obligations of Baxter, which may be significant. It is possible that a court would disregard the allocation agreed to between us and Baxalta and require us to assume responsibility for obligations allocated to Baxalta. Third parties could also seek to hold us responsible for any of these liabilities or obligations, and we may be unsuccessful in obtaining indemnification or the indemnity rights we have under the separation and

distribution agreement may not be sufficient to fully cover all of these liabilities and obligations. Even if we are successful in obtaining indemnification, we may have to bear costs. These risks could negatively affect our business, financial condition or results of operations.

The separation and distribution of Baxalta continues to involve a number of risks, including, among other things, the indemnification risks described above. Certain of the agreements described above provide for the performance of services by each company for the benefit of the other for a period of time. Takeda may elect to extend the term for which we provide services to Baxalta under these agreements. If Baxalta is unable to satisfy its obligations under these agreements, including its indemnification obligations, we could incur losses. These arrangements could also lead to disputes over rights to certain shared property and over the allocation of costs and revenues for products and operations.

***There could be significant liability if the separation and distribution or any Retained Shares Transaction is determined to be a taxable transaction. Baxalta has indemnified us for certain potential liabilities that may arise, and such indemnification obligation is guaranteed by Shire, but Baxalta and Shire may be unable to satisfy their indemnification obligations to us in the future.***

The separation and distribution and the Retained Shares Transactions (collectively, the Baxter Transactions) qualify for tax-free treatment to Baxter and its stockholders under the Internal Revenue Code of 1986, as amended (the Code). Completion of the separation and distribution was conditioned upon, among other things, the receipt of a private letter ruling from the IRS regarding certain issues relating to the tax-free treatment of the Baxter Transactions. Although the IRS private letter ruling is generally binding on the IRS, the continuing validity of such ruling is subject to the accuracy of factual representations and assumptions made in the ruling. Completion of the distribution was also conditioned upon Baxter's receipt of a tax opinion from KPMG LLP regarding certain aspects of the Baxalta separation not covered by the IRS private letter ruling. The opinion was based upon various factual representations and assumptions, as well as certain undertakings made by Baxter and Baxalta. If any of the factual representations or assumptions in the IRS private letter ruling or tax opinion is untrue or incomplete in any material respect, if any undertaking is not complied with, or if the facts upon which the IRS private letter ruling or tax opinion are based are materially different from the actual facts relating to the Baxter Transactions, the opinion or IRS private letter ruling may not be valid. Moreover, opinions of a tax advisor are not binding on the IRS. As a result, the conclusions expressed in the opinion of a tax advisor could be successfully challenged by the IRS.

If the Baxter Transactions are determined to be taxable, Baxter and its stockholders could incur significant tax liabilities. Pursuant to the tax matters agreement, Baxalta agreed to indemnify us for certain tax-related losses incurred if Baxalta's actions cause the separation and distribution and certain related transactions to fail to qualify for tax-free status under the applicable provisions of the Code.

In anticipation of the merger between Baxalta and Shire (the Merger), we entered into a letter agreement with Shire and Baxalta (the Letter Agreement). Under the Letter Agreement, Baxalta agreed to indemnify, and Shire agreed to guarantee such indemnity to, Baxter and each of its affiliates and each of their respective officers, directors and employees against certain tax-related losses attributable to or resulting from (in whole or in part) the Merger as further described in the Letter Agreement. If the Baxter Transactions are determined to be taxable as a result (in whole or in part) of the Merger (for example, if the Merger is deemed to be part of a plan (or series of related transactions) that includes the Baxter Transactions), Baxter and its stockholders could incur significant tax liabilities. Although Baxalta and Shire may be required to indemnify Baxter under the tax matters agreement and the Letter Agreement for any such tax liabilities incurred by Baxter, there can be no assurance that the indemnity from Baxalta or the guarantee thereof by Shire will be sufficient to protect us against all or a part of the amount of such liabilities, or that either Baxalta or Shire will fully satisfy their respective obligations.

Even if we ultimately succeed in recovering from Baxalta or Shire any amounts for which we are held liable, we may be required to bear these costs initially, which could negatively affect our business, results of operations and financial condition.

**Item 1B. Unresolved *Staff Comments*.**

None.

**Item 2. *Properties*.**

Our corporate offices are owned and located at One Baxter Parkway, Deerfield, Illinois 60015.

We own or have long-term leases on all of our manufacturing facilities. The location of the principal manufacturing facilities of each of our geographic segments are listed below:

| Region | Location | Owned/Leased |
|---|---|---|
| Americas | | |
| | Aibonito, Puerto Rico | Leased |
| | Alliston, Canada | Owned |
| | Cali, Colombia | Owned |
| | Cartago, Costa Rica | Owned |
| | Cuernavaca, Mexico | Owned |
| | Guayama, Puerto Rico | Owned |
| | Haina, Dominican Republic | Leased |
| | Hayward, California | Leased |
| | Round Lake, Illinois | Owned |
| | Bloomington, Indiana | Owned/Leased(1) |
| | Cleveland, Mississippi | Leased |
| | Medina, New York | Leased |
| | Jayuya, Puerto Rico | Leased |
| | Opelika, Alabama | Owned |
| | Brooklyn Park, Minnesota | Leased |
| | Pesa, Mexico | Leased |
| | Sao Paulo, Brazil | Owned |
| | Tijuana, Mexico | Owned |
| | Mountain Home, Arkansas | Owned/Leased(1) |
| | North Cove, North Carolina | Owned |
| | St. Paul, Minnesota | Leased |
| | Irvine, California | Owned |
| | Mountain View, California | Leased |
| APAC | | |
| | Ahmedabad, India | Owned |
| | Guangzhou, China | Owned |
| | Shanghai, China | Owned |
| | Suzhou, China | Owned |
| | Toongabbie, Australia | Owned |
| | Woodlands, Singapore | Owned/Leased(2) |
| | Canlubang, Philippines | Leased |
| | Amata, Thailand | Owned |
| | Tianjin, China | Owned |
| | Miyazaki, Japan | Owned |
| EMEA | | |
| | Castlebar, Ireland | Owned |
| | Grosotto, Italy | Owned |
| | Halle, Germany | Owned |
| | Hechingen, Germany | Leased |
| | Lessines, Belgium | Owned |
| | Liverpool, United Kingdom | Leased |
| | Lund, Sweden | Leased |
| | Marsa, Malta | Owned |
| | Medolla, Italy | Owned |
| | Meyzieu, France | Owned |
| | Rostock, Germany | Leased |

| | |
|---|---|
| Sabinanigo, Spain | Owned |
| San Vittore, Switzerland | Owned |
| Sondalo, Italy | Owned |
| Swinford, Ireland | Owned |
| Thetford, United Kingdom | Owned |
| Elstree, United Kingdom | Leased |
| Tunis, Tunisia | Owned |
| Dammam, Saudi Arabia | Owned |

19

(1)     Includes both owned and leased facilities.
(2)     We own the facility located at Woodlands, Singapore and lease the property upon which it rests.

We also own or operate shared distribution facilities throughout the world. In the United States and Puerto Rico, there are six shared distribution facilities with the principal facilities located in Memphis, Tennessee; Cataño, Puerto Rico; North Cove, North Carolina; and Round Lake, Illinois. Internationally, we have more than 100 shared distribution facilities located in Argentina, Australia, Austria, Belgium, Brazil, Canada, Chile, China, Colombia, Costa Rica, the Czech Republic, Ecuador, France, Germany, Greece, Guatemala, Hong Kong, India, Ireland, Italy, Japan, Korea, Mexico, New Zealand, Panama, the Philippines, Poland, Portugal, Russia, Singapore, Spain, Sweden, Switzerland, Thailand, Turkey, the United Arab Emirates, and the United Kingdom.

We continually evaluate our plants and production lines and believe that our current facilities plus any planned expansions are generally sufficient to meet our expected needs and expected near-term growth. Expansion projects and facility closings will be undertaken as necessary in response to market needs.

## Item 3. Legal *Proceedings.*

Incorporated by reference to Note 9 in Item 8 of this Annual Report on Form 10-K.

## Item 4. *Mine Safety Disclosures.*

Not Applicable.

## Executive Officers of the Registrant

As of March 17, 2020, the following serve as Baxter's executive officers:

*José E. Almeida*, age 57, is Chairman, President and Chief Executive Officer, having served in that capacity since January 2016. He began serving as an executive officer of the company in October 2015. He served as Senior Advisor with The Carlyle Group from May 2015 until October 2015. Previously, he served as the Chairman, President and Chief Executive Officer of Covidien plc (Covidien) from March 2012 to January 2015, prior to Medtronic plc's (Medtronic) acquisition of Covidien, and President and Chief Executive Officer of Covidien from July 2011 to March 2012. Mr. Almeida served in other executive roles with Covidien (formerly Tyco Healthcare (Tyco)) between April 2004 and June 2011. Mr. Almeida is a member of the Board of Directors of Walgreens Boots Alliance, Inc.

*Giuseppe Accogli*, age 49, is Senior Vice President and President, Americas. Prior to his current role, Mr. Accogli served as Senior Vice President and President, Global Businesses, from 2017 to 2019. He also served as Corporate Vice President and President, Renal from 2016 to 2017 and as Head of the U.S. region for Baxter's Renal business from 2015 to 2016. Mr. Accogli joined Baxter in 2007 as Renal business unit Director in Italy, and assumed positions of increasing responsibility with the Renal business in Europe, including Head of the EMEA region for Renal from 2013 to 2015. Previously he worked as a Business Unit Manager and Sales and Marketing Manager for Medtronic plc in Italy, and in several sales, product and marketing roles for Tyco and then Covidien in Italy and EMEA. Mr. Accogli has served as a director to AdvaMed, an American medical device trade association, since September 25, 2019.

*Cristiano Franzi*, age 57, is Senior Vice President and President, EMEA. Mr. Franzi joined Baxter in September 2017 from Medtronic, where he served as Vice President and President, Minimally Invasive Therapies Group EMEA from 2015 to August 2017. He served as President EMEA at Covidien prior to Medtronic's acquisition of Covidien. He joined Covidien in 2009 and held roles of increasing responsibility during his tenure. He held a number of commercial and functional roles across Europe, the Middle East and Africa at ev3 Endovascular, Inc., Boston Scientific Corporation and Becton, Dickinson & Co. earlier in his career. He served as a member of the board of Eucomed Medical Technology from 2013 to 2015 and again from 2018 to 2019.

*Andrew Frye*, age 54, is Senior Vice President and President, APAC. Mr. Frye joined Baxter in 2017 from DKSH Holdings Ltd., where he served as Global Head of Healthcare from 2015 to 2017. In that role, he oversaw a portfolio of pharmaceuticals, over-the-counter and device products across 13 countries. Previously, he served as Vice President of Business Development from 2011 to 2014 for DKSH Healthcare. Earlier in his career, he held a number of commercial roles with increasing responsibility at Abbott Laboratories' Pharmaceutical and Nutrition divisions.

20

*Jacqueline Kunzler*, age 54, is Senior Vice President and Chief Quality Officer. Ms. Kunzler joined Baxter in 1993 and has served in roles of increasing responsibility across Baxter's research & development, international marketing, and quality organizations, most recently as Senior Vice President, Chief Quality Officer.

*Sean Martin*, age 57, is Senior Vice President and General Counsel. Mr. Martin joined Baxter in 2017 from Apollo Education Group, Inc., where he served as Senior Vice President, General Counsel and Secretary from 2010 to 2017. Previously, he served as Assistant Secretary (2010), Vice President of Corporate Law (2009 to 2010) and Vice President of Commercial Law (2005 to 2009) for Amgen Inc. He also served as Vice President and Deputy General Counsel at Fresenius Medical Care North America from 2000 to 2005. Mr. Martin was a Partner at the law firm Foley & Lardner LLP from 1998 to 2000 and served eight years as Assistant U.S. Attorney for the Northern District of Illinois.

*Jeanne K. Mason*, Ph.D., age 64, is Senior Vice President, Human Resources. Ms. Mason joined Baxter in 2006 from GE Insurance Solutions, a primary insurance and reinsurance business, where she was responsible for global human resource functions. Ms. Mason began her career with General Electric (GE) in 1988 after serving with the U.S. General Accounting Office in Washington, D.C. Her GE experience included leadership roles in Europe for GE Information Services and GE Capital Real Estate. She is a member of the Board of Directors of Family Service of Lake County and is a member of the Executive Advisory Council for the Chicago Chapter of National Association of African Americans in Human Resources.

*James K. Saccaro*, age 47, is Executive Vice President and Chief Financial Officer. Mr. Saccaro was Senior Vice President and Chief Financial Officer at Hill-Rom Corporation prior to rejoining Baxter in 2014. He originally joined the company in 2002 as Manager of Strategy for the company's BioScience business, and over the years assumed positions of increasing responsibility, including Vice President of Financial Planning, Vice President of Finance for the company's operations in Europe, the Middle East and Africa and Corporate Vice President and Treasurer. He previously held strategy and business development positions at Clear Channel Communications and the Walt Disney Company.

All executive officers hold office until the next annual election of officers and until their respective successors are elected and qualified.

21

**PART II**

**Item 5. Market** *for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.*

The following table includes information about our common stock repurchases during the three-month period ended December 31, 2019.

| Period | Total Number of Shares Purchased(1) | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs(1) | Approximate Dollar Value of Shares that may yet be Purchased Under the Program(1) |
|---|---|---|---|---|
| October 1, 2019 through October 31, 2019 | 2,369,658 | $ 86.02 | 2,369,658 | |
| November 1, 2019 through November 30, 2019 | — | $ — | — | |
| December 1, 2019 through December 31, 2019 | — | $ — | — | |
| Total | 2,369,658 | $ 86.02 | 2,369,658 | $ 897,396,644 |

(1)   On July 25, 2012, we announced that our Board of Directors authorized us to repurchase up to $2.0 billion of our common stock on the open market or in private transactions. The Board of Directors increased this authority by $1.5 billion in each of November 2016 and February 2018 and by an additional $2.0 billion in November 2018. During the fourth quarter of 2019, we repurchased approximately 2.4 million shares for $204 million in cash pursuant to this authority through Rule 10b5-1 purchase plans. The remaining authorization under this program totaled approximately $897 million at December 31, 2019. This program does not have an expiration date.

Our common stock is listed on the New York, Chicago and SIX Swiss stock exchanges. The New York Stock Exchange is the principal market on which our common stock is traded under the symbol "BAX". At February 29, 2020, there were 22,818 holders of record of our common stock.

**Performance Graph**

The following graph compares the change in our cumulative total stockholder return (including reinvested dividends) on our common stock with the Standard & Poor's 500 Composite Index and the Standard & Poor's 500 Health Care Index over the past five years. Performance through June 30, 2015 has been adjusted for the Baxalta separation which occurred on July 1, 2015.



5-Year Total Shareholder Return
12/31/14 - 12/31/19

22

**Item 6. *Selected Financial Data.***

The following selected consolidated financial data should be read in conjunction with our consolidated financial statements and the accompanying notes thereto in Item 8 of this Annual Report on Form 10-K, and the information contained in Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations of this Annual Report on Form 10-K.

| | | | As Restated [1] | | | |
| | | | | | Unaudited | |
| as of or for the years ended December 31 | | 2019 [2] | 2018 | 2017 [3] | 2016 [3,4,5] | 2015 [6] |
|---|---|---|---|---|---|---|
| **Operating Results** | Net sales | $ **11,362** | 11,099 | 10,584 | 10,133 | 9,918 |
| *(in millions)* | Income from continuing operations | $ **1,011** | 1,552 | 609 | 4,936 | 254 |
| | (Loss) income from discontinued operations, net of tax | $ **—** | (6) | (7) | (1) | 571 |
| | Net income attributable to Baxter stockholders | $ **1,001** | 1,546 | 602 | 4,935 | 825 |
| | Earnings per share from continuing operations | | | | | |
| | Basic | $ **1.97** | 2.91 | 1.12 | 9.04 | 0.47 |
| | Diluted | $ **1.93** | 2.84 | 1.10 | 8.96 | 0.46 |
| | (Loss) earnings per share from discontinued operations | | | | | |
| | Basic | $ **—** | (0.01) | (0.01) | — | 1.04 |
| | Diluted | $ **—** | (0.01) | (0.02) | — | 1.04 |
| | Earnings per share | | | | | |
| | Basic | $ **1.97** | 2.90 | 1.11 | 9.04 | 1.51 |
| | Diluted | $ **1.93** | 2.83 | 1.08 | 8.96 | 1.50 |
| | Weighted-average number of shares outstanding | | | | | |
| | Basic | **509** | 534 | 543 | 546 | 545 |
| | Diluted | **519** | 546 | 555 | 551 | 549 |
| **Balance Sheet Information** | Total assets | $ **18,193** | 15,720 | 17,102 | 15,459 | 20,941 |
| *(in millions)* | Total liabilities | $ **10,281** | 7,854 | 7,993 | 7,238 | 12,089 |
| | Total equity | $ **7,912** | 7,866 | 9,109 | 8,221 | 8,852 |
| | Long-term debt and finance lease obligations | $ **4,809** | 3,481 | 3,512 | 2,774 | 3,923 |
| **Cash Flow Information** | Cash flows from operations - continuing operations | $ **2,110** | 2,017 | 1,730 | 1,588 | 1,211 |
| *(in millions)* | Cash flows from investing activities - continuing operations | $ **(1,100)** | (916) | (1,292) | (716) | (855) |
| | Cash flows from financing activities | $ **498** | (2,603) | 93 | (324) | (481) |
| | Capital expenditures - continuing operations | $ **(696)** | (659) | (616) | (705) | (905) |
| **Common Stock Information** | Cash dividends declared per share | $ **0.850** | $ 0.730 | $ 0.610 | $ 0.505 | $ 1.270 |

1. We have restated in this Annual Report on Form 10-K our previously issued audited financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 and selected previously reported financial information as of December 31, 2017, 2016 and 2015 and for the years ended December 31, 2016 and 2015. In addition to the correction of misstatements related to non-operating foreign exchange gains and losses, we also corrected other misstatements that were immaterial, individually and in the aggregate, to our previously issued financial statements. See Note 2, Restatement of Previously Issued Consolidated Financial Statements, in Item 8, Financial Statements and Supplementary Data, for additional information.

2.  Income from continuing operations for the year ended December 31, 2019 included a charge of $755 million related to the annuitization of a portion of our U.S. pension plan.

3.  As of December 31, 2017, total assets have changed from $17,111 million as originally reported to $17,102 million as restated, total liabilities have changed from $7,995 million as originally reported to $7,993 million as restated, total equity has changed from $9,116 million as originally reported to $9,109 million as restated, and long-term debt and finance lease obligations have changed from $3,509 million as originally reported to $3,512 million as restated. See Note 2, Restatement of Previously Issued Consolidated Financial Statements, in Item 8, Financial Statements and Supplementary Data, for information related to the restatement impacts on operating results and cash flow information for the year ended December 31, 2017. Balance sheet information as of December 31, 2017 is unaudited.

4.  As of and for the year ended December 31, 2016, net sales have changed from $10,163 million as originally reported to $10,133 million as restated, income from continuing operations has changed from $4,966 million as originally reported to $4,936 million as restated, net income attributable to Baxter stockholders has changed from $4,965 million as originally reported to $4,935 million as restated, basic earnings per share from continuing operations has changed from $9.10 as originally reported to $9.04 as restated, diluted earnings per share from continuing operations has changed from $9.01 as originally reported to $8.96 as restated, basic loss per share from discontinued operations has changed from $(0.01) as originally reported to $0.00 as restated, basic earnings per share has changed from $9.09 as originally reported to $9.04 as restated, diluted earnings per share has changed from $9.01 as originally reported to $8.96 as restated, total assets have changed from $15,546 million as originally reported to $15,459 million as restated, total liabilities have changed from $7,266 million as originally reported to $7,238 million as restated, total equity has changed from $8,280 million as originally reported to $8,221 million as restated, long-term debt and finance lease obligations have changed from $2,779 million as originally reported to $2,774 million as restated, cash inflows from operations - continuing operations has changed from $1,624 million as originally reported to $1,588 million as restated, cash outflows from investing activities - continuing operations has changed from $730 million as originally reported to $716 million as restated, and capital expenditures - continuing operations has changed from $719 million as originally reported to $705 million as restated.

5.  For the year ended December 31, 2016, income from continuing operations included net realized gains of $4.4 billion related to the disposition of our formerly retained shares in Baxalta (Baxalta Retained Shares).

6.  As of and for the year ended December 31, 2015, net sales have changed from $9,968 million as originally reported to $9,918 million as restated, income from continuing operations has changed from $393 million as originally reported to $254 million as restated, net income attributable to Baxter stockholders has changed from $968 million as originally reported to $825 million as restated, basic earnings per share from continuing operations has changed from $0.72 as originally reported to $0.47 as restated, diluted earnings per share from continuing operations has changed from $0.72 as originally reported to $0.46 as restated, basic earnings per share from discontinued operations has changed from $1.06 as originally reported to $1.04 as restated, basic earnings per share has changed from $1.78 as originally reported to $1.51 as restated, diluted earnings per share has changed from $1.76 as originally reported to $1.50 as restated, total assets have changed from $20,962 million as originally reported to $20,941 million as restated, total liabilities have changed from $12,097 million as originally reported to $12,089 million as restated, total equity has changed from $8,865 million as originally reported to $8,852 million as restated, long-term debt and finance lease obligations have changed from $3,922 million as originally reported to $3,923 million as restated, cash inflows from operations - continuing operations has changed from $1,253 million as originally reported to $1,211 million as restated, cash outflows from investing activities - continuing operations has changed from $861 million as originally reported to $855 million as restated, and capital expenditures - continuing operations has changed from $911 million as originally reported to $905 million as restated.

## Item 7. Management's *Discussion and Analysis of Financial Condition and Results of Operations.*

The following commentary should be read in conjunction with the consolidated financial statements and accompanying notes.

## EXECUTIVE OVERVIEW

## Restatement of Previously Issued Consolidated Financial Statements

We have restated our previously issued consolidated financial statements contained in this Annual Report on Form 10-K. Refer to the "Explanatory Note" preceding Item 1, Business, for background on the restatement, the periods impacted, control considerations, and other information. In addition, we have restated certain previously reported financial information as of December 31, 2018 and for the fiscal years ended December 31, 2018 and December 31, 2017 in this Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations, including but not limited to information within the Results of Operations section. See Note 2, Restatement of Previously Issued Consolidated Financial Statements, in Item 8, Financial Statements and Supplementary Data, for additional information related to the restatement, including descriptions of the misstatements and the impacts on our consolidated financial statements.

## Description of the Company and Business Segments

We manage our business based on three geographic segments: Americas (North and South America), EMEA (Europe, Middle East and Africa) and APAC (Asia-Pacific). Each of our segments provides a broad portfolio of essential healthcare products including acute and chronic dialysis therapies; sterile IV solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products. Our global footprint and the critical nature of our products and services play a key role in expanding access to healthcare in emerging and developed countries. These products are used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices and patients at home under physician supervision.

For financial information about our segments, see Note 18 in Item 8 of this Annual Report on Form 10-K.

## Recent Business Combinations and Asset Acquisitions

Cheetah Medical

In October 2019, we acquired 100 percent of Cheetah Medical, Inc. (Cheetah) for total upfront cash consideration of $195 million, net of cash acquired, with the potential for additional cash consideration, up to $40 million, based on clinical and commercial milestones for which the acquisition date fair value was $18 million. Cheetah is a leading provider of hemodynamic monitoring technologies. Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for additional information regarding the acquisition of Cheetah.

Recothrom and Preveleak

In March 2018, we acquired two hemostat and sealant products from Mallinckrodt plc: RECOTHROM Thrombin topical (Recombinant), the first and only stand-alone recombinant thrombin, and PREVELEAK Surgical Sealant, which is used in vascular reconstruction. The purchase price included an upfront payment of approximately $163 million and potential contingent payments in the future. Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for additional information regarding the acquisition of the RECOTHROM and PREVELEAK products.

Claris Injectables Limited

In July 2017, we acquired 100 percent of Claris Injectables Limited (Claris), a wholly owned subsidiary of Claris Lifesciences Limited, for total cash consideration of approximately $629 million, net of cash acquired. Through the acquisition, we added capabilities in production of essential generic injectable medicines, such as anesthesia and analgesics, renal, anti-infectives and critical care in a variety of presentations including bags, vials and ampoules. Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for additional information regarding the acquisition of Claris.

Seprafilm Adhesion Barrier

In December 2019, we entered into a definitive agreement to acquire Seprafilm Adhesion Barrier (Seprafilm) from Sanofi. The transaction closed in February 2020 and we paid approximately $345 million for the acquired assets, subject to a post-close adjustment. Seprafilm is indicated for use in patients undergoing abdominal or pelvic laparotomy as an adjunct intended to reduce the incidence, extent and severity of postoperative adhesions between the abdominal wall and the underlying viscera such as omentum, small bowel, bladder, and stomach, and between the uterus and surrounding structures such as tubes and ovaries, large bowel, and bladder. As the acquisition was completed after December 31, 2019, our consolidated financial statements do not include the financial condition or results of operations of Seprafilm in any of the periods presented herein.

**Financial Results**

Our global net sales totaled $11.4 billion in 2019, an increase of 2% over 2018 on a reported basis and 5% on a constant currency basis. International sales totaled $6.5 billion in 2019, an increase of 3% compared to 2018 on a reported basis and 7% on a constant currency basis. Sales in the United States totaled $4.8 billion in 2019, an increase of 2% compared to 2018. Refer to the Net Sales discussion in the Results of Operations section below for more information related to changes in net sales on a constant currency basis.

Our income from continuing operations totaled $1.0 billion, or $1.93 per diluted share, in 2019. Income from continuing operations in 2019 included special items which resulted in a net decrease to income from continuing operations of $716 million, or $1.38 per diluted share. Our special items are discussed in the Results of Operations section below.

Our financial results included R&D expenses totaling $595 million in 2019, which reflects our focus on balancing increased investments to support our new product pipeline with efforts to optimize overall R&D spending.

Our financial position remains strong, with operating cash flows from continuing operations totaling $2.1 billion in 2019. We have continued to execute on our disciplined capital allocation framework, which is designed to optimize stockholder value creation through reinvestment in our businesses, dividends and share repurchases, as well as acquisitions and other business development initiatives as discussed in the Strategic Objectives section below.

Capital expenditures totaled $696 million in 2019 as we continue to invest across our businesses to support future growth, including additional investments in support of new and existing product capacity expansions. Our investments in capital expenditures in 2019 were focused on projects that improve production efficiency and enhance manufacturing capabilities to support our strategy of geographic expansion with select investments in growing markets.

We also continued to return value to our stockholders in the form of dividends. During 2019, we paid cash dividends to our stockholders totaling $423 million. Additionally, in 2019 we repurchased 16.5 million shares through cash repurchases pursuant to Rule 10b5-1 repurchase plans, an accelerated share repurchase plan and otherwise. For information on our share repurchase plans, see Note 10 in Item 8 of this Annual Report on Form 10-K.

**Strategic Objectives**

We continue to focus on several key objectives to successfully execute our long-term strategy to achieve sustainable growth and deliver enhanced stockholder value. Our diversified and broad portfolio of medical products that treat life-threatening acute or chronic conditions and our global presence are core components of our strategy to achieve these objectives. We are focused on three strategic factors as part of our pursuit of industry leading performance: optimizing our core portfolio globally; operational excellence focused on streamlining our cost structure and enhancing operational efficiency; and maintaining a disciplined and balanced approach to capital allocation.

Optimizing the Core Portfolio Globally

Our global product portfolio optimization strategy identifies products that we believe to have characteristics of core growth, products that we expect to provide us with a core return on capital, products that we intend to maintain or manage differently and products that we consider to be strategic bets. For products with core growth characteristics, we look to invest for long-term, higher margin growth. For products that we expect to generate a core return on capital, we seek to optimize our return on investment and to maintain or enhance our market position. For products that we intend to maintain or manage differently, we look to sustain or reposition our underlying investment. Finally, we are evaluating our market position and investment strategy for products that we consider to be strategic bets.

As part of our portfolio management strategy, we seek to optimize our position in product areas where we have a stable, profitable business model, identify and alter investments in products that have reached the end of their life cycles or for which market positions have evolved unfavorably. In the course of doing so, we expect to continue to reallocate capital to more promising opportunities or business groupings, as described above.

As part of this strategy, we are shifting our investments to drive innovation in product areas where we have compelling opportunities to serve patients and healthcare professionals while advancing the business and we are accelerating the pace in which we bring these advances to market. We are in the midst of launching several new products, geographic expansions and line extensions by 2023 including in such areas as chronic and acute renal care, smart pump technology, hospital pharmaceuticals and nutritionals, surgical sealants, and more. These comprise a mix of entirely new offerings, improvements on existing technologies, and the expansion of current products into new geographies.

Operational Excellence

We have undertaken a comprehensive review of all aspects of our operations and are actively implementing changes in line with our business goals. As part of our pursuit of improved margin performance, we are working to optimize our cost structure and we are critically assessing optimal support levels in light of our ongoing portfolio optimization efforts. We intend to continue to actively manage our cost structure to help ensure that we are committing resources to the highest value uses. Such high value activities include supporting innovation, building out the portfolio, expanding patient access and accelerating growth for our stockholders.

Maintaining Disciplined and Balanced Capital Allocation

Our capital allocation strategies include the following:

- reinvest in the business by funding opportunities that are positioned to deliver sustainable growth, support our innovation efforts and improve margin performance;

- return capital to stockholders through dividends, which we expect to meaningfully increase with earnings growth;

- share repurchases; and

- identify and pursue accretive merger and acquisition (M&A) opportunities.

**Responsible Corporate Citizen**

We strive for continued growth and profitability, while furthering our focus on acting as a responsible corporate citizen. To us, sustainability means creating lasting social, environmental and economic value by addressing the needs of our wide-ranging stakeholder base. Our comprehensive sustainability program is focused on areas in which we are uniquely positioned to make a positive impact. Priorities include providing employees a safe, healthy and inclusive workplace, fostering a culture that drives integrity, strengthening access to healthcare, enhancing math and science education, and driving environmental performance across the product life cycle, including development, manufacturing and transport. Along with the Baxter International Foundation, we provide financial support and product donations in support of critical needs, from assisting underserved communities to providing emergency relief for countries experiencing natural disasters.

Throughout 2019, we continued to implement a range of water conservation strategies and facility-based energy saving initiatives. In the area of product stewardship and life cycle management, we are pursuing efforts such as sustainable design and reduced packaging. We are also responding to the challenges of climate change through innovative greenhouse gas emissions-reduction programs, such as shifting to less carbon-intensive energy sources in manufacturing and transport. Additionally, we developed new long-term goals to drive continued environmental stewardship while creating healthier, more sustainable communities where our employees work and live.

**Risk Factors**

Our ability to sustain long-term growth and successfully execute the strategies discussed above depends in part on our ability to manage within an increasingly competitive and regulated environment and to address the other risk factors described in Item 1A of this Annual Report on Form 10-K.

**RESULTS OF OPERATIONS**

**Special Items**

The following table provides a summary of our special items and the related impact by line item on our results of continuing operations for 2019, 2018 and 2017.

| years ended December 31 (in millions) | | **2019** | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| **Gross Margin** | | | | | | |
| Intangible asset amortization expense | $ | **(183)** | $ | (169) | $ | (154) |
| Intangible asset impairment[1] | | **(31)** | | — | | — |
| Business optimization items[2] | | **(69)** | | (49) | | (53) |
| Separation-related costs[3] | | **—** | | — | | (1) |
| Product-related items[4] | | **—** | | 6 | | (17) |
| Acquisition and integration expenses[5] | | **(30)** | | (27) | | (8) |
| Litigation and contractual disputes[6] | | **—** | | (8) | | — |
| Hurricane Maria insurance recoveries (costs)[7] | | **—** | | 32 | | (32) |
| European medical devices regulation[8] | | **(25)** | | (6) | | — |
| **Total Special Items** | $ | **(338)** | $ | (221) | $ | (265) |
| **Impact on Gross Margin Ratio** | | **(3.0 pts)** | | (2.0 pts) | | (2.5 pts) |
| **Selling, General and Administrative (SG&A) Expenses** | | | | | | |
| Business optimization items[2] | $ | **70** | $ | 145 | $ | 116 |
| Separation-related costs[3] | | **—** | | — | | 18 |
| Acquisition and integration expenses[5] | | **20** | | 23 | | 20 |
| Litigation and contractual disputes[6] | | **—** | | 2 | | 21 |
| Investigation-related costs[13] | | **8** | | — | | — |
| Historical reserve adjustments[9] | | **—** | | — | | (12) |
| **Total Special Items** | $ | **98** | $ | 170 | $ | 163 |
| **Impact on SG&A Expense Ratio** | | **0.9 pts** | | 1.5 pts | | 1.5 pts |
| **R&D Expenses** | | | | | | |
| Business optimization items[2] | $ | **45** | $ | 26 | $ | — |
| Acquisition and integration expenses[5] | | **8** | | 7 | | — |
| European medical devices regulation[8] | | **—** | | 3 | | — |
| **Total Special Items** | $ | **53** | $ | 36 | $ | — |
| **Impact on R&D Expense Ratio** | | **0.4 pts** | | 0.3 pts | | 0.0 pts |
| **Other Operating Income, net** | | | | | | |
| Acquisition and integration expenses[5] | $ | **(4)** | $ | — | $ | — |
| Hurricane Maria insurance recoveries[7] | | **(100)** | | (10) | | — |
| Claris Settlement[10] | | **—** | | (80) | | — |
| Insurance recoveries from a legacy product-related matter[11] | | **(37)** | | — | | — |
| **Total Special Items** | $ | **(141)** | $ | (90) | $ | — |
| **Other (Income) Expense, Net** | | | | | | |
| Acquisition and integration activities[5] | $ | **—** | $ | (24) | $ | — |
| Pension settlement[14] | | **755** | | — | | — |
| Venezuela deconsolidation[12] | | **—** | | — | | 33 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Special Items** | $ | **755** | $ | (24) $ | 33 |
| **Income Tax Expense** | | | | | |
| Tax effects of special items and impact of U.S. Tax Reform[15] | $ | (387) | $ | (277) $ | 191 |
| **Total Special Items** | $ | **(387)** | $ | **(277)** $ | **191** |
| **Impact on Effective Tax Rate** | | **(20.9 pts)** | | (13.7) pts | 25.4 pts |

28

Intangible asset amortization expense is identified as a special item to facilitate an evaluation of current and past operating performance and is consistent with how management and our Board of Directors internally assess performance. Additional special items are identified above because they are highly variable, difficult to predict and of a size that may substantially impact our results of operations for a period. Management believes that providing the separate impact of the above items on our results in accordance with U.S. GAAP may provide a more complete understanding of our operations and can facilitate a fuller analysis of our results of operations, particularly in evaluating performance from one period to another.

1      Our results in 2019 included a $31 million asset impairment related to a developed-technology intangible asset.

2      In 2019, 2018 and 2017, our results were impacted by costs associated with our execution of programs to optimize our organization and cost structure on a global basis. These actions included streamlining our international operations, rationalizing our manufacturing facilities, reducing our general and administrative infrastructure, re-aligning certain R&D activities and canceling certain R&D programs. Our results in 2019, 2018 and 2017 included business optimization charges of $184 million, $220 million and $169 million, respectively. Refer to Note 12 of this Annual Report on Form 10-K in Item 8 for further information regarding these charges and related liabilities.

3      Our results in 2017 included costs related to the Baxalta separation of $19 million. Refer to Note 3 in Item 8 of this Annual Report on Form 10-K for further information related to the separation of Baxalta.

4      Our results in 2018 included a net benefit of $6 million related to an adjustment to our accrual for SIGMA SPECTRUM infusion pump inspection and remediation activities. Our results in 2017 included a net charge of $17 million related to SIGMA SPECTRUM infusion pump inspection and remediation activities and other historical product reserves.

5      Our results in 2019 included $54 million of acquisition and integration expenses. This included integration expenses relate to our acquisitions of Claris and the RECOTHROM and PREVELEAK products in prior periods, as well as the 2019 acquisitions of Cheetah and in-process R&D assets, partially offset by a benefit related to the change in the estimated fair value of contingent consideration liabilities. Our results in 2018 included $33 million of acquisition and integration costs related to our acquisitions of Claris and the RECOTHROM and PREVELEAK products, upfront payments related to R&D collaborations and license agreements, and a gain from remeasuring our previously held investment to fair value upon acquisition of a controlling interest in our joint venture in Saudi Arabia. Our results in 2017 included acquisition and integration expenses of $28 million related to our acquisition of Claris. Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for further information regarding business development activities.

6      Our results in 2018 included charges of $10 million related to certain product litigation. Our results in 2017 included charges of $21 million related to litigation and contractual disputes for businesses or arrangements in which we are no longer engaged or a party thereto.

7      Our results in 2019 and 2018 included benefits of $100 million and $42 million, respectively, related to insurance recoveries as a result of losses incurred due to Hurricane Maria. Our results in 2017 included a charge of $32 million related to the impact of Hurricane Maria on our operations in Puerto Rico.  The costs primarily included inventory and fixed asset impairments as well as idle facility costs. Refer to Note 9 in Item 8 of this Annual Report on Form 10-K for further information regarding the impact of Hurricane Maria.

8      Our results in 2019 and 2018 included costs of $25 million and $9 million, respectively, related to updating our quality systems and product labeling to comply with the new medical device reporting regulation and other requirements of the European Union's regulations for medical devices that will become effective in 2020.

9      Our results in 2017 included a benefit of $12 million related to an adjustment to our historical rebates and discounts reserve.

10      Our results in 2018 included a benefit of $80 million for the settlement of certain claims related to the acquired operations of Claris. Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for further information regarding the acquisition of Claris.

11      Our results in 2019 included a benefit of $37 million for our allocation of insurance proceeds received pursuant to a settlement and cost-sharing arrangement for a legacy product-related matter. Refer to Note 9 in Item 8 of this Annual Report on Form 10-K for further information.

12      Our results in 2017 included a charge of $33 million related to the deconsolidation of our Venezuelan operations. Refer to Note 1 in Item 8 of this Annual Report on Form 10-K for further information regarding the deconsolidation of our Venezuelan operations.

13      Our results in 2019 included costs of $8 million related to our internal investigation of foreign exchange gains and losses associated with certain intra-company transactions. Refer to Note 9 in Item 8 of this Annual Report on Form 10-K for further information regarding the internal investigation.

14      Our results in 2019 included a charge of $755 million related to the annuitization of a portion of our U.S. pension plan. Refer to Note 13 in Item 8 of this Annual Report on Form 10-K for further information regarding the pension annuitization.

15      Reflected in this item is the income tax impact of the special items identified in this table. Additionally, our results in 2019 included a net tax benefit of $125 million related to income tax reform in Switzerland and India and an adjustment for U.S. federal tax reform. Our results in 2018 included a net tax benefit of $196 million related to updates to the estimated impact of U.S. federal tax reform previously made in 2017.  Our results in 2017 included a net tax charge of $322 million related to the estimated impact of U.S. federal tax reform on our tax related assets and liabilities. The tax effect of each adjustment is based on the jurisdiction in which the adjustment is incurred and the tax laws in effect for each such jurisdiction.

## Net Sales

| years ended December 31 (in millions) | As restated | | | Percent change | | | |
| | | | | At actual currency rates | | At constant currency rates | |
| | 2019 | 2018 | 2017 | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|---|---|---|
| United States | $ 4,826 | $ 4,723 | $ 4,510 | 2 % | 5 % | 2 % | 5 % |
| International | 6,536 | 6,376 | 6,074 | 3 % | 5 % | 7 % | 4 % |
| Total net sales | $ 11,362 | $ 11,099 | $ 10,584 | 2 % | 5 % | 5 % | 4 % |

Net sales for the year ended December 31, 2019 increased 2% at actual rates and 5% at constant currency rates. Net sales for the year ended December 31, 2018 increased 5% at actual and 4% at constant currency rates.

Foreign currency exchange rates unfavorably impacted 2019 net sales growth by three percentage points principally due to the strengthening of the U.S Dollar relative to the Euro, Australian Dollar, British Pound, Chinese Yuan and Colombian Peso. Changes in foreign currency exchange rates favorably impacted 2018 net sales growth by one percentage point, principally due to the weakening of the U.S dollar relative to the Euro, British Pound and Chinese Yuan, partially offset by the strengthening of the U.S. Dollar relative to the Brazilian Real, Turkish Lira and Australian Dollar.

The comparisons presented at constant currency rates reflect current year local currency sales at the prior year's foreign exchange rates. This measure provides information on the change in net sales assuming that foreign currency exchange rates had not changed between the prior and the current period. We believe that the non-GAAP measure of change in net sales at constant currency rates, when used in conjunction with the U.S. GAAP measure of change in net sales at actual currency rates, may provide a more complete understanding and facilitate a fuller analysis of our results of operations, particularly in evaluating performance from one period to another.

In 2019, the acquisition of Cheetah had an insignificant impact on reported revenues. The RECOTHROM and PREVELEAK products acquired in 2018 contributed $80 million and $52 million of revenues in 2019 and 2018, respectively. The acquisition of Claris contributed $140 million and $57 million of revenues in 2018 and 2017, respectively.

Our global operations expose us to risks associated with public health crises and epidemics/pandemics, such as the novel strain of coronavirus that recently originated in China (COVID-19). COVID-19 may have an adverse impact on our operations, supply chains and distribution systems and increase our expenses, including as a result of impacts associated with preventive and precautionary measures that we, other businesses and governments are taking. Due to these impacts and measures, we may experience significant and unpredictable reductions or increases in demand for certain of our products as health care customers re-prioritize the treatment of patients. For example, elective surgeries are being de-prioritized which will negatively impact the usage of certain of our products, while other of our products are experiencing an increase in demand which we may not be able to meet in accordance with the customer's desired timing. In addition to existing travel restrictions, countries may close borders, impose prolonged quarantines, and further restrict travel, which may significantly impact the ability of our employees to get to their places of work to produce products, or may significantly hamper our products from moving through the supply chain. As a result, while the financial impact on us has not been significant to date, given the rapid and evolving nature of the virus, COVID-19 could negatively affect our sales, and it is uncertain how COVID-19 will affect our global operations generally if these impacts persist or exacerbate over an extended period of time. For further discussion, refer to Item 1A of this Annual Report on Form 10-K.

**Global Business Unit Net Sales Reporting**

Our global business units (GBUs) include the following:

- **Renal Care** includes sales of our peritoneal dialysis (PD), hemodialysis (HD) and additional dialysis therapies and services.
- **Medication Delivery** includes sales of our intravenous (IV) therapies, infusion pumps, administration sets and drug reconstitution devices.
- **Pharmaceuticals** includes sales of our premixed and oncology drug platforms, inhaled anesthesia and critical care products and pharmacy compounding services.
- **Clinical Nutrition** includes sales of our parenteral nutrition (PN) therapies and related products.
- **Advanced Surgery** includes sales of our biological products and medical devices used in surgical procedures for hemostasis, tissue sealing and adhesion prevention.
- **Acute Therapies** includes sales of our continuous renal replacement therapies (CRRT) and other organ support therapies focused in the intensive care unit (ICU).
- **Other** primarily includes sales of contract manufacturing services from our pharmaceutical partnering business.

The following is a summary of net sales by GBU.

| | | As restated | | | Percent change | | | |
| | | | | | At actual currency rates | | At constant currency rates | |
| years ended December 31 (in millions) | **2019** | 2018 | 2017 | | **2019** | 2018 | **2019** | 2018 |
|---|---|---|---|---|---|---|---|---|
| Renal Care | $ **3,639** | $ 3,651 | $ 3,491 | | **— %** | 5 % | **3 %** | 4 % |
| Medication Delivery | **2,799** | 2,664 | 2,700 | | **5 %** | (1)% | **7 %** | (2)% |
| Pharmaceuticals | **2,155** | 2,087 | 1,886 | | **3 %** | 11 % | **6 %** | 10 % |
| Clinical Nutrition | **872** | 875 | 885 | | **— %** | (1)% | **3 %** | (3)% |
| Advanced Surgery | **877** | 798 | 708 | | **10 %** | 13 % | **12 %** | 12 % |
| Acute Therapies | **535** | 515 | 457 | | **4 %** | 13 % | **7 %** | 12 % |
| Other | **485** | 509 | 457 | | **(5)%** | 11 % | **(2)%** | 10 % |
| **Total Baxter** | $ **11,362** | $ 11,099 | $ 10,584 | | **2 %** | 5 % | **5 %** | 4 % |

Foreign exchange rates unfavorably impacted Renal Care net sales 3% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Renal Care net sales increased in 2019 and 2018. The increase in 2019 was driven by global patient growth in PD, partially offset by lower U.S. in-center HD sales. The increase in 2018 was primarily driven by global growth in the PD business as well as increased international sales in the HD business.

Foreign exchange rates unfavorably impacted Medication Delivery net sales 2% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Medication Delivery net sales

32

increased in 2019 and decreased in 2018. The increase in 2019 was attributable to increased sales of our Spectrum IQ Infusion System in the U.S. and EVO IQ Infusion System internationally and related IV access administration sets. The decrease in 2018 was partially attributable to supply constraints associated with our small volume parenterals (SVPs) due to Hurricane Maria as well as lower international sales resulting from a reallocation of volume to the U.S.

Foreign exchange rates unfavorably impacted Pharmaceuticals net sales 3% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Pharmaceuticals net sales increased in 2019 and 2018. The increase in 2019 was due to growth in international pharmacy compounding sales and increased sales of our generic injectables. Partially offsetting those increases were reduced sales of inhaled anesthetics as well as BREVIBLOC and U.S. cylophosphamide due to increased generic competition. The increase in 2018 was a result of the benefit from the acquisition of Claris, increased sales of our premixed injectables and inhaled anesthetics, as well as increased demand for pharmacy compounding services.  The acquisition of Claris in 2017 contributed $140 million of net sales in 2018 compared to $57 million of net sales in 2017. Partially offsetting the increase in 2018 was reduced sales of U.S. cyclophosphamide.

Foreign exchange rates unfavorably impacted Clinical Nutrition net sales 3% in 2019 and favorably impacted net sales 2% in 2018, respectively. Excluding the impact of foreign exchange rates, Clinical Nutrition net sales increased in 2019 and decreased in 2018. The increase in 2019 was due to the launch of new products. The decrease in 2018 was driven by the impact of Hurricane Maria related supply constraints which resulted in some customers in the U.S. changing protocols for PN therapies or shifting to outsourced nutrition compounding centers and competitive products, partially offset by improved volumes internationally for our nutritional therapies.

Foreign exchange rates unfavorably impacted Advanced Surgery net sales 2% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Advanced Surgery net sales increased in 2019 and 2018. The increase in 2019 was primarily driven by higher sales as a result of a temporary supply disruption of a competitor. The increase in 2018 was primarily driven by the acquisition of RECOTHROM and PREVELEAK from Mallinckrodt, which contributed $52 million of net sales in 2018, and improved sales for our core hemostats and sealants.

Foreign exchange rates unfavorably impacted Acute Therapies net sales 3% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Acute Therapies net sales increased in 2019 and 2018.  The increase in 2019 was due to higher global demand for our CRRT systems to treat acute kidney injuries, including the launch of PrisMax in several countries across the Americas, Europe and Asia. The increase in 2018 was due to higher demand for our CRRT systems to treat acute kidney injuries and higher demand for other products from an intense flu season.

Foreign exchange rates unfavorably impacted Other net sales 3% in 2019 and favorably impacted net sales 1% in 2018, respectively. Excluding the impact of foreign exchange rates, Other net sales decreased in 2019 in comparison to strong sales performance in the prior year. On a constant currency basis, Other net sales increased in 2018 due primarily to favorable volumes for products manufactured by us on behalf of our pharmaceutical partners, including the impact of those customers increasing safety stock levels of select products.

## Gross Margin and Expense Ratios

| years ended December 31 | 2019 | % of net sales | As restated 2018 | % of net sales | 2017 | % of net sales | 2019 $ change | % change | 2018 $ change | % change |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross margin | $ 4,761 | 41.9 % | $ 4,759 | 42.9 % | $ 4,474 | 42.3 % | $ 2 | — % | $ 285 | 6.4 % |
| SG&A | $ 2,535 | 22.3 % | $ 2,620 | 23.6 % | $ 2,627 | 24.8 % | $ (85) | (3.2)% | $ (7) | (0.3)% |
| R&D | $ 595 | 5.2 % | $ 654 | 5.9 % | $ 615 | 5.8 % | $ (59) | (9.0)% | $ 39 | 6.3 % |

Gross Margin

The gross margin ratio was 41.9%, 42.9% and 42.3% in 2019, 2018 and 2017, respectively. The special items identified above had an unfavorable impact of 3.0, 2.0 and 2.5 percentage points on the gross margin ratio in 2019, 2018 and 2017, respectively. Refer to the Special Items section above for additional detail.

Excluding the impact of the special items, the gross margin ratio was unchanged in 2019 compared to 2018. The gross margin ratio was impacted by an unfavorable product mix as well as inventory write-downs and incremental costs relating to improvements at a dialyzer facility in the U.S. that experienced manufacturing issues during the second quarter of 2019, offset by manufacturing efficiencies.

Excluding the impact of the special items, the gross margin ratio increased 0.1 percentage points in 2018. The gross margin ratio increased primarily due to a favorable product mix and manufacturing efficiencies, partially offset by the negative impact of foreign exchange rates, incremental supply chain costs and the impact of lost sales due to Hurricane Maria.

SG&A

The SG&A expenses ratio was 22.3%, 23.6% and 24.8% in 2019, 2018 and 2017, respectively. The special items identified above had an unfavorable impact of 0.9, 1.5 and 1.5 percentage points on the SG&A expenses ratio in 2019, 2018 and 2017, respectively. Refer to the Special Items section above for additional detail.

Excluding the impact of the special items, the SG&A expenses ratio decreased 0.7 percentage points in 2019 primarily due to actions we took to restructure our cost position and focus on expense management.

Excluding the impact of the special items, the SG&A expenses ratio decreased 1.2 percentage points in 2018 due to the actions taken by us to restructure our cost position and focus on expense management. These savings were partially offset by decreased benefits to the SG&A expenses ratio from increased freight expenses as we worked to ensure adequate product availability to meet customer needs.  In addition, a change in the estimated useful life of our ERP systems in 2018 contributed to the reduction in the SG&A expenses ratio.

R&D

The R&D expenses ratio was 5.2%, 5.9% and 5.8% in 2019, 2018 and 2017, respectively. The special items identified above had an unfavorable impact of 0.4, 0.3 and 0.0 percentage points on the R&D expenses ratio in 2019, 2018 and 2017, respectively. Refer to the Special Items section above for additional detail.

Excluding the impact of the special items, the R&D expenses ratio decreased by 0.8 percentage points in 2019 as a result of reduced project-related expenditures compared to the prior year and actions we took to restructure our cost position and focus on expense management.

Excluding the impact of special items, the R&D expenses ratio decreased by 0.2 percentage points in 2018 as a result of actions we took to restructure our cost position and focus on expense management, partially offset by an increase in project-related expenditures.

Business Optimization Items

In recent years, we have undertaken actions to transform our cost structure and enhance our operational efficiency. These efforts include restructuring the organization, optimizing our manufacturing footprint, R&D operations and supply chain network, employing disciplined cost management, and centralizing and streamlining certain support functions. From the commencement of our business optimization actions in the second half of 2015 through December 31, 2019, we have incurred cumulative pre-tax costs of $980 million related to these actions. The costs consisted primarily of employee termination costs, implementation costs, asset impairments, and accelerated depreciation. We currently expect to incur additional pre-tax costs of approximately $50 million related to these initiatives, primarily related to employee termination costs and implementation costs. To the extent further cost savings opportunities are identified, we may incur additional business optimization expenses. The reductions in our cost base from these actions in the aggregate are expected to provide cumulative annual pretax savings of approximately $1.2 billion once the remaining actions are complete. The savings from these actions will impact cost of sales, SG&A expenses, and R&D expenses. Approximately 95 percent of the expected annual pre-tax savings has been realized through December 31, 2019, with the remainder expected to be realized by the end of 2023. Refer to Note 12 in Item 8 of this Annual Report on Form 10-K for additional information regarding our business optimization programs.

**Other Operating Income, Net**

Other operating income, net was $141 million, $99 million and $56 million in 2019, 2018 and 2017, respectively. In 2019 and 2018, we recognized $100 million and $10 million, respectively, of insurance recoveries related to losses incurred due to Hurricane Maria within Other operating income, net. In 2019, we also recognized a benefit of $37 million when our share of the proceeds under a cost-sharing agreement became realizable following the resolution of a dispute with an insurer related to a legacy product-related matter. In 2018, we settled certain claims with the seller related to the acquired operations of Claris, which resulted in a benefit of $80 million. Additionally, included in other operating income in 2018 and 2017 was $9 million and $56 million, respectively, of transition service income earned in connection with our separation of Baxalta in 2015. The agreement for these services terminated as of July 1, 2018.

**Interest Expense, Net**

Interest expense, net was $71 million, $45 million and $55 million in 2019, 2018 and 2017, respectively. The increase in 2019 was primarily driven by higher average debt outstanding as a result of the issuance of €750 million of 0.40% senior notes due May 2024 and €750 million of 1.3% senior notes due May 2029. The decrease in 2018 was primarily driven by higher interest income earned as a result of favorable interest rates. Refer to Note 5 in Item 8 of this Annual Report on Form 10-K for a summary of the components of interest expense, net for 2019, 2018 and 2017.

**Other (Income) Expense, Net**

Other (income) expense, net was an expense of $731 million in 2019, income of $78 million in 2018 and an expense of $133 million in 2017. The increase in expense in 2019 was primarily driven by a $755 million pension settlement charge related to the transfer of U.S. pension plan liabilities to an insurance company and $37 million of foreign exchange net losses in the current year, partially offset by an impairment of an investment in the prior year. Favorable results in 2018 were primarily driven by $49 million of pension and other postretirement (OPEB) benefits resulting from the split and freeze of our U.S. pension plans announced in January 2018, a $24 million gain from remeasuring our previously held investment to fair value upon acquisition of a controlling interest in our joint venture in Saudi Arabia and $14 million of foreign exchange net gains.

We expect expenses from pension and OPEB plans to increase in 2020 primarily due to lower discount rates and a lower expected return on assets attributable to the transfer of U.S. pension plan liabilities to an insurance company. Refer to Note 13 in Item 8 of this Annual Report on Form 10-K for further information regarding pension and OPEB plan expenses.

The following unaudited quarterly financial information is presented to update our previous discussion and analysis giving effect to our restated results, which primarily impacted other (income) expense, net. The related misstatements are described in more detail in Note 2, Restatement of Previously Issued Consolidated Financial Statements, in Item 8, Financial Statements and Supplementary Data.

| (in millions) | | As Restated | | | | |
|---|---|---|---|---|---|---|
| | | For the six months ended June 30, 2019 | | For the three months ended June 30, 2019 | | For the three months ended March 31, 2019 |
| Foreign exchange losses (gains) | $ | 14 | $ | 15 | $ | (1) |
| Pension and other postretirement benefit plans | | (31) | | (15) | | (16) |
| Other | | — | | 4 | | (4) |
| Other (income) expense, net | $ | (17) | $ | 4 | $ | (21) |

|  |  | As Restated |  |
| --- | --- | --- | --- |
| (in millions) | For the six months ended June 30, 2018 | For the three months ended June 30, 2018 | For the three months ended March 31, 2018 |
| Foreign exchange losses (gains) | $ (29) | $ (26) | $ (3) |
| Pension and other postretirement benefit plans | (26) | (14) | (12) |
| Other | 11 | 2 | 9 |
| Other (income) expense, net | $ (44) | $ (38) | $ (6) |

|  |  | As Restated |  |
| --- | --- | --- | --- |
| (in millions) | For the six months ended June 30, 2017 | For the three months ended June 30, 2017 | For the three months ended March 31, 2017 |
| Foreign exchange losses (gains) | $ 42 | $ 19 | $ 23 |
| Pension and other postretirement benefit plans | 17 | 8 | 9 |
| Venezuela deconsolidation | 33 | 33 | — |
| Other | 5 | 3 | 2 |
| Other (income) expense, net | $ 97 | $ 63 | $ 34 |

Other (income) expense, net was an expense of $4 million in the three months ended June 30, 2019 compared to income of $38 million in the three months ended June 30, 2018. The change was primarily due to $15 million of foreign exchange net losses in 2019 compared to $26 million of foreign exchange net gains in 2018. Other (income) expense, net was income of $21 million and $6 million in the three months ended March 31, 2019 and 2018, respectively. The increase in 2019 was primarily due to favorable fair value adjustments on marketable equity securities in 2019, an investment impairment in 2018, and higher pension benefits in 2019.

Other (income) expense, net was income of $38 million in the three months ended June 30, 2018 compared to expense of $63 million in the three months ended June 30, 2017. The change was primarily due to a $33 million charge related to the deconsolidation of our Venezuelan subsidiary in 2017 and $26 million of foreign exchange net gains in 2018 compared to $19 million of foreign exchange net losses in 2017. Other (income) expense was income of $6 million and expense of $34 million in the three months ended March 31, 2018 and 2017, respectively. The increase in 2018 was primarily due to $3 million of foreign exchange net gains in 2018 compared to $23 million of foreign exchange net losses in 2017. Additionally, we recognized a benefit related to pension and OPEB plans in 2018 compared to a charge in 2017 as a result of the split and freeze of our U.S. pension plans announced in January 2018.

**Income Taxes**

The effective income tax rate for continuing operations was (4.2%) in 2019, 4.0% in 2018, and 44.6% in 2017. The special items identified above had a favorable impact of 20.9 and 13.7 percentage points on the effective income tax rate in 2019 and 2018 and an unfavorable impact of 25.4 percentage points in 2017.  Refer to the Special Items section above for additional detail.

Our provision for income taxes and our effective rate decreased in 2019 compared to 2018 primarily due to special items, the most significant of which was the impact of recently enacted tax reform in Switzerland and India. We recognized a deferred tax benefit of $90 million to reflect a tax basis step-up, net of a valuation allowance, partially offset by a $5 million deferred tax revaluation to reflect an increase in the statutory tax rate, under the newly enacted Swiss tax laws. We also recognized a net deferred tax benefit of $24 million associated with deferred tax revaluation in India to reflect a decrease in the statutory tax rate.

In addition to the Swiss and Indian tax reform impacts, our provision for income taxes and our effective rate decreased in 2019 compared to 2018 due to the recognition of tax benefits associated with a favorable tax ruling, a benefit related to a notional interest deduction on the share capital of a foreign subsidiary, and excess tax benefits on stock compensation awards. Partially offsetting the decrease in the effective tax rate was a partial valuation allowance release against our U.S. foreign deferred tax assets in 2018 which did not recur in 2019.

Our provision for income taxes and our effective rate decreased in 2018 compared to 2017 primarily due to special items, the most significant of which was our finalization of our provisional adjustments resulting from the 2017 Tax Act.  SEC Staff Accounting Bulletin 118 (SAB 118) allowed a one-year measurement period from the December 22, 2017 Tax Act enactment date to refine the provisional amounts recognized in the 2017 financial statements.

We recorded several SAB 118 measurement period provisional adjustments in 2018.  First, after further studying the 2017 Tax Act and related U.S. Treasury Regulations, we refined our provisional estimate of a full valuation allowance against our U.S. foreign tax credit deferred tax assets and released a $194 million valuation allowance due to our ability to utilize a portion of our U.S. foreign tax credit deferred tax assets. Second, the 2017 Tax Act requires us to pay U.S. income taxes on accumulated foreign subsidiary earnings not previously subject to U.S. income tax at a rate of 15.5% to the extent of foreign cash and certain other net current assets and 8% on the remaining earnings. In 2017, we recognized a provisional charge for our one-time transitional tax expense of $529 million, the majority of which was non-cash.  During 2018, we refined our estimated one-time transition tax expense, recognizing a benefit of $5 million. Third, the 2017 Tax Act lowered the U.S. federal rate from 35% to 21% and generally exempts foreign income from U.S. taxation. We finalized our provisional revaluation of U.S. deferred tax assets, recording an additional $8 million benefit.

Our tax provisions for 2019 and 2018 do not include any tax charges related to either the Base Erosion and Anti-Abuse Tax (BEAT) or Global Intangible Low Taxed Income (GILTI) provisions, except for the inability to fully utilize foreign tax credits against such GILTI.

In addition to the 2017 Tax Act SAB 118 measurement period adjustments, our provision for income taxes and our effective rate decreased in 2018 compared to 2017 due to a settlement of a 2008 through 2010 transfer pricing Competent Authority proceeding between the U.S. and Germany, the reversal of a foreign valuation allowance as a result of continued profit improvements, and the receipt of tax-free income from the settlement of Claris contingent matters.  Partially offsetting the decrease in the effective tax rate was a decrease in benefits related to deductions in excess of share-based compensation costs (windfall tax benefits), the revaluation of Swedish net deferred tax assets and miscellaneous transfer pricing-related income tax accruals. Refer to Note 14 in Item 8 of this Annual Report on Form 10-K for further information related to the 2017 Tax Act and the finalization of associated SAB 118 provisional adjustments.

We anticipate that our effective income tax rate from continuing operations, calculated in accordance with U.S. GAAP, will be approximately 17.5% in 2020.  This rate may be further impacted by a number of factors including discrete items, such as tax windfalls or deficiencies attributable to stock compensation exercises as well as additional audit developments, or the tax effects of any future special items.

**Income from Continuing Operations and Earnings per Diluted Share**

Income from continuing operations was $1.0 billion in 2019, $1.6 billion in 2018 and $609 million in 2017. Earnings per share from continuing operations was $1.93 in 2019, $2.84 in 2018 and $1.10 in 2017. The significant factors and events causing the net changes from 2018 to 2019 and 2017 to 2018 are discussed above. Additionally, earnings per share from continuing operations was positively impacted by the repurchase of 35.8 million shares in 2018 through Rule 10b5-1 purchase plans, an accelerated share repurchase plan and otherwise and the repurchase of 16.5 million shares in 2019 through Rule 10b5-1 purchase plans, an accelerated share repurchase plan and otherwise. Refer to Note 10 in Item 8 of this Annual Report on Form 10-K for further information regarding our stock repurchases.

**Loss from Discontinued Operations**

Loss from discontinued operations, net of tax was $6 million in 2018 and $7 million in 2017. The operating results related to Baxalta, which have been reflected as discontinued operations, on a net of tax basis, were a loss of $6 million in 2018 and income of $3 million in 2017. Refer to Note 3 in Item 8 of this Annual Report on Form 10-K for additional information regarding the separation of Baxalta. In addition, we recognized an expense of $10 million, net of tax, within discontinued operations in 2017 related to environmental clean-up costs at a former location.  Refer to Note 9 in Item 8 of this Annual Report on Form 10-K for additional information regarding environmental liabilities.

## Segment results

We use operating income on a segment basis to make resource allocation decisions and assess the ongoing performance of our segments. Refer to Note 18 in Item 8 of this Annual Report on Form 10-K for additional details regarding our segments. The following is a summary of significant factors impacting our reportable segments' financial results.

| | | | As restated | | | | As restated | |
|---|---|---|---|---|---|---|---|---|
| | | Net sales | | | | Operating income | | |
| years ended December 31 (in millions) | 2019 | 2018 | 2017 | | 2019 | 2018 | 2017 |
| Americas | $ 6,094 | $ 5,951 | $ 5,718 | $ | 2,374 | $ 2,411 | $ 2,238 |
| EMEA | 2,968 | 2,946 | 2,752 | | 652 | 666 | 562 |
| APAC | 2,300 | 2,202 | 2,114 | | 549 | 532 | 510 |
| Corporate and other | — | — | — | | (1,803) | (2,025) | (2,022) |
| Total | $ 11,362 | $ 11,099 | $ 10,584 | $ | 1,772 | $ 1,584 | $ 1,288 |

Americas

Segment operating income was $2,374 million, $2,411 million and $2,238 million in 2019, 2018 and 2017, respectively. The decrease in 2019 was primarily driven by lower sales and gross margin in Pharmaceuticals and lower U.S. in-center HD sales, partially offset by favorable performance in Medication Delivery and Advanced Surgery, primarily due to a temporary supply disruption of a competitor. Additionally, results in 2019 were adversely impacted by unfavorable foreign exchange rates. The increase in 2018 was primarily driven by increased net sales and gross margin as a result of the Claris and RECOTHROM and PREVELEAK acquisitions and higher net sales related to premix injectables. Also driving performance was improved performance in Renal Care, driven primarily by PD growth, and Acute Therapies. Negatively impacting performance in 2018 were the sales challenges in the Medication Delivery and Clinical Nutrition GBUs as previously described.

EMEA

Segment operating income was $652 million, $666 million and $562 million in 2019, 2018 and 2017, respectively. The decrease in 2019 was primarily driven by unfavorable foreign exchange rates, partially offset by increased local currency sales and gross margin in Renal Care and Pharmaceuticals. The increase in 2018 was primarily driven by higher net sales across multiple GBUs, and improved margins primarily as a result of product mix.

APAC

Segment operating income was $549 million, $532 million and $510 million in 2019, 2018 and 2017, respectively. Results in 2019 were driven by higher sales and gross margin, primarily from China and Australia, in Renal Care and Pharmaceuticals. Results in 2018 were driven by higher sales, primarily from China, in Renal Care and Clinical Nutrition.

Corporate and other

Certain items are maintained at Corporate and are not allocated to a segment. They primarily include certain foreign currency hedging activities, corporate headquarters costs, certain R&D costs, certain GBU support costs, stock compensation expense, certain employee benefit plan costs, and certain gains, losses, and other charges (such as business optimization, acquisition and integration costs, intangible asset amortization and asset impairments). The operating loss in 2019 decreased due to higher Hurricane Maria insurance recoveries in the current year, a benefit for our allocation of insurance proceeds received pursuant to a settlement and cost-sharing arrangement for a legacy product-related matter in the current year, lower SG&A and R&D expenses in the current year and lower business optimization charges in the current year, partially offset by an impairment of a developed-technology intangible asset in the current year and the benefit from the Claris settlement in the prior year. The operating loss in 2018 increased due to higher acquisition and integration costs, higher intangible asset amortization expense and higher business optimization charges, partially offset by Hurricane Maria insurance recoveries and a benefit from the Claris settlement.

**LIQUIDITY AND CAPITAL RESOURCES**

**Cash Flows from Operations — Continuing Operations**

In 2019, 2018 and 2017, cash provided by operating activities was $2.1 billion, $2.0 billion and $1.7 billion, respectively. Operating cash flows increased in 2019 primarily due to an increase in our operating income, which included the insurance recoveries related to Hurricane Maria and a legacy product-related matter. Operating cash flows increased in 2018 compared to 2017 primarily due to an increase in our operating income, which included the Claris settlement received in 2018, and due to lower pension contributions.

**Cash Flows from Investing Activities**

In 2019, cash used for investing activities included payments for acquisitions of $418 million, primarily related to Cheetah and multiple product acquisitions, and capital expenditures of $696 million. In 2018, cash used for investing activities included payments for acquisitions of $268 million, primarily related to RECOTHROM and PREVELEAK and certain molecules from Celerity Pharmaceuticals, LLC (Celerity), and capital expenditures of $659 million. In 2017, cash used in investing activities included payments for acquisitions of $686 million, primarily related to Claris and the rights to certain molecules from Celerity, and capital expenditures of $616 million.

In December 2019, we entered into a definitive agreement to acquire Seprafilm from Sanofi. The transaction closed in February 2020 and we paid approximately $345 million for the acquired assets, subject to a post-close adjustment. In January 2020, we acquired the U.S. rights to an additional product for $60 million.

We expect that our capital expenditures will increase in 2020 as we make investments in our manufacturing capacity in response to proposed regulatory changes of the U.S. Department of Health and Human Services in kidney health policy and reimbursement, which may substantially change the U.S. end stage renal disease market and demand for our peritoneal dialysis products.

Refer to Note 4 in Item 8 of this Annual Report on Form 10-K for further information about our significant acquisitions and other arrangements.

**Cash Flows from Financing Activities**

In 2019, cash generated from financing activities included $1.7 billion in net proceeds from the issuance of €750 million of senior notes due in 2024 and €750 million of senior notes due in 2029, $222 million of borrowings under our Euro-denominated credit facility, and stock issued under employee benefit plans of $356 million, partially offset by payments for stock repurchases of $1.3 billion and dividend payments of $423 million. In 2018, cash used for financing activities included payments for stock repurchases of $2.5 billion and dividend payments of $376 million, partially offset by the proceeds from stock issued under employee benefit plans of $258 million. In 2017, cash generated from financing activities included $665 million in net proceeds from the issuance of €600 million of senior notes due in May 2025 along with stock issued under employee benefit plans of $347 million, partially offset by payments for stock repurchases of $564 million and dividend payments of $315 million.

As authorized by the Board of Directors, we repurchase our stock depending upon our cash flows, net debt levels and market conditions. In July 2012, the Board of Directors authorized the repurchase of up to $2.0 billion of our common stock. The Board of Directors increased this authority by an additional $1.5 billion in each of November 2016 and February 2018 and by an additional $2.0 billion in November 2018. We paid $1.3 billion in cash to repurchase approximately 16.5 million shares under this authority pursuant to Rule 10b5-1 plans and otherwise in 2019 and had $897 million remaining available under this authorization as of December 31, 2019.

In December 2018, we entered into a $300 million accelerated share repurchase agreement (ASR Agreement) with an investment bank. We funded the ASR Agreement with available cash. Under the ASR Agreement, we received 3.6 million shares upon execution. Based on the volume-weighted average price of our common stock during the term of the ASR Agreement, we received an additional 0.6 million shares from the investment bank at settlement on May 7, 2019.

## Credit Facilities and Access to Capital and Credit Ratings

Credit Facilities

As of December 31, 2019, our U.S. dollar-denominated revolving credit facility had capacity of $2.0 billion. As of December 31, 2019, our Euro-denominated senior revolving credit facility had a capacity of approximately €200 million. Each of the facilities matures in 2024. There was no amount outstanding under our U.S. dollar-denominated credit facility as of December 31, 2019 and €200 million ($224 million) outstanding at a 0.9% interest rate under our Euro-denominated credit facility as of December 31, 2019. There were no amounts outstanding under our credit facilities as of December 31, 2018. As of December 31, 2019, we were in compliance with the financial covenants in these agreements. The non-performance of any financial institution supporting either of the credit facilities would reduce the maximum capacity of these facilities by each institution's respective commitment.

We also maintain other credit arrangements, as described in Note 7 in Item 8 of this Annual Report on Form 10-K.

Access to Capital and Credit Ratings

We intend to fund short-term and long-term obligations as they mature through cash on hand and future cash flows from operations or by issuing additional debt. We had $3.3 billion of cash and cash equivalents as of December 31, 2019, with adequate cash available to meet operating requirements in each jurisdiction in which we operate. We invest our excess cash in money market funds and diversify the concentration of cash among different financial institutions.

Our ability to generate cash flows from operations, issue debt or enter into other financing arrangements on acceptable terms could be adversely affected if there is a material decline in the demand for our products or in the solvency of our customers or suppliers, deterioration in our key financial ratios or credit ratings or other significantly unfavorable changes in conditions. However, we believe we have sufficient financial flexibility to issue debt, enter into other financing arrangements and attract long-term capital on acceptable terms to support our growth objectives.

Our credit ratings at December 31, 2019 were as follows:

|  | Standard & Poor's | Fitch | Moody's |
| --- | --- | --- | --- |
| Ratings | | | |
| Senior debt | A- | A- | Baa1 |
| Short-term debt | A2 | F2 | P2 |
| Outlook | Stable | Stable | Stable |

## Contractual Obligations

As of December 31, 2019, we had contractual obligations, excluding accounts payable and accrued liabilities, payable or maturing in the following periods.

| (in millions) | Total | Less than one year | One to three years | Three to five years | More than five years |
| --- | --- | --- | --- | --- | --- |
| Short-term debt | $ 226 | $ 226 | $ — | $ — | $ — |
| Long-term debt and finance lease obligations, including current maturities | 5,160 | 315 | 609 | 843 | 3,393 |
| Interest on short- and long-term debt and finance lease obligations [1] | 1,436 | 112 | 209 | 194 | 921 |
| Operating leases | 676 | 112 | 176 | 121 | 267 |
| Other non-current liabilities [2] | 407 | — | 127 | 50 | 230 |
| Purchase obligations [3] | 571 | 311 | 163 | 90 | 7 |
| Contractual obligations [2] | $ 8,476 | $ 1,076 | $ 1,284 | $ 1,298 | $ 4,818 |

1. Interest payments on debt and finance lease obligations are calculated for future periods using interest rates in effect at the end of 2019. Certain of these projected interest payments may differ in the future based on changes in floating interest rates, foreign currency fluctuations or other factors or events. The projected interest payments only pertain to obligations and agreements outstanding at December 31, 2019. Refer to Note 7 and Note 8, respectively, in Item 8 of this Annual Report on Form 10-K for further discussion regarding our debt instruments outstanding and finance lease obligations at December 31, 2019.

2. The primary components of other non-current liabilities in our consolidated balance sheet as of December 31, 2019 are pension and other postretirement benefits, deferred tax liabilities, long-term tax liabilities, interest rate contracts, and litigation and environmental reserves. We projected the timing of the related future cash payments based on contractual maturity dates (where applicable) and estimates of the timing of payments (for liabilities with no contractual maturity dates). The actual timing of payments could differ from our estimates.

   We contributed $69 million, $51 million, and $242 million to our defined benefit pension plans in 2019, 2018, and 2017, respectively. The timing of funding in future periods is uncertain and is dependent on future movements in interest rates, investment returns, changes in laws and regulations, and other variables. Therefore, the table above excludes cash outflows related to our pension plans. The amount included within other non-current liabilities (and excluded from the table above) related to our pension plan liabilities was $1.1 billion as of December 31, 2019. In 2020, we have no obligation to fund our principal plans in the United States and we expect to make contributions of at least $5 million to our Puerto Rico plans and $41 million to our foreign pension plans. Additionally, we have excluded long-term tax liabilities related to unrecognized tax positions and deferred tax liabilities from the table above because we are unable to estimate the timing of the related cash outflows. The amounts of long-term tax liabilities related to unrecognized tax positions and deferred tax liabilities included within other non-current liabilities (and excluded from the table above) were $81 million and $192 million, respectively, as of December 31, 2019.

3. Includes our significant contractual unconditional purchase obligations. For cancellable agreements, any penalty due upon cancellation is included. These commitments do not exceed our projected requirements and are in the normal course of business. Examples include firm commitments for raw material purchases, utility agreements and service contracts.

## Off-Balance Sheet Arrangements

We periodically enter into off-balance sheet arrangements. Certain contingencies arise in the normal course of business and are not recorded in the consolidated balance sheets in accordance with U.S. GAAP (such as contingent joint development and commercialization arrangement payments). Also, upon resolution of uncertainties, we may incur charges in excess of presently established liabilities for certain matters (such as contractual indemnifications). For a discussion of our significant off-balance sheet arrangements, refer to Note 16 in Item 8 of this Annual Report on Form 10-K for information regarding receivable transactions, and Note 4 and Note 9 in Item 8 of this Annual Report on Form 10-K regarding joint development and commercialization arrangements, indemnifications and legal contingencies.

## FINANCIAL INSTRUMENT MARKET RISK

We operate on a global basis and are exposed to the risk that our earnings, cash flows and equity could be adversely impacted by fluctuations in foreign exchange and interest rates. Our hedging policy attempts to manage these risks to an acceptable level based on our judgment of the appropriate trade-off between risk, opportunity and costs. Refer to Note 16 and Note 17 in Item 8 of this Annual Report on Form 10-K for further information regarding our financial instruments and hedging strategies.

## Currency Risk

We are primarily exposed to foreign exchange risk with respect to revenues generated outside of the United States denominated in the Euro, British Pound, Chinese Yuan, Korean Won, Australian Dollar, Canadian Dollar, Japanese Yen, Colombian Peso, Brazilian Real, Mexican Peso, and Swedish Krona. We manage our foreign currency exposures on a consolidated basis, which allows us to net exposures and take advantage of any natural offsets. In addition, we use derivative and nonderivative financial instruments to further reduce the net exposure to foreign exchange. Gains and losses on the hedging instruments offset losses and gains on the hedged transactions and reduce the earnings and stockholders' equity volatility relating to foreign exchange. However, we don't hedge our

entire foreign exchange exposure and are still subject to earnings and stockholders' equity volatility relating to foreign exchange risk. Financial market and currency volatility may limit our ability to cost-effectively hedge these exposures.

We use options and forwards to hedge the foreign exchange risk to earnings relating to forecasted transactions denominated in foreign currencies and recognized assets and liabilities. The maximum term over which we have cash flow hedge contracts in place related to foreign exchange risk on forecasted transactions as of December 31, 2019 is 12 months. We also enter into derivative instruments to hedge foreign exchange risk on certain intra-company and third-party receivables and payables and debt denominated in foreign currencies.

As part of our risk-management program, we perform sensitivity analyses to assess potential changes in the fair value of our foreign exchange instruments relating to hypothetical and reasonably possible near-term movements in foreign exchange rates.

A sensitivity analysis of changes in the fair value of foreign exchange option and forward contracts outstanding as of December 31, 2019, while not predictive in nature, indicated that if the U.S. Dollar uniformly weakened by 10% against all currencies, on a net-of-tax basis, the net asset balance of $7 million with respect to those contracts would decrease by $15 million, resulting in a net liability position. A similar analysis performed with respect to option and forward contracts outstanding as of December 31, 2018 indicated that, on a net-of-tax basis, the net asset balance of $16 million would decrease by $26 million, resulting in a net liability position.

The sensitivity analysis model recalculates the fair value of the foreign exchange option and forward contracts outstanding as of December 31, 2019 by replacing the actual exchange rates as of December 31, 2019 with exchange rates that are 10% weaker compared to the actual exchange rates for each applicable currency. All other factors are held constant. These sensitivity analyses disregard the possibility that currency exchange rates can move in opposite directions and that gains from one currency may or may not be offset by losses from another currency. The analyses also disregard the offsetting change in value of the underlying hedged transactions and balances.

Our operations in Argentina are reported using highly inflationary accounting effective July 1, 2018.  Changes in the value of the Argentine peso applied to our peso-denominated net monetary asset positions are recorded in income at the time of the change.  As of December 31, 2019, our net monetary assets denominated in Argentine pesos are not significant.

## Interest Rate and Other Risks

We are also exposed to the risk that our earnings and cash flows could be adversely impacted by fluctuations in interest rates. Our policy is to manage interest costs using a mix of fixed- and floating-rate debt that we believe is appropriate. To manage this mix in a cost-efficient manner, we periodically enter into interest rate swaps in which we agree to exchange, at specified intervals, the difference between fixed and floating interest amounts calculated by reference to an agreed-upon notional amount. We also periodically use forward-starting interest rate swaps and treasury rate locks to hedge the risk to earnings associated with fluctuations in interest rates relating to anticipated issuances of term debt.

As of December 31, 2019, $4.8 billion of our outstanding debt obligations were at fixed interest rates, representing approximately 94 percent of our total debt. We had interest rate derivative instruments outstanding with a notional amount of $550 million and $150 million as of December 31, 2019 and 2018, respectively. A one percent change in interest rates would impact the fair value of our interest rate derivative contracts by approximately $116 million.

## CHANGES IN ACCOUNTING STANDARDS

Refer to Note 1 in Item 8 of this Annual Report on Form 10-K for information on changes in accounting standards.

## RECENT ACCOUNTING PRONOUNCEMENTS

In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2016-13, Financial Instruments - Credit Losses, which requires the measurement of expected credit losses for financial instruments held at the reporting date based on historical experience, current conditions and reasonable forecasts. The main objective of this ASU is to provide financial statement users with more decision-useful information about the expected credit losses on financial instruments and other commitments to extend credit held

by a reporting entity at each reporting date. The standard is effective for our financial statements beginning in 2020. The impact of the adoption of this ASU is not expected to have a material effect on our consolidated financial statements.

In August 2018, the FASB issued ASU 2018-15, Intangibles-Goodwill and Other-Internal-Use Software, which aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software. The standard is effective for our financial statements beginning in 2020. Our policies for capitalizing implementation costs incurred in a hosting arrangement are not expected to be impacted by this ASU. However, we have historically classified those capitalized costs within property, plant and equipment, net on our consolidated balance sheets and as capital expenditures on our consolidated statements of cash flows. Under the new ASU, those capitalized costs will be presented as other non-current assets on our consolidated balance sheets and within operating cash flows on our consolidated statements of cash flows. The impact of those classification changes following the adoption of this ASU is not expected to have a material effect on our consolidated financial statements.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses. A summary of our significant accounting policies is included in Note 1 in Item 8 of this Annual Report on Form 10-K. Certain of our accounting policies are considered critical, as these policies are the most important to the depiction of our financial statements and require significant, difficult or complex judgments by us, often employing the use of estimates about the effects of matters that are inherently uncertain. Actual results that differ from our estimates could have an unfavorable effect on our results of operations and financial position. The following is a summary of accounting policies that we consider critical to the consolidated financial statements.

### Revenue Recognition and Related Provisions and Allowances

Revenues from product sales are recorded at the net sales price (transaction price), which includes estimates of variable consideration related to rebates, product returns, sales discounts and wholesaler chargebacks. These reserves are based on estimates of the amounts earned or to be claimed on the related sales. Our estimates take into consideration historical experience, current contractual and statutory requirements, specific known market events and trends, industry data, and forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the contract. The amount of variable consideration included in the net sales price is limited to the amount that is probable not to result in a significant reversal in the amount of the cumulative revenue recognized in a future period. Additionally, our contracts with customers often include promises to transfer multiple products and services to a customer. Determining whether products and services are considered distinct performance obligations that should be accounted for separately may require significant judgment.

The new standard related to revenue recognition that was effective January 1, 2018 has not had a material impact on our consolidated financial statements as compared to historical revenue recognition guidelines. Refer to Note 1 within Item 8 of this Annual Report on Form 10-K for further information.

### Pension and OPEB Plans

We provide pension and other postretirement benefits to certain of our employees. The service component of employee benefit expenses is reported in the same line items in the consolidated income statements as the applicable employee's compensation expense. All other components of these employee benefit expenses are reported in other (income) expense, net in our consolidated statements of income. The valuation of the funded status and net periodic benefit cost for the plans is calculated using actuarial assumptions. These assumptions are reviewed annually and revised if appropriate. The significant assumptions include the following:

- interest rates used to discount pension and OPEB plan liabilities;

- the long-term rate of return on pension plan assets;

- rates of increases in employee compensation (used in estimating liabilities);

- anticipated future healthcare trend rates (used in estimating the OPEB plan liability); and

- other assumptions involving demographic factors such as retirement, mortality and turnover (used in estimating liabilities).

Selecting assumptions involves an analysis of both short-term and long-term historical trends and known economic and market conditions at the time of the valuation (also called the measurement date). The use of different assumptions would result in different measures of the funded status and net cost. Actual results in the future could differ from expected results.

Our key assumptions are listed in Note 13 in Item 8 of this Annual Report on Form 10-K. The most critical assumptions relate to the plans covering U.S. and Puerto Rico employees, because these plans are the most significant to our consolidated financial statements.

Discount Rate Assumption

Effective for the December 31, 2019 measurement date, we utilized discount rates of 3.44% and 3.16% to measure our benefit obligations for the U.S. and Puerto Rico pension plans and OPEB plan, respectively. We used a broad population of approximately 200 Aa-rated corporate bonds as of December 31, 2019 to determine the discount rate assumption. All bonds were denominated in U.S. dollars, with a minimum amount outstanding of $50 million. This population of bonds was narrowed from a broader universe of approximately 700 Moody's Aa rated, non-callable (or callable with make-whole provisions) bonds by eliminating the top 10th percentile and bottom 40th percentile to adjust for any pricing anomalies and to represent the bonds we would most likely select if we were to actually annuitize our pension and OPEB plan liabilities. This portfolio of bonds was used to generate a yield curve and associated spot rate curve to discount the projected benefit payments for the U.S. and Puerto Rico plans. The discount rate is the single level rate that produces the same result as the spot rate curve.

For plans in Canada, Japan, the United Kingdom and other European countries, we use a method essentially the same as that described for the U.S. and Puerto Rico plans. For our other international plans, the discount rate is generally determined by reviewing country- and region-specific government and corporate bond interest rates.

To understand the impact of changes in discount rates on pension and OPEB plan cost, we perform a sensitivity analysis. Holding all other assumptions constant, for each 50 basis point (i.e., one-half of one percent) increase in the discount rate, global pre-tax pension and OPEB plan cost would decrease by approximately $22 million, and for each 50 basis point decrease in the discount rate, global pre-tax pension and OPEB plan cost would increase by approximately $28 million.

Return on Plan Assets Assumption

In measuring the net periodic cost for 2019, we used a long-term expected rate of return of 6.29% for the pension plans covering U.S. and Puerto Rico employees. This assumption will increase to 6.50% in 2020. This assumption is not applicable to our OPEB plan because it is not funded.

We establish the long-term asset return assumption based on a review of historical compound average asset returns, both company-specific and relating to the broad market (based on our asset allocation), as well as an analysis of current market and economic information and future expectations. The current asset return assumption is supported by historical market experience for both our actual and targeted asset allocation. In calculating net pension cost, the expected return on assets is applied to a calculated value of plan assets, which recognizes changes in the fair value of plan assets in a systematic manner over five years. The difference between this expected return and the actual return on plan assets is a component of the total net unrecognized gain or loss and is subject to amortization in the future.

To understand the impact of changes in the expected asset return assumption on net cost, we perform a sensitivity analysis. Holding all other assumptions constant, for each 50 basis point increase (decrease) in the asset return assumption, global pre-tax pension plan cost would decrease (increase) by approximately $13 million.

Other Assumptions

For the U.S. and Puerto Rico plans, beginning with the December 31, 2019 measurement date, we used the Pri-2012 combined mortality table with improvements projected using the MP-2019 projection scale adjusted to a

43

44

long-term improvement of 0.8%. For all other pension plans, we utilized country- and region-specific mortality tables to calculate the plans' benefit obligations. We periodically analyze and update our assumptions concerning demographic factors such as retirement, mortality and turnover, considering historical experience as well as anticipated future trends.

The assumptions relating to employee compensation increases and future healthcare costs are based on historical experience, market trends, and anticipated future company actions. Refer to Note 13 in Item 8 of this Annual Report on Form 10-K for information regarding the sensitivity of the OPEB plan obligation and the total of the service and interest cost components of OPEB plan cost to potential changes in future healthcare trend rates.

**Deferred Tax Asset Valuation Allowances, Reserves for Uncertain Tax Positions and Tax Reform**

We maintain valuation allowances unless it is more likely than not that all or a portion of the deferred tax asset will be realized. Changes in valuation allowances are included in our tax provision in the period of change. In determining whether a valuation allowance is warranted, we evaluate factors such as prior earnings history, expected future earnings, carryback and carryforward periods, and tax strategies that could potentially enhance the likelihood of realization of a deferred tax asset. The realizability assessments made at a given balance sheet date are subject to change in the future, particularly if earnings of a subsidiary are significantly higher or lower than expected, or if we take operational or tax planning actions that could impact the future taxable earnings of a subsidiary.

In the normal course of business, we are audited by federal, state and foreign tax authorities, and are periodically challenged regarding the amount of taxes due. These challenges relate to the timing and amount of deductions and the allocation of income among various tax jurisdictions. We believe our tax positions comply with applicable tax law and we intend to defend our positions. In evaluating the exposure associated with various tax filing positions, we record reserves for uncertain tax positions in accordance with U.S. GAAP based on the technical support for the positions, our past audit experience with similar situations, and potential interest and penalties related to the matters. Our results of operations and effective tax rate in a given period could be impacted if, upon final resolution with taxing authorities, we prevail in positions for which reserves have been established, or we are required to pay amounts in excess of established reserves.

On December 22, 2017, the 2017 Tax Act was enacted into law and the new legislation contains several key tax provisions that affected us, including a one-time mandatory transition tax on accumulated foreign earnings and a reduction of the U.S. corporate income tax rate to 21% effective January 1, 2018, among others. We were required to recognize the effect of the tax law changes in the period of enactment, such as determining the transition tax, remeasuring our U.S. deferred tax assets and liabilities and reassessing the realizability of our deferred tax assets. In December 2017, the SEC staff issued SAB 118 which allowed us to record provisional amounts during a measurement period not to extend beyond one year of the enactment date. We completed our analysis in accordance with SAB 118 and finalized the accounting for the initial impact of the 2017 Tax Act in 2018. Refer to Note 14 within Item 8 of this Annual Report on Form 10-K for further information.

**Valuation of Intangible Assets, Including IPR&D**

We record acquired intangible assets at fair value in business combinations and at cost in asset acquisitions. Valuations are generally completed for intangible assets acquired in business acquisitions using a discounted cash flow analysis, incorporating the stage of completion and consideration of market participant assumptions. The most significant estimates and assumptions inherent in a discounted cash flow analysis include the amount and timing of projected future cash flows, the discount rate used to measure the risks inherent in the future cash flows, the assessment of the asset's life cycle, and the competitive and other trends impacting the asset, including consideration of technical, legal, regulatory, economic and other factors. Each of these factors and assumptions can significantly affect the value of the intangible asset.

Acquired in-process R&D (IPR&D) is the value assigned to acquired technology or products under development which have not received regulatory approval and have no alternative future use. Acquired IPR&D included in a business combination is capitalized as an indefinite-lived intangible asset. Development costs incurred after the acquisition are expensed as incurred. Upon receipt of regulatory approval of the related technology or product, the indefinite-lived intangible asset is then accounted for as a finite-lived intangible asset and amortized on a straight-line basis over its estimated useful life. If the R&D project is abandoned, the indefinite-lived intangible asset is charged to expense.

44

IPR&D acquired in transactions that are not business combinations is expensed immediately. For such transactions, payments made to third parties on or after regulatory approval are capitalized and amortized over the remaining useful life of the related asset, and are classified as intangible assets.

Due to the inherent uncertainty associated with R&D projects, there is no assurance that actual results will not differ materially from the underlying assumptions used to prepare discounted cash flow analyses, nor that the R&D project will result in a successful commercial product.

## CERTAIN REGULATORY MATTERS

The U.S. Food and Drug Administration (FDA) commenced an inspection of Claris' facilities in Ahmedabad, India in July 2017, immediately prior to the closing of the Claris acquisition. FDA completed the inspection and subsequently issued a Warning Letter based on observations identified in the 2017 inspection (Claris Warning Letter).[1] While FDA has not yet re-inspected the facilities, we are continuing to implement corrective and preventive actions to address FDA's prior observations and other items identified in connection with integrating Claris into our quality systems.

While management cannot speculate on when the Claris Warning Letter will be lifted, management continues to pursue and implement other manufacturing locations, including contract manufacturing organizations, to support the production of new products for distribution in the U.S. in the meantime. As of December 31, 2019, we have secured alternative locations to produce a majority of the planned new products for distribution into the U.S.

On May 6, 2019, we received a Show Cause Notice under the Drugs & Cosmetics Act, 1940 and Rules thereunder (Show Cause Notice) from the Commissioner of the Food & Drugs Control Administration in the Gujarat State in Gandhinagar, India (Commissioner). The Show Cause Notice was issued regarding an April 9, 2019 inspection of our Claris facilities in Ahmedabad, India by the Commissioner. The Show Cause Notice contained a number of observations of alleged Good Manufacturing Practice related issues across a variety of areas, some of which overlap with the areas covered in the Claris 483 or the Claris Warning Letter. We responded to the Show Cause Notice and a follow up inspection occurred in July 2019. No further action has been undertaken by the Gujarat authorities.

In June 2013, we received a Warning Letter from FDA regarding operations and processes at our North Cove, North Carolina and Jayuya, Puerto Rico facilities. We attended Regulatory Meetings with FDA regarding one or both of these facilities in October 2014, November 2015, July 2017, April 2018 and October 2018. The Warning Letter addresses observations related to Current Good Manufacturing Practice violations at the two facilities. The Warning Letter was closed out in September 2019.

As previously disclosed, in the fourth quarter of 2012, we received two investigative demands from the United States Attorney for the Western District of North Carolina for information regarding our quality and manufacturing practices and procedures at our North Cove facility. In January 2017, the parties resolved the matter by entering into a deferred prosecution agreement and a civil settlement whereby we agreed to pay approximately $18 million and implement certain enhanced compliance measures. In July 2019, the deferred prosecution agreement expired and, based on our fulfillment of the terms of the agreement, the court dismissed the criminal information previously filed in the case with prejudice.

Refer to Item 1A of this Annual Report on Form 10-K for additional discussion of regulatory matters and how they may impact us.

[1] Available online at https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm613538.htm

## FORWARD-LOOKING INFORMATION

This annual report includes forward-looking statements. Use of the words "may," "will," "would," "could," "should," "believes," "estimates," "projects," "potential," "expects," "plans," "seeks," "intends," "evaluates," "pursues," "anticipates," "continues," "designs," "impacts," "affects," "forecasts," "target," "outlook," "initiative," "objective," "designed," "priorities," "goal," or the negative of those words or other similar expressions is intended to identify forward-looking statements that represent our current judgment about possible future events. These forward-looking statements may include statements with respect to accounting estimates and assumptions, litigation-related matters including outcomes, impacts of the internal investigation related to foreign exchange gains and losses and the

material weakness identified as a result thereof, future regulatory filings and our R&D pipeline, strategic objectives, sales from new product offerings, credit exposure to foreign governments, potential developments with respect to credit ratings, investment of foreign earnings, estimates of liabilities including those related to uncertain tax positions, contingent payments, future pension plan contributions, costs, discount rates and rates of return, our exposure to financial market volatility and foreign currency and interest rate risks, potential tax liability associated with the separation of our biopharmaceuticals and medical products businesses, the impact of competition, future sales growth, business development activities (including the acquisitions of Cheetah and Seprafilm from Sanofi), business optimization initiatives, cost saving initiatives, future capital and R&D expenditures, future debt issuances, manufacturing expansion, the sufficiency of our facilities and financial flexibility, the adequacy of credit facilities, tax provisions and reserves, the effective tax rate and all other statements that do not relate to historical facts.

These forward-looking statements are based on certain assumptions and analyses made in light of our experience and perception of historical trends, current conditions, and expected future developments as well as other factors that we believe are appropriate in the circumstances. While these statements represent our judgment on what the future may hold, and we believe these judgments are reasonable, these statements are not guarantees of any events or financial results. Whether actual future results and developments will conform to expectations and predictions is subject to a number of risks and uncertainties, including the following factors, many of which are beyond our control:

- failure to achieve our long-term financial improvement goals;

- demand for and market acceptance risks for and competitive pressures related to new and existing products (including challenges with our ability to accurately predict these pressures and the resulting impact on customer inventory levels), and the impact of those products on quality and patient safety concerns;

- product development risks, including satisfactory clinical performance, the ability to manufacture at appropriate scale, and the general unpredictability associated with the product development cycle;

- our ability to finance and develop new products or enhancements on commercially acceptable terms or at all;

- our ability to identify business development and growth opportunities and to successfully execute on business development strategies;

- product quality or patient safety issues, leading to product recalls, withdrawals, launch delays, warning letters, import bans, sanctions, seizures, litigation, or declining sales;

- the continuity, availability and pricing of acceptable raw materials and component supply, and the related continuity of our manufacturing and distribution;

- inability to create additional production capacity in a timely manner or the occurrence of other manufacturing, sterilization or supply difficulties (including as a result of natural disaster, public health crises and epidemics/pandemics, regulatory actions or otherwise);

- breaches or failures of our information technology systems or products, including by cyber-attack, data leakage, unauthorized access or theft;

- future actions of (or failures to act or delays in acting by) FDA, the European Medicines Agency or any other regulatory body or government authority (including the SEC, DOJ or the Attorney General of any State) that could delay, limit or suspend product development, manufacturing or sale or result in seizures, recalls, injunctions, monetary sanctions or criminal or civil liabilities, including the continued delay in lifting the warning letter at our Ahmedabad facility or proceedings related to the misstatements in previously reported non-operating income related to foreign exchange gains and losses;

- the impacts of the material weakness identified as a result of the internal investigation related to foreign exchange gains and losses and our remediation efforts, including the risk that we may experience additional material weaknesses;

- developments that would require the correction of additional misstatements in our previously issued financial statements;

- failures with respect to our environmental, quality, compliance or ethics programs;

- future actions of third parties, including third-party payers, the impact of healthcare reform and its implementation, suspension, repeal, replacement, amendment, modification and other similar actions undertaken by the United States or foreign governments, including with respect to pricing, reimbursement, taxation and rebate policies; legislation, regulation and other governmental pressures in the United States or globally, including the cost of compliance and potential penalties for purported noncompliance thereof, all of which may affect pricing, reimbursement, taxation and rebate policies of government agencies and private payers or other elements of our business, including new or amended laws, rules and regulations (such as the California Consumer Privacy Act of 2018, the European Union's General Data Protection Regulation and proposed regulatory changes of the U.S. Department of Health and Human Services in kidney health policy and reimbursement, which may substantially change the U.S. end stage renal disease market and demand for our peritoneal dialysis products, necessitating significant multi-year capital expenditures, which are difficult to estimate in advance, for example);

- the outcome of pending or future litigation or government investigations, including the opioid litigation and litigation related to our internal investigation of foreign exchange gains and losses;

- the impact of competitive products and pricing, including generic competition, drug reimportation and disruptive technologies;

- global regulatory, trade and tax policies;

- the ability to protect or enforce our owned or in-licensed patent or other proprietary rights (including trademarks, copyrights, trade secrets and know-how) or patents of third parties preventing or restricting our manufacture, sale or use of affected products or technology;

- the impact of any goodwill or other intangible asset impairments on our operating results;

- any failure by Baxalta or Shire to satisfy its obligations under the separation agreements, including the tax matters agreement, or that certain letter agreement entered into with Shire and Baxalta;

- the impact of global economic conditions (including potential trade wars) and public health crises and epidemics, such as the novel strain of coronavirus that recently originated in China (COVID-19), on us and our customers and suppliers, including foreign governments in countries in which we operate;

- fluctuations in foreign exchange and interest rates;

- any changes in law concerning the taxation of income (whether with respect to current or future tax reform), including income earned outside the United States and potential taxes associated with the Base Erosion and Anti-Abuse Tax;

- actions by tax authorities in connection with ongoing tax audits;

- loss of key employees or inability to identify and recruit new employees;

47

48

- other factors identified elsewhere in this Annual Report on Form 10-K including those factors described in Item 1A and other filings with the SEC, all of which are available on our website.

Actual results may differ materially from those projected in the forward-looking statements. We do not undertake to update our forward-looking statements.

**Item 7A.** *Quantitative and Qualitative Disclosures About Market Risk.*

Incorporated by reference to the section entitled "Financial Instrument Market Risk" in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 of this Annual Report on Form 10-K.

48

**Item 8.** *Financial Statements and Supplementary Data.*

## CONSOLIDATED BALANCE SHEETS

| as of December 31 (in millions, except share information) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 3,335 | $ | 1,838 |
| Accounts receivable, net | | 1,896 | | 1,840 |
| Inventories | | 1,653 | | 1,667 |
| Prepaid expenses and other current assets | | 619 | | 614 |
| Total current assets | | 7,503 | | 5,959 |
| Property, plant and equipment, net | | 4,512 | | 4,530 |
| Goodwill | | 3,030 | | 3,002 |
| Other intangible assets, net | | 1,471 | | 1,410 |
| Operating lease right-of-use assets | | 608 | | — |
| Other non-current assets | | 1,069 | | 819 |
| Total assets | $ | 18,193 | $ | 15,720 |
| Current liabilities: | | | | |
| Short-term debt | $ | 226 | $ | 2 |
| Current maturities of long-term debt and finance lease obligations | | 315 | | 2 |
| Accounts payable and accrued liabilities | | 2,689 | | 2,810 |
| Total current liabilities | | 3,230 | | 2,814 |
| Long-term debt and finance lease obligations | | 4,809 | | 3,481 |
| Operating lease liabilities | | 510 | | — |
| Other non-current liabilities | | 1,732 | | 1,559 |
| Total liabilities | | 10,281 | | 7,854 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares in 2019 and 2018 | | 683 | | 683 |
| Common stock in treasury, at cost, 177,340,358 shares in 2019 and 170,495,859 shares in 2018 | | (10,764) | | (9,989) |
| Additional contributed capital | | 5,955 | | 5,898 |
| Retained earnings | | 15,718 | | 15,075 |
| Accumulated other comprehensive (loss) income | | (3,710) | | (3,823) |
| Total Baxter stockholders' equity | | 7,882 | | 7,844 |
| Noncontrolling interests | | 30 | | 22 |
| Total equity | | 7,912 | | 7,866 |
| Total liabilities and equity | $ | 18,193 | $ | 15,720 |

The accompanying notes are an integral part of these consolidated financial statements.

49

**CONSOLIDATED STATEMENTS OF INCOME**

| | | | | As Restated | | |
|---|---|---|---|---|---|---|
| years ended December 31 (in millions, except per share data) | | **2019** | | 2018 | | 2017 |
| Net sales | $ | **11,362** | $ | 11,099 | $ | 10,584 |
| Cost of sales | | **6,601** | | 6,340 | | 6,110 |
| Gross margin | | **4,761** | | 4,759 | | 4,474 |
| Selling, general and administrative expenses | | **2,535** | | 2,620 | | 2,627 |
| Research and development expenses | | **595** | | 654 | | 615 |
| Other operating income, net | | **(141)** | | (99) | | (56) |
| Operating income | | **1,772** | | 1,584 | | 1,288 |
| Interest expense, net | | **71** | | 45 | | 55 |
| Other (income) expense, net | | **731** | | (78) | | 133 |
| Income from continuing operations before income taxes | | **970** | | 1,617 | | 1,100 |
| Income tax expense (benefit) | | **(41)** | | 65 | | 491 |
| Income from continuing operations | | **1,011** | | 1,552 | | 609 |
| Loss from discontinued operations, net of tax | | **—** | | (6) | | (7) |
| Net income | | **1,011** | | 1,546 | | 602 |
| Less: Net income attributable to noncontrolling interests | | **10** | | — | | — |
| Net income attributable to Baxter stockholders | $ | **1,001** | $ | 1,546 | $ | 602 |
| **Earnings per share from continuing operations** | | | | | | |
|   Basic | $ | **1.97** | $ | 2.91 | $ | 1.12 |
|   Diluted | $ | **1.93** | $ | 2.84 | $ | 1.10 |
| **Loss per share from discontinued operations** | | | | | | |
|   Basic | $ | **—** | $ | (0.01) | $ | (0.01) |
|   Diluted | $ | **—** | $ | (0.01) | $ | (0.02) |
| **Earnings per share** | | | | | | |
|   Basic | $ | **1.97** | $ | 2.90 | $ | 1.11 |
|   Diluted | $ | **1.93** | $ | 2.83 | $ | 1.08 |
| **Weighted-average number of shares outstanding** | | | | | | |
|   Basic | | **509** | | 534 | | 543 |
|   Diluted | | **519** | | 546 | | 555 |

The accompanying notes are an integral part of these consolidated financial statements.

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Net income | $ | 1,011 | $ | 1,546 | $ | 602 |
| Other comprehensive (loss) income, net of tax: | | | | | | |
| Currency translation adjustments, net of tax expense (benefit) of ($5) in 2019, ($52) in 2018 and $89 in 2017 | | (95) | | (323) | | 599 |
| Pension and other postretirement benefit plans, net of tax expense of $130 in 2019, $10 in 2018, and $60 in 2017 | | 408 | | 33 | | 134 |
| Hedging activities, net of tax expense (benefit) of ($11) in 2019, $3 in 2018, and ($6) in 2017 | | (39) | | 9 | | (13) |
| Available-for-sale securities, net of tax expense of zero in 2019, 2018 and 2017, respectively | | — | | — | | 2 |
| Total other comprehensive (loss) income, net of tax | | 274 | | (281) | | 722 |
| Comprehensive income | | 1,285 | | 1,265 | | 1,324 |
| Less: Comprehensive income attributable to noncontrolling interests | | 10 | | — | | — |
| Comprehensive income attributable to Baxter stockholders | $ | 1,275 | $ | 1,265 | $ | 1,324 |

The accompanying notes are an integral part of these consolidated financial statements.

51

## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY

| (in millions) | Baxter International Inc. stockholders' equity | | | | | | | | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | | |
| Balance as of January 1, 2017 (As Restated) | 683 | $ 683 | 144 | $ (7,995) | $ 5,958 | $ 13,846 | $ (4,261) | $ 8,231 | $ (10) | $ 8,221 |
| Net income | — | — | — | — | — | 602 | — | $ 602 | — | $ 602 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 722 | 722 | — | 722 |
| Purchases of treasury stock | — | — | 9 | (564) | — | — | — | (564) | — | (564) |
| Stock issued under employee benefit plans and other | — | — | (11) | 578 | (18) | (134) | — | 426 | — | 426 |
| Dividends declared on common stock | — | — | — | — | — | (334) | — | (334) | — | (334) |
| Distribution of Baxalta | — | — | — | — | — | 34 | — | 34 | — | 34 |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of December 31, 2017 (As Restated) | 683 | $ 683 | $ 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (22) | (3) | (25) | — | (25) |
| Net income | — | — | — | — | — | 1,546 | — | 1,546 | — | 1,546 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (281) | (281) | — | (281) |
| Purchases of treasury stock | — | — | 36 | (2,415) | (60) | — | — | (2,475) | — | (2,475) |
| Stock issued under employee benefit plans and other | — | — | (8) | 407 | 18 | (71) | — | 354 | — | 354 |
| Dividends declared on common stock | — | — | — | — | — | (392) | — | (392) | — | (392) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 30 | 30 |
| Balance as of December 31, 2018 (As Restated) | 683 | $ 683 | $ 170 | $ (9,989) | $ 5,898 | $ 15,075 | $ (3,823) | $ 7,844 | $ 22 | $ 7,866 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 1,001 | — | 1,001 | 10 | 1,011 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 274 | 274 | — | 274 |
| Purchases of treasury stock | — | — | 16 | (1,293) | 46 | — | — | (1,247) | — | (1,247) |
| Stock issued under employee benefit plans and other | — | — | (9) | 518 | 11 | (84) | — | 445 | — | 445 |
| Dividends declared on common stock | — | — | — | — | — | (435) | — | (435) | — | (435) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | (2) | (2) |
| Balance as of December 31, 2019 | 683 | $ 683 | 177 | $ (10,764) | $ 5,955 | $ 15,718 | $ (3,710) | $ 7,882 | $ 30 | $ 7,912 |

The accompanying notes are an integral part of these consolidated financial statements.

52

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | | As Restated | | |
|---|---|---|---|---|---|
| years ended December 31 (in millions) | | **2019** | | 2018 | 2017 |
| Cash flows from operations | | | | | |
| Net income | $ | **1,011** | $ | 1,546 $ | 602 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | | | | |
| Loss from discontinued operations, net of tax | | **—** | | 6 | 7 |
| Depreciation and amortization | | **789** | | 771 | 750 |
| Pension settlement charges | | **755** | | 1 | 2 |
| Net periodic pension benefit and other postretirement costs | | **22** | | 39 | 123 |
| Deferred income taxes | | **(310)** | | (263) | 211 |
| Stock compensation | | **122** | | 115 | 107 |
| Intangible asset impairment | | **31** | | — | — |
| Other | | **115** | | 50 | 38 |
| Changes in balance sheet items: | | | | | |
| Accounts receivable, net | | **(65)** | | (12) | 30 |
| Inventories | | **4** | | (197) | 76 |
| Accounts payable and accrued liabilities | | **(212)** | | 60 | 11 |
| Other | | **(152)** | | (99) | (227) |
| Cash flows from operations – continuing operations | | **2,110** | | 2,017 | 1,730 |
| Cash flows from operations – discontinued operations | | **(6)** | | — | (16) |
| Cash flows from operations | | **2,104** | | 2,017 | 1,714 |
| Cash flows from investing activities | | | | | |
| Capital expenditures | | **(696)** | | (659) | (616) |
| Acquisitions and investments, net of cash acquired | | **(418)** | | (268) | (686) |
| Other investing activities, net | | **14** | | 11 | 10 |
| Cash flows from investing activities | | **(1,100)** | | (916) | (1,292) |
| Cash flows from financing activities | | | | | |
| Issuances of long-term debt | | **1,661** | | — | 665 |
| Borrowings under revolving credit facility | | **222** | | — | — |
| Cash dividends on common stock | | **(423)** | | (376) | (315) |
| Proceeds from stock issued under employee benefit plans | | **356** | | 258 | 347 |
| Purchases of treasury stock | | **(1,270)** | | (2,452) | (564) |
| Other financing activities, net | | **(48)** | | (33) | (40) |
| Cash flows from financing activities | | **498** | | (2,603) | 93 |
| Effect of foreign exchange rate changes on cash and cash equivalents | | **(5)** | | (63) | 102 |
| Increase (decrease) in cash and cash equivalents | | **1,497** | | (1,565) | 617 |
| Cash and cash equivalents at beginning of year | | **1,838** | | 3,403 | 2,786 |
| Cash and cash equivalents at end of year | $ | **3,335** | $ | 1,838 $ | 3,403 |
| Other supplemental information | | | | | |
| Interest paid, net of portion capitalized | $ | **103** | $ | 94 $ | 80 |
| Income taxes paid | $ | **294** | $ | 301 $ | 253 |

The accompanying notes are an integral part of these consolidated financial statements.

53

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1**
**SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Nature of Operations**

Baxter International Inc., through our subsidiaries (collectively, Baxter, we, our or us), provides a broad portfolio of essential healthcare products, including acute and chronic dialysis therapies; sterile intravenous (IV) solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products. Our global footprint and the critical nature of our products and services play a key role in expanding access to healthcare in emerging and developed countries. These products are used by hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices and patients at home under physician supervision. We operate in three segments: Americas, EMEA and APAC, which are described in Note 18.

**Use of Estimates**

The preparation of the financial statements in conformity with U.S. Generally Accepted Accounting Principles (U.S. GAAP) requires us to make estimates and assumptions that affect reported amounts and related disclosures. Actual results could differ from those estimates.

**Basis of Presentation**

The consolidated financial statements include the accounts of Baxter and our majority-owned subsidiaries that we control, after elimination of intra-company transactions. Certain reclassifications have been made to conform the prior period consolidated financial statements to the current period presentation.

On October 25, 2019, we acquired 100 percent of Cheetah Medical, Inc. (Cheetah) for total upfront cash consideration of $195 million, net of cash acquired, with the potential for additional cash consideration, up to $40 million, based on clinical and commercial milestones for which the acquisition date fair value was $18 million. Beginning October 25, 2019, our financial statements include the assets, liabilities and operating results of Cheetah. Refer to Note 4 for additional information.

On November 18, 2018, we acquired a controlling financial interest in our joint venture in Saudi Arabia. The acquisition allows us to increase manufacturing output and utilize the facilities for additional capacity for certain products in the region. Beginning November 18, 2018, we consolidated the financial statements of the joint venture with our consolidated financial statements. Refer to Note 4 for additional information.

On March 16, 2018, we acquired two hemostat and sealant products from Mallinckrodt plc: RECOTHROM Thrombin topical (Recombinant) and PREVELEAK Surgical Sealant for total consideration of $184 million. Beginning March 16, 2018, our financial statements include the assets, liabilities and operating results of RECOTHROM and PREVELEAK. Refer to Note 4 for additional information.

On July 27, 2017, we acquired 100 percent of Claris Injectables Limited (Claris), a wholly owned subsidiary of Claris Lifesciences Limited, for total cash consideration of approximately $629 million, net of cash acquired. Beginning July 27, 2017, our financial statements include the assets, liabilities and operating results of Claris. Refer to Note 4 for additional information.

Currency restrictions enacted in Venezuela require approval from the Venezuelan government to exchange Venezuelan bolivars for U.S. dollars. Due to a decline in transactions to exchange Venezuelan bolivars for U.S. dollars, and limitations on our ability to repatriate funds generated by our Venezuela operations, we concluded in the second quarter of 2017 that we no longer met the accounting criteria for control over our business in Venezuela and we deconsolidated our Venezuelan operations on June 30, 2017. As a result of deconsolidating the Venezuelan operations, we recorded a pre-tax charge of $33 million in other (income) expense, net in 2017. This charge included the write-off of our investment in our Venezuelan operations, related cumulative translation adjustments and elimination of intra-company amounts. Beginning in the third quarter of 2017, we no longer included the results of our Venezuelan business in our consolidated financial statements. In 2018, we liquidated our subsidiary in

54

Venezuela and currently sell direct to distributors in that country through legal entities outside of Venezuela. The distributors purchase our products in U.S. dollars and are responsible for importing those products into Venezuela.

**Revenue Recognition**

We adopted Accounting Standards Update (ASU) No. 2014-9, Revenue from Contracts with Customers (Topic 606) as of January 1, 2018. Results for the years ended December 31, 2019 and 2018 are presented under Topic 606, while the 2017 period is presented under previous guidance. See further discussion of the impact of Topic 606 below under the header "New Accounting Standards."

Revenue is measured as the amount of consideration we expect to receive in exchange for transferring goods or providing services. A performance obligation is a promise in a contract to transfer a distinct good or service to the customer and is the unit of account in the contract. A contract's transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. Some of our contracts have multiple performance obligations. For contracts with multiple performance obligations, we allocate the contract's transaction price to each performance obligation using our best estimate of the standalone selling price of each distinct good or service in the contract. Our global payment terms are typically between 30-90 days.

The majority of our performance obligations are satisfied at a point in time. This includes sales of our broad portfolio of essential healthcare products across our geographic segments, including acute and chronic dialysis therapies; sterile IV solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products. For a majority of these sales, our performance obligation is satisfied upon delivery to the customer. Shipping and handling activities are considered to be fulfillment activities and are not considered to be a separate performance obligation.

To a lesser extent, in all of our segments, we enter into other types of contracts, including contract manufacturing arrangements, equipment leases, and certain subscription software and licensing arrangements. We recognize revenue for these arrangements over time or at a point in time depending on our evaluation of when the customer obtains control of the promised goods or services. Revenue is recognized over time when we are creating or enhancing an asset that the customer controls as the asset is created or enhanced or when our performance does not create an asset with an alternative use and we have an enforceable right to payment for performance completed.

As of December 31, 2019, we had $8.6 billion of transaction price allocated to remaining performance obligations related to executed contracts with an original duration of one year or more, which are primarily included in the Americas segment. Some contracts in the United States included in this amount contain index-dependent price increases, which are not known at this time. We expect to recognize approximately 25% of this amount as revenue in each of 2020 and 2021, 20% in each of 2022 and 2023, 5% in 2024, and the remaining balance thereafter.

*Significant Judgments*

Revenues from product sales are recorded at the net sales price (transaction price), which includes estimates of variable consideration related to rebates, product returns, sales discounts and wholesaler chargebacks. These reserves are based on estimates of the amounts earned or to be claimed on the related sales and are included in accounts receivable, net and accounts payable and accrued liabilities on the consolidated balance sheets. Management's estimates take into consideration historical experience, current contractual and statutory requirements, specific known market events and trends, industry data, and forecasted customer buying and payment patterns. Overall, these reserves reflect our best estimates of the amount of consideration to which we are entitled based on the terms of the contract using the expected value method. The amount of variable consideration included in the net sales price is limited to the amount that is probable not to result in a significant reversal in the amount of the cumulative revenue recognized in a future period. Revenue recognized in years ended December 31, 2019 and 2018 related to performance obligations satisfied in prior periods was not material.

*Contract Balances*

The timing of revenue recognition, billings and cash collections results in the recognition of trade accounts receivable, unbilled receivables, contract assets, and customer advances and deposits (contract liabilities) on our consolidated balance sheets. Net trade accounts receivable was $1.8 billion as of December 31, 2019 and 2018.

For contract manufacturing arrangements, revenue is primarily recognized throughout the production cycle, which typically lasts up to 90 days, resulting in the recognition of contract assets until the related services are completed and the customers are billed. Additionally, for arrangements containing a performance obligation to deliver software that can be used with medical devices, we recognize revenue upon delivery of the software, which results in the recognition of contract assets when customers are billed over time, generally over one to five years. For bundled contracts involving equipment delivered up-front and consumable medical products to be delivered over time, total contract revenue is allocated between the equipment and consumable medical products. In certain of those arrangements, a contract asset is created for the difference between the amount of equipment revenue recognized upon delivery and the amount of consideration initially receivable from the customer. In those arrangements, the contract asset becomes a trade account receivable as consumable medical products are provided and billed, generally over one to seven years. Our contract asset balances totaled $131 million as of December 31, 2019, of which $36 million related to contract manufacturing services, $43 million related to software sales and $52 million related to bundled equipment and consumable medical products contracts. Our contract asset balances totaled $80 million as of December 31, 2018, of which $33 million related to contract manufacturing services and $47 million related to software sales. Contract assets are presented within accounts receivable, net ($63 million and $50 million as of December 31, 2019 and 2018, respectively) and other non-current assets ($68 million and $30 million as of December 31, 2019 and 2018, respectively) on the consolidated balance sheets. Contract liabilities were $12 million as of December 31, 2019 and were included in other non-current liabilities on the consolidated balance sheet. Contract liabilities as of December 31, 2018 were not significant.

*Practical Expedients*

We apply a practical expedient to expense as incurred costs to obtain a contract with a customer when the amortization period would have been one year or less. We do not disclose the value of the transaction price that is allocated to unsatisfied performance obligations for contracts with an original expected length of one year or less. We have elected to use the practical expedient to not adjust the promised amount of consideration for the effects of a significant financing component if it is expected, at contract inception, that the period between when we transfer a promised good or service to a customer and when the customer pays for that good or service will be one year or less. Additionally, all taxes assessed by a governmental authority that are both imposed on and concurrent with a specific revenue-producing transaction and collected from a customer are excluded from revenue.

*Disaggregation of Net Sales*

The following tables disaggregate our net sales from contracts with customers by Global Business Unit (GBU) between the U.S. and international:

| | | | | | As Restated | | | | |
| years ended December 31 (in millions) | 2019 | | | 2018 | | | 2017 | | |
| | U.S. | International | Total | U.S. | International | Total | U.S. | International | Total |
|---|---|---|---|---|---|---|---|---|---|
| Renal Care[1] | $ 791 | $ 2,848 | $ 3,639 | $ 816 | $ 2,835 | $ 3,651 | $ 754 | $ 2,737 | $ 3,491 |
| Medication Delivery[2] | 1,822 | 977 | 2,799 | 1,690 | 974 | 2,664 | 1,698 | 1,002 | 2,700 |
| Pharmaceuticals[3] | 940 | 1,215 | 2,155 | 996 | 1,091 | 2,087 | 892 | 994 | 1,886 |
| Clinical Nutrition[4] | 320 | 552 | 872 | 321 | 554 | 875 | 359 | 526 | 885 |
| Advanced Surgery[5] | 535 | 342 | 877 | 466 | 332 | 798 | 403 | 305 | 708 |
| Acute Therapies[6] | 184 | 351 | 535 | 174 | 341 | 515 | 147 | 310 | 457 |
| Other[7] | 234 | 251 | 485 | 260 | 249 | 509 | 257 | 200 | 457 |
| Total Baxter | $ 4,826 | $ 6,536 | $ 11,362 | $ 4,723 | $ 6,376 | $ 11,099 | $ 4,510 | $ 6,074 | $ 10,584 |

[1] Renal Care includes sales of our peritoneal dialysis (PD), hemodialysis (HD) and additional dialysis therapies and services.
[2] Medication Delivery includes sales of our IV therapies, infusion pumps, administration sets and drug reconstitution devices.
[3] Pharmaceuticals includes sales of our premixed and oncology drug platforms, inhaled anesthesia and critical care products and pharmacy compounding services.
[4] Clinical Nutrition includes sales of our parenteral nutrition (PN) therapies and related products.

[5] Advanced Surgery includes sales of our biological products and medical devices used in surgical procedures for hemostasis, tissue sealing and adhesion prevention.

[6] Acute Therapies includes sales of our continuous renal replacement therapies (CRRT) and other organ support therapies focused in the intensive care unit (ICU).

[7] Other primarily includes sales of contract manufacturing services from our pharmaceutical partnering business.

## Accounts Receivable and Allowance for Doubtful Accounts

In the normal course of business, we provide credit to our customers, perform credit evaluations of these customers and maintain reserves for potential credit losses. In determining the amount of the allowance for doubtful accounts, we consider, among other items, historical credit losses, the past-due status of receivables, payment histories and other customer-specific information. Receivables are written off when we determine they are uncollectible. The allowance for doubtful accounts was $112 million and $110 million as of December 31, 2019 and 2018, respectively.

## Shipping and Handling Costs

Shipping costs, which are costs incurred to physically move product from our premises to the customer's premises, are classified as selling, general and administrative (SG&A) expenses. Handling costs, which are costs incurred to store, move and prepare products for shipment, are classified as cost of sales. Approximately $324 million in 2019, $329 million in 2018 and $292 million in 2017 of shipping costs were classified in SG&A expenses.

## Cash and Cash Equivalents

Cash and cash equivalents include cash, certificates of deposit and money market and other short-term funds with original maturities of three months or less.

## Inventories

Inventories are stated at the lower of cost or net realizable value determined by the first-in, first-out method. We review inventories on hand at least quarterly and record provisions for estimated excess, slow-moving and obsolete inventory, as well as inventory with a carrying value in excess of net realizable value.

## Property, Plant and Equipment, Net

Property, plant and equipment are stated at cost. Depreciation expense is calculated using the straight-line method over the estimated useful lives of the related assets, which range from 20 to 50 years for buildings and improvements and from three to 15 years for machinery and equipment. Leasehold improvements are amortized over the life of the related facility lease (including any renewal periods, if appropriate) or the asset, whichever is shorter. We capitalize certain computer software and software development costs incurred in connection with developing or obtaining software for internal use. Capitalized software costs are included within machinery and equipment and are amortized on a straight-line basis over the estimated useful lives of the software, which generally range from three to five years.

## Research and Development

Research and development (R&D) costs, including R&D acquired in transactions that are not business combinations, are expensed as incurred. Pre-regulatory approval contingent milestone obligations to counterparties in collaborative arrangements, which include acquired R&D, are expensed when the milestone is achieved. Contingent milestone payments made to such counterparties on or after regulatory approval are capitalized and amortized over the remaining useful life of the related product. Amounts capitalized for such payments are included in other intangible assets, net.

Acquired in-process R&D (IPR&D) is the value assigned to technology or products under development acquired in a business combination which have not received regulatory approval and have no alternative future use. Acquired IPR&D is capitalized as an indefinite-lived intangible asset. Development costs incurred after the acquisition are expensed as incurred. Upon receipt of regulatory approval of the related technology or product, the indefinite-lived intangible asset is accounted for as a finite-lived intangible asset and amortized on a straight-line basis over the

estimated economic life of the related technology or product, subject to annual impairment reviews as discussed below. If the R&D project is abandoned, the indefinite-lived asset is charged to expense.

## Collaborative Arrangements

We enter into collaborative arrangements in the normal course of business. These collaborative arrangements take a number of forms and structures and are designed to enhance and expedite long-term sales and profitability growth. These arrangements may provide for us to obtain commercialization rights to a product under development, and require us to make upfront payments, contingent milestone payments, profit-sharing, and/or royalty payments. We may be responsible for ongoing costs associated with the arrangements, including R&D cost reimbursements to the counterparty. See the R&D section of this note regarding the accounting treatment of upfront and contingent milestone payments. Any royalty and profit-sharing payments during the commercialization phase are expensed as cost of sales when they become due and payable.

## Restructuring Charges

We record liabilities for costs associated with exit or disposal activities in the period in which the liability is incurred. Employee termination costs are primarily recorded when actions are probable and estimable. Costs for one-time termination benefits in which the employee is required to render service until termination in order to receive the benefits are recognized ratably over the future service period. Refer to the discussion below regarding the accounting for asset impairment charges.

## Goodwill, Intangible Assets, and Other Long-Lived Assets

Goodwill is the excess of the purchase price over the fair value of acquired assets and liabilities in a business combination. Goodwill is not amortized but is subject to an impairment review annually and whenever indicators of impairment exist. We have the option to assess goodwill for impairment by initially performing a qualitative assessment to determine whether it is more-likely-than-not that the fair value of a reporting unit is less than its carrying amount. If we determine that it is not more-likely-than-not that the fair value of a reporting unit is less than its carrying amount, then the two-step goodwill impairment test is not required to be performed. If we determine that it is more-likely-than-not that the fair value of a reporting unit is less than its carrying amount, or if we do not elect the option to perform an initial qualitative assessment, we perform the two-step goodwill impairment test. In the first step, the fair value of the reporting unit is compared with its book value including goodwill. If the fair value of the reporting unit is in excess of its book value, the related goodwill is not impaired and no further analysis is necessary. If the fair value of the reporting unit is less than its book value, there is an indication of potential impairment and a second step is performed. When required, the second step of testing involves calculating the implied fair value of goodwill for the reporting unit. The implied fair value of goodwill is determined in the same manner as goodwill recognized in a business combination, which is the excess of the fair value of the reporting unit determined in step one over the fair value of its net assets, including identifiable intangible assets, as if the reporting unit had been acquired. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess.

Indefinite-lived intangible assets, such as IPR&D acquired in business combinations and certain trademarks with indefinite lives, are subject to an impairment review annually and whenever indicators of impairment exist. We have the option to assess indefinite-lived intangible assets for impairment by first performing qualitative assessments to determine whether it is more-likely-than-not that the fair values of its indefinite-lived intangible assets are less than the carrying amounts. If we determine that it is more-likely-than-not that an indefinite-lived intangible asset is impaired, or if we elect not to perform an initial qualitative assessment, we then perform the quantitative impairment test by comparing the fair value of the indefinite-lived intangible asset with its carrying amount. If the carrying amount exceeds the fair value of the indefinite-lived intangible asset, we write the carrying amount down to the fair value.

We review the carrying amounts of long-lived assets, other than goodwill and intangible assets not subject to amortization, for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating recoverability, we group assets and liabilities at the lowest level such that the identifiable cash flows relating to the group are largely independent of the cash flows of other assets and liabilities. We then compare the carrying amounts of the assets or asset groups with the related estimated undiscounted future cash flows. In the event impairment exists, an impairment charge is recorded as the amount by which the carrying amount of the asset or asset group exceeds the fair value.

**Income Taxes**

Deferred taxes are recognized for the future tax effects of temporary differences between financial and income tax reporting based on enacted tax laws and rates. We maintain valuation allowances unless it is more-likely-than-not that the deferred tax asset will be realized. With respect to uncertain tax positions, we determine whether the position is more-likely-than-not to be sustained upon examination based on the technical merits of the position. Any tax position that meets the more-likely-than-not recognition threshold is measured and recognized in the consolidated financial statements at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. The liability relating to uncertain tax positions is classified as current in the consolidated balance sheets to the extent that we anticipate making a payment within one year. Interest and penalties associated with income taxes are classified in the income tax expense line in the consolidated statements of income.

Refer to the Recently Adopted Accounting Pronouncements section of this note and Note 14 for additional information related to the Tax Cuts and Jobs Act of 2017 (2017 Tax Act).

**Foreign Currency Translation**

Currency translation adjustments (CTA) related to foreign operations are included in other comprehensive income (OCI). For foreign operations in highly inflationary economies, translation gains and losses are included in other (income) expense, net, and were not material in 2019, 2018 and 2017.

**Derivatives and Hedging Activities**

All derivative instruments are recognized as either assets or liabilities at fair value in the consolidated balance sheets and are classified as short-term or long-term based on the scheduled maturity of the instrument. We designate certain of our derivatives and foreign-currency denominated debt instruments as hedging instruments in cash flow, fair value or net investment hedges.

For each derivative instrument that is designated and effective as a cash flow hedge, the gain or loss on the derivative is recorded in accumulated other comprehensive income (AOCI) and then recognized in earnings consistent with the underlying hedged item. Option premiums or net premiums paid are initially recorded as assets and reclassified to OCI over the life of the option, and then recognized in earnings consistent with the underlying hedged item. Cash flow hedges are classified in cost of sales and interest expense, net, and are primarily related to forecasted third-party sales denominated in foreign currencies, forecasted intra-company sales denominated in foreign currencies and anticipated issuances of debt, respectively.

For each derivative instrument that is designated and effective as a fair value hedge, the gain or loss on the derivative is recognized immediately to earnings, and offsets changes in fair value attributable to a particular risk, such as changes in interest rates, of the hedged item, which are also recognized in earnings. Fair value hedges are classified in interest expense, net, as they hedge the interest rate risk associated with certain of our fixed-rate debt.

We have designated our Euro-denominated senior notes as hedges of our net investment in our European operations and, as a result, mark to spot rate adjustments on the outstanding debt balances are recorded as a component of AOCI.

For derivative instruments that are not designated as hedges, the change in fair value is recorded directly to other (income) expense, net.

If it is determined that a derivative or nonderivative hedging instrument is no longer highly effective as a hedge, we discontinue hedge accounting prospectively. Gains or losses relating to terminations of effective cash flow hedges generally continue to be deferred and are recognized consistent with the loss or income recognition of the underlying hedged items. However, if it is probable that the hedged forecasted transactions will not occur, any gains or losses would be immediately reclassified from AOCI to earnings. If we terminate a fair value hedge, an amount equal to the cumulative fair value adjustment to the hedged item at the date of termination is amortized to earnings over the remaining term of the hedged item. If we remove a net investment hedge designation, any gains or losses recognized in AOCI are not reclassified to earnings until we sell, liquidate, or deconsolidate the foreign investments that were being hedged.

Derivatives, including those that are not designated as a hedge, are principally classified in the operating section of the consolidated statements of cash flows.

Refer to Note 16 for further information regarding our derivative and hedging activities.

**New Accounting Standards**

*Recently adopted accounting pronouncements*

As of January 1, 2019, we adopted Accounting Standards Update (ASU) No. 2016-02, Leases (Topic 842). Under this guidance, lessees are required to recognize a right-of-use asset and a lease liability on the balance sheet for all operating leases, other than those that meet the definition of a short-term lease. We adopted Topic 842 using the modified retrospective method. We elected the following practical expedients when assessing the transition impact: i) not to reassess whether any expired or existing contracts as of the adoption date are or contain leases; ii) not to reassess the lease classification for any expired or existing leases as of the adoption date; and iii) not to reassess initial direct costs for any existing leases as of the adoption date. The adjustment to record operating lease right-of-use assets and operating lease liabilities was $502 million as of January 1, 2019. The impact to the consolidated statements of income was not material and there was no net impact to the consolidated statements of cash flows.

As of January 1, 2019, we adopted ASU No. 2017-12, Targeted Improvements to Accounting for Hedging Activities. The purpose of this ASU is to better align a company's risk management activities and financial reporting for hedging relationships, simplify the hedge accounting requirements, and improve the disclosures of hedging arrangements. The adoption of this standard did not have a material impact on our consolidated financial statements.

As of January 1, 2019, we adopted ASU No. 2018-02, Reclassification of Certain Tax Effects from AOCI. As a result of the enactment of the U.S. Tax Cuts and Jobs Act of 2017 (the 2017 Tax Act), this guidance provides for a reclassification of certain tax effects from AOCI to retained earnings. The impact of the adoption of this standard was a $161 million increase to retained earnings.

As of January 1, 2018, we adopted ASU No. 2016-16, Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other than Inventory (ASU No. 2016-16) using the modified retrospective method. ASU No. 2016-16 generally accelerates the recognition of income tax consequences for intra-company asset transfers other than inventory. We recorded a $70 million reduction to retained earnings upon adoption of the standard on January 1, 2018 related to the unrecognized income tax effects of asset transfers that occurred prior to adoption. Net income increased $14 million for the year ended December 31, 2018 as a result of the adoption of the standard.

As of January 1, 2018, we adopted ASU No. 2016-01, Financial Instruments: Recognition and Measurement of Financial Assets and Liabilities. The new standard amends certain aspects of accounting and disclosure requirements of financial instruments, including the requirement that equity investments with readily determinable fair values be measured at fair value with changes in fair value recognized in earnings. For privately-held securities, we elected the measurement alternative approach for our investments, which is applied prospectively upon adoption. This approach requires entities to measure their investments at cost minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. The adoption of this standard did not have a material impact on our consolidated financial statements.

As of January 1, 2018, we adopted Topic 606, which amends the existing accounting standards for revenue recognition. ASU No. 2014-09 is based on principles that govern the recognition of revenue at an amount an entity expects to be entitled to receive when products are transferred to customers. The primary impact of the new standard relates to our contract manufacturing operations and software arrangements. Certain contract manufacturing arrangements require revenue recognition over-time in situations in which we produce products that have no alternative use and we have an enforceable right to payment for performance completed to date, inclusive of a reasonable profit margin. This results in an acceleration of revenue recognition for certain contractual arrangements as compared to recognition under prior accounting literature. The new guidance also impacts our arrangements subject to previous software revenue recognition guidance, as we are required to recognize as revenue a significant portion of the contract consideration upon delivery of the software compared to the previous practice of recognizing the contract consideration ratably over time for certain arrangements. We adopted Topic 606 using the modified retrospective method. The adjustment upon adoption increased our opening balance of retained

earnings by approximately $45 million, net of tax, on January 1, 2018. The impact to net sales as a result of the adoption was an increase of $7 million for the year ended December 31, 2018.  The impact to cost of sales was not material for the year ended December 31, 2018.

In December 2017, the SEC issued guidance for situations where the accounting for certain elements of the 2017 Tax Act could not be completed prior to the release of a company's financial statements. For specific elements of the 2017 Tax Act, we determined a reasonable estimate for certain effects and recorded that estimate as a provisional amount in 2017. The guidance provided a measurement period to allow a company to account for these specific elements, which began in the reporting period that included the enactment of the 2017 Tax Act and ended when we obtained, prepared and analyzed the information needed in order to complete its accounting assessments or one year, whichever occurred sooner. The resulting tax effects were to be recognized in the period the assessment was complete, and included in income tax expense, accompanied by appropriate disclosures.  The measurement period closed in 2018 and we recorded adjustments to reduce income tax expense by $207 million in 2018. Refer to Note 14 for additional information related to the 2017 Tax Act.

## NOTE 2
### RESTATEMENT OF PREVIOUSLY ISSUED CONSOLIDATED FINANCIAL STATEMENTS

We have restated herein our consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017. We have also restated impacted amounts within the accompanying notes to the consolidated financial statements, as applicable.

### Restatement Background

On October 24, 2019, we reported that we had commenced an internal investigation into certain intra-company transactions that impacted our previously reported non-operating foreign exchange gains and losses. Our internal investigation, as it pertains to the evaluation of related financial statement impacts, is complete.

We previously had applied a longstanding convention for the initial measurement of foreign currency transactions and the subsequent remeasurement of foreign currency denominated monetary assets and liabilities (collectively, our historical exchange rate convention) that was not consistent with U.S. GAAP. U.S. GAAP requires that foreign currency transactions be initially measured and recorded in an entity's functional currency using the exchange rate on the date of the transaction and it requires that foreign currency denominated monetary assets and liabilities be remeasured at the end of each reporting period using the exchange rate at that date. Under our historical exchange rate convention, all foreign currency transactions in a given month were initially measured using exchange rates from a specified date near the middle of the previous month. Additionally, all foreign currency denominated monetary assets and liabilities were subsequently remeasured at the end of each month using exchange rates from a specified date near the middle of the then current month. Beginning years after the adoption of our historical exchange rate convention, certain intra-company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses.

We identified misstatements relating to foreign currency denominated monetary assets and liabilities and foreign currency derivative contracts that caused our Other income (expense), net and Income from continuing operations before income taxes to be overstated by $59 million and $113 million, respectively, for the years ended December 31, 2018 and 2017. Our quantification of those misstatements to our previously reported foreign exchange gains and losses was not limited to intra-company transactions undertaken for the purpose of generating foreign exchange gains or avoiding foreign exchange losses after the related exchange rates were already known. Rather, we identified every legal entity within our consolidated group that had foreign exchange gains or losses above an immaterial threshold and, for those entities, we remeasured all foreign exchange gains and losses from foreign currency denominated cash balances and intra-company loan receivables and payables using the exchange rates required by U.S. GAAP. For those entities, we also quantified misstatements to our previously reported gains and losses on foreign currency derivative contracts, which had used foreign exchange rates determined under our historical exchange rate convention as inputs to the fair value measurements of those contracts. Our quantification of misstatements to the consolidated financial statements did not include foreign currency gains or losses from short-term third-party and intra-company trade receivables and trade payables denominated in foreign currencies. We determined that any potential misstatements relating to such balances that arise in the ordinary course of business and are ultimately settled for cash within a short period of time, generally thirty to sixty days, would not be material to our consolidated financial statements.

In order to correct our previously issued financial statements, we have restated herein our consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017, in accordance with Accounting Standards Codification (ASC) Topic 250, *Accounting Changes and Error Corrections*. In addition to the misstatements described above relating to foreign exchange gains and losses, we corrected additional misstatements that were not material, individually or in the aggregate, to our previously issued consolidated financial statements. Those other immaterial misstatements relate to equipment leased to customers under operating leases, classification of foreign currency gains and losses on cash balances and intra-company loan receivables and payables in our consolidated statements of cash flows, translation of the financial position and results of operations of our foreign operations into U.S. dollars, income statement classification of transition services income related to the separation of Baxalta in 2015, other miscellaneous adjustments, and the income tax effects of those items.

We believe that the use of our historical exchange rate convention to generate non-operating foreign exchange gains and avoid losses had occurred for at least ten years. The cumulative impact of misstatements related to non-operating foreign exchange gains and losses that we corrected for periods earlier than 2017, as well as the cumulative impact of correcting other immaterial misstatements relating to those earlier periods, have been recorded as a reduction to our opening retained earnings as of January 1, 2017.

Restated interim financial information for the quarterly periods ended June 30, 2019, March 31, 2019, December 31, 2018, June 30, 2018, and March 31, 2018 is included in Note 19, *Quarterly Financial Results (Unaudited)*.

The categories of misstatements and their impact on our previously issued consolidated financial statements are described in more detail below.

**Description of Misstatements**

*Misstatements of Foreign Exchange Gains and Losses*

(a) Foreign Currency Denominated Monetary Assets and Liabilities

As discussed above, we recorded adjustments to correct foreign exchange gains and losses on monetary assets and liabilities denominated in a foreign currency to reflect the gains and losses resulting from application of the exchange rates required by U.S. GAAP. The impacts of the foreign currency gain or loss misstatements on each period are discussed in restatement reference (a) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

(b) Foreign Currency Derivative Contracts

As discussed above, we recorded adjustments to correct gains and losses on foreign currency derivative contracts by using current exchange rates at the applicable measurement dates as inputs to the related fair value measurements. The impacts of the foreign currency derivative contract gain or loss misstatements on each period are discussed in restatement reference (b) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

*Additional Misstatements*

(c) Equipment Leased to Customers under Operating Leases

Our manufacturing subsidiaries often sell products to commercial subsidiaries within our consolidated group which then sell or lease those products to third-party customers. Under U.S. GAAP, intra-company sales, intra-company cost of sales, and any step-ups in the carrying amount of inventory from intra-company transactions are eliminated in consolidation. If we subsequently sell the products to a third-party customer, the related intra-company profit previously eliminated in consolidation is recognized in our consolidated statements of income. For transactions in which we lease, rather than sell, our products to customers under operating lease arrangements, no profit or loss should be recognized at inception of the arrangement and any intra-company profit previously eliminated in consolidation should be recognized as a reduction to the carrying amount of the related leased assets. Prior to the third quarter of 2019, our international operations incorrectly recognized intra-company profit previously eliminated in consolidation as a reduction of cost of sales, rather than as a reduction of leased assets, at inception of operating lease arrangements. Accordingly, we have recorded adjustments to increase cost of sales and decrease property, plant, and equipment, net in our consolidated financial statements. Those adjustments include corrections of depreciation expense and accumulated depreciation resulting from the decreases to the carrying amounts of the

62

related leased equipment. The impacts of the operating lease misstatements on each period are discussed in restatement reference (c) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows

We previously included foreign exchange gains and losses related to intra-company receivables and payables and cash balances within our cash flows from operations. In the accompanying consolidated statements of cash flows, foreign exchange gains and losses, as restated, related to intra-company receivables and payables and cash balances are presented as reconciling items between income from continuing operations and cash flows from operations. The impacts of those misclassifications on our operating cash flows for each period are discussed in restatement reference (d) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars

U.S. GAAP specifies that the income statement of a foreign operation should be translated into the reporting currency using the exchange rates on the dates the income or expense was recognized and indicates that the use of weighted-average exchange rates during the period is generally appropriate. Similar to our convention for the initial measurement of foreign currency transactions, we historically translated the results of operations of our foreign operations for a given month into U.S. dollars using exchange rates from a specified date near the middle of the previous month. Accordingly, we have recorded adjustments to translate the income statements of our foreign operations into U.S. dollars using the applicable average foreign exchange rates for each month.

U.S. GAAP specifies that the assets and liabilities of foreign operations be translated into the reporting currency at the end of each reporting period using the exchange rate at that date. Similar to our convention for the subsequent remeasurement of foreign currency denominated monetary assets and liabilities, our financial reporting systems were previously configured to translate assets and liabilities at the end of each month using exchange rates from a specified date near the middle of the current month. In recent years, we separately computed the impact of translating assets and liabilities at period-end exchange rates and adjusted our consolidated balance sheets to reflect that difference. However, due to an incorrect input in those manual calculations as of December 31, 2018, our balance sheet was misstated as of that date.

The impacts of misstatements related to the translation of the financial position and results of operations of our foreign operations on each period are discussed in restatement reference (e) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

(f) Income Statement Classification of Transition Services Income

We entered into a transition services agreement (TSA) with Baxalta in connection with the July 1, 2015 separation transaction. Services we provided under the TSA included, among others, finance, information technology, human resources, quality, supply chain, and certain other administrative services. Those services generally commenced on July 1, 2015 and concluded on July 1, 2018. As previously disclosed, we recognized income of approximately $9 million and $56 million, respectively, under the TSA for the years ended December 31, 2018 and 2017. The amounts earned for those services were previously presented as a reduction of Selling, general, and administrative expenses (which we previously referred to as "Marketing and administrative expenses") in our consolidated statements of income. The accompanying restated consolidated statements of income for the years ended December 31, 2018 and 2017 present the amounts earned for those services within Other operating income, net, rather than as a reduction of Selling, general, and administrative expenses. The impacts of the income statement misclassification of TSA income on each period are discussed in restatement reference (f) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

(g) Other Miscellaneous Adjustments

We recorded adjustments to correct other out-of-period items and previously uncorrected misstatements that were not material, individually or in the aggregate, to our consolidated financial statements. Those other misstatements were primarily related to a historical restructuring liability and amounts related to our separation of Baxalta in 2015. The impacts of the other miscellaneous adjustments on each period are discussed in restatement reference (g) throughout this note and in Note 19, *Quarterly Financial Results (Unaudited)*.

63

**Description of Restatement Tables**

The following tables present the impact of the adjustments described above to our previously reported consolidated balance sheet as of December 31, 2018 and the consolidated statements of income, comprehensive income, changes in equity, and cash flows for the years ended December 31, 2018 and 2017.

Following the restated consolidated financial statement tables, we have presented reconciliations from our prior periods as previously reported to the restated amounts. The amounts as previously reported for the years ended December 31, 2018 and 2017 were derived from our Annual Report on Form 10-K for the year ended December 31, 2018 filed on February 21, 2019.

64

Baxter International Inc.

Consolidated Balance Sheet

(in millions, except per share)

| | | December 31, 2018 | | | |
| --- | --- | --- | --- | --- | --- |
| | | As previously reported | Restatement impacts | Restatement reference | As restated |
| Current assets: | | | | | |
| Cash and cash equivalents | $ | 1,832 | $ 6 | (e) | $ 1,838 |
| Accounts receivable, net | | 1,812 | 28 | (e)(g) | 1,840 |
| Inventories | | 1,653 | 14 | (e)(g) | 1,667 |
| Prepaid expenses and other current assets | | 622 | (8) | (b)(e)(g) | 614 |
| Total current assets | | 5,919 | 40 | | 5,959 |
| Property, plant and equipment, net | | 4,542 | (12) | (c)(e) | 4,530 |
| Goodwill | | 2,958 | 44 | (e) | 3,002 |
| Other intangible assets, net | | 1,398 | 12 | (e)(g) | 1,410 |
| Other non-current assets | | 824 | (5) | (a)(c)(e)(g) | 819 |
| Total assets | $ | 15,641 | $ 79 | | $ 15,720 |
| Current liabilities: | | | | | |
| Short-term debt | $ | 2 | $ — | | $ 2 |
| Current maturities of long-term debt and finance lease obligations | | 2 | — | | 2 |
| Accounts payable and accrued liabilities | | 2,832 | (22) | (b)(e)(g) | 2,810 |
| Total current liabilities | | 2,836 | (22) | | 2,814 |
| Long-term debt and finance lease obligations | | 3,473 | 8 | (e) | 3,481 |
| Other non-current liabilities | | 1,516 | 43 | (a)(c)(e)(g) | 1,559 |
| Total liabilities | | 7,825 | 29 | | 7,854 |
| Commitments and contingencies | | | | | |
| Equity: | | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | | 683 | — | | 683 |
| Common stock in treasury, at cost, 170,495,859 shares | | (9,989) | — | | (9,989) |
| Additional contributed capital | | 5,898 | — | | 5,898 |
| Retained earnings | | 15,626 | (551) | (a)(b)(c)(e)(g) | 15,075 |
| Accumulated other comprehensive (loss) income | | (4,424) | 601 | (a)(e) | (3,823) |
| Total Baxter stockholders' equity | | 7,794 | 50 | | 7,844 |
| Noncontrolling interests | | 22 | — | | 22 |
| Total equity | | 7,816 | 50 | | 7,866 |
| Total liabilities and equity | $ | 15,641 | $ 79 | | $ 15,720 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $487 million and accumulated other comprehensive loss of $482 million and increases to other non-current assets of $8 million and other non-current liabilities of $13 million as of December 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $2 million, accounts payable and accrued liabilities of $1 million, and retained earnings of $1 million as of December 31, 2018.

65

66

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $53 million, other non-current liabilities of $5 million, and retained earnings of $38 million and an increase to other non-current assets of $10 million as of December 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to cash and cash equivalents of $6 million, accounts receivable, net of $22 million, inventories of $19 million, prepaid expenses and other current assets of $2 million, property, plant and equipment of $41 million, goodwill of $44 million, other intangible assets, net of $13 million, other non-current assets of $6 million, accounts payable and accrued liabilities of $24 million, long-term debt and finance lease obligations of $8 million and other non-current liabilities of $19 million as of December 31, 2018. The correction of these misstatements also resulted in decreases to retained earnings of $17 million and accumulated other comprehensive loss of $119 million as of December 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million, and retained earnings of $10 million, and increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million as of December 31, 2018.

Baxter International Inc.

Consolidated Statement of Income

(in millions, except per share)

| | | Year ended December 31, 2018 | | | |
|---|---|---|---|---|---|
| | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ 11,127 | $ (28) | (e) | $ | 11,099 |
| Cost of sales | 6,346 | (6) | (c)(e) | | 6,340 |
| Gross margin | 4,781 | (22) | | | 4,759 |
| Selling, general and administrative expenses | 2,617 | 3 | (e)(f) | | 2,620 |
| Research and development expenses | 655 | (1) | (e) | | 654 |
| Other operating income, net | (90) | (9) | (f) | | (99) |
| Operating income | 1,599 | (15) | | | 1,584 |
| Interest expense, net | 45 | — | | | 45 |
| Other (income) expense, net | (139) | 61 | (a)(b)(e) | | (78) |
| Income from continuing operations before income taxes | 1,693 | (76) | | | 1,617 |
| Income tax expense (benefit) | 63 | 2 | (c)(e)(g) | | 65 |
| Income from continuing operations | 1,630 | (78) | | | 1,552 |
| Loss from discontinued operations, net of tax | (6) | — | | | (6) |
| Net income | $ 1,624 | $ (78) | | $ | 1,546 |
| Earnings per share from continuing operations | | | | | |
| Basic | $ 3.05 | $ (0.14) | | $ | 2.91 |
| Diluted | $ 2.99 | $ (0.15) | | $ | 2.84 |
| Loss per share from discontinued operations | | | | | |
| Basic | $ (0.01) | $ — | | $ | (0.01) |
| Diluted | $ (0.02) | $ 0.01 | | $ | (0.01) |
| Earnings per share | | | | | |
| Basic | $ 3.04 | $ (0.14) | | $ | 2.90 |
| Diluted | $ 2.97 | $ (0.14) | | $ | 2.83 |
| Weighted-average number of shares outstanding | | | | | |
| Basic | 534 | — | | | 534 |
| Diluted | 546 | — | | | 546 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in a decrease to other (income) expense, net of $64 million for the year ended December 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to other (income) expense, net of $5 million for the year ended December 31, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $11 million and a decrease to income tax expense of $3 million for the year ended December 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to net sales of $28 million, cost of sales of $17 million, SG&A expense of $6 million, R&D expense of $1 million, other (income) expense, net of $2 million, and income tax expense of $2 million for the year ended December 31, 2018.

67

68

(f) Income Statement Classification of Transition Services Income—The correction of these misstatements resulted in increases to SG&A expense and other operating income, net of $9 million for the year ended December 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in an increase to income tax expense of $7 million for the year ended December 31, 2018.

68

Baxter International Inc.

Consolidated Statement of Income

(in millions, except per share)

| | | Year ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- | --- |
| | | As previously reported | Restatement impacts | Restatement reference | As restated |
| Net sales | $ | 10,561 $ | 23 | (e) | $ 10,584 |
| Cost of sales | | 6,091 | 19 | (c)(e) | 6,110 |
| Gross margin | | 4,470 | 4 | | 4,474 |
| Selling, general and administrative expenses | | 2,566 | 61 | (e)(f) | 2,627 |
| Research and development expenses | | 613 | 2 | (e) | 615 |
| Other operating income, net | | — | (56) | (f) | (56) |
| Operating income | | 1,291 | (3) | | 1,288 |
| Interest expense, net | | 55 | — | | 55 |
| Other (income) expense, net | | 19 | 114 | (a)(b)(e) | 133 |
| Income from continuing operations before income taxes | | 1,217 | (117) | | 1,100 |
| Income tax expense (benefit) | | 493 | (2) | (c)(e) | 491 |
| Income from continuing operations | | 724 | (115) | | 609 |
| Loss from discontinued operations, net of tax | | (7) $ | — | | (7) |
| Net income | $ | 717 $ | (115) | $ | 602 |
| Earnings per share from continuing operations | | | | | |
| Basic | $ | 1.33 $ | (0.21) | $ | 1.12 |
| Diluted | $ | 1.30 $ | (0.20) | $ | 1.10 |
| Loss per share from discontinued operations | | | | | |
| Basic | $ | (0.01) $ | — | $ | (0.01) |
| Diluted | $ | (0.01) $ | (0.01) | $ | (0.02) |
| Earnings per share | | | | | |
| Basic | $ | 1.32 $ | (0.21) | $ | 1.11 |
| Diluted | $ | 1.29 $ | (0.21) | $ | 1.08 |
| Weighted-average number of shares outstanding | | | | | |
| Basic | | 543 | — | | 543 |
| Diluted | | 555 | — | | 555 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to other (income) expense, net of $96 million.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to other (income) expense, net of $17 million.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $8 million and a decrease to income tax expense of $3 million for the year ended December 31, 2017.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to net sales of $23 million, cost of sales of $11 million, SG&A expense of $5 million, R&D expense of $2 million, other (income) expense, net of $1 million and income tax expense of $1 million for the year ended December 31, 2017.

69

70

71

(f) Income Statement Classification of Transition Services Income—The correction of these misstatements resulted in increases to SG&A expense and other operating income, net of $56 million for the year ended December 31, 2017.

70

71

Baxter International Inc.

Consolidated Statement of Comprehensive Income

(in millions)

| | | Year ended December 31, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As previously reported | | Restatement impacts | | As restated |
| Net income | $ | 1,624 | $ | (78) | $ | 1,546 |
| Other comprehensive (loss) income, net of tax: | | | | | | |
| Currency translation adjustments | | (461) | | 138 | | (323) |
| Pension and other postretirement benefit plans | | 32 | | 1 | | 33 |
| Hedging activities | | 9 | | — | | 9 |
| Total other comprehensive (loss) income, net of tax | | (420) | | 139 | | (281) |
| Comprehensive income | $ | 1,204 | $ | 61 | $ | 1,265 |

The $78 million decrease to net income was driven by the items described above in the consolidated statement of income for the year ended December 31, 2018 section.

The $138 million decrease to currency translation adjustments for the year ended December 31, 2018 is comprised of a $74 million decrease to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars and a $64 million decrease from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses.

The $1 million increase to pension and other postretirement benefit plans for the year ended December 31, 2018 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

71

Baxter International Inc.

Consolidated Statement of Comprehensive Income

(in millions)

| | | Year ended December 31, 2017 | | |
| --- | --- | --- | --- | --- |
| | | As previously reported | Restatement impacts | As restated |
| Net income | $ | 717 $ | (115) $ | 602 |
| Other comprehensive (loss) income, net of tax: | | | | |
| Currency translation adjustments | | 425 | 174 | 599 |
| Pension and other postretirement benefit plans | | 141 | (7) | 134 |
| Hedging activities | | (13) | — | (13) |
| Available-for-sale securities | | 2 | — | 2 |
| Total other comprehensive (loss) income, net of tax | | 555 | 167 | 722 |
| Comprehensive income | $ | 1,272 $ | 52 $ | 1,324 |

The $115 million decrease to net income was driven by the items described above in the consolidated statement of income for the year ended December 31, 2017 section.

The $174 million increase to currency translation adjustments for the year ended December 31, 2017 is comprised of a $78 million increase to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars and a $96 million increase from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses.

The $7 million decrease to pension and other postretirement benefit plans for the year ended December 31, 2017 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

72

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,483 | $ (4,001) | $ 9,124 | $ (8) | $ 9,116 |
| Adoption of new accounting standards | — | — | — | — | — | (18) | (3) | (21) | — | (21) |
| Net income | — | — | — | — | — | 1,624 | — | 1,624 | — | 1,624 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (420) | (420) | — | (420) |
| Purchases of treasury stock | — | — | 36 | (2,415) | (60) | — | — | (2,475) | — | (2,475) |
| Stock issued under employee benefit plans and other | — | — | (8) | 407 | 18 | (71) | — | 354 | — | 354 |
| Dividends declared on common stock | — | — | — | — | — | (392) | — | (392) | — | (392) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 30 | 30 |
| Balance as of December 31, 2018 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,626 | $ (4,424) | $ 7,794 | $ 22 | $ 7,816 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2018 | — | $ — | — | $ — | $ — | $ (469) | $ 462 | $ (7) | $ — | $ (7) |
| Adoption of new accounting standards | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Net income | — | — | — | — | — | (78) | — | (78) | — | (78) |
| Other comprehensive income (loss) | — | — | — | — | — | — | 139 | 139 | — | 139 |
| Balance as of December 31, 2018 | — | $ — | — | $ — | $ — | $ (551) | $ 601 | $ 50 | $ — | $ 50 |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (22) | (3) | (25) | — | (25) |
| Net income | — | — | — | — | — | 1,546 | — | 1,546 | — | 1,546 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (281) | (281) | — | (281) |
| Purchases of treasury stock | — | — | 36 | (2,415) | (60) | — | — | (2,475) | — | (2,475) |
| Stock issued under employee benefit plans and other | — | — | (8) | 407 | 18 | (71) | — | 354 | — | 354 |
| Dividends declared on common stock | — | — | — | — | — | (392) | — | (392) | — | (392) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 30 | 30 |
| Balance as of December 31, 2018 | 683 | 683 | 170 | (9,989) | 5,898 | 15,075 | (3,823) | 7,844 | 22 | 7,866 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the year ended December 31, 2018 sections above. Additionally, we recorded an adjustment to the opening balance of retained earnings on January 1, 2018 for the adoption of ASU No. 2016-16, which was impacted by our adjustments to equipment leased to customers under operating leases.

73

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2017 | 683 | $ 683 | 144 | $ (7,995) | $ 5,958 | $ 14,200 | $ (4,556) | $ 8,290 | $ (10) | $ 8,280 |
| Net income | — | — | — | — | — | 717 | — | $ 717 | — | $ 717 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 555 | 555 | — | 555 |
| Purchases of treasury stock | — | — | 9 | (564) | — | — | — | (564) | — | (564) |
| Stock issued under employee benefit plans and other | — | — | (11) | 578 | (18) | (134) | — | 426 | — | 426 |
| Dividends declared on common stock | — | — | — | — | — | (334) | — | (334) | — | (334) |
| Distribution of Baxalta | — | — | — | — | — | 34 | — | 34 | — | 34 |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of December 31, 2017 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,483 | $ (4,001) | $ 9,124 | $ (8) | $ 9,116 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2017 | — | $ — | — | $ — | $ — | $ (354) | $ 295 | $ (59) | $ — | $ (59) |
| Net income | — | — | — | — | — | (115) | — | (115) | — | (115) |
| Other comprehensive income (loss) | — | — | — | — | — | — | 167 | 167 | — | 167 |
| Balance as of December 31, 2017 | — | $ — | — | $ — | $ — | $ (469) | $ 462 | $ (7) | $ — | $ (7) |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2017 | 683 | $ 683 | 144 | $ (7,995) | $ 5,958 | $ 13,846 | $ (4,261) | $ 8,231 | $ (10) | $ 8,221 |
| Net income | — | — | — | — | — | 602 | — | 602 | — | 602 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 722 | 722 | — | 722 |
| Purchases of treasury stock | — | — | 9 | (564) | — | — | — | (564) | — | (564) |
| Stock issued under employee benefit plans and other | — | — | (11) | 578 | (18) | (134) | — | 426 | — | 426 |
| Dividends declared on common stock | — | — | — | — | — | (334) | — | (334) | — | (334) |
| Distribution of Baxalta | — | — | — | — | — | 34 | — | 34 | — | 34 |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of December 31, 2017 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |

The adjustment to the January 1, 2017 retained earnings and accumulated other comprehensive loss represent the cumulative impacts of foreign exchange gains and losses and the translation of our financial position and results of operations for our foreign operations into U.S. dollars for the periods prior to January 1, 2017. Retained earnings also includes the cumulative impacts of equipment leased to customers under operating leases and other miscellaneous adjustments for the periods prior to January 1, 2017.

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the year ended December 31, 2017 sections above.

Baxter International Inc.

Consolidated Statement of Cash Flows

(in millions)

| | As previously reported | Restatement impacts | Restatement reference | As restated |
|---|---|---|---|---|
| | | Year ended December 31, 2018 | | |
| Cash flows from operations | | | | |
| Net income | $ 1,624 | $ (78) | | $ 1,546 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | | | |
| Loss from discontinued operations, net of tax | 6 | — | | 6 |
| Depreciation and amortization | 785 | (14) | (c)(g) | 771 |
| Pension settlement charges | 1 | — | | 1 |
| Net periodic pension benefit and other postretirement costs | 39 | — | | 39 |
| Deferred income taxes | (267) | 4 | (c)(g) | (263) |
| Stock compensation | 115 | — | | 115 |
| Other | 43 | 7 | (d) | 50 |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | (12) | — | | (12) |
| Inventories | (197) | — | | (197) |
| Accounts payable and accrued liabilities | 64 | (4) | (b) | 60 |
| Other | (105) | 6 | (b)(e)(g) | (99) |
| Cash flows from operations | 2,096 | (79) | | 2,017 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (681) | 22 | (c) | (659) |
| Acquisitions and investments, net of cash acquired | (268) | — | | (268) |
| Other investing activities, net | 11 | — | | 11 |
| Cash flows from investing activities | (938) | 22 | | (916) |
| Cash flows from financing activities | | | | |
| Cash dividends on common stock | (376) | — | | (376) |
| Proceeds from stock issued under employee benefit plans | 258 | — | | 258 |
| Purchases of treasury stock | (2,452) | — | | (2,452) |
| Other financing activities, net | (33) | — | | (33) |
| Cash flows from financing activities | (2,603) | — | | (2,603) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (117) | 54 | (a)(d)(e) | (63) |
| Increase (decrease) in cash and cash equivalents | (1,562) | (3) | | (1,565) |
| Cash and cash equivalents at beginning of year | 3,394 | 9 | (e) | 3,403 |
| Cash and cash equivalents at end of year | $ 1,832 | $ 6 | (e) | $ 1,838 |
| Other supplemental information | | | | |
| Interest paid, net of portion capitalized | $ 94 | — | | $ 94 |
| Income taxes paid | $ 302 | (1) | (e) | $ 301 |

The $78 million decrease to net income was driven by the items described above in the consolidated statement of income for the year ended December 31, 2018 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $64 million for the year ended December 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in decreases to changes in accounts payable and accrued liabilities of $4 million and other changes in balance sheet items of $1 million for the year ended December 31, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $11 million, deferred income taxes of $3 million and capital expenditures of $22 million for the year ended December 31, 2018.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in a decrease to the effect of foreign exchange rate changes on cash and cash equivalents and an increase to other adjustments to reconcile net income to net cash from operating activities of $7 million for the year ended December 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in increases to cash and cash equivalents at the beginning of the period of $9 million, at the end of the period of $6 million, and to other changes in balance sheet items of $4 million and decreases in the effect of foreign exchange rate changes on cash and cash equivalents of $3 million and income taxes paid of $1 million for the year ended December 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in a decrease to depreciation and amortization of $3 million and increases to deferred income taxes of $7 million and other changes in balance sheet items of $3 million for the year ended December 31, 2018.

Baxter International Inc.
Consolidated Statement of Cash Flows
(in millions)

| | Year ended December 31, 2017 | | | |
| | As previously reported | Restatement impacts | Restatement reference | As restated |
|---|---|---|---|---|
| Cash flows from operations | | | | |
| Net income | $ 717 | $ (115) | | $ 602 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | | | |
| Loss from discontinued operations, net of tax | 7 | — | | 7 |
| Depreciation and amortization | 761 | (11) | (c)(g) | 750 |
| Pension settlement charges | 2 | — | | 2 |
| Net periodic pension benefit and other postretirement costs | 123 | — | | 123 |
| Deferred income taxes | 211 | — | | 211 |
| Stock compensation | 107 | — | | 107 |
| Other | 43 | (5) | (d)(g) | 38 |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | 30 | — | | 30 |
| Inventories | 76 | — | | 76 |
| Accounts payable and accrued liabilities | 5 | 6 | (b) | 11 |
| Other | (229) | 2 | (b)(c)(e) | (227) |
| Cash flows from operations - continuing operations | 1,853 | (123) | | 1,730 |
| Cash flows from operations - discontinued operations | (16) | — | | (16) |
| Cash flows from operations | 1,837 | (123) | | 1,714 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (634) | 18 | (c) | (616) |
| Acquisitions and investments, net of cash acquired | (686) | — | | (686) |
| Other investing activities, net | 10 | — | | 10 |
| Cash flows from investing activities | (1,310) | 18 | | (1,292) |
| Cash flows from financing activities | | | | |
| Issuances of debt | 633 | 32 | (a) | 665 |
| Cash dividends on common stock | (315) | — | | (315) |
| Proceeds from stock issued under employee benefit plans | 347 | — | | 347 |
| Purchases of treasury stock | (564) | — | | (564) |
| Other financing activities, net | (40) | — | | (40) |
| Cash flows from financing activities | 61 | 32 | | 93 |
| Effect of foreign exchange rate changes on cash and cash equivalents | 5 | 97 | (a)(d)(e) | 102 |
| Increase (decrease) in cash and cash equivalents | 593 | 24 | | 617 |
| Cash and cash equivalents at beginning of year | 2,801 | (15) | (e) | 2,786 |
| Cash and cash equivalents at end of year | $ 3,394 | $ 9 | (e) | $ 3,403 |
| Other supplemental information | | | | |
| Interest paid, net of portion capitalized | $ 80 | — | | $ 80 |

| Income taxes paid | $ | 255 | (2) (e) | $ | 253 |

The $115 million decrease to net income was driven by the items described above in the consolidated statement of income for the year ended December 31, 2017 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $99 million for the year ended December 31, 2017. Additionally, issuances of debt increased $32 million with an offsetting decrease to the effect of foreign exchange rate changes on cash and cash equivalents to remeasure the proceeds received from the issuance of our Euro-denominated senior notes in May 2017.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to changes in accounts payable and accrued liabilities of $6 million and other changes in balance sheet items of $8 million for the year ended December 31, 2017.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $10 million, other changes in balance sheet items of $3 million and capital expenditures of $18 million for the year ended December 31, 2017.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents and a decrease to other adjustments to reconcile net income to net cash from operating activities of $6 million for the year ended December 31, 2017.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in increases in cash and cash equivalents at the end of the period of $9 million and the effect of foreign exchange rate changes on cash and cash equivalents of $24 million and decreases to cash and cash equivalents at the beginning of the period of $15 million, other changes in balance sheet items of $3 million and income taxes paid of $2 million for the year ended December 31, 2017.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in a decrease to depreciation and amortization and an increase to other adjustments to reconcile net income to net changes from operating activities of $1 million for the year ended December 31, 2017.

## NOTE 3

### SEPARATION OF BAXALTA

On July 1, 2015, we completed the distribution of approximately 80.5% of the outstanding common stock of Baxalta to our stockholders (the Distribution). After giving effect to the Distribution, we retained 19.5% of the outstanding common stock, or 131,902,719 shares of Baxalta (Retained Shares). The Distribution was made to our stockholders of record as of the close of business on June 17, 2015 (Record Date), who received one share of Baxalta common stock for each of our shares held as of the Record Date. As a result of the Distribution, Baxalta became an independent public company. In 2016, we disposed of our remaining 19.5% interest in Baxalta through a series of transactions including debt-for-equity exchanges, an equity-for-equity exchange and a contribution to our U.S. pension plan.

We entered into several additional agreements with Baxalta as a result of the July 1, 2015 separation, including a transition services agreement (TSA), separation and distribution agreement, manufacturing and supply agreements (MSA), tax matters agreement and a long-term services agreement.

Pursuant to the TSA, we and our subsidiaries, along with Baxalta and their respective subsidiaries, provided to each other, on an interim, transitional basis, various services. Services provided by us included, among others, finance, information technology, human resources, quality, supply chain and certain other administrative services. The services generally commenced on the Distribution date and terminated as of July 1, 2018. Billings by us under the TSA are presented within other operating income, net in the consolidated statements of income. In 2018 and 2017, we recognized approximately $9 million and $56 million, respectively, related to the TSA.

Cash outflows of $6 million, zero and $16 million in 2019, 2018 and 2017, respectively, were reported in cash flows from operations – discontinued operations. These cash flows relate to payments under the tax matters agreement, non-assignable tenders whereby we remained the seller of Baxalta products, transactions related to importation services we provided in certain countries and trade payables settled following local separation on Baxalta's behalf.

**NOTE 4**

**ACQUISITIONS AND OTHER ARRANGEMENTS**

Results of operations of acquired companies are included in our results of operations as of the respective acquisition dates. The purchase price of each acquisition is allocated to the net assets acquired based on estimates of their fair values at the date of the acquisition. Any purchase price in excess of these net assets is recorded as goodwill. The allocation of purchase price in certain cases may be subject to revision based on the final determination of fair values during the measurement period, which may be up to one year from the acquisition date.

Contingent consideration related to business combinations is recognized at its estimated fair value on the acquisition date. Subsequent changes to the fair value of those contingent consideration arrangements are recognized in earnings. Contingent consideration related to acquisitions may consist of development, regulatory and commercial milestone payments, and sales or earnings-based payments, and are valued using discounted cash flow techniques. The fair value of development, regulatory and commercial milestone payments reflects management's expectations of the probability of payment, and increases or decreases as the probability of payment or expectation of timing or amount of payments changes. The fair value of sales-based payments is based upon probability-weighted future revenue estimates and increases or decreases as revenue estimates or expectation of timing or amount of payments changes.

Cheetah Medical, Inc.

On October 25, 2019, we acquired 100 percent of Cheetah Medical, Inc. (Cheetah) for total upfront cash consideration of $195 million, net of cash acquired, with the potential for additional cash consideration, up to $40 million, based on clinical and commercial milestones for which the acquisition date fair value was $18 million. Cheetah is a leading provider of hemodynamic monitoring technologies. The fair value of the potential contingent consideration payments was estimated by applying a probability-weighted expected payment model for the clinical milestone and a Monte Carlo simulation model for the commercial milestone, which were then discounted to present value. The fair value measurements were based on Level 3 inputs. Refer to Note 17 for additional information regarding fair value measurements.

The following table summarizes the fair value of consideration transferred:

| (in millions) | | |
|---|---|---|
| Cash consideration transferred | $ | 197 |
| Contingent consideration | | 18 |
| Total consideration | $ | 215 |

The following table summarizes the fair values of the assets acquired and liabilities assumed as of the acquisition date:

| (in millions) | | |
|---|---|---|
| **Assets acquired and liabilities assumed** | | |
| Cash | $ | 2 |
| Accounts receivable, net | | 3 |
| Inventories | | 1 |
| Prepaid expenses and other current assets | | 1 |
| Property, plant and equipment | | 1 |
| Goodwill | | 111 |
| Other intangible assets | | 131 |
| Operating lease right-of-use assets | | 1 |
| Accounts payable and other accrued liabilities | | (4) |
| Other non-current liabilities | | (32) |
| Total assets acquired and liabilities assumed | $ | 215 |

79

The results of operations of the acquired business have been included in our consolidated statement of income since the date the business was acquired and were not significant. Acquisition and integration costs associated with the acquisition were $3 million in 2019.

We allocated $123 million of the total consideration to the developed product rights with a weighted-average useful life of 15 years and $8 million to customer relationships with a useful life of 13 years. The fair values of the intangible assets were determined using the income approach. The discount rates used to measure the intangible assets were 11.0% for developed product rights and 10.0% for customer relationships. We consider the fair value of the intangible assets to be Level 3 measurements due to the significant estimates and assumptions used by management in establishing the estimated fair values.

The goodwill, which is not deductible for tax purposes, includes the value of potential future technologies as well as the overall strategic benefits provided to our product portfolio and is included primarily in the Americas segment.

RECOTHROM and PREVELEAK

On March 16, 2018, we acquired two hemostat and sealant products from Mallinckrodt plc: RECOTHROM Thrombin topical (Recombinant), the first and only stand-alone recombinant thrombin, and PREVELEAK Surgical Sealant, which is used in vascular reconstruction. We concluded that the acquired assets met the definition of a business and accounted for the transaction as a business combination using the acquisition method of accounting. The purchase price included an upfront payment of approximately $163 million in 2018. In addition, the purchase price included new and assumed contingent payments in the future related to inventory and technology transfer milestones and net revenue royalty payments with an estimated fair value of $21 million as of the acquisition date. The maximum aggregate amounts payable for the inventory and technology transfer and net revenue royalties were $7 million, $15 million and $143 million, respectively. The fair value of the potential contingent consideration payments was estimated by applying a probability-weighted expected payment model for the inventory and technology transfer payments and a Monte Carlo simulation model for contingent royalty payments, which were then discounted to present value.

The following table summarizes the fair value of consideration transferred:

(in millions)

| | | |
|---|---|---|
| Cash consideration transferred | $ | 163 |
| Contingent consideration | | 21 |
| Total consideration | $ | 184 |

The following table summarizes the fair value of the assets acquired as of the acquisition date:

(in millions)

| | | |
|---|---|---|
| **Assets acquired** | | |
| Accounts receivable, net | $ | 2 |
| Inventory | | 80 |
| Goodwill | | 2 |
| Other intangible assets | | 100 |
| Total assets acquired | $ | 184 |

The results of operations of the acquired business have been included in our consolidated statement of income since the date the business was acquired. The RECOTHROM and PREVELEAK acquisitions contributed $80 million and $52 million of net sales for the years ended December 31, 2019 and 2018, respectively. Acquisition and integration costs, including incremental cost of sales relating to inventory fair value step-ups, associated with the acquisition were $20 million and $17 million, respectively, in 2019 and 2018.

We allocated $100 million of the total consideration to the RECOTHROM and PREVELEAK developed product rights with a weighted-average useful life of 10 years. The fair value of the intangible assets was determined using the income approach. The discount rates used to measure the RECOTHROM and PREVELEAK intangible assets were 12.5% and 13.0%, respectively. We consider the fair value of the intangible assets to be Level 3 measurements due to the significant estimates and assumptions used by management in establishing the estimated fair values.

80

The goodwill, which is deductible for tax purposes, includes the value of potential future technologies as well as the overall strategic benefits provided to our surgical portfolio of hemostats and sealants, and is included in the Americas segment.

<u>Saudi Arabia Joint Venture</u>

In November 2018, we acquired additional equity to obtain a 51% controlling financial interest of our joint venture in Saudi Arabia that was previously accounted for under the equity method of accounting. The acquisition allows us to increase manufacturing output and utilize the facilities for additional capacity for certain products in the region. Beginning in the fourth quarter of 2018, we consolidated the financial statements of the joint venture with our consolidated financial statements. The results of operations of the joint venture have been included in our consolidated statement of income since the date the business was acquired and were not significant.

The guidance on accounting for business combinations requires that an acquirer remeasure its previously held equity interest in an acquiree at its acquisition date fair value and recognize the resulting gain or loss in earnings. Thus, in connection with the acquisition, the carrying amount of our previously held equity interest in the joint venture was remeasured to fair value at the acquisition date, resulting in a gain in the fourth quarter of 2018 of $24 million, which was included in other (income) expense, net in the consolidated statement of income. The fair value of the equity interest on the acquisition date was $39 million and we consider the fair value to be a Level 3 measurement due to the significant estimates and assumptions used by management in establishing the estimated fair value.

The following table summarizes the fair value of consideration transferred:

(in millions)

| Consideration transferred | | |
|---|---|---|
| Cash | $ | 2 |
| Fair value of equity investment | | 39 |
| Noncontrolling interest | | 39 |
| Total consideration transferred | $ | 80 |

The following table summarizes the fair value of assets acquired and liabilities assumed as of the acquisition date:

(in millions)

| Assets acquired and liabilities assumed | | |
|---|---|---|
| Cash | $ | 4 |
| Accounts receivable, net | | 25 |
| Inventories | | 8 |
| Property, plant and equipment | | 12 |
| Goodwill | | 17 |
| Other intangible assets | | 40 |
| Other non-current assets | | 2 |
| Short-term debt | | (4) |
| Accounts payable and accrued liabilities | | (16) |
| Other non-current liabilities | | (8) |
| Total assets acquired and liabilities assumed | $ | 80 |

The goodwill, which is not deductible for tax purposes, includes the value to create a more fully integrated supply chain and go-to-market business model and is included in the EMEA segment.

In connection with the acquisition, we reacquired certain license rights which had provided the joint venture with the exclusive and perpetual rights to manufacture and distribute our products for sale in specified territories. Reacquired license rights with fair values totaling $10 million were assigned a useful life of 12 years. Other amortizable intangible assets consist of customer relationships and have a weighted-average estimated useful life of 10 years.  The intangible assets were valued using the income approach. The discount rates used to measure the reacquired rights and customer relationship intangible assets were 13.0% and 14.0%, respectively. We consider the

fair value of each of the acquired intangible assets to be Level 3 measurements due to the significant estimates and assumptions used by management in establishing the estimated fair values.

The fair value of the 49% noncontrolling interest in the joint venture is estimated to be $39 million. The fair value of the noncontrolling interest was estimated using the income approach applied to the projected cash flows of the joint venture. As the joint venture is a private company, the fair value measurement is based on significant inputs that are not observable in the market and thus represents a Level 3 measurement.

Claris Injectables Limited

On July 27, 2017, we acquired 100 percent of Claris, a wholly owned subsidiary of Claris Lifesciences Limited, for total cash consideration of approximately $629 million, net of cash acquired. Through the acquisition, we added capabilities in production of essential generic injectable medicines, such as anesthesia and analgesics, renal, anti-infectives and critical care in a variety of presentations including bags, vials and ampoules.

In the third quarter of 2018, we finalized our valuation of the acquisition date assets acquired and liabilities assumed. The measurement period adjustments in 2018 included a $2 million reduction in property, plant and equipment, a $1 million increase in accounts payable and accrued liabilities and a $2 million increase in other non-current liabilities. These adjustments resulted in a corresponding increase to goodwill of $5 million. The measurement period adjustments did not have a material impact on our results of operations in 2018.

The following table summarizes the fair value of the assets acquired and liabilities assumed as of the acquisition date for our acquisition of Claris:

(in millions)

| Assets acquired and liabilities assumed | | |
|---|---|---|
| Cash | $ | 11 |
| Accounts receivable, net | | 16 |
| Inventories | | 30 |
| Prepaid expenses and other current assets | | 16 |
| Property, plant and equipment | | 130 |
| Goodwill | | 296 |
| Other intangible assets | | 280 |
| Other non-current assets | | 20 |
| Accounts payable and accrued liabilities | | (23) |
| Other non-current liabilities | | (136) |
| Total assets acquired and liabilities assumed | $ | 640 |

The results of operations of Claris have been included in our consolidated statement of income since the date the business was acquired. The Claris acquisition contributed $140 million and $57 million, respectively, of net sales for the years ended December 31, 2018 and 2017. Acquisition and integration costs associated with the Claris acquisition were $27 million in 2019, $33 million in 2018 and $28 million in 2017, and were primarily included within SG&A in the consolidated statements of income.

We allocated $280 million of the total consideration to acquired intangible assets. The acquired intangible assets include $140 million of developed technology with a weighted-average useful life of 8 years and $140 million of IPR&D with an indefinite useful life. For the IPR&D, additional R&D will be required prior to technological feasibility.

The fair value of intangible assets was determined using the income approach. The income approach is a valuation technique that provides an estimate of the fair value of an asset based on market participant expectations of the cash flows an asset will generate over its remaining useful life, discounted to present value. The discount rates used to measure the developed technology and IPR&D intangible assets were 12.0% and 13.0%, respectively. We consider the fair value of each of the acquired intangible assets to be Level 3 measurements due to the significant estimates and assumptions used by management in establishing the estimated fair values.

The goodwill, which is not deductible for tax purposes, includes the value of potential future technologies as well as the overall strategic benefits to us in the injectables market, and is included in the Americas segment.

In the first quarter of 2018, we settled certain claims with Claris Lifesciences Limited related to the acquired operations and terminated a development agreement with Dorizoe Lifesciences Limited. As a result, we received cash of $73 million in February 2018 and were released from an accrued liability to Claris Lifesciences Limited of $7 million. The total of $80 million is reflected as a benefit within other operating income, net in the 2018 consolidated statement of income.

**Other Business Combinations**

Total consideration transferred for other acquisitions totaled $10 million, $36 million and $16 million in 2019, 2018 and 2017, respectively, and primarily resulted in the recognition of intangible assets. These acquisitions did not materially affect our results of operations.

We have not presented pro forma financial information for any of the 2019, 2018 or 2017 acquisitions because their results are not material to our consolidated financial statements.

Other Business Development Activities

Celerity Pharmaceuticals, LLC

In September 2013, we entered into an agreement with Celerity Pharmaceutical, LLC (Celerity) to develop certain acute care generic injectable premix and oncolytic molecules through regulatory approval. We transferred our rights in these molecules to Celerity and Celerity assumed ownership and responsibility for development of the molecules. We are obligated to purchase the individual product rights from Celerity if the products obtain regulatory approval. In 2019, 2018 and 2017, we paid $86 million, $72 million and $20 million, respectively, to acquire the rights to various molecules that have received regulatory approval. The payment in 2018 for one of the molecules was based on tentative approval from the U.S. Food and Drug Administration (FDA). Full approval from FDA was received in the third quarter of 2018. We capitalized the purchase prices of products that were purchased upon regulatory approval as intangible assets and are amortizing the assets over their estimated useful lives of 12 years. As of December 31, 2019, our contingent future payments total up to $79 million upon Celerity's achievement of specified regulatory approvals.

Seprafilm Adhesion Barrier

In December 2019, we entered into a definitive agreement to acquire Seprafilm Adhesion Barrier (Seprafilm) from Sanofi. The transaction closed in February 2020 and we paid approximately $345 million for the acquired assets, subject to a post-close adjustment. Seprafilm is indicated for use in patients undergoing abdominal or pelvic laparotomy as an adjunct intended to reduce the incidence, extent and severity of postoperative adhesions between the abdominal wall and the underlying viscera such as omentum, small bowel, bladder, and stomach, and between the uterus and surrounding structures such as tubes and ovaries, large bowel, and bladder. As the acquisition was completed after December 31, 2019, our consolidated financial statements do not include the financial condition or results of operations of Seprafilm in any of the periods presented herein. We expect that most of the purchase price will be allocated to intangible assets and we are evaluating whether this transaction will be accounted for as an asset acquisition or a business combination.

Other Intangible Acquisitions

During the year ended December 31, 2019, we acquired the rights to multiple products for an aggregate purchase price of $80 million. The purchase prices were capitalized primarily as developed-technology intangible assets and are being amortized over a weighted-average useful of 10 years. Net sales related to these products for the year ended December 31, 2019 were not material.

In January 2020, we acquired the U.S. rights to an additional product for $60 million. The purchase price will be capitalized as a developed-technology intangible asset in the quarter ending March 31, 2020 and will be amortized over its estimated useful life of 11 years.

Other

In addition to the significant arrangements described above, we have entered into several other collaborative arrangements. We could make additional payments of up to $26 million upon the achievement of certain development and regulatory milestones, in addition to future payments related to contingent commercialization milestones, profit-sharing and royalties.

**NOTE 5**

**SUPPLEMENTAL FINANCIAL INFORMATION**

**Inventories**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Raw materials | $ | 377 | $ | 367 |
| Work in process | | 185 | | 207 |
| Finished goods | | 1,091 | | 1,093 |
| Inventories | $ | 1,653 | $ | 1,667 |

**Prepaid Expenses and Other Current Assets**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Prepaid value added taxes | $ | 140 | $ | 131 |
| Prepaid income taxes | | 90 | | 79 |
| Other | | 389 | | 404 |
| Prepaid expenses and other current assets | $ | 619 | $ | 614 |

**Property, Plant and Equipment, Net**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Land | $ | 148 | $ | 142 |
| Buildings and leasehold improvements | | 1,761 | | 1,703 |
| Machinery and equipment | | 6,671 | | 6,423 |
| Equipment with customers | | 1,489 | | 1,364 |
| Construction in progress | | 591 | | 701 |
| Total property, plant and equipment, at cost | | 10,660 | | 10,333 |
| Accumulated depreciation | | (6,148) | | (5,803) |
| Property, plant and equipment (PP&E), net | $ | 4,512 | $ | 4,530 |

Purchases of property, plant and equipment included in accounts payable and accrued liabilities as of December 31, 2019 and 2018 was $87 million and $97 million, respectively. Depreciation expense was $606 million in 2019, $602 million in 2018 and $596 million in 2017.

**Other Non-Current Assets**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Deferred tax assets | $ | 621 | $ | 483 |
| Non-current receivables, net | | 163 | | 146 |
| Contract assets | | 68 | | 30 |
| Investments | | 76 | | 44 |
| Other | | 141 | | 116 |
| Other non-current assets | $ | 1,069 | $ | 819 |

**Accounts Payable and Accrued Liabilities**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Accounts payable | $ | 892 | $ | 998 |
| Common stock dividends payable | | 111 | | 101 |
| Employee compensation and withholdings | | 456 | | 486 |
| Property, payroll and certain other taxes | | 113 | | 131 |
| Restructuring reserves | | 83 | | 90 |
| Accrued rebates | | 208 | | 193 |
| Operating lease liabilities | | 101 | | — |
| Income taxes payable | | 85 | | 104 |
| Other | | 640 | | 707 |
| Accounts payable and accrued liabilities | $ | 2,689 | $ | 2,810 |

**Other Non-Current Liabilities**

| as of December 31 (in millions) | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| Pension and other postretirement benefits | $ | 1,260 | $ | 1,087 |
| Deferred tax liabilities | | 192 | | 215 |
| Long-term tax liabilities | | 81 | | 77 |
| Interest rate contracts | | 52 | | 3 |
| Litigation and environmental reserves | | 30 | | 31 |
| Restructuring reserves | | 9 | | 11 |
| Other | | 108 | | 135 |
| Other non-current liabilities | $ | 1,732 | $ | 1,559 |

**Interest Expense, net**

| years ended December 31 (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Interest costs | $ | 120 | $ | 105 | $ | 98 |
| Interest costs capitalized | | (9) | | (12) | | (13) |
| Interest expense | | 111 | | 93 | | 85 |
| Interest income | | (40) | | (48) | | (30) |
| Interest expense, net | $ | 71 | $ | 45 | $ | 55 |

85

**Other (Income) Expense, net**

| years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Foreign exchange losses (gains), net | $ | 37 | $ | (14) | $ | 63 |
| Gain on sale of investments | | (1) | | (3) | | (3) |
| Saudi Arabia joint venture gain | | — | | (24) | | — |
| Venezuela deconsolidation | | — | | — | | 33 |
| Pension settlement | | 755 | | 1 | | 2 |
| Pension and other postretirement benefit plans | | (53) | | (49) | | 31 |
| Other, net | | (7) | | 11 | | 7 |
| Other (income) expense, net | $ | 731 | $ | (78) | $ | 133 |

# NOTE 6

## GOODWILL AND OTHER INTANGIBLE ASSETS, NET

### Goodwill

The following table is a summary of the activity in goodwill by segment.

| (in millions) | | Americas | | EMEA | | APAC | | Total |
|---|---|---|---|---|---|---|---|---|
| December 31, 2017 (As Restated) | $ | 2,476 | $ | 393 | $ | 233 | $ | 3,102 |
| Additions | | 15 | | 17 | | — | $ | 32 |
| Currency translation and other adjustments | | (105) | | (17) | | (10) | $ | (132) |
| December 31, 2018 (As Restated) | $ | 2,386 | $ | 393 | $ | 223 | $ | 3,002 |
| Additions | | 101 | | 10 | | — | | 111 |
| Currency translation and other adjustments | | (59) | | (18) | | (6) | | (83) |
| December 31, 2019 | $ | 2,428 | $ | 385 | $ | 217 | $ | 3,030 |

As of December 31, 2019, there were no reductions in goodwill relating to impairment losses.

### Other Intangible Assets, Net

The following table is a summary of our other intangible assets.

| (in millions) | | Developed technology, including patents | | Other amortized intangible assets | | Indefinite-lived intangible assets | | Total |
|---|---|---|---|---|---|---|---|---|
| **December 31, 2019** | | | | | | | | |
| Gross other intangible assets | $ | 2,309 | $ | 464 | $ | 173 | $ | 2,946 |
| Accumulated amortization | | (1,190) | | (285) | | — | $ | (1,475) |
| Other intangible assets, net | $ | 1,119 | $ | 179 | $ | 173 | $ | 1,471 |
| December 31, 2018 (As Restated) | | | | | | | | |
| Gross other intangible assets | $ | 2,135 | $ | 457 | $ | 188 | $ | 2,780 |
| Accumulated amortization | | (1,117) | | (253) | | — | $ | (1,370) |
| Other intangible assets, net | $ | 1,018 | $ | 204 | $ | 188 | $ | 1,410 |

Intangible asset amortization expense was $183 million in 2019, $169 million in 2018, and $154 million in 2017. The anticipated

annual amortization expense for definite-lived intangible assets recorded as of December 31, 2019 is $188 million in 2020, $184 million in 2021, $179 million in 2022, $167 million in 2023 and $145 million in 2024.

In the second quarter of 2019, we recognized a $31 million impairment charge related to a developed-technology intangible asset due to a decline in market expectations for the related product. The fair value of the intangible asset was measured using a discounted cash flow approach and the charge is classified within cost of sales in the accompanying consolidated statement of income for the year ended December 31, 2019. We consider the fair

86

value of the asset to be a Level 3 measurement due to the significant estimates and assumptions we used in establishing the estimated fair value.

## NOTE 7

## DEBT AND CREDIT FACILITIES

### Debt Outstanding

At December 31, 2019 and 2018, we had the following debt outstanding:

| | | | As Restated |
|---|---|---|---|
| as of December 31 (in millions) | Effective interest rate in 2019 | 2019[1] | 2018[1] |
| Variable-rate loan due 2020 | 1.0 % | $ 313 | $ 310 |
| 1.7% notes due 2021 | 1.9 % | 398 | 398 |
| 2.4% notes due 2022 | 2.5 % | 203 | 202 |
| 0.40% notes due 2024 | 0.6 % | 834 | — |
| 1.3% notes due in 2025 | 1.4 % | 669 | 684 |
| 2.6% notes due 2026 | 2.7 % | 746 | 745 |
| 7.65% debentures due 2027 | 7.7 % | 5 | 5 |
| 6.625% debentures due 2028 | 6.7 % | 98 | 98 |
| 1.3% notes due 2029 | 1.3 % | 830 | — |
| 6.25% notes due 2037 | 6.3 % | 265 | 265 |
| 3.65% notes due 2042 | 3.7 % | 6 | 6 |
| 4.5% notes due 2043 | 4.5 % | 255 | 255 |
| 3.5% notes due 2046 | 3.6 % | 440 | 439 |
| Finance leases and other | 10.0 % | 62 | 76 |
| Total debt | | 5,124 | 3,483 |
| Current portion | | (315) | (2) |
| Long-term portion | | $ 4,809 | $ 3,481 |

[1]Book values include any discounts, premiums and adjustments related to hedging instruments.

### Significant Debt Issuances

In May 2017, we issued €600 million of 1.3% senior notes due May 2025. In May 2019, we issued €750 million of 0.40% senior notes due May 2024 and €750 million of 1.3% senior notes due May 2029. We have designated these debt instruments as net investment hedges of our European operations. Refer to Note 16 for additional information.

### Credit Facilities

In December 2019, we entered into new U.S. and Euro-denominated credit facilities. Our U.S. dollar-denominated revolving credit facility has a capacity of $2.0 billion and our Euro-denominated senior revolving credit facility has a capacity of approximately €200 million. Each of the facilities matures in 2024. As of December 31, 2019, we had €200 million ($224 million) outstanding under our Euro-denominated facility at a 0.91% interest rate and no borrowings outstanding under our U.S. dollar-denominated credit facility. The facilities enable us to borrow funds on an unsecured basis at variable interest rates, and contain various covenants, including a maximum net leverage ratio. Fees under the credit facilities are 0.09% annually as of December 31, 2019 and are based on our credit ratings and the total capacity of the facility. Prior to entering into these new credit facilities, our previous U.S. dollar-denominated revolving credit facility and Euro-denominated senior revolving credit facility had a maximum capacity of $1.5 billion and €200 million, respectively. Fees under these credit facilities were 0.10% annually as of December 31, 2018 and were based on our credit ratings and the total capacity of the facility. There were no borrowings outstanding under these credit facilities as of December 31, 2018.

We also maintain other credit arrangements, which totaled approximately $200 million as of December 31, 2019 and 2018, respectively. We had $2 million outstanding under these arrangements as of December 31, 2019 and 2018, respectively.

As of December 31, 2019, we were in compliance with the financial covenants in these agreements. The non-performance of any financial institution supporting any of the credit facilities would reduce the maximum capacity of these facilities by each institution's respective commitment.

**Future Debt Maturities**

| as of and for the years ended December 31 (in millions) | | Debt maturities |
|---|---|---|
| 2020 | $ | 315 |
| 2021 | | 402 |
| 2022 | | 207 |
| 2023 | | 1 |
| 2024 | | 842 |
| Thereafter | | 3,393 |
| Total obligations and commitments | | 5,160 |
| Discounts, premiums, and adjustments relating to hedging instruments | | (36) |
| Total debt | $ | 5,124 |

**NOTE 8**

**LEASES**

**Lessee Activity**

We have entered into operating and finance leases primarily for office, manufacturing and R&D facilities, vehicles and equipment. Our leases have remaining terms from one to 25 years and some of those leases include options that provide us with the ability to extend the lease term for periods ranging from one to 16 years. Such options are included in the lease term when it is reasonably certain that the option will be exercised.

Certain of our leases include provisions for variable lease payments which are based on, but not limited to, maintenance, insurance, taxes, index escalations and usage-based amounts. For all asset classes, we have elected to apply a practical expedient to account for other services within lease contracts as components of the lease. We also have elected to apply a practical expedient for short-term leases whereby we do not recognize a lease liability and right-of-use asset for leases with a term of less than 12 months.

We classify our leases as operating or finance at the lease commencement date. Finance leases are generally those leases for which we will pay substantially all of the underlying asset's fair value or will use the asset for all or a major part of its economic life, including circumstances in which we will ultimately own the asset. All other leases are operating leases. For finance leases, we recognize interest expense using the effective interest method and we recognize amortization expense on the right-of-use asset over the shorter of the lease term or the useful life of the asset. For operating leases, we recognize lease cost on a straight-line basis over the term of the lease.

Lease liabilities and right-of-use assets are recognized at the lease commencement date based on the present value of minimum lease payments over the lease term. We determine the present value of payments under a lease based on our incremental borrowing rate as of the lease commencement date. The incremental borrowing rate is equal to the rate of interest that we would have to pay to borrow on a collateralized basis over a similar term in an amount equal to the lease payments in a similar economic environment. For operating leases that commenced prior to our adoption of Topic 842, we measured the lease liabilities and right-of-use assets using our incremental borrowing rate as of January 1, 2019.

The components of lease cost for the year ended December 31, 2019 were:

| (in millions) | | 2019 |
|---|---|---|
| Operating lease cost | $ | 121 |
| Finance lease cost | | |
| Amortization of right-of-use assets | | 5 |
| Interest on lease liabilities | | 5 |
| Variable lease cost | | 89 |
| Lease cost | $ | 220 |

The following table contains supplemental cash flow information related to leases for the year ended December 31, 2019:

| (in millions) | | 2019 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows from operating leases | $ | 119 |
| Operating cash flows from finance leases | | 4 |
| Financing cash flows from finance leases | | 4 |
| | | |
| Right-of-use operating lease assets obtained in exchange for lease obligations | | 207 |

There were no material lease transactions that we entered into but have not yet commenced as of December 31, 2019. Supplemental balance sheet information related to leases as of December 31, 2019 includes:

| (in millions) | | December 31, 2019 |
|---|---|---|
| **Operating leases** | | |
| Operating lease right-of-use assets | $ | 608 |
| | | |
| Accounts payable and accrued liabilities | $ | 101 |
| Operating lease liabilities | | 510 |
| Total operating lease liabilities | $ | 611 |
| | | |
| **Finance leases** | | |
| Property, plant and equipment, at cost | $ | 63 |
| Accumulated depreciation | | (19) |
| Property, plant and equipment, net | $ | 44 |
| | | |
| Current maturities of long-term debt and finance lease obligations | $ | — |
| Long-term debt and finance lease obligations | | 54 |
| Total finance lease liabilities | $ | 54 |

Lease term and discount rates as of December 31, 2019 were:

| | December 31, 2019 |
|---|---|
| Weighted-average remaining lease term (years) | |
| Operating leases | 10 |
| Finance leases | 15 |
| Weighted-average discount rate | |
| Operating leases | 2.8 % |
| Finance leases | 10.6 % |

Maturities of operating and finance lease liabilities as of December 31, 2019 were:

| (in millions) | | Finance Leases | | Operating Leases |
|---|---|---|---|---|
| 2020 | $ | 7 | $ | 112 |
| 2021 | | 7 | | 96 |
| 2022 | | 7 | | 80 |
| 2023 | | 6 | | 67 |
| 2024 | | 6 | | 54 |
| Thereafter | | 78 | | 267 |
| Total minimum lease payments | | 111 | | 676 |
| Less: imputed interest | | (57) | | (65) |
| Present value of lease liabilities | $ | 54 | $ | 611 |

Maturities of operating and finance lease liabilities as of December 31, 2018 were:

| | | As Restated | | |
|---|---|---|---|---|
| (in millions) | | Capital Leases | | Operating Leases |
| 2019 | $ | 7 | $ | 123 |
| 2020 | | 7 | | 94 |
| 2021 | | 8 | | 86 |
| 2022 | | 8 | | 72 |
| 2023 | | 6 | | 64 |
| Thereafter | | 88 | | 212 |
| Total minimum lease payments | | 124 | $ | 651 |
| Less: imputed interest | | (62) | | |
| Present value of lease liabilities | $ | 62 | | |

For the years ended December 31, 2018 and 2017, rent expense was $152 million and $155 million, respectively.

**Lessor Activity**

We lease medical equipment, such as renal dialysis equipment and infusion pumps, to customers, primarily in conjunction with arrangements to provide consumable medical products such as dialysis therapies, intravenous (IV) fluids and inhaled anesthetics. Certain of our equipment leases are classified as sales-type leases and the remainder are operating leases. The terms of the related contracts, including the proportion of fixed versus variable payments and any options to shorten or extend the lease term, vary by customer. We allocate revenue between equipment leases and medical products based on their standalone selling prices.

The components of lease revenue for the year ended December 31, 2019 were:

| (in millions) | | 2019 |
|---|---|---|
| Sales-type lease revenue | $ | 35 |
| Operating lease revenue | | 61 |
| Variable lease revenue | | 85 |
| Total lease revenue | $ | 181 |

The components of our net investment in sales-type leases as of December 31, 2019 were:

| (in millions) | | 2019 |
|---|---|---|
| Minimum lease payments | $ | 110 |
| Unguaranteed residual values | | 11 |
| Net investment in leases | $ | 121 |

Our net investment in sales-type leases is classified as follows in the accompanying consolidated balance sheets:

| (in millions) | | December 31, 2019 |
|---|---|---|
| Accounts receivable, net | $ | 45 |
| Other non-current assets | | 76 |
| Total | $ | 121 |

Maturities of sales-type and operating leases as of December 31, 2019 were:

| (in millions) | | Sales-type Leases | | Operating Leases |
|---|---|---|---|---|
| 2020 | $ | 45 | $ | 61 |
| 2021 | | 32 | | 60 |
| 2022 | | 22 | | 60 |
| 2023 | | 14 | | 33 |
| 2024 | | 7 | | 15 |
| Thereafter | | 1 | | 4 |
| Total minimum lease payments | | 121 | $ | 233 |
| Less: imputed interest | | (11) | | |
| Present value of minimum lease payments | $ | 110 | | |

## NOTE 9
## COMMITMENTS AND CONTINGENCIES

Refer to Note 4 for information regarding our unfunded contingent payments associated with collaborative and other arrangements.

### Indemnifications

During the normal course of business, we make indemnities, commitments and guarantees pursuant to which we may be required to make payments related to specific transactions. Indemnifications include: (i) intellectual property indemnities to customers in connection with the use, sales or license of products and services; (ii) indemnities to customers in connection with losses incurred while performing services on their premises; (iii) indemnities to vendors and service providers pertaining to claims based on negligence or willful misconduct; (iv) indemnities involving the representations and warranties in certain contracts; (v) contractual indemnities related to the separation and distribution as set forth in certain of the agreements entered into in connection with such transactions (including the separation and distribution agreement and the tax matters agreement with Baxalta); and (vi) contractual indemnities for our directors and certain of our executive officers for services provided to or at the request of us. In addition, under our Amended and Restated Certificate of Incorporation, and consistent with Delaware General Corporation Law, we have agreed to indemnify our directors and officers for certain losses and expenses upon the occurrence of certain prescribed events. The majority of these indemnities, commitments and guarantees do not provide for any limitation on the maximum potential for future payments that we could be obligated to make. To help address some of these risks, we maintain various insurance coverages. Based on historical experience and evaluation of the agreements, we do not believe that any payments related to our indemnities will have a material impact on our financial condition or results of operations.

### Legal Contingencies

We are involved in product liability, patent, commercial, and other legal matters that arise in the normal course of our business. We record a liability when a loss is considered probable and the amount can be reasonably estimated. If the reasonable estimate of a probable loss is a range, and no amount within the range is a better estimate, the minimum amount in the range is accrued. If a loss is not probable or a probable loss cannot be reasonably estimated, no liability is recorded. As of December 31, 2019 and 2018, our total recorded reserves with respect to legal and environmental matters were $56 million and $46 million, respectively, and there were no related receivables.

We have established reserves for certain of the matters discussed below. We are not able to estimate the amount or range of any loss for certain contingencies for which there is no reserve or additional loss for matters already reserved. While our liability in connection with these claims cannot be estimated and the resolution thereof in any reporting period could have a significant impact on our results of operations and cash flows for that period, the outcome of these legal proceedings is not expected to have a material adverse effect on our consolidated financial position. While we believe that we have valid defenses in the matters set forth below, litigation is inherently uncertain, excessive verdicts do occur, and we may incur material judgments or enter into material settlements of claims.

In addition to the matters described below, we remain subject to the risk of future administrative and legal actions. With respect to governmental and regulatory matters, these actions may lead to product recalls, injunctions, and other restrictions on our operations and monetary sanctions, including significant civil or criminal penalties. With respect to intellectual property, we may be exposed to significant litigation concerning the scope of our and others' rights. Such litigation could result in a loss of patent protection or the ability to market products, which could lead to a significant loss of sales, or otherwise materially affect future results of operations.

## Environmental

We are involved as a potentially responsible party (PRP) for environmental clean-up costs at six Superfund sites. Under the U.S. Superfund statute and many state laws, generators of hazardous waste sent to a disposal or recycling site are liable for site cleanup if contaminants from that property later leak into the environment. The laws generally provide that a PRP may be held jointly and severally liable for the costs of investigating and remediating the site. Separate from the Superfund cases noted above, we are involved in an ongoing voluntary environmental remediation associated with historic operations at our Irvine, California, United States, facility. In 2017, we recorded a pre-tax charge of $15 million related to a former location and included that charge within loss from discontinued operations, net of tax, on the consolidated statement of income. As of December 31, 2019 and 2018, our environmental reserves, which are measured on an undiscounted basis, were $18 million and $19 million, respectively. After considering these reserves, management is of the opinion that the outcome of these matters will not have a material adverse effect on our financial position or results of operations.

## General litigation

In November 2016, a purported antitrust class action complaint seeking monetary and injunctive relief was filed in the United States District Court for the Northern District of Illinois. The complaint alleges a conspiracy among manufacturers of IV solutions to restrict output and affect pricing in connection with a shortage of such solutions. Similar parallel actions subsequently were filed. In January 2017, a single consolidated complaint covering these matters was filed in the Northern District of Illinois. We filed a motion to dismiss the consolidated complaint in February 2017.  The court granted our motion to dismiss the consolidated complaint without prejudice in July 2018. The plaintiffs filed an amended complaint on September 6, 2018. We filed a motion to dismiss the amended complaint on November 9, 2018.

In April 2017, we became aware of a criminal investigation by the U.S. Department of Justice (DOJ), Antitrust Division and a federal grand jury in the United States District Court for the Eastern District of Pennsylvania. We and an employee received subpoenas seeking production of documents and testimony regarding the manufacturing, selling, pricing and shortages of IV solutions and containers (including saline solutions and certain other injectable medicines sold by us) and communications with competitors regarding the same. On November 30, 2018, the DOJ notified us that it had closed the investigation. The New York Attorney General has also requested that we provide information regarding business practices in the IV saline industry. We are cooperating with the New York Attorney General.

In August 2019, we were named in an amended complaint filed by Fayette County, Georgia in the MDL *In re: National Prescription Opiate Litigation* pending in the U.S. District Court, Northern District of Ohio. The complaint alleges that multiple manufacturers and distributors of opiate products improperly marketed and diverted these products, which caused harm to Fayette County. The complaint is limited in its allegations as to Baxter and does not distinguish between injectable opiate products and orally administered opiates. We manufactured generic injectable opiate products in our facility in Cherry Hill, NJ, which we divested in 2011.
In November 2019, we and certain of our officers were named in a class action complaint captioned *Ethan E. Silverman et al. v. Baxter International Inc. et al.* that was filed in the United States District Court for the Northern District of Illinois. The plaintiff, who allegedly purchased shares of our common stock during the specified class

period, filed this putative class action on behalf of himself and shareholders who acquired Baxter common stock between February 21, 2019 and October 23, 2019. The plaintiff alleges that we and certain officers violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by making allegedly false and misleading statements and failing to disclose material facts relating to certain intra-company transactions undertaken for the purpose of generating foreign exchange gains or avoiding foreign exchange losses, as well as our internal controls over financial reporting. On January 29, 2020, the Court appointed Varma Mutual Pension Insurance Company and Louisiana Municipal Police Employees Retirement System as lead plaintiffs in the case. In addition, we have received a stockholder request for inspection of our books and records in connection with the announcement made in our Form 8-K on October 24, 2019 that we had commenced an internal investigation into certain intra-company transactions that impacted our previously reported non-operating foreign exchange gains and losses. As initially disclosed on October 24, 2019, we also voluntarily advised the staff of the SEC of our previously disclosed internal investigation and we are continuing to cooperate with the staff of the SEC.

In March 2020, two lawsuits were filed against us in the Northern District of Illinois by plaintiffs alleging injuries as a result of exposure to ethylene oxide used in our manufacturing facility in Mountain Home, Arkansas to sterilize certain of our products. The plaintiffs seek damages, including compensatory and punitive damages in an unspecified amount, and unspecified injunctive and declaratory relief.

## Other

As previously disclosed, in 2008 we recalled our heparin sodium injection products in the United States. Following the recall, more than 1,000 lawsuits alleging that plaintiffs suffered various reactions to a heparin contaminant, in some cases resulting in fatalities, were filed. In January 2019, the last of these cases was settled. In 2019, following the resolution of an insurance dispute, we received cash proceeds of $39 million for our allocation of the insurance proceeds under a settlement and cost-sharing agreement related to the defense of the heparin product liability cases. We recognized a $37 million gain in connection with the resolution of the dispute with the insurer that is classified within other operating income, net on the consolidated statement of income for the year ended December 31, 2019.

In September 2017, Hurricane Maria caused damage to certain of our assets in Puerto Rico and disrupted operations. Insurance, less applicable deductibles and subject to any coverage exclusions, covered the repair or replacement of our assets that suffered loss or damage, and also provided coverage for interruption to our business, including lost profits, and reimbursement for other expenses and costs that have been incurred relating to the damages and losses suffered. In 2017, we recorded $32 million of pre-tax charges related to damages caused by the hurricane, including $11 million related to the impairment of damaged inventory and fixed assets as well as $21 million of idle facility and other costs. These amounts were recorded as a component of cost of sales in the consolidated statement of income for year ended December 31, 2017. In 2019 and 2018, we recognized $100 million and $42 million, respectively, of insurance recoveries related to the previously mentioned asset impairments and idle facility and other costs suffered as a result of the hurricane. These benefits were recorded as a reduction of cost of sales and within other operating income, net on the consolidated statements of income for the years ended December 31, 2019 and 2018. No further insurance recoveries are expected.

## NOTE 10
## STOCKHOLDERS' EQUITY

### Stock-Based Compensation

Our stock-based compensation generally includes stock options, restricted stock units (RSUs), performance share units (PSUs) and purchases under our employee stock purchase plan. Shares issued relating to our stock-based plans are generally issued out of treasury stock.

As of December 31, 2019, approximately 24 million authorized shares are available for future awards under our stock-based compensation plans.

Stock Compensation Expense

Stock compensation expense was $122 million, $115 million and $107 million in 2019, 2018 and 2017, respectively. The related tax benefit recognized was $70 million in 2019, $61 million in 2018 and $87 million in 2017. Included in the benefit in 2019, 2018 and 2017 were realized excess tax benefits for stock-based compensation of $54 million, $40 million and $56 million, respectively.

Stock compensation expense is recorded at the corporate level and is not allocated to the segments. Approximately 80% of stock compensation expense is classified in SG&A expenses, with the remainder classified in cost of sales and R&D expenses. Costs capitalized in the consolidated balance sheets at December 31, 2019 and 2018 were not material.

Stock compensation expense is based on awards expected to vest, and therefore has been reduced by estimated forfeitures.

Stock Options

Stock options are granted to employees and non-employee directors with exercise prices equal to 100% of the market value on the date of grant. Stock options granted to employees generally vest in one-third increments over a three-year period. Stock options granted to non-employee directors generally vest immediately on the grant date and are issued with a six-month claw-back provision. Stock options typically have a contractual term of 10 years. The grant-date fair value, adjusted for estimated forfeitures, is recognized as expense on a straight-line basis over the substantive vesting period.

The fair value of stock options is determined using the Black-Scholes model. The weighted-average assumptions used in estimating the fair value of stock options granted during each year, along with the weighted-average grant-date fair values, were as follows:

| years ended December 31 | 2019 | 2018 | 2017 |
|---|---|---|---|
| Expected volatility | 19 % | 18 % | 19 % |
| Expected life (in years) | 5.5 | 5.5 | 5.5 |
| Risk-free interest rate | 2.5 % | 2.6 % | 2.1 % |
| Dividend yield | 1.0 % | 1.0 % | 1.0 % |
| Fair value per stock option | $ 15 | $ 13 | $ 10 |

The following table summarizes stock option activity for the year ended December 31, 2019 and the outstanding stock options as of December 31, 2019.

| (options and aggregate intrinsic values in thousands) | Options | Weighted-average exercise price | Weighted-average remaining contractual term (in years) | Aggregate intrinsic value |
|---|---|---|---|---|
| Outstanding as of January 1, 2019 | 25,314 | $ 43.76 | | |
| Granted | 3,801 | $ 75.03 | | |
| Exercised | (8,043) | $ 38.52 | | |
| Forfeited | (596) | $ 66.91 | | |
| Expired | (132) | $ 46.44 | | |
| Outstanding as of December 31, 2019 | 20,344 | $ 50.99 | 6.1 | $ 663,620 |
| Vested or expected to vest as of December 31, 2019 | 20,029 | $ 50.66 | 6.0 | $ 660,342 |
| Exercisable as of December 31, 2019 | 12,945 | $ 41.74 | 4.9 | $ 542,128 |

The aggregate intrinsic value in the table above represents the difference between the exercise price and our closing stock price on the last trading day of the year. The total intrinsic value of options exercised in 2019, 2018 and 2017 was $272 million, $222 million and $203 million, respectively.

As of December 31, 2019, $55 million of unrecognized compensation cost related to stock options is expected to be recognized as expense over a weighted-average period of approximately 1.7 years.

RSUs

RSUs are granted to employees and non-employee directors. RSUs granted to employees generally vest in one-third increments over a three-year period. RSUs granted to non-employee directors generally vest immediately on the grant date and are issued with a six-month claw-back provision. The grant-date fair value, adjusted for estimated forfeitures, is recognized as expense on a straight-line

basis over the substantive vesting period. The fair

94

value of RSUs is determined based on the number of shares granted and the closing price of our common stock on the date of grant.

The following table summarizes nonvested RSU activity for the year ended December 31, 2019.

| (share units in thousands) | Share units | | Weighted-average grant-date fair value |
|---|---|---|---|
| Nonvested RSUs as of January 1, 2019 | 1,611 | $ | 56.45 |
| Granted | 537 | $ | 75.60 |
| Vested | (740) | $ | 51.82 |
| Forfeited | (134) | $ | 63.90 |
| Nonvested RSUs as of December 31, 2019 | 1,274 | $ | 66.46 |

As of December 31, 2019, $46 million of unrecognized compensation cost related to RSUs is expected to be recognized as expense over a weighted-average period of approximately 1.7 years. The weighted-average grant-date fair value of RSUs granted in 2019, 2018 and 2017 was $75.60, $67.11 and $55.11, respectively. The fair value of RSUs vested in 2019, 2018 and 2017 was $57 million, $69 million and $88 million, respectively.

PSUs

Our annual equity awards stock compensation program for senior management includes the issuance of PSUs based on adjusted operating margin as well as stock performance relative to our peer group. Fifty percent of the PSUs granted in 2015 were based on return on invested capital (ROIC) instead of adjusted operating margin. The vesting condition for adjusted operating margin or ROIC PSUs is set at the beginning of the year for each tranche of the award during the 3-year service period. Compensation cost for the adjusted operating margin or ROIC PSUs is measured based on the fair value of the awards on the date that the specific vesting terms for each tranche of the award are established. The fair value of the awards is determined based on the quoted price of our stock on the grant date for each tranche of the award. The compensation cost for adjusted operating margin or ROIC PSUs is adjusted at each reporting date to reflect the estimated vesting outcome.

The fair value for PSUs based on stock performance relative to our peer group is determined using a Monte Carlo model. The assumptions used in estimating the fair value of these PSUs granted during the period, along with the grant-date fair values, were as follows:

| years ended December 31 | 2019 | 2018 | 2017 |
|---|---|---|---|
| Baxter volatility | 19 % | 19 % | 19 % |
| Peer group volatility | 18%-113% | 16%-53% | 16%-54% |
| Correlation of returns | 0.13-0.63 | 0.16-0.61 | 0.19-0.58 |
| Risk-free interest rate | 2.5 % | 2.3 % | 1.6 % |
| Fair value per PSU | $ 106 | $ 90 | $ 69 |

Unrecognized compensation cost related to all unvested PSUs of $18 million at December 31, 2019 is expected to be recognized as expense over a weighted-average period of 1.6 years.

The following table summarizes nonvested PSU activity for the year ended December 31, 2019.

| (share units in thousands) | Share units | | Weighted-average grant-date fair value |
|---|---|---|---|
| Nonvested PSUs as of January 1, 2019 | 913 | $ | 63.88 |
| Granted | 626 | $ | 69.36 |
| Vested | (559) | $ | 46.47 |
| Forfeited | (50) | $ | 77.70 |
| Nonvested PSUs as of December 31, 2019 | 930 | $ | 75.50 |

95

96

<u>Employee Stock Purchase Plan</u>

Nearly all employees are eligible to participate in our employee stock purchase plan. The employee purchase price is 85% of the closing market price on the purchase date.

The Baxter International Inc. Employee Stock Purchase Plan provides for 10 million shares of common stock available for issuance to eligible participants, of which approximately three million shares were available for future purchases as of December 31, 2019.

During 2019, 2018, and 2017, we issued approximately 0.7 million, 0.8 million and 0.8 million shares, respectively, under the employee stock purchase plan.

**Cash Dividends**

Total cash dividends declared per share for 2019, 2018, and 2017 were $0.85, $0.73 and $0.61, respectively.

A quarterly dividend of $0.19 per share ($0.76 on an annualized basis) was declared in February 2019 and was paid in April 2019. Quarterly dividends of $0.22 per share ($0.88 on an annualized basis) were declared in May and July of 2019 and were paid in July and October of 2019, respectively. Our Board of Directors declared a quarterly dividend of $0.22 per share in November of 2019, which was paid in January of 2020.

**Stock Repurchase Programs**

As authorized by the Board of Directors, we repurchase our stock depending on our cash flows, net debt level and market conditions. In July 2012, the Board of Directors authorized the repurchase of up to $2.0 billion of our common stock. The Board of Directors increased this authority by an additional $1.5 billion in each of November 2016 and February 2018 and by an additional $2.0 billion in November 2018. We repurchased 16.5 million shares under this authority pursuant to Rule 10b5-1 plans and otherwise for $1.3 billion in cash in 2019, 35.8 million shares under this authority pursuant to Rule 10b5-1 plans and otherwise for $2.5 billion in cash in 2018 and 9.2 million shares under this authority pursuant to Rule 10b5-1 plans for $564 million in cash in 2017. As of December 31, 2018, we recognized a liability within accounts payable and accrued liabilities of $23 million for share repurchases that settled in early January 2019. We had $897 million of purchase authority available as of December 31, 2019.

**Accelerated Share Repurchase Agreement**

In December 2018, we entered into a $300 million accelerated share repurchase agreement (ASR Agreement) with an investment bank. We funded the ASR Agreement with available cash. The ASR Agreement was executed pursuant to the 2012 Repurchase Authorization described above. Under the ASR Agreement, we received 3.6 million shares upon execution. Based on the volume-weighted average price of our common stock during the term of the ASR Agreement, we received an additional 0.6 million shares from the investment bank at settlement on May 7, 2019.

**NOTE 11**

**ACCUMULATED OTHER COMPREHENSIVE INCOME**

Comprehensive income includes all changes in stockholders' equity that do not arise from transactions with stockholders, and consists of net income, CTA, certain gains and losses from other postretirement benefit (OPEB) plans, gains and losses on cash flow hedges and, prior to 2018, unrealized gains and losses on available-for-sale equity securities. As a result of changes in accounting guidance related to available-for-sale equity securities, the unrealized gains and losses associated with these assets are no longer recognized in AOCI beginning January 1, 2018. The following table is a net-of-tax summary of the changes in AOCI by component for the years ended December 31, 2019 and 2018.

| (in millions) | | CTA | Pension and OPEB plans | Hedging activities | Total |
|---|---|---|---|---|---|
| *Gains (losses)* | | | | | |
| Balance as of December 31, 2018 (as restated) | $ | (2,868) $ | (954) $ | (1) $ | (3,823) |
| Adoption of new accounting standard | | 9 | (169) | (1) | (161) |
| Other comprehensive (loss) income before reclassifications | | (95) | (184) | (36) | (315) |
| Amounts reclassified from AOCI (a) | | — | 592 | (3) | 589 |
| Net other comprehensive (loss) income | | (95) | 408 | (39) | 274 |
| Balance as of December 31, 2019 | $ | (2,954) $ | (715) $ | (41) $ | (3,710) |

| | | | As Restated | | | |
|---|---|---|---|---|---|---|
| (in millions) | | CTA | Pension and OPEB plans | Hedging activities | Available-for-sale-equity securities | Total |
| *Gains (losses)* | | | | | | |
| Balance as of December 31, 2017 | $ | (2,545) $ | (987) $ | (10) $ | 3 $ | (3,539) |
| Adoption of new accounting standard | | — | — | — | (3) | (3) |
| Other comprehensive income (loss) before reclassifications | | (323) | (23) | (1) | — | (347) |
| Amounts reclassified from AOCI (a) | | — | 56 | 10 | — | 66 |
| Net other comprehensive (loss) income | | (323) | 33 | 9 | — | (281) |
| Balance as of December 31, 2018 | $ | (2,868) $ | (954) $ | (1) $ | — $ | (3,823) |

(a) See table below for details about these reclassifications.

The following table is a summary of the amounts reclassified from AOCI to net income during the years ended December 31, 2019 and 2018.

| | | Amounts reclassified from AOCI (a) | | |
|---|---|---|---|---|
| | | | As Restated | |
| (in millions) | | 2019 | 2018 | Location of impact in income statement |
| Pension and OPEB items | | | | |
| Amortization of net losses and prior service costs or credits | $ | (31) $ | (69) | Other (income) expense, net |
| Settlement charge | | (755) | (1) | Other (income) expense, net |
| | | (786) | (70) | Total before tax |
| Less: Tax effect | | 194 | 14 | Income tax expense |
| | $ | (592) $ | (56) | Net of tax |
| Gains (losses) on hedging activities | | | | |
| Foreign exchange contracts | $ | 4 $ | (12) | Cost of sales |
| Less: Tax effect | | (1) | 2 | Income tax expense |
| | $ | 3 $ | (10) | Net of tax |
| Total reclassification for the period | $ | (589) $ | (66) | Total net of tax |

(a)    Amounts in parentheses indicate reductions to net income.

Refer to Note 13 for additional information regarding the amortization of pension and OPEB items and Note 16 for additional

information regarding hedging activity.

97

**NOTE 12**

**BUSINESS OPTIMIZATION CHARGES**

In recent years, we have undertaken actions to transform our cost structure and enhance operational efficiency. These efforts include restructuring the organization, optimizing the manufacturing footprint, R&D operations and supply chain network, employing disciplined cost management, and centralizing and streamlining certain support functions. From the commencement of our business optimization activities through December 31, 2019, we have incurred cumulative pre-tax costs of approximately $980 million related to these actions. The costs consisted primarily of employee termination, implementation costs, asset impairments and accelerated depreciation. We currently expect to incur additional pre-tax cash costs of approximately $50 million through the completion of these initiatives under our current program. These costs will primarily include employee termination costs, implementation costs, and accelerated depreciation. To the extent further cost savings opportunities are identified, we may incur additional business optimization expenses.

We recorded the following charges related to business optimization programs in 2019, 2018, and 2017:

| years ended December 31 (in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Restructuring charges | $ | 134 | $ | 117 | $ | 70 |
| Costs to implement business optimization programs | | 45 | | 94 | | 89 |
| Accelerated depreciation | | 5 | | 9 | | 10 |
| Total business optimization charges | $ | 184 | $ | 220 | $ | 169 |

For segment reporting, business optimization charges are unallocated expenses.

Costs to implement business optimization programs for the years ended December 31, 2019, 2018 and 2017, consisted primarily of external consulting and transition costs, including employee compensation and related costs. The costs were generally included within cost of sales, SG&A expense and R&D expense.

For the years ended December 31, 2019, 2018 and 2017, we recognized accelerated depreciation, primarily associated with facilities to be closed. The costs were recorded within cost of sales and SG&A expense.

During the years ended December 31, 2019, 2018 and 2017, we recorded the following restructuring charges:

| | | 2019 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (in millions) | | COGS | | SG&A | | R&D | | Total | |
| Employee termination costs | $ | 13 | $ | 37 | $ | 25 | $ | 75 | |
| Contract termination and other costs | | 10 | | 1 | | — | | 11 | |
| Asset impairments | | 37 | | 2 | | 9 | | 48 | |
| Total restructuring charges | $ | 60 | $ | 40 | $ | 34 | $ | 134 | |

| | | 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (in millions) | | COGS | | SG&A | | R&D | | Total | |
| Employee termination costs | $ | 30 | $ | 51 | $ | 19 | $ | 100 | |
| Contract termination and other costs | | 4 | | 6 | | — | | 10 | |
| Asset impairments | | 1 | | 6 | | — | | 7 | |
| Total restructuring charges | $ | 35 | $ | 63 | $ | 19 | $ | 117 | |

| | | 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (in millions) | | COGS | | SG&A | | R&D | | Total | |
| Employee termination costs | $ | 22 | $ | 39 | $ | (2) | $ | 59 | |
| Contract termination and other costs | | — | | 5 | | — | | 5 | |
| Asset impairments | | 5 | | 1 | | — | | 6 | |
| Total restructuring charges | $ | 27 | $ | 45 | $ | (2) | $ | 70 | |

98

99

The following table summarizes activity in the liability related to our restructuring initiatives.

(in millions)

| | | |
|---|---|---:|
| Liability balance as of December 31, 2016 (As Restated) | $ | 164 |
| Charges | | 83 |
| Payments | | (140) |
| Reserve adjustments | | (19) |
| Currency translation | | 24 |
| Liability balance as of December 31, 2017 (As Restated) | | 112 |
| Charges | | 126 |
| Payments | | (96) |
| Reserve adjustments | | (16) |
| Currency translation | | (25) |
| Liability balance as of December 31, 2018 (As Restated) | | 101 |
| Charges | | 113 |
| Payments | | (93) |
| Reserve adjustments | | (27) |
| Currency translation | | (2) |
| Liability balance as of December 31, 2019 | $ | 92 |

Reserve adjustments primarily relate to employee termination cost reserves established in prior periods.

Substantially all of our restructuring liabilities as of December 31, 2019 relate to employee termination costs, with the remaining liabilities attributable to contract termination costs. Substantially all of the cash payments for those liabilities are expected to be disbursed by the end of 2020.

## NOTE 13

## PENSION AND OTHER POSTRETIREMENT BENEFIT PROGRAMS

We sponsor a number of qualified and nonqualified pension plans for eligible employees. We also sponsor certain unfunded contributory healthcare and life insurance benefits for substantially all domestic retired employees. Newly hired employees in the United States and Puerto Rico are not eligible to participate in the pension plans but receive a higher level of company contributions in the defined contribution plans.

### Reconciliation of Pension and Other Postretirement Benefit Plan Obligations, Assets and Funded Status

The benefit plan information in the table below pertains to all of our pension and OPEB plans, both in the United States and in other countries.

99

| | Pension benefits | | OPEB | |
| | | As Restated | | |
| as of and for the years ended December 31 (in millions) | **2019** | 2018 | **2019** | 2018 |
|---|---|---|---|---|
| **Benefit obligations** | | | | |
| Beginning of period | $ **5,635** | $ 6,182 | $ **211** | $ 235 |
| Service cost | **74** | 87 | **1** | 1 |
| Interest cost | **172** | 178 | **8** | 7 |
| Participant contributions | **4** | 5 | **—** | — |
| Actuarial (gain) loss | **924** | (431) | **26** | (14) |
| Benefit payments | **(267)** | (259) | **(18)** | (18) |
| Settlements | **(2,550)** | (6) | **—** | — |
| Curtailment | **(13)** | (56) | **—** | — |
| Foreign exchange and other | **(6)** | (65) | **—** | — |
| End of period | **3,973** | 5,635 | **228** | 211 |
| **Fair value of plan assets** | | | | |
| Beginning of period | **4,774** | 5,261 | **—** | — |
| Actual return on plan assets | **939** | (237) | **—** | — |
| Employer contributions | **69** | 51 | **18** | 18 |
| Participant contributions | **4** | 5 | **—** | — |
| Benefit payments | **(267)** | (259) | **(18)** | (18) |
| Settlements | **(2,550)** | (6) | **—** | — |
| Foreign exchange and other | **4** | (41) | **—** | — |
| End of period | **2,973** | 4,774 | **—** | — |
| Funded status at December 31 | $ **(1,000)** | $ (861) | $ **(228)** | $ (211) |
| **Amounts recognized in the consolidated balance sheets** | | | | |
| Noncurrent asset | $ **77** | $ 60 | $ **—** | $ — |
| Current liability | **(25)** | (25) | **(20)** | (20) |
| Noncurrent liability | **(1,052)** | (896) | **(208)** | (191) |
| Net liability recognized at December 31 | $ **(1,000)** | $ (861) | $ **(228)** | $ (211) |

The pension obligation information in the table above represents the projected benefit obligation (PBO). The PBO incorporates assumptions relating to future compensation levels. The accumulated benefit obligation (ABO) is the same as the PBO except that it includes no assumptions relating to future compensation levels. The ABO for all of our pension plans was $3.7 billion and $5.4 billion at the 2019 and 2018 measurement dates, respectively.

The information in the funded status table above represents the totals for all of our pension plans. The following table is information relating to the individual plans in the funded status table above that have an ABO in excess of plan assets.

| | | As Restated |
| | | |
| as of December 31 (in millions) | **2019** | 2018 |
|---|---|---|
| ABO | $ **3,240** | $ 4,981 |
| Fair value of plan assets | $ **2,339** | $ 4,246 |

The following table presents information relating to the individual plans in the funded status table above that have a PBO in excess of plan assets (many of which also have an ABO in excess of assets and are therefore also included in the table directly above).

| as of December 31 (in millions) | | 2019 | As Restated 2018 |
|---|---|---|---|
| PBO | $ | 3,688 | $ 5,386 |
| Fair value of plan assets | $ | 2,611 | $ 4,465 |

**Expected Net Pension and OPEB Plan Payments for the Next 10 Years**

| (in millions) | | Pension benefits | OPEB |
|---|---|---|---|
| 2020 | $ | 86 | $ 20 |
| 2021 | | 104 | 18 |
| 2022 | | 118 | 17 |
| 2023 | | 132 | 17 |
| 2024 | | 149 | 16 |
| 2024 through 2028 | | 917 | 71 |
| Total expected net benefit payments for next 10 years | $ | 1,506 | $ 159 |

The expected net benefit payments above reflect the total net benefits expected to be paid from the plans' assets (for funded plans) or from our assets (for unfunded plans). The federal subsidies relating to the Medicare Prescription Drug, Improvement and Modernization Act are not expected to be significant.

**Amounts Recognized in AOCI**

The pension and OPEB plans' gains or losses, prior service costs or credits, and transition assets or obligations not yet recognized in net periodic benefit cost are recognized on a net-of-tax basis in AOCI and will be amortized from AOCI to net periodic benefit cost in the future. For active employees, we utilize the average future working lifetime as the amortization period for prior service. For inactive employees, we utilize the average remaining life expectancy as the amortization period for prior service.

The following table is a summary of the pre-tax losses included in AOCI at December 31, 2019 and December 31, 2018.

| (in millions) | | Pension benefits | OPEB |
|---|---|---|---|
| Actuarial loss (gain) | $ | 1,025 | $ (41) |
| Prior service credit and transition obligation | | (9) | (59) |
| Total pre-tax loss recognized in AOCI at December 31, 2019 | $ | 1,016 | $ (100) |
| Actuarial loss (gain) | $ | 1,607 | $ (79) |
| Prior service credit and transition obligation | | (10) | (74) |
| Total pre-tax loss (gain) recognized in AOCI at December 31, 2018 (As Restated) | $ | 1,597 | $ (153) |

Refer to Note 11 for the net-of-tax balances included in AOCI as of each of the year-end dates. The following table is a summary of the net-of-tax amounts recorded in OCI relating to pension and OPEB plans.

| Year ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Gain (loss) arising during the year, net of tax expense (benefit) of $(64) in 2019, $(4) in 2018 and $25 in 2017 | $ | (184) | $ | (22) | $ | 32 |
| Amortization of loss to earnings, net of tax benefit of $6 in 2019, $14 in 2018 and $35 in 2017 | | 25 | | 55 | | 102 |
| Settlement charge, net of tax benefit of $188 in 2019 | $ | 567 | $ | — | $ | — |
| Pension and other employee benefits gain | $ | 408 | $ | 33 | $ | 134 |

In 2019, OCI activity for pension and OPEB plans was primarily related to the U.S. pension settlement charge, further discussed below, and actuarial gains and losses. In 2018 and 2017, OCI activity for pension and OPEB plans was primarily related to actuarial gains and losses.

101

**Amounts Expected to be Amortized from AOCI to Net Periodic Benefit Cost in 2020**

With respect to the AOCI balance at December 31, 2019, the following table is a summary of the pre-tax amounts expected to be amortized to net periodic benefit cost in 2020.

| (in millions) | Pension benefits | OPEB |
|---|---:|---:|
| Actuarial loss/(gain) | $ 78 | $ (4) |
| Prior service credit and transition obligation | (1) | (14) |
| Total pre-tax amount expected to be amortized from AOCI to net pension and OPEB cost in 2020 | $ 77 | $ (18) |

**Net Periodic Benefit Cost – Continuing Operations**

| | | | As Restated | |
|---|---:|---:|---:|---:|
| Year ended December 31 (in millions) | | **2019** | 2018 | 2017 |
| **Pension benefits** | | | | |
| Service cost | $ | **74** | $ 87 | $ 91 |
| Interest cost | | **172** | 178 | 180 |
| Expected return on plan assets | | **(264)** | (303) | (291) |
| Amortization of net losses and other deferred amounts | | **58** | 94 | 163 |
| Settlement charges | | **755** | 1 | 2 |
| Other | | **—** | — | (2) |
| Net periodic pension benefit cost | $ | **795** | $ 57 | $ 143 |
| **OPEB** | | | | |
| Service cost | $ | **1** | $ 1 | $ 1 |
| Interest cost | | **8** | 7 | 7 |
| Amortization of net losses and prior service credit | | **(27)** | (25) | (26) |
| Net periodic OPEB cost | $ | **(18)** | $ (17) | $ (18) |

**Weighted-Average Assumptions Used in Determining Benefit Obligations at the Measurement Date**

| | Pension benefits | | OPEB | |
|---|---:|---:|---:|---:|
| | **2019** | 2018 | **2019** | 2018 |
| **Discount rate** | | | | |
| U.S. and Puerto Rico plans | **3.44 %** | 4.31 % | **3.16 %** | 4.20 % |
| International plans | **1.34 %** | 2.02 % | **n/a** | n/a |
| **Rate of compensation increase** | | | | |
| U.S. and Puerto Rico plans | **3.68 %** | 3.66 % | **n/a** | n/a |
| International plans | **3.03 %** | 3.08 % | **n/a** | n/a |
| **Annual rate of increase in the per-capita cost** | **n/a** | n/a | **6.75 %** | 7.00 % |
| Rate decreased to | **n/a** | n/a | **5.00 %** | 5.00 % |
| by the year ended | **n/a** | n/a | **2027** | 2027 |

The assumptions above, which were used in calculating the December 31, 2019 measurement date benefit obligations, will be used in the calculation of net periodic benefit cost in 2020.

**Weighted-Average Assumptions Used in Determining Net Periodic Benefit Cost**

|  | Pension benefits | | | OPEB | | |
|---|---|---|---|---|---|---|
|  | **2019** | 2018 | 2017 | **2019** | 2018 | 2017 |
| **Discount rate** | | | | | | |
| U.S. and Puerto Rico plans | **4.18 %** | 3.60 % | 4.09 % | **4.20 %** | 3.51 % | 3.89 % |
| International plans | **2.02 %** | 2.02 % | 2.03 % | **n/a** | n/a | n/a |
| **Expected return on plan assets** | | | | | | |
| U.S. and Puerto Rico plans | **6.29 %** | 6.25 % | 6.50 % | **n/a** | n/a | n/a |
| International plans | **5.45 %** | 5.58 % | 5.77 % | **n/a** | n/a | n/a |
| **Rate of compensation increase** | | | | | | |
| U.S. and Puerto Rico plans | **3.66 %** | 3.42 % | 3.75 % | **n/a** | n/a | n/a |
| International plans | **3.08 %** | 3.05 % | 3.11 % | **n/a** | n/a | n/a |
| **Annual rate of increase in the per-capita cost** | **n/a** | n/a | n/a | **6.75 %** | 7.00 % | 6.25 % |
| Rate decreased to | **n/a** | n/a | n/a | **5.00 %** | 5.00 % | 5.00 % |
| by the year ended | **n/a** | n/a | n/a | **2027** | 2027 | 2023 |

We established the expected return on plan assets assumption primarily based on a review of historical compound average asset returns, both company-specific and relating to the broad market (based on our asset allocation), as well as an analysis of current market and economic information and future expectations. We plan to use a 6.50% assumption for our U.S. and Puerto Rico plans for 2020.

Actuarial gains and losses result from changes in actuarial assumptions (such as changes in the discount rate and revised mortality rates). Actuarial losses in 2019 and gains in 2018 related to plan benefit obligations were primarily the result of changes in discount rates.

**Effect of a One-Percent Change in Assumed Healthcare Cost Trend Rate on the OPEB Plan**

The effect of a one-percent change in the assumed healthcare cost trend rate on the service and interest cost components of OPEB cost as well as the OPEB obligation were not significant for 2019 or 2018, respectively.

**Pension Plan Assets**

An investment committee of members of senior management is responsible for supervising, monitoring and evaluating the invested assets of our funded pension plans. The investment committee, which meets at least quarterly, abides by documented policies and procedures relating to investment goals, targeted asset allocations, risk management practices, allowable and prohibited investment holdings, diversification, use of derivatives, the relationship between plan assets and benefit obligations, and other relevant factors and considerations.

The investment committee's policies and procedures include the following:

- Ability to pay all benefits when due;
- Targeted long-term performance expectations relative to applicable market indices, such as Russell, MSCI EAFE, and other indices;
- Targeted asset allocation percentage ranges (summarized below), and periodic reviews of these allocations;
- Diversification of assets among third-party investment managers, and by geography, industry, stage of business cycle and other measures;
- Specified investment holding and transaction prohibitions (for example, private placements or other restricted securities, securities that are not traded in a sufficiently active market, short sales, certain derivatives, commodities and margin transactions);
- Specified portfolio percentage limits on holdings in a single corporate or other entity (generally 5% at time of purchase, except for holdings in U.S. government or agency securities);

103

104

- Specified average credit quality for the fixed-income securities portfolio (at least A- by Standard & Poor's or A3 by Moody's);

- Specified portfolio percentage limits on foreign holdings; and

- Periodic monitoring of investment manager performance and adherence to the investment committee's policies.

Plan assets are invested using a total return investment approach whereby a mix of equity securities, debt securities and other investments are used to preserve asset values, diversify risk and exceed the planned benchmark investment return. Investment strategies and asset allocations are based on consideration of plan liabilities, the plans' funded status and other factors, such as the plans' demographics and liability durations. Investment performance is reviewed by the investment committee on a quarterly basis and asset allocations are reviewed at least annually.

Plan assets are managed in a balanced portfolio comprised of two major components: return-seeking investments and liability hedging investments. The target allocations for plan assets are 53% in return-seeking investments and 47% in liability hedging investments and other holdings. The documented policy includes an allocation range based on each individual investment type within the major components that allows for a variance from the target allocations depending on the investment type. Return-seeking investments primarily include common stock of U.S. and international companies, common/collective trust funds, mutual funds, hedge funds, and partnership investments. Liability hedging investments and other holdings primarily include cash, money market funds with an original maturity of three months or less, U.S. and foreign government and governmental agency issues, corporate bonds, municipal securities, derivative contracts and asset-backed securities.

While the investment committee provides oversight over plan assets for U.S. and international plans, the summary above is specific to the plans in the United States. The plan assets for international plans are managed and allocated by the entities in each country, with input and oversight provided by the investment committee. The plan assets for the U.S. and international plans are included in the table below.

The following tables summarize our pension plan financial instruments that are measured at fair value on a recurring basis.

104

| (in millions) | Balance at December 31, 2019 | Basis of fair value measurement | | | |
| --- | --- | --- | --- | --- | --- |
| | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Measured at NAV |
| **Assets** | | | | | |
| Fixed income securities | | | | | |
| Cash and cash equivalents | $ 224 | $ 72 | $ 152 | $ — | $ — |
| U.S. government and government agency issues | 452 | — | 452 | — | — |
| Corporate bonds | 352 | — | 352 | — | — |
| Equity securities | | | | | |
| Common stock: | | | | | |
| Large cap | 231 | 231 | — | — | — |
| Mid cap | 158 | 158 | — | — | — |
| Small cap | 37 | 37 | — | — | — |
| Total common stock | 426 | 426 | — | — | — |
| Mutual funds | 442 | 189 | 253 | — | — |
| Common/collective trust funds | 668 | 19 | 272 | — | 377 |
| Partnership investments | 333 | — | — | — | 333 |
| Other holdings | 76 | 8 | 58 | 10 | — |
| Collateral held on loaned securities | 9 | — | 9 | — | — |
| **Liabilities** | | | | | |
| Collateral to be paid on loaned securities | (9) | (9) | — | — | — |
| Fair value of pension plan assets | $ 2,973 | $ 705 | $ 1,548 | $ 10 | $ 710 |

105

|  | | As Restated | | | |
|  | | Basis of fair value measurement | | | |
| (in millions) | Balance at December 31, 2018 | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Measured at NAV |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Fixed income securities | | | | | |
| Cash and cash equivalents | $ 145 | $ 21 | $ 124 | $ — | $ — |
| U.S. government and government agency issues | 735 | — | 735 | — | — |
| Corporate bonds | 1,127 | — | 1,127 | — | — |
| Equity securities | | | | | |
| Common stock: | | | | | |
| Large cap | 541 | 541 | — | — | — |
| Mid cap | 298 | 298 | — | — | — |
| Small cap | 91 | 91 | — | — | — |
| Total common stock | 930 | 930 | — | — | — |
| Mutual funds | 356 | 135 | 221 | — | — |
| Common/collective trust funds | 919 | — | 210 | — | 709 |
| Partnership investments | 390 | — | — | — | 390 |
| Other holdings | 172 | 11 | 151 | 10 | — |
| Collateral held on loaned securities | 196 | — | 196 | — | — |
| **Liabilities** | | | | | |
| Collateral to be paid on loaned securities | (196) | (34) | (162) | — | — |
| Fair value of pension plan assets | $ 4,774 | $ 1,063 | $ 2,602 | $ 10 | $ 1,099 |

The following table is a reconciliation of changes in fair value measurements that used significant unobservable inputs (Level 3).

| (in millions) | Total | Common/collective trust funds | Other holdings |
|---|---|---|---|
| Balance at December 31, 2017 | $ 18 | $ 8 | $ 10 |
| Transfers out | (8) | (8) | — |
| Balance at December 31, 2018 | 10 | — | 10 |
| Purchases | — | — | — |
| Balance at December 31, 2019 | $ 10 | $ — | $ 10 |

106

The assets and liabilities of our pension plans are valued using the following valuation methods:

| Investment category | Valuation methodology |
|---|---|
| Cash and cash equivalents | These largely consist of a short-term investment fund, U.S. dollars and foreign currency. The fair value of the short-term investment fund is based on the net asset value |
| U.S. government and government agency issues | Values are based on reputable pricing vendors, who typically use pricing matrices or models that use observable inputs |
| Corporate bonds | Values are based on reputable pricing vendors, who typically use pricing matrices or models that use observable inputs |
| Common stock | Values are based on the closing prices on the valuation date in an active market on national and international stock exchanges |
| Mutual funds | Values are based on the net asset value of the units held in the respective fund which are obtained from national and international exchanges or based on the net asset value of the underlying assets of the fund provided by the fund manager |
| Common/collective trust funds | Values are based on the net asset value of the units held at year end |
| Partnership investments | Values are based on the net asset value of the participation by us in the investment as determined by the general partner or investment manager of the respective partnership |
| Other holdings | The value of these assets vary by investment type, but primarily are determined by reputable pricing vendors, who use pricing matrices or models that use observable inputs |
| Collateral held on loaned securities | Values are based on the net asset value per unit of the fund in which the collateral is invested |
| Collateral to be paid on loaned securities | Values are based on the fair value of the underlying securities loaned on the valuation date |

## Expected Pension and OPEB Plan Funding

Our funding policy for our pension plans is to contribute amounts sufficient to meet legal funding requirements, plus any additional amounts that we may determine to be appropriate considering the funded status of the plans, tax deductibility, the cash flows generated by us, and other factors. Volatility in the global financial markets could have an unfavorable impact on future funding requirements. We have no obligation to fund our principal plans in the United States in 2020. We continually reassess the amount and timing of any discretionary contributions. In 2020, we expect to make contributions of at least $5 million to our Puerto Rico pension plan and $41 million to our foreign pension plans. We expect to have net cash outflows relating to our OPEB plan of approximately $20 million in 2020.

The following table details the funded status percentage of our pension plans as of December 31, 2019, including certain plans that are unfunded in accordance with the guidelines of our funding policy outlined above.

| | United States and Puerto Rico | | International | | |
|---|---|---|---|---|---|
| as of December 31, 2019 (in millions) | Qualified plans | Nonqualified plan | Funded plans | Unfunded plans | Total |
| Fair value of plan assets | $ 2,060 | n/a | $ 913 | n/a $ | 2,973 |
| PBO | 2,278 | $ 243 | 1,001 | $ 451 | 3,973 |
| Funded status percentage | 90 % | n/a | 91 % | n/a | 75 % |

## Pension Annuitization

As part of our continued effort to reduce pension plan obligations, we transferred approximately $2.4 billion of U.S. qualified pension plan liabilities to an insurance company through the purchase of a group annuity contract in October 2019. As a result of this transaction, we recognized a non-cash pretax pension settlement charge of $755 million in the fourth quarter of 2019.

**Pension Plan Amendments and Other Events**

In January 2018, we announced changes to our U.S. pension plans. We spun off the assets and liabilities of the qualified plan attributable to current employees into a new plan and will freeze the pay and service amounts used to calculate pension benefits for active participants in the U.S. pension plans as of December 31, 2022. The assets and liabilities attributable to retired and former company employees remained with the original qualified plan. Years of additional service earned and eligible compensation received after December 31, 2022 will not be included in the determination of the benefits payable to participants. These changes resulted in a $57 million decline in the PBO upon the effective date of the changes. As a result of these changes, net periodic pension and OPEB expense decreased in 2019 and 2018.

**U.S. Defined Contribution Plan**

Most U.S. employees are eligible to participate in a qualified defined contribution plan. We recognized expense of $53 million in 2019, $50 million in 2018 and $45 million in 2017 related to contributions to this plan.

## NOTE 14

### INCOME TAXES

**Income from Continuing Operations Before Income Tax Expense by Category**

| | | | | As Restated | | |
|---|---|---|---|---|---|---|
| years ended December 31 (in millions) | | 2019 | | 2018 | | 2017 |
| United States | $ | (586) | $ | 7 | $ | (320) |
| International | | 1,556 | | 1,610 | | 1,420 |
| Income from continuing operations before income taxes | $ | 970 | $ | 1,617 | $ | 1,100 |

**Income Tax Expense Related to Continuing Operations**

| | | | | As Restated | | |
|---|---|---|---|---|---|---|
| years ended December 31 (in millions) | | 2019 | | 2018 | | 2017 |
| Current | | | | | | |
| United States | | | | | | |
| Federal | $ | 8 | $ | 21 | $ | 8 |
| State and local | | 3 | | (1) | | 11 |
| International | | 258 | | 308 | | 261 |
| Current income tax expense | | 269 | | 328 | | 280 |
| Deferred | | | | | | |
| United States | | | | | | |
| Federal | | (140) | | (228) | | 230 |
| State and local | | (29) | | — | | 1 |
| International | | (141) | | (35) | | (20) |
| Deferred income tax expense (benefit) | | (310) | | (263) | | 211 |
| Income tax expense (benefit) | $ | (41) | $ | 65 | $ | 491 |

**Deferred Tax Assets and Liabilities**

| | | 2019 | | As Restated 2018 |
|---|---|---|---|---|
| as of December 31 (in millions) | | **2019** | | 2018 |
| Deferred tax assets | | | | |
| Accrued liabilities and other | $ | **209** | $ | 227 |
| Pension and other postretirement benefits | | **258** | | 222 |
| Tax credit and net operating loss carryforwards | | **928** | | 862 |
| Swiss tax reform net asset basis step-up | | **159** | | — |
| Operating lease liabilities | | **153** | | — |
| Valuation allowances | | **(420)** | | (310) |
| Total deferred tax assets | | **1,287** | | 1,001 |
| Deferred tax liabilities | | | | |
| Subsidiaries' unremitted earnings | | **57** | | 43 |
| Long-lived assets and other | | **649** | | 690 |
| Operating lease right-of-use assets | | **152** | | — |
| Total deferred tax liabilities | | **858** | | 733 |
| Net deferred tax asset | $ | **429** | $ | 268 |

At December 31, 2019, we had U.S. state operating loss carryforwards totaling $1.1 billion, U.S. federal operating loss carryforwards totaling $58 million and tax credit carryforwards totaling $410 million, which includes a U.S. foreign tax credit carryforward of $395 million. The U.S. federal and state operating loss carryforwards expire between 2020 and 2038 and the tax credits expire between 2020 and 2038.

At December 31, 2019, with respect to our operations outside the U.S., we had foreign operating loss carryforwards totaling $1.3 billion and foreign tax credit carryforwards totaling $49 million. The foreign operating loss carryforwards expire between 2020 and 2031 with $814 million having no expiration date. The foreign tax credits expire between 2021 and 2027 with $48 million having no expiration date.

Realization of these operating loss and tax credit carryforwards depends on generating sufficient future earnings. A valuation allowance of $420 million and $310 million was recognized as of December 31, 2019 and 2018, respectively, to reduce the deferred tax assets associated with net operating loss and tax credit carryforwards because we do not believe it is more likely than not that these assets will be fully realized prior to expiration. After evaluating the 2017 Tax Act and related U.S. Treasury Regulations, any elections or other opportunities that may be available, and the future expiration of certain U.S. tax provisions that will impact the utilization of our U.S. foreign tax credit carryforwards, management expects to be able to realize some, but not all, of the U.S. foreign tax credit deferred tax assets up to its overall domestic loss balance plus other recurring and non-recurring foreign inclusions. Therefore, a valuation allowance of $180 million and $175 million was recognized with respect to the foreign tax credit carryforwards as of December 31, 2019 and 2018, respectively. We will continue to evaluate the need for additional valuation allowances and, as circumstances change, the valuation allowance may change.

As a result of Swiss tax reform legislation enacted during 2019, we recognized an $863 million net asset basis step-up that is amortizable as a tax deduction ratably over tax years 2025 through 2029. The net asset basis step-up resulted in a $159 million deferred tax asset. We expect to realize some, but not all, of the Swiss deferred tax assets based principally on expected future earnings generated by the Swiss subsidiary during the period in which the tax basis will be amortized. Therefore, a valuation allowance of $69 million was recognized on the Swiss deferred tax assets as of December 31, 2019, resulting in a net deferred tax benefit of $90 million for the year ended December 31, 2019.

**Income Tax Expense (Benefit) Reconciliation**

| years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Income tax expense at U.S. statutory rate | $ | 204 | $ | 340 | $ | 383 |
| Tax incentives | | (140) | | (161) | | (139) |
| State and local taxes, net of federal benefit | | (17) | | 5 | | (6) |
| Impact of foreign taxes | | 65 | | 122 | | (41) |
| Swiss tax reform net asset basis step-up | | (159) | | — | | — |
| Deferred tax revaluation due to 2017 Tax Act and foreign tax reform | | (19) | | (8) | | (283) |
| Transition tax due to 2017 Tax Act | | (16) | | (5) | | 529 |
| U.S. valuation allowance due to 2017 Tax Act | | — | | (194) | | 339 |
| Other valuation allowances | | 110 | | 21 | | (6) |
| Stock compensation windfall tax benefits | | (54) | | (40) | | (56) |
| Foreign tax credits | | — | | — | | (246) |
| Research and development tax credits | | (13) | | (17) | | (5) |
| Other, net | | (2) | | 2 | | 22 |
| Income tax expense (benefit) | $ | (41) | $ | 65 | $ | 491 |

In the above reconciliation, the 2017 income tax expense associated with deferred tax revaluation, the transition tax and the U.S. valuation allowance, all of which result directly or indirectly from the enactment of the 2017 Tax Act, included, or were, provisional amounts. In 2018, we completed our one-year measurement period adjustments to the 2017 Tax Act provisional amounts in accordance with SAB 118. In addition, the tax impact of non-deductible corrections of misstatements related to foreign exchange gains and losses for the years ended December 31, 2018 and 2017 is included above within the impact of foreign taxes.

The 2017 Tax Act reduced the U.S. statutory tax rate from 35% to 21% for years after 2017. Accordingly, upon its enactment in 2017, we remeasured our deferred tax assets and liabilities as of December 31, 2017 to reflect the reduced rate that will apply in future periods when these deferred taxes are settled or realized. We recognized a SAB 118 provisional deferred tax benefit of $283 million to reflect the reduced U.S. tax rate and other effects of the 2017 Tax Act. In 2018, we collected all of the necessary data to complete our analysis of the effect of the 2017 Tax Act on the remeasurement of the underlying deferred taxes and recognized an additional deferred tax benefit of $8 million.

The 2017 Tax Act requires us to pay U.S. income taxes on accumulated foreign subsidiary earnings not previously subject to U.S. income tax at a rate of 15.5% to the extent of foreign cash and certain other net current assets and 8% on the remaining earnings. We recognized a $529 million provisional charge in 2017 for that one-time transitional tax, the majority of which was non-cash. This charge was inclusive of relevant non-U.S. withholding taxes and U.S. state income taxes on the portion of the earnings expected to be repatriated. In 2018, after further study of the 2017 Tax Act and related U.S. Treasury Regulations, and further analysis of historical earnings and profits and tax pools, as well as refinements of the cash portion of the charge, which was provisional due to certain foreign subsidiaries with non-calendar tax year-ends, we reduced our one-time transitional tax expense by $5 million. Additionally, the 2017 Tax Act changed the rules that enabled taxpayers to generate foreign source income related to export sales that were eligible to utilize foreign tax credits. Consequently, we did not believe in 2017 that it would be more likely than not that we would be able to utilize our existing foreign tax credit deferred tax assets within the applicable carryforward periods. As such, a provisional $339 million U.S. valuation allowance was recognized in respect of our foreign tax credit deferred tax assets in accordance with SAB118. After studying the 2017 Tax Act and related U.S. Treasury Regulations and evaluating any elections or other opportunities that may be available, we currently expect to be able to realize some, but not all, of the foreign tax credit deferred tax assets up to our overall domestic loss (ODL) balance plus recurring and non-recurring foreign inclusions. Accordingly, we reduced our provisional foreign tax credit deferred tax asset valuation allowance and recognized a 2018 benefit of $194 million.

Our tax provisions for 2019 and 2018 do not include any tax charges related to either the Base Erosion and Anti-Abuse Tax (BEAT) or Global Intangible Low Taxed Income (GILTI) provisions, except for the inability to fully utilize

110

111

foreign tax credits against such GILTI. While we are not expecting to be subject to a tax charge under the 2017 Tax Act GILTI provisions in the near term, our accounting policy is to recognize this charge as a period cost.

The enactment of the 2017 Tax Act created a territorial tax system that allows companies to repatriate certain foreign earnings without incurring additional U.S. federal tax by providing for a 100% dividend exemption. Under the dividend-exemption provision, 100% of the foreign-source portion of dividends paid by certain foreign corporations to a U.S. corporate stockholder are exempt from U.S. federal taxation. As a result of the U.S. change to a territorial tax system and the incurrence of the one-time transition tax charge, we plan to repatriate our foreign earnings that were previously considered indefinitely reinvested with the exception of approximately $192 million of accumulated earnings as of December 31, 2019 related to one of our foreign operations. Additional withholding taxes of $19 million would be incurred if such earnings were remitted currently.

In 2019, Switzerland and India enacted tax reform legislation that had a material impact on our effective tax rate. We recognized a deferred tax benefit of $90 million to reflect a tax basis step-up, net of a valuation allowance, partially offset by a $5 million deferred tax revaluation to reflect an increase in the statutory tax rate, under the newly enacted Swiss tax laws. We also recognized a net deferred tax benefit of $24 million associated with deferred tax revaluation in India to reflect a decrease in the statutory tax rate. Our effective tax rate was also favorably impacted by $57 million in 2019 related to a notional interest deduction on the share capital of a foreign subsidiary. The gross tax benefit of the deduction is included in the table above within impact of foreign taxes and the portion not expected to be realized is included within other valuation allowances.

## Unrecognized Tax Benefits

We classify interest and penalties associated with income taxes in income tax expense (benefit) within the consolidated statements of income. Net interest and penalties recognized were not significant during 2019, 2018 and 2017. The liability recognized related to interest and penalties was $21 million and $22 million as of December 31, 2019 and 2018, respectively. The total amount of gross unrecognized tax benefits that, if recognized, would impact the effective tax rate are $70 million, $84 million and $88 million as of December 31, 2019, 2018 and 2017, respectively.

The following table is a reconciliation of our unrecognized tax benefits, including those related to discontinued operations, for the years ended December 31, 2019, 2018 and 2017.

| as of and for the years ended (in millions) | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|
| Balance at beginning of the year | $ | 127 | $ 108 | $ | 82 |
| Increase associated with tax positions taken during the current year | | 8 | 33 | | 33 |
| Increase (decrease) associated with tax positions taken during a prior year | | (3) | 13 | | 2 |
| Settlements | | (20) | (5) | | (6) |
| Decrease associated with lapses in statutes of limitations | | (1) | (22) | | (3) |
| Balance at end of the year | $ | 111 | $ 127 | $ | 108 |

Of the gross unrecognized tax benefits, $62 million and $68 million were recognized as liabilities in the consolidated balance sheets as of December 31, 2019 and 2018, respectively. We have recognized net indemnification receivables from Baxalta in the amount of $6 million, $6 million and $13 million as of December 31, 2019, 2018 and 2017, respectively, related to the unrecognized tax benefits for which we are the primary obligor but economically relate to Baxalta operations.

## Tax Incentives

We have received tax incentives in Puerto Rico, Switzerland, Dominican Republic, Costa Rica and certain other tax jurisdictions outside the United States. The financial impact of the reductions as compared to the statutory tax rates is indicated in the income tax expense reconciliation table above. The tax reductions as compared to the local statutory rate favorably impacted earnings per diluted share from continuing operations by $0.27 in 2019, $0.29 in 2018, and $0.25 in 2017. The above grants provide that our manufacturing operations are and will be partially exempt from local taxes with varying expirations from 2025 to 2027.

**Examinations of Tax Returns**

As of December 31, 2019, we had ongoing audits in the United States, Germany, Sweden, Belgium and other jurisdictions. During 2019, Baxter obtained a settlement in a transfer pricing Competent Authority proceeding, covering the period from 2009 through 2013, between the U.S. and Switzerland.  Tax years 2009 and forward remain under examination by the IRS while additional Competent Authority proceedings take place.  We believe that it is reasonably possible that our gross unrecognized tax benefits will be reduced within the next 12 months by $27 million. While the final outcome of these matters is inherently uncertain, we believe we have made adequate tax provisions for all years subject to examination.

## NOTE 15

### EARNINGS PER SHARE

The numerator for both basic and diluted earnings per share (EPS) is either net income, income from continuing operations, or loss from discontinued operations. The denominator for basic EPS is the weighted-average number of shares outstanding during the period. The dilutive effect of outstanding stock options, RSUs and PSUs is reflected in the denominator for diluted EPS using the treasury stock method.

The following table is a reconciliation of income from continuing operations to net income attributable to Baxter stockholders.

| years ended December 31(in millions) | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Income from continuing operations | $ | 1,011 | $ | 1,552 | $ | 609 |
| Less: Income from continuing operations attributable to noncontrolling interests | $ | 10 | $ | — | $ | — |
| Income from continuing operations attributable to Baxter stockholders | $ | 1,001 | $ | 1,552 | $ | 609 |
| Loss from discontinued operations attributable to Baxter stockholders | $ | — | $ | (6) | $ | (7) |
| Net income attributable to Baxter stockholders | $ | 1,001 | $ | 1,546 | $ | 602 |

The following table is a reconciliation of basic shares to diluted shares.

| years ended December 31(in millions) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Basic shares | 509 | 534 | 543 |
| Effect of dilutive securities | 10 | 12 | 12 |
| Diluted shares | 519 | 546 | 555 |

The effect of dilutive securities included unexercised stock options, unvested RSUs and contingently issuable shares related to granted PSUs. The computation of diluted EPS excluded 4 million, 3 million, and 2 million equity awards in 2019, 2018, and 2017, respectively, because their inclusion would have had an anti-dilutive effect on diluted EPS. Refer to Note 10 for additional information regarding items impacting basic shares.

## NOTE 16

### FINANCIAL INSTRUMENTS, DERIVATIVES AND HEDGING ACTIVITIES

**Accounts Receivable Sales**

For accounts receivable originated in Japan, we have entered into agreements with financial institutions in which the entire interest in and ownership of the receivable is sold. We continue to service the receivables in this arrangement. Servicing assets or liabilities are not recognized because we receive adequate compensation to service the sold receivables. The Japanese arrangement includes limited recourse provisions, which are not material.

The following is a summary of the activity relating to the arrangement.

| as of and for the years ended December 31 (in millions) | 2019 | | As Restated 2018 | | 2017 | |
|---|---|---|---|---|---|---|
| Sold receivables at beginning of year | $ | 69 | $ | 70 | $ | 67 |
| Proceeds from sales of receivables | $ | 292 | $ | 267 | $ | 270 |
| Cash collections (remitted to the owners of the receivables) | $ | (282) | $ | (270) | $ | (270) |
| Effect of foreign exchange rate changes | $ | — | $ | 2 | $ | 3 |
| Sold receivables at end of year | $ | 79 | $ | 69 | $ | 70 |

The net losses relating to the sales of accounts receivable were immaterial for each year.

**Concentrations of Credit Risk**

We invest excess cash in certificates of deposit or money market funds and diversify the concentration of cash among different financial institutions. With respect to financial instruments, where appropriate, we have diversified our selection of counterparties, and have arranged collateralization and master-netting agreements to minimize the risk of loss.

Global economic conditions and liquidity issues in certain countries have resulted, and may continue to result, in delays in the collection of receivables and credit losses. Global economic conditions, governmental actions and customer-specific factors may require us to re-evaluate the collectability of our receivables and we could potentially incur additional credit losses. These conditions may also impact the stability of the Euro.

**Foreign Currency and Interest Rate Risk Management**

We operate on a global basis and are exposed to the risk that our earnings, cash flows and equity could be adversely impacted by fluctuations in foreign exchange and interest rates. Our hedging policy attempts to manage these risks to an acceptable level based on our judgment of the appropriate trade-off between risk, opportunity and costs.

We are primarily exposed to foreign exchange risk with respect to recognized assets and liabilities, forecasted transactions and net assets denominated in the Euro, British Pound, Chinese Yuan, Korean Won, Australian Dollar, Canadian Dollar, Japanese Yen, Colombian Peso, Brazilian Real, Mexican Peso and Swedish Krona. We manage our foreign currency exposures on a consolidated basis, which allows us to net exposures and take advantage of any natural offsets. In addition, we use derivative and nonderivative instruments to further reduce the net exposure to foreign exchange risk. Gains and losses on the hedging instruments offset losses and gains on the hedged transactions and reduce the earnings and equity volatility resulting from changes in foreign exchange rates. Financial market and currency volatility may limit our ability to cost-effectively hedge these exposures.

We are also exposed to the risk that our earnings and cash flows could be adversely impacted by fluctuations in interest rates. Our policy is to manage interest costs using a mix of fixed- and floating-rate debt that we believe is appropriate. To manage this mix in a cost-efficient manner, we periodically enter into interest rate swaps in which we agree to exchange, at specified intervals, the difference between fixed and floating interest amounts calculated by reference to an agreed-upon notional amount.

We do not hold any instruments for trading purposes and none of our outstanding derivative instruments contain credit-risk-related contingent features.

Cash Flow Hedges

We may use options, including collars and purchased options, forwards and cross-currency swaps to hedge the foreign exchange risk to earnings relating to forecasted transactions and recognized assets and liabilities. We periodically use treasury rate locks to hedge the risk to earnings associated with movements in interest rates relating to anticipated issuances of debt.

The notional amounts of foreign exchange contracts designated as cash flow hedges were $617 million and $706 million as of December 31, 2019 and 2018, respectively. The maximum term over which we have cash flow hedge

contracts in place related to forecasted transactions at December 31, 2019 is 12 months for foreign exchange contracts. The total notional amounts of interest rate contracts designated as cash flow hedges were $550 million and $150 million as of December 31, 2019 and 2018, respectively. The interest rate contracts have maturity dates in 2022 and hedge the variability in future benchmark interest payments attributable to changes in interest rates on the forecasted issuance of fixed-rate debt.

Fair Value Hedges

We periodically use interest rate swaps to convert a portion of our fixed-rate debt into variable-rate debt. These instruments hedge our earnings from changes in the fair value of debt due to fluctuations in the designated benchmark interest rate.

There were no outstanding interest rate contracts designated as fair value hedges as of December 31, 2019 and 2018.

Net Investment Hedges

In May 2017, we issued €600 million of senior notes due May 2025. In May 2019, we issued €750 million of senior notes due May 2024 and €750 million of senior notes due May 2029. We have designated these debt obligations as hedges of our net investment in our European operations and, as a result, mark to spot rate adjustments of the outstanding debt balances are recorded as a component of AOCI. As of December 31, 2019, we had an accumulated pre-tax unrealized translation loss in AOCI of $21 million related to the Euro-denominated senior notes.

In May 2019, we entered into forward contracts designated as net investment hedges to reduce exposure to changes in currency rates on €1.2 billion of our net investment in our European operations. Those hedges were entered into in advance of the issuance of our senior notes mentioned above, were settled in the second quarter of 2019 and resulted in an insignificant loss.

Dedesignations

If it is determined that a derivative or nonderivative hedging instrument is no longer highly effective as a hedge, we discontinue hedge accounting prospectively. Gains or losses relating to terminations of effective cash flow hedges generally continue to be deferred and are recognized consistent with the loss or income recognition of the underlying hedged items. However, if it is probable that hedged forecasted transactions will not occur, any gains or losses would be immediately reclassified from AOCI to earnings. There were no cash flow hedge dedesignations in 2019, 2018 or 2017 resulting from changes in our assessment of the probability that the hedged forecasted transactions would occur.

If we terminate a fair value hedge, an amount equal to the cumulative fair value adjustment to the hedged item at the date of termination is amortized to earnings over the remaining term of the hedged item. There were no fair value hedges terminated in 2019 or 2017. In 2018, we terminated our interest rate fair value hedges and the cumulative fair value adjustment to the hedged item was insignificant.

If we terminate a net investment hedge, any gain or loss recognized in AOCI is not reclassified to earnings until we sell, liquidate, or deconsolidate the foreign investments that were being hedged. In 2019, we dedesignated €1.2 billion of forward contracts designated as a net investment hedge of our European operations. There were no net investment hedge dedesignations in 2018 or 2017.

Undesignated Derivative Instruments

We use forward contracts to hedge foreign exchange gains and losses relating to certain of our intra-company and third-party receivables and payables denominated in a foreign currency. These derivative instruments are generally not formally designated as hedges and the terms of these instruments generally do not exceed one month.

The total notional amount of undesignated derivative instruments was $619 million and $487 million as of December 31, 2019 and 2018, respectively.

114

Gains and Losses on Hedging Instruments and Undesignated Derivative Instruments

The following table summarizes the income statement locations and gains and losses on our hedging instruments for the years ended December 31, 2019, 2018, and 2017.

| | Gain (loss) recognized in OCI | | | Location of gain (loss) in income statement | Gain (loss) reclassified from AOCI into income | | |
| | | | As Restated | | | | |
| (in millions) | 2019 | 2018 | 2017 | | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|---|---|
| **Cash flow hedges** | | | | | | | |
| Interest rate contracts | $ (37) | $ (3) | $ (3) | Interest expense, net | $ — | $ — | $ — |
| Foreign exchange contracts | (9) | 3 | (24) | Cost of sales | 4 | (12) | (8) |
| **Net investment hedges** | 12 | 32 | (65) | Other (income) expense, net | — | — | — |
| Total | $ (34) | $ 32 | $ (92) | | $ 4 | $ (12) | $ (8) |

| | Location of gain (loss) in income statement | Gain (loss) recognized in income | | |
| | | | As Restated | |
| (in millions) | | 2019 | 2018 | 2017 |
|---|---|---|---|---|
| **Fair value hedges** | | | | |
| Interest rate contracts | Interest expense, net | $ — | $ (4) | $ (3) |
| **Undesignated derivative instruments** | | | | |
| Foreign exchange contracts | Other (income) expense, net | $ (17) | $ — | $ (37) |

For our fair value hedges, equal and offsetting gains of $4 million and $3 million were recognized in interest expense, net as an adjustment to the underlying hedged items, fixed-rate debt, in 2018 and 2017, respectively.

The following table summarizes net-of-tax activity in AOCI, a component of stockholders' equity, related to our cash flow hedges.

| as of and for the year ended December 31 (in millions) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Accumulated other comprehensive income (loss) balance at beginning of year | $ (1) | $ (10) | $ 3 |
| Adoption of new accounting standard | (1) | — | — |
| (Loss) gain in fair value of derivatives during the year | (36) | (1) | (18) |
| Amount reclassified to earnings during the year | (3) | 10 | 5 |
| Accumulated other comprehensive income (loss) balance at end of year | $ (41) | $ (1) | $ (10) |

As of December 31, 2019, $6 million of deferred, net after-tax losses on derivative instruments included in AOCI are expected to be recognized in earnings during the next 12 months, coinciding with when the hedged items are expected to impact earnings.

<u>Derivative Assets and Liabilities</u>

The following table summarizes the classification and fair value amounts of derivative instruments reported in the consolidated balance sheet as of December 31, 2019.

| (in millions) | Derivatives in asset positions | | Derivatives in liability positions | |
|---|---|---|---|---|
| | Balance sheet location | Fair value | Balance sheet location | Fair value |
| **Derivative instruments designated as hedges** | | | | |
| Interest rate contracts | Other non-current assets $ | 10 | Other non-current liabilities $ | 52 |
| Foreign exchange contracts | Prepaid expenses and other current assets | 10 | Accounts payable and accrued liabilities | — |
| Foreign exchange contracts | Other non-current assets | — | Other non-current liabilities | — |
| Total derivative instruments designated as hedges | | 20 | | 52 |
| **Undesignated derivative instruments** | | | | |
| Foreign exchange contracts | Prepaid expenses and other current assets | 1 | Accounts payable and accrued liabilities | 2 |
| Total derivative instruments | $ | 21 | $ | 54 |

The following table summarizes the classification and fair values of derivative instruments reported in the consolidated balance sheet as of December 31, 2018.

| (in millions) | Derivatives in asset positions | As Restated | Derivatives in liability positions | As Restated |
|---|---|---|---|---|
| | Balance sheet location | Fair value | Balance sheet location | Fair value |
| **Derivative instruments designated as hedges** | | | | |
| Interest rate contracts | Other non-current assets $ | — | Other non-current liabilities $ | 3 |
| Foreign exchange contracts | Prepaid expenses and other current assets | 22 | Accounts payable and accrued liabilities | 1 |
| Foreign exchange contracts | Other non-current assets | 1 | Other non-current liabilities | — |
| Total derivative instruments designated as hedges | | 23 | | 4 |
| **Undesignated derivative instruments** | | | | |
| Foreign exchange contracts | Prepaid expenses and other current assets | 2 | Accounts payable and accrued liabilities | 2 |
| Total derivative instruments | $ | 25 | $ | 6 |

While some of our derivatives are subject to master netting arrangements, we present our assets and liabilities related to derivative instruments on a gross basis within the consolidated balance sheets. Additionally, we are not required to post collateral for any of our outstanding derivatives.

The following table provides information on our derivative positions as if they were presented on a net basis, allowing for the right of offset by counterparty.

| | December 31, 2019 | | December 31, 2018 | |
| | | | As Restated | |
| (in millions) | Asset | Liability | Asset | Liability |
|---|---|---|---|---|
| Gross amounts recognized in the consolidated balance sheets | $ 21 | $ 54 | $ 25 | $ 6 |
| Gross amount subject to offset in master netting arrangements not offset in the consolidated balance sheets | (11) | (11) | (3) | (3) |
| Total | $ 10 | $ 43 | $ 22 | $ 3 |

The following table presents the amounts recorded on the consolidated balance sheets related to fair value hedges:

| | Carrying amount of hedged item | | Cumulative amount of fair value hedging adjustment included in the carrying amount of the hedged item (a) | |
| (in millions) | Balance as of December 31, 2019 | Balance as of December 31, 2018 | Balance as of December 31, 2019 | Balance as of December 31, 2018 |
|---|---|---|---|---|
| Long-term debt | $ 103 | $ 103 | $ 6 | $ 7 |

(a) These fair value hedges were terminated prior to December 31, 2018.

## NOTE 17

## FAIR VALUE MEASUREMENTS

The fair value hierarchy under the accounting standard for fair value measurements consists of the following three levels:

- Level 1 — Quoted prices in active markets that we have the ability to access for identical assets or liabilities;

- Level 2 — Quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuations in which all significant inputs are observable in the market; and

- Level 3 — Valuations using significant inputs that are unobservable in the market and include the use of judgment by management about the assumptions market participants would use in pricing the asset or liability.

The following table summarizes financial instruments that are measured at fair value on a recurring basis.

| | | Basis of fair value measurement | | |
| (in millions) | Balance as of December 31, 2019 | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| --- | --- | --- | --- | --- |
| **Assets** | | | | |
| Foreign exchange contracts | $ 11 | $ — | $ 11 | $ — |
| Interest rate contracts | 10 | — | 10 | — |
| Marketable equity securities | 3 | 3 | — | — |
| Total | $ 24 | $ 3 | $ 21 | $ — |
| **Liabilities** | | | | |
| Foreign exchange contracts | $ 2 | $ — | $ 2 | $ — |
| Interest rate contracts | 52 | — | 52 | — |
| Contingent payments related to acquisitions | 39 | — | — | 39 |
| Total | $ 93 | $ — | $ 54 | $ 39 |

| | As Restated | | | |
| | | Basis of fair value measurement | | |
| (in millions) | Balance as of December 31, 2018 | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| --- | --- | --- | --- | --- |
| **Assets** | | | | |
| Foreign exchange contracts | $ 25 | $ — | $ 25 | $ — |
| Marketable equity securities | 3 | 3 | — | — |
| Total | $ 28 | $ 3 | $ 25 | $ — |
| **Liabilities** | | | | |
| Foreign exchange contracts | $ 3 | $ — | $ 3 | $ — |
| Interest rate contracts | 3 | — | 3 | — |
| Contingent payments related to acquisitions | 32 | — | — | 32 |
| Total | $ 38 | $ — | $ 6 | $ 32 |

As of December 31, 2019 and 2018, cash and cash equivalents of $3.3 billion and $1.8 billion, respectively, included money market and other short-term funds of approximately $1.7 billion and $169 million, respectively, which are considered Level 2 in the fair value hierarchy.

For assets that are measured using quoted prices in active markets, the fair value is the published market price per unit multiplied by the number of units held, without consideration of transaction costs. The majority of the derivatives entered into by us are valued using internal valuation techniques as no quoted market prices exist for such instruments. The principal techniques used to value these instruments are discounted cash flow and Black-Scholes models. The key inputs, which are considered observable and vary depending on the type of derivative, include contractual terms, interest rate yield curves, foreign exchange rates and volatility.

Contingent payments related to acquisitions, which consist of milestone payments and sales-based payments, are valued using discounted cash flow techniques. The fair value of milestone payments reflects management's expectations of probability of payment, and increases as the probability of payment increases or the expected timing of payments is accelerated. The fair value of sales-based payments is based upon probability-weighted future revenue estimates, and increases as revenue estimates increase,

probability weighting of higher revenue scenarios increases or the expected timing of payment is accelerated. The following table is a reconciliation of our recurring

118

fair value measurements that use significant unobservable inputs (Level 3), which consist of contingent payments related to acquisitions.

| as of and for the years ended December 31 (in millions) | | 2019 | | 2018 |
|---|---|---|---|---|
| Fair value at beginning of period | $ | 32 | $ | 9 |
| Additions | | 18 | | 24 |
| Change in fair value recognized in earnings | | (4) | | — |
| Payments | | (7) | | (1) |
| Fair value at end of period | $ | 39 | $ | 32 |

Equity investments not measured at fair value are comprised of other equity investments without readily determinable fair values and were $73 million and $41 million at December 31, 2019 and 2018, respectively. These amounts are included in Other non-current assets.

Fair Values of Financial Instruments Not Measured at Fair Value

In addition to the financial instruments that we are required to recognize at fair value in the consolidated balance sheets, we have certain financial instruments that are recognized at amortized cost or some basis other than fair value. For these financial instruments, the following table provides the values recognized in the consolidated balance sheets and the estimated fair values.

| | Book values | | | Fair values(a) | | |
|---|---|---|---|---|---|---|
| | | | As Restated | | | As Restated |
| as of December 31 (in millions) | | 2019 | 2018 | | 2019 | 2018 |
| **Liabilities** | | | | | | |
| Short-term debt | $ | 226 | $ 2 | $ | 226 | $ 2 |
| Current maturities of long-term debt and finance lease obligations | | 315 | 2 | | 315 | 2 |
| Long-term debt and finance lease obligations | | 4,809 | 3,481 | | 5,156 | 3,469 |

(a) These fair value amounts are classified as Level 2 within the fair value hierarchy as they are estimated based on observable inputs.

The carrying value of short-term debt approximates its fair value due to the short-term maturities of the obligations. The estimated fair values of current and long-term debt were computed by multiplying price by the notional amount of the respective debt instruments. Price is calculated using the stated terms of the respective debt instrument and yield curves commensurate with our credit risk. The carrying values of other financial instruments approximate their fair values due to the short-term maturities of most of those assets and liabilities.

# NOTE 18

## SEGMENT INFORMATION

We manage our business based on three geographical segments: Americas (North and South America), EMEA (Europe, Middle East and Africa) and APAC (Asia Pacific). Our segments provide a broad portfolio of essential healthcare products, including acute and chronic dialysis therapies; sterile IV solutions; infusion systems and devices; parenteral nutrition therapies; inhaled anesthetics; generic injectable pharmaceuticals; and surgical hemostat and sealant products.

We use operating income on a segment basis to make resource allocation decisions and assess the ongoing performance of our business segments. Intersegment sales are eliminated in consolidation.

Certain items are maintained at Corporate and are not allocated to a segment. They primarily include the majority of foreign currency hedging activities, corporate headquarters costs, certain R&D costs, certain GBU support costs, stock compensation expense, certain employee benefit plan costs, and certain gains, losses, and other charges (such as business optimization, acquisition and integration costs, intangible asset amortization and asset impairments). Our chief operating decision maker does not receive any asset information by operating segment and, accordingly, we do not report asset information by operating segment.

Financial information for our segments is as follows:

| for the years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Net sales: | | | | | | |
| Americas | $ | 6,094 | $ | 5,951 | $ | 5,718 |
| EMEA | | 2,968 | | 2,946 | | 2,752 |
| APAC | | 2,300 | | 2,202 | | 2,114 |
| Total net sales | $ | 11,362 | $ | 11,099 | $ | 10,584 |
| Operating income: | | | | | | |
| Americas | $ | 2,374 | $ | 2,411 | $ | 2,238 |
| EMEA | | 652 | | 666 | | 562 |
| APAC | | 549 | | 532 | | 510 |
| Total segment operating income | $ | 3,575 | $ | 3,609 | $ | 3,310 |
| Depreciation Expense: | | | | | | |
| Americas | $ | 255 | $ | 229 | $ | 231 |
| EMEA | | 149 | | 158 | | 149 |
| APAC | | 85 | | 95 | | 84 |
| Corporate and other | | 117 | | 120 | | 132 |
| Total depreciation expense | $ | 606 | $ | 602 | $ | 596 |
| Capital expenditures: | | | | | | |
| Americas | $ | 325 | $ | 296 | $ | 269 |
| EMEA | | 143 | | 140 | | 141 |
| APAC | | 98 | | 122 | | 95 |
| Corporate and other | | 120 | | 134 | | 101 |
| Total capital expenditures | $ | 686 | $ | 692 | $ | 606 |

The following table is a reconciliation of segment operating income to income from continuing operations before income taxes per the consolidated statements of income.

| for the years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Total segment operating income | $ | 3,575 | $ | 3,609 | $ | 3,310 |
| Corporate and other | | (1,803) | | (2,025) | | (2,022) |
| Total operating income | | 1,772 | | 1,584 | | 1,288 |
| Net interest expense | | 71 | | 45 | | 55 |
| Other (income) expense, net | | 731 | | (78) | | 133 |
| Income from continuing operations before income taxes | $ | 970 | $ | 1,617 | $ | 1,100 |

**Geographic information**

| for the years ended December 31 (in millions) | | 2019 | | As Restated 2018 | | 2017 |
|---|---|---|---|---|---|---|
| Net sales: | | | | | | |
| United States | $ | 4,826 | $ | 4,723 | $ | 4,510 |
| Latin America and Canada | | 1,268 | | 1,228 | | 1,208 |
| Total Americas | $ | 6,094 | $ | 5,951 | $ | 5,718 |

| | | | | | |
|---|---|---|---|---|---|
| EMEA | | **2,968** | | 2,946 | 2,752 |
| APAC | | **2,300** | | 2,202 | 2,114 |
| Total net sales | $ | **11,362** | $ | 11,099 | $ | 10,584 |

120

| as of December 31 (in millions) | | 2019 | As Restated 2018 |
|---|---|---|---|
| PP&E and operating lease right-of-use assets, net: | | | |
| United States | $ | 1,889 | $ 1,786 |
| EMEA | | 1,447 | 1,204 |
| APAC | | 959 | 892 |
| Latin America and Canada | | 825 | 648 |
| Consolidated PP&E and operating lease right-of-use assets, net | $ | 5,120 | $ 4,530 |

**NOTE 19**

**QUARTERLY FINANCIAL DATA (UNAUDITED)**

| years ended December 31 (in millions, except per share data) | As Restated First quarter | Second quarter | Third quarter | Fourth quarter[1] | Full year |
|---|---|---|---|---|---|
| **2019** | | | | | |
| Net sales | $ 2,638 | $ 2,834 | $ 2,851 | $ 3,039 | $ 11,362 |
| Gross margin | 1,080 | 1,153 | 1,230 | 1,298 | 4,761 |
| Net income (loss) attributable to Baxter stockholders | 342 | 313 | 369 | (23) | 1,001 |
| Earnings (loss) per share | | | | | |
| Basic | 0.67 | 0.61 | 0.72 | (0.05) | 1.97 |
| Diluted | 0.66 | 0.60 | 0.71 | (0.05) | 1.93 |
| Cash dividends declared per share | 0.190 | 0.220 | 0.220 | 0.220 | 0.850 |
| Market price per share | | | | | |
| High | 81.31 | 82.41 | 89.78 | 88.45 | 89.78 |
| Low | 64.48 | 73.44 | 81.40 | 76.70 | 64.48 |

| | As Restated First quarter | Second quarter | Third quarter | As Restated Fourth quarter | Full year |
|---|---|---|---|---|---|
| **2018** | | | | | |
| Net sales | $ 2,692 | $ 2,813 | $ 2,761 | $ 2,833 | $ 11,099 |
| Gross margin | 1,121 | 1,223 | 1,232 | 1,183 | 4,759 |
| Income from continuing operations | 382 | 341 | 518 | 311 | 1,552 |
| Earnings per share from continuing operations | | | | | |
| Basic | 0.71 | 0.64 | 0.97 | 0.59 | 2.91 |
| Diluted | 0.69 | 0.62 | 0.95 | 0.58 | 2.84 |
| Loss from discontinued operations, net of tax | — | — | — | (6) | (6) |
| Loss per share from discontinued operations | | | | | |
| Basic | — | — | — | (0.01) | (0.01) |
| Diluted | — | — | — | (0.01) | (0.01) |
| Net income | 382 | 341 | 518 | 305 | 1,546 |
| Earnings per share | | | | | |
| Basic | 0.71 | 0.64 | 0.97 | 0.58 | 2.90 |
| Diluted | 0.69 | 0.62 | 0.95 | 0.57 | 2.83 |
| Cash dividends declared per share | 0.160 | 0.190 | 0.190 | 0.190 | 0.730 |

Market price per share

| | | | | | |
|---|---|---|---|---|---|
| High | 72.26 | 75.41 | 77.75 | 77.80 | 77.80 |
| Low | 62.56 | 63.43 | 70.71 | 61.45 | 61.45 |

121

122

Case: 1:19-cv-07786 Document #: 41-4 Filed: 08/24/20 Page 165 of 586 PageID #:986

Market price per share

| | | | | | |
|---|---|---|---|---|---|
| High | 72.26 | 75.41 | 77.75 | 77.80 | 77.80 |
| Low | 62.56 | 63.43 | 70.71 | 61.45 | 61.45 |

[1]Results for the fourth quarter and full year of 2019 include a $755 million pre-tax charge related to the annuitization of a portion of our U.S. pension plan.

We are presenting herein restated unaudited condensed consolidated financial information for each quarterly and year-to-date interim period within the six months ended June 30, 2019 and the year ended December 31, 2018, except for the three and nine months ended September 30, 2018. See Note 2, *Restatement of Previously Issued Consolidated Financial Statements*, for additional information and refer to our Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2019, filed on March 17, 2020, for information about the restatement of our unaudited interim financial statements for the three and nine months ended September 30, 2018.

The amounts as previously reported for the quarters ended June 30, 2019 and March 31, 2019 were derived from our Quarterly Reports on Form 10-Q filed on July 30, 2019 and May 8, 2019, respectively. The amounts as previously reported for the quarter ended December 31, 2018 were derived from our Annual Report on Form 10-K for the year ended December 31, 2018 filed on February 21, 2019. The amounts as previously reported as of September 30, 2018 and for the quarters and year-to-date interim periods ended June 30, 2018 and March 31, 2018 were derived from our Quarterly Reports on Form 10-Q filed on November 5, 2018, August 6, 2018 and May 9, 2018, respectively. See Note 2, *Restatement of Previously Issued Consolidated Financial Statements*, for a description of the misstatements in each category of restatements referenced by (a) through (g).

122

Baxter International Inc.

Condensed Consolidated Balance Sheets

(in millions, except per share)

| | | As Restated | |
| --- | --- | --- | --- |
| | | June 30, 2019 | March 31, 2019 |
| Current assets: | | | |
| Cash and cash equivalents | $ | 2,934 $ | 1,902 |
| Accounts receivable, net | | 1,897 | 1,801 |
| Inventories | | 1,756 | 1,743 |
| Prepaid expenses and other current assets | | 642 | 614 |
| Total current assets | | 7,229 | 6,060 |
| Property, plant and equipment, net | | 4,485 | 4,476 |
| Goodwill | | 2,937 | 2,929 |
| Other intangible assets, net | | 1,363 | 1,440 |
| Operating lease right-of-use assets | | 595 | 513 |
| Other non-current assets | | 894 | 823 |
| Total assets | $ | 17,503 $ | 16,241 |
| Current liabilities: | | | |
| Short-term debt | $ | 2 $ | 796 |
| Current maturities of long-term debt and finance lease obligations | | 2 | 2 |
| Accounts payable and accrued liabilities | | 2,553 | 2,478 |
| Total current liabilities | | 2,557 | 3,276 |
| Long-term debt and finance lease obligations | | 5,157 | 3,451 |
| Operating lease liabilities | | 496 | 417 |
| Other non-current liabilities | | 1,490 | 1,504 |
| Total liabilities | | 9,700 | 8,648 |
| Commitments and contingencies | | | |
| Equity: | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares at June 30, 2019 and March 31, 2019 | | 683 | 683 |
| Common stock in treasury, at cost, 173,275,586 shares at June 30, 2019 and 173,447,198 shares at March 31, 2019 | | (10,322) | (10,284) |
| Additional contributed capital | | 5,906 | 5,839 |
| Retained earnings | | 15,598 | 15,414 |
| Accumulated other comprehensive (loss) income | | (4,086) | (4,082) |
| Total Baxter stockholders' equity | | 7,779 | 7,570 |
| Noncontrolling interests | | 24 | 23 |
| Total equity | | 7,803 | 7,593 |
| Total liabilities and equity | $ | 17,503 $ | 16,241 |

123

Baxter International Inc.

Condensed Consolidated Balance Sheets

(in millions, except per share)

| | | As Restated | | |
|---|---|---|---|---|
| | | September 30, 2018 | June 30, 2018 | March 31, 2018 |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 2,863 $ | 2,858 $ | 2,949 |
| Accounts receivable, net | | 1,837 | 1,789 | 1,818 |
| Inventories | | 1,716 | 1,616 | 1,578 |
| Prepaid expenses and other current assets | | 615 | 621 | 610 |
| Total current assets | | 7,031 | 6,884 | 6,955 |
| Property, plant and equipment, net | | 4,476 | 4,486 | 4,576 |
| Goodwill | | 2,978 | 2,981 | 3,103 |
| Other intangible assets, net | | 1,400 | 1,424 | 1,505 |
| Other non-current assets | | 918 | 744 | 704 |
| Total assets | $ | 16,803 $ | 16,519 $ | 16,843 |
| Current liabilities: | | | | |
| Current maturities of long-term debt and finance lease obligations | $ | 3 $ | 3 $ | 3 |
| Accounts payable and accrued liabilities | | 2,660 | 2,583 | 2,598 |
| Total current liabilities | | 2,663 | 2,586 | 2,601 |
| Long-term debt and finance lease obligations | | 3,480 | 3,491 | 3,550 |
| Other non-current liabilities | | 1,570 | 1,612 | 1,630 |
| Total liabilities | | 7,713 | 7,689 | 7,781 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares at September 30, 2018, June 30, 2018 and March 31, 2018 | | 683 | 683 | 683 |
| Common stock in treasury, at cost, 150,213,621 shares at September 30, 2018, 148,485,202 shares at June 30, 2018 and 146,993,164 shares at March 31, 2018 | | (8,639) | (8,485) | (8,354) |
| Additional contributed capital | | 5,931 | 5,916 | 5,912 |
| Retained earnings | | 14,886 | 14,484 | 14,254 |
| Accumulated other comprehensive (loss) income | | (3,754) | (3,756) | (3,427) |
| Total Baxter stockholders' equity | | 9,107 | 8,842 | 9,068 |
| Noncontrolling interests | | (17) | (12) | (6) |
| Total equity | | 9,090 | 8,830 | 9,062 |
| Total liabilities and equity | $ | 16,803 $ | 16,519 $ | 16,843 |

124

Baxter International Inc.

Condensed Consolidated Statements of Income

(in millions, except per share)

| | | As Restated | | |
| --- | --- | --- | --- | --- |
| | | June 30, 2019 | | March 31, 2019 |
| | | Six months ended | Three months ended | Three months ended |
| Net sales | $ | 5,472 $ | 2,834 $ | 2,638 |
| Cost of sales | | 3,239 | 1,681 | 1,558 |
| Gross margin | | 2,233 | 1,153 | 1,080 |
| Selling, general and administrative expenses | | 1,242 | 641 | 601 |
| Research and development expenses | | 295 | 166 | 129 |
| Other operating income, net | | (37) | (4) | (33) |
| Operating income | | 733 | 350 | 383 |
| Interest expense, net | | 38 | 20 | 18 |
| Other (income) expense, net | | (17) | 4 | (21) |
| Income before income taxes | | 712 | 326 | 386 |
| Income tax expense | | 57 | 13 | 44 |
| Net income | $ | 655 $ | 313 $ | 342 |
| **Earnings per share** | | | | |
| Basic | $ | 1.28 $ | 0.61 $ | 0.67 |
| Diluted | $ | 1.26 $ | 0.60 $ | 0.66 |
| **Weighted-average number of shares outstanding** | | | | |
| Basic | | 511 | 510 | 512 |
| Diluted | | 520 | 519 | 522 |

Baxter International Inc.

Condensed Consolidated Statements of Income

(in millions, except per share)

| | | As Restated | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | June 30, 2018 | March 31, 2018 | |
| | Three months ended | Six months ended | Three months ended | Three months ended |
| Net sales | $ 2,833 | $ 5,505 | $ 2,813 | $ 2,692 |
| Cost of sales | 1,650 | 3,161 | 1,590 | 1,571 |
| Gross margin | 1,183 | 2,344 | 1,223 | 1,121 |
| Selling, general and administrative expenses | 627 | 1,309 | 676 | 633 |
| Research and development expenses | 175 | 313 | 172 | 141 |
| Other operating income, net | (10) | (89) | (2) | (87) |
| Operating income | 391 | 811 | 377 | 434 |
| Interest expense, net | 11 | 23 | 11 | 12 |
| Other (income) expense, net | (33) | (44) | (38) | (6) |
| Income from continuing operations before income taxes | 413 | 832 | 404 | 428 |
| Income tax expense | 102 | 109 | 63 | 46 |
| Income from continuing operations | 311 | 723 | 341 | 382 |
| Loss from discontinued operations, net of tax | (6) | — | — | — |
| Net income | $ 305 | $ 723 | $ 341 | $ 382 |
| **Earnings per share from continuing operations** | | | | |
| Basic | $ 0.59 | $ 1.35 | $ 0.64 | $ 0.71 |
| Diluted | $ 0.58 | $ 1.32 | $ 0.62 | $ 0.69 |
| **Loss per share from discontinued operations** | | | | |
| Basic | $ (0.01) | $ — | $ — | $ — |
| Diluted | $ (0.01) | $ — | $ — | $ — |
| **Earnings per share** | | | | |
| Basic | $ 0.58 | $ 1.35 | $ 0.64 | $ 0.71 |
| Diluted | $ 0.57 | $ 1.32 | $ 0.62 | $ 0.69 |
| **Weighted-average number of shares outstanding** | | | | |
| Basic | 528 | 537 | 535 | 539 |
| Diluted | 538 | 549 | 547 | 551 |

126

Baxter International Inc.

Condensed Consolidated Statements of Comprehensive Income

(in millions)

| | | As Restated | | | |
|---|---|---|---|---|---|
| | | June 30, 2019 | | | March 31, 2019 |
| | | Six months ended | Three months ended | | Three months ended |
| Net income | $ | 655 | $ | 313 | $ | 342 |
| Other comprehensive (loss) income, net of tax: | | | | | |
| Currency translation adjustments | | (95) | 2 | | (97) |
| Pension and other postretirement benefit plans | | 20 | 6 | | 14 |
| Hedging activities | | (27) | (12) | | (15) |
| Total other comprehensive (loss) income, net of tax | | (102) | (4) | | (98) |
| Comprehensive income | $ | 553 | $ | 309 | $ | 244 |

Baxter International Inc.

Condensed Consolidated Statements of Comprehensive Income

(in millions)

| | | As Restated | | | |
|---|---|---|---|---|---|
| | | June 30, 2018 | | | March 31, 2018 |
| | | Six months ended | Three months ended | | Three months ended |
| Net income | $ | 723 | $ | 341 | $ | 382 |
| Other comprehensive (loss) income, net of tax: | | | | | |
| Currency translation adjustments | | (305) | (368) | | 63 |
| Pension and other postretirement benefit plans | | 85 | 28 | | 57 |
| Hedging activities | | 6 | 11 | | (5) |
| Total other comprehensive (loss) income, net of tax | | (214) | (329) | | 115 |
| Comprehensive income | $ | 509 | $ | 12 | $ | 497 |

127

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | | | | | | | As Restated | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | For the Three Months Ended June 30, 2019 | | | | |
| | | | | | Baxter International Inc. stockholders' equity | | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| Balance as of April 1, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,414 | $ (4,082) | $ 7,570 | $ 23 | $ 7,593 |
| Net income | — | — | — | — | — | 313 | — | 313 | — | 313 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (4) | (4) | — | (4) |
| Purchases of treasury stock | — | — | 2 | (157) | 46 | — | — | (111) | — | (111) |
| Stock issued under employee benefit plans and other | — | — | (2) | 119 | 21 | (17) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (112) | — | (112) | — | (112) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 15,598 | $ (4,086) | $ 7,779 | $ 24 | $ 7,803 |

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | | | | | | | As Restated | | | |
| | | | | | | | For the Six Months Ended June 30, 2019 | | | |
| | | | | | | Baxter International Inc. stockholders' equity | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,075 | $ (3,823) | $ 7,844 | $ 22 | $ 7,866 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 655 | — | 655 | — | 655 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (102) | (102) | — | (102) |
| Purchases of treasury stock | — | — | 10 | (743) | 46 | — | — | (697) | — | (697) |
| Stock issued under employee benefit plans and other | — | — | (7) | 410 | (38) | (83) | — | 289 | — | 289 |
| Dividends declared on common stock | — | — | — | — | — | (210) | — | (210) | — | (210) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 15,598 | $ (4,086) | $ 7,779 | $ 24 | $ 7,803 |

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | As Restated | | | | | |
| | | | | For the Three Months Ended March 31, 2019 | | | | | | |
| | | | | Baxter International Inc. stockholders' equity | | | | | | |
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,075 | $ (3,823) | $ 7,844 | $ 22 | $ 7,866 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 342 | — | 342 | — | 342 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (98) | (98) | — | (98) |
| Purchases of treasury stock | — | — | 8 | (586) | — | — | — | (586) | — | (586) |
| Stock issued under employee benefit plans and other | — | — | (5) | 291 | (59) | (66) | — | 166 | — | 166 |
| Dividends declared on common stock | — | — | — | — | — | (98) | — | (98) | — | (98) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of March 31, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,414 | $ (4,082) | $ 7,570 | $ 23 | $ 7,593 |

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | As Restated | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | For the Three Months Ended June 30, 2018 | | | | | | | | | |
| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| Balance as of April 1, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,254 | $ (3,427) | $ 9,068 | $ (6) | $ 9,062 |
| Net income | — | — | — | — | — | 341 | — | 341 | — | 341 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (329) | (329) | — | (329) |
| Purchases of treasury stock | — | — | 3 | (259) | — | — | — | (259) | — | (259) |
| Stock issued under employee benefit plans and other | — | — | (2) | 128 | 4 | (9) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (102) | — | (102) | — | (102) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | (6) | (6) |
| Balance as of June 30, 2018 | 683 | 683 | 148 | (8,485) | 5,916 | 14,484 | (3,756) | 8,842 | (12) | 8,830 |

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **As Restated** | | | | |
| | | | | | **For the Six Months Ended June 30, 2018** | | | | | |
| | | | | **Baxter International Inc. stockholders' equity** | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (20) | (3) | (23) | — | (23) |
| Net income | — | — | — | — | — | 723 | — | 723 | — | 723 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (214) | (214) | — | (214) |
| Purchases of treasury stock | — | — | 11 | (781) | — | — | — | (781) | — | (781) |
| Stock issued under employee benefit plans and other | — | — | (5) | 277 | (24) | (45) | — | 208 | — | 208 |
| Dividends declared on common stock | — | — | — | — | — | (188) | — | (188) | — | (188) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | (4) | (4) |
| Balance as of June 30, 2018 | 683 | $ 683 | 148 | $ (8,485) | $ 5,916 | $ 14,484 | $ (3,756) | $ 8,842 | $ (12) | $ 8,830 |

Baxter International Inc.

Condensed Consolidated Statements of Changes in Equity

(in millions)

| | As Restated | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | For the Three Months Ended March 31, 2018 | | | | | | | | | |
| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (20) | (3) | (23) | — | (23) |
| Net income | — | — | — | — | — | 382 | — | 382 | — | 382 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 115 | 115 | — | 115 |
| Purchases of treasury stock | — | — | 8 | (522) | — | — | — | (522) | — | (522) |
| Stock issued under employee benefit plans and other | — | — | (3) | 149 | (28) | (36) | — | 85 | — | 85 |
| Dividends declared on common stock | — | — | — | — | — | (86) | — | (86) | — | (86) |
| Change in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of March 31, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,254 | $ (3,427) | $ 9,068 | $ (6) | $ 9,062 |

Baxter International Inc.

Condensed Consolidated Statements of Cash Flows

(in millions)

| | As Restated | |
| --- | --- | --- |
| | Six months ended June 30, 2019 | Three months ended March 31, 2019 |
| Cash flows from operations | | |
| Net income | $ 655 | $ 342 |
| Adjustments to reconcile net income to net cash from operating activities: | | |
| Depreciation and amortization | 385 | 192 |
| Deferred income taxes | (63) | (6) |
| Stock compensation | 57 | 22 |
| Net periodic pension benefit and other postretirement costs | 7 | 3 |
| Intangible asset impairment | 31 | — |
| Other | 44 | 14 |
| Changes in balance sheet items: | | |
| Accounts receivable, net | (60) | 32 |
| Inventories | (91) | (82) |
| Accounts payable and accrued liabilities | (299) | (335) |
| Other | (86) | (48) |
| Cash flows from operations – continuing operations | 580 | 134 |
| Cash flows from operations – discontinued operations | (6) | (6) |
| Cash flows from operations | 574 | 128 |
| Cash flows from investing activities | | |
| Capital expenditures | (338) | (193) |
| Acquisitions and investments, net of cash acquired | (111) | (109) |
| Other investing activities, net | 1 | 1 |
| Cash flows from investing activities | (448) | (301) |
| Cash flows from financing activities | | |
| Issuances of debt | 1,661 | — |
| Net increases in debt obligations with original maturities of three months or less | — | 795 |
| Cash dividends on common stock | (198) | (101) |
| Proceeds from stock issued under employee benefit plans | 262 | 173 |
| Purchases of treasury stock | (720) | (597) |
| Other financing activities, net | (37) | (32) |
| Cash flows from financing activities | 968 | 238 |
| Effect of foreign exchange rate changes on cash and cash equivalents | 2 | (1) |
| Increase in cash and cash equivalents | 1,096 | 64 |
| Cash and cash equivalents at beginning of period | 1,838 | 1,838 |
| Cash and cash equivalents at end of period | $ 2,934 | $ 1,902 |

Baxter International Inc.

Condensed Consolidated Statements of Cash Flows

(in millions)

| | As Restated | |
| --- | --- | --- |
| | Six months ended June 30, 2018 | Three months ended March 31, 2018 |
| **Cash flows from operations** | | |
| Net income | $ 723 | $ 382 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | |
| Depreciation and amortization | 382 | 190 |
| Deferred income taxes | (51) | (38) |
| Stock compensation | 54 | 20 |
| Net periodic pension benefit and other postretirement costs | 21 | 10 |
| Other | — | (1) |
| Changes in balance sheet items: | | |
| Accounts receivable, net | 43 | 76 |
| Inventories | (134) | (56) |
| Accounts payable and accrued liabilities | (124) | (119) |
| Other | (82) | (34) |
| Cash flows from operations | 832 | 430 |
| **Cash flows from investing activities** | | |
| Capital expenditures | (303) | (152) |
| Acquisitions and investments, net of cash acquired | (228) | (219) |
| Cash flows from investing activities | (531) | (371) |
| **Cash flows from financing activities** | | |
| Cash dividends on common stock | (173) | (87) |
| Proceeds from stock issued under employee benefit plans | 170 | 82 |
| Purchases of treasury stock | (781) | (522) |
| Other financing activities, net | (24) | (18) |
| Cash flows from financing activities | (808) | (545) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (38) | 32 |
| Decrease in cash and cash equivalents | (545) | (454) |
| Cash and cash equivalents at beginning of period | 3,403 | 3,403 |
| Cash and cash equivalents at end of period | $ 2,858 | $ 2,949 |

Baxter International Inc.

Condensed Consolidated Balance Sheet

(in millions, except per share)

| | | June 30, 2019 | | |
|---|---|---|---|---|
| | As previously reported | Restatement impacts | Restatement reference | As restated |
| Current assets: | | | | |
| Cash and cash equivalents | $ 2,925 | $ 9 | (e) | $ 2,934 |
| Accounts receivable, net | 1,885 | 12 | (e)(g) | 1,897 |
| Inventories | 1,757 | (1) | (e)(g) | 1,756 |
| Prepaid expenses and other current assets | 651 | (9) | (b)(e)(g) | 642 |
| Total current assets | 7,218 | 11 | | 7,229 |
| Property, plant and equipment, net | 4,541 | (56) | (c)(e) | 4,485 |
| Goodwill | 2,938 | (1) | (e) | 2,937 |
| Other intangible assets, net | 1,364 | (1) | (g) | 1,363 |
| Operating lease right-of-use assets | 588 | 7 | (e) | 595 |
| Other non-current assets | 895 | (1) | (a)(c)(e)(g) | 894 |
| Total assets | $ 17,544 | $ (41) | | $ 17,503 |
| Current liabilities: | | | | |
| Short-term debt | $ 2 | $ — | | $ 2 |
| Current maturities of long-term debt and finance lease obligations | 2 | — | | 2 |
| Accounts payable and accrued liabilities | 2,593 | (40) | (b)(e)(g) | 2,553 |
| Total current liabilities | 2,597 | (40) | | 2,557 |
| Long-term debt and finance lease obligations | 5,157 | — | | 5,157 |
| Operating lease liabilities | 490 | 6 | (e) | 496 |
| Other non-current liabilities | 1,464 | 26 | (a)(c)(e)(g) | 1,490 |
| Total liabilities | 9,708 | (8) | | 9,700 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | 683 | — | | 683 |
| Common stock in treasury, at cost, 173,275,586 shares | (10,322) | — | | (10,322) |
| Additional contributed capital | 5,906 | — | | 5,906 |
| Retained earnings | 16,184 | (586) | (a)(b)(c)(e)(g) | 15,598 |
| Accumulated other comprehensive (loss) income | (4,639) | 553 | (a)(e) | (4,086) |
| Total Baxter stockholders' equity | 7,812 | (33) | | 7,779 |
| Noncontrolling interests | 24 | — | | 24 |
| Total equity | 7,836 | (33) | | 7,803 |
| Total liabilities and equity | $ 17,544 | $ (41) | | $ 17,503 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $514 million and accumulated other comprehensive loss of $514 million and increases to other non-current assets of $12 million and other non-current liabilities of $12 million as of June 30, 2019.

137

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $2 million and accounts payable and other accrued liabilities of $4 million and a decrease to retained earnings of $2 million as of June 30, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $61 million, other non-current liabilities of $6 million, and retained earnings of $44 million and an increase to other non-current assets of $11 million as of June 30, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to cash and cash equivalents of $9 million, accounts receivable, net of $6 million, inventories of $4 million, prepaid expenses and other current assets of $1 million, property, plant and equipment, net of $5 million, operating lease right-of-use assets of $7 million, other non-current assets of $5 million, accounts payable and accrued liabilities of $3 million, operating lease liabilities of $6 million, and other non-current liabilities of $4 million and decreases to goodwill of $1 million, retained earnings of $16 million, and accumulated other comprehensive loss of $39 million as of June 30, 2019.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million and decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million and retained earnings of $10 million as of June 30, 2019.

137

Baxter International Inc.

Condensed Consolidated Balance Sheet

(in millions, except per share)

| | | | March 31, 2019 | | | | |
|---|---|---|---|---|---|---|---|
| | | As previously reported | | Restatement impacts | Restatement reference | | As restated |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ | 1,908 | $ | (6) | (e) | $ | 1,902 |
| Accounts receivable, net | | 1,802 | | (1) | (e)(g) | | 1,801 |
| Inventories | | 1,751 | | (8) | (e)(g) | | 1,743 |
| Prepaid expenses and other current assets | | 626 | | (12) | (b)(e)(g) | | 614 |
| Total current assets | | 6,087 | | (27) | | | 6,060 |
| Property, plant and equipment, net | | 4,539 | | (63) | (c)(e) | | 4,476 |
| Goodwill | | 2,930 | | (1) | (e) | | 2,929 |
| Other intangible assets, net | | 1,441 | | (1) | (g) | | 1,440 |
| Operating lease right-of-use assets | | 517 | | (4) | (e) | | 513 |
| Other non-current assets | | 836 | | (13) | (a)(c)(e)(g) | | 823 |
| Total assets | $ | 16,350 | $ | (109) | | $ | 16,241 |
| Current liabilities: | | | | | | | |
| Short-term debt | $ | 796 | $ | — | | $ | 796 |
| Current maturities of long-term debt and finance lease obligations | | 2 | | — | | | 2 |
| Accounts payable and accrued liabilities | | 2,529 | | (51) | (e)(g) | | 2,478 |
| Total current liabilities | | 3,327 | | (51) | | | 3,276 |
| Long-term debt and finance lease obligations | | 3,451 | | — | | | 3,451 |
| Operating lease liabilities | | 420 | | (3) | (e) | | 417 |
| Other non-current liabilities | | 1,483 | | 21 | (a)(c)(e)(g) | | 1,504 |
| Total liabilities | | 8,681 | | (33) | | | 8,648 |
| Commitments and contingencies | | | | | | | |
| Equity: | | | | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | | 683 | | — | | | 683 |
| Common stock in treasury, at cost, 173,447,198 shares | | (10,284) | | — | | | (10,284) |
| Additional contributed capital | | 5,839 | | — | | | 5,839 |
| Retained earnings | | 15,970 | | (556) | (a)(b)(c)(e)(g) | | 15,414 |
| Accumulated other comprehensive (loss) income | | (4,562) | | 480 | (a)(e) | | (4,082) |
| Total Baxter stockholders' equity | | 7,646 | | (76) | | | 7,570 |
| Noncontrolling interests | | 23 | | — | | | 23 |
| Total equity | | 7,669 | | (76) | | | 7,593 |
| Total liabilities and equity | $ | 16,350 | $ | (109) | | $ | 16,241 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $491 million and accumulated other comprehensive loss of $487 million and increases to other non-current assets of $9 million and other non-current liabilities of $13 million as of March 31, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $1 million and retained earnings of $1 million as of March 31, 2019.

138

139

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $55 million, other non-current liabilities of $5 million, and retained earnings of $40 million and an increase to other non-current assets of $10 million as of March 31, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to cash and cash equivalents of $6 million, accounts receivable, net of $7 million, inventories of $3 million, prepaid expenses and other current assets of $1 million, property, plant and equipment, net of $8 million, goodwill of $1 million, operating lease right-of-use assets of $4 million, other non-current assets of $3 million, accounts payable and accrued liabilities of $4 million, operating lease liabilities of $3 million, other non-current liabilities of $3 million, retained earnings of $16 million and an increase to accumulated other comprehensive loss of $7 million as of March 31, 2019.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million and decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million, and retained earnings of $10 million as of March 31, 2019.

139

Baxter International Inc.

Condensed Consolidated Balance Sheet

(in millions, except per share)

| | September 30, 2018 | | | |
| --- | --- | --- | --- | --- |
| | As previously reported | Restatement impacts | Restatement reference | As restated |
| Current assets: | | | | |
| Cash and cash equivalents | $ 2,860 | $ 3 | (e) | $ 2,863 |
| Accounts receivable, net | 1,826 | 11 | (e)(g) | 1,837 |
| Inventories | 1,718 | (2) | (e)(g) | 1,716 |
| Prepaid expenses and other current assets | 624 | (9) | (b)(g) | 615 |
| Total current assets | 7,028 | 3 | | 7,031 |
| Property, plant and equipment, net | 4,520 | (44) | (c)(e) | 4,476 |
| Goodwill | 2,980 | (2) | (e) | 2,978 |
| Other intangible assets, net | 1,402 | (2) | (e)(g) | 1,400 |
| Other non-current assets | 917 | 1 | (a)(c)(e)(g) | 918 |
| Total assets | $ 16,847 | $ (44) | | $ 16,803 |
| Current liabilities: | | | | |
| Current maturities of long-term debt and finance lease obligations | $ 3 | $ — | | $ 3 |
| Accounts payable and accrued liabilities | 2,701 | (41) | (b)(e)(g) | 2,660 |
| Total current liabilities | 2,704 | (41) | | 2,663 |
| Long-term debt and finance lease obligations | 3,485 | (5) | (e) | 3,480 |
| Other non-current liabilities | 1,545 | 25 | (a)(c)(e)(g) | 1,570 |
| Total liabilities | 7,734 | (21) | | 7,713 |
| Commitments and contingencies | | | | |
| Equity: | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | 683 | — | | 683 |
| Common stock in treasury, at cost, 150,213,621 shares | (8,639) | — | | (8,639) |
| Additional contributed capital | 5,931 | — | | 5,931 |
| Retained earnings | 15,394 | (508) | (a)(b)(c)(e)(g) | 14,886 |
| Accumulated other comprehensive (loss) income | (4,239) | 485 | (a)(e) | (3,754) |
| Total Baxter stockholders' equity | 9,130 | (23) | | 9,107 |
| Noncontrolling interests | (17) | — | | (17) |
| Total equity | 9,113 | (23) | | 9,090 |
| Total liabilities and equity | $ 16,847 | $ (44) | | $ 16,803 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $448 million and accumulated other comprehensive loss of $456 million and increases to other non-current assets of $20 million and other non-current liabilities of $12 million as of September 30, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $3 million and accounts payable and accrued liabilities of $4 million and a decrease to retained earnings of $1 million as of September 30, 2018.

141

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $49 million, other non-current liabilities of $2 million, and retained earnings of $35 million and an increase to other non-current assets of $12 million as of September 30, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to cash and cash equivalents of $3 million, accounts receivable, net of $5 million, inventories of $3 million, property, plant and equipment, net of $5 million and accounts payable and accrued liabilities of $2 million and decreases to goodwill of $2 million, other intangible assets, net of $1 million, other non-current assets of $2 million, long-term debt and finance lease obligations of $5 million, other non-current liabilities of $1 million, retained earnings of $14 million, and accumulated other comprehensive loss of $29 million as of September 30, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million and decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million, and retained earnings of $10 million as of September 30, 2018.

141

Baxter International Inc.

Condensed Consolidated Balance Sheet

(in millions, except per share)

| | | As previously reported | | Restatement impacts | Restatement reference | | As restated |
|---|---|---|---|---|---|---|---|
| | | | | June 30, 2018 | | | |
| Current assets: | | | | | | | |
| Cash and cash equivalents | $ | 2,857 | $ | 1 | (e) | $ | 2,858 |
| Accounts receivable, net | | 1,783 | | 6 | (g) | | 1,789 |
| Inventories | | 1,622 | | (6) | (e)(g) | | 1,616 |
| Prepaid expenses and other current assets | | 628 | | (7) | (b)(e)(g) | | 621 |
| Total current assets | | 6,890 | | (6) | | | 6,884 |
| Property, plant and equipment, net | | 4,531 | | (45) | (c) | | 4,486 |
| Goodwill | | 2,984 | | (3) | (e) | | 2,981 |
| Other intangible assets, net | | 1,427 | | (3) | (e)(g) | | 1,424 |
| Other non-current assets | | 746 | | (2) | (a)(c)(g) | | 744 |
| Total assets | $ | 16,578 | $ | (59) | | $ | 16,519 |
| Current liabilities: | | | | | | | |
| Current maturities of long-term debt and finance lease obligations | $ | 3 | $ | — | | $ | 3 |
| Accounts payable and accrued liabilities | | 2,626 | | (43) | (b)(g) | | 2,583 |
| Total current liabilities | | 2,629 | | (43) | | | 2,586 |
| Long-term debt and finance lease obligations | | 3,495 | | (4) | (e) | | 3,491 |
| Other non-current liabilities | | 1,585 | | 27 | (a)(c)(g) | | 1,612 |
| Total liabilities | | 7,709 | | (20) | | | 7,689 |
| Commitments and contingencies | | | | | | | |
| Equity: | | | | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | | 683 | | — | | | 683 |
| Common stock in treasury, at cost, 148,485,202 shares | | (8,485) | | — | | | (8,485) |
| Additional contributed capital | | 5,916 | | — | | | 5,916 |
| Retained earnings | | 14,966 | | (482) | (a)(c)(e)(g) | | 14,484 |
| Accumulated other comprehensive (loss) income | | (4,199) | | 443 | (a)(e) | | (3,756) |
| Total Baxter stockholders' equity | | 8,881 | | (39) | | | 8,842 |
| Noncontrolling interests | | (12) | | — | | | (12) |
| Total equity | | 8,869 | | (39) | | | 8,830 |
| Total liabilities and equity | $ | 16,578 | $ | (59) | | $ | 16,519 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $425 million and accumulated other comprehensive loss of $428 million and increases to other non-current assets of $16 million and other non-current liabilities of $13 million as of June 30, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $4 million and accounts payable and accrued liabilities of $4 million as of June 30, 2018.

142

143

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $45 million, other non-current liabilities of $2 million, and retained earnings of $32 million and an increase to other non-current assets of $11 million as of June 30, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to cash and cash equivalents of $1 million and prepaid expenses and other current assets of $1 million and decreases to inventories of $1 million, goodwill of $3 million, other intangible assets, net of $2 million, long-term debt and finance lease obligations of $4 million, retained earnings of $15 million, and accumulated other comprehensive loss of $15 million as of June 30, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million and decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million, and retained earnings of $10 million as of June 30, 2018.

143

Baxter International Inc.

Condensed Consolidated Balance Sheet

(in millions, except per share)

| | | March 31, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ | 2,947 | $ 2 | (e) | $ | 2,949 |
| Accounts receivable, net | | 1,807 | 11 | (e)(g) | | 1,818 |
| Inventories | | 1,581 | (3) | (e)(g) | | 1,578 |
| Prepaid expenses and other current assets | | 621 | (11) | (b)(g) | | 610 |
| Total current assets | | 6,956 | (1) | | | 6,955 |
| Property, plant and equipment, net | | 4,614 | (38) | (c)(e) | | 4,576 |
| Goodwill | | 3,107 | (4) | (e) | | 3,103 |
| Other intangible assets, net | | 1,507 | (2) | (e)(g) | | 1,505 |
| Other non-current assets | | 706 | (2) | (a)(c)(e)(g) | | 704 |
| Total assets | $ | 16,890 | $ (47) | | $ | 16,843 |
| Current liabilities: | | | | | | |
| Current maturities of long-term debt and finance lease obligations | $ | 3 | $ — | | $ | 3 |
| Accounts payable and accrued liabilities | | 2,639 | (41) | (b)(e)(g) | | 2,598 |
| Total current liabilities | | 2,642 | (41) | | | 2,601 |
| Long-term debt and finance lease obligations | | 3,550 | — | | | 3,550 |
| Other non-current liabilities | | 1,605 | 25 | (a)(c)(e)(g) | | 1,630 |
| Total liabilities | | 7,797 | (16) | | | 7,781 |
| Commitments and contingencies | | | | | | |
| Equity: | | | | | | |
| Common stock, $1 par value, authorized 2,000,000,000 shares, issued 683,494,944 shares | | 683 | — | | | 683 |
| Common stock in treasury, at cost, 146,993,164 shares | | (8,354) | — | | | (8,354) |
| Additional contributed capital | | 5,912 | — | | | 5,912 |
| Retained earnings | | 14,734 | (480) | (a)(b)(c)(e)(g) | | 14,254 |
| Accumulated other comprehensive (loss) income | | (3,876) | 449 | (a)(e) | | (3,427) |
| Total Baxter stockholders' equity | | 9,099 | (31) | | | 9,068 |
| Noncontrolling interests | | (6) | — | | | (6) |
| Total equity | | 9,093 | (31) | | | 9,062 |
| Total liabilities and equity | $ | 16,890 | $ (47) | | $ | 16,843 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to retained earnings of $426 million and accumulated other comprehensive loss of $432 million and increases to other non-current assets of $20 million and other non-current liabilities of $14 million as of March 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to prepaid expenses and other current assets of $1 million and accounts payable and accrued liabilities of $4 million and a decrease to retained earnings of $3 million as of March 31, 2018.

145

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to property, plant and equipment, net of $44 million, other non-current liabilities of $2 million, and retained earnings of $31 million and an increase to other non-current assets of $11 million as of March 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to cash and cash equivalents of $2 million, accounts receivable, net of $5 million, inventories of $2 million, property, plant and equipment, net of $6 million, and accounts payable and accrued liabilities of $2 million and decreases to goodwill of $4 million, other intangible assets, net of $1 million, other non-current assets of $4 million, other non-current liabilities of $3 million, retained earnings of $10 million, and accumulated other comprehensive loss of $17 million as of March 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in increases to accounts receivable, net of $6 million and other non-current liabilities of $16 million and decreases to inventories of $5 million, prepaid expenses and other current assets of $12 million, other intangible assets, net of $1 million, other non-current assets of $29 million, accounts payable and accrued liabilities of $47 million, and retained earnings of $10 million as of March 31, 2018.

145

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Three months ended June 30, 2019 | | | |
|---|---|---|---|---|---|
| | | As previously reported | Restatement impacts | Restatement reference | As restated |
| Net sales | $ | 2,840 $ | (6) | (e) | $ 2,834 |
| Cost of sales | | 1,681 | — | (c)(e) | 1,681 |
| Gross margin | | 1,159 | (6) | | 1,153 |
| Selling, general and administrative expenses | | 642 | (1) | (e) | 641 |
| Research and development expenses | | 166 | — | | 166 |
| Other operating income, net | | (4) | — | | (4) |
| Operating income | | 355 | (5) | | 350 |
| Interest expense, net | | 20 | — | | 20 |
| Other (income) expense, net | | (28) | 32 | (a)(b) | 4 |
| Income before income taxes | | 363 | (37) | | 326 |
| Income tax expense | | 20 | (7) | (a)(c) | 13 |
| Net income | $ | 343 $ | (30) | | $ 313 |
| **Earnings per share** | | | | | |
| Basic | $ | 0.67 $ | (0.06) | | $ 0.61 |
| Diluted | $ | 0.66 $ | (0.06) | | $ 0.60 |
| **Weighted-average number of shares outstanding** | | | | | |
| Basic | | 510 | — | | 510 |
| Diluted | | 519 | — | | 519 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in a decrease to other (income) expense, net of $26 million and a decrease to income tax expense of $5 million for the three months ended June 30, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in a decrease to other (income) expense, net of $6 million for the three months ended June 30, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $5 million and a decrease to income tax expense of $2 million for the three months ended June 30, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to net sales of $6 million, cost of sales of $5 million and SG&A expense of $1 million for the three months ended June 30, 2019.

146

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Six months ended June 30, 2019 | | | | | |
|---|---|---|---|---|---|---|---|
| | | As previously reported | | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ | 5,472 | $ | — | | $ | 5,472 |
| Cost of sales | | 3,233 | | 6 | (c)(e) | | 3,239 |
| Gross margin | | 2,239 | | (6) | | | 2,233 |
| Selling, general and administrative expenses | | 1,242 | | — | | | 1,242 |
| Research and development expenses | | 295 | | — | | | 295 |
| Other operating income, net | | (37) | | — | | | (37) |
| Operating income | | 739 | | (6) | | | 733 |
| Interest expense, net | | 38 | | — | | | 38 |
| Other (income) expense, net | | (53) | | 36 | (a)(b) | | (17) |
| Income before income taxes | | 754 | | (42) | | | 712 |
| Income tax expense | | 64 | | (7) | (a)(b)(c) | | 57 |
| Net income | $ | 690 | $ | (35) | | $ | 655 |
| **Earnings per share** | | | | | | | |
| Basic | $ | 1.35 | $ | (0.07) | | $ | 1.28 |
| Diluted | $ | 1.33 | $ | (0.07) | | $ | 1.26 |
| **Weighted-average number of shares outstanding** | | | | | | | |
| Basic | | 511 | | — | | | 511 |
| Diluted | | 520 | | — | | | 520 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to other (income) expense, net of $31 million and income tax expense of $4 million for the six months ended June 30, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in decreases to other (income) expense, net of $5 million and income tax expense of $1 million for the six months ended June 30, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $7 million and a decrease to income tax expense of $2 million for the six months ended June 30, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in a decrease to cost of sales of $1 million for the six months ended June 30, 2019.

147

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

|  | Three months ended March 31, 2019 | | | |
|  | As previously reported | Restatement impacts | Restatement reference | As restated |
| --- | --- | --- | --- | --- |
| Net sales | $ 2,632 | $ 6 | (e) | $ 2,638 |
| Cost of sales | 1,552 | 6 | (c)(e) | 1,558 |
| Gross margin | 1,080 | — | | 1,080 |
| Selling, general and administrative expenses | 600 | 1 | (e) | 601 |
| Research and development expenses | 129 | — | | 129 |
| Other operating income, net | (33) | — | | (33) |
| Operating income | 384 | (1) | | 383 |
| Interest expense, net | 18 | — | | 18 |
| Other (income) expense, net | (25) | 4 | (a)(b) | (21) |
| Income before income taxes | 391 | (5) | | 386 |
| Income tax expense | 44 | — | | 44 |
| Net income | $ 347 | $ (5) | | $ 342 |
| **Earnings per share** | | | | |
| Basic | $ 0.68 | $ (0.01) | | $ 0.67 |
| Diluted | $ 0.66 | $ — | | $ 0.66 |
| **Weighted-average number of shares outstanding** | | | | |
| Basic | 512 | — | | 512 |
| Diluted | 522 | — | | 522 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in a decrease to other (income) expense, net of $5 million for the three months ended March 31, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to other (income) expense, net of $1 million for the three months ended March 31, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $2 million for the three months ended March 31, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to net sales of $6 million, cost of sales of $4 million and SG&A expense of $1 million for the three months ended March 31, 2019.

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Three months ended December 31, 2018 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ | 2,841 | $ (8) | (e) | $ | 2,833 |
| Cost of sales | | 1,649 | 1 | (c)(e) | | 1,650 |
| Gross margin | | 1,192 | (9) | | | 1,183 |
| Selling, general and administrative expenses | | 629 | (2) | (e) | | 627 |
| Research and development expenses | | 175 | — | | | 175 |
| Other operating income, net | | (10) | — | | | (10) |
| Operating income | | 398 | (7) | | | 391 |
| Interest expense, net | | 11 | — | | | 11 |
| Other (income) expense, net | | (58) | 25 | (a)(b) | | (33) |
| Income from continuing operations before income taxes | | 445 | (32) | | | 413 |
| Income tax expense | | 91 | 11 | (a)(c)(g) | | 102 |
| Income from continuing operations | | 354 | (43) | | | 311 |
| Loss from discontinued operations | | (6) | — | | | (6) |
| Net income | $ | 348 | $ (43) | | $ | 305 |
| **Earnings per share from continuing operations** | | | | | | |
| Basic | $ | 0.67 | $ (0.08) | | $ | 0.59 |
| Diluted | $ | 0.66 | $ (0.08) | | $ | 0.58 |
| **Loss per share from discontinued operations** | | | | | | |
| Basic | $ | (0.01) | $ — | | $ | (0.01) |
| Diluted | $ | (0.01) | $ — | | $ | (0.01) |
| **Earnings per share** | | | | | | |
| Basic | $ | 0.66 | $ (0.08) | | $ | 0.58 |
| Diluted | $ | 0.65 | $ (0.08) | | $ | 0.57 |
| **Weighted-average number of shares outstanding** | | | | | | |
| Basic | | 528 | — | | | 528 |
| Diluted | | 538 | — | | | 538 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in a decrease to other (income) expense, net of $26 million and an increase to income tax expense of $5 million for the three months ended December 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to other (income) expense, net of $1 million.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $4 million and a decrease to income tax expense of $1 million for the three months ended December 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to net sales of $8 million, cost of sales of $3 million and SG&A expense of $2 million for the three months ended December 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in an increase to income tax expense of $7 million for the year ended December 31, 2018.

149

150

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Three months ended June 30, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ | 2,842 | $ (29) | (e) | $ | 2,813 |
| Cost of sales | | 1,603 | (13) | (c)(e) | | 1,590 |
| Gross margin | | 1,239 | (16) | | | 1,223 |
| Selling, general and administrative expenses | | 681 | (5) | (e)(f) | | 676 |
| Research and development expenses | | 174 | (2) | (e) | | 172 |
| Other operating income, net | | — | (2) | (f) | | (2) |
| Operating income | | 384 | (7) | | | 377 |
| Interest expense, net | | 11 | — | | | 11 |
| Other (income) expense, net | | (31) | (7) | (b)(e) | | (38) |
| Income before income taxes | | 404 | — | | | 404 |
| Income tax expense | | 61 | 2 | (b)(c)(e) | | 63 |
| Net income | $ | 343 | $ (2) | | $ | 341 |
| **Earnings per share** | | | | | | |
| Basic | $ | 0.64 | $ — | | $ | 0.64 |
| Diluted | $ | 0.63 | $ (0.01) | | $ | 0.62 |
| **Weighted-average number of shares outstanding** | | | | | | |
| Basic | | 535 | — | | | 535 |
| Diluted | | 547 | — | | | 547 |

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to other (income) expense, net of $8 million and income tax expense of $4 million for the three months ended June 30, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $2 million and a decrease to income tax expense of $1 million for the three months ended June 30, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to net sales of $29 million, cost of sales of $15 million, SG&A expense of $7 million, R&D expense of $2 million, other (income) expense, net of $1 million and income tax expense of $1 million for the three months ended June 30, 2018.

(f) Income Statement Classification of Transition Services Income—The correction of these misstatements resulted in increases to SG&A expense and other operating income, net of $2 million for the three months ended June 30, 2018.

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Six months ended June 30, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ | 5,519 | $ (14) | (e) | $ | 5,505 |
| Cost of sales | | 3,166 | (5) | (c)(e) | | 3,161 |
| Gross margin | | 2,353 | (9) | | | 2,344 |
| Selling, general and administrative expenses | | 1,303 | 6 | (e)(f) | | 1,309 |
| Research and development expenses | | 314 | (1) | (e) | | 313 |
| Other operating income, net | | (80) | (9) | (f) | | (89) |
| Operating income | | 816 | (5) | | | 811 |
| Interest expense, net | | 23 | — | | | 23 |
| Other (income) expense, net | | (49) | 5 | (a)(b)(e) | | (44) |
| Income before income taxes | | 842 | (10) | | | 832 |
| Income tax expense | | 110 | (1) | (a)(b)(c)(e) | | 109 |
| Net income | $ | 732 | $ (9) | | $ | 723 |
| **Earnings per share** | | | | | | |
| Basic | $ | 1.36 | $ (0.01) | | $ | 1.35 |
| Diluted | $ | 1.33 | $ (0.01) | | $ | 1.32 |
| **Weighted-average number of shares outstanding** | | | | | | |
| Basic | | 537 | — | | | 537 |
| Diluted | | 549 | — | | | 549 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to other (income) expense, net of $9 million and income tax expense of $3 million for the six months ended June 30, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in increases to other (income) expense, net of $5 million and income tax of $4 million for the six months ended June 30, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $3 million and a decrease to income tax expense of $1 million for the six months ended June 30, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in decreases to net sales of $14 million, cost of sales of $8 million, SG&A expense of $3 million, R&D expense of $1 million, other (income) expense, net of $1 million and income tax expense of $1 million for the six months ended June 30, 2018.

(f) Income Statement Classification of Transition Services Income—The correction of these misstatements resulted in increases to SG&A expense and other operating income, net of $9 million for the six months ended June 30, 2018.

Baxter International Inc.

Condensed Consolidated Statement of Income

(in millions, except per share)

| | | Three months ended March 31, 2018 | | | | |
|---|---|---|---|---|---|---|
| | | As previously reported | Restatement impacts | Restatement reference | | As restated |
| Net sales | $ | 2,677 | $ 15 | (e) | $ | 2,692 |
| Cost of sales | | 1,563 | 8 | (c)(e) | | 1,571 |
| Gross margin | | 1,114 | 7 | | | 1,121 |
| Selling, general and administrative expenses | | 622 | 11 | (e)(f) | | 633 |
| Research and development expenses | | 140 | 1 | (e) | | 141 |
| Other operating income, net | | (80) | (7) | (f) | | (87) |
| Operating income | | 432 | 2 | | | 434 |
| Interest expense, net | | 12 | — | | | 12 |
| Other (income) expense, net | | (18) | 12 | (a)(b) | | (6) |
| Income before income taxes | | 438 | (10) | | | 428 |
| Income tax expense | | 49 | (3) | (a) | | 46 |
| Net income | $ | 389 | $ (7) | | $ | 382 |
| **Earnings per share** | | | | | | |
| Basic | $ | 0.72 | $ (0.01) | | $ | 0.71 |
| Diluted | $ | 0.71 | $ (0.02) | | $ | 0.69 |
| **Weighted-average number of shares outstanding** | | | | | | |
| Basic | | 539 | — | | | 539 |
| Diluted | | 551 | — | | | 551 |

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in decreases to other (income) expense, net of $9 million and income tax expense of $3 million for the three months ended March 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in a decrease to other (income) expense, net of $3 million for the three months ended March 31, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in an increase to cost of sales of $1 million for the three months ended March 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars—The correction of these misstatements resulted in increases to net sales of $15 million, cost of sales of $7 million, SG&A expense of $4 million and R&D expense of $1 million for the three months ended March 31, 2018.

(f) Income Statement Classification of Transition Services Income—The correction of these misstatements resulted in increases to SG&A expense and other operating income, net of $7 million for the three months ended March 31, 2018.

153

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | | Three months ended June 30, 2019 | | |
| --- | --- | --- | --- | --- |
| | | As previously reported | Restatement impacts | As restated |
| Net income | $ | 343 $ | (30) $ | 313 |
| Other comprehensive (loss) income, net of tax: | | | | |
| Currency translation adjustments | | (78) | 80 | 2 |
| Pension and other postretirement benefit plans | | 13 | (7) | 6 |
| Hedging activities | | (12) | — | (12) |
| Total other comprehensive loss, net of tax | | (77) | 73 | (4) |
| **Comprehensive income** | $ | 266 $ | 43 $ | 309 |

The $30 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended June 30, 2019 section.

The $80 million decrease to currency translation adjustments for the three months ended June 30, 2019 is comprised of a $54 million decrease to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars and a $26 million decrease from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses on intra-company receivables and payables.

The $7 million decrease to pension and other postretirement benefit plans for the three months ended June 30, 2019 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

153

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | Six months ended June 30, 2019 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement impacts | As restated |
| Net income | $ 690 | $ (35) | $ 655 |
| Other comprehensive (loss) income, net of tax: | | | |
| Currency translation adjustments | (48) | (47) | (95) |
| Pension and other postretirement benefit plans | 21 | (1) | 20 |
| Hedging activities | (27) | — | (27) |
| Total other comprehensive loss, net of tax | (54) | (48) | (102) |
| **Comprehensive income** | $ 636 | $ (83) | $ 553 |

The $35 million decrease to net income was driven by the items described above in the consolidated statement of income for the six months ended June 30, 2019 section.

The $47 million increase to currency translation adjustments for the six months ended June 30, 2019 is comprised of a $78 million increase to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars partially offset by a $31 million decrease from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses on intra-company receivables and payables.

The $1 million decrease to pension and other postretirement benefit plans for the six months ended June 30, 2019 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | Three months ended March 31, 2019 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement impacts | As restated |
| Net income | $ 347 | $ (5) | $ 342 |
| Other comprehensive (loss) income, net of tax: | | | |
| Currency translation adjustments | 30 | (127) | (97) |
| Pension and other postretirement benefit plans | 8 | 6 | 14 |
| Hedging activities | (15) | — | (15) |
| Total other comprehensive (loss) income, net of tax | 23 | (121) | (98) |
| **Comprehensive income** | $ 370 | $ (126) | $ 244 |

The $5 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended March 31, 2019 section.

The $127 million decrease to currency translation adjustments for the three months ended March 31, 2019 is comprised of a $132 million decrease to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars partially offset by a $5 million increase from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses on intra-company receivables and payables.

The $6 million increase to pension and other postretirement benefit plans for the three months ended March 31, 2019 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

155

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | Three months ended June 30, 2018 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement impacts | As restated |
| Net income | $ 343 | $ (2) | $ 341 |
| Other comprehensive (loss) income, net of tax: | | | |
| Currency translation adjustments | (363) | (5) | (368) |
| Pension and other postretirement benefit plans | 29 | (1) | 28 |
| Hedging activities | 11 | — | 11 |
| Total other comprehensive loss, net of tax | (323) | (6) | (329) |
| **Comprehensive income** | $ 20 | $ (8) | $ 12 |

The $2 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended June 30, 2018 section.

The $5 million increase to currency translation adjustments for the three months ended June 30, 2018 is comprised of a $5 million increase to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

The $1 million decrease to pension and other postretirement benefit plans for the three months ended June 30, 2018 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | Six months ended June 30, 2018 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement impacts | As restated |
| Net income | $ 732 | $ (9) | $ 723 |
| Other comprehensive (loss) income, net of tax: | | | |
| Currency translation adjustments | (282) | (23) | (305) |
| Pension and other postretirement benefit plans | 81 | 4 | 85 |
| Hedging activities | 6 | — | 6 |
| Total other comprehensive loss, net of tax | (195) | (19) | (214) |
| **Comprehensive income** | $ 537 | $ (28) | $ 509 |

The $9 million decrease to net income was driven by the items described above in the consolidated statement of income for the six months ended June 30, 2018 section.

The $23 million increase to currency translation adjustments for the six months ended June 30, 2018 is comprised of a $32 million increase to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars partially offset by a $9 million decrease from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses on intra-company receivables and payables.

The $4 million increase to pension and other postretirement benefit plans for the six months ended June 30, 2018 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

Baxter International Inc.

Condensed Consolidated Statement of Comprehensive Income

(in millions)

| | Three months ended March 31, 2018 | | |
| --- | --- | --- | --- |
| | As previously reported | Restatement impacts | As restated |
| Net income | $ 389 | $ (7) | $ 382 |
| Other comprehensive (loss) income, net of tax: | | | |
| Currency translation adjustments | 81 | (18) | 63 |
| Pension and other postretirement benefit plans | 52 | 5 | 57 |
| Hedging activities | (5) | — | (5) |
| Total other comprehensive income, net of tax | 128 | (13) | 115 |
| **Comprehensive income** | $ 517 | $ (20) | $ 497 |

The $7 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended March 31, 2018 section.

The $18 million decrease to currency translation adjustments for the three months ended March 31, 2018 is comprised of a $27 million decrease to correct the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars partially offset by a $9 million increase from the offsetting balance sheet impact of the adjustments to foreign exchange gains and losses on intra-company receivables and payables.

The $5 million increase to pension and other postretirement benefit plans for the three months ended March 31, 2018 is a result of the correction of the foreign exchange rates used to translate the financial position and results of operations of our foreign operations into U.S. dollars.

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Three Months Ended June 30, 2019

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of April 1, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,970 | $ (4,562) | $ 7,646 | $ 23 | $ 7,669 |
| Net income | — | — | — | — | — | 343 | — | 343 | — | 343 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (77) | (77) | — | (77) |
| Purchases of treasury stock | — | — | 2 | (157) | 46 | — | — | (111) | — | (111) |
| Stock issued under employee benefit plans and other | — | — | (2) | 119 | 21 | (17) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (112) | — | (112) | — | (112) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 16,184 | $ (4,639) | $ 7,812 | $ 24 | $ 7,836 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of April 1, 2019 | — | $ — | — | $ — | $ — | $ (556) | $ 480 | $ (76) | $ — | $ (76) |
| Net income | — | — | — | — | — | (30) | — | (30) | — | (30) |
| Other comprehensive income (loss) | — | — | — | — | — | — | 73 | 73 | — | 73 |
| Balance as of June 30, 2019 | — | $ — | — | $ — | $ — | $ (586) | $ 553 | $ (33) | $ — | $ (33) |
| **As restated** | | | | | | | | | | |
| Balance as of April 1, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,414 | $ (4,082) | $ 7,570 | $ 23 | $ 7,593 |
| Net income | — | — | — | — | — | 313 | — | 313 | — | 313 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (4) | (4) | — | (4) |
| Purchases of treasury stock | — | — | 2 | (157) | 46 | — | — | (111) | — | (111) |
| Stock issued under employee benefit plans and other | — | — | (2) | 119 | 21 | (17) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (112) | — | (112) | — | (112) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 15,598 | $ (4,086) | $ 7,779 | $ 24 | $ 7,803 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the three months ended June 30, 2019 sections above.

159

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Six Months Ended June 30, 2019

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,626 | $ (4,424) | $ 7,794 | $ 22 | $ 7,816 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 690 | — | 690 | — | 690 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (54) | (54) | — | (54) |
| Purchases of treasury stock | — | — | 10 | (743) | 46 | — | — | (697) | — | (697) |
| Stock issued under employee benefit plans and other | — | — | (7) | 410 | (38) | (83) | — | 289 | — | 289 |
| Dividends declared on common stock | — | — | — | — | — | (210) | — | (210) | — | (210) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 16,184 | $ (4,639) | $ 7,812 | $ 24 | $ 7,836 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2019 | — | $ — | — | $ — | $ — | $ (551) | $ 601 | $ 50 | $ — | $ 50 |
| Net income | — | — | — | — | — | (35) | — | (35) | — | (35) |
| Other comprehensive income (loss) | — | — | — | — | — | — | (48) | (48) | — | (48) |
| Balance as of June 30, 2019 | — | $ — | — | $ — | $ — | $ (586) | $ 553 | $ (33) | $ — | $ (33) |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,075 | $ (3,823) | $ 7,844 | $ 22 | $ 7,866 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 655 | — | 655 | — | 655 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (102) | (102) | — | (102) |
| Purchases of treasury stock | — | — | 10 | (743) | 46 | — | — | (697) | — | (697) |
| Stock issued under employee benefit plans and other | — | — | (7) | 410 | (38) | (83) | — | 289 | — | 289 |
| Dividends declared on common stock | — | — | — | — | — | (210) | — | (210) | — | (210) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of June 30, 2019 | 683 | $ 683 | 173 | $ (10,322) | $ 5,906 | $ 15,598 | $ (4,086) | $ 7,779 | $ 24 | $ 7,803 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the six months ended June 30, 2019 sections above.

160

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Three Months Ended March 31, 2019

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,626 | $ (4,424) | $ 7,794 | $ 22 | $ 7,816 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 347 | — | 347 | — | 347 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 23 | 23 | — | 23 |
| Purchases of treasury stock | — | — | 8 | (586) | — | — | — | (586) | — | (586) |
| Stock issued under employee benefit plans and other | — | — | (5) | 291 | (59) | (66) | — | 166 | — | 166 |
| Dividends declared on common stock | — | — | — | — | — | (98) | — | (98) | — | (98) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of March 31, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,970 | $ (4,562) | $ 7,646 | $ 23 | $ 7,669 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2019 | — | $ — | — | $ — | $ — | $ (551) | $ 601 | $ 50 | $ — | $ 50 |
| Net income | — | — | — | — | — | (5) | — | (5) | — | (5) |
| Other comprehensive income (loss) | — | — | — | — | — | — | (121) | (121) | — | (121) |
| Balance as of March 31, 2019 | — | $ — | — | $ — | $ — | $ (556) | $ 480 | $ (76) | $ — | $ (76) |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2019 | 683 | $ 683 | 170 | $ (9,989) | $ 5,898 | $ 15,075 | $ (3,823) | $ 7,844 | $ 22 | $ 7,866 |
| Adoption of new accounting standards | — | — | — | — | — | 161 | (161) | — | — | — |
| Net income | — | — | — | — | — | 342 | — | 342 | — | 342 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (98) | (98) | — | (98) |
| Purchases of treasury stock | — | — | 8 | (586) | — | — | — | (586) | — | (586) |
| Stock issued under employee benefit plans and other | — | — | (5) | 291 | (59) | (66) | — | 166 | — | 166 |
| Dividends declared on common stock | — | — | — | — | — | (98) | — | (98) | — | (98) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 1 | 1 |
| Balance as of March 31, 2019 | 683 | $ 683 | 173 | $ (10,284) | $ 5,839 | $ 15,414 | $ (4,082) | $ 7,570 | $ 23 | $ 7,593 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the three months ended March 31, 2019 sections above.

161

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Three Months Ended June 30, 2018

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of April 1, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,734 | $ (3,876) | $ 9,099 | $ (6) | $ 9,093 |
| Net income | — | — | — | — | — | 343 | — | 343 | — | 343 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (323) | (323) | — | (323) |
| Purchases of treasury stock | — | — | 3 | (259) | — | — | — | (259) | — | (259) |
| Stock issued under employee benefit plans and other | — | — | (2) | 128 | 4 | (9) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (102) | — | (102) | — | (102) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | (6) | (6) |
| Balance as of June 30, 2018 | 683 | $ 683 | 148 | $ (8,485) | $ 5,916 | $ 14,966 | $ (4,199) | $ 8,881 | $ (12) | $ 8,869 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of April 1, 2018 | — | $ — | — | $ — | $ — | $ (480) | $ 449 | $ (31) | $ — | $ (31) |
| Net income | — | — | — | — | — | (2) | — | (2) | — | (2) |
| Other comprehensive income (loss) | — | — | — | — | — | — | (6) | (6) | — | (6) |
| Balance as of June 30, 2018 | — | $ — | — | $ — | $ — | $ (482) | $ 443 | $ (39) | $ — | $ (39) |
| **As restated** | | | | | | | | | | |
| Balance as of April 1, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,254 | $ (3,427) | $ 9,068 | $ (6) | $ 9,062 |
| Net income | — | — | — | — | — | 341 | — | 341 | — | 341 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (329) | (329) | — | (329) |
| Purchases of treasury stock | — | — | 3 | (259) | — | — | — | (259) | — | (259) |
| Stock issued under employee benefit plans and other | — | — | (2) | 128 | 4 | (9) | — | 123 | — | 123 |
| Dividends declared on common stock | — | — | — | — | — | (102) | — | (102) | — | (102) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | (6) | (6) |
| Balance as of June 30, 2018 | 683 | $ 683 | 148 | $ (8,485) | $ 5,916 | $ 14,484 | $ (3,756) | $ 8,842 | $ (12) | $ 8,830 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the three months ended June 30, 2018 sections above.

162

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Six Months Ended June 30, 2018

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,483 | $ (4,001) | $ 9,124 | $ (8) | $ 9,116 |
| Adoption of new accounting standards | — | — | — | — | — | (16) | (3) | (19) | — | (19) |
| Net income | — | — | — | — | — | 732 | — | 732 | — | 732 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (195) | (195) | — | (195) |
| Purchases of treasury stock | — | — | 11 | (781) | — | — | — | (781) | — | (781) |
| Stock issued under employee benefit plans and other | — | — | (5) | 277 | (24) | (45) | — | 208 | — | 208 |
| Dividends declared on common stock | — | — | — | — | — | (188) | — | (188) | — | (188) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | (4) | (4) |
| Balance as of June 30, 2018 | 683 | $ 683 | 148 | $ (8,485) | $ 5,916 | $ 14,966 | $ (4,199) | $ 8,881 | $ (12) | $ 8,869 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2018 | — | $ — | — | $ — | $ — | $ (469) | $ 462 | $ (7) | $ — | $ (7) |
| Adoption of new accounting standards | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Net income | — | — | — | — | — | (9) | — | (9) | — | (9) |
| Other comprehensive income (loss) | — | — | — | — | — | — | (19) | (19) | — | (19) |
| Balance as of June 30, 2018 | — | $ — | — | $ — | $ — | $ (482) | $ 443 | $ (39) | $ — | $ (39) |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (20) | (3) | (23) | — | (23) |
| Net income | — | — | — | — | — | 723 | — | 723 | — | 723 |
| Other comprehensive income (loss) | — | — | — | — | — | — | (214) | (214) | — | (214) |
| Purchases of treasury stock | — | — | 11 | (781) | — | — | — | (781) | — | (781) |
| Stock issued under employee benefit plans and other | — | — | (5) | 277 | (24) | (45) | — | 208 | — | 208 |
| Dividends declared on common stock | — | — | — | — | — | (188) | — | (188) | — | (188) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | (4) | (4) |
| Balance as of June 30, 2018 | 683 | $ 683 | 148 | $ (8,485) | $ 5,916 | $ 14,484 | $ (3,756) | $ 8,842 | $ (12) | $ 8,830 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the six months ended June 30, 2018 sections above. Additionally, we recorded an adjustment to the opening balance of retained earnings on January 1, 2018 for the adoption of ASU No. 2016-16, which was impacted by our adjustments to equipment leased to customers under operating leases.

163

Baxter International Inc.

Consolidated Statement of Changes in Equity

(in millions)

For the Three Months Ended March 31, 2018

| | Baxter International Inc. stockholders' equity | | | | | | | | | |
| | Common stock shares | Common stock | Common stock shares in treasury | Common stock in treasury | Additional contributed capital | Retained earnings | Accumulated other comprehensive income (loss) | Total Baxter stockholders' equity | Noncontrolling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **As previously reported** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,483 | $ (4,001) | $ 9,124 | $ (8) | $ 9,116 |
| Adoption of new accounting standards | — | — | — | — | — | (16) | (3) | (19) | — | (19) |
| Net income | — | — | — | — | — | 389 | — | 389 | — | 389 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 128 | 128 | — | 128 |
| Purchases of treasury stock | — | — | 8 | (522) | — | — | — | (522) | — | (522) |
| Stock issued under employee benefit plans and other | — | — | (3) | 149 | (28) | (36) | — | 85 | — | 85 |
| Dividends declared on common stock | — | — | — | — | — | (86) | — | (86) | — | (86) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of March 31, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,734 | $ (3,876) | $ 9,099 | $ (6) | $ 9,093 |
| **Restatement impacts** | | | | | | | | | | |
| Balance as of January 1, 2018 | — | $ — | — | $ — | $ — | $ (469) | $ 462 | $ (7) | $ — | $ (7) |
| Adoption of new accounting standards | — | — | — | — | — | (4) | — | (4) | — | (4) |
| Net income | — | — | — | — | — | (7) | — | (7) | — | (7) |
| Other comprehensive income (loss) | — | — | — | — | — | — | (13) | (13) | — | (13) |
| Balance as of March 31, 2018 | — | $ — | — | $ — | $ — | $ (480) | $ 449 | $ (31) | $ — | $ (31) |
| **As restated** | | | | | | | | | | |
| Balance as of January 1, 2018 | 683 | $ 683 | 142 | $ (7,981) | $ 5,940 | $ 14,014 | $ (3,539) | $ 9,117 | $ (8) | $ 9,109 |
| Adoption of new accounting standards | — | — | — | — | — | (20) | (3) | (23) | — | (23) |
| Net income | — | — | — | — | — | 382 | — | 382 | — | 382 |
| Other comprehensive income (loss) | — | — | — | — | — | — | 115 | 115 | — | 115 |
| Purchases of treasury stock | — | — | 8 | (522) | — | — | — | (522) | — | (522) |
| Stock issued under employee benefit plans and other | — | — | (3) | 149 | (28) | (36) | — | 85 | — | 85 |
| Dividends declared on common stock | — | — | — | — | — | (86) | — | (86) | — | (86) |
| Changes in noncontrolling interests | — | — | — | — | — | — | — | — | 2 | 2 |
| Balance as of March 31, 2018 | 683 | $ 683 | 147 | $ (8,354) | $ 5,912 | $ 14,254 | $ (3,427) | $ 9,068 | $ (6) | $ 9,062 |

See descriptions of the net income and other comprehensive income impacts in the consolidated statement of income and consolidated statement of comprehensive income for the three months ended March 31, 2018 sections above. Additionally, we recorded an adjustment to the opening balance of retained earnings on January 1, 2018 for the adoption of ASU No. 2016-16, which was impacted by our adjustments to equipment leased to customers under operating leases.

164

Baxter International Inc.

Condensed Consolidated Statement of Cash Flows

(in millions)

| | For the Six Months Ended June 30, 2019 | | | |
| --- | --- | --- | --- | --- |
| | As previously reported | Restatement impacts | Restatement reference | As restated |
| Cash flows from operations | | | | |
| Net income | $ 690 | $ (35) | | $ 655 |
| Adjustments to reconcile net income to net cash from operating activities: | | | | |
| Depreciation and amortization | 393 | (8) | (c)(g) | 385 |
| Deferred income taxes | (55) | (8) | (c)(g) | (63) |
| Stock compensation | 57 | — | | 57 |
| Net periodic pension benefit and other postretirement costs | 7 | — | | 7 |
| Intangible asset impairment | 31 | — | | 31 |
| Other | 34 | 10 | (d) | 44 |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | (60) | — | | (60) |
| Inventories | (91) | — | | (91) |
| Accounts payable and accrued liabilities | (303) | 4 | (b) | (299) |
| Other | (86) | — | (e)(g) | (86) |
| Cash flows from operations - continuing operations | 617 | (37) | | 580 |
| Cash flows from operations - discontinued operations | (6) | — | | (6) |
| Cash flows from operations | 611 | (37) | | 574 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (352) | 14 | (c) | (338) |
| Acquisitions and investments, net of cash acquired | (111) | — | | (111) |
| Other investing activities, net | 1 | — | | 1 |
| Cash flows from investing activities | (462) | 14 | | (448) |
| Cash flows from financing activities | | | | |
| Issuances of debt | 1,661 | — | | 1,661 |
| Cash dividends on common stock | (198) | — | | (198) |
| Proceeds from stock issued under employee benefit plans | 262 | — | | 262 |
| Purchases of treasury stock | (720) | — | | (720) |
| Other financing activities, net | (37) | — | | (37) |
| Cash flows from financing activities | 968 | — | | 968 |
| Effect of foreign exchange rate changes on cash and cash equivalents | (24) | 26 | (a)(d)(e) | 2 |
| Increase in cash and cash equivalents | 1,093 | 3 | | 1,096 |
| Cash and cash equivalents at beginning of period | 1,832 | 6 | (e) | 1,838 |
| Cash and cash equivalents at end of period | $ 2,925 | $ 9 | (e) | 2,934 |

The $35 million decrease to net income was driven by the items described above in the consolidated statement of income for the six months ended June 30, 2019 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $33 million for the six months ended June 30, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to changes in accounts payable and accrued liabilities of $4 million for the six months ended June 30, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $7 million, deferred income taxes of $2 million and capital expenditures of $14 million for the six months ended June 30, 2019.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in a decrease to the effect of foreign exchange rate changes on cash and cash equivalents and an increase to other adjustments to reconcile net income to net cash from operating activities of $10 million for the six months ended June 30, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in an increase in cash and cash equivalents at the beginning of the period of $6 million, at the end of the period of $9 million and the effect of foreign exchange rate changes on cash and cash equivalents of $3 million and a decrease to other changes in balance sheet items of $1 million for the six months ended June 30, 2019.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in decreases to depreciation and amortization of $1 million and deferred income taxes of $6 million and an increase to other changes in balance sheet items of $1 million for the six months ended June 30, 2019.

Baxter International Inc.

Condensed Consolidated Statement of Cash Flows

(in millions)

| | For the Three Months Ended March 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | As previously reported | Restatement impacts | Restatement reference | As restated |
| Cash flows from operations | | | | |
| Net income | $ 347 | $ (5) | | $ 342 |
| Adjustments to reconcile net income to net cash from operating activities: | | | | |
| Depreciation and amortization | 195 | (3) | (c) | 192 |
| Deferred income taxes | (6) | — | | (6) |
| Stock compensation | 22 | — | | 22 |
| Net periodic pension benefit and other postretirement costs | 3 | — | | 3 |
| Other | 19 | (5) | (d) | 14 |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | 32 | — | | 32 |
| Inventories | (82) | — | | (82) |
| Accounts payable and accrued liabilities | (333) | (2) | (b)(g) | (335) |
| Other | (49) | 1 | (b)(e)(g) | (48) |
| Cash flows from operations - continuing operations | 148 | (14) | | 134 |
| Cash flows from operations - discontinued operations | (6) | — | | (6) |
| Cash flows from operations | 142 | (14) | | 128 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (198) | 5 | (c) | (193) |
| Acquisitions and investments, net of cash acquired | (109) | — | | (109) |
| Other investing activities, net | 1 | — | | 1 |
| Cash flows from investing activities | (306) | 5 | | (301) |
| Cash flows from financing activities | | | | |
| Net increases in debt obligations with original maturities of three months of less | 795 | — | | 795 |
| Cash dividends on common stock | (101) | — | | (101) |
| Proceeds from stock issued under employee benefit plans | 173 | — | | 173 |
| Purchases of treasury stock | (597) | — | | (597) |
| Other financing activities, net | (32) | — | | (32) |
| Cash flows from financing activities | 238 | — | | 238 |
| Effect of foreign exchange rate changes on cash and cash equivalents | 2 | (3) | (a)(d)(e) | (1) |
| Increase (decrease) in cash and cash equivalents | 76 | (12) | | 64 |
| Cash and cash equivalents at beginning of period | 1,832 | 6 | (e) | 1,838 |
| Cash and cash equivalents at end of period | $ 1,908 | $ (6) | (e) | 1,902 |

The $5 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended March 31, 2019 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $4 million for the three months ended March 31, 2019.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in a decrease to changes in accounts payable and accrued liabilities of $1 million and an increase in other changes in balance sheet items of $1 million for the three months ended March 31, 2019.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $3 million and capital expenditures of $5 million for the three months ended March 31, 2019.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents and a decrease to other adjustments to reconcile net income to net cash from operating activities of $5 million for the three months ended March 31, 2019.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in an increase in cash and cash equivalents at the beginning of the period of $6 million and decreases to other changes in balance sheet items of $1 million, cash and cash equivalents at the end of the period of $6 million and the effect of foreign exchange rate changes on cash and cash equivalents of $12 million for the three months ended March 31, 2019.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in an increase to other changes in balance sheet items of $1 million and a decrease in changes in accounts payable and accrued liabilities of $1 million for the three months ended March 31, 2019.

Baxter International Inc.

Condensed Consolidated Statement of Cash Flows

(in millions)

| | For the Six Months Ended June 30, 2018 | | | |
| --- | --- | --- | --- | --- |
| | As previously reported | Restatement impacts | Restatement reference | As restated |
| Cash flows from operations | | | | |
| Net income | $ 732 | $ (9) | | $ 723 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | | | |
| Depreciation and amortization | 387 | (5) | (c) | 382 |
| Deferred income taxes | (51) | — | (c)(g) | (51) |
| Stock compensation | 54 | — | | 54 |
| Net periodic pension benefit and other postretirement costs | 21 | — | | 21 |
| Other | 10 | (10) | (d) | — |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | 43 | — | | 43 |
| Inventories | (134) | — | | (134) |
| Accounts payable and accrued liabilities | (126) | 2 | (b) | (124) |
| Other | (84) | 2 | (e) | (82) |
| Cash flows from operations | 852 | (20) | | 832 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (311) | 8 | (c) | (303) |
| Acquisitions and investments, net of cash acquired | (228) | — | | (228) |
| Cash flows from investing activities | (539) | 8 | | (531) |
| Cash flows from financing activities | | | | |
| Cash dividends on common stock | (173) | — | | (173) |
| Proceeds from stock issued under employee benefit plans | 170 | — | | 170 |
| Purchases of treasury stock | (781) | — | | (781) |
| Other financing activities, net | (24) | — | | (24) |
| Cash flows from financing activities | (808) | — | | (808) |
| Effect of foreign exchange rate changes on cash and cash equivalents | (42) | 4 | (a)(d)(e) | (38) |
| Decrease in cash and cash equivalents | (537) | (8) | | (545) |
| Cash and cash equivalents at beginning of period | 3,394 | 9 | (e) | 3,403 |
| Cash and cash equivalents at end of period | $ 2,857 | $ 1 | (e) | 2,858 |

The $9 million decrease to net income was driven by the items described above in the consolidated statement of income for the six months ended June 30, 2018 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $2 million for the six months ended June 30, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in an increase to changes in accounts payable and accrued liabilities of $2 million for the six months ended June 30, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $5 million, deferred income taxes of $1 million and capital expenditures of $8 million for the six months ended June 30, 2018.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents and a decrease to other adjustments to reconcile net income to net cash from operating activities of $10 million for the six months ended June 30, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in increases in other changes in balance sheet items of $2 million, cash and cash equivalents at the beginning of the period of $9 million and at the end of the period of $1 million and a decrease to the effect of foreign exchange rate changes on cash and cash equivalents of $8 million for the six months ended June 30, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in an increase to deferred income taxes of $1 million for the six months ended June 30, 2018.

Baxter International Inc.

Condensed Consolidated Statement of Cash Flows

(in millions)

| | As previously reported | Restatement impacts | Restatement reference | As restated |
|---|---|---|---|---|
| | For the Three Months Ended March 31, 2018 | | | |
| Cash flows from operations | | | | |
| Net income | $ 389 | $ (7) | | $ 382 |
| Adjustments to reconcile income from continuing operations to net cash from operating activities: | | | | |
| Depreciation and amortization | 192 | (2) | (c) | 190 |
| Deferred income taxes | (33) | (5) | (g) | (38) |
| Stock compensation | 20 | — | | 20 |
| Net periodic pension benefit and other postretirement costs | 10 | — | | 10 |
| Other | 2 | (3) | (d) | (1) |
| Changes in balance sheet items: | | | | |
| Accounts receivable, net | 76 | — | | 76 |
| Inventories | (56) | — | | (56) |
| Accounts payable and accrued liabilities | (120) | 1 | (b)(g) | (119) |
| Other | (33) | (1) | (b)(e) | (34) |
| Cash flows from operations | 447 | (17) | | 430 |
| Cash flows from investing activities | | | | |
| Capital expenditures | (155) | 3 | (c) | (152) |
| Acquisitions and investments, net of cash acquired | (219) | — | | (219) |
| Cash flows from investing activities | (374) | 3 | | (371) |
| Cash flows from financing activities | | | | |
| Cash dividends on common stock | (87) | — | | (87) |
| Proceeds from stock issued under employee benefit plans | 82 | — | | 82 |
| Purchases of treasury stock | (522) | — | | (522) |
| Other financing activities, net | (18) | — | | (18) |
| Cash flows from financing activities | (545) | — | | (545) |
| Effect of foreign exchange rate changes on cash and cash equivalents | 25 | 7 | (a)(d)(e) | 32 |
| Decrease in cash and cash equivalents | (447) | (7) | | (454) |
| Cash and cash equivalents at beginning of period | 3,394 | 9 | (e) | 3,403 |
| Cash and cash equivalents at end of period | $ 2,947 | $ 2 | (e) | 2,949 |

The $7 million decrease to net income was driven by the items described above in the consolidated statement of income for the three months ended March 31, 2018 section.

(a) Foreign Currency Denominated Monetary Assets and Liabilities—The correction of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents of $11 million for the three months ended March 31, 2018.

(b) Foreign Currency Derivative Contracts—The correction of these misstatements resulted in a decrease to changes in accounts payable and accrued liabilities of $1 million and an increase to other changes in balance sheet items of $2 million for the three months ended March 31, 2018.

(c) Equipment Leased to Customers under Operating Leases—The correction of these misstatements resulted in decreases to depreciation and amortization of $2 million and capital expenditures of $3 million for the three months ended March 31, 2018.

(d) Classification of Foreign Currency Gains and Losses in our Consolidated Statements of Cash Flows - The corrections of these misstatements resulted in an increase to the effect of foreign exchange rate changes on cash and cash equivalents and a decrease to other adjustments to reconcile net income to net cash from operating activities of $3 million for the three months ended March 31, 2018.

(e) Translation of the Financial Position and Results of Operations of our Foreign Operations into U.S. Dollars - The corrections of these misstatements resulted in increases in cash and cash equivalents at the beginning of the period of $9 million and at the end of the period of $2 million and decreases to other changes in balance sheet items of $3 million and the effect of foreign exchange rate changes on cash and cash equivalents of $7 million for the three months ended March 31, 2018.

(g) Other miscellaneous adjustments - The correction of these misstatements resulted in a decrease to deferred income taxes of $5 million and an increase to changes in accounts payable and accrued liabilities of $2 million for the three months ended March 31, 2018.

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Baxter International Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Baxter International Inc. and its subsidiaries (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of income, comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2019, including the related notes and financial statement schedule listed in the index appearing under Item 15(2) (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date related to the accounting for certain foreign exchange gains and losses arising from intra-company transactions.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Assessment of Internal Control Over Financial Reporting appearing under Item 9A. We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements.

*Restatement of Previously Issued Financial Statements*

As discussed in Note 2 to the consolidated financial statements, the Company has restated its 2018 and 2017 financial statements to correct misstatements.

*Change in Accounting Principle*

As discussed in Note 1 to the consolidated financial statements, the Company changed the manner in which it accounts for leases in 2019.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in management's report referred to above. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Foreign exchange gains and losses*

As described in Notes 2 and 5 to the consolidated financial statements, on October 24, 2019, the Company reported that it had commenced an internal investigation into certain intra-Company transactions that impacted the Company's previously reported non-operating foreign exchange gains and losses. As further disclosed by management, certain intra-Company transactions were undertaken, after the related exchange rates were already known, solely for the purpose of generating non-operating foreign exchange gains or avoiding foreign exchange losses. In connection with the internal investigation, the Company identified misstatements relating to foreign currency denominated monetary assets and liabilities and foreign currency derivative contracts that caused Other income (expense), net and Income from continuing operations before income taxes to be overstated by $59 million and $113 million, respectively, for the years ended December 31, 2018 and 2017 and the Company has restated its consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 to correct misstatements to the Company's previously reported foreign exchange gains and losses. The quantification of misstatements to the previously reported foreign exchange gains and losses was not limited to intra-Company transactions undertaken for the purpose of generating foreign exchange gains or avoiding foreign exchange losses after the related exchange rates were already known. Rather, management identified every legal entity within the Company's consolidated group that had foreign exchange gains or losses above an immaterial threshold and for those entities management remeasured all foreign exchange gains and losses from foreign currency denominated cash balances and intra-company loan receivables and payables using the exchange rates required by U.S. GAAP. Management also quantified misstatements to its previously reported gains and losses on

174

foreign currency derivative contracts, which used foreign exchange rates determined under its historical exchange rate convention as inputs to the fair value measurements of those contracts. The Company recorded foreign exchange losses, net, of $37 million for the year ended December 31, 2019.

The principal considerations for our determination that performing procedures relating to foreign exchange gains and losses is a critical audit matter are a high degree of auditor judgment and subjectivity was necessary to evaluate the audit evidence obtained related to the Company's internal investigation into certain intra-Company transactions that impacted the Company's non-operating foreign exchange gains and losses, significant audit effort was necessary to evaluate the audit evidence relating to the foreign exchange gains and losses, and the audit effort involved the use of professionals with specialized skill and knowledge to assist in performing these procedures and evaluating the audit evidence obtained from these procedures. As described in the "Opinions on the Financial Statements and Internal Control over Financial Reporting" section, a material weakness was identified related to this matter.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included, among others, evaluating the scope and extent of management's quantification of the misstatements of foreign exchange gains and losses, testing management's calculation of the misstatements of foreign exchange gains and losses, agreeing foreign exchange rates used by management to third party sources, and agreeing a sample of foreign currency denominated cash balances, intra-Company loan receivables and payables, and foreign currency derivative contracts to source documents. Professionals with specialized skill and knowledge were used to assist in evaluating the audit evidence related to the scope and extent of management's quantification of the misstatements of foreign exchange gains and losses.

*Valuation Allowances on United States (U.S.) Foreign Tax Credit Carryforwards and Swiss Deferred Tax Assets*

As described in Note 14 to the consolidated financial statements, as of December 31, 2019, the Company has $1,707 million of total deferred tax assets, including $395 million of deferred tax assets for U.S. foreign tax credit carryforwards in the United States and $159 million of Swiss deferred tax assets which were established for a step-up in tax basis that resulted from the enactment of new tax laws in Switzerland during 2019. The deferred tax assets for U.S. foreign tax credit carryforwards and Swiss deferred tax assets are partially offset by valuation allowances of $180 million and $69 million, respectively. Management maintains valuation allowances unless it is more likely than not that all or a portion of the deferred tax asset will be realized. In determining whether a valuation allowance is warranted, management evaluates factors such as prior earnings history, expected future earnings, carryback and carryforward periods, and tax strategies that could potentially enhance the likelihood of realization of a deferred tax asset. After evaluating the 2017 Tax Act and related U.S. Treasury Regulations, any elections or other opportunities that may be available, and the future expiration of certain U.S. tax provisions that will impact the utilization of the Company's U.S. foreign tax credit carryforwards, management expects to be able to realize some, but not all, of the U.S. foreign tax credit deferred tax assets up to its overall domestic loss balance plus other recurring and non-recurring foreign inclusions. With regards to the Swiss deferred tax assets, management expects to realize some, but not all, of the Swiss deferred tax assets based principally on expected future earnings generated by the Swiss subsidiary during the period in which the tax basis may be amortized.

The principal considerations for our determination that performing procedures relating to the valuation allowances on U.S. foreign tax credit carryforwards and Swiss deferred tax assets is a critical audit matter are the significant judgment by management when developing assumptions related to expected future earnings, which in turn led to a high degree of auditor judgment, subjectivity and audit effort in performing procedures and evaluating evidence related to management's expected future earnings.

175

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls over the valuation allowances on U.S. foreign tax credit carryforwards and Swiss deferred tax assets, including controls over the development of assumptions related to expected future earnings. These procedures also included, among others, evaluating management's assessment of the realizability of the deferred tax assets, including evaluating the reasonableness of assumptions relating to expected future earnings during the applicable periods. Evaluating management's assumptions related to expected future earnings involved evaluating whether the assumptions used by management related to expected future earnings were reasonable considering the current and past performance of the Company and whether the assumptions were consistent with evidence obtained in other areas of the audit.

/s/ PricewaterhouseCoopers LLP
Chicago, Illinois
March 17, 2020

We have served as the Company's auditor since 1985.

176

**Item 9.** *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.*

None.

**Item 9A.** *Controls and Procedures.*

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)) as of December 31, 2019.

Based on that evaluation, Chief Executive Officer and our Chief Financial Officer concluded that, as of December 31, 2019, due to the material weakness in our internal control over financial reporting described below, our disclosure controls and procedures were not effective to provide reasonable assurance that the information we are required to disclose in the reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

*Management's Assessment of Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP).

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies may deteriorate.

Management performed an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2019. In making this assessment, management used the framework in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that assessment under the framework in *Internal Control-Integrated Framework (2013)*, management concluded that our internal control over financial reporting was not effective as of December 31, 2019.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements would not be prevented or detected on a timely basis.

We did not maintain effective controls over the accounting for certain foreign exchange gains and losses. Specifically, we did not have controls in place to monitor and quantify the difference between the foreign exchange gains and losses that we reported and the foreign exchange gains and losses that we would have reported using exchange rates determined in accordance with U.S. GAAP. Additionally, our policies and controls related to approvals and monitoring of intra-company transactions were insufficient to prevent or detect intra-company transactions undertaken solely for the purpose of generating foreign exchange gains or avoiding losses under our historical exchange rate convention. This material weakness resulted in the restatement of our consolidated financial statements as of December 31, 2018 and for the years ended December 31, 2018 and 2017 and each of the quarterly and year-to-date periods in the year ended December 31, 2018 and the first two quarters and related year-to-date interim period in the year ended December 31, 2019. Additionally, this material weakness could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

Because of this material weakness, management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2019.

177

The effectiveness of our internal control over financial reporting as of December 31, 2019 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

### *Remediation of the Material Weakness*

Management has been implementing changes to strengthen our internal controls over the accounting for foreign exchange gains and losses. These changes are intended to address the identified material weakness and enhance our overall control environment and include the ongoing activities described below.

- Exchange Rate Policy – We have discontinued the use of our historical exchange rate convention and are using the exchange rates determined in accordance with U.S. GAAP for purposes of measuring foreign currency transactions and remeasuring monetary assets and liabilities denominated in a foreign currency.
- Automated Feed – We have implemented an automated feed that extracts foreign exchange rates on a daily basis from a recognized third-party exchange rate source.
- Daily Rate Comparison – We have implemented a daily rate comparison control that extracts foreign exchange rates from (a) a third-party exchange rate source, (b) our treasury application, and (c) our enterprise resource planning (ERP) system and compares those rates in order to identify any potential differences and provide assurance that the correct rates were captured and are being used in our financial systems.
- Intra-company Transaction Approvals – We have updated our policies to require additional approvals of intra-company transactions and implemented a requirement that such transactions be supported by a documented business purpose.
- Personnel - We have made personnel changes including hiring a new treasurer from outside Baxter with more than thirty years of treasury experience and responsibility, including at four publicly traded companies. We have also hired another experienced treasury professional in a newly created director role responsible for treasury governance and controls. Additionally, we have created a treasury controller role within our accounting function and are continuing to add resources as appropriate to improve our financial reporting controls related to treasury activities.

While we believe that the above actions will ultimately remediate the material weakness, we intend to continue to refine those controls and monitor their effectiveness for a sufficient period of time prior to reaching any determination as to whether the material weakness has been remediated.

Notwithstanding the identified material weakness, management believes that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.

### *Changes in Internal Control over Financial Reporting*

As previously disclosed, we are currently implementing an upgrade to our ERP software. In connection with the ERP upgrade, we are updating the processes that constitute our internal control over financial reporting, as necessary. This normal course of business ERP upgrade is being implemented to remain current with the latest release of the software.

As previously disclosed, since 2017, we have been implementing a long-term business transformation project within the finance, human resources, purchasing and information technology functions which will further centralize and standardize business processes and systems across the company. We are transitioning some processes to our shared services centers while others have been moved to outsourced providers. This multi-year initiative will be conducted in phases and include modifications to the design and operation of controls over financial reporting.

Other than as described in the two preceding paragraphs and in the *Remediation of Material Weakness* section above, there have been no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended December 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Item 9B. *Other Information.*

New Almeida Offer Letter

178

On March 12, 2020, Baxter entered into a new offer letter with Mr. Almeida that replaced his prior offer letter. The terms of the new offer letter will be effective until December 31, 2023. Under the new letter, Mr. Almeida will continue to serve as Chairman of the Board and President and Chief Executive Officer of the Company. Mr. Almeida's base salary will remain $1,300,000 per annum. His target bonus and target long-term incentive opportunity were increased starting in 2020 commensurate with such compensation elements for Chief Executive Officers in Baxter's peer group. Specifically, Mr. Almeida's target bonus opportunity was increased from 145% of base salary to 165% of base salary, and his long-term incentive opportunity was increased from $10,000,000 to $11,000,000. Mr. Almeida remains eligible to receive benefits to the same extent and on the same terms as those benefits provided to other senior executives. The offer letter also continues to provide Mr. Almeida with the right to receive cash severance equal to two years' base salary and target bonus in the event of an involuntary termination without cause or termination with good reason prior to December 31, 2023. In addition, beginning with Mr. Almeida's 2020 equity award grants and for all future annual equity awards granted through the end of 2023, Mr. Almeida will be eligible to receive Baxter's equity award retirement treatment when he attains 60 years of age (as opposed to 65 years of age), which will provide for continued vesting of his stock option and PSU awards and a longer period of time to exercise his outstanding stock options upon his retirement.

In addition to these benefits, in accordance with the terms of his change of control agreement, Mr. Almeida remains eligible for certain payments in the event of his termination for good reason or termination without cause following a change in control. Mr. Almeida is also subject to certain restrictive covenants, including non-competition, non-solicitation of customers, suppliers and employees and non-disparagement.

The foregoing summary does not purport to be complete and is qualified in its entirety by reference to the full text of the offer letter, which is filed as Exhibit 10.23 to this Annual Report on Form 10-K and is incorporated into this filing by reference.

**PART III**

### Item 10. *Directors, Executive Officers and Corporate Governance.*

Refer to information under the captions entitled "Corporate Governance at Baxter International Inc. — Proposal 1 — Election of Directors," "— Directors Continuing in Office," "— Board of Directors — Nomination of Directors," "— Committees of the Board — Audit Committee," "— Board Responsibilities — Code of Conduct," and "Ownership of Our Stock — Section 16(a) Beneficial Ownership Reporting Compliance" in Baxter's definitive proxy statement to be filed with the Securities and Exchange Commission and delivered to stockholders in connection with the Annual Meeting of Stockholders expected to be held on May 5, 2020 (the Proxy Statement), all of which information is incorporated herein by reference. Also refer to information regarding executive officers of Baxter under the caption entitled "Executive Officers of the Registrant" in Part I of this Annual Report on Form 10-K.

### Item 11. *Executive Compensation.*

Refer to information under the captions entitled "Executive Compensation," and "Corporate Governance at Baxter International— Director Compensation" in the Proxy Statement, all of which information is incorporated herein by reference.

### Item 12. *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.*

The following table provides information relating to shares of common stock that may be issued under our existing equity compensation plans as of December 31, 2019.

179

| Plan Category | Number of Shares to be Issued upon Exercise of Outstanding Options, Warrants and Rights(a) | | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights(b) | | | Number of Shares Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Shares Reflected in Column(a)(b)) | |
|---|---|---|---|---|---|---|---|
| Equity Compensation Plans Approved by Stockholders | 22,507,640 | (1) | $ | 51.08 | (2) | 23,664,836 | (3) |
| Equity Compensation Plans Not Approved by Stockholders | 86,227 | (4) | $ | 28.97 | | — | |
| Total | 22,593,867 | (5) | $ | 50.99 | (2) | 23,664,836 | |

(1) Excludes purchase rights under the Employee Stock Purchase Plan. Under the Employee Stock Purchase Plan, eligible employees may purchase shares of common stock through payroll deductions of up to 15 percent of base pay at a purchase price equal to 85 percent of the closing market price on the purchase date (as defined by the Employee Stock Purchase Plan). A participating employee may not purchase more than $25,000 in fair market value of common stock under the Employee Stock Purchase Plan in any calendar year and may withdraw from the Employee Stock Purchase Plan at any time.

(2) Restricted stock units and performance share units are excluded when determining the weighted-average exercise price of outstanding options.

(3) Includes (i) 2,702,381 shares of common stock available for purchase under the Employee Stock Purchase Plan; (ii) 427,682 shares of common stock available under the 2007 Incentive Plan; (iii) 8,597,492 shares of common stock available under the 2011 Incentive Plan; and (iv) 11,937,281 shares of common stock available under the 2015 Incentive Plan.

(4) Includes shares of common stock issuable upon exercise of options granted under the 2001 Incentive Compensation Program. These shares were made available pursuant to an amendment thereto not approved by stockholders. These additional shares were approved by our Board of Directors, not our stockholders, although our stockholders have approved the 2001 Incentive Compensation Program.

(5) Includes outstanding awards of 20,343,699 stock options, which have a weighted-average exercise price of $50.99 and a weighted-average remaining term of 6.1 years, 1,274,436 shares of common stock issuable upon vesting of restricted stock units, and 929,665 shares of common stock reserved for issuance in connection with performance share unit grants.

Refer to information under the captions entitled "Ownership of Our Stock — Security Ownership by Directors and Executive Officers" and "— Security Ownership by Certain Beneficial Owners" in the Proxy Statement, all of which information is incorporated herein by reference.

**Item 13. *Certain Relationships and Related Transactions, and Director Independence*.**

Refer to the information under the first paragraph of the caption entitled "Corporate Governance—at Baxter International Inc.—Board of Directors" and the captions entitled "Corporate Governance at Baxter International Inc.—Board of Directors—Director Independence" and "Corporate Governance at Baxter International Inc.—Other Corporate Governance Information—Certain Relationships and Related Person Transactions" in the Proxy Statement, all of which information is incorporated herein by reference.

**Item 14. *Principal Accountant Fees and Services.***

Refer to the information under the caption entitled "Audit Matters — Audit and Non-Audit Fees" and "—Pre-Approval of Audit and Permissible Non-Audit Fees" in the Proxy Statement, all of which information is incorporated herein by reference.

**PART IV**

**Item 15. *Exhibits and Financial Statement Schedules.***

The following documents are filed as a part of this report:

|  | | Page Number |
|---|---|---:|
| (1) | Financial Statements: | |
| | Consolidated Balance Sheets | 49 |
| | Consolidated Statements of Income | 50 |
| | Consolidated Statements of Comprehensive Income | 51 |
| | Consolidated Statements of Changes in Equity | 52 |
| | Consolidated Statements of Cash Flows | 53 |
| | Notes to Consolidated Financial Statements | 54 |
| | Report of Independent Registered Public Accounting Firm | 173 |
| (2) | Schedules required by Article 12 of Regulation S-X: | |
| | Schedule II — Qualifying and Valuation accounts for each of the three years in the period ended December 31, 2019 | 188 |
| | All other schedules have been omitted because they are not applicable or not required. | |

(3) Exhibits required by Item 601 of Regulation S-K are listed in the Exhibit Index, which is incorporated herein by reference. Exhibits in the Exhibit Index marked with a "C" in the left margin constitute management contracts or compensatory plans or arrangements contemplated by Item 15(b) of Form 10-K.

**Item 16. *Form 10-K Summary.***

Not applicable.

181

**EXHIBIT INDEX**

Number and Description of Exhibit

| | |
|---|---|
| 2.1 | Separation and Distribution Agreement (incorporated by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, filed on July 7, 2015). |
| 3.1 | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed on May 10, 2013). |
| 3.2 | Certificate of Amendment to the Amended and Restated Certificate of Incorporation dated May 3, 2016 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed on May 4, 2016). |
| 3.3 | Bylaws, as amended and restated on November 13, 2018 (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K, filed on November 15, 2018). |
| 4.1(P) | Form of Common Stock Certificate of the Company (incorporated by reference to Exhibit(a) to the Company's Registration Statement on Form S-16 (Registration No. 02-65269), filed on August 17, 1979). |
| 4.2 | Indenture, dated August 8, 2006, between the Company and J.P. Morgan Trust Company, National Association, as Trustee (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed on August 9, 2006). |
| 4.3 | Second Supplemental Indenture, dated December 7, 2007, between the Company and The Bank of New York Trust Company, N.A. (as successor in interest to J.P. Morgan Trust Company, National Association), as Trustee (including form of 6.250% Senior Note due 2037) (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed on December 7, 2007). |
| 4.4 | Eighth Supplemental Indenture, dated August 13, 2012, between the Company and The Bank of New York Mellon Trust Company, N.A. (as successor in interest to J.P. Morgan Trust Company, National Association), as Trustee (including forms of 2.400% Senior Notes due 2022 and 3.650% Senior Notes due 2042) (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed on August 13, 2012). |
| 4.5 | Ninth Supplemental Indenture, dated June 11, 2013, between the Company and The Bank of New York Mellon Trust Company, N.A. (as successor in interest to J.P. Morgan Trust Company, National Association), as Trustee (including form of 4.500% Senior Notes due 2043) (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K, filed on June 11, 2013). |
| 4.6 | Tenth Supplemental Indenture, dated August 13, 2016, between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (including forms of 1.700% Senior Notes due 2021, 2.600% Senior Notes due 2026 and 3.500% Senior Notes due 2046) (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, filed on August 15, 2016). |
| 4.7 | Eleventh Supplemental Indenture, dated as of May 30, 2017, by and between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (including form of 1.300% Senior Notes due 2025) (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K, filed on May 30, 2017). |
| 4.8 | Twelfth Supplemental Indenture, dated as of May 15, 2019, by and between the Company and The Bank of New York Mellon Trust Company, N.A., as Trustee (including form of 0.400% Senior Notes due 2024 and form of 1.300% Senior Notes due 2029) (incorporated by reference to Exhibit 4.2 of the Company's Current Report on Form 8-K, filed on May 15, 2019). |
| 4.9* | Description of Securities Registered Under Section 12 of the Exchange Act |
| 10.1 | Five-Year Credit Agreement, dated as of July 1, 2015, among Baxter International Inc. as Borrower, JPMorgan Chase Bank, National Association, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K, filed on July 7, 2015). |
| 10.2 | Amendment No. 1 to the Five-Year Credit Agreement, dated as of October 26, 2015, among Baxter International Inc. as Borrower, JPMorgan Chase Bank, National Association, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on October 27, 2015). |
| 10.3* | Amendment No. 2 to the Five-Year Credit Agreement, dated as of October 31, 2019, among Baxter International Inc. as Borrower, JPMorgan Chase Bank, National Association, as Administrative Agent and certain other financial institutions named therein. |

Number and Description of Exhibit

10.4 Five-Year Credit Agreement, dated as of December 20, 2019, among Baxter International Inc. as Borrower, JPMorgan Chase Bank, National Association, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on December 20, 2019).

10.5 Credit Agreement, dated as of July 1, 2015, among Baxter Healthcare SA and Baxter World Trade SPRL, as Borrowers, J.P. Morgan Europe Limited, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K, filed on July 7, 2015).

10.6 Amendment No. 1 to the Credit Agreement, dated as of October 26, 2015, among Baxter Healthcare SA and Baxter World Trade SPRL, as Borrowers, J.P. Morgan Europe Limited, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed on October 27, 2015).

10.7* Amendment No. 1 to the Guaranty of the Credit Agreement, as amended, dated as of October 31, 2019, among Baxter International Inc., as Guarantor, J.P. Morgan Europe Limited, as Administrative Agent, and the various lenders thereto.

10.8* Waiver to Credit Agreement, dated as of October 31, 2019 among Baxter Healthcare SA and Baxter World Trade SPRL, as Borrowers, J.P. Morgan Europe Limited, as Administrative Agent and certain other financial institutions named therein.

10.9 Credit Agreement, dated as of December 20, 2019, among Baxter Healthcare SA and Baxter World Trade SPRL, as Borrowers, J.P. Morgan Europe Limited, as Administrative Agent and certain other financial institutions named therein (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed on December 20, 2019).

10.10 Tax Matters Agreement, dated as of June 30, 2015, by and between Baxter International Inc. and Baxalta Incorporated (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed on July 7, 2015).

10.11 Letter Agreement, dated as of January 11, 2016, by and among Baxter International Inc., Baxalta Incorporated and Shire plc. (Incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on January 11, 2016).

10.12 Support Agreement, dated as of September 29, 2015, by and among Baxter International Inc., Third Point LLC, Third Point Partners L.P., Third Point Partners Qualified L.P., Third Point Offshore Master Fund L.P., Third Point Ultra Master Fund L.P., Third Point Reinsurance Co. Ltd., Third Point Advisors LLC, Third Point Advisors II LLC, Daniel S. Loeb and Munib Islam (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on September 30, 2015).

C 10.13 Form of Indemnification Agreement entered into with directors and officers (incorporated by reference to Exhibit 10.8 to the Company's Annual Report on Form 10-K, filed on February 21, 2019).

C 10.14 Baxter International Inc. 2007 Incentive Plan (incorporated by reference to Appendix A to the Company's Definitive Proxy Statement on Schedule 14A, filed on March 20, 2007).

C 10.15 Baxter International Inc. Equity Plan for the 2007 Incentive Plan (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on March 16, 2007).

C 10.16 Baxter International Inc. 2011 Incentive Plan (incorporated by reference to Appendix B to the Company's Definitive Proxy Statement on Schedule 14A, filed on March 18, 2011).

C 10.17 Baxter International Inc. Equity Plan for the 2011 Incentive Plan (incorporated by reference to Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q, filed on May 3, 2011).

C 10.18 Baxter International Inc. 2015 Incentive Plan (incorporated by reference to Appendix A to the Company's Definitive Proxy Statement on Schedule 14A, filed on March 25, 2015).

C 10.19 Baxter International Inc. Equity Plan for the 2015 Incentive Plan (incorporated by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K, filed on July 7, 2015).

C 10.20 Baxter International Inc. Equity Plan for José E. Almeida under the 2015 Incentive Plan (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed on October 29, 2015).

Number and Description of Exhibit

| | |
|---|---|
| C 10.21 | Baxter International Inc. 2017 Equity Plan, effective as of March 2, 2017 (incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, filed on March 3, 2017). |
| C 10.22* | Baxter International Inc. 2020 Equity Plan, effective as of March 16, 2020. |
| C 10.23 | Baxter International Inc. Directors' Deferred Compensation Plan (amended and restated effective May 6, 2019) (incorporated by reference to Exhibit 10.16 to the Company's Quarterly Report on Form 10-Q, filed on May 8, 2019). |
| C 10.24 | Offer Letter between Baxter International Inc. and José E. Almeida, dated as of October 28, 2015 (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on October 29, 2015). |
| C 10.25* | Offer Letter between Baxter International Inc. and José E. Almeida, dated as of March 12, 2020. |
| C 10.26* | Offer letter between Baxter Healthcare SA and Cristiano Franzi, dated June 8, 2017. |
| C 10.27 | Form of Severance Agreement entered into with executive officers (incorporated by reference to Exhibit 10.11 to the Company's Annual Report on Form 10-K, filed on February 21, 2014). |
| C 10.28 | Baxter International Inc. Employee Stock Purchase Plan (as amended and restated effective July 1, 2011) (incorporated by reference to Appendix A to the Company's Definitive Proxy Statement on Schedule 14A, filed on March 18, 2011). |
| C 10.29 | First Amendment to Baxter International Inc. Employee Stock Purchase Plan (dated as of July 15, 2016) (incorporated by reference to Exhibit 10.27 to the Company's Annual Report on Form 10-K, filed on February 23, 2017). |
| C 10.30 | Baxter International Inc. Non-Employee Director Compensation Plan (as amended and restated effective January 1, 2018) (incorporated by reference to Exhibit 10.21 to the Company's Annual Report on Form 10-K, filed on February 21, 2019). |
| C 10.31 | Form of Non-Competition, Non-Solicitation and Confidentiality Agreement (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on April 14, 2017). |
| C 10.32*ᴿ | Commitment Agreement, dated as of October 4, 2019, by and among Baxter International Inc., The Prudential Insurance Company of America and State Street Global Advisors Trust Company, acting solely in its capacity as the independent fiduciary of the Baxter International Inc. and Subsidiaries Pension Plan. |
| C 10.33 | Baxter International Inc. and Subsidiaries Pension Plan (Amended and Restated effective January 5, 2018) (incorporated by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on January 8, 2018). |
| C 10.34* | First Amendment to the Baxter International Inc. and Subsidiaries Pension Plan. |
| C 10.35* | Second Amendment to the Baxter International Inc. and Subsidiaries Pension Plan. |
| C 10.36* | Baxter International Inc. and Subsidiaries Pension Plan II (Amended and Restated effective January 1, 2019). |
| C 10.37 | Baxter International Inc. and Subsidiaries Supplemental Pension Plan (Amended and Restated effective January 5, 2018) (incorporated by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K, filed on January 8, 2018). |
| C 10.38 | Baxter International Inc. and Subsidiaries Deferred Compensation Plan (Amended and Restated effective January 5, 2018) (incorporated by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K, filed on January 8, 2018). |
| 21* | Subsidiaries of Baxter International Inc. |
| 23* | Consent of PricewaterhouseCoopers LLP. |
| 31.1* | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as amended. |
| 31.2* | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as amended. |

184

185

186

Number and Description of Exhibit

32.1*    Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2*    Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

101.INS*    XBRL Instance Document

101.SCH*    XBRL Taxonomy Extension Schema Document

101.CAL*    XBRL Taxonomy Extension Calculation Linkbase Document

101.LAB*    XBRL Taxonomy Extension Label Linkbase Document

101.PRE*    XBRL Taxonomy Extension Presentation Linkbase Document

101.DEF*    XBRL Taxonomy Extension Definition Linkbase Document

_____

* Filed herewith.
*R Filed herewith with redactions.
C Management contract or compensatory plan or arrangement.
(P)            Paper exhibit

185

186

**SIGNATURES**

**Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.**

BAXTER INTERNATIONAL INC.


By:     /s/ José E. Almeida
_____

        José E. Almeida

        *Chairman and Chief Executive Officer*


DATE: March 17, 2020


**Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 17, 2020.**


186

| Signature | Title |
|---|---|
| /s/ José E. Almeida | Chairman and Chief Executive Officer |
| José E. Almeida | (principal executive officer) |
| /s/ James K. Saccaro | Executive Vice President and Chief Financial Officer |
| James K. Saccaro | (principal financial officer) |
| /s/ Brian C. Stevens | Senior Vice President, Chief Accounting Officer and Controller |
| Brian C. Stevens | (principal accounting officer) |
| /s/ Thomas F. Chen | Director |
| Thomas F. Chen | |
| /s/ John D. Forsyth | Director |
| John D. Forsyth | |
| /s/ James R. Gavin III, M.D., Ph.D. | Director |
| James R. Gavin III, M.D., Ph.D. | |
| /s/ Peter S. Hellman | Director |
| Peter S. Hellman | |
| /s/ Michael F. Mahoney | Director |
| Michael F. Mahoney | |
| /s/ Patricia B. Morrison | Director |
| Patricia B. Morrison | |
| /s/ Stephen N. Oesterle, M.D. | Director |
| Stephen N. Oesterle, M.D. | |
| /s/ Cathy R. Smith | Director |
| Cathy R. Smith | |
| /s/ Thomas T. Stallkamp | Director |
| Thomas T. Stallkamp | |
| /s/ Albert P. L. Stroucken | Director |
| Albert P. L. Stroucken | |
| /s/ Amy A. Wendell | Director |
| Amy A. Wendell | |

**SCHEDULE II – Qualifying and Valuation accounts for each of the three years in the period ended December 31, 2019**

| Valuation and Qualifying Accounts (in millions) | Balance at beginning of period | | Additions | | Deductions | | Balance at end of period | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Charged to costs and expenses | (Credited) charged to other accounts (1) | | | | |
| Year ended December 31, 2019: | | | | | | | | |
| Allowance for doubtful accounts | $ | 110 | 18 | (8) | (8) | $ | | 112 |
| Deferred tax asset valuation allowance | $ | 310 | 117 | — | (7) | $ | | 420 |
| Year ended December 31, 2018: | | | | | | | | |
| Allowance for doubtful accounts | $ | 120 | 4 | (7) | (7) | $ | | 110 |
| Deferred tax asset valuation allowance (as restated) | $ | 483 | 20 | (4) | (189) | $ | | 310 |
| Year ended December 31, 2017: | | | | | | | | |
| Allowance for doubtful accounts | $ | 127 | 4 | 8 | (19) | $ | | 120 |
| Deferred tax asset valuation allowance | $ | 150 | 350 | — | (17) | $ | | 483 |

_____
(1)      Valuation accounts of acquired or divested companies and foreign currency translation adjustments.

Reserves are deducted from assets to which they apply.

188

**EXHIBIT 4.9**

**BAXTER INTERNATIONAL INC.**

**DESCRIPTION OF SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934 AS OF DECEMBER 31, 2019**

The following is a summary description of each class of securities of Baxter International Inc. (the "Company") that is registered under Section 12 of the Securities and Exchange Act of 1934, as amended, as of December 31, 2019, consisting of (1) our Common Stock, (2) our 1.3% Senior Notes due 2025, (3) our 1.3% Senior Notes due 2029 and (4) our 0.4% Senior Notes due 2024.

In this summary, when we refer to the "Company," "we," "us" or "our" or when we otherwise refer to ourselves, we mean Baxter International Inc., excluding the Company's subsidiaries, unless otherwise expressly stated or as the context requires; all references to "common stock" refer only to common stock issued by the Company and not to any common stock issued by any subsidiary.

SC1:5167064.1A

**DESCRIPTION OF COMMON STOCK**

The following is a brief description of the material terms of the Company's common stock. The following summary does not purport to be complete and is qualified in its entirety by reference to the pertinent sections of the Company's Amended and Restated Certificate of Incorporation (as amended by the Certificate of Amendment to the Amended and Restated Certificate of Incorporation, the "Certificate of Incorporation") and the Company's Bylaws, as amended and restated on November 13, 2008 (the "Bylaws"), which are exhibits to the Annual Report of which this exhibit is a part. We encourage you to read the Charter and Bylaws and the applicable provisions of the General Corporation Law of Delaware for additional information.

**Authorized Capital Shares**

Under our Certificate of Incorporation, we have authority to issue 2,100,000,000 shares of capital stock, consisting of 2,000,000,000 shares of common stock, par value $1.00 per share, and 100,000,000 shares of preferred stock, no par value.

**Common Stock**

*Dividend Rights*

Subject to preferences that may apply to any shares of preferred stock outstanding at the time, the holders of our common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and then only at the times and in the amounts that our board of directors may determine. The ability of our board of directors to declare and pay dividends on our common stock is subject to the laws of the state of Delaware and the availability of funds.

*Voting Rights*

Each holder of our common stock is entitled to one vote for each share of record held on all matters submitted to a vote of stockholders, except as otherwise required by law and subject to the rights and preferences of the holders of any outstanding shares of our preferred stock. We have not provided for cumulative voting for the election of directors in our Certificate of Incorporation. On May 3, 2016, we amended our Certificate of Incorporation to eliminate classification of the board of directors. As of the 2018 annual meeting of stockholders, the board of directors is no longer classified under Section 141(d) of the Delaware General Corporation Law and directors are no longer divided into three classes.

*No Preemptive or Similar Rights*

Our common stock is not entitled to preemptive rights, and is not subject to conversion, redemption or sinking fund provisions.

*Right to Receive Liquidation Distributions*

Upon our liquidation, dissolution or winding-up, the assets legally available for distribution to our stockholders would be distributable ratably among the holders of our common stock and any participating preferred stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities.

The rights, preferences, and privileges of the holders of common stock are subject to, and may be adversely affected by, the rights of the holders of any series of preferred stock that we may designate

and issue in the future. As of the date of this prospectus, there are no shares of preferred stock outstanding.

*Section 203 of the Delaware General Corporation Law*

Baxter is subject to the provisions of Section 203 of the Delaware General Corporation Law. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a business combination with an interested stockholder for a period of three years after the date of the transaction in which the person became an interested stockholder, unless the business combination is approved in a prescribed manner or a certain level of stock is acquired upon consummation of the transaction in which the person became an interested stockholder. A business combination includes, among other things, a merger, asset sale or a transaction resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an interested stockholder is a person who, together with affiliates and associates, owns (or, in certain cases, within three years prior, did own) 15% or more of the corporation's outstanding voting stock. Under Section 203 of the Delaware General Corporation Law, a business combination between Baxter and an interested stockholder is prohibited during the relevant three-year period unless it satisfies one of the following conditions:

- prior to the time the stockholder became an interested stockholder, the Baxter board of directors approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- on consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of Baxter's voting stock outstanding at the time the transaction commenced (excluding, for purposes of determining the number of shares outstanding, shares owned by persons who are directors and officers); or

- the business combination is approved by the Baxter board of directors and authorized at an annual or special meeting of the stockholders by the affirmative vote of at least 66 2/3% of outstanding voting stock that is not owned by the interested stockholder.

*Certain Anti-Takeover Matters*

The Certificate of Incorporation and Bylaws include a number of provisions that may have the effect of encouraging persons considering unsolicited tender offers or other unilateral takeover proposals to negotiate with the Baxter board of directors rather than pursue non-negotiated takeover attempts. These provisions include:

Board of Directors

Vacancies and newly created seats on the board may be filled only by the board of directors. Subject to limitations contained in the Certificate of Incorporation, only the board of directors may determine the number of directors on the board of directors. The inability of stockholders to determine the number of directors or to fill vacancies or newly created seats on the board makes it more difficult to change the composition of the board of directors, but these provisions promote a continuity of existing management.

Advance Notice Requirements

The Bylaws establish advance notice procedures with regard to stockholder proposals and nomination of candidates for election as directors to be brought before meetings of Baxter stockholders. These procedures provide that notice of such stockholder proposals must be timely given in writing to the

corporate secretary prior to the meeting at which the action is to be taken. Generally, to be timely, notice must be received at the principal executive offices of Baxter not less than 90 days nor more than 120 days prior to the first anniversary date of the annual meeting for the preceding year. The notice must contain certain information specified in the Bylaws.

Special Meetings of Stockholders

The Bylaws provide that special meetings of the stockholders may be called by the chairman of the board, the chief executive officer or the corporate secretary at the direction of the board of directors, or at the request of holders of at least 25% of the shares of common stock outstanding at the time that would be entitled to vote at the meeting.

No Written Consent of Stockholders

The certificate of incorporation requires all stockholder actions to be taken by a vote of the stockholders at an annual or special meeting. The certificate of incorporation does not permit holders of common stock to act by written consent without a meeting.

Amendment of Bylaws and Certificate of Incorporation

Our Certificate of Incorporation may be amended pursuant to Section 242 of the Delaware General Corporation Law. Our Bylaws may be amended by affirmative vote of a majority of directors present at any meeting of the board of directors or by an affirmative vote of a majority of shares present in person or by proxy and entitled to vote on the matter at any regular meeting of the stockholders or any special meeting of the stockholders.

Blank Check Preferred Stock

The Certificate of Incorporation provides for one hundred million (100,000,000) authorized shares of preferred stock. The existence of authorized but unissued shares of preferred stock may enable the board of directors to render more difficult or to discourage an attempt to obtain control of Baxter by means of a merger, tender offer, proxy contest or otherwise. For example, if in the due exercise of its fiduciary obligations, the board of directors were to determine that a takeover proposal is not in the best interests of Baxter or otherwise determines it is in the best interests of Baxter to issue preferred stock, the board of directors could cause shares of preferred stock to be issued without stockholder approval in one or more private offerings or other transactions that might dilute the voting or other rights of the proposed acquirer or insurgent stockholder or stockholder group. In this regard, the Certificate of Incorporation grants the board of directors broad power to establish the rights and preferences of authorized and unissued shares of preferred stock. The issuance of shares of preferred stock could decrease the amount of earnings and assets available for distribution to holders of shares of common stock, as dividends payable to preferred stockholders are typically senior to those that may be declared on shares of common stock. The issuance may also adversely affect the rights and powers, including voting rights, of such holders and may have the effect of delaying, deterring or preventing a change in control. The board of directors currently does not intend to seek stockholder approval prior to any issuance of shares of preferred stock, unless otherwise required by law.

-4-

*Limitations on Directors' Liability*

Section 145 of the General Corporation Law of the State of Delaware, as amended, provides that under certain circumstances a corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in right of the corporation), by reason of the fact that such person is or was a director, officer, employee or agent of the corporation or is or was serving at its request in such capacity in another corporation or business association, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The statute provides that indemnification pursuant to its provisions is not exclusive of other rights of indemnification to which a person may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise. Article NINTH of Baxter's Certificate of Incorporation provides that Baxter shall indemnify directors and officers of Baxter and its subsidiaries against certain liabilities that may arise as a result of such service to the fullest extent permitted by the General Corporation Law of the State of Delaware.

Baxter is also empowered by Section 102(b)(7) of the General Corporation Law of the State of Delaware to include a provision in its certificate of incorporation to limit under certain circumstances a director's liability to Baxter or its stockholders for monetary damages for breaches of fiduciary duty as a director. Article EIGHTH of Baxter's Certificate of Incorporation states that to the fullest extent permitted by the General Corporation Law of Delaware as the same exists or may hereafter be amended, directors of Baxter shall not be liable to Baxter or its stockholders for monetary damages for breach of fiduciary duty as a director. Under currently applicable Delaware law, directors will remain liable for damages for (i) a breach of their duty of loyalty to Baxter and its stockholders; (ii) acts or omissions not in good faith; (iii) their intentional misconduct or knowing violation of law; (iv) unlawful dividend payments, stock repurchases or redemptions; and (v) any transaction from which the director derived an improper personal benefit.

*Listing*

The Common Stock is listed on The New York Stock Exchange under the trading symbol "BAX".

-5-

## DESCRIPTION OF 1.3% SENIOR NOTES DUE 2025

The Company previously filed a registration statement on Form S-3 (File No. 333-207810), which was filed with the Securities and Exchange Commission on November 14, 2015 and covers the issuance of the Company's 1.3% Senior Notes due 2025. The following description of our 1.3% Senior Notes is a summary and does not purport to be complete. It is subject to and qualified in its entirety by reference to the indenture, dated as of August 8, 2006 (the "Base Indenture"), between Baxter International Inc. and J.P. Morgan Trust Company, N.A., as trustee, as supplemented by the eleventh supplemental indenture, dated as of May 30, 2017, which is incorporated by reference as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.9 is a part.

We encourage you to read the above referenced indenture, as supplemented, for additional information.

### General

We initially issued a total of €600,000,000 aggregate principal amount of notes that will mature on May 30, 2025. We may, from time to time, without the consent of the holders of the notes, issue additional notes on terms and conditions substantially identical to those of the notes (except for the issue date and, in some cases, the initial interest payment date), so that such additional notes will increase the aggregate principal amount of, and will be consolidated and form a single series with, the notes and will otherwise have the same terms as the notes.

We issued the notes in registered form represented by one or more global notes registered in the name of a nominee of, and deposited with, a common depositary for Euroclear and Clearstream, Luxembourg (which we may refer to along with its successors in such capacity as the common depositary). The notes were issued exclusively in registered form and in the minimum denomination of €100,000, and in integral multiples of €1,000 in excess thereof.

The notes are not subject to a sinking fund provision.

### Interest Rate

The notes bear interest at a rate of 1.300% per annum. Interest on the notes shall be payable annually in arrears on May 30 of each year, beginning on May 30, 2018. We will make each interest payment to the holders in whose names the notes are registered at the close of business on the date that is (i) in the case of notes represented by a global note, the clearing system business day (which, for these purposes, is a day on which Euroclear and Clearstream, Luxembourg settle payments in euros) immediately prior to the relevant interest payment date and (ii) in all other cases, 15 calendar days prior to the relevant interest payment date (whether or not a business day) (for the purposes of clauses (i) and (ii), such day, the "Record Date").

Interest on the notes shall be computed on the basis of the actual number of days in the period for which interest is being calculated and the actual number of days from and including the last date on which interest was paid on the notes (or from May 30, 2017, if no interest has been paid on the notes) to, but excluding, the next scheduled interest payment date. This payment convention is referred to as ACTUAL/ACTUAL (ICMA) (as defined in the rulebook of the International Capital Market Association).

### Ranking

The notes are our direct, unsecured and unsubordinated obligations and will rank equal in priority of payment with all of our other existing and future unsecured and unsubordinated indebtedness, and senior in right of payment to any future subordinated indebtedness. In addition to the notes, we may issue

other series of debt securities under the indenture. There is no limit on the total aggregate principal amount of debt securities that we can issue under the indenture.

The notes will be structurally subordinated to all indebtedness and other liabilities, including trade payables, of our subsidiaries.

## Issuance in Euros

Initial holders of the notes were required to pay for the notes in euros, and principal, premium, if any, and interest payments and additional amounts, if any, in respect of the notes will be payable in euros, except as described below.

If the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or the euro is no longer used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of transactions by public institutions within the international banking community, then all payments in respect of the notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euros will be converted to U.S. dollars on the basis of the most recently available market exchange rate for euros, as determined by us in our sole discretion. Any payment in respect of the notes so made in U.S. dollars will not constitute an event of default under the indenture or the notes. Neither the trustee nor the paying agent will be responsible for obtaining exchange rates, effecting conversions or otherwise handling redenominations.

## Payment of Additional Amounts

All payments in respect of the notes will be made by or on behalf of us without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature, imposed or levied by the United States or any taxing authority thereof or therein, unless such withholding or deduction is required by law. If such withholding or deduction is required by law, we will pay to a beneficial owner who is not a United States person (as defined below) such additional amounts on the notes as are necessary in order that the net payment of the principal of, and premium or redemption price, if any, and interest on, such notes to such beneficial owner, after such withholding or deduction (including any withholding or deduction on such additional amounts), will not be less than the amount provided in such notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts will not apply:

1. to any tax, assessment or other governmental charge that would not have been imposed but for the beneficial owner, or a fiduciary, settlor, beneficiary, member or shareholder of the beneficial owner if the beneficial owner is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as (i) having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of such notes, the receipt of any payment or the enforcement of any rights thereunder), including being or having been a citizen or resident of the United States, or being or having been engaged in a trade or business in the United States or having or having had a permanent establishment in the United States; (ii) being a controlled foreign corporation related to Baxter directly, indirectly or constructively through stock ownership for U.S. federal income tax purposes; (iii) being an owner of a 10% or greater interest in voting stock of Baxter within the meaning of Section 871(h)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or any successor provision; or (iv) being a bank receiving payments on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business;

2. to any holder that is not the sole beneficial owner of such notes, or a portion of such notes, or that is a fiduciary, partnership or limited liability company, but only to the extent that a

-7-

beneficiary or settlor with respect to the fiduciary, a beneficial owner or a member of the partnership or limited liability company would not have been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly from Baxter its beneficial or distributive share of the payment;

3.  to any tax, assessment or other governmental charge imposed by reason of the holder's or beneficial owner's past or present status as a passive foreign investment company, a controlled foreign corporation, a foreign tax exempt organization or a personal holding company with respect to the United States or as a corporation that accumulates earnings to avoid U.S. federal income tax;

4.  to any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or beneficial owner of the applicable notes to comply with any applicable certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such notes, if compliance is required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

5.  to any tax, assessment or other governmental charge that is imposed otherwise than by withholding or deducting from the payment;

6.  to any estate, inheritance, gift, sales, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge;

7.  to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any such note, if such payment can be made without such withholding by at least one other paying agent;

8.  to any tax, assessment or other governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later;

9.  to any tax, assessment or other governmental charge that would have been imposed but for presentation by the holder of any note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later, except to the extent that the holder or beneficial owner thereof would have been entitled to additional amounts had the note been presented for payment on the last day of such 30 day period;

10. to any withholding or deduction that is imposed on a payment pursuant to Sections 1471 through 1474 of the Code and related Treasury regulations and pronouncements or any successor provisions thereto (that are substantively comparable and not materially more onerous to comply with) and any regulations or official law, agreement or interpretations thereof in any jurisdiction implementing an intergovernmental approach thereto; or

11. in the case of any combination of the above listed items.

Except as specifically provided under this heading "—Payment of Additional Amounts," we will not be required to make any payment for any present or future tax, duty, assessment or governmental charge of whatever nature imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

-8-

As used under this heading "—Payment of Additional Amounts" and under the heading "—Redemption for Tax Reasons" the term "United States" means the United States of America, any state thereof, and the District of Columbia, and the term "United States person" means (i) any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States, any state thereof or the District of Columbia (other than a partnership that is not treated as a United States person for U.S. federal income tax purposes), (iii) any estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) any trust if a U.S. court can exercise primary supervision over the administration of the trust and one or more United States persons can control all substantial trust decisions, or if a valid election is in place to treat the trust as a United States person.

**Optional Redemption**

The notes, at any time prior to the date that is three months prior to their maturity date (the "Par Call Date"), will be redeemable in whole at any time or in part, from time to time, at our option, at a "make-whole" redemption price equal to the greater of (1) 100% of the principal amount of the notes to be redeemed plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption, and (2) the sum of the present values of the principal amount of the notes to be redeemed and the scheduled payments of interest thereon (exclusive of interest accrued to the date of redemption) from the redemption date to the Par Call Date, discounted to the date of redemption on an annual basis (ACTUAL/ACTUAL (ICMA)) at the applicable Comparable Government Bond Rate, as defined below, plus 20 basis points, plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption. We shall calculate the redemption price.

On or after the date that is three months prior to their maturity date, the notes will be redeemable in whole at any time or in part, from time to time, at our option, at a redemption price equal to 100% of the principal amount of the notes to be redeemed, plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption.

"*Comparable Government Bond*" means, in relation to any Comparable Government Bond Rate (as defined below) calculation, at the discretion of the Independent Investment Bank (as defined below) selected by us, a bond that is a direct obligation of the Federal Republic of Germany ("German government bond"), whose maturity is closest to the Par Call Date, or if the Independent Investment Bank in its discretion determines that such similar bond is not in issue, such other German government bond as the Independent Investment Bank may, with the advice of three brokers of, and/or market makers in, German government bonds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

"*Comparable Government Bond Rate*" means the yield to maturity, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), on the third business day in London prior to the date fixed for redemption, of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 a.m. (London time) on such business day as determined by the Independent Investment Bank selected by us.

"*Independent Investment Bank*" means one of the Reference Treasury Dealers that we shall appoint to act as the Independent Investment Bank.

"*Reference Treasury Dealers*" means Deutsche Bank Aktiengesellschaft, Goldman Sachs & Co. LLC and J.P. Morgan Securities plc (or their respective affiliates that are Primary Treasury Dealers (as defined below)) and their respective successors; provided, however, that if any of the foregoing shall cease to be a broker or dealer of, and/or market maker in, German government bonds (a "Primary Treasury Dealer"), we will substitute therefor another Primary Treasury Dealer.

To exercise our option to redeem the notes, we will give each holder of notes to be redeemed a notice in writing at least 30 days but not more than 60 days before the redemption date (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes to be so redeemed, or (ii) in the case of definitive notes, to each holder of record of the notes to be redeemed at its registered address. If we elect to redeem fewer than all the notes, the trustee will select the particular notes to be redeemed by such method as the trustee deems fair and appropriate and in accordance with the indenture, subject to applicable procedures of Euroclear and Clearstream, Luxembourg as to global notes.

Unless a default occurs in payment of the redemption price, from and after the redemption date interest will cease to accrue on the notes or portions thereof called for redemption.

**Redemption for Tax Reasons**

If, as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated under the laws) of the United States (or any taxing authority thereof or therein), or any change in, or amendments to, an official position regarding the application or interpretation of such laws, regulations or rulings, which change or amendment is announced or becomes effective on or after the date of this prospectus supplement, we become or, based upon a written opinion of independent tax counsel of recognized standing selected by us, will become obligated to pay additional amounts as described herein under the heading "—Payment of Additional Amounts" with respect to the notes, then we may at our option redeem the notes at any time, in whole, but not in part, having given not less than 30 nor more than 60 days prior notice, (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes to be redeemed, or (ii) in the case of definitive notes, to each holder of record of the notes to be redeemed at its registered address, at a redemption price equal to 100% of the principal amount, plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption.

**Offer to Purchase Upon Change of Control Triggering Event**

If a Change of Control Triggering Event occurs, other than with respect to notes for which we have exercised our option to redeem as described above, we will be required to make an offer (the "Change of Control Offer") to each holder of the notes to repurchase all or any part (equal to €100,000 and integral multiples of €1,000 in excess thereof) of that holder's notes on the terms set forth in the notes. In the Change of Control Offer, we will be required to offer payment in cash equal to 101% of the aggregate principal amount of notes to be repurchased, plus accrued and unpaid interest (including any additional amounts), if any, on the notes to be repurchased to, but excluding, the date of repurchase (the "Change of Control Payment"). Within 30 days following any Change of Control Triggering Event or, at our option, prior to any Change of Control, but after public announcement of the transaction that constitutes or may constitute the Change of Control, we will give notice, (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes, or (ii) in the case of definitive notes, to each holder of record of the notes at its registered address, with a copy to the trustee describing the transaction that constitutes or may constitute the Change of Control Triggering Event and offering to repurchase such notes on the date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is given (the "Change of Control Payment Date"). The notice will, if given prior to the date of consummation of the Change of Control, state that the offer to purchase is conditioned on the Change of Control Triggering Event occurring on or prior to the Change of Control Payment Date.

On the Change of Control Payment Date, we will, to the extent lawful:

•   accept for payment all notes or portions of notes properly tendered pursuant to the Change of Control Offer;

-10-

- deposit with the paying agent an amount equal to the Change of Control Payment in respect of all notes or portions of notes properly tendered; and

- deliver or cause to be delivered to the trustee such notes properly accepted together with an officers' certificate stating the aggregate principal amount of notes or portions of notes being repurchased.

We will not be required to comply with the obligations relating to repurchasing the notes if a third party instead satisfies them. In addition, we will not repurchase any notes if there has occurred and is continuing on the Change of Control Payment Date an event of default under the indenture with respect to such notes, other than a default in the payment of the Change of Control Payment upon a Change of Control Triggering Event.

We will comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and any other securities laws and regulations applicable to the repurchase of the notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any such securities laws or regulations conflict with the change of control offer provisions of the notes, we will comply with those securities laws and regulations and will not be deemed to have breached our obligations under the change of control offer provisions of the notes by virtue of any such conflict.

If a Change of Control Offer is made, there can be no assurance that we will have available funds sufficient to make the Change of Control Payment for all of the notes that may be tendered for repurchase. See "Risk Factors—We may not be able to repurchase all of the notes upon a change of control triggering event, which would result in a default under the notes."

For purposes of the change of control offer provisions of the notes, the following terms will be applicable:

"*Change of Control*" means the occurrence of any of the following: (1) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one of our subsidiaries, becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of our Voting Stock or other Voting Stock into which our Voting Stock is reclassified, consolidated, exchanged or changed, measured by voting power rather than number of shares, (2) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of our assets and the assets of our subsidiaries, taken as a whole, to one or more "persons" (as that term is defined in the indenture), other than us or one of our subsidiaries or (3) the adoption of a plan relating to our liquidation or dissolution. Notwithstanding the foregoing, a transaction will not be deemed to be a Change of Control if (1) we become a direct or indirect wholly-owned subsidiary of a holding company and (2)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of our Voting Stock immediately prior to that transaction or (B) immediately following that transaction no "person" (as that term is used in Section 13(d)(3) of the Exchange Act) (other than a holding company satisfying the requirements of this sentence) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"*Change of Control Triggering Event*" means the occurrence of both a Change of Control and a Rating Event.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, and the equivalent investment grade credit rating from any replacement Rating Agency or Rating Agencies.

-11-

"*Moody's*" means Moody's Investors Service, Inc.

"*Rating Agencies*" means (1) each of Moody's and S&P, and (2) if either Moody's or S&P ceases to rate the notes or fails to make a rating of the notes publicly available for reasons outside of our control, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act selected by us (as certified by a resolution of our board of directors) as a replacement agency for Moody's or S&P, or both of them, as the case may be.

"*Rating Event*" means the rating on the notes is lowered by each of the Rating Agencies and the notes are rated below an Investment Grade Rating by each of the Rating Agencies on any day within the 60-day period (which 60-day period will be extended so long as the rating of the notes is under publicly announced consideration for a possible downgrade by any of the Rating Agencies but no longer than 180 days) after the earlier of (1) the occurrence of a Change of Control and (2) public notice of our intention to effect a Change of Control; provided, however, that a Rating Event otherwise arising by virtue of a particular reduction in rating will not be deemed to have occurred in respect of a particular Change of Control (and thus will not be deemed a Rating Event for purposes of the definition of Change of Control Triggering Event) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm to us in writing at our request that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control has occurred at the time of the Rating Event).

"*S&P*" means S&P Global Ratings, a division of S&P Global, Inc.

"*Voting Stock*" means, with respect to any specified "person" (as that term is used in Section 13(d)(3) of the Exchange Act), as of any date, the capital stock of such person that is at the time entitled to vote generally in the election of the board of directors of such person.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition, in one or a series of related transactions, of "all or substantially all" of our assets and the assets of our subsidiaries, taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of such phrase under applicable law. Accordingly, the ability of a holder of the notes to require us to repurchase that holder's notes as a result of the sale, transfer, conveyance or other disposition of less than all of our assets and the assets of our subsidiaries, taken as a whole, to one or more persons may be uncertain.

Our obligation to purchase the notes following a Change of Control Triggering Event is subject to the provisions described in the accompanying prospectus described in the section entitled "Description of Debt Securities—Defeasance and Covenant Defeasance."

**Book-Entry Procedures, Delivery and Form**

The notes were issued in the form of one or more permanent global notes in fully registered, book-entry form. The global notes are registered in the name of a nominee of, and deposited with, a common depositary for Euroclear and Clearstream, Luxembourg. The notes were not issued in a form that would, on the date of this prospectus supplement, enable them to satisfy the European Central Bank's criteria to be recognized as eligible collateral for Eurosystem monetary policy and intra-day credit operations by the Eurosystem. Any such recognition in the future will depend upon the European Central Bank being satisfied that the Eurosystem eligibility criteria then in effect have been met.

Except as set forth below, the global notes may be transferred, in whole and not in part, only to another nominee of Euroclear or Clearstream, Luxembourg. Beneficial interests in the global notes may not be exchanged for definitive notes except in the limited circumstances described below. See "—

-12-

Exchange of Global Notes for Definitive Notes." Except in the limited circumstances described below, owners of beneficial interests in the global notes will not be entitled to receive definitive notes.

**Global Clearance and Settlement**

The description in this section reflects our understanding of the rules and procedures of Euroclear and Clearstream, Luxembourg as they are in effect as of the date of this prospectus supplement. Those systems could change their rules and procedures at any time.

Beneficial interests in the global notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as accountholders in Euroclear and Clearstream, Luxembourg (together, the "ICSDs"). Investors may hold interests in the global notes through either Euroclear or Clearstream, Luxembourg, either directly if they are accountholders in such systems, or indirectly through organizations that are accountholders in such systems.

Euroclear and Clearstream, Luxembourg each holds securities of institutions that have accounts with the ICSD ("participants") and facilitates the clearance and settlement of securities transactions among their participants in such securities by electronic book-entry transfer between their respective participants, thereby eliminating the need for physical movement of securities certificates. The ICSDs' participants include securities brokers and dealers (which may include the underwriters), banks, trust companies, clearing corporations and certain other organizations. Access to the ICSDs' book-entry system is also available to others such as banks, brokers, dealers and trust companies ("indirect participants") that clear through or maintain a custodial relationship with a participant, whether directly or indirectly. Euroclear and Clearstream, Luxembourg provide various services including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Clearstream, Luxembourg also deal with domestic securities markets in several countries through established depository and custodial relationships. Euroclear and Clearstream, Luxembourg have established an electronic bridge between their two systems across which their respective participants may settle trades with each other.

We expect that pursuant to procedures established by the ICSDs, upon the deposit of the global notes with the common depositary, the ICSDs will credit, on their book-entry registration and transfer systems, the interest in the notes represented by such global notes to the accounts of participants. The accounts to be credited shall be designated by the underwriters of the notes. Ownership of beneficial interests in the global notes will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in the global notes will be shown on, and the transfer of those ownership interests will be effected only through, records maintained by the ICSDs (with respect to participants' interests) and such participants and indirect participants (with respect to the owners of beneficial interests in the global notes other than participants).

So long as the nominee of the common depositary is the registered holder and owner of the global notes, such nominee will be considered the sole legal owner and holder of the notes evidenced by the global notes for all purposes of such notes. Except as set forth below, as an owner of a beneficial interest in the global notes, you will not be entitled to have the notes represented by the global notes registered in your name, will not receive or be entitled to receive physical delivery of definitive notes and will not be considered to be the owner or holder of any notes under the global notes. We understand that under existing industry practice, in the event an owner of a beneficial interest in the global notes desires to take any action that the nominee of the common depositary, as the holder of the global notes, is entitled to take, the common depositary will authorize the participants to take such action, and that the participants will authorize beneficial owners owning through such participants to take such action or would otherwise act upon the instructions of beneficial owners owning through them.

All payments on notes represented by the global notes registered in the name of the nominee of the common depositary will be made to the ICSDs or the nominee of the common depositary, as the case

-13-

may be, as the registered owner and holder of the global notes, and our obligations to make payment on notes will, to the extent of such payments to the ICSDs or, as the case may be, the nominee of the common depositary, be discharged.

We expect that the ICSDs, upon receipt of any payment on the global notes, will credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the global notes as shown on the records of the ICSDs. We also expect that payments by participants or indirect participants to owners of beneficial interests in the global notes held through such participants or indirect participants will be governed by standing instructions and customary practices and will be the responsibility of such participants or indirect participants. We will not have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interests in the global notes for any notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or for any other aspect of the relationship between the ICSDs and their participants or indirect participants or the relationship between such participants or indirect participants and the owners of beneficial interests in the global notes owning through such participants or indirect participants.

Although the ICSDs customarily operate the foregoing procedures in order to facilitate transfers of interests in the global notes among participants or indirect participants of the ICSDs, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither we nor the trustee will have any responsibility or liability for the performance by either ICSD or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Secondary Transfers**

Transfers of any interests in notes represented by a global note within Euroclear and Clearstream, Luxembourg will be effected in accordance with the customary rules and operating procedures of the relevant clearing system.

On or after the issue date of the notes, transfers of notes represented by a global note between accountholders in Clearstream, Luxembourg and Euroclear will generally have a settlement date three clearing system business days (which, for these purposes, is a day on which Euroclear and Clearstream, Luxembourg settle payments in euro) after the trade date (T+3).

None of the us, the trustee, the paying agent or any underwriter will be responsible for any performance by Euroclear or Clearstream, Luxembourg or their accountholders of their respective obligations under the rules and procedures governing their operations and none of them will have any liability for any aspect of the records relating to or payments made on account of beneficial interests in the notes represented by a global note or for maintaining, supervising or reviewing any records relating to such beneficial interests.

**Same-Day Settlement and Payment**

We will make payments in respect of the notes represented by the global notes (including principal, premium, if any, and interest and additional amounts, if any) by wire transfer of immediately available funds to the account specified by the paying agent; provided, however, that at our option payment in respect of definitive notes may be made by (1) check mailed to the address of the person entitled thereto as such address shall appear in the security register on the Record Date or (2) wire transfer as directed by the holder of the relevant notes, in immediately available funds to accounts maintained by the holder of notes or its nominee; provided further that in the case of a definitive note (x) the holder thereof shall have provided written wiring instructions to the paying agent on or before the related Record Date and (y) if appropriate instructions for any such wire transfer are not received by the

-14-

related Record Date, then such payment shall be made by check mailed to the address of such holder specified in the security register on the Record Date.

If the principal of or any premium or interest or additional amounts on the notes or amounts payable upon any redemption of the notes is payable on a day that is not a Payment Business Day, the payment will be made on the following Payment Business Day without the accrual of any interest on that payment.

For these purposes "Payment Business Day" means any day that is:

1. a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in New York City and the City of London and, in the case of definitive notes only, the relevant place of presentation; and

2. a day on which the TARGET 2 System is open for the settlement of payment in euros.

For these purposes "TARGET 2 System" means the Trans-European Automatic Real-Time Gross Settlement Express Transfer (TARGET 2) System (or any successor thereto).

**Exchange of Global Notes for Definitive Notes**

We will issue definitive notes upon surrender of the global notes in accordance with their terms only if:

1. an Event of Default has occurred and is continuing; or

2. either Euroclear or Clearstream, Luxembourg is closed for business for a continuous period of 14 days or more (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so and no alternative clearing system satisfactory to the trustee is available; or

3. we would suffer a disadvantage as a result of a change in laws or regulations (taxation or otherwise) or as a result of a change in the practice of Euroclear and/or Clearstream, Luxembourg which would not be suffered were the notes in definitive form and a certificate to such effect signed by one of our authorized signatories is given to the trustee.

Thereupon (in the case of (a) or (b) above) the holder of a global note (acting on behalf of one or more of the accountholders) or the trustee may give notice to us and (in the case of (c) above) we may give notice to the trustee and the noteholders, of our intention to exchange a global note for definitive notes on or after the Exchange Date (as defined below).

On or after the Exchange Date the holder of the global note may, or in the case of (c) above, shall surrender it to or to the order of the trustee or registrar. In exchange for the global note, we shall deliver, or procure the delivery of, an equal aggregate principal amount of definitive notes, security printed in accordance with any applicable legal and stock exchange requirements. On exchange of the global note, we will procure that it is cancelled.

For these purposes, "Exchange Date" means a day specified in the notice requiring exchange falling not less than 60 days after that on which the notice requiring exchange is given and being a day on which banks are open for general business in London, the place in which the specified office of the trustee is located and, except in case of exchange pursuant to (b) above, in the place in which Euroclear and Clearstream, Luxembourg are located.

-15-

In all cases, definitive notes delivered in exchange for any global note or beneficial interest in any global note will be registered in the names, and issued in any approved denominations, requested by or on behalf of the holder of the relevant global notes, provided that the denomination of any definitive note may not, at any time, be less than €100,000.

Neither we nor the trustee will be liable for any delay by the holder of the relevant global notes identifying the holders of beneficial interests in the global notes, and each such person may conclusively rely on, and will be protected in relying on, instructions from Euroclear or Clearstream, Luxembourg for all purposes (including with respect to the registration and delivery, and the respective principal amounts, of the definitive notes to be issued).

## Certain Covenants

Unless otherwise indicated in the prospectus supplement, Baxter will not, and will not cause or permit any restricted subsidiary to, create, incur, assume or guarantee any indebtedness that is secured by a security interest in any principal facilities of Baxter or any restricted subsidiary or in shares of stock owned directly or indirectly by Baxter in any restricted subsidiary or in indebtedness for money borrowed by one of its restricted subsidiaries from Baxter or another of the restricted subsidiaries ("secured debt") unless the debt securities then outstanding and any other indebtedness of or guaranteed by Baxter or such restricted subsidiary then entitled to be so secured is secured equally and ratably with or prior to any and all other obligations and indebtedness thereby secured, with exceptions as listed in the indenture. These restrictions do not apply to indebtedness secured by:

- any security interest on any property which is a parcel of real property at a manufacturing plant, a warehouse or an office building and which is acquired, constructed, developed or improved by Baxter or a restricted subsidiary, which security interest secures or provides for the payment of all or any part of the acquisition cost of the property or the cost of the construction, development or improvement of the property and which security interest is created prior to, at the same time as, or within 120 days after (i) in the case of the acquisition of property, the completion of the acquisition of the property and (ii) in the case of construction, development or improvement of property, the later to occur of the completion of such construction, development or improvement or the commencement of operation, use or commercial production of the property

- any security interest on property existing at the time of the acquisition of such property by Baxter or a restricted subsidiary which security interest secures obligations assumed by Baxter or a restricted subsidiary;

- any security interest arising from conditional sales agreements or title retention agreements with respect to property acquired by Baxter or any restricted subsidiary; • security interests existing on the property or on the outstanding shares or indebtedness of a corporation or firm at the time the corporation or firm becomes a restricted subsidiary or is merged or consolidated with Baxter or a restricted subsidiary or at the time the corporation or firm sells, leases or otherwise disposes of its property as an entirety or substantially as an entirety to Baxter or a restricted subsidiary;

- security interests securing indebtedness of a restricted subsidiary to Baxter or to another restricted subsidiary;

- mechanics' and other statutory liens arising in the ordinary course of business in respect of obligations which are not due or which are being contested in good faith; • security interests arising by reason of deposit with, or the giving of any form of security to, any governmental agency which is required by law as a condition to the transaction of any business;

-16-

- security interests for taxes, assessments or governmental charges or levies not yet delinquent or security interests for taxes, assessments or governmental charges or levies already delinquent but which are being contested in good faith; • security interests arising in connection with legal proceedings, including judgment liens, so long as the proceedings are being contested in good faith and, in the case of judgment liens, the execution has been stayed;

- landlords' liens on fixtures leased by Baxter or a restricted subsidiary in the ordinary course of business;

- security interests arising in connection with contracts and subcontracts with or made at the request of the United States, any state, or any department, agency or instrumentality of the United States or any state;

- security interests that secure an obligation issued by the United States or any state, territory or possession of the United States or any of their political subdivisions or the District of Columbia, in connection with the financing of the cost of construction or acquisition of a principal facility or a part of a principal facility;

- security interests by reason of deposits to qualify Baxter or a restricted subsidiary to conduct business, to maintain self-insurance, or to obtain the benefits of, or comply with, laws;

- the extension of any security interest existing on the date of the indenture on a principal facility to additions, extensions or improvements to the principal facility and not as a result of borrowing money or the securing of indebtedness incurred after the date of the indenture; or

- any extension, renewal or refunding, or successive extensions, renewals or refundings, in whole or in part of any secured debt secured by any security interest listed above, provided that the principal amount of the secured debt secured thereby does not exceed the principal amount outstanding immediately prior to the extension, renewal or refunding and that the security interest securing the secured debt is limited to the property which, immediately prior to the extension, renewal or refunding, secured the secured debt and additions to the property.

For purposes of the indenture, "principal facilities" are any manufacturing plants, warehouses, office buildings and parcels of real property owned by Baxter or any restricted subsidiary, provided each such facility has a gross book value, without deduction for any depreciation reserves, in excess of 2% of Baxter's consolidated net tangible assets other than any facility that is determined by Baxter's board of directors to not be of material importance to the business conducted by Baxter and its subsidiaries taken as a whole.

For purposes of the indenture, "consolidated net tangible assets" are the total amount of assets that would be included on Baxter's consolidated balance sheet under generally accepted accounting principles after deducting all short-term liabilities and liability items, except for indebtedness payable more than one year from the date of incurrence and all goodwill, trade names, trademarks, patents, unamortized debt discount and unamortized expense incurred in the issuance of debt and other like intangibles, except for prepaid royalties.

Notwithstanding the limitations on secured debt described above, Baxter and any restricted subsidiary may create, incur, assume or guarantee secured debt, without equally and ratably securing the debt securities, provided that the sum of such secured debt and all other secured debt entered into after the date of the indenture, other than secured debt permitted as described in the bullet points above, does not exceed 15% of Baxter's consolidated net tangible assets.

-17-

For purposes of the indenture, a "restricted subsidiary" is any corporation in which Baxter owns voting securities entitling it to elect a majority of the directors and which is either designated as a restricted subsidiary in accordance with the indenture or:

- existed as such on the date of the indenture or is the successor to, or owns, any equity interest in, a corporation which so existed;

- has its principal business and assets in the United States;

- the business of which is other than the obtaining of financing in capital markets outside the United States or the financing of the acquisition or disposition of real or personal property or dealing in real property for residential or office building purposes; and

- does not have assets substantially all of which consist of securities of one or more corporations which are not restricted subsidiaries.

## Restrictions on Mergers, Consolidations and Transfers of Assets

Unless otherwise indicated in the prospectus supplement, Baxter will not consolidate with or merge into or sell, transfer or lease all or substantially all of its respective properties and assets to another person unless:

- in the case of a merger, Baxter is the surviving corporation, or

- the person into which Baxter is merged or which acquires all or substantially all of the properties and assets of Baxter expressly assumes all of the obligations of Baxter relating to the debt securities and the indenture.

Upon any of the consolidation, merger or transfer, the successor corporation will be substituted for Baxter under the indenture. The successor corporation may then exercise all of the powers and rights of Baxter under the indenture, and Baxter will be released from all of its obligations and covenants under the debt securities and the indenture. If Baxter leases all or substantially all of its assets, the lessee corporation will be the successor and may exercise all of the respective powers and rights under the indenture but Baxter will not be released from its obligations and covenants under the debt securities and the indenture.

## Events of Default

The indenture defines an "event of default" with respect to any series of debt securities. Each of the following will be an event of default under the indenture for any series of debt securities:

- our failure to pay interest on any of the debt securities when due, and continuance of the default for a period of 30 days;

- our failure to pay principal or premium, if any, on that series of the debt securities when due, whether at maturity or otherwise;

- default in the deposit of any sinking fund payment or payment under any analogous provision when due with respect to any of the debt securities of such series;

- our failure to perform, or our breach, of any covenant or warranty in the indenture in respect of that series, other than a covenant or warranty included in the indenture solely for the benefit of another series of debt securities, and continuance of that failure or breach, without that failure or breach having been cured or waived, for a period of 90 days after the trustee

-18-

-19-

gives notice to us or, in the case of notice by the holders, the holders not less than 25% in aggregate principal amount of the outstanding debt securities of that series give notice to us and the trustee, specifying the default or breach;

• specified events involving our bankruptcy, insolvency or reorganization; or

• any other event of default we may provide for that series.

An event of default under one series of debt securities does not necessarily constitute an event of default under any other series of debt securities. The indenture provides that, within 90 days after the occurrence of any default with respect to a series of debt securities, the trustee will mail to all holders of debt securities of that series notice of the default, unless the default has been cured or waived. However, the indenture provides that the trustee may withhold notice of a default with respect to a series of debt securities, except a default in payment of principal, premium, if any, or interest, if any, if the trustee considers it in the best interest of the holders to do so. In the case of a default in the performance, or breach, of any covenant or warranty in the indenture or in respect of a series of debt securities, no notice will be given until at least 30 days after the occurrence of the default or breach. As used in this paragraph, the term "default" means any event which is, or after notice or lapse of time or both would become, an event of default with respect to a series of debt securities.

The indenture provides that if an event of default, other than an event of default relating to events of bankruptcy, insolvency or reorganization, with respect to a series of debt securities occurs and is continuing, either the trustee or the holders of not less than 25% in aggregate principal amount of the outstanding debt securities of that series may declare the principal of, and accrued and unpaid interest, if any, on, the debt securities in that series to be due and payable immediately. The indenture also provides that if an event of default relating to events of bankruptcy, insolvency or reorganization with respect to a series of debt securities occurs then the principal of, and accrued and unpaid interest, if any, on, all the debt securities of that series will automatically become and be immediately due and payable without any declaration or other act on the part of the trustee or any holder of the debt securities. However, upon specified conditions, the holders of not less than a majority in aggregate principal amount of the outstanding debt securities of a series may rescind and annul an acceleration of the debt securities of that series and its consequences.

Subject to the provisions of the Trust Indenture Act requiring the trustee, during the continuance of an event of default under the indenture, to act with the requisite standard of care, the trustee is under no obligation to exercise any of its rights or powers under the indenture at the request or direction of any of the holders of debt securities unless those holders have offered to the trustee security or indemnity satisfactory to the trustee against the costs, expenses and liabilities that may be incurred by taking such action.

Subject to this requirement, holders of a majority in aggregate principal amount of the outstanding debt securities of a series have the right to direct the time, method and place of conducting any proceeding for any remedy available to the trustee under the indenture with respect to the debt securities of that series.

The indenture requires the annual filing with the trustee of a certificate signed by the principal executive officer, the principal financial officer or the principal accounting officer of Baxter that states whether Baxter is in default under the terms, provisions or conditions of the indenture.
Notwithstanding any other provision of the indenture, the holder of a debt security will have the right, which is absolute and unconditional, to receive payment of the principal of, and premium, if any, and interest, if any, on that debt security on the respective due dates for those payments and to institute suit

-19-

for the enforcement of those payments, and this right will not be impaired without the consent of the holder.

**Modification and Waivers**

The indenture permits Baxter and the trustee, with the consent of the holders of a majority in aggregate principal amount of the outstanding debt securities of a series affected by a modification or amendment, to modify or amend any of the provisions of the indenture or of the debt securities or the rights of the holders of the debt securities under the indenture. However, no modification or amendment may, without the consent of the holder of each outstanding debt security affected by the modification or amendment, among other things:

- change the stated maturity of the principal of, or premium, if any, or any installment of interest, if any, with respect to the debt securities;

- reduce the principal of or any premium on the debt securities or reduce the rate of interest on or the redemption or repurchase price of the debt securities;

- change any place where or the currency in which the principal of, any premium or interest on, any debt security is payable;

- impair a holder's right to institute suit to enforce any payment on or after the stated maturity of the debt securities or, in the case of redemption, on or after the redemption date;

- reduce the percentage in principal amount of outstanding debt securities whose holders must consent to any modification or amendment or any waiver of compliance with specific provisions of the indenture or specified defaults under the indenture and their consequences;

- make certain modifications to the provisions for modification of the indenture and for certain waivers, except to increase the principal amount of outstanding debt securities necessary to consent to any such change; or

- make any change that adversely affects the right, if any, to convert or exchange any debt security for common stock or other securities in accordance with its terms.

The indenture also contains provisions permitting Baxter and the trustee, without the consent of the holders of the debt securities, to modify or amend the indenture, among other things:

- to convey, transfer, assign, mortgage or pledge to the trustee as security for the debt securities any property or assets which Baxter may desire;

- to evidence succession of another corporation to Baxter, or its successors, and the assumption by the successor corporation of the covenants, agreements and obligations of Baxter;

- to add covenants and agreements of Baxter to those included in the indenture for the protection of holders of debt securities and to make the occurrence of a default of any such covenants or agreements a default or an event of default permitting enforcement of the remedies set forth in the indenture;

- to add, delete or modify the events of default with respect to any series of debt securities the form and terms of which are being established pursuant to such supplemental indenture;

-20-

- to prohibit the authentication and delivery of additional series of debt securities under the indenture;

- to cure any ambiguity or correct or supplement any provision contained in the indenture or any supplemental indenture which may be defective or inconsistent with any other provisions contained therein;

- to make such other provisions in regard to matters or questions arising under the indenture as are not inconsistent with the provisions of the indenture or any supplemental indenture and shall not adversely affect the interests of the holders of the debt securities in any material respect;

- to establish the form and terms of debt securities of any series issued under the indenture; or

- to evidence and provide for acceptance of appointment under the indenture by a successor trustee with respect to the debt securities of one or more series or to add to or change any of the provisions of the indenture as shall be necessary to provide for or facilitate the administration of the trusts under the indenture by more than one trustee.

The holders of a majority in aggregate principal amount of the outstanding debt securities may waive our compliance with some of the restrictive provisions of the indenture. The holders of a majority in aggregate principal amount of the outstanding debt securities may, on behalf of all holders of debt securities, waive any past default under the indenture with respect to the debt securities and its consequences, except a default in the payment of the principal of, or premium, if any, or interest, if any, on the debt securities or a default in respect of a covenant or provision which cannot be modified or amended without the consent of the holder of each outstanding debt security.

In order to determine whether the holders of the requisite principal amount of the outstanding debt securities have taken an action under an indenture as of a specified date:

- the principal amount of an "original issue discount security" that will be deemed to be outstanding will be the amount of the principal that would be due and payable as of that date upon acceleration of the maturity to that date,

- if, as of that date, the principal amount payable at the stated maturity of a debt security is not determinable, for example, because it is based on an index, the principal amount of the debt security deemed to be outstanding as of that date will be an amount determined in the manner prescribed for the debt security,

- the principal amount of a debt security denominated in one or more foreign currencies or currency units that will be deemed to be outstanding will be the U.S. currency equivalent, determined as of that date in the manner prescribed for the debt security, of the principal amount of the debt security or, in the case of a debt security described in the two preceding bullet points, of the amount described above, and

- debt securities owned by us or any other obligor upon the debt securities or any of our or their affiliates will be disregarded and deemed not to be outstanding.

**Satisfaction and Discharge**

Upon the direction of Baxter, the indenture will cease to be of further effect with respect to any debt security specified, subject to the survival of specified provisions of the indenture, when:

-21-

- either: (i) all debt securities issued under the indenture, subject to exceptions, have been delivered to the trustee for cancellation; or (ii) all debt securities issued under the indenture have become due and payable or will become due and payable at their stated maturity within one year or are to be called for redemption within one year and Baxter has deposited with the trustee, in trust, funds in United States dollars, or direct or indirect obligations of the United States ("government obligations") in an amount sufficient to pay the entire indebtedness on the debt securities including the principal, premium, if any, interest, if any, to the date of the deposit, if the debt securities have become due and payable, or to the maturity or redemption date of the debt securities, as the case may be;

- Baxter has paid all other sums payable under the indenture with respect to the outstanding debt securities issued under the indenture; and

- the trustee has received each officer's certificate and opinion of counsel called for by the indenture.

**Defeasance and Covenant Defeasance**

Baxter may elect with respect to the debt securities issued under the indenture either

- to defease and be discharged from all of its obligations with respect to the outstanding debt securities ("defeasance"), except for, among other things,

  - the obligation to register the transfer or exchange of the debt securities,

  - the obligation to replace temporary or mutilated, destroyed, lost or stolen debt securities,

  - the obligation to maintain an office or agency in respect of the debt securities, and

  - the obligation to hold monies for payment in trust; or

- to be released from its obligations with respect to the debt securities under specified covenants in the indenture including those described under the heading "Certain Covenants — Restrictions on the creation of secured debt", and any omission to comply with those obligations will not constitute a default or an event of default with respect to the debt securities ("covenant defeasance"),

in either case upon the irrevocable deposit by Baxter with the trustee, or other qualifying trustee, in trust for that purpose, of an amount in United States dollars and/or government obligations which, through the payment of principal and interest in accordance with their terms, will provide money in an amount sufficient to pay the principal, premium, if any, and interest, if any, on the due dates for those payments.

The defeasance or covenant defeasance described above will only be effective if, among other things:

- it will not result in a breach or violation of, or constitute a default under, the indenture or any other material agreement or instrument to which Baxter is a party or is bound;

- in the case of defeasance, Baxter will have delivered to the trustee an opinion of independent counsel confirming that

-22-

• Baxter has received from or there has been published by the Internal Revenue Service a ruling, or

• since the date of the indenture there has been a change in applicable federal income tax law,

in either case to the effect that, and based on this ruling or change in law, the opinion of counsel will confirm that the holders of the debt securities then outstanding will not recognize income, gain or loss for federal income tax purposes as a result of the defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if the defeasance had not occurred;

• in the case of covenant defeasance, Baxter will have delivered to the trustee an opinion of independent counsel to the effect that the holders of the debt securities then outstanding will not recognize income, gain or loss for federal income tax purposes as a result of the covenant defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if the covenant defeasance had not occurred;

• if the cash and/or government obligations deposited are sufficient to pay the principal of, and premium, if any, and interest, if any, with respect to the debt securities provided the debt securities are redeemed on a particular redemption date, Baxter will have given the trustee irrevocable instructions to redeem the debt securities on that date; and

• no event of default or event which with notice or lapse of time or both would become an event of default with respect to the debt securities will have occurred and be continuing on the date of the deposit into trust, and, solely in the case of defeasance, no event of default or event which with notice or lapse of time or both would become an event of default arising from specified events of bankruptcy, insolvency or reorganization with respect to Baxter will have occurred and be continuing during the period through and including the 91st day after the date of the deposit into trust.

In the event covenant defeasance is effected with respect to the debt securities and those debt securities are declared due and payable because of the occurrence of any event of default other than an event of default with respect to the covenants as to which covenant defeasance has been effected, which would no longer be applicable to the debt securities after covenant defeasance, the amount of monies and/or government obligations deposited with the trustee to effect covenant defeasance may not be sufficient to pay amounts due on the debt securities at the time of any acceleration resulting from that event of default. However, Baxter would remain liable to make payment of those amounts due at the time of acceleration.

**Listing**

The 2025 Notes are traded on The New York Stock Exchange under the bond trading symbol of "Bax 25".

**Governing Law**

The indenture is, and the notes are, governed by and construed in accordance with the laws of the State of New York, as applied to contracts made and performed within the State of New York, without regard to principles of conflicts of law.

-23-

**The Trustee, Registrar and Paying Agent**

The Bank of New York Mellon Trust Company, N.A. is the trustee and registrar and The Bank of New York Mellon, London Branch is the paying agent with respect to the notes. Neither the trustee nor the paying agent shall be responsible for monitoring our rating status, making any request upon any Rating Agency, or determining whether any Rating Event or Change of Control Triggering Event has occurred.

**Notices**

So long as any notes are represented by a global note and such global note is held on behalf of a clearing system, (i) notices to the holders of notes of the series may be given by delivery of the relevant notice to that clearing system for communication by it to entitled accountholders, and (ii) notices of holders of notes may be given to us through the clearing systems in accordance with the rules and regulations of the clearing systems in effect from time to time.

-24-

**DESCRIPTION OF 1.3% SENIOR NOTES DUE 2029 AND 0.4% SENIOR NOTES DUE 2024**

The Company Previously filed a registration statement on Form S-3 (File No. 333-226987), which was filed with the Securities and Exchange Commission on August 23, 2018 and covers the issuance of the Company's 1.3% Senior Notes due 2029 and 0.4% Senior Notes due 2024. The following description is a summary and does not purport to be complete. It is subject to and qualified in its entirety by reference to the indenture, dated as of August 8, 2006 (the "Base Indenture"), between Baxter International Inc. and J.P. Morgan Trust Company, N.A., as trustee, as supplemented by the twelfth supplemental indenture, dated as of May 15, 2019, which is incorporated by reference as exhibit to the Annual Report on Form 10-K of which this Exhibit 4.9 is a part.

**General**

We initially issued €750,000,000 aggregate principal amount of fixed rate notes that will mature on May 15, 2024 (the "2024 Notes") and €750,000,000 aggregate principal amount of fixed rate notes that will mature on May 15, 2029 (the "2029 Notes" and, together with the 2024 Notes, the "notes"). We will make each interest payment to the holders in whose names the notes are registered at the close of business on the date that is (i) in the case of notes represented by a global note, the clearing system business day (which, for these purposes, is a day on which Euroclear and Clearstream, Luxembourg settle payments in euros) immediately prior to the relevant interest payment date and (ii) in all other cases, 15 calendar days prior to the relevant interest payment date (whether or not a business day) (for the purposes of clauses (i) and (ii), such day, the "Record Date"). Interest on the notes began to accrue from May 15, 2019.

We may, from time to time, without the consent of the holders of any series of the notes, issue additional notes of any such series on terms and conditions substantially identical to those of the notes of such series (except for the issue date and, in some cases, the initial interest payment date), so that such additional notes will increase the aggregate principal amount of, and will be consolidated and form a single series with, the notes of such series and will otherwise have the same terms as the notes of such series; provided that we will not issue such additional notes as part of the same series as the outstanding notes, unless the additional notes are fungible with the outstanding notes for U.S. federal income tax purposes.

We issued each series of notes in registered form, each represented by one or more global notes registered in the name of a nominee of, and deposited with, a common depositary for Euroclear and Clearstream, Luxembourg (which we may refer to along with its successors in such capacity as the common depositary). The notes were issued exclusively in registered form and in the minimum denomination of €100,000, with integral multiples of €1,000 in excess thereof.

The notes are not subject to a sinking fund provision.

**Interest on the Notes**

The 2024 Notes accrue interest at a rate of 0.400% per annum and the 2029 Notes accrue interest at a rate of 1.300% per annum. Interest on the 2024 Notes is payable annually in arrears on May 15 of each year, beginning on May 15, 2020. Interest on the 2029 Notes is payable annually in arrears on May 15 of each year, beginning on May 15, 2020.

Interest on each series of notes is computed on the basis of the actual number of days in the period for which interest is being calculated for such series of notes and the actual number of days from and including the last date on which interest was paid on such series of notes (or from May 15, 2019, if no interest has been paid on the notes) to, but excluding, the next scheduled interest payment date. This

-25-

payment convention is referred to as ACTUAL/ACTUAL (ICMA) (as defined in the rulebook of the International Capital Market Association).

**Ranking**

The notes are our direct, unsecured and unsubordinated obligations and will rank equal in priority of payment with all of our other existing and future unsecured and unsubordinated indebtedness, and senior in right of payment to any future subordinated indebtedness. In addition to the notes, we may issue other series of debt securities under the indenture. There is no limit on the total aggregate principal amount of debt securities that we can issue under the indenture.

The notes will be structurally subordinated to all indebtedness and other liabilities, including trade payables, of our subsidiaries.

**Issuance in Euros**

Initial holders of the notes were required to pay for the notes in euros, and principal, premium, if any, and interest payments and additional amounts, if any, in respect of the notes will be payable in euros, except as described below.

If the euro is unavailable to us due to the imposition of exchange controls or other circumstances beyond our control or the euro is no longer used by the then member states of the European Monetary Union that have adopted the euro as their currency or for the settlement of transactions by public institutions within the international banking community, then all payments in respect of the notes will be made in U.S. dollars until the euro is again available to us or so used. In such circumstances, the amount payable on any date in euros will be converted to U.S. dollars on the basis of the most recently available market exchange rate for euros, as determined by us in our sole discretion. Any payment in respect of the notes so made in U.S. dollars will not constitute an event of default under the indenture or the notes. Neither the trustee nor the paying agent will be responsible for obtaining exchange rates, effecting conversions or otherwise handling redenominations.

**Payment of Additional Amounts**

All payments in respect of the notes will be made by or on behalf of us without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature, imposed or levied by the United States or any taxing authority thereof or therein, unless such withholding or deduction is required by law. If such withholding or deduction is required by law, we will pay to a beneficial owner who is not a United States person (as defined below) such additional amounts on the notes as are necessary in order that the net payment of the principal of, and premium or redemption price, if any, and interest on, such notes to such beneficial owner, after such withholding or deduction (including any withholding or deduction on such additional amounts), will not be less than the amount provided in such notes to be then due and payable; provided, however, that the foregoing obligation to pay additional amounts will not apply:

> (a) to any tax, assessment or other governmental charge that would not have been imposed but for the beneficial owner, or a fiduciary, settlor, beneficiary, member or shareholder of the beneficial owner if the beneficial owner is an estate, trust, partnership or corporation, or a person holding a power over an estate or trust administered by a fiduciary holder, being considered as (i) having a current or former connection with the United States (other than a connection arising solely as a result of the ownership of such notes, the receipt of any payment or the enforcement of any rights thereunder), including being or having been a citizen or resident of the United States, or being or having been engaged in a trade or business in the United States or having or having had a permanent establishment

-26-

in the United States; (ii) being a controlled foreign corporation related to Baxter directly, indirectly or constructively through stock ownership for U.S. federal income tax purposes; or (iii) being an owner of a 10% or greater interest in voting stock of Baxter within the meaning of Section 871(h)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or any successor provision;

(b) to any holder that is not the sole beneficial owner of such notes, or a portion of such notes, or that is a fiduciary, partnership or limited liability company, but only to the extent that a beneficiary or settlor with respect to the fiduciary, a beneficial owner or a member of the partnership or limited liability company would not have been entitled to the payment of an additional amount had the beneficiary, settlor, beneficial owner or member received directly from Baxter its beneficial or distributive share of the payment;

(c) to any tax, assessment or other governmental charge imposed by reason of the holder's or beneficial owner's past or present status as a passive foreign investment company, a controlled foreign corporation, a foreign tax exempt organization or a personal holding company with respect to the United States or as a corporation that accumulates earnings to avoid U.S. federal income tax;

(d) to any tax, assessment or other governmental charge that would not have been imposed but for the failure of the holder or beneficial owner of the applicable notes to comply with any applicable certification, identification or information reporting requirements concerning the nationality, residence, identity or connection with the United States of the holder or beneficial owner of such notes, if compliance is required by statute, by regulation of the United States or any taxing authority therein or by an applicable income tax treaty to which the United States is a party as a precondition to exemption from such tax, assessment or other governmental charge;

(e) to any tax, assessment or other governmental charge that is imposed otherwise than by withholding or deducting from the payment;

(f) to any estate, inheritance, gift, sales, transfer, wealth, capital gains or personal property tax or similar tax, assessment or other governmental charge;

(g) to any tax, assessment or other governmental charge required to be withheld by any paying agent from any payment of principal of or interest on any such note, if such payment can be made without such withholding by at least one other paying agent;

(h) to any tax, assessment or other governmental charge that is imposed or withheld solely by reason of a change in law, regulation, or administrative or judicial interpretation that becomes effective more than 15 days after the payment becomes due or is duly provided for, whichever occurs later;

(i) to any tax, assessment or other governmental charge that would have been imposed but for presentation by the holder of any note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later, except to the extent that the holder or beneficial owner thereof would have been entitled to additional amounts had the note been presented for payment on the last day of such 30 day period;

-27-

(j) to any withholding or deduction that is imposed on a payment pursuant to Sections 1471 through 1474 of the Code and related Treasury regulations and pronouncements or any successor provisions thereto (that are substantively comparable and not materially more onerous to comply with) and any regulations or official law, agreement or interpretations thereof in any jurisdiction implementing an intergovernmental approach thereto; or

(k) in the case of any combination of the above listed items.

Except as specifically provided under this heading "—Payment of Additional Amounts," we will not be required to make any payment for any present or future tax, duty, assessment or governmental charge of whatever nature imposed by any government or a political subdivision or taxing authority of or in any government or political subdivision.

As used under this heading "—Payment of Additional Amounts" and under the heading "—Redemption for Tax Reasons" the term "United States" means the United States of America, any state thereof, and the District of Columbia, and the term "United States person" means (i) any individual who is a citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation, partnership or other entity created or organized in or under the laws of the United States, any state thereof or the District of Columbia (other than a partnership that is not treated as a United States person for U.S. federal income tax purposes), (iii) any estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) any trust if a U.S. court can exercise primary supervision over the administration of the trust and one or more United States persons can control all substantial trust decisions, or if a valid election is in place to treat the trust as a United States person.

**Optional Redemption**

The 2024 Notes, at any time prior to the date that is one month prior to their maturity date, and the 2029 Notes, at any time prior to the date that is three months prior to their maturity date (each such date, a "Par Call Date"), will be redeemable, in whole at any time or in part, from time to time, at our option, at a "make-whole" redemption price equal to the greater of (1) 100% of the principal amount of the relevant series of notes to be redeemed plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption, and (2) the sum of the present values of the principal amount of the relevant series of notes to be redeemed and the scheduled payments of interest thereon (exclusive of interest accrued to the date of redemption) from the redemption date to the applicable Par Call Date for such series, in each case discounted to the date of redemption on an annual basis (ACTUAL/ACTUAL (ICMA)) at the applicable Comparable Government Bond Rate, as defined below, plus 15 basis points, in the case of the 2024 Notes, and plus 25 basis points, in the case of the 2029 Notes, in each case plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption. We will calculate the redemption price.

On or after the applicable Par Call Date for each series of notes, such notes will be redeemable, in whole at any time or in part, from time to time, at our option, at a redemption price equal to 100% of the principal amount of the notes to be redeemed, plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption.

"Comparable Government Bond" means, in relation to any Comparable Government Bond Rate (as defined below) calculation, at the discretion of the Independent Investment Bank (as defined below) selected by us, a bond that is a direct obligation of the Federal Republic of Germany ("German government bond"), whose maturity is closest to the Par Call Date, or if the Independent Investment Bank in its discretion determines that such similar bond is not in issue, such other German government bond as the Independent Investment Bank may, with the advice of three brokers of, and/or market makers in, German government bonds selected by us, determine to be appropriate for determining the Comparable Government Bond Rate.

-28-

"Comparable Government Bond Rate" means the yield to maturity, expressed as a percentage (rounded to three decimal places, with 0.0005 being rounded upwards), on the third business day in London prior to the date fixed for redemption, of the Comparable Government Bond on the basis of the middle market price of the Comparable Government Bond prevailing at 11:00 a.m. (London time) on such business day as determined by the Independent Investment Bank selected by us.

"Independent Investment Bank" means one of the Reference Bond Dealers that we shall appoint to act as the Independent Investment Bank.

"Reference Bond Dealers" means Barclays Bank PLC, Citigroup Global Markets Limited and Merrill Lynch International (or their respective affiliates that are Primary Bond Dealers (as defined below)) and their respective successors; provided, however, that if any of the foregoing shall cease to be a broker or dealer of, and/or market maker in, German government bonds (a "Primary Bond Dealer"), we will substitute therefor another Primary Bond Dealer.

To exercise our option to redeem any series of notes, we will give each holder of notes of such series to be redeemed a notice in writing at least 10 days but not more than 60 days before the redemption date (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes to be so redeemed, or (ii) in the case of definitive notes, to each holder of record of the notes to be redeemed at its registered address. If we elect to redeem fewer than all the notes of a series, the trustee will select the particular notes to be redeemed by such method as the trustee deems fair and appropriate and in accordance with the indenture, subject to applicable procedures of Euroclear and Clearstream, Luxembourg as to global notes. Notices of redemption may be subject to the satisfaction of one or more conditions precedent established by us in our sole discretion.

Unless a default occurs in payment of the redemption price, from and after the redemption date interest will cease to accrue on the notes or portions thereof called for redemption.

**Redemption for Tax Reasons**

If, as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated under the laws) of the United States (or any taxing authority thereof or therein), or any change in, or amendments to, an official position regarding the application or interpretation of such laws, regulations or rulings, which change or amendment is announced or becomes effective on or after the date of this prospectus supplement, we become or, based upon a written opinion of independent tax counsel of recognized standing selected by us, will become obligated to pay additional amounts as described herein under the heading "—Payment of Additional Amounts" with respect to the notes, then we may at our option redeem the notes at any time, in whole, but not in part, having given not less than 10 nor more than 60 days prior notice, (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes to be redeemed, or (ii) in the case of definitive notes, to each holder of record of the notes to be redeemed at its registered address, at a redemption price equal to 100% of the principal amount, plus accrued and unpaid interest (including any additional amounts), if any, to, but excluding, the date of redemption.

**Offer to Purchase Upon Change of Control Triggering Event**

If a Change of Control Triggering Event occurs, other than with respect to the notes for which we have exercised our option to redeem as described above, we will be required to make an offer (the "Change of Control Offer") to each holder of the notes to repurchase all or any part (equal to €100,000 and integral multiples of €1,000 in excess thereof) of that holder's notes on the terms set forth in the notes. In the Change of Control Offer, we will be required to offer payment in cash equal to 101% of the aggregate principal amount of notes to be repurchased, plus accrued and unpaid interest (including any

-29-

additional amounts), if any, on the notes to be repurchased to, but excluding, the date of repurchase (the "Change of Control Payment"), subject to the right of holders of record of the notes on the relevant Record Date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control Triggering Event or, at our option, prior to any Change of Control, but after public announcement of the transaction that constitutes or may constitute the Change of Control, we will give notice, (i) in the case of notes represented by a global note, to and through Euroclear or Clearstream, Luxembourg for communication by them to the holders of interests in the notes, or (ii) in the case of definitive notes, to each holder of record of the notes at its registered address, with a copy to the trustee describing the transaction that constitutes or may constitute the Change of Control Triggering Event and offering to repurchase such notes on the date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such notice is given (the "Change of Control Payment Date"). The notice will, if given prior to the date of consummation of the Change of Control, state that the offer to purchase is conditioned on the Change of Control Triggering Event occurring on or prior to the Change of Control Payment Date.

On the Change of Control Payment Date, we will, to the extent lawful:

- accept for payment all notes or portions of notes properly tendered pursuant to the Change of Control Offer;

- deposit with the paying agent an amount equal to the Change of Control Payment in respect of all notes or portions of notes properly tendered; and

- deliver or cause to be delivered to the trustee such notes properly accepted together with an officers' certificate stating the aggregate principal amount of notes or portions of notes being repurchased.

We will not be required to comply with the obligations relating to repurchasing the notes if a third party instead satisfies them. In addition, we will not repurchase any notes if there has occurred and is continuing on the Change of Control Payment Date an event of default under the indenture with respect to such notes, other than a default in the payment of the Change of Control Payment upon a Change of Control Triggering Event.

We will comply with the requirements of Rule 14e-1 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and any other securities laws and regulations applicable to the repurchase of the notes as a result of a Change of Control Triggering Event. To the extent that the provisions of any such securities laws or regulations conflict with the change of control offer provisions of the notes, we will comply with those securities laws and regulations and will not be deemed to have breached our obligations under the change of control offer provisions of the notes by virtue of any such conflict.

If a Change of Control Offer is made, there can be no assurance that we will have available funds sufficient to make the Change of Control Payment for all of the notes that may be tendered for repurchase. See "Risk Factors—We may not be able to repurchase all of the notes upon a change of control triggering event, which would result in a default under the notes."

For purposes of the change of control offer provisions of the notes, the following terms will be applicable:

"Change of Control" means the occurrence of any of the following: (1) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than us or one of our subsidiaries, becomes the beneficial owner (as defined in Rules 13d-3 and l3d-5 under the Exchange Act), directly or indirectly, of more than 50% of our Voting Stock or other Voting Stock into which our

-30-

Voting Stock is reclassified, consolidated, exchanged or changed, measured by voting power rather than number of shares, (2) the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of our assets and the assets of our subsidiaries, taken as a whole, to one or more "persons" (as that term is defined in the indenture), other than us or one of our subsidiaries or (3) the adoption of a plan relating to our liquidation or dissolution. Notwithstanding the foregoing, a transaction will not be deemed to be a Change of Control if (1) we become a direct or indirect wholly-owned subsidiary of a holding company and (2)(A) the direct or indirect holders of the Voting Stock of such holding company immediately following that transaction are substantially the same as the holders of our Voting Stock immediately prior to that transaction or (B) immediately following that transaction no "person" (as that term is used in Section 13(d)(3) of the Exchange Act) (other than a holding company satisfying the requirements of this sentence) is the beneficial owner, directly or indirectly, of more than 50% of the Voting Stock of such holding company.

"Change of Control Triggering Event" means the occurrence of both a Change of Control and a Rating Event.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, and the equivalent investment grade credit rating from any replacement Rating Agency or Rating Agencies.

"Moody's" means Moody's Investors Service, Inc.

"Rating Agencies" means (1) each of Moody's and S&P, and (2) if either Moody's or S&P ceases to rate the notes or fails to make a rating of the notes publicly available for reasons outside of our control, a "nationally recognized statistical rating organization" within the meaning of Section 3(a)(62) of the Exchange Act selected by us (as certified by a resolution of our board of directors) as a replacement agency for Moody's or S&P, or both of them, as the case may be.

"Rating Event" means, with respect to any series of the notes, the rating on such notes is lowered by each of the Rating Agencies and such notes are rated below an Investment Grade Rating by each of the Rating Agencies on any day within the 60-day period (which 60-day period will be extended so long as the rating of such notes is under publicly announced consideration for a possible downgrade by any of the Rating Agencies but no longer than 180 days) after the earlier of (1) the occurrence of a Change of Control and (2) public notice of our intention to effect a Change of Control; provided, however, that a Rating Event otherwise arising by virtue of a particular reduction in rating will not be deemed to have occurred in respect of a particular Change of Control (and thus will not be deemed a Rating Event for purposes of the definition of Change of Control Triggering Event) if the Rating Agencies making the reduction in rating to which this definition would otherwise apply do not announce or publicly confirm to us in writing at our request that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the applicable Change of Control (whether or not the applicable Change of Control has occurred at the time of the Rating Event).

"S&P" means S&P Global Ratings, a division of S&P Global, Inc.

"Voting Stock" means, with respect to any specified "person" (as that term is used in Section 13(d)(3) of the Exchange Act), as of any date, the capital stock of such person that is at the time entitled to vote generally in the election of the board of directors of such person.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, transfer, conveyance or other disposition, in one or a series of related transactions, of "all or substantially all" of our assets and the assets of our subsidiaries, taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of such phrase under applicable law. Accordingly, the ability of a holder of the notes to require us to repurchase

-31-

that holder's notes as a result of the sale, transfer, conveyance or other disposition of less than all of our assets and the assets of our subsidiaries, taken as a whole, to one or more persons may be uncertain.

Our obligation to purchase the notes following a Change of Control Triggering Event is subject to the provisions described in the accompanying prospectus described in the section entitled "Description of Debt Securities—Defeasance and Covenant Defeasance."

**Assumption of Obligations**

With respect to each series of notes, if we become a direct or indirect wholly-owned subsidiary of a holding company, such holding company may elect to assume our obligations (or those of any entity which shall have previously assumed our obligations) under the notes of such series; provided, that the successor entity expressly assumes such obligations, and will be substituted in all respects, under the indenture, in a form satisfactory to the trustee, and we are released from all of our obligations under the notes.

Upon any such assumption, the successor entity will succeed to, and be substituted for, and may exercise all of our rights and powers under the indenture with respect to the notes of such series with the same effect as if the successor entity had been named under the indenture.

**Book-Entry Procedures, Delivery and Form**

The notes were issued in the form of one or more permanent global notes in fully registered, book-entry form. The global notes are registered in the name of a nominee of, and deposited with, a common depositary for Euroclear and Clearstream, Luxembourg. The notes were not issued in a form that would, on the date of issuance, enable them to satisfy the European Central Bank's criteria to be recognized as eligible collateral for Eurosystem monetary policy and intra-day credit operations by the Eurosystem. Any such recognition in the future will depend upon the European Central Bank being satisfied that the Eurosystem eligibility criteria then in effect have been met.

Except as set forth below, the global notes may be transferred, in whole and not in part, only to another nominee of Euroclear or Clearstream, Luxembourg. Beneficial interests in the global notes may not be exchanged for definitive notes except in the limited circumstances described below. See "—Exchange of Global Notes for Definitive Notes." Except in the limited circumstances described below, owners of beneficial interests in the global notes will not be entitled to receive definitive notes.

**Global Clearance and Settlement**

The description in this section reflects our understanding of the rules and procedures of Euroclear and Clearstream, Luxembourg as they are in effect as of the date of this prospectus supplement. Those systems could change their rules and procedures at any time.

Beneficial interests in the global notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as accountholders in Euroclear and Clearstream, Luxembourg (together, the "ICSDs"). Investors may hold interests in the global notes through either Euroclear or Clearstream, Luxembourg, either directly if they are accountholders in such systems, or indirectly through organizations that are accountholders in such systems.

Euroclear and Clearstream, Luxembourg each holds securities of institutions that have accounts with the ICSD ("participants") and facilitates the clearance and settlement of securities transactions among their participants in such securities by electronic book-entry transfer between their respective participants, thereby eliminating the need for physical movement of securities certificates. The ICSDs' participants include securities brokers and dealers (which may include the underwriters), banks, trust companies, clearing corporations and certain other organizations. Access to the ICSDs' book-entry

-32-

system is also available to others such as banks, brokers, dealers and trust companies ("indirect participants") that clear through or maintain a custodial relationship with a participant, whether directly or indirectly. Euroclear and Clearstream, Luxembourg provide various services including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Euroclear and Clearstream, Luxembourg also deal with domestic securities markets in several countries through established depository and custodial relationships. Euroclear and Clearstream, Luxembourg have established an electronic bridge between their two systems across which their respective participants may settle trades with each other.

We expect that pursuant to procedures established by the ICSDs, upon the deposit of the global notes with the common depositary, the ICSDs will credit, on their book-entry registration and transfer systems, the interest in the notes represented by such global notes to the accounts of participants. The accounts to be credited shall be designated by the underwriters of the notes. Ownership of beneficial interests in the global notes will be limited to participants or persons that may hold interests through participants. Ownership of beneficial interests in the global notes will be shown on, and the transfer of those ownership interests will be effected only through, records maintained by the ICSDs (with respect to participants' interests) and such participants and indirect participants (with respect to the owners of beneficial interests in the global notes other than participants).

So long as the nominee of the common depositary is the registered holder and owner of the global notes, such nominee will be considered the sole legal owner and holder of the notes evidenced by the global notes for all purposes of such notes. Except as set forth below, as an owner of a beneficial interest in the global notes, you will not be entitled to have the notes represented by the global notes registered in your name, will not receive or be entitled to receive physical delivery of definitive notes and will not be considered to be the owner or holder of any notes under the global notes. We understand that under existing industry practice, in the event an owner of a beneficial interest in the global notes desires to take any action that the nominee of the common depositary, as the holder of the global notes, is entitled to take, the common depositary will authorize the participants to take such action, and that the participants will authorize beneficial owners owning through such participants to take such action or would otherwise act upon the instructions of beneficial owners owning through them.

All payments on notes represented by the global notes registered in the name of the nominee of the common depositary will be made to the ICSDs or the nominee of the common depositary, as the case may be, as the registered owner and holder of the global notes, and our obligations to make payment on notes will, to the extent of such payments to the ICSDs or, as the case may be, the nominee of the common depositary, be discharged.

We expect that the ICSDs, upon receipt of any payment on the global notes, will credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the global notes as shown on the records of the ICSDs. We also expect that payments by participants or indirect participants to owners of beneficial interests in the global notes held through such participants or indirect participants will be governed by standing instructions and customary practices and will be the responsibility of such participants or indirect participants. We will not have any responsibility or liability for any aspect of the records relating to, or payments made on account of, beneficial ownership interests in the global notes for any notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or for any other aspect of the relationship between the ICSDs and their participants or indirect participants or the relationship between such participants or indirect participants and the owners of beneficial interests in the global notes owning through such participants or indirect participants.

Although the ICSDs customarily operate the foregoing procedures in order to facilitate transfers of interests in the global notes among participants or indirect participants of the ICSDs, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither we nor the trustee will have any responsibility or liability for the

-33-

performance by either ICSD or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Secondary Transfers**

Transfers of any interests in notes represented by a global note within Euroclear and Clearstream, Luxembourg will be effected in accordance with the customary rules and operating procedures of the relevant clearing system.

On or after the issue date of the notes, transfers of notes represented by a global note between accountholders in Clearstream, Luxembourg and Euroclear will generally have a settlement date two clearing system business days (which, for these purposes, is a day on which Euroclear and Clearstream, Luxembourg settle payments in euro) after the trade date (T+2).

None of the us, the trustee, the paying agent or any underwriter will be responsible for any performance by Euroclear or Clearstream, Luxembourg or their accountholders of their respective obligations under the rules and procedures governing their operations and none of them will have any liability for any aspect of the records relating to or payments made on account of beneficial interests in the notes represented by a global note or for maintaining, supervising or reviewing any records relating to such beneficial interests.

**Same-Day Settlement and Payment**

We will make payments in respect of the notes represented by the global notes (including principal, premium, if any, and interest and additional amounts, if any) by wire transfer of immediately available funds to the account specified by the paying agent; provided, however, that at our option payment in respect of definitive notes may be made by (1) check mailed to the address of the person entitled thereto as such address shall appear in the security register on the Record Date or (2) wire transfer as directed by the holder of the relevant notes, in immediately available funds to accounts maintained by the holder of notes or its nominee; provided further that in the case of a definitive note (x) the holder thereof shall have provided written wiring instructions to the paying agent on or before the related Record Date and (y) if appropriate instructions for any such wire transfer are not received by the related Record Date, then such payment shall be made by check mailed to the address of such holder specified in the security register on the Record Date.

If the principal of or any premium or interest or additional amounts on the notes or amounts payable upon any redemption of the notes is payable on a day that is not a Payment Business Day, the payment will be made on the following Payment Business Day without the accrual of any interest on that payment.

For these purposes "Payment Business Day" means any day that is:

a) a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in New York City and the City of London and, in the case of definitive notes only, the relevant place of presentation; and

b) a day on which the TARGET 2 System is open for the settlement of payment in euros.

For these purposes "TARGET 2 System" means the Trans-European Automatic Real-Time Gross Settlement Express Transfer (TARGET 2) System (or any successor thereto).

**Exchange of Global Notes for Definitive Notes**

-34-

We will issue definitive notes upon surrender of the global notes in accordance with their terms only if:

a) an Event of Default has occurred and is continuing; or

b) either Euroclear or Clearstream, Luxembourg is closed for business for a continuous period of 14 days or more (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so and no alternative clearing system satisfactory to the trustee is available; or

c) we would suffer a disadvantage as a result of a change in laws or regulations (taxation or otherwise) or as a result of a change in the practice of Euroclear and/or Clearstream, Luxembourg which would not be suffered were the notes in definitive form and a certificate to such effect signed by one of our authorized signatories is given to the trustee.

Thereupon (in the case of (a) or (b) above) the holder of a global note (acting on behalf of one or more of the accountholders) or the trustee may give notice to us and (in the case of (c) above) we may give notice to the trustee and the noteholders, of our intention to exchange a global note for definitive notes on or after the Exchange Date (as defined below).

On or after the Exchange Date the holder of the global note may, or in the case of (c) above, shall surrender it to or to the order of the trustee or registrar. In exchange for the global note, we shall deliver, or procure the delivery of, an equal aggregate principal amount of definitive notes, security printed in accordance with any applicable legal and stock exchange requirements. On exchange of the global note, we will procure that it is cancelled.

For these purposes, "Exchange Date" means a day specified in the notice requiring exchange falling not less than 60 days after that on which the notice requiring exchange is given and being a day on which banks are open for general business in London, the place in which the specified office of the trustee is located and, except in case of exchange pursuant to (b) above, in the place in which Euroclear and Clearstream, Luxembourg are located.

In all cases, definitive notes delivered in exchange for any global note or beneficial interest in any global note will be registered in the names, and issued in any approved denominations, requested by or on behalf of the holder of the relevant global notes, provided that the denomination of any definitive note may not, at any time, be less than €100,000.

Neither we nor the trustee will be liable for any delay by the holder of the relevant global notes identifying the holders of beneficial interests in the global notes, and each such person may conclusively rely on, and will be protected in relying on, instructions from Euroclear or Clearstream, Luxembourg for all purposes (including with respect to the registration and delivery, and the respective principal amounts, of the definitive notes to be issued).

**Certain Covenants**

Unless otherwise indicated in the prospectus supplement, Baxter will not, and will not cause or permit any restricted subsidiary to, create, incur, assume or guarantee any indebtedness that is secured by a security interest in any principal facilities of Baxter or any restricted subsidiary or in shares of stock owned directly or indirectly by Baxter in any restricted subsidiary or in indebtedness for money borrowed by one of its restricted subsidiaries from Baxter or another of the restricted subsidiaries ("secured debt") unless the debt securities then outstanding and any other indebtedness of or guaranteed by Baxter or such restricted subsidiary then entitled to be so secured is secured equally and ratably with or prior to any

-35-

and all other obligations and indebtedness thereby secured, with exceptions as listed in the indenture. These restrictions do not apply to indebtedness secured by:

- any security interest on any property which is a parcel of real property at a manufacturing plant, a warehouse or an office building and which is acquired, constructed, developed or improved by Baxter or a restricted subsidiary, which security interest secures or provides for the payment of all or any part of the acquisition cost of the property or the cost of the construction, development or improvement of the property and which security interest is created prior to, at the same time as, or within 120 days after (i) in the case of the acquisition of property, the completion of the acquisition of the property and (ii) in the case of construction, development or improvement of property, the later to occur of the completion of such construction, development or improvement or the commencement of operation, use or commercial production of the property

- any security interest on property existing at the time of the acquisition of such property by Baxter or a restricted subsidiary which security interest secures obligations assumed by Baxter or a restricted subsidiary;

- any security interest arising from conditional sales agreements or title retention agreements with respect to property acquired by Baxter or any restricted subsidiary; • security interests existing on the property or on the outstanding shares or indebtedness of a corporation or firm at the time the corporation or firm becomes a restricted subsidiary or is merged or consolidated with Baxter or a restricted subsidiary or at the time the corporation or firm sells, leases or otherwise disposes of its property as an entirety or substantially as an entirety to Baxter or a restricted subsidiary;

- security interests securing indebtedness of a restricted subsidiary to Baxter or to another restricted subsidiary;

- mechanics' and other statutory liens arising in the ordinary course of business in respect of obligations which are not due or which are being contested in good faith; • security interests arising by reason of deposit with, or the giving of any form of security to, any governmental agency which is required by law as a condition to the transaction of any business;

- security interests for taxes, assessments or governmental charges or levies not yet delinquent or security interests for taxes, assessments or governmental charges or levies already delinquent but which are being contested in good faith; • security interests arising in connection with legal proceedings, including judgment liens, so long as the proceedings are being contested in good faith and, in the case of judgment liens, the execution has been stayed;

- landlords' liens on fixtures located on premises leased by Baxter or a restricted subsidiary in the ordinary course of business;

- security interests arising in connection with contracts and subcontracts with or made at the request of the United States, any state of the United States, or any department, agency or instrumentality of the United States or any state of the United States;

- security interests that secure an obligation issued by the United States or any state, territory or possession of the United States or any of their political subdivisions or the District of Columbia, in connection with the financing of the cost of construction or acquisition of a principal facility or a part of a principal facility;

-36-

- security interests by reason of deposits to qualify Baxter or a restricted subsidiary to conduct business, to maintain self-insurance, or to obtain the benefits of, or comply with, laws;

- the extension of any security interest existing on the date of the indenture on a principal facility to additions, extensions or improvements to the principal facility and not as a result of borrowing money or the securing of indebtedness incurred after the date of the indenture; or

- any extension, renewal or refunding, or successive extensions, renewals or refundings, in whole or in part of any secured debt secured by any security interest listed above, provided that the principal amount of the secured debt secured thereby does not exceed the principal amount outstanding immediately prior to the extension, renewal or refunding and that the security interest securing the secured debt is limited to the property which, immediately prior to the extension, renewal or refunding, secured the secured debt and additions to the property.

For purposes of the indenture, "principal facilities" are any manufacturing plants, warehouses, office buildings and parcels of real property owned by Baxter or any restricted subsidiary, provided each such facility has a gross book value, without deduction for any depreciation reserves, in excess of 2% of Baxter's consolidated net tangible assets other than any facility that is determined by Baxter's board of directors to not be of material importance to the business conducted by Baxter and its subsidiaries taken as a whole.

For purposes of the indenture, "consolidated net tangible assets" are the total amount of assets that would be included on Baxter's consolidated balance sheet under U.S. generally accepted accounting principles after deducting all short-term liabilities and liability items, except for indebtedness payable more than one year from the date of incurrence and all goodwill, trade names, trademarks, patents, unamortized debt discount and unamortized expense incurred in the issuance of debt and other like intangibles, except for prepaid royalties.

Notwithstanding the limitations on secured debt described above, Baxter and any restricted subsidiary may create, incur, assume or guarantee secured debt, without equally and ratably securing the debt securities, provided that the sum of such secured debt and all other secured debt entered into after the date of the indenture, other than secured debt permitted as described in the bullet points above, does not exceed 15% of Baxter's consolidated net tangible assets.

For purposes of the indenture, a "restricted subsidiary" is any corporation in which Baxter owns voting securities entitling it to elect a majority of the directors and which is either designated as a restricted subsidiary in accordance with the indenture or:

- existed as such on the date of the indenture or is the successor to, or owns, any equity interest in, a corporation which so existed;

- has its principal business and assets in the United States;

- the business of which is other than the obtaining of financing in capital markets outside the United States or the financing of the acquisition or disposition of real or personal property or dealing in real property for residential or office building purposes; and

- does not have assets substantially all of which consist of securities of one or more corporations which are not restricted subsidiaries.

**Restrictions on Mergers, Consolidations and Transfers of Assets**

-37-

Unless otherwise indicated in the prospectus supplement, Baxter will not consolidate with or merge into or sell, transfer or lease all or substantially all of its properties and assets to another person unless:

- in the case of a merger, Baxter is the surviving corporation, or

- the person into which Baxter is merged or which acquires all or substantially all of the properties and assets of Baxter expressly assumes the payment of principal of, and premium, if any, and interest on the debt securities and Baxter's other obligations under the indenture.

Upon any of the consolidation, merger or transfer, the successor corporation will be substituted for Baxter under the indenture. The successor corporation may then exercise all of the powers and rights of Baxter under the indenture, and Baxter will be released from all of its obligations and covenants under the debt securities and the indenture. If Baxter leases all or substantially all of its assets, the lessee corporation will be the successor and may exercise all of the respective powers and rights under the indenture but Baxter will not be released from its obligations and covenants under the debt securities and the indenture.

## Events of Default

The indenture defines an "event of default" with respect to any series of debt securities. Each of the following will be an event of default under the indenture for any series of debt securities:

- our failure to pay interest on any of the debt securities of that series when due, and continuance of the default for a period of 30 days;

- our failure to pay principal or premium, if any, on any of the debt securities of that series when due, whether at maturity or otherwise;

- default in the deposit of any sinking fund payment or payment under any analogous provision when due with respect to any of the debt securities of that series;

- our failure to perform, or our breach, of any covenant or warranty in the indenture in respect of that series, other than a covenant or warranty included in the indenture solely for the benefit of another series of debt securities, and continuance of that failure or breach, without that failure or breach having been cured or waived, for a period of 90 days after the trustee gives notice to us or, in the case of notice by the holders, the holders of at least 25% in aggregate principal amount of the outstanding debt securities of that series give notice to us and the trustee, specifying the default or breach;

- specified events involving our bankruptcy, insolvency or reorganization; or

- any other event of default we may provide for that series.

An event of default under one series of debt securities does not necessarily constitute an event of default under any other series of debt securities. The indenture provides that, within 90 days after the occurrence of any default with respect to a series of debt securities, the trustee will mail to all holders of debt securities of that series notice of the default, unless the default has been cured or waived. However, the indenture provides that the trustee may withhold notice of a default with respect to a series of debt securities, except a default in payment of principal, premium, if any, or interest, if any, if the trustee considers it in the best interest of the holders to do so. In the case of a default in the performance, or breach, of any covenant or warranty in the indenture or in respect of a series of debt securities, no notice will be given until at least 30 days after the occurrence of the default or breach. As used in this paragraph,

-38-

the term "default" means any event which is, or after notice or lapse of time or both would become, an event of default with respect to a series of debt securities.

The indenture provides that if an event of default, other than an event of default relating to events of bankruptcy, insolvency or reorganization, with respect to a series of debt securities occurs and is continuing, either the trustee or the holders of not less than 25% in aggregate principal amount of the outstanding debt securities of that series may declare the principal of, and accrued and unpaid interest, if any, on, the debt securities in that series to be due and payable immediately. The indenture also provides that if an event of default relating to events of bankruptcy, insolvency or reorganization with respect to a series of debt securities occurs then the principal of, and accrued and unpaid interest, if any, on, all the debt securities of that series will automatically become and be immediately due and payable without any declaration or other act on the part of the trustee or any holder of the debt securities. However, upon specified conditions, the holders of not less than a majority in aggregate principal amount of the outstanding debt securities of a series may rescind and annul an acceleration of the debt securities of that series and its consequences.

Subject to the provisions of the Trust Indenture Act requiring the trustee, during the continuance of an event of default under the indenture, to act with the requisite standard of care, the trustee is under no obligation to exercise any of its rights or powers under the indenture at the request or direction of any of the holders of debt securities unless those holders have offered to the trustee security or indemnity satisfactory to the trustee against the costs, expenses and liabilities that may be incurred by taking such action.

Subject to this requirement, holders of a majority in aggregate principal amount of the outstanding debt securities of a series have the right to direct the time, method and place of conducting any proceeding for any remedy available to the trustee under the indenture with respect to the debt securities of that series.

The indenture requires the annual filing with the trustee of a certificate signed by the principal executive officer, the principal financial officer or the principal accounting officer of Baxter that states whether Baxter is in default under the terms, provisions or conditions of the indenture.

Notwithstanding any other provision of the indenture, the holder of a debt security will have the right, which is absolute and unconditional, to receive payment of the principal of, and premium, if any, and interest, if any, on that debt security on the respective due dates for those payments and to institute suit for the enforcement of those payments, and this right will not be impaired without the consent of the holder.

## Modification and Waivers

The indenture permits Baxter and the trustee, with the consent of the holders of a majority in aggregate principal amount of the outstanding debt securities of a series affected by a modification or amendment, to modify or amend any of the provisions of the indenture or of the debt securities or the rights of the holders of the debt securities under the indenture. However, no modification or amendment may, without the consent of the holder of each outstanding debt security affected by the modification or amendment, among other things:

• change the stated maturity of the principal of, or premium, if any, or any installment of interest, if any, on the debt securities;

• reduce the principal of or premium, if any, on the debt securities or reduce the rate of interest on or the redemption or repurchase price of the debt securities;

-39-

• change any place where or the currency in which the principal of, any premium or interest on, any debt security is payable;

• impair a holder's right to institute suit to enforce any payment on or after the stated maturity of the debt securities or, in the case of redemption, on or after the redemption date;

• reduce the percentage in principal amount of outstanding debt securities whose holders must consent to any modification or amendment or any waiver of compliance with specific provisions of the indenture or specified defaults under the indenture and their consequences;

• make certain modifications to the provisions for modification of the indenture and for certain waivers, except to increase the principal amount of outstanding debt securities necessary to consent to any such change; or

• make any change that adversely affects the right, if any, to convert or exchange any debt security for common stock or other securities in accordance with its terms.

The indenture also contains provisions permitting Baxter and the trustee, without the consent of the holders of the debt securities, to modify or amend the indenture, among other things:

• to convey, transfer, assign, mortgage or pledge to the trustee as security for the debt securities any property or assets which Baxter may desire;

• to evidence succession of another corporation to Baxter, or its successors, and the assumption by the successor corporation of the covenants, agreements and obligations of Baxter;

• to add covenants and agreements of Baxter to those included in the indenture for the protection of holders of debt securities and to make the occurrence of a default of any such covenants or agreements a default or an event of default permitting enforcement of the remedies set forth in the indenture;

• to add, delete or modify the events of default with respect to any series of debt securities the form and terms of which are being established pursuant to such supplemental indenture;

• to prohibit the authentication and delivery of additional series of debt securities under the indenture;

• to cure any ambiguity or correct or supplement any provision contained in the indenture or any supplemental indenture which may be defective or inconsistent with any other provisions contained therein;

• to make such other provisions in regard to matters or questions arising under the indenture as are not inconsistent with the provisions of the indenture or any supplemental indenture and do not adversely affect the interests of the holders of the debt securities in any material respect;

• to establish the form and terms of debt securities of any series issued under the indenture; or

• to evidence and provide for acceptance of appointment under the indenture by a successor trustee with respect to the debt securities of one or more series or to add to or change any of the provisions of the indenture as shall be necessary to provide for or facilitate the administration of the trusts under the indenture by more than one trustee.

The holders of a majority in aggregate principal amount of the outstanding debt securities may waive our compliance with some of the restrictive provisions of the indenture. The holders of a majority in aggregate principal amount of the outstanding debt securities may, on behalf of all holders of debt securities, waive any past default under the indenture with respect to the debt securities and its consequences, except a default in the payment of the principal of, or premium, if any, or interest, if any, on the debt securities or a default in respect of a covenant or provision which cannot be modified or amended without the consent of the holder of each outstanding debt security.

In order to determine whether the holders of the requisite principal amount of the outstanding debt securities have taken an action under an indenture as of a specified date:

• the principal amount of an "original issue discount security" that will be deemed to be outstanding will be the amount of the principal that would be due and payable as of that date upon acceleration of the maturity to that date,

• if, as of that date, the principal amount payable at the stated maturity of a debt security is not determinable, for example, because it is based on an index, the principal amount of the debt security deemed to be outstanding as of that date will be an amount determined in the manner prescribed for the debt security,

• the principal amount of a debt security denominated in one or more foreign currencies or currency units that will be deemed to be outstanding will be the U.S. dollar equivalent, determined as of that date in the manner prescribed for the debt security, of the principal amount of the debt security or, in the case of a debt security described in the two preceding bullet points, of the amount described above, and

• debt securities owned by us or any other obligor upon the debt securities or any of our or their affiliates will be disregarded and deemed not to be outstanding.

## Satisfaction and Discharge

Upon the direction of Baxter, the indenture will cease to be of further effect with respect to any debt security specified, subject to the survival of specified provisions of the indenture, when:

• either: (i) all debt securities issued under the indenture, subject to exceptions, have been delivered to the trustee for cancellation; or (ii) all debt securities issued under the indenture have become due and payable or will become due and payable at their stated maturity within one year or are to be called for redemption within one year and Baxter has deposited with the trustee, in trust, funds in United States dollars, or direct or indirect obligations of the United States ("government obligations") in an amount sufficient to pay the entire indebtedness on the debt securities including the principal, premium, if any, interest, if any, to the date of the deposit, if the debt securities have become due and payable, or to the maturity or redemption date of the debt securities, as the case may be;

• Baxter has paid all other sums payable under the indenture with respect to the outstanding debt securities issued under the indenture; and

• the trustee has received each officer's certificate and opinion of counsel called for by the indenture.

## Defeasance and Covenant Defeasance

Baxter may elect with respect to the debt securities issued under the indenture either

-41-

• to defease and be discharged from all of its obligations with respect to the outstanding debt securities ("defeasance"), except for, among other things,

  • the obligation to register the transfer or exchange of the debt securities,

  • the obligation to replace temporary or mutilated, destroyed, lost or stolen debt securities,

  • the obligation to maintain an office or agency in respect of the debt securities, and

  • the obligation to hold monies for payment in trust; or

• to be released from its obligations with respect to the debt securities under specified covenants in the indenture including those described under the heading "Certain Covenants — Restrictions on the creation of secured debt", and any omission to comply with those obligations will not constitute a default or an event of default with respect to the debt securities ("covenant defeasance"),

in either case upon the irrevocable deposit by Baxter with the trustee, or other qualifying trustee, in trust for that purpose, of an amount in United States dollars and/or government obligations which, through the payment of principal and interest in accordance with their terms, will provide money in an amount sufficient to pay the principal, premium, if any, and interest, if any, on the due dates for those payments.

The defeasance or covenant defeasance described above will only be effective if, among other things:

• it will not result in a breach or violation of, or constitute a default under, the indenture or any other material agreement or instrument to which Baxter is a party or is bound;

• in the case of defeasance, Baxter will have delivered to the trustee an opinion of independent counsel confirming that

  • Baxter has received from or there has been published by the Internal Revenue Service a ruling, or

  • since the date of the indenture there has been a change in applicable federal income tax law,

in either case to the effect that, and based on this ruling or change in law, the opinion of counsel will confirm that the holders of the debt securities then outstanding will not recognize income, gain or loss for federal income tax purposes as a result of the defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if the defeasance had not occurred;

• in the case of covenant defeasance, Baxter will have delivered to the trustee an opinion of independent counsel to the effect that the holders of the debt securities then outstanding will not recognize income, gain or loss for federal income tax purposes as a result of the covenant defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if the covenant defeasance had not occurred;

• if the cash and/or government obligations deposited are sufficient to pay the principal of, and premium, if any, and interest, if any, with respect to the debt securities provided the debt

securities are redeemed on a particular redemption date, Baxter will have given the trustee irrevocable instructions to redeem the debt securities on that date; and

• no event of default or event which with notice or lapse of time or both would become an event of default with respect to the debt securities will have occurred and be continuing on the date of the deposit into trust, and, solely in the case of defeasance, no event of default or event which with notice or lapse of time or both would become an event of default arising from specified events of bankruptcy, insolvency or reorganization with respect to Baxter will have occurred and be continuing during the period through and including the 91st day after the date of the deposit into trust.

In the event covenant defeasance is effected with respect to the debt securities and those debt securities are declared due and payable because of the occurrence of any event of default other than an event of default with respect to the covenants as to which covenant defeasance has been effected, which would no longer be applicable to the debt securities after covenant defeasance, the amount of monies and/or government obligations deposited with the trustee to effect covenant defeasance may not be sufficient to pay amounts due on the debt securities at the time of any acceleration resulting from that event of default. However, Baxter would remain liable to make payment of those amounts due at the time of acceleration.

## Listing

The 2029 Notes and the 2024 Notes are each traded on The New York Stock Exchange under the bond trading symbols of "BAX 29" and "BAX 24," respectively.

## Governing Law

The indenture is, and the notes are, governed by and construed in accordance with the laws of the State of New York, as applied to contracts made and performed within the State of New York, without regard to principles of conflicts of law.

## The Trustee, Registrar and Paying Agent

The Bank of New York Mellon Trust Company, N.A. is the trustee and registrar and The Bank of New York Mellon, London Branch is the paying agent with respect to the notes. Neither the trustee nor the paying agent shall be responsible for monitoring our rating status, making any request upon any Rating Agency, or determining whether any Rating Event or Change of Control Triggering Event has occurred.

## Notices

So long as any notes are represented by a global note and such global note is held on behalf of a clearing system, (i) notices to the holders of notes of the series may be given by delivery of the relevant notice to that clearing system for communication by it to entitled accountholders, and (ii) notices of holders of notes may be given to us through the clearing systems in accordance with the rules and regulations of the clearing systems in effect from time to time.

-43-

**EXHIBIT 10.3**

### AMENDMENT NO. 2 TO CREDIT AGREEMENT

This AMENDMENT NO. 2 TO CREDIT AGREEMENT (this "Amendment") is made as of October 31, 2019 among Baxter International Inc., a Delaware corporation (the "Borrower"), JPMorgan Chase Bank, National Association, as administrative agent under the hereinafter defined Credit Agreement (the "Administrative Agent"), and the other financial institutions signatory hereto.

R E C I T A L S:

A. The Borrower, the Administrative Agent and certain financial institutions are parties to a Five-Year Credit Agreement dated as of July 1, 2015 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of October 26, 2015, the "Credit Agreement").

B. The Borrower, the Administrative Agent and the undersigned Banks wish to amend the Credit Agreement on the terms and conditions set forth below.

Now, therefore, in consideration of the mutual execution hereof and other good and valuable consideration, the parties hereto agree as follows:

**1.** Definitions. Unless otherwise specified herein, all capitalized terms used herein shall have the meanings specified in the Credit Agreement.

**2.** Amendments to Credit Agreement. Upon the Effective Time (as defined below), Section 8.01(f)(i) of the Credit Agreement is hereby amended to add the following parenthetical immediately following the words "(B) fifty-five (55) days after the end of each of the first three (3) quarters of each fiscal year of the Borrower" contained therein: "(or, with respect to the fiscal quarter ending September 30, 2019, by December 31, 2019),".

**3.** Waiver. The Administrate Agent and the Majority Banks hereby waive any Unmatured Event of Default or Event of Default that may directly arise out of, or directly relate to, the investigation into certain intra-company transactions undertaken for the purpose of generating foreign exchange gains or losses, as more fully described under the heading "Investigation" in the Borrower's Form 8-K filed on October 24, 2019 (the "Specified Matters"); provided such Specified Matters shall include (i) any amendment to the Company's periodic reports previously filed with the Securities and Exchange Commission the ("SEC") to include restated financial statements that correct misstatements resulting from the Specified Matters, or inclusion in periodic reports filed with the SEC for future periods restated comparative financial statements that correct such misstatements (and any delay in the filing of any such amendment or future periodic report) and (ii) the correction of certain items that affect operating income that were immaterial to the Company's previously reported results of operations, including the impact of the use of the foreign exchange rate convention to translate the results of the Company's foreign operations into U.S. dollars and the impact of the incorrect accounting for placed equipment that the Company leases to its customers; provided, further, that the foregoing waiver shall automatically terminate and cease to be of any force and effect on December 31, 2019. This specific waiver applies only to the Specified Matters and only for the express circumstances described above. This specific waiver shall not be construed to constitute (x) a waiver of any other event, circumstance or condition or of any other right or remedy available to the Administrative Agent or any Bank pursuant to the Credit Agreement or any other Loan Document or other applicable law or (y) a custom or course of dealing or a consent to any departure by any Loan Party from any other term or requirement of the Credit Agreement or any other Loan Document. This Section 3 is a limited waiver and shall not be deemed to constitute a waiver of any other term, provision or condition of the Credit Agreement or any other Loan Document, as applicable, or to prejudice any right, power or remedy that Administrative Agent and the Banks may now have or may have in the future under or in connection with the Credit Agreement or any other Loan Document or other applicable law.

**4.** Representations and Warranties of the Borrower . The Borrower represents and warrants that:

(a) the execution, delivery and performance by the Borrower of this Amendment have been duly authorized by all necessary corporate action and that this Amendment is a legal, valid and binding obligation of the Borrower enforceable against the Borrower in accordance with its terms, except as the enforcement thereof may be subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally; and

(b) no Event of Default or Unmatured Event of Default has occurred and is continuing.

**5.** Effective Time. This Amendment shall become effective on the date (the "Effective Time") upon the execution and delivery hereof by the Borrower, the Administrative Agent and the Majority Banks.

US-DOCS\111504822.6

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**6.** <u>Miscellaneous</u>.

    **(a)** Except as specifically amended hereby, the Credit Agreement, the Notes and the other agreements, instruments and documents executed in connection therewith (collectively, the "<u>Loan Documents</u>") shall remain in full force and effect and are hereby ratified and confirmed.

    **(b)** The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Administrative Agent or any Bank under the Credit Agreement or any other Loan Document, or constitute a waiver of any provision of the Credit Agreement or any other Loan Document. Upon the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Credit Agreement as amended hereby.

    **(c)** Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

    **(d)** This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument. Delivery of an executed signature page of this Amendment by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

    **(e)** Sections 11.09 and 11.10 of the Credit Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis,* and the parties hereto agree that such provisions shall apply to this Amendment with the same force and effect as if set forth herein in their entirety.

**7.** <u>Costs and Expenses</u>. The Borrower hereby affirms its obligation under Section 11.04 of the Credit Agreement to reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation, negotiation, execution and delivery of this Amendment, including but not limited to the reasonable and documented fees, charges and disbursements of attorneys for the Administrative Agent with respect thereto.

**8.** <u>Governing Law</u>. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

[signature pages follow] 2

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first above written.

BAXTER INTERNATIONAL INC.

By: /s/ James Saccaro
Name: James Saccaro
Title: Executive Vice President and Chief Financial Officer

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Administrative Agent and as a Bank

By: /s/ Erik Barragan
Name: Erik Barragan
Title: Authorized Officer

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

BANK OF AMERICA, N.A.

By: /s/ Yinghua Zhang
Name: Yinghua Zhang
Title: Director

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

CITIBANK, N.A.

By: /s/ Richard Rivera
Name: Richard Rivera
Title: Vice President

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]



MIZUHO BANK, LTD.

By: /s/ Tracy Rahn
Name: Tracy Rahn
Title: Executive Director

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

DEUTSCHE BANK AG NEW YORK BRANCH

By: /s/ Ming K. Chu
Name: Ming K. Chu
Title: Director

By: /s/ Virginia Cosenza
Name: Virginia Cosenza
Title: Vice President

**[signature page to Amendment No. 2 to Credit Agreement]**

---

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

GOLDMAN SACHS BANK USA

By: /s/ Jamie Minieri
Name: Jamie Minieri
Title: Authorized Signatory

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

UBS AG, STAMFORD BRANCH

By: /s/ Darlene Arias
Name: Darlene Arias
Title: Director

By: /s/ Anthony Joseph
Name: Anthony Joseph
Title: Associate Director

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH

By: /s/ John D. Toronto
Name: John D. Toronto
Title: Authorized Signatory

By: /s/ Emerson Almeida
Name: Emerson Almeida
Title: Authorized Signatory

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

BARCLAYS BANK PLC

By: /s/ Stephanie Crombie
Name: Stephanie Crombie
Title: Director

[signature page to Amendment No. 2 to Credit Agreement]

---

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

HSBC BANK USA, N.A.

By: /s/ Iain Stewart
Name: Iain Stewart
Title: Managing Director

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

[signature page to Amendment No. 2 to Credit Agreement]

The Toronto-Dominion Bank, New York Branch

By: /s/ Brian MacFarlane
Name: Brian MacFarlane
Title: Authorized Signatory

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

THE BANK OF NEW YORK MELLON

By: /s/ Clifford A. Mull
Name: Clifford A. Mull
Title: Director

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

MORGAN STANLEY BANK, N.A.

By: /s/ Jackson Eng
Name: Jackson Eng
Title: Authorized Signatory

**[signature page to Amendment No. 2 to Credit Agreement]**

**[signature page to Amendment No. 2 to Credit Agreement]**

MUFG Bank, Ltd

By: /s/ S. Hughes
Name: S. Hughes
Title: Managing Director

**[signature page to Amendment No. 2 to Credit Agreement]**

**EXHIBIT 10.7**

### AMENDMENT NO. 1 TO GUARANTY

This AMENDMENT NO. 1 TO GUARANTY (this "Amendment") is made as of October 31, 2019 between Baxter International Inc., a Delaware corporation (the "Guarantor") and J.P. Morgan Europe Limited, as agent under the hereinafter defined Guaranty (the "Agent") for the financial institutions party to that certain Credit Agreement, dated as of July 1, 2015 for Baxter Healthcare SA and Baxter World Trade SPRL.

R E C I T A L S:

**A.** The Guarantor executed in favor of the Agent that certain Guaranty, as of July 1, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty").

**B.** The Guarantor and the Agent wish to amend the Guaranty on the terms and conditions set forth below.

Now, therefore, in consideration of the mutual execution hereof and other good and valuable consideration, the parties hereto agree as follows:

**1.** Definitions. Unless otherwise specified herein, all capitalized terms used herein shall have the meanings specified in the Guaranty.

**2.** Amendments to Guaranty. Upon the Effective Time (as defined below), Section 12(a)(i) of the Guaranty is hereby amended to add the following parenthetical immediately following the words "(B) fifty-five (55) days after the end of each of the first three (3) quarters of each fiscal year of the Guarantor" contained therein: "(or, with respect to the fiscal quarter ending September 30, 2019, by December 31, 2019),".

**3.** Waiver. The Agent hereby waives any Unmatured Event of Default or Event of Default in the Guaranty that may directly arise out of, or directly relate to, the investigation into certain intra-company transactions undertaken for the purpose of generating foreign exchange gains or losses, as more fully described under the heading "Investigation" in the Guarantor's Form 8-K filed on October 24, 2019 (the "Specified Matters"); provided such Specified Matters shall include (i) any amendment to the Company's periodic reports previously filed with the Securities and Exchange Commission the ("SEC") to include restated financial statements that correct misstatements resulting from the Specified Matters, or inclusion in periodic reports filed with the SEC for future periods restated comparative financial statements that correct such misstatements (and any delay in the filing of any such amendment or future periodic report) and (ii) the correction of certain items that affect operating income that were immaterial to the Company's previously reported results of operations, including the impact of the use of the foreign exchange rate convention to translate the results of the Company's foreign operations into U.S. dollars and the impact of the incorrect accounting for placed equipment that the Company leases to its customers; provided, further, that the foregoing waiver shall automatically terminate and cease to be of any force and effect on December 31, 2019. This specific waiver applies only to the Specified Matters and only for the express circumstances described above. This specific waiver shall not be construed to constitute (x) a waiver of any other event, circumstance or condition or of any other right or remedy available to the Agent or any Bank pursuant to the Guaranty, the Credit Agreement or any other Loan Document or other applicable law or (y) a custom or course of dealing or a consent to any departure by any Loan Party from any other term or requirement of the Guaranty, the Credit Agreement or any other Loan Document. This Section 3 is a limited waiver and shall not be deemed to constitute a waiver of any other term, provision or condition of the Guaranty, the Credit Agreement or any other Loan Document, as applicable, or to prejudice any right, power or remedy that Agent and the Banks may now have or may have in the future under or in connection with the Guaranty, the Credit Agreement or any other Loan Document or other applicable law.

**4.** Representations and Warranties of the Guarantor . The Guarantor represents and warrants that:

(a) the execution, delivery and performance by the Guarantor of this Amendment have been duly authorized by all necessary corporate action and that this Amendment is a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, except as the enforcement thereof may be subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally; and

(b) no Event of Default or Unmatured Event of Default has occurred and is continuing.

**5.** Effective Time. This Amendment shall become effective on the date (the "Effective Time") upon the execution and delivery hereof by the Guarantor and the Agent.

US-DOCS\111506705.6

**6.** Miscellaneous.

(a) Except as specifically amended hereby, the Guaranty, and the other agreements, instruments and documents executed in connection therewith (collectively, the "Loan Documents") shall remain in full force and effect and are hereby ratified and confirmed.

(b) The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of the Agent or any Bank under the Guaranty, the Credit Agreement or any other Loan Document, or constitute a waiver of any provision of the Guaranty, the Credit Agreement or any other Loan Document. Upon the effectiveness of this Amendment, each reference in the Guaranty to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Guaranty as amended hereby.

(c) Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

(d) This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument. Delivery of an executed signature page of this Amendment by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

(e) Sections 21 and 22 of the Guaranty are hereby incorporated by reference into this Amendment, *mutatis mutandis,* and the parties hereto agree that such provisions shall apply to this Amendment with the same force and effect as if set forth herein in their entirety.

**7.** Costs and Expenses. The Guarantor hereby agrees to reimburse the Agent for all reasonable and documented out-of-pocket expenses incurred by the Agent in connection with the preparation, negotiation, execution and delivery of this Amendment, including but not limited to the reasonable and documented fees, charges and disbursements of attorneys for the Agent with respect thereto.

**8.** Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

[signature pages follow] 2

**[signature page to Amendment No. 1 to Guaranty]**

**[signature page to Amendment No. 1 to Guaranty]**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date and year first above written.

BAXTER INTERNATIONAL INC.

By: /s/ James Saccaro  Name: James Saccaro
Title: Executive Vice President and Chief Financial Officer

**[signature page to Amendment No. 1 to Guaranty]**

---

**[signature page to Amendment No. 1 to Guaranty]**

J.P. MORGAN EUROPE LIMITED, as Agent

By: /s/ Fatma Mustafa
Name: Fatma Mustafa
Title: Vice President

**[signature page to Amendment No. 1 to Guaranty]**

EXHIBIT 10.8

**WAIVER TO CREDIT AGREEMENT**

This WAIVER (this "Waiver"), dated as of October 31, 2019 among Baxter Healthcare SA, a corporation duly organized and existing under the laws of Switzerland ("Baxter Healthcare SA"), Baxter World Trade SPRL, a corporation duly organized and existing under the laws of Belgium ("Baxter World Trade SPRL") (Baxter Healthcare SA and Baxter World Trade SPRL are each individually a "Borrower" and collectively, the "Borrowers"), J.P. Morgan Europe Limited, as administrative agent under the hereinafter defined Credit Agreement (the "Administrative Agent"), the other financial institutions signatory hereto and, solely for purposes of Section 8 hereof, Baxter International Inc., a Delaware corporation (the "Guarantor").

R E C I T A L S:

A. The Borrowers, the Administrative Agent and certain financial institutions are parties to a Credit Agreement dated as of July 1, 2015 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of October 26, 2015, the "Credit Agreement").

B. The Administrative Agent and the undersigned Banks wish to provide the Waiver on the terms and conditions set forth below.

Now, therefore, in consideration of the mutual execution hereof and other good and valuable consideration, the parties hereto agree as follows:

1. Definitions. Unless otherwise specified herein, all capitalized terms used herein shall have the meanings specified in the Credit Agreement.

2. Waiver. The Administrative Agent and the Majority Banks hereby waive any Unmatured Event of Default or Event of Default that may directly arise out of, or directly relate to, the investigation into certain intra-company transactions undertaken for the purpose of generating foreign exchange gains or losses, as more fully described under the heading "Investigation" in the Guarantor's Form 8-K filed on October 24, 2019 (the "Specified Matters"); provided such Specified Matters shall include (i) any amendment to the Company's periodic reports previously filed with the Securities and Exchange Commission the ("SEC") to include restated financial statements that correct misstatements resulting from the Specified Matters, or inclusion in periodic reports filed with the SEC for future periods restated comparative financial statements that correct such misstatements (and any delay in the filing of any such amendment or future periodic report) and (ii) the correction of certain items that affect operating income that were immaterial to the Company's previously reported results of operations, including the impact of the use of the foreign exchange rate convention to translate the results of the Company's foreign operations into U.S. dollars and the impact of the incorrect accounting for placed equipment that the Company leases to its customers; provided, further, that the foregoing waiver shall automatically terminate and cease to be of any force and effect on December 31, 2019. This specific waiver applies only to the Specified Matters and only for the express circumstances described above. This specific waiver shall not be construed to constitute (x) a waiver of any other event, circumstance or condition or of any other right or remedy available to the Administrative Agent or any Bank pursuant to the Credit Agreement or any other Loan Document or other applicable law or (y) a custom or course of dealing or a consent to any departure by any Loan Party from any other term or requirement of the Credit Agreement or any other Loan Document. This Section 2 is a limited waiver and shall not be deemed to constitute a waiver of any other term, provision or condition of the Credit Agreement or any other Loan Document, as applicable, or to prejudice any right, power or remedy that Administrative Agent and the Banks may now have or may have in the future under or in connection with the Credit Agreement or any other Loan Document or other applicable law.

3. Representations and Warranties of the Borrowers . Each Borrower represents and warrants that:

(a) the execution, delivery and performance by such Borrowers of this Waiver have been duly authorized by all necessary corporate action and that this Waiver is a legal, valid and binding obligation of such Borrower enforceable against such Borrower in accordance with its terms, except as the enforcement thereof may be subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally; and

(b) no Event of Default or Unmatured Event of Default has occurred and is continuing.

4. Effective Time. This Waiver shall become effective on the date (the "Effective Time") upon the execution and delivery hereof by the Borrowers, the Guarantor, the Administrative Agent and the Majority Banks.

US-DOCS\111531747.3

S&C Draft of October 30, 2019

**5.** <u>Miscellaneous</u>.

**(a)** Subject to the waiver contained herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

**(b)** Section headings in this Waiver are included herein for convenience of reference only and shall not constitute a part of this Waiver for any other purposes.

**(c)** This Waiver may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all such counterparts shall constitute one and the same instrument. Delivery of an executed signature page of this Waiver by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

**(d)** Sections 11.09 and 11.10 of the Credit Agreement are hereby incorporated by reference into this Waiver, *mutatis mutandis* and the parties hereto agree that such provisions shall apply to this Waiver with the same force and effect as if set forth herein in their entirety.

**6.** <u>Costs and Expenses</u>. Each Borrower hereby agrees to reimburse the Administrative Agent for all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent in connection with the preparation, negotiation, execution and delivery of this Waiver, including but not limited to the reasonable and documented fees, charges and disbursements of attorneys for the Administrative Agent with respect thereto.

**7.** <u>Governing Law</u>. This Waiver shall be governed by, and construed in accordance with, the laws of the State of New York.

**8.** <u>Reaffirmation</u>. The Guarantor hereby (a) consents to this Waiver and each of the transactions referenced herein and (b) reaffirms its obligations under the Guaranty.

[signature pages follow] 2

**[signature page to Waiver]**

IN WITNESS WHEREOF, the parties have executed this Waiver as of the date and year first above written.

BAXTER HEALTHCARE SA

By: /s/ James Saccaro  Name: James Saccaro
Title: Authorized Representative

BAXTER WORLD TRADE SPRL

By: /s/ James Saccaro  Name: James Saccaro
Title: Authorized Representative

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

BAXTER INTERNATIONAL INC.

By: /s/ James Saccaro  Name: James Saccaro
 Title: Executive Vice President and Chief Financial Officer

**[signature page to Waiver]**

---

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

J.P. MORGAN EUROPE LIMITED, as Administrative Agent

By: /s/ Fatma Mustafa
Name: Fatma Mustafa
**[signature page to Waiver]**Title: Vice President

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Bank

By: /s/ Erik Barragan
Name: Erik Barragan
Title: Authorized Officer

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

CITIBANK, N.A., LONDON BRANCH, as Bank

By: /s/ Sahir Mudasar
Name: Sahir Mudasar
Title: Vice President

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

DEUTSCHE BANK AG, LONDON BRANCH, as Bank

By: /s/ David Garcia-Capel
Name: David Garcia Capel
Title: Director


By: /s/ Violaine Averous
Name: Violaine Averous
Title: Director

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

BANK OF AMERICA, N.A., as Bank

By: /s/ Yinghua Zhang
Name: Yinghua Zhang
Title: Director

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

**[signature page to Waiver]**

BARCLAYS BANK PLC, as Bank

By: /s/ Stephanie Crombie
Name: Stephanie Crombie
**[signature page to Waiver]**Title: Director

---

**[signature page to Waiver]**

**[signature page to Waiver]**

CREDIT SUISSE INTERNATIONAL, as Bank

By: /s/ N. Grant
Name: N. Grant
Title: Director


By: /s/ Brian Fitzgerald
Name: Brian Fitzgerald
**[signature page to Waiver]**Title: Authorised Signatory

---

**[signature page to Waiver]**

UBS AG, STAMFORD BRANCH, as Bank

By: /s/ Darlene Arias
Name: Darlene Arias
 Title: Director


By: /s/ Anthony Joseph
Name: Anthony Joseph
 Title: Associate Director

**[signature page to Waiver]**

**EXHIBIT 10.22**

**Baxter International Inc.**
**Equity Plan**
**Adopted as of March 16, 2020**

## 1. Purpose

This Equity Plan (the "Plan") has been adopted by the Compensation Committee (the "Committee") of the Board of Directors (the "Board") of Baxter International Inc. ("Baxter") as of March 16, 2020.

## 2. Participants

Participants in this Plan (each a "Participant") shall be select employees of Baxter or its subsidiaries (the "Company") to whom the Committee may make awards of stock options (each an "Option"), performance share units (each a "PSU") and restricted stock units (each an "RSU", and together with Options and PSUs, "Awards") under this Plan.

## 3. Awards

**3.1** Awards shall be made pursuant to and for the purposes stated in the Company incentive compensation program or plan (the "Program") identified in the individual grant materials provided to the Participant (the "Grant") and are subject to the terms and conditions set forth in such Program. Such Grant materials consist of a communication letter to Participants notifying them of their Awards and may include alternative terms with respect to vesting, in which case the vesting terms in the Grant communication letter shall govern. All Awards granted hereunder shall be subject to the Company's Incentive Compensation Recoupment Policy or Executive Compensation Recoupment Policy, as applicable, and shall be subject to potential clawback in accordance with Section 8 of this Plan as well as any clawback provisions in the Program. Copies of the Company's Incentive Recoupment Policy and Executive Compensation Recoupment Policy are attached hereto as Exhibits A and B. Each Award shall be granted as of the date approved and as provided in the Grant, or for eligible French employees as soon thereafter as practicable pursuant to applicable French law (as provided in the attached French Addendum which shall govern such Awards) (the "Grant Date"). The purchase price for each Share subject to an Option shall be the Fair Market Value of a share of common stock (the "Common Stock"), par value $1.00, of Baxter (each a "Share") on the Grant Date. The terms of each Award will be as set forth in this Plan. Unless otherwise defined herein, capitalized terms used in this Plan shall have the meanings set forth in the Program. Options are not intended to qualify as Incentive Stock Options within the meaning of section 422 of the United States Internal Revenue Code, as amended (the "Code").

**3.2** Notwithstanding any other provision in the Plan to the contrary, any Grant or Award made under the Plan on or after March 16, 2020 shall be cancelled and no Award will vest or be exercisable if the Participant does not accept, sign, date and return, as directed by Baxter, the Non-Competition, Non-Solicitation and Confidentiality Agreement within sixty (60) days of being provided a copy of such agreement.

## 4. Options

**4.1.** Options shall become exercisable as follows: (i) one-third on the first anniversary of the Grant Date, (ii) one-third on the second anniversary of the Grant Date, and (iii) the remainder on the third anniversary of the Grant Date. If Options would become exercisable on a date that is not a business day, they will become exercisable on the next business day. A business day is any day on which the Common Stock is traded on the New York Stock Exchange. After Options become exercisable (in each case, in whole or in part) and until they expire, the Options may be exercised in whole or in part, in the manner specified by the Committee. Under no circumstances may Options be exercised after they have expired. Shares may be used to pay the purchase price for Shares to be acquired upon exercise of Options or fulfill any tax withholding obligation, subject to any requirements or restrictions specified by the Committee.

**4.2.** Subject to Section 8, if a Participant's employment with the Company terminates before the Participant's Options become exercisable, the Options will expire when the Participant's employment with the Company terminates, except (i) in connection with a Qualifying Retirement or death or disability (each as outlined below) or (ii) if the Participant is rehired by the Company within ninety days of termination, in which case the Participant shall be construed to have been continuously employed by the Company for purposes of vesting and exercise.

**4.3.** Subject to Section 8, if a Participant's employment with the Company terminates after the Participant's Options become exercisable, the Options will not expire immediately but will remain exercisable. Subject to Section 4.6, and except in the event of a Qualifying Retirement (as provided in Section 4.4), the Options will expire ninety days after the Participant's employment with the Company terminates. If the Participant dies or becomes disabled during the ninety-day period, the Options will expire on the fifth anniversary of the termination date.

**4.4.** Subject to Section 8, if the employment of a Participant who is at least 65 years of age, or at least 55 years of age with at least 10 years of employment with the Company, is terminated other than for Cause or by reason of the Participant's death or disability (a "<u>Qualifying Retirement</u>") then (i) if the date of such termination is after the calendar year of the Grant Date, the Options shall continue to vest as provided in Section 4.1, or (ii) if the date of such termination is in the calendar year of the Grant Date, a portion of the Options shall continue to vest as provided in Section 4.1, which portion shall be determined as follows: (# shares covered by Option award) * (# of months worked in that year, rounded to nearest whole month) / 12. Subject to Sections 4.6 and 8, the Participant's Options (whether vesting pursuant to (i) or (ii) or previously vested) shall expire on the fifth anniversary of the termination date.

**4.5.** If the employment of a Participant is terminated due to death or disability, then (i) if the date of such termination is after the calendar year of the Grant Date, the Options shall vest immediately, or (ii) if the date of such termination is in the calendar year of the Grant Date, a portion of the Options shall vest immediately, which portion shall be determined as follows: (# shares covered by Option award) * (# of months worked in that year, rounded to nearest whole month) / 12. Subject to Section 4.6, such Options will expire on the fifth anniversary of the termination date.

**4.6.** Subject to Section 8, Options that have not previously expired will expire at the close of business on the tenth anniversary of the Grant Date. If Options would expire on a date that is not a business day, they will expire at the close of business on the last business day preceding that date.

**4.7.** Except as the Committee may otherwise provide, Options may only be exercised by the Participant, the Participant's legal representative, or a person to whom the Participant's rights in the Options are transferred by will or the laws of descent and distribution.

**4.8.** A transfer of employment within the Company will not constitute a termination of employment within the meaning of the Plan.

**4.9.** A transfer of employment to a company that assumes an Option or issues a substitute option in a transaction to which Section 424 of the Code applies will not constitute a termination of employment within the meaning of the Plan.

**4.10.** Except to the extent that it would cause the Option to be subject to Section 409A of the Code, the Committee may, in its sole discretion and without receiving permission from any Participant, substitute stock appreciation rights ("SARs") for any or all outstanding Options. Upon the grant of substitute SARs, the related Options replaced by the substitute SARs shall be cancelled. The grant price of the substitute SARs shall be equal to the Option Price of the related Options, the term of the substitute SARs shall not exceed the term of the related Options, and the terms and conditions applicable to the substitute SARs shall otherwise be substantially the same as those applicable to the related Options replaced by the substitute SARs. Upon exercise, the SARs will be settled in Shares.

**4.11.** To the extent that an Option has not been exercised on the date the Option would otherwise expire pursuant to Sections 4.6 and 8, and the Fair Market Value of the Common Stock on such date exceeds the exercise price, Baxter may (but shall not be obligated to), on behalf of the Participant, direct that the Option be exercised and the shares of Common Stock sold, with the proceeds used to pay the exercise price and any applicable tax withholding, and the remaining proceeds credited to the Participant's account, or take such other action as the Committee may determine; provided that in no event shall Baxter, any member of the Committee, or any person acting on their behalf have any liability to a Participant for failing to take any such action.

## 5. Performance Share Units

**5.1.** The PSUs will be earned one-third under 5.1(a), one-third under 5.1(b) and one-third under 5.1(c) as follows:

**5.1(a).** The PSUs earned under this subsection (a) will be earned based on the rank of Baxter's total shareholder return ("TSR") relative to the TSR of companies in the healthcare peer group selected by the Committee within the first ninety (90) days of 2020 (the "TSR PSUs"). TSR will be measured over a three-year period beginning with the first day of the calendar year of the Grant Date and ending on the last day of the third calendar year (the "TSR Performance Period").

The TSR PSUs will pay out in shares of Common Stock in a range of 0% to 200% of the number of TSR PSUs awarded to the Participant as follows:

| Baxter's Percent Rank | Percentage of Target Grant Earned |
|---|---|
| 80 percent or above | 200% |
| 50 percent | 100% |
| 35 percent | 50% |
| Below 35 percent | 0% |

The TSR PSUs will pay out linearly between each set of data points. Should Baxter's absolute TSR, as measured for 2020 PSU grants, be negative but otherwise have resulted in a payout greater than 100% based on the above schedule, the payout will be capped at 100%. TSR will be measured based on the average closing stock prices over the last twenty days of the TSR Performance Period (plus reinvested dividends) divided by average closing stock prices over the twenty trading days prior to the beginning of the TSR Performance Period.

**5.1(b).** The PSUs earned under this subsection (b) will be earned based on Baxter's Compound Annual Growth Rate Sales Grown (CAGR) performance (the "CAGR PSUs"), as defined below. CAGR performance will be measured over a three-year period, beginning with the first day of the calendar year of the Grant Date and ending on the last day of the third calendar year (the "CAGR Performance Period"). The Committee will set a target CAGR performance within the first ninety (90) days of the three-year period and assess annual performance against that target after the conclusion of that three-year period, which shall be finalized in accordance with 5.1(d).

The CAGR PSUs will pay out in shares of Common Stock in a range of 0% to 200% to the Participant as follows:

| Baxter CAGR Performance | Percentage of Target Grant Earned |
|---|---|
| 7 percent and above | 200% |
| 5 percent | 100% |
| 3 percent | 50% |
| Below 3 percent | 0% |

The CAGR PSUs will pay out linearly between each set of data points. CAGR performance will be measured based on the change in net sales over a three-year period as if the growth happened steadily over that period of time.

The calculation is as follows:

Calculate Net Sales at the end of the period divided by Net Sales at the beginning of the period and raise the result to an exponent of one divided by the number of years within the period. Subtract one from the subsequent result to arrive at the growth percentage.

**5.1(c).** The PSUs earned under this subsection (b) will be earned based on Baxter's Adjusted Return on Invested Capital (ROIC) performance (the "ROIC PSUs"), as defined below. ROIC

Case: 1:19-cv-07786 Document #: 41-4 Filed: 08/24/20 Page 329 of 586 PageID #:1150

performance will be measured over a three-year period, beginning with the first day of the calendar year of the Grant Date and ending on the last day of the third calendar year (the "ROIC Performance Period"). The Committee will set a target ROIC performance within the first ninety (90) days of the three-year period and assess annual performance against that target after the conclusion of that three-year period, which shall be finalized in accordance with 5.1(d).

The ROIC PSUs will pay out in shares of Common Stock in a range of 0% to 200% to the Participant as follows:

| Baxter ROIC Performance | Percentage of Target Grant Earned |
|---|---|
| 120 percent and above | 200% |
| 100 percent | 100% |
| 80 percent | 50% |
| Below 80 percent | 0% |

The ROIC PSUs will pay out linearly between each set of data points. ROIC performance will be measured for the three-year period based on each year's net operating profit less adjusted tax, divided by average invested capital, then calculating a simple average for each of the results of the three years of the performance period.

**5.1(d).** Following the end of the Performance Periods, the Committee shall determine the PSU payout, which determination shall be final and binding. Shares of Common Stock earned will be delivered or otherwise made available to the Participant as soon as practical after the Committee makes its determination but not later than the March 15 after the end of the Performance Periods. PSUs will only be settled in shares of Common Stock. Any other settlement modality shall be considered an exception, which would have to be approved separately by the Committee.

**5.2.** Subject to Section 8, if a Participant's employment with the Company terminates before the end of the Performance Periods, any unvested PSUs shall be forfeited on the effective date of termination, except (i) in connection with a Qualifying Retirement or death or disability (each as outlined below), or (ii) if the Participant is rehired by the Company within ninety days of termination, in which case the Participant shall be construed to have been continuously employed by the Company for purposes of vesting.

**5.3.** Subject to Section 8, if the employment of a Participant terminates in a Qualifying Retirement then (i) if the date of such termination is after the calendar year of the Grant Date, the PSUs will remain eligible for payout at the end of the Performance Periods on the terms provided in Section 5.1, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the unearned PSUs shall remain eligible for payout at the end of the Performance Periods on the terms provided in Section 5.1, which portion shall be determined as follows: (# PSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

**5.4.** If the employment with the Company of a Participant is terminated due to death or disability, the PSUs shall vest as follows: (i) if the date of such termination is after the calendar year of the Grant Date, PSUs shall pay out at 100% of the Target Grant (as depicted in the tables

in Section 5.1.), or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the unearned PSUs shall pay out as provided in (i), which portion shall be determined as follows: (# PSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

**5.5.** The PSUs shall not be transferable and may not be sold, assigned, pledged, hypothecated or otherwise encumbered.

**5.6.** A transfer of employment within the Company will not constitute a termination of employment within the meaning of the Plan.

**5.7.** Until the shares of Common Stock have been delivered or otherwise made available as provided in Section 5.1, the Participant shall not be treated as a shareholder as to those shares of Common Stock relating to the PSUs. Notwithstanding the foregoing, the Participant shall be permitted to receive additional PSUs with respect to outstanding PSUs based upon the dividends and distributions paid on shares of Common Stock to the same extent as if each PSU were a share of Common Stock (without adjustment prior to vesting for payment levels set forth in the table in Section 5.1), which additional PSUs shall be determined in amount and value in the Company's discretion and shall be delivered or made available at the same time and to the same extent as the PSUs to which they relate or as otherwise determined by the Company.

**5.8.** To the extent required by Section 409A of the Internal Revenue Code, no PSUs that become payable to a specified employee (as defined in the Baxter International Inc. and Subsidiaries Deferred Compensation Plan) by reason of a separation from service shall be paid until the first day of the seventh month following the separation from service, and the PSUs shall be otherwise interpreted and administered in accordance with Section 409A.

## 6. Restricted Stock Units

**6.1.** Except for RSUs granted to the employees of the Company's subsidiaries in France, RSUs are subject to being earned and vested as follows: (i) one-third on the first anniversary of the Grant Date, (ii) one-third on the second anniversary of the Grant Date, and (iii) the remainder on the third anniversary of the Grant Date (each as applicable, a "Vesting Date"). RSUs granted to the employees of the Company's subsidiaries in France are subject to being earned and vested on the second anniversary of the Grant Date in accordance with the attached French Addendum. If RSUs would become earned and vested on a date that is not a business day, the next business day shall be the Vesting Date. The Company will deliver or otherwise make available to the Participant within 2½ months following the applicable Vesting Date one Share for each RSU that vests. RSUs will only be settled in Shares. Any other settlement method would be considered an exception and would have to be approved separately by the Committee.

**6.2.** Subject to Section 8, if a Participant's employment with the Company terminates before a given Vesting Date, any unvested RSUs will be forfeited when the Participant's employment with the Company terminates, except (i) in connection with a Qualifying Retirement or death or disability (each as outlined below), or (ii) if the Participant is rehired by the Company within

ninety days of termination, in which case the Participant shall be construed to have been continuously employed by the Company for purposes of vesting and payout.

**6.3.** Subject to Section 8, if the employment of a Participant terminates in a Qualifying Retirement then (i) if the date of such termination is after the calendar year of the Grant Date, the RSUs will remain eligible for payout on the terms provided in Section 6.1, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the RSUs shall remain eligible for payout on the terms provided in Section 6.1, which portion shall be determined as follows: (# RSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

**6.4.** If the employment with the Company of a Participant is terminated due to death or disability, the RSUs shall vest as follows: (i) if the date of such termination is after the calendar year of the Grant Date, all the RSUs shall pay out within sixty days, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the RSUs shall pay out within sixty days, which portion shall be determined as follows: (# RSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

**6.5.** The RSUs shall not be transferable and may not be sold, assigned, pledged, hypothecated or otherwise encumbered.

**6.6.** A transfer of employment within the Company will not constitute a termination of employment within the meaning of the Plan.

**6.7.** Until the Shares have been delivered or otherwise made available as provided in Section 6.1, the Participant shall not be treated as a shareholder as to those Shares relating to the RSUs. Notwithstanding the foregoing, the Participant shall be permitted to receive additional RSUs with respect to the RSUs based upon the dividends and distributions paid on Shares to the same extent as if each RSU were a Share, which additional RSUs shall be delivered or made available at the same time and to the same extent as the RSUs to which they relate or as otherwise determined by the Company.

7. **Change in Control**

Notwithstanding any other provision of the Program or this Plan (and in lieu of vesting at the times otherwise provided in the Program), if the termination of employment of a Participant occurs upon or within twenty-four (24) months following a Change in Control by reason of (a) termination by the Company for reasons other than for Cause or (b) termination by the Participant for Good Reason, then all Awards shall become immediately vested and exercisable.

**8. Equity Clawback**

**8.1.** For purposes of the Plan: (a) a <u>Disqualifying Termination</u> occurs if (i) the Participant's employment with the Company terminates and (ii) such Participant violates (either during and/or after employment with Baxter) the terms of the Participant's Non-Competition, Non-Solicitation and Confidentiality Agreement with Baxter International Inc. as described in and required by

Section 3.2; (b) the <u>Termination Date</u> shall mean the last date of employment with Baxter by such Participant, and (c) a Participant's Non-Competition, Non-Solicitation and Confidentiality Agreement shall mean such Participant's non-competition, non-solicitation and confidentiality agreement entered into with Baxter in connection with the grant of Awards under the Plan.

**8.2** If a Participant has a Disqualifying Termination, then any Awards that have not vested or are not exercisable as of the Termination Date (including any Awards that would later vest as a result of a Qualifying Retirement) shall be cancelled and shall not vest or be exercisable.

**8.3** If a Participant has a Disqualifying Termination on or after March 16, 2020, then (a) any Awards which have vested or became exercisable within the 12 months preceding the Termination Date shall be forfeited and shall be returned to Baxter, and (b) any Awards that vested after the Termination Date as a result of a Qualifying Retirement, shall be forfeited and shall be returned to Baxter. If the Participant has sold or exercised any such Awards, then Participant shall make a cash payment to Baxter in an amount equal to the amount of net gain recognized from the sale or exercise of such Awards within 30 business days of written notice by Baxter to the Participant.

**9. Additional Definitions**

For purposes of the Plan, the following capitalized terms shall have the meanings provided below.

"Affiliate" shall have the meaning set forth in Rule 12b-2 promulgated under Section 12 of the Securities Exchange Act of 1934, as amended.

"Cause" means (i) the willful and continued failure by the Participant to substantially perform his duties with the Company that has not been cured within 30 days after written demand for substantial performance is delivered by the Company, which demand specifically identifies the manner in which the Participant has not substantially performed (other than any such failure resulting from the Participant's incapacity due to physical or mental illness), (ii) the willful engaging by the Participant in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise, or (iii) the engaging by the Participant in egregious misconduct involving serious moral turpitude, determined in the reasonable judgment of the Committee. For purposes hereof, no act, or failure to act, on the Participant's part shall be deemed "willful" unless done, or omitted to be done, by the Participant not in good faith and without reasonable belief that such action was in the best interest of the Company. Notwithstanding the foregoing, if a Participant is a party to a Change in Control Agreement, "Cause" with respect to such Participant shall have the meaning given to such term in the Change in Control Agreement.

"Change in Control" means the first to occur of any of the following: (i) any Person is or becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Baxter (not including in the securities beneficially owned by such Person any securities acquired directly from the Company or its Affiliates) representing 30% or more of the combined voting power of Baxter's then outstanding securities, excluding any

Person who becomes such a beneficial owner in connection with a merger or consolidation of Baxter or any direct or indirect subsidiary of Baxter with any other corporation immediately following which the individuals who comprise the Board immediately prior thereto constitute at least a majority of the board of directors of (A) any parent of Baxter or the entity surviving such merger or consolidation or (B) if there is no such parent, of Baxter or such surviving entity; (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who, on the Grant Date, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of Baxter) whose appointment or election by the Board or nomination for election by Baxter's shareholders was approved or recommended by a vote of at least two-thirds (2/3) of the directors then still in office who either were directors on the Grant Date or whose appointment, election or nomination for election was previously so approved or recommended; (iii) there is consummated a merger or consolidation of Baxter or any direct or indirect subsidiary of Baxter with any other corporation or other entity, other than a merger or consolidation immediately following which the individuals who comprise the Board immediately prior thereto constitute at least a majority of the board of directors of (A) any parent of Baxter or the entity surviving such merger or consolidation or (B) if there is no such parent, of Baxter or such surviving entity; or (iv) the shareholders of Baxter approve a plan of complete liquidation or dissolution of Baxter or there is consummated an agreement for the sale or disposition by Baxter of all or substantially all of Baxter's assets, other than a sale or disposition by Baxter of all or substantially all of Baxter's assets immediately following which the individuals who comprise the Board immediately prior thereto constitute at least a majority of the board of directors of (A) any parent of Baxter or of the entity to which such assets are sold or disposed or (B) if there is no such parent, of Baxter or such entity.

"Change in Control Agreement" means an employment agreement, change in control agreement or plan, severance agreement or plan, or other agreement between the Company and a Participant or Company plan covering a Participant that provides for benefits upon termination for good reason or cause in connection with a change in control of Baxter and that has been approved by the Board or the Committee.

"Good Reason" means the occurrence (without the Participant's express written consent) of any of the following which occur on or after a Change in Control: (i) reduction by the Company in the Participant's annual base salary as in effect on the Grant Date or as the same may be increased from time to time; (ii) the relocation of the Participant's principal place of employment to a location more than fifty (50) miles from the Participant's principal place of employment immediately prior to the Change in Control or the Company's requiring the Participant to be based anywhere other than such principal place of employment (or permitted relocation thereof) except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations as in effect immediately prior to the Change in Control; or (iii) the failure by the Company to pay to the Participant any portion of the Participant's current compensation or to pay to the Participant any portion of an installment of deferred compensation under any deferred compensation program of the Company, within seven (7) days of the date such compensation is due. Notwithstanding the foregoing, if a Participant is

a party to a Change in Control Agreement, "Good Reason" with respect to such Participant shall have the meaning given to such term in the Change in Control Agreement.

"Person" shall have the meaning given in Section 3(a)(9) of the Securities Exchange Act of 1934, as amended, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) Baxter or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of Baxter or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the shareholders of Baxter in substantially the same proportions as their ownership of stock of Baxter.

## 10. Withholding

Except as otherwise provided by the Committee, all Awards (including the payout of Awards) under the Plan are subject to withholding of all applicable taxes, which withholding obligations may be satisfied, with the consent of the Committee, through the surrender of Shares that the Participant already owns or to which a Participant is otherwise entitled under the Plan; provided, however, with the consent of the Committee, previously-owned Shares that have been held by the Participant or Shares to which the Participant is entitled under the Plan may only be used to satisfy the minimum tax withholding required by applicable law (or other rates that will not have a negative accounting impact).

## 11. Program Controls

**Except as specifically provided in the Plan, in the event of any inconsistency between the Plan and the Program, the Program will control, but only to the extent such Program provisions will not violate the provisions of section 409A of the Code.**

**BAXTER INTERNATIONAL INC.**
**French Addendum To 2020 Annual Equity Plan**
**Adopted as of March 16, 2020**

## 1. PURPOSES OF THIS ADDENDUM

This Addendum (the "Addendum") approved on March 16, 2020, sets out the terms for French Qualified Stock Options and French Qualified Free Shares granted jointly under the Annual Equity Plan (the "Plan") adopted as of March 16, 2020 by Baxter International Inc. (the "Company") to Eligible Participants, residents in France, or otherwise selected by the Committee for participation under this Addendum and the Company incentive compensation program or plan (the "Program") identified in the individual grant materials provided to the Eligible Participant. This Addendum is adopted in accordance with Sections 3 "Administration" and 9 "Amendment and Termination" of the Program to benefit from the specific tax and social security treatment applicable in France to Qualified Option Awards and Qualified Free Share Awards.

For the avoidance of doubt, the present Addendum is not applicable to awards paid in cash and to awards of Performance Shares, Restricted Shares, Performance Units, Cash Incentive Awards or Stock Appreciation Rights. Consequently, dispositions of the Program and/or the Plan applicable to these are not applicable to Awards made further to the present Addendum.

The rules contained in the Program and the Plan will apply to Awards made under this Addendum, unless specifically stated otherwise. The terms and conditions of the present Addendum are identical to the Plan except as provided below. Words and expressions used in this Addendum and not defined herein shall have the same meaning as those words and expressions used in the Program and Plan. The additional terms and conditions in this Addendum are to be read in conjunction with the Program and Plan.

To the extent that the Program and the Plan contradict the provisions set forth hereinafter, the Addendum provisions shall prevail. In addition, to the extent that the terms and conditions specified in the applicable grant communication letter contradict the provisions set forth hereinafter, the Addendum provisions shall prevail.

## 2. OPTION AWARDS

### 2.1. General

The Addendum contains the term of "Qualified Stock Option" which refers to the awards of Options granted as per Section 6 of the Program jointly with Section 4 of the Plan in accordance with articles L.225-177 to L.225-185 of the French Commercial Code. Consequently, the terms "Stock Option", "Options", "Qualified Stock Option Awards" and "Option Award" herein shall be construed and interpreted accordingly.

## 2.2. Grant of Options

Notwithstanding the provisions of the Plan, the following rules shall apply to Options Awards granted under this Addendum.

In no event shall the number of shares of Common Stock subject to outstanding unexercised Options granted pursuant to this Addendum give right to subscribe shares exceeding one-third (1/3) of the Company's share capital. The total number of shares of Common Stock that may be granted to Participants under this Addendum shall not exceed 10% of the Granting Company's share capital at Grant Date, when Options are over existing shares. Outstanding unvested Full Value Awards shall be treated as shares of Common Stock in order to determine the threshold of 10% of the granting Company's share capital.

If an Option provides a right to acquired already existing shares / treasury shares, the Company shall procure sufficient shares to satisfy the Exercise of such Option at least one day prior to the Participant's having the right to Exercise such Option. Shares acquired by the Participant upon Option Exercise shall be registered in the name of the Participant or held in an identifiable account. Participants will have the voting and dividend rights attached to the Shares acquired upon Exercise Date as of that date. Upon Exercise, no cash replacement of shares of Common Stock is allowed.

Any market repurchased shares of Common Stock to be delivered to Eligible Individuals upon exercise of Awards granted hereunder shall be acquired by the Company at least one (1) day before the applicable vesting date. The Vesting Date designates the date upon which options, in full or in part, become exercisable by the Participant.

## 2.3. Grant Date

No Options may be granted under this Addendum: (a) before the end of a period of twenty (20) trading days following (i) a dividend record date for any dividend or (ii) an agreement by the shareholders of the Company to increase the issued share capital of the Company; (b) within a period of ten (10) trading days before and after the publication of consolidated accounting results of the Company (e.g., the filing of an Annual Report on Form 10-K); or (c) within a period beginning with the date upon which the Company's executive officers become aware of any nonpublic information that, if it were to become publicly known, would reasonably be expected to affect the value of the Company's shares of Common Stock and ending ten (10) trading days after that information has been publicized.

The Grant Date shall be the date upon which the Committee approves grants to Eligible Individuals or as soon thereafter as possible, ensuring that the above dispositions are respected. The Grant date shall be stated in the grant documentation letter.

## 2.4. Eligible Individuals

Notwithstanding the provisions of Sections 2(k) or 2(l), as applicable, and Section 4 of the Program or Section 2 of the Plan, Options may only be granted under this Addendum to Eligible

Individuals. No Option Award may be made to Eligible Individuals holding more than ten percent (10%) of the issued share capital in the Company.

## 2.5. Option Price

The Option Price shall be the greatest of: (a) the Fair Market Value of a share of Common Stock on the Grant Date; (b) eighty percent (80%) of the average opening price of a share of Common Stock over the twenty (20) trading days preceding Grant Date; (c) if treasury shares are used to satisfy exercise of the Options, eighty percent (80%) of the average repurchase price per share paid by the Company for such treasury shares. The Option Price is stated in the grant documentation letter and is fixed on the Grant Date.

## 2.6. Adjustment to Option Price

The number of Options and the Option Price for grants made pursuant to this Addendum may be adjusted in connection with changes in capital operations described in article L.225-181 of the French Commercial Code so that economic rights are maintained.

## 2.7. Vesting and Exercise of Options

Options granted pursuant to this Addendum shall vest one-third on the first three anniversaries of the Grant Date. In case of earlier exercise of Options further notably to Change of Control or Termination of Employment, the Committee may, upon discretionary decision, impose a share sale restriction to the Participant as necessary to secure eligibility to the French stock-option regime.

## 2.8. Termination of Employment

Notwithstanding anything to the contrary, no Option may be exercised before the first anniversary of the Grant Date. By exception, the Committee may discretionarily decide that Options may be exercised at an earlier date and / or shares sold at an earlier date.

If a Participant's employment with the Company terminates after the Participant's Options become exercisable, the Options will not expire immediately but will remain exercisable. Subject to Section 4.6 of the Plan, and except in the event of a Qualifying Retirement, the Options will expire ninety days after the Participant's employment with the Company terminates. If the Participant dies or becomes disabled during the ninety-day period, the Options will expire on the fifth anniversary of the termination date.

If the employment of a Participant who is at least 65 years of age, or at least 55 years of age with at least 10 years of employment with the Company, is terminated other than for Cause or by reason of the Participant's death or disability (a "Qualifying Retirement") then (i) if the date of such termination is after the calendar year of the Grant Date, the Options shall continue to vest as provided in Section 2.7, or (ii) if the date of such termination is in the calendar year of the Grant Date, a portion of the Options shall continue to vest as provided in Section 2.7, which portion shall be determined as follows: (# shares covered by Option award) * (# of months worked in

that year, rounded to nearest whole month) / 12. Subject to Section 4.6 of the Plan, the Participant's Options (whether vesting pursuant to (i) or (ii) or previously vested) shall expire on the fifth anniversary of the termination date.

If the employment of a Participant is terminated due to death, all Options shall vest immediately and the shares shall be immediately transferable.

If the employment of a Participant is terminated due to disability corresponding to the 2nd or 3rd categories of Article L.341-4 of the French Social Security Code1, then (i) if the date of such termination is after the calendar year of the Grant Date, the Options shall vest immediately, or (ii) if the date of such termination is in the calendar year of the Grant Date, a portion of the Options shall vest immediately, which portion shall be determined as follows: (# shares covered by Option award) * (# of months worked in that year, rounded to nearest whole month) / 12. Subject to Section 4.6 of the Plan, such Options will expire on the fifth anniversary of the termination date. The shares acquired upon option exercise shall be immediately transferable.

If the employment of a Participant is terminated due to disability other than to the 2nd or 3rd categories of Article L.341-4 of the French Social Security Code, then (i) if the date of such termination is after the calendar year of the Grant Date, the Options shall continue to vest as provided in Section 2.7, or (ii) if the date of such termination is in the calendar year of the Grant Date, a portion of the Options shall continue to vest as provided in Section 2.7, which portion shall be determined as follows: (# shares covered by Option award) * (# of months worked in that year, rounded to nearest whole month) / 12. Subject to Section 4.6 of the Plan, such Options will expire on the fifth anniversary of the termination date.

### 2.9. Substitution of SARs for Options – Tandem Awards

Neither SARs nor any other incentive may be substituted for Options granted pursuant to this Addendum. No tandem awards may be made pursuant to this Addendum.

### 3. FULL VALUE AWARDS

### 3.1. Definitions

"Full Value Award" means a grant made by Baxter International Inc. to the Participant of a right to receive one Share in the future at a nil cost, in the form of a Restricted Stock Unit. Such grant can be paid exclusively in shares of Common Stock, is awarded respectively in accordance with Section 7 of the Program, in accordance with Section 5 of the Plan for Restricted Stock Units, and in accordance with articles L.225-197-1 to L.225-197-6 of the French Commercial Code on Qualified Free Shares Awards. Such grant cannot be subject to conditions, restrictions and contingencies relating to dividend or dividend equivalent rights and deferred payment or settlement. The purpose of this Addendum is to ensure that grants over shares of Common Stock are in conformity with the applicable French legislation, and are entitled to the corresponding specific French tax and social security treatment. One (1) award gives right to acquire one (1) share subject to satisfaction of applicable considerations, contingencies, conditions, restrictions, if any.

"Grant Date" means the date on which the Committee designates the Participant eligible to receive a Full Value Award further to the present Addendum, and specifies the terms and conditions of such Award, including the maximum number of underlying shares, the Vesting and Share Sale Restriction Periods. The Grant Date is stated in the grant communication letter.

"Vesting Date" means the date on which the Participant acquires the shares of Common Stock. The Vesting Date is stated in the grant communication letter.

## 3.2. Grant

Notwithstanding the provisions of the Plan, the following rules shall apply to Full Value Awards granted under this Addendum.

The total number of shares of Common Stock that may be granted to Participants under this Addendum shall not exceed 10% of the Granting Company's share capital at Grant Date. Outstanding unvested Full Value Awards shall be treated as shares of Common Stock in order to determine the threshold of 10% of the granting Company's share capital. Shares of Common Stock of the Company to be delivered under the Plan may be market repurchased shares (already existing shares) or newly issued shares. For Full Value Awards granted over already existing shares, corresponding shares shall be repurchased by the Company at least one day before the applicable Vesting Date.

A Full Value Award may not be made to employees and/or Corporate Officers holding more than 10% of the issued share capital in the Company or who, after having received shares under a Full Value Award granted hereunder, would hold more than 10% of the issued share capital in the Company.

Shares acquired by the Participant upon Vesting Date will be registered in the name of the Participant or be held in an identifiable account. Participants will have the voting and dividend rights attached to the Shares acquired upon Vesting Date as of that date.

## 3.3. Vesting period / Performance period

Notwithstanding anything to the contrary, in relation to Full Value Awards, the Vesting Date shall not be earlier than the second anniversary of the Grant Date, in any circumstances other than in the event of the death of the Participant or in the event of disability corresponding to the 2nd or 3rd categories of Article L.341-4 of the French Social Security Code.

Unless otherwise stated in the grant documentation letter, the Vesting Date for Restricted Stock Units shall be the second anniversary of the Grant Date. The Board of Directors or the Committee reserves the right to reduce or modify the Vesting Date in accordance with and to conform with any amendments to the French Tax Code and/or to the provisions of the French Commercial Code governing Qualified Free Shares. By exception, the Board or the Committee

may discretionarily decide that Vesting Date may occur before the second (2nd) anniversary of the Grant Date.

## 3.4. Share Sale Restriction Period

As of the Vesting Date, shares of Common Stock acquired pursuant to Full Value Award are subject to a minimum of two (2) year share sale restriction, during which the shares may not be sold (the "Share Sale Restriction Period"). If the Participant leaves the employment of the Company or any Affiliate(s), at any time after the Vesting Date, the shares acquired shall not be freely transferable before the expiration of the Share Sale Restriction Period.

By exception, in the event of the Participant's death, the heirs shall not be subject to the Share Sale Restriction Period, the shares being freely transferable upon the Participant's death. By exception, notwithstanding any provision of the Plan and the present Addendum to the contrary, in case of disability corresponding to the 2nd or 3rd categories of Article L.341-4 of the French Social Security Code1, the Participant is entitled to sell the shares prior to the end of the Share Sale Restriction Period, if any.

For the avoidance of doubt, if the Participant leaves the employment, the Company or any Affiliate(s), at any time before the term of the Share Sale Restriction Period, due to his/her Disability other than of second (2nd) or third (3rd) category as defined in Article L.341-4 of the French Social Security Code[1], the Participant shall not be entitled to sale the shares before the second (2nd) anniversary of the Vesting Date.

By exception, the Board or the Committee may discretionarily decide that a Participant shall not be subject to the Share Sale Restriction Period.

## 3.5. Additional Full Value Awards

Notwithstanding anything to the contrary in the Program or the Plan, the Participant shall not be permitted to receive additional Full Value Awards with respect to the Restricted Stock Units based upon the dividends and distributions paid on shares of Common Stock as if each Restricted Stock Unit was a share of Common Stock.

## 3.6. Termination of employment

Notwithstanding anything to the contrary in the Program or the Plan, in case of Participant's death, his/her heirs may request the acquisition of the unvested Restricted Stock Units within six (6) months following this event.

By exception, if the Participant ceases his employment within the Company or any Affiliate(s) due to his disability corresponding to the 2nd or 3rd categories of Article L.341-4 of the French Social Security Code[1], the Award shall vest as follows: (i) if the date of such termination is after the calendar year of the Grant Date, all the RSUs shall pay out within sixty days, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the RSUs shall pay out as provided in (i), which portion shall be determined as follows: (# RSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

Notwithstanding anything to the contrary, if the employment with the Company or any Affiliate(s) is terminated due to disability other than of second (2nd) or third (3rd) category as defined in Article L.341-4 of the French Social Security Code, (i) if the date of such termination is after the calendar year of the Grant Date, the RSUs will remain eligible for payout on the terms provided in Section 3.3, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the RSUs shall remain eligible for payout on the terms provided in Section 3.3, which portion shall be determined as follows: (# RSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

Notwithstanding anything to the contrary, if the employment with the Company or any Affiliate(s) is terminated due to Qualified Retirement, (i) if the date of such termination is after the calendar year of the Grant Date, the RSUs will remain eligible for payout on the terms provided in Section 3.3, or (ii) if the date of such termination is in the calendar year of the Grant Date a portion of the RSUs shall remain eligible for payout on the terms provided in Section 3.3, which portion shall be determined as follows: (# RSUs awarded) * (# of months worked in that year, rounded to nearest whole month) / 12.

## 4. Non-Transferability of Awards

No Award granted under the Plan shall be transferable other than by will or the law of descent and distribution.

## 4.1. Change in Control

When a tax favourable treatment may be available further to French legislation (article 163 bis C-1 bis of the French Tax Code), the Committee, upon discretionary decision, may give the choice to French participants, but has no obligation to. When the Company decides to exchange shares with no cash consideration, pursuant to applicable French legal and tax rules and notably, article L.225-197-1 § III of the French Commercial Code (as amended), then the dispositions of the Plan as well as the periods of Vesting and Share Sale Restriction will remain applicable to shares or rights received in exchange.

## 5. Tax Withholding

Notwithstanding any provision to the contrary, no shares of Common Stock may be used to satisfy any social security or tax withholding due for Awards granted further to the present Addendum.

The Company or its Affiliates shall have the right to require payment from a Participant to cover any applicable withholding or other employment taxes due with respect to Awards granted hereunder or shall have the right to deduct any applicable withholding or other employment taxes due from other compensation income paid to the Participant.

## 6. Amendment, Modifications to this Addendum.

No modification can be made to this Addendum, or to outstanding Awards granted hereunder, which is disadvantageous to the Participant or which is in contradiction to the French Commercial Code and French Tax Code provisions, unless the modification is the result of a new law or regulation or any other obligatory disposition or ruling applied to the Company or any other Subsidiary, having legal, fiscal or social implications.

The terms of this Addendum shall be interpreted in accordance with the relevant provisions set forth by French tax and social laws, as well as the regulations issued by the French tax and social administrations.

In the event of any conflict between the provisions of this Addendum and the Plan, the provisions of the Addendum shall prevail for any Awards made to Participants under this Addendum.

## 7. Additional Definitions

"Affiliate" means any entity:

- in which the Company holds, directly or indirectly, at least 10% of the voting rights and / or equity;

- that holds, directly or indirectly, at least 10% of the voting rights and / or equity in the Company;

- in which at least 50% of the equity or voting rights are held, directly or indirectly, by a company which itself holds at least 50% of the Company.

"Company" means Baxter International Inc., a Delaware corporation.

"Corporate Officers" mean "Président du Conseil d'Administration" (Chairman of the Board); "Directeur Général" (Managing Director); "Directeurs Généraux Délégués" (Delegated Managing Directors); Members of the "Directoire"; "Gérant" of a "Société en Commandite par Actions"; "Président" (if a private individual) d'une Société par Actions Simplifiée".

"Eligible Individual" means any employee with a valid employment contract ("contrat de travail") at Grant Date, and/or Corporate Officer with or without an employment contract with the Company or Affiliate(s). For the avoidance of doubt, officers and directors of the Company, or of Affiliate(s), are eligible Participants if they have a valid employment contract with one of these entities, or if they are Corporate Officers. Awards cannot be granted under this Addendum to non-employee members of a "Conseil d'Administration" (the Board), to consultant, to independent agent of the Company or Affiliate(s).

**Exhibit A**
**to**
**2020 Equity Plan**

[Exhibit Intentionally Omitted]

**Exhibit B**
**to**
**2020 Equity Plan**

[Exhibit Intentionally Omitted]

**EXHIBIT 10.25**



March 12, 2020

Mr. Jose E. Almeida
Chairman and CEO
Baxter International, Inc.
One Baxter Parkway
Deerfield, IL 60015

<u>**UPDATED TERMS OF EMPLOYMENT**</u>

Dear Joe,

The independent members of Baxter's Board of Directors believe you have and will continue to make outstanding contributions to the Company and want to retain you as Chairman and CEO (subject to the Board's annual election process as required by the Company's Bylaws).  This letter is intended to replace your original employment letter/agreement dated October 28, 2015, and to provide the following updated terms of your ongoing employment through December 31, 2023:

- Your annual salary will continue to be $1,300,000, which will be reviewed each year at the same time as other executive officers, when the independent members of the Board may approve an increase but not a reduction unless commonly applied to all executive officers.

- You will continue to be eligible to participate in the Company's annual cash bonus program. Your target bonus will be increased from 145% of your annual salary to 165% starting in 2020. The target bonus will be reviewed each year at the same time as other executive officers, when the independent members of the Board may approve an increase but not a reduction unless commonly applied to all executive officers. The actual bonus you will receive will continue to vary depending on both business performance and your individual performance, as determined by the independent members of the Board.

- You will continue to be eligible to participate in the long-term incentive (LTI) program for senior management. Your annual LTI target grant value will be increased from $10,000,000 in 2019 to $11,000,000 in 2020 and your LTI grant-value mix will continue to be 50% stock options and 50% performance share units (PSUs). *Please note that the LTI grant-value mix and your target grant value are reviewed annually and are subject to change based on market competitiveness and the Company's financial performance.* All LTI awards are made pursuant to the Baxter International Equity Plan Adopted as of February 28, 2019 (Equity Plan).

- Starting with your 2020 LTI grant, and for all of your future regular annual LTI grants made through the end of 2023, you will be eligible for a "Qualifying Retirement" under Section 4.4 of the Equity Plan when you attain age 60 rather than needing to attain age 65 (or age 55 with ten-or-more years of service). This definitional change is intended to enable you to continue your outstanding, unvested LTI grants post-retirement according to the terms of the Equity Plan and applicable grant agreements if you remain employed through your 60th birthday (September 22, 2022) or longer. *Please note that the above definition of a Qualifying Retirement will be unique to your future LTI grants and will not apply to other Equity Plan Participants, nor will it necessarily apply to one-off or special awards made to you under the Equity Plan.*

- You will continue to be eligible for the existing severance agreement that applies in the event of a change in control of the Company (CIC Agreement).

- Outside the context of the CIC Agreement, if your employment is terminated on or before December 31, 2023, other than (a) by the Company for Cause or (b) by you without Good Reason, the Company will continue to provide you not more than sixty days following your Date of Termination of employment with a lump-sum separation payment equal to two times your annual base salary and annual target bonus, as well as health-care coverage described in the CIC Agreement; provided you have properly executed within forty-five days following your Date of Termination and not timely revoked a customary release of claims in a form reasonably acceptable to the Company. In exchange, you agree to continue to abide by the non-competition, non-solicitation, and non-disparagement provisions provided in Section 9 of the CIC Agreement. *Please note that the capitalized terms in this paragraph have the meanings provided in the CIC Agreement without regard to whether a CIC has occurred.*

- Baxter provides comprehensive health-and-welfare benefits, executive physical examinations, an Employee Stock Purchase Plan (ESPP), and a 401(k) Plan. In all cases, your participation and coverages will continue the same as now. *Please note that Baxter's benefit program is subject to change and any such change would supersede this letter.*

- You will continue to be eligible to participate in Baxter's U.S. Deferred Compensation Plan, where you may elect to defer eligible compensation (base salary and annual bonus) and receive Company contributions in respect to amounts above the Internal Revenue Service limits set for qualified 401(k) plans.

- You will continue to be eligible for five weeks of vacation per year.

- Your employment will continue to be "at-will," meaning that you or the Company may end your employment at any time and for any reason.

- All payments to you from the Company will continue to be subject to tax and other withholding and deductions, as required or permitted by applicable law and Company policies.

- All payments to you from the Company will continue to be subject to Baxter's Executive Compensation Recoupment Policy.

- All consideration to be paid or provided to you by the Company is intended to comply with or be exempt from Section 409A of the Internal Revenue Code, so you are not subject to penalties that may be imposed under 409A. This letter shall be interpreted consistent with that intent, and, to the extent any provision hereof would result in your payment of such taxes or penalties, this letter would be amended in a manner to bring it into compliance with 409A and preserve as possible the economic value of the relevant consideration.

Please indicate your written acceptance of by signing below with knowledge that the Board looks forward to your continued successful leadership of a truly outstanding organization that you helped to build.

Sincerely,

Baxter Board of Directors by

Tom Stallkamp, Lead Director

/s/ Tom Stallkamp_____

John Forsyth, Compensation Committee Chair

/s/ John Forsyth_____

Jim Gavin, Corporate Governance Committee Chair

/s/ Jim Gavin_____

Accepted by:

Jose E. Almeida

/s/ Jose E. Almeida_____

*[Signature Page to Amended J. Almeida Employment Agreement – Fall 2019]*



**EXHIBIT 10.26**

Cristiano Franzi

Traubenweg 17,
8700 Kuesnacht,
Switzerland
Glattpark, June 8, 2017

**Employment Contract**

Dear Cristiano,

Further to previous discussions regarding your employment we would like to confirm the following:

Employment

Effective September 1, 2017, you will be employed by Baxter Healthcare SA (The Company) as Senior Vice President & President, EMEA reporting to the Chairman, CEO, and President. The Company reserves the right, however, to assign to the Employee other positions, duties or responsibilities to the extent required due to operational needs and as may be reasonably requested from the Employee.

The effective employment is contingent upon you securing the proper visa and work permit for Switzerland.

Compensation

Your gross annual base salary has been determined as CHF 675'000 p.a., to be paid in 12 equal monthly installments. This will be reviewed in March 2018 in line with the Swiss merit increase and thereafter at the annual merit review.

You are eligible to participate in the Officer Incentive Compensation Program (OICP) with a bonus target of 80% of your annual base salary. It is important to note that your 2017 bonus will be based on eight full months of plan participation, which will be a target of CHF 360,000. The actual bonus you will receive will vary depending on both business performance and your individual assessment of the year.

The bonus is not an entitlement. In addition, the payment of the bonus in a particular year does not give rise to a bonus entitlement for the following years. The amount of the bonus, if any, is also at the sole discretion of the Company. The Company may at any time amend the provisions or decide not to carry out the OICP, which is a voluntary program at the full discretion of the Company.

Page 1 of 1



In the event you are not paid your 2017 annual cash bonus by your former employer, you will receive a supplemental gross cash payment of CHF 340,000. This payment will be paid to you within 60 days of your employment start date with the Company. Should you resign from Baxter within 12 months of your start date, you will be responsible for 100% re-payment of the sign-on bonus and should you resign from Baxter within 24 months you will be responsible for 50% re-payment of the bonus. A termination by the Company of this employment contract based on a determination that you have breached law, government regulations or Baxter policy/rules/ regulations, within the period set out above, shall lead to a repayment obligation in the percentage applicable to the relevant period.

Sign-on Cash Bonus

You will also receive a one-time, supplemental gross cash payment of CHF 445,000. This payment will be paid to you within 60 days of your employment start date with the Company. Should you resign from Baxter within 12 months of your start date, you will be responsible for 100% re-payment and should you resign from Baxter within 24 months you will be responsible for 50% re-payment. A termination by the Company of this employment contract based on a determination that you have breached law, government regulations or Baxter policy/rules/ regulations, within the period set out above, shall lead to a repayment obligation in the percentage applicable to the relevant period.

Company Car

You will be provided with a car cash allowance or a company car as per Baxter Healthcare SA's car policy.

Vacation

You are entitled to 25 workdays vacation per full calendar year. The vacation is to be taken during the respective calendar year as agreed with your supervisor.

Support

The local HR team is available to provide any support or assistance needed during your settling in period. They are located at the Zurich office and will handle all aspects of your employment.

Pension Plan and Benefits

With regard to retirement pension you will be insured in the Baxter Defined Contribution scheme according to the summary of the main plan provisions attached.

Information Technology

You must not use any computer programs or software on your company computer that has not been purchased by the Company.

Change in Control

Page 2 of 2

Page 3 of 3



You will be eligible for a special agreement in the event of a change in control of the Company ("CIC Agreement"). Upon joining the Company, you will be provided a copy of the CIC Agreement as part of your on-boarding.

Termination

The employment contract may be terminated by either party giving 3 months' notice at the end of each month.

In the event that the Company terminates this employment contract for any reason other than a determination that you have breached law, government regulations or Baxter policy/rules/ regulations, then contingent upon your waiver and release of claims against the Company from the employment and its termination and all claims against affiliates of BHSA, you will receive a one-time gross cash payment equivalent to 18 months base salary and target bonus (less any severance benefits payable under any applicable Baxter plan or benefit or applicable law, including the CIC Agreement). The payment will be paid within sixty days following your termination of employment.

Your employment will be automatically terminated at the end of the month during which you reach the age of retirement that is valid at that time.

Stock Ownership

You will be required to own a minimum of Baxter stock equal to four times your base salary. You will have five years from your official Officer appointment to achieve this ownership level. More details on the officer stock ownership guidelines will be provided at your new Officer orientation with the Executive Compensation Team.

Further Stipulations and Changes to this Contract

For all matters not specifically covered in this letter, the Swiss Code of Obligations, Art. 319 & ff. as well as the general employment regulations for all Baxter companies in Switzerland are applicable.

Code of Conduct

A copy of the Baxter Code of Conduct is attached. Please read this document and return the employee acknowledgement form to Human Resources.

Confidentiality and Secrecy

You are bound to absolute secrecy on all matters and procedures in relation to your duties and responsibilities, particularly any business secrets. This commitment is also extended to your contact with other Baxter employees if they are not entitled to have knowledge of such matters due to their position or responsibility.

Please sign the attached confidentiality clause.

Page 3 of 3



We kindly request you to return to us a signed copy of this contract as confirmation of your agreement.

With best regards,

**Baxter Healthcare SA**

/s/ Gerald Heritier                                    /s/ Angela Guertler

**Gerald Heritier**                                    **Angela Guertler**
Vice President Human Resources                Senior HR Business Partner
EMEA Area                                              Switzerland & EMEA

In agreement with the above:

Date:     25/06/2017                          Signature:     /s/ Cristiano Franzi
                                                                            Cristiano Franzi

Attachments: Code of Conduct

Pension Plan Summary
Baxter New Hire Privacy Notice

        Page 4 of 4

## 1.     CONFIDENTIALITY

1.1

As used herein, "**Confidential Information**" shall include, but not be limited to, all business, trade, and technical information of Baxter and its holding company, its parent and all affiliated, related and subsidiary companies, (all such entities and persons collectively being the "**Baxter Group**"), and of any third party, whether patentable or not, which is of a confidential, trade secret and/or proprietary character and which is either developed by Employee (alone or with others) or to which Employee has had access during his/her employment with the Baxter Group.

1.2

Employee shall not at any time during the continuance of his/her employment with the Baxter Group or at any time thereafter directly or indirectly use for his/her own purposes or for any purposes other than those of the Baxter Group, record, divulge, disclose or communicate to any person, company, business entity or other organization or, through any failure to exercise due care and diligence, cause any unauthorized disclosure of, any trade secrets or Confidential Information except as may be necessary for the proper performance of Employee's duties or as may be specifically authorized in writing by Baxter.

1.3

Upon termination of his employment hereunder (for whatever reason) and at any other time at the Employer's request the Employee shall, without retaining any copies or other record thereof, deliver to the Employer or any person the Employer may nominate each and every document and all other material of whatever nature in the possession or under the control of the Employee containing or relating directly or indirectly to any Confidential Information.

1.4

Employee will notify Baxter in writing of any circumstances which may constitute unauthorized disclosure, transfer, or use of Confidential Information. Employee will use best efforts to protect Confidential Information from unauthorized disclosure, transfer, or use. Employee will implement and abide by all procedures adopted by the Baxter Group to prevent unauthorized disclosure, transfer, or use of Confidential Information.

1.5

The confidentiality undertaking set forth in this Section 1 shall cease to apply to any information which shall become available to the public generally otherwise than through the default of the Employee.

Date:     25/06/2017                                    Signature:     /s/ Cristiano Franzi

                                                                           Cristiano Franzi

Page 5 of 5

EXHIBIT 10.32

THE USE OF THE FOLLOWING NOTATION IN THIS EXHIBIT INDICATES THAT A CONFIDENTIAL PORTION HEREOF OR AN IMMATERIAL SCHEDULE OR ATTACHMENT HERETO HAS BEEN OMITTED: [***]

COMMITMENT AGREEMENT

October 4, 2019 (the "Commitment Agreement Date")

The Prudential Insurance Company of America ("Prudential") is pleased to provide, on the following terms, the non-participating single premium group annuity contract, supported by an insulated separate account (the "Contract") for the Baxter International Inc. and Subsidiaries Pension Plan (the "Plan") in consideration of the mutual promises made and representations, warranties and covenants contained in this Commitment Agreement (this "Commitment Agreement"). For purposes of this Commitment Agreement, capitalized terms will have the meaning set forth in paragraph 11. By signing this Commitment Agreement, Prudential, Baxter International Inc. (the "Company"), and State Street Global Advisors Trust Company, acting solely in its capacity as the independent fiduciary of the Plan (the "Independent Fiduciary"), agree as follows:

1.  GAC Issuance and GAC Issuance True-Up Premium. Prudential agrees to issue the Contract as follows:

    a. Specimen GAC Form Issuance. On the Scheduled GAC Issuance Date, subject to Prudential's receipt of the Premium Due Date Transfers and any GAC Issuance True-Up Premium due to Prudential and subject to the terms of paragraphs 1.b. and 1.c., Prudential irrevocably agrees to issue the Contract with an effective date that is the Premium Due Date and in accordance with this Commitment Agreement and the Contract, irrevocably commits to make payments owed to Payees under the Contract on and after the Annuity Start Date. The Contract will be in substantially the form of the specimen group annuity contract (the "Specimen GAC Form") attached hereto as Schedule 1 unless a Modified GAC Form is issued pursuant to and in accordance with paragraph 2.

    b. Form of Annuities and Payments under the Contract. The type, description and forms of annuities (e.g., single life annuity, joint and survivor annuity), payments under the Contract and other terms of the Contract will be consistent with the terms of Prudential's proposal dated October 2, 2019 (the "Proposal") as updated to reflect (i) any modifications contemplated in Prudential's Final Annuity Quote Sheet dated October 4, 2019 (the "Final Annuity Quote Sheet") and (ii) any modifications mutually agreed to between the parties after the Commitment Agreement Date and before the 35th Business Day prior to the Scheduled GAC Issuance Date. Subject to Prudential's receipt of the Premium Due Date Transfers, Prudential will make payments to Payees commencing on the Annuity Start Date in accordance with the Proposal and the Final Annuity Quote Sheet until the Contract has been issued and, for the avoidance of doubt, will make such payments even if the Contract has not been issued by Prudential as of the Annuity Start Date. The original annuity exhibit to the Contract will be consistent with the Payees (including annuitants, contingent annuitants, alternate payees and beneficiaries) on Tab DG2 of the Base File.

    c. Necessary Data. As a condition to Prudential's issuing the Contract, the Company will deliver or cause to be delivered to Prudential the data necessary for Prudential to prepare the annuity exhibit and the

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

2

information necessary for Prudential to draft provisions of the Contract and administer the payments thereunder. If there are any delays in the delivery of the foregoing information based on the delivery dates set forth in Schedule 7 or such other delivery dates as may be reasonably designated by Prudential, Prudential may refer any Payee who contacts Prudential to the Company Contact for assistance and Prudential may, in its sole discretion, delay the mailing of Welcome Kits and annuity certificates. The annuity exhibit will not include any Payee for which Prudential has not been provided each of the following: (i) name, (ii) gender, (iii) date of birth and (iv) social security or federal taxpayer identification number. Prudential will conduct a data integrity review of certain data elements (including if any potential Payee was deceased prior to the date of the Premium Due Date Transfers) in accordance with Prudential's standard verification practices and procedures.

d. <u>GAC Issuance True-Up Premium</u>. Schedule 8 provides a description of the methodologies and procedures by which Prudential will calculate the GAC Issuance True-Up Premium. Prudential and the Company will cooperate in good faith so that Prudential can calculate the GAC Issuance True-Up Premium, subject to the following acknowledgements, limitations and conditions:

   i. <u>GAC Issuance Data</u>. To the extent that the Company discovers or has any Removed Lives or Data Corrections after the Commitment Agreement Date and prior to the date that is 35 Business Days prior to the Scheduled GAC Issuance Date (the "<u>GAC Issuance Data Notice Date</u>"), the Company will provide written notice of such Removed Life or Data Correction as promptly as reasonably practicable to Prudential. Prudential will only be responsible for incorporating into the calculation of the GAC Issuance True-Up Premium those Data Corrections and Removed Lives that have been notified to Prudential by the Company on or prior to the GAC Issuance Data Notice Date together with any other Removed Lives and Data Corrections identified by Prudential (the "<u>GAC Issuance Data</u>"). Such incorporation is subject to Prudential's agreement with such Removed Lives or Data Corrections, which agreement Prudential shall not unreasonably withhold, and any limitations on incorporating such Data Corrections and Removed Lives into the GAC Issuance True-Up Premium set forth in Schedule 8.

   ii. <u>GAC Issuance Annuity Exhibit</u>. Twenty Business Days prior to the Scheduled GAC Issuance Date, Prudential will deliver to the Company a proposed annuity exhibit utilizing and consistent with the Base File and the GAC Issuance Data. Fifteen Business Days prior to the Scheduled GAC Issuance Date, the Company will respond to Prudential with any questions on the annuity exhibit. Prudential and the Company will cooperate in good faith to resolve any discrepancies on or prior to the eleventh Business Day prior to the Scheduled GAC Issuance Date and Prudential will reflect in the annuity exhibit any changes that have been agreed to on or prior to such eleventh Business Day. The annuity exhibit will not include any Payee for which Prudential has not been provided each of the following: (1) name, (2) gender, (3) date of birth and (4) social security or federal taxpayer identification number.

   iii. <u>GAC Issuance True-Up Premium</u>. Eight Business Days prior to the Scheduled GAC Issuance Date, Prudential will send the calculation of the GAC Issuance True-Up Premium to the Company for review. Five Business Days prior to the Scheduled GAC Issuance Date, the Company will respond to Prudential with any questions on the GAC Issuance True-Up Premium. Prudential and the Company will cooperate in good faith to resolve any discrepancies on or prior to the third Business Day prior to the Scheduled GAC Issuance Date. If the Company and Prudential cannot

**CONFIDENTIAL**

resolve any dispute with respect to the GAC Issuance True-Up Premium on or prior to the date that is three Business Days prior to the Scheduled GAC Issuance Date, then Prudential's determination will control for purposes of the GAC Issuance True-Up Premium but the Company may immediately commence an arbitration dispute pursuant to Schedule 4 with respect to the GAC Issuance True-Up Premium, and Prudential's determination shall be subject to retroactive adjustment based on the determination of such arbitration.

iv. <u>GAC Issuance True-Up Premium Payment</u>. The GAC Issuance True-Up Premium will be paid on the Scheduled GAC Issuance Date as follows: (A) if the GAC Issuance True-Up Premium is a positive number, then the Independent Fiduciary will direct the Plan Trustee to pay to Prudential an amount, in Cash, equal to the GAC Issuance True-Up Premium or (B) if the GAC Issuance True-Up Premium is a negative number, then Prudential will pay to the Plan Trust an amount, in Cash, equal to the absolute value of the GAC Issuance True-Up Premium.

2. <u>Negotiation of Modified GAC Form</u>. After the Commitment Agreement Date, Prudential, the Company and the Independent Fiduciary will each use commercially reasonable efforts to revise the Specimen GAC Form to reflect such revisions that were mutually agreed to by the parties prior to the Commitment Agreement Date and will use commercially reasonable efforts to negotiate any additional revisions to the Specimen GAC Form (the "<u>Modified GAC Form</u>") and related forms of annuity certificates, subject to the following acknowledgements, limitations and conditions:

   a. <u>Regulatory Approvals</u>. Prudential will use commercially reasonable efforts to obtain regulatory approvals, to the extent required by applicable law, of the Modified GAC Form prior to the date that is 120 Business Days after the Commitment Agreement Date (the "<u>Modified GAC Deadline Date</u>") and in the event that any approval, to the extent required by applicable law, is not granted, or if the Contract is disapproved, Prudential, the Independent Fiduciary and the Company will cooperate in good faith to mutually agree on modifications to the Contract to address the requests, if any, of the Illinois Department of Insurance and, to the extent possible, to preserve the provisions included in the Modified GAC Form. Prudential will use commercially reasonable efforts to obtain regulatory approvals of customized annuity certificates prior to the annuity certificate mailing date set forth in paragraph 5.b.

   b. <u>Modified GAC Form Issuance</u>. If, in accordance with paragraph 2.a., the negotiation of the Modified GAC Form and the receipt of any related regulatory approvals for all negotiated changes to the Specimen GAC Form are completed by the Modified GAC Deadline Date, then, subject to Prudential's receipt of the Premium Due Date Transfers and any GAC Issuance True-Up Premium due to Prudential, (i) if Prudential has not previously issued the Contract in the form of the Specimen GAC Form, Prudential will issue the Contract using the Modified GAC Form in lieu of the Specimen GAC Form, subject to and in accordance with paragraphs 1.a., 1.b. and 1.c., or (ii) if Prudential has previously issued the Contract in the form of the Specimen GAC Form subject to and in accordance with paragraphs 1.a., 1.b. and 1.c., Prudential will amend and restate the Contract so that its terms are replaced by the Modified GAC Form (or applicable provisions thereof). Such Contract will have an effective date that is the Premium Due Date.

3

**Commitment Agreement, dated October 4, 2019**

**CONFIDENTIAL**

**Commitment Agreement, dated October 4, 2019**

3.  <u>Premium Due Date Transfers</u>. So long as the conditions to closing set forth in paragraph 10 have been satisfied, the Independent Fiduciary will direct the Plan Trustee to pay Prudential [***] (the "<u>Premium Amount</u>") on the Premium Due Date by:

> (x)  assigning, transferring and delivering to Prudential, or instructing The Depository Trust Clearing Corporation to transfer to Prudential, by the Cut-Off Time, all rights, title and interests in and to each Eligible Asset, and
> (y)  paying to Prudential an amount in Cash equal to the excess, if any, of the Premium Amount over the [***].

In addition, so long as the conditions to closing set forth in paragraph 10 have been satisfied, on the Premium Due Date, the Independent Fiduciary will direct the Plan Trustee to pay or cause to be paid to Prudential the [***] (such payment, together with the payment of the Premium Amount, the "<u>Premium Due Date Transfers</u>"). If on or following the Premium Due Date, the Plan, the Plan Trust or the Company receives any payments with respect to any [***] that were due and payable prior to the Commitment Agreement Date and not reflected in the [***] used to determine the Premium Amount, then the Plan, the Plan Trust (or, if the Plan Trust no longer exists, the Company) shall retain such payment; otherwise, then the Independent Fiduciary will direct the Plan Trustee to promptly pay to Prudential an amount in Cash equal to such payment.

> a.  <u>Schedule 2 Updates</u>. On the second Business Day after the Commitment Agreement Date, Prudential will deliver to the Company an updated Schedule 2 that reflects the Asset Market Value of each Schedule 2 Asset [***] with respect to each [***]. If the Company, Prudential and the Independent Fiduciary, despite using commercially good faith efforts, cannot resolve any dispute with respect to any such information on or prior to the Premium Due Date, then [***] may immediately commence an arbitration dispute pursuant to Schedule 4 with respect to any such information, and Prudential's determination shall be subject to retroactive adjustment based on the determination of such arbitration. On the Premium Due Date, Prudential will, if needed, update Schedule 2 to reflect the removal of [***]. Prudential will, if needed, further update Schedule 2 to reflect the removal of [***] and is returned to the Plan Trust in accordance therewith.
>
> b.  [***]. On and as of the Business Day prior to the Premium Due Date, Prudential will provide to the Company [***] in the form of Schedule 5 [***]. Prior to the Premium Due Date, the Company will confirm to Prudential in writing that such information is accurate and complete or will provide any additions, deletions or corrections to such information. If the Company and Prudential have a dispute with respect to any such information and, despite using commercially good faith efforts, cannot resolve such dispute on or prior to the Business Day prior to the Premium Due Date, then [***] may immediately commence an arbitration dispute pursuant to Schedule 4 with respect to any such information, and Prudential's asset portfolio activity information shall be subject to retroactive adjustment based on the determination of such arbitration.
>
> c.  [***]. By written notice to the other party on or before the fifth Business Day following the Premium Due Date, the Company or Prudential may identify [***] and the parties will work in good faith for seven Business Days following the receipt of such notice to agree on which, if any, [***]. If the parties agree that an asset is an Ineligible Asset within such seven Business Days following the receipt of such notice,

4

<p align="center"><b>Commitment Agreement, dated October 4, 2019</b><br><b>CONFIDENTIAL</b></p>

then, on or before the date that is three Business Days following such agreement, the Independent Fiduciary will direct the Plan Trustee to promptly pay or cause to be paid to Prudential an amount, in Cash, equal to [***], and, simultaneously with receipt of such payment, Prudential will return [***] to the Plan Trust together with any Interim Asset Cash Flows associated [***].

d. <u>Additional Actions with respect to Assets</u>. The Independent Fiduciary will direct the Plan Trustee to promptly give or cause to be given all notices that are required, under applicable law and the terms of each Eligible Asset, in connection with the sale, assignment, transfer and delivery of the Eligible Assets on the Premium Due Date. The Independent Fiduciary will direct the Plan Trustee to and Prudential will promptly execute, deliver, record or file or cause to be executed, delivered, recorded or filed any and all releases, affidavits, waivers, notices or other documents that the Company or Prudential may reasonably request in order to implement the transfer of the Eligible Assets to Prudential.

e. <u>Transferred Assets; Risk of Loss on Transferred Assets; Gains on Transferred Assets</u>. Prudential acknowledges and agrees that, if the Premium Due Date Transfers occur, then, from and after the Commitment Agreement Date, Prudential bears any and all risks associated with each Transferred Asset.

f. <u>Available Assets</u>. The Company will cause the Plan Trust to have sufficient Cash or other assets (whether by means of a Cash contribution or otherwise) to enable the Plan Trustee to pay all amounts that it is directed to pay to Prudential by the Independent Fiduciary pursuant to this Commitment Agreement.

4. <u>Public Announcements</u>.

a. <u>Press Releases</u>. The Company and Prudential have the right to issue a transaction announcement or press release regarding the transactions contemplated by this Commitment Agreement, a copy of which will be provided to the other party for review no less than two Business Days prior to the issuance thereof, and the party issuing the transaction announcement or press release will consider in good faith any comments made by the other party; provided, however, that, if the Company has not issued a transaction announcement or press release, Prudential will not issue a transaction announcement or press release without the prior written consent of the Company; provided, further, that nothing contained in this paragraph 4.a. will prevent Prudential from communicating with Payees on or after the 5th Business Day following the Commitment Agreement Date, including through communications posted to Prudential's website.

b. <u>SEC Filings</u>. If the Company concludes that disclosure of this Commitment Agreement and/or the Contract is required by the rules of the Securities and Exchange Commission ("SEC"), (i) the Company will, in good faith, consider whether to make an application with the SEC for confidential treatment of information that the Company concludes is competitively sensitive from the perspective of the Company or otherwise merits confidential treatment and (ii) the Company will provide Prudential with a copy of any material correspondence (written or oral) with the SEC regarding any such application for confidential treatment, and the Company and Prudential will otherwise reasonably cooperate in connection with any such application (including the Company considering, in good faith, whether to request to the SEC for the confidential treatment of such categories of information as Prudential may reasonably believe to be appropriate for confidential treatment).

5

    c. <u>No Insurer Communications</u>. From the Commitment Agreement Date until the issuance of any annuity certificate by Prudential to an annuitant, other than as provided for in this Commitment Agreement, without the Company's prior written consent, (i) Prudential will cause the employees of its retirement services business unit not to initiate any contact or communication with any participant or beneficiary of the Plan in connection with any transactions other than those transactions contemplated by this Commitment Agreement and (ii) Prudential will not, and will cause all of its affiliates not to, provide any of their respective insurance agents, wholesalers, retailers or other representatives with any contact information of such participants and beneficiaries of the Plan obtained from the Company or any of its representatives in connection with the transactions contemplated by this Commitment Agreement, except for those representatives of Prudential or any of their respective affiliates who need to know such information for purposes of the transactions contemplated by this Commitment Agreement and agree to comply with the requirements of this Commitment Agreement. However, this paragraph 4.c. will not restrict employees of Prudential's retirement services business unit from contacting any participant or beneficiary of the Plan in connection with, or to facilitate, Prudential's performance of its obligations under the Contract, the annuity certificates or this Commitment Agreement. Until the issuance of an annuity certificate by Prudential to an annuitant, other than as provided for in this Commitment Agreement, if any participant or beneficiary of the Plan contacts an employee of Prudential's retirement services business unit, Prudential and the Company will cooperate to coordinate on a response to such participant or beneficiary of the Plan.

    d. [***].

5.   <u>Welcome Kits and Annuity Certificates.</u>

    a. <u>Welcome Kits</u>. On or before December 24, 2019, Prudential will mail a welcome kit to each annuitant under the Contract (the "<u>Welcome Kit</u>"). Prudential will send a preliminary draft of the Welcome Kit to the Company and the Independent Fiduciary as soon as practicable, and Prudential will consider in good faith any comments made by the Company or the Independent Fiduciary on the "Frequently Asked Questions" document of the Welcome Kit on or before the fifth Business Day after receipt of the preliminary draft of the Welcome Kit from Prudential.

    b. <u>Annuity Certificates</u>. Prudential will mail an annuity certificate to each applicable Payee on or before the later of (i) 20 Business Days after the Contract is issued, (ii) 120 Business Days after the date on which the Welcome Kit is mailed to Payees and (iii) 30 Business Days after the parties, each acting in good faith, have agreed upon the forms of annuity certificates, in each case, subject to receiving regulatory approvals for any such annuity certificate, if needed. Prudential will send a preliminary draft (which need not include a customized annuity form description) of the annuity certificate to the Company and the Independent Fiduciary as soon as practicable and Prudential will consider in good faith any comments made by the Company and the Independent Fiduciary on the annuity certificate on or before the fifth Business Day after receipt of the preliminary draft of the annuity certificate from Prudential; provided that, in no event shall Prudential be obligated to agree to any such comment that would require it to obtain any additional regulatory approval. Each annuity certificate will include a statement informing a Payee of his or her right to obtain a copy of the Contract (redacted to exclude information concerning other annuitants), how to contact Prudential and his or her right to enforce all provisions of the Contract, and

6

7

will be sent together with a set of "Frequently Asked Questions" which will inform each Payee of how to obtain such copy of the Contract. The rights of a Payee are not conditioned on the issuance of the annuity certificates, and any delay in issuing a certificate shall not have any effect on the date as of which the Payee has enforceable rights against Prudential.

6. <u>Administration and Transfer</u>.

    a. <u>Administrative Transition</u>. The Company will provide or cause to be provided to Prudential the information needed to administer the payments under the Contract and will complete or cause to be completed all processes set forth in Schedule 7. The Company and Prudential will use commercially reasonable efforts to take or cause to be taken all actions and do or cause to be done all things necessary to coordinate the takeover by Prudential of all administration responsibilities necessary to effectively provide recordkeeping and administration services regarding payments under the Contract commencing on the Annuity Start Date. The Company will provide Prudential with final census data in good order on or before October 14, 2019 in order for Prudential to provide recordkeeping and administration services regarding payments under the Contract commencing on the Annuity Start Date. The Company agrees to cooperate with Prudential in the takeover of such recordkeeping and administration services, including ensuring that any third-party service provider provides Prudential with any reasonably necessary information or records relating to the Plan benefits and the Payees in its possession. The Company will make subject matter experts available to promptly address any questions Prudential may have regarding the benefit provisions, including but not limited to forms of annuity, eligibility conditions, administrative practices and calculation methodology. Prudential shall perform all of its obligations contemplated under this Commitment Agreement and the Contract, including the transfer of personal data and Confidential Information, in compliance with all applicable laws. In administering the Contract, Prudential will (i) comply with its rules and procedures not less favorable to Payees under the Contract than the rules and procedures that are generally applicable to the administration of Prudential's other portfolio protected buy-out group annuity contracts, and (ii) comply with applicable laws and regulations; with respect to both (i) and (ii), each as in effect from time to time and as may be modified to reflect changes in law and customary insurance industry standards.

    b. <u>Call Center and Company Contact</u>. Prudential will maintain, at its cost and expense, a toll-free phone number and/or a website (the "<u>Call Center</u>") which will be available starting from December 24, 2019 for Payees to contact Prudential with questions related to the Contract and the annuity certificates. For a period of five years following the Premium Due Date, the Company will maintain, at its cost and expense, a point of contact (the "<u>Company Contact</u>") to which Prudential may refer Payees who pose questions related to their Plan benefits. In the event that a Payee contacts the Company with questions related to the Contract and the annuity certificates, the Company may refer the Payee to the Call Center. In the event that a Payee contacts Prudential with questions related to their Plan benefits, Prudential may refer the Payee to the Company Contact.

7. [***].

    [***]:

7

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

8

[***]:
    (1) [***]
    (2) [***], and

[***].

[***].

[***].

8. <u>Termination</u>.

This Commitment Agreement (i) may be terminated at Prudential's option if the Premium Due Date Transfers have not occurred in accordance with this Commitment Agreement on the Premium Due Date, or (ii) will be terminated upon the payment of [***]. If this Commitment Agreement is terminated pursuant to the preceding sentence, all rights and obligations of the parties under this Commitment Agreement will terminate and will become null and void except that paragraph 7 ([***]), this paragraph 8 (Termination), paragraph 11 (Definitions) and paragraph 14 (Miscellaneous) will survive any such termination and no party will otherwise have any liability to any other party under this Commitment Agreement. However, nothing in this paragraph 8 will relieve any party from liability for any fraud or willful and material breach of this Commitment Agreement.

9. <u>Representations and Warranties.</u>

    a. <u>Prudential Representations and Warranties</u>. Prudential hereby represents and warrants to the Company and the Independent Fiduciary as of the Commitment Agreement Date and as of the Premium Due Date that:
        i. <u>Due Organization, Good Standing and Corporate Power</u>. Prudential is a life insurance company, duly organized, validly existing and in good standing under the laws of the State of New Jersey. Prudential is duly qualified or licensed to do business and is in good standing in each jurisdiction in which its performance of its obligations in the Commitment Agreement and the Ancillary Agreements makes such qualification or licensing necessary, except in such jurisdictions where the failure to be in good standing or so qualified or licensed would not be material. Prudential has all requisite power and authority to enter into and carry out its obligations under this Commitment Agreement and the Ancillary Agreements and to consummate the transactions contemplated to be undertaken by Prudential in this Commitment Agreement and the Ancillary Agreements.
        ii. <u>Authorization of Commitment Agreement and Enforceability</u>. Prudential has received all necessary corporate approvals and no other action on the part of Prudential is necessary to authorize the execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated to be undertaken by Prudential in this

8

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Commitment Agreement and the Ancillary Agreements. This Commitment Agreement and the Ancillary Agreements have been duly executed and delivered by Prudential, and each is (or when executed will be) a valid and binding obligation of Prudential, enforceable against Prudential in accordance with its terms, subject to the applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles ("Enforceability Exceptions").

iii. No Conflict. The execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements by Prudential, and the consummation by Prudential of the transactions contemplated to be undertaken by Prudential in this Commitment Agreement do not (1) violate or conflict with any provision of its certificates or articles of incorporation, bylaws, code of regulations, or the comparable governing documents, (2) assuming that the requisite filings and approvals of state insurance governmental authorities in the states listed on Schedule 10 are duly made and/or obtained, violate or conflict with any law or order of any governmental authority applicable to Prudential, (3) require any governmental or governmental agency approval other than any filing made or approval received as of the Commitment Agreement Date and filings with and approvals of state insurance governmental authorities in the states listed on Schedule 10 or (4) require any consent of or other action by any person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any contract to which Prudential is a party, except where the occurrence of any of the foregoing would not have a material adverse effect on Prudential's ability to consummate the transactions and perform its obligations contemplated by this Commitment Agreement. No filing or approval is required to issue the annuity certificates in accordance with the Contract, other than any filing made or approval received as of the Commitment Agreement Date and filings with and approvals of state insurance governmental authorities in the states listed on Schedule 10.

iv. Compliance with Laws. The business of insurance conducted by Prudential has been and is being conducted in material compliance with applicable laws, and none of the licenses, permits or governmental approvals required for the continued conduct of the business of Prudential as such business is currently being conducted will lapse, terminate, expire or otherwise be impaired as a result of the consummation of the transactions contemplated to be undertaken by Prudential in this Commitment Agreement, except as, in either case, would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Prudential to perform its obligations under this Commitment Agreement.

v. Accuracy of Information. To Prudential's Knowledge (x) all material information provided by Prudential to the Company or the Independent Fiduciary (other than any component incorporated into the calculation of the Premium Amount or the GAC Issuance True-Up Premium not calculated, determined or provided by Prudential, including the Base File, and any information provided by Prudential based on any such component) in connection with the transactions contemplated by this Commitment Agreement was, as of the date indicated on such information, true and correct in all material respects and (y) no change has occurred since the date indicated on such information that Prudential has not publicly disclosed or disclosed to the recipient of such information that would cause such information, taken as a whole, to be materially false or misleading.

9

**Commitment Agreement, dated October 4, 2019**

**CONFIDENTIAL**

vi. <u>Relationship to the Plan</u>. Prudential is not (1) a trustee of the Plan (other than a non-discretionary trustee who does not render investment advice with respect to any assets of the Plan), (2) a plan administrator (within the meaning of ERISA § 3(16)(A) and the Code § 414(g)) with respect to the Plan or) or (3) an employer any of whose employees are covered by the Plan. Schedule 6 sets forth a true and complete list of (x) Prudential and Prudential's affiliates that are investment managers within the meaning of ERISA § 3(38)(B) and (y) without duplication of clause (x), Prudential and Prudential's affiliates that are registered as investment advisers under the Investment Advisers Act of 1940; provided, however, that solely with respect to the representation and warranty as to Schedule 6 to be made by Prudential on and as of the Premium Due Date, Prudential may update Schedule 6 through the day that is two Business Days prior to the Premium Due Date by providing a written update to the Company so that the information included therein is current on and as of the Premium Due Date.

vii. <u>No Post-Closing Liability</u>. Following receipt by Prudential of the Premium Due Date Transfers, the Plan, the Company and the Independent Fiduciary and their respective affiliates and representatives will not have any liability to pay any annuity payment under the Contract.

viii. <u>The Contract</u>. The Contract, when executed, will be duly executed and delivered by Prudential and will be a valid and binding obligation of Prudential and enforceable against Prudential by the Company and each Payee in accordance with its terms, subject to the Enforceability Exceptions. At all times, the right to a benefit under the Contract, in accordance with the Contract's terms, will be enforceable by the sole choice of the Payee to whom the benefit is owed by the Contract, subject to the Enforceability Exceptions. In the event that the Company, as the contract holder, ceases to exist, notifies Prudential that it will cease to perform its obligations under the Contract, or no longer has obligations under the Contract, the Contract will remain a valid and binding obligation of Prudential, irrevocable and in full force and effect, and enforceable against Prudential by each Payee in accordance with its terms, subject to the Enforceability Exceptions.

ix. <u>Litigation</u>. There is no action pending or, to Prudential's Knowledge, threatened against Prudential that in any manner challenges or seeks to prevent, enjoin or materially alter or delay the transactions contemplated by this Commitment Agreement or that could reasonably be expected to materially impair or restrict Prudential's ability to consummate the transactions contemplated by this Commitment Agreement and to perform its obligations hereunder.

x. <u>No Commissions</u>. No commissions are or will be owed by Prudential to any individual or entity in connection with the transactions contemplated in this Commitment Agreement and the Ancillary Agreements for which any other party, or its respective affiliates or representatives, could be liable.

xi. <u>RBC Ratio</u>. Prudential has adopted and adheres to a capital policy, which has been approved by its board of directors, that provides for Prudential, together with its parent company, to hold sources of capital that are sufficient to maintain Prudential's RBC Ratio at [***].

xii. <u>Sophisticated Investor</u>. Prudential has had access to such information as it deems necessary in order to make its decision to acquire any asset that was transferred to Prudential as part of the Premium Due Date Transfer. Prudential is a sophisticated investor with experience in the assets of the type to be included in the transfer. Prudential has determined to acquire such assets and the investment risk associated with the assets. Prudential acknowledges and agrees that neither the Company, the Independent Fiduciary nor the Plan has given any investment advice or rendered

10

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Commitment Agreement, dated October 4, 2019**

any opinion to Prudential as to whether the acquisition of such assets is prudent. For the avoidance of doubt, nothing in this paragraph 9.a.xii will affect the truth or accuracy of the Company's or the Independent Fiduciary's representations and warranties expressly set forth herein.

b. <u>Company Representations and Warranties</u>. The Company hereby represents and warrants to Prudential and the Independent Fiduciary as of the Commitment Agreement Date and as of the Premium Due Date that:

i. <u>Due Organization, Good Standing and Corporate Power</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company is duly qualified or licensed to do business and is in good standing in each jurisdiction in which its performance of its obligations in the Commitment Agreement and the Ancillary Agreements to which it is a party makes such qualification or licensing necessary, except in such jurisdictions where the failure to be in good standing or so qualified or licensed would not be material. The Company has all requisite power and authority to enter into and carry out its obligations under this Commitment Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated to be undertaken by the Company in this Commitment Agreement and the Ancillary Agreements.

ii. <u>Authorization of Commitment Agreement and Enforceability</u>. The Company has received all necessary corporate approvals and no other action on the part of the Company is necessary to authorize the execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated to be undertaken by the Company in this Commitment Agreement and the Ancillary Agreements to which it is a party. This Commitment Agreement and the Ancillary Agreements to which it is a party have been duly executed and delivered by the Company, and each is (or when executed will be) a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to the Enforceability Exceptions.

iii. <u>No Conflict</u>. The execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements to which it is a party by the Company, and the consummation by the Company of the transactions contemplated to be undertaken by the Company in this Commitment Agreement do not (1) violate or conflict with any provision of the Plan and any documents and instruments governing the Plan as contemplated under ERISA § 404(a)(1)(D) (the "<u>Plan Governing Documents</u>"), the certificates or articles of incorporation, bylaws, code of regulations, or the comparable governing documents of the Company, (2) violate or conflict with any law or order of any governmental authority applicable to the Company or the Plan Governing Documents, (3) require any governmental or governmental agency approval or (4) require any consent of or other action by any person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any contract to which the Company is a party, except where the occurrence of any of the foregoing would not have a material adverse effect on the Company's ability to consummate the transactions contemplated by this Commitment Agreement.

11

iv. <u>Accuracy of Information</u>. Notwithstanding anything to the contrary in the Company NDA, to the Company's Knowledge, (1) the mortality experience data file provided by or on behalf of the Company to Prudential identified on Schedule 9 did not contain any misstatements or omissions that were, in the aggregate, material, and (2) the data in respect of benefit amounts, forms of annuities, date of birth, date of death, state of residence, gender, , status (beneficiary in pay or participant), years of service, exit and 1.0 Flag, in each case, with respect to the Payees that was furnished by or on behalf of the Company to Prudential, was not generated using any materially incorrect systematic assumptions or material omissions.

v. <u>Compliance with ERISA</u>. The Plan and Plan Trust are maintained under and subject to ERISA and, to the Company's Knowledge, are in compliance with ERISA in all material respects. To the Company's Knowledge, no event has occurred that is reasonably likely to result in the Plan losing its status as qualified by the Code for preferential tax treatment under Code §§ 401(a) and 501(a). All Plan amendments necessary to effect the transactions contemplated by this Commitment Agreement and the Ancillary Agreements have been duly executed and, to the extent that they require authorization by the Company, have been, or will be by the Premium Due Date, duly authorized and made by the Company.

vi. <u>Plan Investments</u>. Neither Prudential nor any of Prudential's affiliates is a fiduciary of the Plan who either (A) has or exercises any discretionary authority or control with respect to the investment of Plan Assets that are or will be involved in the transactions contemplated by the Commitment Agreement or the Ancillary Agreements or (B) renders investment advice (within the meaning of ERISA § 3(21)(A)(ii) or Code § 4975(e)(3)(B)) with respect to such assets. There are no commingled investment vehicles that hold Plan Assets, the units of which are or will be Plan Assets involved in the transactions contemplated by this Commitment Agreement or the Ancillary Agreements. No Plan Assets that are or will be involved in the transactions contemplated by this Commitment Agreement or the Ancillary Agreements are or will be managed by any investment manager listed on Schedule 6, and no investment advisor listed on Schedule 6 renders or will render investment advice (within the meaning of ERISA § 3(21)(A)(ii)) with respect to those assets.

vii. <u>Independent Fiduciary</u>. The Independent Fiduciary has been duly appointed as independent fiduciary of the Plan with respect to the purchase of one or more group annuity contracts to (1) be the sole fiduciary responsible for selecting one or more insurers to provide annuities in accordance and compliance with the ERISA Requirements, (2) determine whether the transactions contemplated by this Commitment Agreement and the Ancillary Agreements satisfy ERISA, (3) represent the interests of the Plan and all of its participants, beneficiaries and alternate payees in connection with the negotiation of a commitment agreement and, to the extent set forth in the IF Engagement Letter, the terms of any agreements with Prudential, including the Contract and the annuity certificates, (4) direct the Plan Trustee on behalf of the Plan to transfer the Premium Due Date Transfers in connection with the consummation of the transactions contemplated by this Commitment Agreement and any amounts required pursuant to paragraphs 1.d.iv. and 3.c. and (5) take all other actions on behalf of the Plan necessary to effectuate the foregoing to the extent set forth in the IF Engagement Letter.

viii. <u>Plan Trustee is Directed Trustee</u>. The Plan Trustee has been duly appointed as the directed trustee of the Plan Trust and is obligated to follow the Independent Fiduciary's directions to

12

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

13

effectuate and consummate the transactions contemplated by this Commitment Agreement and the IF Engagement Letter.

ix. <u>Litigation</u>. There is no action pending or, to the Company's Knowledge, threatened against the Company or the Plan that in any manner challenges or seeks to prevent, enjoin or materially alter or delay the transactions contemplated by this Commitment Agreement or that could reasonably be expected to materially impair or restrict such party's ability to consummate the transactions contemplated by this Commitment Agreement and to perform its obligations hereunder.

x. <u>No Commissions</u>. No commissions are or will be owed by the Company to any individual or entity in connection with the transactions contemplated in this Commitment Agreement and the Ancillary Agreements for which any other party, or its respective affiliates or representatives, could be liable.

c. <u>Independent Fiduciary Representations and Warranties</u>. The Independent Fiduciary hereby represents and warrants to the Company and Prudential as of the Commitment Agreement Date, as of the Premium Due Date, and, with respect to paragraph 9.c.v only, as of any other date on which the Plan Trustee pays Cash or assets to Prudential in connection with the transactions contemplated by this Commitment Agreement or the Contract, that:

i. <u>Due Organization, Good Standing and Corporate Power</u>. The Independent Fiduciary is a trust company, duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. The Independent Fiduciary is duly qualified or licensed to do business and is in good standing in each jurisdiction in which its performance of its obligations in the Commitment Agreement and the Ancillary Agreements to which it is a party makes such qualification or licensing necessary, except in such jurisdictions where the failure to be in good standing or so qualified or licensed would not be material. The Independent Fiduciary has all requisite corporate power and legal authority to enter into and carry out its obligations under this Commitment Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated to be undertaken by the Independent Fiduciary in this Commitment Agreement and the Ancillary Agreements.

ii. <u>Authorization of Commitment Agreement and Enforceability</u>. The Independent Fiduciary has received all necessary corporate approvals and no other action on the part of the Independent Fiduciary is necessary to authorize the execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated to be undertaken by the Independent Fiduciary in this Commitment Agreement and the Ancillary Agreements to which it is a party. This Commitment Agreement and the Ancillary Agreements to which it is a party have been duly executed and delivered by the Independent Fiduciary and each is (or when executed will be) a valid and binding obligation of the Independent Fiduciary, enforceable against the Independent Fiduciary, in accordance with its terms, subject to the Enforceability Exceptions.

iii. <u>No Conflict</u>. The execution, delivery and performance of this Commitment Agreement and the Ancillary Agreements to which it is a party by the Independent Fiduciary, and the consummation by the Independent Fiduciary of the transactions contemplated to be undertaken by the Independent Fiduciary in this Commitment Agreement do not (1) violate or conflict with any provision of its certificates or articles of incorporation, bylaws, code of regulations, or the comparable governing documents, (2) violate or conflict with any law or order of any governmental authority applicable to

13

**Commitment Agreement, dated October 4, 2019**

**CONFIDENTIAL**

the Independent Fiduciary, (3) require any governmental or governmental agency approval, (4) violate or conflict with any law or order of any governmental authority applicable to any provision of the Plan Governing Documents or (5) require any consent of or other action by any person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any contract to which the Independent Fiduciary is a party, except where the occurrence of any of the foregoing would not have a material adverse effect on the Independent Fiduciary's ability to consummate the transactions and perform its obligations contemplated by this Commitment Agreement.

iv. Independent Fiduciary Compliance with ERISA.

1. The Independent Fiduciary meets the requirements of, and in the transactions contemplated by this Commitment Agreement and the Ancillary Agreements is acting as, an "investment manager" under ERISA § 3(38), and further constitutes a "qualified professional asset manager" under the U.S. Department of Labor Prohibited Transaction Class Exemption 84-14 solely with respect to the transfer of assets to Prudential in connection with the transactions contemplated by this Commitment Agreement and the Ancillary Agreements (but not the selection of such assets or the management of such assets prior to the transfer).

2. The Independent Fiduciary has accepted, and has not rescinded or terminated, its designation as the sole fiduciary of the Plan with authority to select one or more insurers to issue one or more group annuity contracts in the IF Engagement Letter (a true and correct copy of which has been provided to Prudential, except that the fees and expenses to be paid under such IF Engagement Letter and indemnification provisions have been redacted), and the Independent Fiduciary reaffirms its fiduciary status as set forth in the IF Engagement Letter.

3. The Independent Fiduciary has accepted, and has not rescinded or terminated, appointment as independent fiduciary of the Plan with respect to the purchase of one or more group annuity contracts to (a) be the sole fiduciary responsible for selecting one or more insurers to provide annuities in accordance and compliance with the ERISA Requirements, (b) determine whether the transactions contemplated by this Commitment Agreement and the Ancillary Agreements satisfy the ERISA Requirements, (c) represent the interests of the Plan and all of its participants, beneficiaries and alternate payees in connection with the negotiation of a commitment agreement and, to the extent set forth in the IF Engagement Letter, the terms of any agreements with Prudential, including the Contract and the annuity certificates, (d) direct the Plan Trustee on behalf of the Plan to transfer the Premium Due Date Transfers in connection with the consummation of the transactions contemplated by this Commitment Agreement and the Contract and any amounts required pursuant to paragraphs 1.d.iv. and 3.c. and (e) take all other actions on behalf of the Plan necessary to effectuate the foregoing to the extent set forth in the IF Engagement Letter, including to perform the covenants and agreements and make the representations and warranties set forth in this Commitment Agreement, to the extent to be performed or made by the Independent Fiduciary.

4. The Independent Fiduciary is experienced in independent fiduciary work, is fully qualified and has the requisite expertise together with its reliance on its consultant, Mercer Health & Benefits LLC, and its counsel, K&L Gates LLP, to serve as an independent fiduciary in connection with

14

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

the transactions contemplated by this Commitment Agreement and the Ancillary Agreements, and it is independent of the Company and Prudential within the meaning of 29 C.F.R. § 2570.31(j).

v. <u>ERISA Related Determinations</u>.

1. The Independent Fiduciary has selected Prudential to issue the Contract as set forth in this Commitment Agreement and such selection, the transactions contemplated by this Commitment Agreement (including the purchase of the Contract), the Plan's use of assets for the purchase of the Contract as contemplated by this Commitment Agreement and the Contract (including its terms) each satisfies the ERISA Requirements. The Independent Fiduciary has delivered a certification confirming the foregoing, executed by a duly authorized officer of the Independent Fiduciary, to the Committee.

2. The transactions contemplated by this Commitment Agreement and the purchase of the Contract do not result in a Non-Exempt Prohibited Transaction, provided that the representations in paragraphs 9.a.vi and 9.b.vi are true and correct in all material respects as of the Premium Due Date.

3. The Plan Trust (I) will receive no less than "adequate consideration" for the Transferred Assets and (II) will pay no more than "adequate consideration" for the Contract, in each case within the meaning of "adequate consideration" under ERISA § 408(b)(17)(B) and Code § 4975(f)(10).

4. The Independent Fiduciary is responsible for exercising independent judgment in evaluating any transactions that the Plan engages in with Prudential (including purchase of the Contract). The Independent Fiduciary is not an affiliate of Prudential and does not have a financial interest, ownership interest or other relationship, agreement or understanding with Prudential that would limit or might otherwise affect its ability to exercise its best judgment as a fiduciary. The Independent Fiduciary understands that Prudential did not undertake and is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with any transactions that the Plan engages in with Prudential (including purchase of the Contract).

5. The Independent Fiduciary has provided and will continue to provide the services described in the IF Engagement Agreement prudently and for the exclusive benefit and in the sole interest of the Plan and all of its participants, beneficiaries and alternate payees.

vi. <u>No Commissions</u>. No commissions are or will be owed by the Independent Fiduciary to any individual or entity in connection with the transactions contemplated in this Commitment Agreement and the Ancillary Agreements for which any other party, or its respective affiliates or representatives, could be liable.

vii. <u>Litigation.</u> There is no action pending or, to the Independent Fiduciary's Knowledge, threatened against the Independent Fiduciary that in any manner challenges or seeks to prevent, enjoin or materially alter or delay the transactions contemplated by this Commitment Agreement or that could reasonably be expected to materially impair or restrict such party's ability to consummate the transactions contemplated by this Commitment Agreement and to perform its obligations hereunder.

15

10. <u>Conditions to Closing</u>. The parties' obligations to consummate the transactions contemplated by this Commitment Agreement in connection with the Premium Due Date Transfers, including the Independent Fiduciary's obligation to direct the Plan Trustee to consummate the transactions contemplated by this Commitment Agreement, are subject to the conditions that:

    a. the Independent Fiduciary will have confirmed that the transactions contemplated by this Commitment Agreement continue to satisfy the ERISA Requirements because an Independent Fiduciary MAC has not occurred or, if an Independent Fiduciary MAC has occurred, it is not continuing on the Premium Due Date;

    b. no court or government agency has taken any action after the Commitment Agreement Date that would (i) cause the consummation of the transactions contemplated by this Commitment Agreement to violate the law or (ii) cause the Plan to fail to remain qualified under Code Section 401(a); provided that, if the condition to closing set forth in this paragraph 10.b.ii is not satisfied, [***] shall be payable in accordance with paragraph 7; and

    c. each of the representations and warranties of the other parties set forth in paragraph 9 shall be true and correct as of the Commitment Agreement Date and as of the Premium Due Date, except where the failure to be so true and correct could not reasonably be expected to materially impair or restrict such other party's ability to consummate the transactions contemplated by this Commitment Agreement and to perform its obligations hereunder; provided that, if the condition to closing set forth in this paragraph 10.c is not satisfied with respect to a representation or warranty of the Company, as set forth in paragraph 9.b, or of the Independent Fiduciary, as set forth in paragraph 9.c, the Reimbursement Amount shall be payable in accordance with paragraph 7.

All conditions to the closing set forth in this paragraph 10 shall be deemed to have been satisfied or waived following the Premium Due Date Transfers; provided, that the foregoing shall not preclude any party hereto from bringing a valid fraud or breach of contract claim under this Commitment Agreement.

11. <u>Definitions</u>. For purposes of this Commitment Agreement, the following defined terms will have the following meanings:

    a. "<u>AAA</u>" is defined in Schedule 4.
    b. "<u>Ancillary Agreements</u>" means, collectively, the Contract and the Plan Trustee Agreement.
    c. "<u>Annuity Start Date</u>" means January 1, 2020.
    d. "<u>Annual Benefit</u>" is defined in Schedule 8.
    e. "<u>Approved Firm</u>" is defined in Schedule 4.
    f. [***].
    g. [***].
    h. "<u>Base File</u>" means the data file titled [***], provided by the Company to Prudential as posted to Willis Towers Watson OnePlace secure website at 2:25p.m. eastern time on September 10, 2019 and further updated by any email clarifications prior to September 19, 2019.
    i. "<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks located in New York, New York are authorized or required by law to close.

16

j. [***].

k. "Call Center" is defined in paragraph 6.b.

l. "Cash" means a wire transfer, through the Federal Reserve System, of currency of the United States of America.

m. "Check Register" is defined in Schedule 7.

n. "Code" means the Internal Revenue Code of 1986 and the applicable Treasury Regulations issued thereunder.

o. "Commitment Agreement" is defined in the preamble.

p. "Commitment Agreement Date" is defined in the preamble.

q. "Committee" means the Investment Committee for the Baxter International Inc. Employee Benefit Plans.

r. "Company" is defined in the preamble.

s. "Company Contact" is defined in paragraph 6.b.

t. "Company NDA" is defined in paragraph 14.c.

u. "Confidential Information" has the meaning ascribed to such term in the Company NDA.

v. "Contract" is defined in the preamble.

w. "Corridor Breach" is defined in Schedule 8.

x. "Cut-Off Time" means 1:00 p.m. eastern time on the Premium Due Date.

y. "Data Corrections" is defined in Schedule 8.

z. "Data Correction Adjustment" is defined in Schedule 8.

aa. "Data Load File" is defined in Schedule 7.

bb. "Data Load File Sign-Off" is defined in Schedule 7.

cc. "Deleted Lives" is defined in Schedule 8.

dd. "Deleted Lives Percentage" is defined in Schedule 8.

ee. "Disputes" is defined in paragraph 14.b.

ff. "Eligible Asset" means a Schedule 2 Asset that meets the Asset Eligibility Criteria as of the Commitment Agreement Date and to which the Company or Plan Trust has valid title, free and clear of all Liens, other than Permitted Liens on the Premium Due Date at the time of transfer.

gg. "Enforceability Exceptions" is defined in paragraph 9.a.ii.

hh. "ERISA" means Employee Retirement Income Security Act of 1974, as amended, and any federal agency regulations promulgated thereunder that are currently in effect and applicable.

ii. "ERISA Requirements" means all of the applicable requirements of ERISA and applicable guidance promulgated thereunder, including Interpretive Bulletin 95-1.

jj. [***].

kk. "Final Annuity Quote Sheet" is defined in paragraph 1.b.

ll. "Final Production Data File" is defined in Schedule 7.

mm. "GAC Issuance Data" is defined in paragraph 1.d.i.

nn. "GAC Issuance Data Notice Date" is defined in paragraph 1.d.i.

oo. "GAC Issuance True-Up Premium" is defined in Schedule 8.

pp. [***]

qq. "IF Engagement Letter" means the Engagement Letter dated August 16, 2019 between the Investment Committee of the Baxter International Inc. Employee Benefits Plans and the Independent Fiduciary

**Commitment Agreement, dated October 4, 2019**

**CONFIDENTIAL**

appointing the Independent Fiduciary to act as an independent fiduciary in connection with an annuity purchase.

rr. "IFID NDA" is defined in paragraph 14.c.

ss. "Indemnified Claims" is defined in paragraph 12.a.

tt. "Indemnified Party" is defined in paragraph 12.a.

uu. "Independent Fiduciary" is defined in the preamble.

vv. "Independent Fiduciary MAC" means (i) the occurrence of a material adverse change, as determined in the Independent Fiduciary's sole discretion, in or directly affecting Prudential after the Commitment Agreement Date that would cause the selection of Prudential and the purchase of the Contract to fail to satisfy the ERISA Requirements, or (ii) the occurrence of a change in ERISA Requirements after the Commitment Agreement Date that would cause the selection of Prudential and the Plan's purchase of the Contract to fail to satisfy ERISA Requirements.

ww. [***].

xx. [***].

yy. "Knowledge" means actual knowledge after making appropriate inquiry.

zz. "Liability Baseline Value" is defined in Schedule 8.

[[. "Lien" means any lien, mortgage, security interest, pledge, deposit, encumbrance, restrictive covenant or other similar restriction.

aaa. "Losses" is defined in paragraph 12.a.

bbb. [***].

ccc. "Modified GAC Deadline Date" is defined in paragraph 2.a.

ddd. "Modified GAC Form" is defined in paragraph 2.

eee. "Mortalities" is defined in Schedule 8.

fff. "Mortality Corrections" is defined in Schedule 8.

ggg. "NDA" is defined in paragraph 14.c.

hhh. "New Lives" is defined in Schedule 8.

iii. "New Lives Percentage" is defined in Schedule 8.

jjj. "Non-Exempt Prohibited Transaction" means a transaction prohibited by ERISA § 406 or Code § 4975, for which no statutory exemption or U.S. Department of Labor class exemption is available.

kkk. "Payee" means any payee under the Contract, including annuitants, contingent annuitants, alternate payees and beneficiaries, as applicable.

lll. "Permitted Liens" means:

   i. any Liens created by operation of law in respect of restrictions on transfer of securities (other than restrictions relating to the transfer of a Transferred Asset on the Premium Due Date in violation of applicable law); or

   ii. with respect to any Transferred Asset, any transfer restrictions or other limitations on assignment, transfer or the alienability of rights under any indenture, debenture or other similar governing agreement to which such assets are subject (other than restrictions relating to the transfer of such an asset on the Premium Due Date in violation of any such restriction).

mmm. "Plan" is defined in the preamble.

nnn. "Plan Asset" means an asset of the Plan within the meaning of ERISA.

ooo. "Plan Governing Documents" is defined in paragraph 9.b.iii.

18

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

ppp. "Plan Trust" means the Baxter International Inc. and Subsidiaries Pension Master Trust.

qqq. "Plan Trustee" means State Street Bank and Trust Company in its capacity as trustee for the Plan Trust.

rrr. "Plan Trustee Agreement" means the agreement, dated as of the date hereof, among Prudential, the Plan Trustee and the Independent Fiduciary.

sss. Production Data File" is defined in Schedule 7.

ttt. "Premium Amount" is defined in paragraph 3.

uuu. "Premium Due Date" means five Business Days following the Commitment Agreement Date.

vvv. "Premium Due Date Transfers" is defined in paragraph 3.

www. "Proposal" is defined in paragraph 1.b.

xxx. "Prudential" is defined in the preamble.

yyy. "RBC Ratio" means the risk-based capital ratio of Prudential [***].

zzz. [***].

[[[. "Relevant Percentage" is defined in Schedule 8.

aaaa. "Removed Lives" is defined in Schedule 8.

bbbb. "Scaled GAAP PBO" is defined in Schedule 8.

cccc. "Schedule 2 Asset" means each asset listed from time to time on Schedule 2 [***].

dddd. "Scheduled GAC Issuance Date" means on or before April 17, 2020 or, if applicable, and, if later, by the date that is five Business Days following the final resolution of any arbitration disputes in accordance with Schedule 4.

eeee. "SEC" is defined in paragraph 4.b.

ffff. "Specimen GAC Form" is defined in paragraph 1.a.

gggg. [***]

hhhh. [***]

iiii. [***]

jjjj. "Update File" is defined in Schedule 7.

kkkk. "Welcome Kit" is defined in paragraph 5.a.

12. Indemnification by Prudential.

   a. From and after the Premium Due Date, Prudential agrees to indemnify, defend and hold the Company, the Independent Fiduciary, and the Plan, and their respective affiliates, officers, directors, stockholders, employees, Plan fiduciaries, and agents (each an "Indemnified Party") harmless from and against any and all actual (but not potential, consequential or contingent) losses, damages, costs and expenses (in each case, including reasonable out-of-pocket expenses and reasonable fees and expenses of counsel) ("Losses"), to the extent arising out of or relating to the portion of any action, lawsuit, proceeding, investigation, demand or other claim against such Indemnified Party by a third party that is threatened or brought against or that involves an Indemnified Party and that arises out of or relates to [***] ("Indemnified Claims"). If, however, the allegations of the claim, action or proceeding are that the Losses otherwise indemnified were primarily caused by actions or omissions of any of the Indemnified Parties and not primarily caused by Prudential, and these allegations are proven or necessarily established by a binding final decision in any action or proceeding, Prudential shall have no obligation to indemnify for Losses

19

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

representing either a settlement or the payment of a judgment. The remedy provided by this paragraph 12 shall be the sole and exclusive remedy available to the Indemnified Parties against Prudential with respect to third-party claims, actions or proceedings for Indemnified Claims. Notwithstanding the foregoing, this paragraph shall not apply to any failure by Prudential to make any such payments or to comply with any terms of this Commitment Agreement in the event that this Commitment Agreement is terminated pursuant to paragraph 8.

b. Any Indemnified Party making an Indemnified Claim under paragraph 12.a shall notify Prudential of such Indemnified Claim [***]. Such notice shall describe the Indemnified Claim, the amount thereof (if known and quantifiable) and the basis thereof in reasonable detail.

c. Prudential will have the right at any time to assume the defense against any Indemnified Claim with counsel of its choice reasonably satisfactory to the Indemnified Party and control the defense, settlement or litigation or other dispute resolution process to the final resolution of such Indemnified Claim; provided that, the consent of the Indemnified Party to Prudential's choice of counsel shall not be unreasonably withheld and shall be deemed provided unless the Indemnified Party provides reasonable objection to Prudential [***].

d. From and after the date that Prudential has assumed the defense of an Indemnified Claim in accordance with paragraph 12.c, and subject to paragraph 12.c, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in, but not control, the defense of such Indemnified Claim, (ii) the parties will cooperate with each other in connection with the defense of any such Indemnified Claim; provided that, the foregoing will not require any party to waive, or take any action which has the effect of waiving, its attorney-client privilege, attorney work-product, or any other applicable privilege with respect thereto, and (iii) Prudential will not agree without the prior written consent of the Indemnified Party (which will not be unreasonably withheld, conditioned or delayed) to the entry of any judgment or settlement that calls for the admission of liability on the part of the Indemnified Party, provides for equitable relief affecting the future conduct of the Indemnified Party or requires the Indemnified Party to pay any amount.

e. The Indemnified Parties shall use commercially reasonable efforts to mitigate or otherwise reduce the amount of any Losses that any one or more of them incurs in connection with any matter with respect to which any one or more of them is entitled to indemnification pursuant to this paragraph 12.

13. <u>Privacy and Data Security</u>.

Prudential will comply, and will ensure that all of its affiliates, agents, and subcontractors comply, with all applicable laws and regulations governing the Confidential Information of all Payees, including those laws relating to privacy, data security and protection and the safeguarding of such information, and its maintenance, disclosure and use. Prudential will maintain administrative, technical and physical safeguards to protect the privacy and security of the Confidential Information related to Payees in its custody or under its control. Prudential will comply in all material respects with any internal written policies relating to the Confidential Information of any Payee in its custody or under its control as in effect from time to time. Prudential acknowledges that it is solely responsible from and after the Commitment Agreement Date for any Data Breach. For purposes of this paragraph 13, "<u>Data Breach</u>" means any act or omission by Prudential or its agents, subcontractors or service providers ("Authorized Persons") that

20

**Commitment Agreement, dated October 4, 2019**

**CONFIDENTIAL**

21

compromises either the security, confidentiality or integrity of Payee data in its custody or under its control or the physical, technical, administrative or organizational safeguards put in place by Prudential (or any Authorized Persons) that relate to the protection of the security, confidentiality or integrity of any personally identifying information of any Payee in its custody or under its control.

14. Miscellaneous.

    a. This Commitment Agreement, together with the Schedules to this Commitment Agreement, which are incorporated by reference and made a part of this Commitment Agreement as if fully set forth herein, constitutes the sole and entire agreement of the parties to this Commitment Agreement with respect to the subject matter contained herein and therein. The parties each hereby acknowledge that they jointly and equally participated in the drafting of this Commitment Agreement and all other agreements contemplated hereby, and no presumption will be made that any provision of this Commitment Agreement will be construed against any party by reason of such role in the drafting of this Commitment Agreement or any other agreement contemplated hereby. No amendment of any of the provisions hereof shall be effective unless set forth in writing and signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Commitment Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. For avoidance of doubt, this Commitment Agreement shall survive the execution of the Contract. Except to the extent expressly provided in this Commitment Agreement, nothing in this Commitment Agreement shall confer any rights or remedies upon any person other than the parties hereto.

    b. This Commitment Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). Any and all disputes, claims or controversies ("Disputes") arising out of or relating to this Commitment Agreement, including without limitation, any Dispute as to the existence, validity, performance, breach or termination of this Agreement, shall be resolved pursuant to the dispute arbitration provisions of Schedule 4. Any suit, action or proceeding seeking equitable relief or enforcement of an arbitration ruling arising out of or relating to this Commitment Agreement may be instituted in the courts of the State of New York in each case located in the city of New York and County of New York, and each party hereby irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding. The parties agree that irreparable damage would occur if any provisions of this Commitment Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to seek equitable relief, including injunctive relief or specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. To the fullest extent permitted by law, none of the parties will be liable to any other party for any punitive or exemplary damages of any nature in respect of matters arising out of this Commitment Agreement.

    c. Notwithstanding anything to the contrary in the Mutual Non-Disclosure Agreement, dated as of September 6, 2018, between the Company and Prudential (the "Company NDA"), and the Non-Disclosure Agreement, dated as of August 30, 2019, between Prudential and the Independent Fiduciary

21

**Commitment Agreement, dated October 4, 2019**

22

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

(the "IFID NDA" and, together with the Company NDA, the "NDAs" and each an "NDA"), each NDA shall continue in full force and effect except that, if the Premium Due Date Transfers are transferred to and received by Prudential, (a) each NDA shall continue indefinitely and shall not be terminated without the mutual written agreement of (i) the Company and Prudential in the case of the Company NDA and (ii) Prudential and the Independent Fiduciary in the case of the IFID NDA, and (b) with respect to the Company NDA, Prudential will not be required to return or destroy any Confidential Information and will not be restricted in its use or disclosure of any Confidential Information related to Payees, annuity payments under the Contract or the pricing or underwriting of the Contract, received from another party, provided, that Prudential will use such Confidential Information only in compliance with all applicable laws relating to privacy of personally identifying information.

d. Prudential, the Company and the Independent Fiduciary shall not assign or transfer this Commitment Agreement or any of its rights or obligations hereunder without the prior written consent of the other parties. Any assignment or transfer in violation of this paragraph 14.d will be null and void from the outset, without any effect whatsoever.

e. This Commitment Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

22

**Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

IN WITNESS WHEREOF, the Company, Prudential, and the Independent Fiduciary have executed this Commitment Agreement as of the date first written above.

BAXTER INTERNATIONAL INC.

By: /S/ JEANNE MASON

Print Name: Jeanne Mason

Title: SVP, Human Resources

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

By: /S/ GLENN O'BRIEN

Print Name: Glenn O'Brien

Title: Managing Director, PICA

STATE STREET GLOBAL ADVISORS TRUST COMPANY, acting solely in its capacity as Independent Fiduciary of the Plan

By: /S/ DENISE SISK

Print Name: Denise Sisk

Title: Managing Director

**Commitment Agreement Signature Page**
**CONFIDENTIAL**

<div align="right">
Schedule 1

to

Commitment Agreement
</div>

SPECIMEN GAC FORM

ex1030redactedcommitmi.jpg

<div align="right">
**The Prudential Insurance Company of America**
751 Broad Street, Newark, New Jersey 07102
1-800-621-1089
</div>

**Contract-Holder:**            ABC Company

**Plan:**                       ABC Retirement Plan
**Contract Number:**            GA-XXXXXX
**Jurisdiction:**               State
**Effective Date**:             Date

**Initial Premium Amount:**     $X,XXX,XXX,XXX

This Group Annuity Contract (the "Contract") includes the attached Cash and Transferred Assets Schedule, Premium Schedule, and the Annuity Exhibit, which may be amended or supplemented as described herein.

**ABC COMPANY**                 **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA**


By: _____    _____
Title: _____   Chief Executive Officer


Print Name:_____   _____
Date: _____    Secretary



                                Attested by:_____

                                Date: _____

GAC-PRTBO-SA-2016



GAC-PRTBO-SA-2016  Page 2

**Single-Premium Non-Participating Group Annuity Contract supported by the Separate Account and the General Account, as set forth herein, which provides for an irrevocable commitment to make Annuity Payments, subject to the provisions of this Contract. The Annuity Payments hereunder do not vary based on any gains or losses of the assets allocated to the Separate Account or the General Account.**

GAC-PRTBO-SA-2016  Page 2

**TABLE OF CONTENTS**

**PROVISION I DEFINED TERMS, [***]** 3

    **1.1 Defined Terms** 3
    **1.2** [***]
    **1.3** [***]
    **1.4** [***]
    **1.5** [***]
    **1.6** [***]
    **1.7** [***]
    **1.8** [***]
    **1.9** [***]
    **1.10** [***]


**PROVISION II [***]**

    **2.1** [***]
    **2.2** [***]
    **2.3** [***]
    **2.4** [***]
    **2.5** [***]
    **2.6** [***]
    **2.7** [***]
    **2.8** [***]
    **2.9** [***]
    **2.10** [***]


**PROVISION III GENERAL TERMS** 17

    **3.1 Entire Contract** 17
    **3.2 Communication** 17
    **3.3 U.S. Currency** 17
    **3.4** [***]
    **3.5** [***]
    **3.6** [***]
    **3.7** [***]
    **3.8 Third-Party Beneficiaries; Enforceability** 19
    **3.9 Contract Assignment, Transfer, Reinsurance and Novation** 20
    **3.10 [***]**

[***]

[***]

[***]

*IDefined Terms, [\*\*\*]*

## 1.1 Defined Terms

The following capitalized terms used in this Provision I and throughout the Contract are defined as follows and will control in the event the term is otherwise defined on the Annuity Exhibit or other attachments to this Contract:

[\*\*\*]
[\*\*\*]

[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]

[\*\*\*]
[\*\*\*]

[\*\*\*]

[\*\*\*]



[***]
[***]

[***]

[***]
[***]

[***]

[***]
[***]

[***]

[***]
[***]

[***]

[***]
[***]

[***]
[***]
[***]

[***]

[***]
[***]

[***]
[***]
[***]

[***]

[***]
[***]

[***]

[***]
[***]

[***]

## 1.2 [***]

[***]

[***]

[***]

[***]
(i) [***]
(ii) [***]
(iii) [***]
(iv) [***]

[***]

[***]

[***]

[***]

## 1.3 [***]

[***]

[***]

[***]

[***]

## 1.4 [***]

[***]

[***]

GAC-PRTBO-SA-2016 Page 5

**1.5** [***]

[***]

**1.6** [***]

[***]

**1.7** [***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

[***]

**1.8** [***]

[***]

**1.9** [***]

[***]

**1.10** [***]

[***]



*II[***]*

## 2.1 [***]

[***]

[***]

[***]

[***]

## 2.2 [***]

[***]

(i) [***]

[***]

(ii) [***]

[***]

[***]



(iii) [***]

[***]

[***]

(iv) [***]

[***]

[***]

[***]

[***]

(v) [***]

[***]

[***]

(vi) [***]

[***]

**2.3** [***]

[***]

**2.4** [***]

[***]

[***]

**2.5** [***]

(i)       [***]

(ii)      [***]

(iii)     [***]

(iv)     [***]

GAC-PRTBO-SA-2016 Page 8

**2.6 [\*\*\*]**

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

**2.7 [\*\*\*]**

[\*\*\*]

**2.8 [\*\*\*]**

    [\*\*\*]

**2.9 [\*\*\*]**

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

    [\*\*\*]

**2.10 [\*\*\*]**

    [\*\*\*]

*Provision III General Terms*

## 3.1 Entire Contract

[***]

[***]

[***]

## 3.2 Communication

[***]

[***]

[***]

## 3.3 [***]

[***]

## 3.4 [***]

[***]

[***]

[***]

## 3.5 [***]

[***]

## 3.6 [***]

(i) [***]

[***]

(ii) [***]

[***]

(iii) [***]

GAC-PRTBO-SA-2016 Page 10

GAC-PRTBO-SA-2016 Page 11

[***]

(iv) [***]

[***]

(v) [***]

[***]

**3.7 [***]**

    [***]

    [***]

**3.8 Third-Party Beneficiaries; Enforceability**

    (i) [***]

    [***]

    [***]

    (ii) [***]

    [***]

    (iii) [***]

    [***]

**3.9 Contract Assignment, Transfer, Reinsurance and Novation**

    [***]

3.10 **[***]**

GAC-PRTBO-SA-2016 Page 13

GAC-PRTBO-SA-2016 Page 14

GAC-PRTBO-SA-2016 Page 15

**Schedule 1 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

[***]

GAC-PRTBO-SA-2016 Page 14

GAC-PRTBO-SA-2016 Page 15

1

**Schedule 1 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**[\*\*\*]**

GAC-PRTBO-SA-2016 Page 15

**Schedule 1 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Schedule 2 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

[***]

**Schedule 1 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Schedule 2 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 2
to
Commitment Agreement

[***]

[***]

**Schedule 2 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Schedule 3 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 3
to
Commitment Agreement

[***]

[***]

1

**Schedule 3 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 4

to

Commitment Agreement

ARBITRATION DISPUTE RESOLUTION

1.  Any and all Disputes arising out of or relating to this Agreement shall be resolved in the following manner.

2.  A party must first send written notice of the Dispute to the other party or parties for attempted resolution by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Commitment Agreement. Negotiations must be conducted within 14 days after such notice is received (all references to "days" in this Schedule 12 are to calendar days). During such 14 day-period, the executives of the parties shall meet at a mutually acceptable time(s) and place(s), and as often as they reasonably deem necessary, to attempt to resolve the Dispute. All negotiations pursuant to this clause are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

3.  If the parties fail to meet or if the matter has not been resolved within 14 days, any party may initiate arbitration with respect to the matters submitted to negotiation and mediation by filing a written demand for arbitration. Disputes shall be settled by final and binding arbitration administered by the International Institute for Conflict Prevention & Resolution (CPR) in accordance with its arbitration rules ("Rules").

4.  The place of arbitration shall be Chicago, IL.

5.  Notwithstanding the foregoing, to the extent a party is seeking injunctive relief, any party may immediately bring a proceeding seeking preliminary injunctive relief in a court having jurisdiction, and this relief shall remain in effect until the parties reach a resolution or so long as the arbitrator(s) feel as appropriate.

6.  For Disputes under $5,000,000, one arbitrator shall either be mutually agreed by the parties or appointed in accordance with the administrator's Rules and the arbitration shall be conducted, to the extent not inconsistent with this Schedule 4, in accordance with the Fast Track Arbitration Rules of CPR. For Disputes of $5,000,000 or more, a panel of three arbitrators shall be appointed in accordance with the administrator's Rules. All arbitration proceedings shall be conducted in the English language.

7.  The parties mutually desire and intend for proceedings under this provision to be expedited and rapid with the goal of achieving an efficient and streamlined resolution of any dispute within 90 days of the date on which a demand for arbitration is filed, unless the parties agree or the arbitrator(s) determines in his judgment that a longer schedule for a particular dispute would be appropriate and consistent with the goal

1

**Schedule 4 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

1

**Schedule 4 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

of expedition. The arbitrator(s) are instructed to apply these principles in developing a schedule and procedures for the prompt resolution of any dispute.

8. Following completion of the hearing, each party may submit to the other party and the arbitrator(s) a post-hearing brief in support of its proposed rulings and remedies, provided that such brief shall not contain or discuss any new evidence. The arbitrator(s) shall rule on each disputed issue and shall exercise their judgment in reaching a fair and appropriate damages award, provided however that the arbitrator(s) shall not award damages in excess of the amount sought by the prevailing party. Arbitration costs shall be evenly split between the parties, and each party shall bear its own fees and other expenses. The rulings of the arbitrator(s) shall be binding, non-reviewable and non-appealable, and may be entered as a final judgment in any court having jurisdiction. Except as required by law, the parties agree to keep confidential the existence of the arbitration, the submissions made by the parties (including exhibits, testimony, proposed rulings and briefs) and the decisions made by the arbitrator(s), including its awards.

9. If applicable, the parties will promptly amend the Schedules hereto to reflect any arbitration decision.

10. [***].

**Schedule 4 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Schedule 5 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 5
to
Commitment Agreement

[***]

[***]

**Schedule 5 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 6
to
Commitment Agreement

INVESTMENT MANAGERS AND INVESTMENT ADVISERS

1.  Jennison Associates LLC
     Doing Business As:
       • Jennison
       • Jennison Associates
2.  QMA LLC
     Doing Business As:
       • QMA
     Formerly Known As:
       • Quantitative Management Associates LLC
3.  PGIM, Inc.
     Doing Business As:
       • PGIM Investments
       • Prudential Capital Group
       • PGIM Fixed Income
       • PGIM
       • Prudential Financial, Inc.
       • Prudential Real Estate Fixed Income Investors
       • PRICOA Capital Group
       • Prudential Capital Partners
       • PRICOA Capital Partners
       • PGIM Institutional Advisory & Solutions
       • PGIM Real Estate
       • PGIM Private Capital
       • Pramerica Capital Energy Partners
       • PGIM Global Partners
4.  The Prudential Insurance Company of America
     Doing Business As:
       • Prudential Financial, Inc.
5.  Prudential Trust Company
6.  Prudential Retirement Insurance and Annuity Company
7.  PGIM Limited
     Doing Business As:

• PGIM Fixed Income

**Schedule 6 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**Schedule 6 to Commitment Agreement, dated October 4, 2019**

- PGIM Real Estate
- PGIM Real Estate Finance
8. PGIM Fund Management Limited
   Doing Business As:
   - PGIM Real Estate
9. Global Portfolio Strategies, Inc.
10. PGIM Investments LLC
    Formerly Known As:
    - Prudential Investments LLC
11. Prudential Private Placement Investors, L.P.
12. AST Investment Services, Inc.
13. Prudential International Investment Advisers, LLC
    Doing Business As:
    - PGIM Global Partners
14. Pruco Securities LLC
    Doing Business As:
    - Prudential Financial Planning Services
15. PGIM Real Estate Finance, LLC
    Doing Business As:
    - PGIM Real Estate Finance
    - Prudential Agricultural Investments
    Formerly Known As:
    - PRICOA Mortgage Capital Company
    - Prudential Mortgage Capital Company
16. PGIM Real Estate Luxembourg S.A.
17. QMA Wadhwani LLP
    Formerly Known As:
    - Wadhwani Asset Management LLP
18. Prudential Customer Solutions LLC

2

**Schedule 6 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 7

to

Commitment Agreement

## ADMINISTRATION AND TRANSFER

This Schedule 7 sets forth the actions that the Company and Prudential will take or cause to be taken at the times identified in the table below. All Delivery Dates after the first Delivery Date assume the prior delivery, to a party responsible for a subsequent deliverable, of relevant materials needed from other parties, on or prior to the required Delivery Dates set forth below, including cooperation of other parties in resolving any open issues.

### Defined Terms

"Check Register" means an electronic file showing gross amounts, net amounts and deductions with respect to payments to each Payee. Dates shown for the Check Register can be changed if mutually agreed upon.

"Data Load File" means the file as extracted from Prudential's recordkeeping systems and reflected in a report provided to the Plan and Company.

"Data Load File Sign-Off" means the written confirmation by the Plan that the Data Load File accurately reflects the data provided.

Production Data File" means the complete production data file, as populated as based on information from the recordkeeper's internal system.

"Update File" means an itemized list of updates that should be made to the file that was last delivered.

1

**Schedule 7 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

| Deliverable | Delivery Date | Action by the Company/Plan | Action by Prudential |
|---|---|---|---|
| Check Register (as of October 1, 2019) | October 14, 2019 | Deliver Check Register | Receive Check Register |
| Production Data File | October 14, 2019 | Deliver Production Data File | Receive Production Data File |
| Check Register (as of November 1, 2019) | November 1, 2019 | Deliver Check Register | Receive Check Register |
| Update File | November 19, 2019 | Deliver Update File | Receive Update File |
| Data Load File (related to Production Data File) | November 22, 2019 | Receive Data Load File | Deliver Data Load File |
| Data Load File Sign-Off (related to Production Data File) | December 2, 2019 | Approve Data Load File | Receive Data Load File Sign-Off |
| Update File | December 3, 2019 | Deliver Update File | Receive Update File |

Schedule 8

to

Commitment Agreement

GAC ISSUANCE TRUE-UP PREMIUM

This Schedule provides a description of the methodologies and procedures by which Prudential will calculate the GAC Issuance True-Up Premium.

[***].

2

**Schedule 7 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 9

to

Commitment Agreement

HISTORICAL MORTALITY DATA

Historical mortality data was provided by the Company to Prudential and posted to Willis Towers Watson OnePlace on June 26, 2019 in the file titled [***].

1

**Schedule 9 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

Schedule 10

to

Commitment Agreement

STATE INSURANCE GOVERNMENTAL AUTHORITIES

1. Arkansas

2. Florida

3. Idaho

4. Illinois

5. Iowa

6. Louisiana

7. Minnesota

8. Mississippi

9. Montana

10. New Hampshire

11. North Dakota

12. Ohio

13. Oklahoma

14. Puerto Rico

15. South Dakota

16. Texas

17. Vermont

18. Washington

19. West Virginia

1

**Schedule 10 to Commitment Agreement, dated October 4, 2019**

Schedule 11

to

Commitment Agreement

## RBC RATIO CALCULATION

Prudential's normal-course RBC Ratio preparation is completed in a reasonable manner, using reasonable assumptions and in accordance with prevailing regulatory standards. [***].

Such projected RBC Ratios are completed in accordance with methodologies prescribed by the National Association of Insurance Commissioners ("NAIC") for the calculation of company action level risk-based capital and total adjusted capital. The NAIC publishes detailed instructions annually for calculating year-end reported company action level risk-based capital ratios using company action level risk-based capital and total adjusted capital (NAIC Life Risk-Based Capital Report Including Overview and Instructions for Companies). Prudential's RBC Ratio utilizes the same formula as these instructions [***]. Such projections also incorporate NAIC changes to the extent Prudential expects that these changes are expected to be adopted by the NAIC and effective for the forecasted period.

2

**Schedule 11 to Commitment Agreement, dated October 4, 2019**
**CONFIDENTIAL**

**EXHIBIT 10.34**

# FIRST AMENDMENT

## TO THE
## BAXTER INTERNATIONAL INC. AND SUBSIDIARIES
## PENSION PLAN
(Amended and Restated January 5, 2018)

Pursuant to Section 11.1 of the Baxter International Inc. and Subsidiaries Pension Plan, as amended and restated effective January 5, 2018 (the "Plan"), the Plan is amended in the following particulars, effective as of January 5, 2018 unless otherwise indicated below:

1.      By adding the following new paragraph at the end of Section 2.18 of the Plan:

"Notwithstanding any provision of the Plan to the contrary, an Employer's classification as to whether an individual constitutes an Employee will be determinative for purposes of an individual's eligibility under the Plan. An individual who is classified as an independent contractor (or other non-employee classification) will not be considered an Employee and will not be eligible for participation in the Plan, regardless of any subsequent reclassification of such individual as an Employee, or an employee of an Employer, by an Employer, any government agency, court or other third-party. Any such reclassification will not have a retroactive effect for purposes of the Plan."

2. By substituting the following three subsections for subsections 2.42(c) and (d) of the Plan:

"(c) the Participant's service with an Employer after December 31, 2006, that would have constituted Years of Service if the Participant had not elected to cease accruing benefits as of December 31, 2006, pursuant to subsection 3.1(c); plus

(d) the Participant's Years of Service under subsection 2.53(b) after the date on which he or she is reemployed after December 31, 2006; minus

(e) any Years of Service under subsection 2.53(a) attributable to prior Lump Sums of $5,000 or less."

3. By substituting the following for subsection 3.3(b) of the Plan:

1

"(b) Re-Employment after December 31, 2006. Notwithstanding the foregoing, a Participant who incurred a Termination of Employment, and is subsequently re-employed after December 31, 2006, will not be eligible to resume accruing benefits under the Plan. Such Participant's Accrued Benefit will be fixed as of the date on which he incurred the Termination of Employment. An Eligible Employee who incurred a Termination of Employment prior to having become a Participant, and who is subsequently re-employed after December 31, 2006, will not be an Eligible Employee and will not become a Participant."

4. By substituting the following for the fourth sentence of each of subsections 4.1(b), 4.2(b), 4.3(b), and 4.4(c), as well as substituting the following for the fifth sentence of subsection 4.5(b), of the Plan:

"In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed."

5. By substituting the following for Section 6.7 of the Plan:

"**6.7. Designation of Beneficiary**. Subject to subsection 7.4(d) and Section 13.4, a Participant's surviving Spouse is entitled to the Death Benefit, if any, which is payable with respect to the Participant. A Participant may designate a Beneficiary who is not the Participant's surviving Spouse, provided that such surviving Spouse consents to the designation. The designation of such Beneficiary can be made only after the notice required by Code Section 417(a)(3)(B) is provided to the Participant during the time periods specified in Code Section 417 and will be effective only if the consent of the surviving Spouse:

(i) is in writing;

(ii) acknowledges the effect of the Participant's designation of a Beneficiary other than the Spouse and the identity of such Beneficiary; and

(iii) is witnessed by a notary public; provided, however, such consent will be deemed to have been granted where it is established to the satisfaction of the Administrative Committee that the consent of the Spouse cannot be obtained because (1) there is no surviving Spouse, (2) the surviving Spouse cannot be located, or (3) there exist such other circumstances as may be prescribed by regulations under ERISA or the Code. Consent of the surviving Spouse to a designated Beneficiary and any contingent Beneficiary is irrevocable. Each change from one non-Spouse

2

Beneficiary to another, or change of contingent Beneficiary, requires a new consent from the surviving Spouse.

If the Participant dies leaving no surviving Spouse and either (a) the Participant failed to file a valid beneficiary designation form, or (b) all persons designated on the beneficiary designation form have predeceased the Participant, the Participant's Death Benefit described in Section 6.4 will be paid in a lump sum to the Participant's estate. If an estate is not opened on behalf of the Participant, then the Participant's Death Benefit described in Section 6.4 will be distributed in a lump sum to the duly authorized individual properly designated by any applicable small estate affidavit or similar documentation issued pursuant to applicable state law.

Notwithstanding any provision of the Plan to the contrary, with respect to the death of any Participant, if such Participant had designated his or her Spouse as his or her Beneficiary, then a subsequent divorce decree or a Qualified Domestic Relations Order (as defined in Section 13.4) that relates to such Spouse will be deemed to have revoked the Participant's designation of the Spouse as his or her Beneficiary unless a subsequent Beneficiary designation form naming the Spouse as a Beneficiary is filed with the Plan. In addition, to be entitled to receive any benefit of a Participant, a Beneficiary must be alive or in existence at the time of the Participant's death. In the event that the order of the deaths of the Participant and any Beneficiary cannot be determined or have occurred within 120 hours of each other, the Participant will be deemed to have survived. In the event that the death of the Participant or any Beneficiary is the result of a criminal act involving any other Beneficiary, a person convicted of such criminal act will not be entitled to receive any benefit under the Plan. In accordance with rules and procedures established by the Administrative Committee, a Beneficiary may disclaim all or any portion of the benefit payable to him or her under the Plan, provided that such disclaimer meets the requirements of a 'qualified disclaimer' under Code Section 2518 and the Treasury Regulations and other guidance issued thereunder, and the requirements of applicable state law."

6. By substituting the following for the first sentence of subsection 7.4(g) of the Plan:

"Except as otherwise provided below, a Participant may not change his form of payment or designate a new Beneficiary after his Payment Date (or, if later, after the last day on which he is permitted to revoke his election pursuant to subsection (c)), even if his Beneficiary dies or he is divorced from his Beneficiary."

7. By substituting the following for subsection 7.5(d) of the Plan:

"(d) Each Participant, alternate payee and Beneficiary must file with the Administrative Committee from time to time his or her post office address and each change of post office address. Any communication, statement or

3

notice addressed to a Participant, alternate payee or Beneficiary at his or her last post office address filed with the Administrative Committee, or if no address is filed with the Administrative Committee then, in the case of a Participant, at the Participant's last post office address as shown on the Employer's records, will be considered a notification for purposes of the Plan and will be binding on the Participant, alternate payee and Beneficiary for all purposes of the Plan. If the Administrative Committee notifies a Participant, alternate payee or Beneficiary that he or she is entitled to a benefit under the Plan, and the Participant, alternate payee or Beneficiary fails to claim his or her benefit or make his or her whereabouts known to the Administrative Committee within a reasonable time after the notification; or if payment of a benefit is made to a Participant, alternate payee or Beneficiary and such payment remains unclaimed; the Administrative Committee will make reasonable efforts to locate the Participant, alternate payee or Beneficiary. Such measures may include:

(i) Searching Plan and related plan and publicly-available records or directories for alternative contact information;

(ii) Utilizing a commercial locator service, credit reporting agency, or proprietary internet search service;

(iii) Attempting contact with the Participant, alternate payee or Beneficiary via email and/or telephone; and

(iv) Sending a registered letter, return receipt requested, to the last known address of such Participant, alternate payee or Beneficiary.

In the event that the Administrative Committee is unable after a reasonable effort to locate a Participant, alternate payee or Beneficiary to whom a benefit is due by the date as of which payment is required to commence pursuant to the applicable provision of this Section 7.5, such benefit will be forfeited in accordance with rules and procedures established by the Administrative Committee; provided, however, that if such Participant or Beneficiary subsequently makes an application for such benefit, the forfeited benefit will be restored, with appropriate adjustments. Nothing contained herein will be construed to preclude the Administrative Committee from using any other method permitted by applicable law to satisfy the Plan's obligations to a missing Participant, alternate payee or Beneficiary, including use of the Pension Benefit Guaranty Corporation Missing Participant Program, if applicable. Checks that are not cashed, deposited or otherwise negotiated will be handled (including the forfeiture and reinstatement of such amounts) in accordance with rules and procedures established by the Administrative Committee, including those rules and procedures described above."

8. By substituting the following for Section 8.10 of the Plan:

   "**8.10 Claims Procedure.** Each person entitled to benefits under the Plan (the 'Applicant') must submit a written claim for benefits to the Administrative Committee (or its delegate, as the Administrative Committee may direct). Such claim shall be filed not more than one year after the Applicant knows (or with the exercise of reasonable diligence would know) of the existence of a basis for a claim; provided that nothing herein shall be construed to permit the forfeiture of a Participant's benefit for failure to file a timely application for such benefit; and provided further that the Administrative Committee may waive or extend such requirement in its sole discretion. If a claim for benefits by the Applicant is denied, in whole or in part, the Administrative Committee will cause the Applicant to be furnished, within 90 days after receipt of such claim (or within 180 days after receipt if special circumstances require an extension of time), a written notice which specifies the reason for the denial, refers to the pertinent provisions of the Plan on which the denial is based, describes any additional material or information necessary for properly completing the claim and explains why such material or information is necessary, and explains the claim review procedures of this Section 8.10. Such notice will further describe that the Applicant has a right to bring a civil action under Section 502 of ERISA if his claim is denied after an appeal and review. Any Applicant whose claim is denied under the provisions described above may request a review of the denied claim by written request to the Administrative Committee within 60 days after receiving notice of the denial. In connection with such request, the Applicant or his authorized representative may review pertinent documents and may submit issues and comments in writing. If such a request is made, the Administrative Committee will make a full and fair review of the denial of the claim and will make a decision not later than 60 days after receipt of the request, unless special circumstances (such as the need to hold a hearing) require an extension of time, in which case a decision will be made as soon as possible but not later than 120 days after receipt of the request for review, and written notice of the extension will be given to the Applicant before the commencement of the extension. The decision on review must be in writing and must include specific reasons for the decision and specific references to the pertinent provisions of the Plan on which the decision is based. Such notice will further describe that the Applicant has a right to bring a civil action under ERISA Section 502 if his claim is denied after an appeal and review. No person entitled to benefits under the Plan has any right to seek review of a denial of benefits, or to bring any action to enforce a claim for benefits, in any court prior to his filing a claim for benefits and exhausting all of his rights under this Section 8.10, or more than six months after receipt of the decision on review. Although not required to do so, an Applicant may choose to state the reason or reasons he believes he is entitled to benefits, and may choose to submit written evidence, during the initial claim process or review of claim denial process. However, failure to state any such reason or submit such evidence during the initial claim process or review of claim denial process, or by written notice to the Administrative Committee within 60 days of the date of the decision on the review of the claim denial, will permanently bar the Applicant, and his successors in interest, from raising such reason or submitting such evidence in any forum at any later date. An Applicant whose claim is denied initially or on review is

5

entitled to receive, on request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to such claim for benefits."

*** 

**[signature follows on next page]**

6

IN WITNESS WHEREOF, Baxter International, Inc. has caused this amendment to be executed by a

duly authorized member of the Baxter International Inc. Administrative Committee this 21st day of December, 2018.

BAXTER INTERNATIONAL INC.

/s/ Mark E. Valerius

for the Baxter International Inc.
Administrative Committee

7

**EXHIBIT 10.35**

## Memorandum of Plan Actions

**WHEREAS**, the Administrative Committee for the Baxter International Inc. Employee Benefit Plans (the "Administrative Committee"), acting solely in a non-fiduciary settlor capacity with respect to the Baxter International Inc. and Subsidiaries Pension Plan (the "Plan") sponsored by Baxter International Inc. (the "Company"), previously approved the implementation of a settlement strategy to de-risk the Plan through an annuity purchase for substantially all or a significant portion of the Plan's retirees by the end of October 2019 (or by or at such other dates as the Administrative Committee (or its designee) may deem advisable) with the use of an independent fiduciary selected and engaged by the applicable Plan fiduciary (the "Plan Settlement"); and

**WHEREAS**, the Administrative Committee has authorized any member thereof to make Plan design determinations and adopt applicable Plan amendments related to the Plan Settlement as such member deems advisable.

**NOW, THEREFORE**, the Plan is hereby amended as set forth in Exhibit A attached hereto to this Memorandum of Plan Actions.

The Administrative Committee (or its designee) and each member thereof, is authorized and empowered in the name and on behalf of the Company, Plan and/or Administrative Committee to take any action (including, without limitation, the payment of expenses) and to execute in any appropriate manner and deliver any and all agreements, certificates, instruments, and other documents (under corporate seal of the Company or otherwise) that the Administrative Committee (or its designee) or such member thereof may deem necessary, appropriate, or desirable in order to carry out the purposes and intent of each and all of the foregoing amendments.

On behalf of the Company and Administrative Committee, the undersigned has adopted the amendment to the Plan attached hereto.

APPROVED:

/s/ Jeanne Mason
Jeanne Mason
Senior Vice President – Human Resources
Administrative Committee Member

10/4/19
Date

1

# EXHIBIT A

Retiree Annuity Purchase Amendment
for the
Baxter International Inc. and Subsidiaries Pension Plan

2

<div style="border:1px solid black; padding:10px;">
<p align="center"><b>SECOND AMENDMENT TO THE<br>
BAXTER INTERNATIONAL INC. AND SUBSIDIARIES PENSION PLAN<br>
(As Amended and Restated January 5, 2018)</b></p>
</div>

Pursuant to Section 11.1 of the Baxter International Inc. and Subsidiaries Pension Plan, as amended and restated effective January 5, 2018 (the "Plan"), the Plan is amended in the following particulars, effective as of October 4, 2019 (or such other date indicated below):

1. Article I of the Plan is amended by adding the following new Section 1.7:

"1.7 Annuity Purchase.

Effective as of October 4, 2019, the Plan was amended by the addition of Supplement N to reflect an annuity purchase for substantially all of the Plan's participants and beneficiaries in pay status."

2. The Plan is amended by adding the following Supplement N:

"    <u>**Supplement N**</u>

<p align="center"><b>Retiree Annuity Purchase Provisions</b></p>

(a) <u>Annuity Purchase</u>. Notwithstanding any other provision of the Plan, on or before October 11, 2019 (or as soon as practicable thereafter), the Plan shall purchase one or more annuity contracts (such term to include group annuity contracts) pursuant to the following provisions:

   (1) The annuity contract shall be fully guaranteed by the insurance company by way of an irrevocable commitment to pay each Designated Retiree Participant's Plan benefit (or applicable portion thereof in the case of multiple annuity contracts) transferred to the insurance company on and after Annuity Contract Start Date.

   (2) The annuity contract shall provide for the continued payment of the Designated Retiree Participant's Plan benefit (or applicable portion thereof in the case of multiple annuity contracts) transferred to the insurance company on and after the Annuity Contract Start Date, in the same form of payment that was in effect under the Plan immediately before the Annuity Contract Start Date, including any applicable Beneficiary, joint annuitant, contingent annuitant, or

3

similar designation, any survivor benefit election or waiver, and the terms of any QDRO.

(3) The annuity contract(s) shall provide that the benefits are legally enforceable by the sole choice of the individual against the insurance company issuing the contract.

(4) A certificate under the annuity contract(s) shall be issued by the insurance company to each Designated Retiree Participant on or as soon as administratively practicable after the date of the annuity purchase(s).

(5) The Independent Fiduciary, acting as a fiduciary of the Plan, shall select the insurance company (or companies) and shall have the full discretionary authority to approve all terms and conditions of the annuity contract(s), and to direct the transfer of designated Plan assets in consideration therefore. On or before October 11, 2019 (or as soon as practicable thereafter), the Independent Fiduciary shall enter into a purchase commitment agreement with the Company and the selected insurance company (or companies) pursuant to which, upon the closing date of such purchase commitment agreement, provided that all applicable closing conditions therein are satisfied or waived, the Independent Fiduciary shall direct the transfer of Plan assets (in cash and/or in-kind as determined by the Investment Committee or its designee) to the insurance company (or companies) in consideration for such annuity contract(s) and the liability for the Plan benefits of each Designated Retiree Participant shall be transferred to such insurance company (or companies).

(6) Each arrangement with an insurance company shall be established and maintained pursuant to a written contract or policy with an insurance company qualified to do business in a State (as defined under ERISA). Reference herein to an insurance company shall also include an insurance service or insurance organization, if and as applicable.

(7) The Plan shall not be the contract-holder of the annuity contract(s) nor shall such annuity contract(s) be held as an asset of the Plan.

(8) Reference herein to the benefit payable to a Designated Retiree Participant shall include such amounts payable to the Designated Retiree Participant and, as applicable, to his/her current or future Beneficiary, eligible or surviving Spouse, joint or contingent annuitant, survivor, or alternate payee.

4

(9) After the Annuity Contract Start Date, the Plan shall have no further obligation to make any payment with respect to any Plan benefit of a Designated Retiree Participant transferred to the insurance company, including with respect to his/her Beneficiary, eligible or surviving Spouse, joint or contingent annuitant, survivor, or alternate payee, or other person claiming any rights or benefits by or through the Designated Retiree Participant. After the Annuity Contract Start Date, the Plan shall have no liability to such individuals and such individuals shall cease to be covered under the Plan as provided under ERISA and applicable Department of Labor regulations thereunder.

(b) <u>Definitions</u>. For purposes of this Supplement N, the following definitions shall apply.

(1) "Annuity Contract Start Date" shall be January 1, 2020, or, if applicable for an annuity contract, such other date set under the terms of the annuity contract when the Designated Retiree Participant's benefit (or applicable portion thereof in the case of multiple annuity contracts) under the Plan shall be fully guaranteed and paid pursuant to the annuity contract.

(2) "Covered Individual" refers to a Participant, or Beneficiary, eligible Spouse, surviving Spouse, joint annuitant, contingent annuitant, or alternate payee of a Participant.

(3) "Designated Retiree Participant" refers to a Covered Individual who satisfies the following conditions:

(i) the payment of the Covered Individual's benefit under the Plan commenced from the Plan on or before January 1, 2019; and

(ii) the Covered Individual's benefit under the Plan is being paid in the form of an annuity (including, without limitation, the term certain portion of a life and term certain annuity); and

(iii) such Covered Individual is not an Excluded Person.

The list of Designated Retiree Participants shall be the list of individuals designated as "Annuitants" (or such other similar term having similar import) that is included as an exhibit or schedule to the purchased annuity contract(s) described in this Supplement N.

5

(4) "Excluded Person" refers to any Covered Individual who satisfies any of the following conditions immediately before the purchase of the annuity contract(s) described in this Supplement N:

(i) A person who resides in the European Union; or

(ii) A person whose Plan benefits are paid in part by a legacy annuity contract previously purchased by the Plan; or

(iii) A person for whom the Plan Administrator has determined that, due to administrative complexities, such benefit is not suitable to be included in the purchased annuity contract(s) described in this Supplement N.

(5) "Independent Fiduciary" refers to the Investment Manager appointed by the Investment Committee in connection with the purchase of the annuity contract(s) described in this Supplement N.

(c) The provisions of this Supplement N shall supersede the provisions of the main Plan document to the extent necessary to eliminate any inconsistencies between the Plan document and this Supplement N."

6

**EXHIBIT 10.36**

**BAXTER INTERNATIONAL INC.**

**AND SUBSIDIARIES PENSION PLAN II**
**(As Amended and Restated Effective January 1, 2019)**

# C E R T I F I C A T E

Baxter International, Inc., acting through a duly authorized member of the Baxter International Inc. Administrative Committee, as the duly authorized delegate of the Board of Directors, hereby adopts this amendment and restatement of the Baxter International Inc. and Subsidiaries Pension Plan II, effective January 1, 2019, in the form attached hereto.

Dated this 22nd day of May, 2019.

Baxter International Inc.

By: _/s/ Mark E. Valerius_____

Mark E. Valerius
Administrative Committee Member

**TABLE OF CONTENTS**

ARTICLE I. INTRODUCTION 1
    1.1. The Plan 1
    1.2. Plan Objectives 1
    1.3. Benefits of Participants Terminating Employment 1
    1.4. Supplements 1

ARTICLE II. DEFINITIONS 2
    2.1. "Accrued Benefit" 2
    2.2. "Actuarial Equivalent" 4
    2.3. "Administrative Committee" 5
    2.4. "American" 5
    2.5. "Average Monthly Compensation" 5
    2.6. "Beneficiary" 8
    2.7. "Benefit Reduction Factors" 8
    2.8. "Board of Directors" 9
    2.9. "Code" 9
    2.10. "Company" 9
    2.11. "Compensation" 9
    2.12. "Computation Period" 13
    2.13. "Death Benefit" 13
    2.14. "Disability" 13
    2.15. "Early Retirement Date" 13
    2.16. "Effective Date" 13
    2.17. "Eligible Employee" 14
    2.18. "Employee" 14
    2.19. "Employer" 15
    2.20. "Employment Date" 15
    2.21. "Entry Date" 15
    2.22. "ERISA" 16
    2.23. "Excluded Division" 16
    2.24. "Freeze Date" 16
    2.25. "Highly Compensated Employee" 16
    2.26. "Hour of Service" 16
    2.27. "Investment Committee" 18
    2.28. "Investment Manager" 18
    2.29. "Joint and 50 Percent Survivor Annuity" 18
    2.30. "Lump Sum" 18
    2.31. "Non-forfeitable" 18
    2.32. "Non-Participating Employer" 19
    2.33. "Normal Retirement Date" 19
    2.34. "One-Year Break in Service" 19
    2.35. "Participant" 19
    2.36. "Participating Employer" 19
    2.37. "Participating Employer Contributions" 19
    2.38. "Payment Date" 19

- i -

**TABLE OF CONTENTS**

**Page**

2.39. "Pension Benefit" 19

2.40. "Plan" 19

2.41. "Plan Year" 19

2.42. "Points" 19

2.43. "Primary Social Security Benefit" 20

2.44. "Prior Plan" 22

2.45. "Projected Benefit Service" 22

2.46. "Single Life Annuity" 22

2.47. "Spouse" 22

2.48. "Termination of Employment" 22

2.49. "Trust" 23

2.50. "Trust Agreement" 23

2.51. "Trust Fund" 23

2.52. "Trustee" 23

2.53. "Year of Service" 23

ARTICLE III. PARTICIPATION 27

3.1. Participation 27

3.2. Ceasing to Be a Participant 28

3.3. Reemployment 28

3.4. Change of Job Status 29

3.5. Transfers 29

3.6. International Employees 29

3.7. Reemployment of Veterans 29

ARTICLE IV. ELIGIBILITY FOR AND AMOUNT OF PENSION BENEFITS 31

4.1. Normal Retirement 31

4.2. Late Retirement 31

4.3. Early Retirement 31

4.4. Disability Retirement 32

4.5. Deferred Vested Benefit 33

4.6. Deferral of Payment Date 34

ARTICLE V. SPECIAL VESTING PROVISIONS FOR DIVESTED EMPLOYEES 35

5.1. Accelerated Vesting 35

5.2. Re-employment 35

ARTICLE VI. BENEFITS AFTER DEATH 36

6.1. Death after Payment Date 36

6.2. Death before Payment Date 36

6.3. Death Benefits Payable to Spouses 36

6.4. Survivor Benefits Payable to Non-Spouse Beneficiaries 37

6.5. Death Benefits for Disability Retirees 38

6.6. Pre-Retirement Death Benefits Payable in a Lump Sum 38

6.7. Designation of Beneficiary 38

6.8. Incapacitated Participants or Beneficiaries 39

- ii -

**TABLE OF CONTENTS**

**Page**

6.9. Death During Military Service 39
ARTICLE VII. FORM AND PAYMENT OF PENSION BENEFITS AND DEATH BENEFITS 40
7.1. Normal Form of Payment 40
7.2. Optional Forms of Payment 40
7.3. Lump Sum Cash-Out 41
7.4. Rules as to Election and Discontinuance of Optional Forms of Payment 42
7.5. Special Payment Limitations 45
7.6. Effect of Prior Lump Sums on Pension Benefits 47
7.7. Effect of Participant Resuming Employment after Benefits Commence 47

ARTICLE VIII. PLAN COMMITTEES 50
8.1. Membership of Administrative and Investment Committees 50
8.2. Administrative Committee Powers and Duties 50
8.3. Investment Committee Powers and Duties 52
8.4. Conflicts of Interest 53
8.5. Compensation; Reimbursement 53
8.6. Standard of Care 53
8.7. Action by Committees 54
8.8. Resignation or Removal of Committee Member 54
8.9. Uniform Application of Rules by Administrative Committee 54
8.10. Claims Procedure 54
8.11. Correction of Errors 55

ARTICLE IX. TRUST, THE TRUSTEE AND PLAN FINANCING 57
9.1. Establishment of Trust; Trust Agreement 57
9.2. Selection of Trustee 57
9.3. Trustee's Duties 57
9.4. Trust Income 57
9.5. Expenses 57
9.6. Trust Entity 57
9.7. Funding Policy 57
9.8. Participating Employer Contributions 57
9.9. Forfeitures 58
9.10. Exclusive Benefit of Participants 58
9.11. Benefits Payable Only from Trust Fund 59

ARTICLE X. ADOPTION AND WITHDRAWAL FROM PLAN 60
10.1. Procedure for Adoption 60
10.2. Procedure for Withdrawal 60

ARTICLE XI. AMENDMENT AND TERMINATION 61
11.1. Amendments 61
11.2. Termination 63
11.3. Disposition of Fund on Termination 63
11.4. Disposition Medium 64

- iii -

**TABLE OF CONTENTS**

**Page**

ARTICLE XII. SPECIAL TOP-HEAVY RULES 65
    12.1. Application 65
    12.2. Special Terms 65
    12.3. Vested Percentage 68
    12.4. Minimum Benefit 69
    12.5. Maximum Benefit Accrual 70
    12.6. Termination of Top-Heavy Status 70

ARTICLE XIII. MISCELLANEOUS PROVISIONS 71
    13.1. Company Merger 71
    13.2. Plan Merger 71
    13.3. Nonalienation of Benefits 71
    13.4. Qualified Domestic Relations Orders 71
    13.5. No Employment Guarantee 72
    13.6. Termination of Employment 72
    13.7. Limitation on Vesting 72
    13.8. No Duplication of Benefits 72
    13.9. Source of Benefits 72
    13.10. Reduction for Overpayment 72
    13.11. Limitations on Pension Benefits Payable to Highly Compensated Participants 72
    13.12. Maximum Pensions 73
    13.13. Funding-Based Limitations on Benefits 73
    13.14. Indemnity 78
    13.15. Gender and Number 78
    13.16. Severability 78
    13.17. Headings 79
    13.18. Uniform and Nondiscriminatory Treatment 79
    13.19. Applicable Law 79
    13.20. Action by the Participating Employer 79
    13.21. Participant Litigation 79

SUPPLEMENT A  Early Payment Factors Percentage of Age 65 Accrued Benefit Payable for Commencement from Ages 44-65 81

SUPPLEMENT B  Excluded Divisions 85

SUPPLEMENT C  Provisions Applicable to Participants Transferred to Allegiance 86

SUPPLEMENT D  Entitlement Codes for Non-Resident Aliens with U.S.-Source Income Excluded from Participation in the Plan 88

SUPPLEMENT E  Regression Factors 89

SUPPLEMENT F  Average Monthly Compensation for Participants Incurring Termination of Employment Prior to January 1, 1998 90

- iv -

- v -

**TABLE OF CONTENTS**

**Page**

SUPPLEMENT G  Transfer of Assets from BOC Group Cash Balance Retirement Plan 92

SUPPLEMENT H  Transfer of Assets from the Clintec Pension Plan 99

SUPPLEMENT I  Merger of the Immuno-U.S., Inc. Defined Benefit Plan 105

- v -

**BAXTER INTERNATIONAL INC.**

**AND SUBSIDIARIES PENSION PLAN II**
**(As Amended and Restated Effective January 1, 2019)**

**ARTICLE I.**

**Introduction**

**1.1. The Plan.** Prior to January 1, 2018, Baxter International Inc. (the "Company") maintained the Baxter International Inc. and Subsidiaries Pension Plan (the "Prior Plan") for the benefit of Eligible Employees of the Company and any Employer who adopted the Prior Plan. On January 1, 2018, the assets and liabilities of the Prior Plan attributable to Participants in the Prior Plan who were employed by an Employer under the Prior Plan on January 1, 2018 (the "Active Participants"), were spun-off and transferred to this Plan in accordance with Code Sections 401(a)(12), 411(d)(6) and 414(l) (and the regulations promulgated thereunder) and ERISA Section 4044, as applicable. Immediately following such spin-off and transfer, subject to the provisions of the Plan, the Active Participants automatically became Participants in this Plan, and their Accrued Benefits will be payable solely from this Plan. Each such Participant will receive credit for Years of Service and Compensation under this Plan to the same extent that he received credit for Years of Service and Compensation under the Prior Plan. Effective January 5, 2018, the Plan was amended and restated to reflect the freeze of Accrued Benefits under the Plan, effective December 31, 2022. Participants will not accrue any additional benefits under this Plan after such date. The Plan was subsequently amended and restated effective January 1, 2019 (the "Effective Date").

**1.2. Plan Objectives.** The Plan is a defined benefit pension plan maintained by Baxter International Inc. to assist in providing Participants with retirement benefits.

**1.3. Benefits of Participants Terminating Employment**. Except to the extent expressly provided to the contrary in an applicable Supplement or elsewhere in the Plan, as required by applicable law, or in accordance with uniform procedures adopted by the Administrator, the Accrued Benefits, eligibility, vesting and other rights of Participants incurring a Termination of Employment will be governed by the terms and conditions of the Plan as in effect at the time of such Termination of Employment.

**1.4. Supplements.** Supplements to the Plan may be adopted, attached to and incorporated in the Plan at any time. The provisions of any such Supplements will have the same effect that such provisions would have if they were included within the basic text of the Plan. Supplements will specify the persons affected and will supersede the other provisions of the Plan to the extent necessary to eliminate inconsistencies between the Plan provisions and the provisions of such Supplements.

## ARTICLE II.

**Definitions**

The following terms, whenever used in the capitalized form, will have the meanings set forth below unless the context clearly indicates otherwise:

**2.1. "Accrued Benefit"** means, subject to subsection (c) below and the limitations of Sections 13.11 and 13.12, a monthly amount payable to or for the benefit of a Participant commencing on the Payment Date for his Normal Retirement Pension Benefit under Section 4.1 (or if later, the Payment Date for his Late Retirement Pension Benefit described in Section 4.2), equal to the greater of (a) or (b):

(a) General Formula. A Single Life Annuity in an amount equal to (i) minus (ii) multiplied by (iii):

    (i) an amount equal to one and three-quarters percent (1-3/4%) of the Participant's Average Monthly Compensation multiplied by his Projected Benefit Service; *minus*

    (ii) an amount equal to one and three-quarters percent (1-3/4%) of the Participant's Primary Social Security Benefit multiplied by his Projected Benefit Service. In no event will the amount calculated under this paragraph (ii) exceed 60 percent (60%) of the Participant's Primary Social Security Benefit; *multiplied by*

    (iii) an amount equal to a fraction, the numerator of which is the Participant's actual Years of Service and the denominator of which is the Participant's Projected Benefit Service.

For Participants who terminate employment on or after December 31, 1997 with a Non-forfeitable Accrued Benefit, the benefit provided under this subsection will be increased as necessary so that the monthly payment is not less than $100.

(a) Alternate Formulae**.** The Accrued Benefit of a Participant will be the greater of the Accrued Benefit described in subsection (a) above or, if applicable, the greatest Accrued Benefit payable as a Single Life Annuity for such Participant which is determined as follows:

    (i) American Merger Benefit. Subject to the conditions described in the Plan as in effect on November 25, 1985 (the "Merger Date"), each Participant who was a Participant on the Merger Date is entitled to a fully vested benefit (referred to as the "American Merger Benefit") which is payable in lieu of any other benefits under the Plan if such American Merger Benefit is larger than the benefits otherwise payable to or for the benefit of such Participant hereunder. Such American Merger Benefit will be

- 2 -

determined under the terms of the Plan as in effect on the Merger Date and will be an amount determined as of the Merger Date equal to (A) minus (B) multiplied by (C):

(A) an amount equal to four and one-quarter percent (4¼%) of the Participant's Average Monthly Compensation as of the Merger Date (under the terms of the Plan as then in effect) multiplied by his Projected Benefit Service as of the Merger Date; *minus*

(B) an amount equal to one and three-quarters percent (1¾%) of the Participant's Primary Social Security Benefit as of the Merger Date (under the terms of the Plan as then in effect) multiplied by his Projected Benefit Service as of such date (under the terms of the Plan as then in effect). In no event will the amount calculated under this subparagraph (B) exceed 60 percent (60%) of the Participant's Primary Social Security Benefit; *multiplied by*

(C) an amount equal to a fraction, the numerator of which is the Participant's actual Years of Service as of the Merger Date (under the terms of the Plan as then in effect) and the denominator of which is the Participant's Projected Benefit Service determined as of the Merger Date (under the terms of the Plan as then in effect).

(ii) Alternative Benefit under Applicable Supplement. The Accrued Benefit of certain groups of Participants which are frozen or otherwise limited or modified may be preserved as a minimum benefit in accordance with an applicable Supplement.

(iii) No Diminishment of Benefit Amount after Early Retirement. In no event will the Accrued Benefit of a Participant eligible for a normal retirement benefit be less than the largest early retirement benefit the Participant could have received if he had retired on his Early Retirement Date.

(iv) Top-Heavy Minimum Benefit. If Article XII is applicable to the Plan, the minimum benefit requirements of Section 12.4 may entitle certain Participants to minimum benefits under the Plan.

(v) Pre-1989 Accrued Benefit. Each Participant who was an Eligible Employee on December 31, 1988, under the terms of the Plan as in effect on such date is entitled to a "1988 Minimum Benefit" which is payable in lieu of any other benefits under the Plan if such 1988 Minimum Benefit is larger than the benefits otherwise payable to or for the benefit of such Participant hereunder. Such 1988 Minimum Benefit will be an amount determined in accordance with the provisions of subsection 2.1(a), except that such determination will not be subject to subsection 2.11(e), and such determination will be made as of December 31, 1988, on the basis of the

- 3 -

Participant's Average Monthly Compensation, Projected Benefit Service, Primary Social Security Benefit and Actual Years of Service of such Participant as of such date as determined under the terms of the Plan as then in effect.

(vi) Pre-1990 Accrued Benefit. Each Participant who was an Eligible Employee on December 31, 1989 under the terms of the Plan as in effect on such date is entitled to a "1989 Minimum Benefit," which is payable in lieu of any other benefits under the Plan if such 1989 Minimum Benefit is larger than the benefits otherwise payable to or for the benefit of such Participant hereunder. Such 1989 Minimum Benefit will be an amount determined as of December 31, 1989 in accordance with subsection 2.1(a), except that for purposes of this paragraph (b)(vi) the Average Monthly Compensation, the Projected Benefit Service, the Primary Social Security Benefit and the actual Years of Service of a Participant will be determined as of December 31, 1989 based upon the terms of the Plan as then in effect.

(b) Nondiscrimination Limitations. The benefits accrued on behalf of any Participant who is a Highly Compensated Employee will be limited to no more than the maximum amount that may be so accrued on behalf of such Highly Compensated Employee under the Code Section 401(a)(4) nondiscrimination compliance testing method then in effect.

(c) Freeze of Accrued Benefits. Effective on the Freeze Date, the accrual of benefits under the Plan will be frozen, and the Accrued Benefit of each Participant on and after January 1, 2023, will be equal to his Accrued Benefit calculated as if he had incurred a Termination of Employment on the Freeze Date (or, if earlier, on the date of his actual Termination of Employment).

The benefit under any of paragraphs 2.1(b)(i)-(vi) will be determined with reference to all of the provisions of the previous versions of this Plan referred to in such paragraph, including minimum benefit provisions similar to the other minimum benefit provisions of paragraphs 2.1(b)(i)-(vi).

2.2. "Actuarial Equivalent" means, for purposes of computing a Lump Sum or the payments under the forms of benefit described in Article VII and for purposes of computing any adjustments applicable under the Plan to reflect the commencement of any form of benefit payments on or after the Effective Date and at a time other than a Participant's Normal Retirement Date, the Pension Benefit having the same value as the Accrued Benefit based upon the applicable interest rates and mortality assumptions described below.

(a) The following interest rates and mortality assumptions will apply with respect to a Participant who incurs a Termination of Employment:

- 4 -

(i) Ten percent (10%) per annum compounded annually and applied as of the date of determination with respect to any computation of an optional form of benefit other than a Lump Sum;

(ii) For a Lump Sum, the interest rate will be the applicable segment rate, based upon the number of years until the Participant's Normal Retirement Date, as determined under Code Section 417(e)(3) (as amended by the Pension Protection Act of 2006), for August of the year prior to the Plan Year in which the Participant's benefit hereunder is paid.

(b) The mortality assumption is determined in accordance with the 1971 Group Annuity Mortality Table, weighted seventy-five percent (75%) male and twenty-five percent (25%) female. The mortality assumption for purposes of the calculation of a Lump Sum payment will be the applicable mortality table prescribed by the Secretary of the Treasury pursuant to Code Section 417(e)(3)(B). Each such applicable mortality table is incorporated herein by this reference.

2.3. **"Administrative Committee"** means the committee which is responsible for administering the Plan in accordance with Article VIII.

2.4. **"American"** means American Hospital Supply Corporation, the sponsor of the AHSC Plan prior to the Merger Date.

2.5. **"Average Monthly Compensation"** means the amount determined under this Section. Prior to April 1, 2004, Average Monthly Compensation will be determined in accordance with Section 2.5 of the Prior Plan as in effect prior to such date (including all interpretations and administrative practices thereunder); provided that in no event will any amendment to this Section 2.5 reduce any Participant's Accrued Benefit as of March 31, 2004).

Average Monthly Compensation is the Participant's Compensation paid while an Eligible Employee during the five consecutive Plan Years during the Participant's compensation history which produces the largest amount, divided by 60. A Participant's compensation history includes the ten consecutive Plan Years preceding his most recent Termination of Employment. However, if a Participant's Termination of Employment is on or after December 7 of a Plan Year, such Plan Year will be included in the Participant's ten-year compensation history. If a Participant has fewer than five consecutive Plan Years but at least one Plan Year in his Compensation history, the Compensation from those years will be divided by the number of months in those Plan Years.

A Participant's compensation history and Average Monthly Compensation will be determined without regard to the following "drop-out years" and the Compensation earned in such years:

(i) the Participant's first partial Plan Year of employment as an Eligible Employee,

- 5 -

(ii) any Plan Year in which the Participant was an Eligible Employee and was credited with less than 1,000 Hours of Service,

(iii) any Plan Year in which the Participant performed no services for an Employer, and

(iv) any Plan Year in which the Participant was employed at any time during such Plan Year by a Non-Participating Employer other than an Employer that has adopted the Baxter Healthcare Corporation of Puerto Rico Pension Plan as described in subsection (d), below, unless the Participant transferred from a Participating Employer to any such Non-Participating Employer on or after December 7 of the Plan Year, in which case the Plan Year will be included in determining Average Monthly Compensation, subject to clause (ii), above; provided, that this exclusion will only apply to Plan Years beginning with 2007 if the Non-Participating Employer to which the Participant is transferred is not a United States domestic Employer.

Except as provided in subparagraph 2.11(a)(i)(A)(20), and subject to other provisions of the Plan, Compensation for any Plan Year will not include Compensation paid more than 30 days after the Participant's Termination of Employment.

Compensation will not be disregarded solely because it was used to calculate an Accrued Benefit that was previously paid in a lump sum.

The following special rules will apply in determining Average Monthly Compensation:

(a) Participants with Less Than One Year of Compensation. If, after the drop-out years are disregarded, a Participant has less than one Plan Year of Compensation while an Eligible Employee, Average Monthly Compensation means the Participant's total Compensation as an Eligible Employee annualized based on the period over which such Compensation was earned and divided by twelve.

(b) Disabled Participants. The Average Monthly Compensation of a Participant entitled to disability retirement benefits will be subject to the modification described in subsection 4.4(b).

(c) Imputed Compensation. Participants transferred to Allegiance Corporation on or about September 30, 1996, who consequently did not receive a full year of Compensation during the 1996 Plan Year will have their Average Monthly Compensation adjusted as set forth in Supplement C.

(d) Transfers to/from Puerto Rico. If a Participant transfers from a Participating Employer to a Non-Participating Employer that has adopted the Baxter Healthcare Corporation of Puerto Rico Pension Plan, or transfers from such Non-Participating Employer doing business in the Commonwealth of Puerto Rico to a

- 6 -

Participating Employer, his Average Monthly Compensation will take into account both his Compensation and the Plan Years while employed by such Non-Participating Employer doing business in the Commonwealth of Puerto Rico and the Participating Employer as if he were at all times an Eligible Employee.

(e) Rehired Participants.

    (i) A Participant's Compensation in the year he was rehired will be disregarded for purposes of determining his Average Monthly Compensation, except as otherwise provided in clause (ii).

    (ii) If the Participant was rehired in the same year that he incurred a Termination of Employment, such Plan Year and the Compensation earned during such Plan Year may be included in determining Average Monthly Compensation, subject to the drop-out rules, above, but if such Plan Year is included the calculation of Average Monthly Compensation will be adjusted to reflect the fraction of the Plan Year of rehire during which the Compensation was earned.

    (iii) A rehired Participant's Compensation earned as an Eligible Employee prior to his Termination of Employment will be included (subject to the drop-out rules) regardless of whether he incurred a One-Year Break in Service prior to being rehired and regardless of whether he received a Lump Sum payment upon Termination of Employment. The Administrative Committee may establish procedures for estimating a Participant's Compensation during a prior period of employment if the actual amount cannot be ascertained.

    (iv) The provisions of this paragraph (e) do not apply to a Participant who is rehired after December 31, 2006.

(f) Transition Rules. The rules in this Section will apply with respect to Participants whose Termination of Employment occurs after December 31, 1997. If a Participant commenced a new compensation history under the Plan prior to January 1, 1998 under the prior rules for determining Average Monthly Compensation because of non-continuous service (a "service break"), and the Compensation for the Plan Year following the Plan Year in which the service break ends was more than the Compensation for the Plan Year prior to the Plan Year in which the service break began, then the rules in this Section will apply only with respect to the compensation history following such service break. If the Compensation in the Plan Year following the Plan Year in which the service break ends is less than the Compensation in the Plan Year prior to the Plan Year in which the service break began, then the rules in this Section will apply to all Plan Years prior to such service break and to all Plan Years following such service break. However, the foregoing sentence will not apply if subsequent

- 7 -

increases in Compensation result in a reduction in a Participant's Accrued Benefit in violation of Code Section 411(d)(6).

(g) Rehires after Divestitures. In any case in which a Participant ceased to participate in the Prior Plan as the result of a sale or other divestiture of the business that employed the Participant, and the Participant's Accrued Benefit and the assets attributable to such Accrued Benefit were transferred to another plan in connection with the transaction, if such Participant was subsequently rehired by an Employer, the Compensation paid to such Employee prior to such transaction was not included in Average Monthly Compensation unless the Participant was rehired prior to January 1, 2007, and the Accrued Benefit and attributable assets were transferred back to the Prior Plan.

(h) Freeze. Compensation paid to a Participant after the Freeze Date will be excluded for purposes of determining a Participant's Average Monthly Compensation.

**2.6. "Beneficiary"** means the persons or trusts validly designated by a Participant or the Plan in accordance with Section 6.7 to receive any benefits payable on behalf of such Participant after his death.

**2.7. "Benefit Reduction Factors"** means the factors utilized to adjust the amount of a Participant's benefits to reflect that such benefits are paid earlier than the Participant's Normal Retirement Date. The Benefit Reduction Factors utilized for purposes of the Plan will be determined as follows:

(a) Participants with 85 Points. Except as provided in subsection (d) below, the benefits of a Participant will not be reduced to reflect early payment if the total number of the Participant's Points as of his Termination of Employment equals or exceeds 85 Points.

(b) Participants with At Least 65 but Fewer Than 85 Points and Disabled Participants. Except as provided in subsection (d) below, the benefits of a Participant whose total number of Points as of his Termination of Employment equals 65 or more Points but less than 85 Points, or who qualifies for Disability Retirement under Section 4.4, will be calculated in accordance with Table 1 of Supplement A as of the date his payments commence.

(c) Reduction Factors Applicable to Participants with Fewer Than 65 Points. Except as provided in subsection (d) below, a Participant who incurs a Termination of Employment prior to attaining 65 Points and elects to cause his Benefits to commence at or after attainment of 65 Points will be subject to the Benefit Reduction Factors described in Table 4 of Supplement A.

(d) Reduction Factors Applicable to Pre-1990 Accrued Benefits. In the case of a Participant whose Accrued Benefit is determined on the basis of his American Merger Benefit in accordance with paragraph 2.1(b)(i), the Benefit Reduction

- 8 -

Factors are set forth in Table 3 of Supplement A. In the case of a Participant whose Accrued Benefit is determined on the basis of his 1988 Accrued Benefit in accordance with paragraph 2.1(b)(v) or on the basis of his 1989 Accrued Benefit in accordance with paragraph 2.1(b)(vi), the Benefit Reduction Factors are set forth in Table 2 of Supplement A. However, if any Participant is age 55 upon Termination of Employment and his Accrued Benefit is based on the 1988 Accrued Benefit or the 1989 Accrued Benefit, the reduction factor will be ¼ percent (0.25%) per month for each month that the Payment Date precedes the Participant's Normal Retirement Date. A Participant entitled to the American Merger Benefit is entitled to the ¼ percent (0.25%) factor only if he attained age 55 as of November 25, 1985.

In no case will the benefit calculated above be less than the benefit to which a participant who did not incur a Termination of Employment prior to January 1, 1985 would be entitled on December 31, 1984 using the Actuarial Equivalent assumptions then in effect.

**2.8. "Board of Directors"** means the Board of Directors of the Company.

**2.9. "Code"** means the Internal Revenue Code of 1986, as amended.

**2.10. "Company"** means Baxter International Inc.

**2.11. "Compensation"** means the amount determined with respect to a Participant in accordance with the following alternative definitions:

(a) Compensation. Except as required by subsection (b), (c) or (d) below, for each Eligible Employee, "Compensation" means the amounts paid by the Participating Employers during the Plan Year to such Eligible Employee for services as an Employee which is included in such Compensation under the rules set forth in paragraph 2.11(a)(i) below, other than such Compensation which is excluded under the rules set forth in paragraph 2.11(a)(ii) below. Compensation also includes amounts paid by a Non-Participating Employer that has adopted the Baxter Healthcare Corporation of Puerto Rico Pension Plan while an Eligible Employee is on the payroll of such Non-Participating Employer.

(i) Included Pay. For purposes of this subsection 2.11(a), an Eligible Employee's Compensation includes the amounts described in subparagraphs (A) and (B), below:

(A) The amounts described in subparagraphs (1) – (19) below, which are required to be reported as taxable income on Form W-2 (or which would be required to be so reported but for the fact that such Compensation is paid by an Employer in the Commonwealth of Puerto Rico):

- 9 -

1. bonuses paid pursuant to the Management Incentive Compensation Plan or any annual bonus plan adopted in replacement thereof; payments in lieu of salary increases; bonuses paid to sales representatives if included in the compensation plan; and other bonuses under bonus plans specifically designated by the Administrative Committee as constituting Compensation hereunder, other than bonuses described in subparagraph 2.11(a)(ii)(C)(7);

2. commission pay;

3. double time pay;

4. funeral pay;

5. holiday pay;

6. jury duty pay;

7. mealtime pay;

8. military pay;

9. notice pay;

10. on-call pay;

11. overtime pay;

12. paid time off (PTO) absences;

13. parental leave pay;

14. back pay;

15. salary or other regular pay;

16. shift differentials;

17. sick pay or other short-term disability pay;

18. stand-in pay; and

19. volunteer pay.

(B) the amount of any salary reduction or cash or deferred contributions made by such Eligible Employee under any plan maintained by the Participating Employers which satisfies the

requirements of Code Section 125 (other than the amounts described in subparagraphs 2.11(a)(ii)(C)(11) and (12) below), Code Section 401(k), or Code Section 132(f).

(ii) **Excluded Pay**. For purposes of this subsection 2.11(a), an Eligible Employee's Compensation excludes all amounts other than the amounts described in paragraph (i) above, including but not limited to:

(A) Amounts required to be reported on such form as imputed income arising from the Participating Employer's moving expense reimbursement policies, the Participating Employer's life insurance plans or the Participating Employer's other fringe benefit plans;

(B) Amounts paid to replace benefits not provided under any qualified plan due to the contribution or benefit limitations or non-discrimination restrictions; and

(C) The following amounts paid, accrued or imputed:

1. attendance awards;

2. automobile allowances;

3. business expense reimbursements;

4. cash prizes or awards;

5. gifts;

6. contest pay;

7. deferred compensation, including deferred bonuses;

8. discretionary awards;

9. employee referral awards;

10. executive perquisite allowances;

11. flex credits;

12. flex cash;

13. hiring bonuses;

14. income from sale of stock;

15. income from the exercise of stock options;

16. interest earnings on deferred compensation, including deferred bonuses;

17. invention fees and awards;

18. long term disability pay;

19. mortgage differential payments;

20. noncash prizes or awards;

21. pay for unused sick time;

22. performance shares;

23. promotional awards;

24. relocation expense reimbursements;

25. restricted stock rights;

26. retention bonuses;

27. severance pay;

28. stock appreciation rights;

29. tax equalization payments to expatriates;

30. technical achievement awards;

31. travel allowances;

32. tuition reimbursements; and

33. workers' compensation benefits.

(b) Compensation of Commissioned Sales Representatives. Except as provided in subsections (c) and (d) below, the definition of Compensation set forth in subsection 2.11(a) will apply with respect to an Eligible Employee who is a commissioned sales representative receiving Compensation without reimbursement for expenses under Pay Plan D, except that only eighty-five percent (85%) of the amounts included in Compensation will be recognized.

(c) "Compensation" for Certain Purposes. For purposes of Section 13.12, and for purposes of determining whether an Employee is a Highly Compensated Employee, "Compensation" means the compensation paid by an Employer during the Plan Year to an Employee for personal services rendered and which is

reportable as taxable income on IRS Form W-2, plus the amount of any salary reduction or cash or deferred contributions made by such Eligible Employee under any plan maintained by the Participating Employers which satisfies the requirements of Code Section 125, Code Section 401(k), or Code Section 132(f). Anything else contained herein to the contrary notwithstanding, effective January 1, 2008, "Compensation" for such purposes will not include any amount paid to an Employee after the Employee's termination of employment unless (i) such amount is paid by the later of the end of the year in which employment is terminated or two and one half months after the date of termination, (ii) such amount would otherwise have been included in the applicable definition of Compensation, and (iii) such amount constitutes either salary, wages (including overtime, shift differentials and similar amounts), commissions or bonuses that would have been paid prior to termination of employment if the Employee's employment had not terminated, payment for unused sick, vacation or other leave that the Employee would have been able to use if employment had continued, or payment of nonqualified deferred compensation that would have been paid at the same time had employment not terminated.

(d) Maximum Amount of "Compensation." The annual Compensation for each Eligible Employee taken into account under the Plan in any Plan Year will not exceed $275,000, as adjusted for such Plan Year for cost-of-living as provided in Code Section 401(a)(17). If Compensation for any prior Plan Year is taken into account in determining an Employee's benefits accruing in the current Plan Year, the Compensation for that prior Plan Year will be subject to the compensation limit in effect for that prior Plan Year; provided that the compensation limit for Plan Years prior to 2003 will be $200,000.

(e) Differential Military Pay. Any amount paid to a Participant while on active duty for a period of more than 30 days in the uniformed services of the United States, which represents all or a portion of the Compensation the Participant would have received if not on active duty, will constitute Compensation for all purposes of the Plan.

(f) Freeze. Compensation paid to a Participant after the Freeze Date will not be taken into account for any purpose under the Plan.

**2.12. "Computation Period"** means the Plan Year or, solely for purposes of determining Years of Eligibility Service under subsection 2.53(c), either the twelve-month period commencing on the Employment Date or any Plan Year beginning with the first Plan Year commencing after the Employment Date.

**2.13. "Death Benefit"** means the benefit, if any, provided under Article VI of the Plan.

**2.14. "Disability"** means a mental or physical condition which occurs prior to a Participant's Termination of Employment which entitles the Participant to disability benefits under the federal Social Security Act. To qualify as a Disability, the Participant must be

- 13 -

determined to be disabled by the Social Security Administration as of a date which falls on or before his Termination of Employment (determined without regard to subsection 2.48(b)).

**2.15. "Early Retirement Date"** means the date of the Participant's Termination of Employment subsequent to the date he has accumulated 65 Points and five Years of Service as defined in subsection 2.53(b) (or after he has attained age 55, in the case of a Participant who first became a Participant prior to January 1, 1990 and whose Benefit is determined on the basis of his Pre-1990 Accrued Benefit in accordance with paragraph 2.1(b)(i), (v) or (vi**)).

**2.16. "Effective Date"** means January 1, 2019, except as expressly provided otherwise in the Plan.

**2.17. "Eligible Employee"** means any Employee who was on the payroll of a Participating Employer under the Prior Plan on December 31, 2006, and whose Compensation constitutes wages from employment within the meaning of Sections 3121(a) and (b) of the Federal Insurance Contributions Act on and after the effective date of the adoption of the Plan (or the Prior Plan, as applicable) by the Participating Employer. Eligible Employees will not include any of the following:

(a) Collective Bargaining Exclusion. An Employee who is a member of a unit of employees covered by a collective bargaining agreement if there is evidence that retirement benefits were the subject of good faith bargaining between representatives of such unit and an Employer;

(b) Excluded Classifications. (i) Employees employed in the Commonwealth of Puerto Rico or an Excluded Division listed on Supplement B; (ii) non-resident aliens with no U.S.-source income; (iii) non-resident aliens with U.S.-source income who have been assigned one of the benefit entitlement codes listed in Supplement D; (iv) any Employees (including U.S. citizens) accruing benefits under the Company's pension plan for international employees, (v) leased employees described in Code Section 414(n) or (vi) an independent contractor or self-employed individual. If an Employee is excluded from participation in the Plan as an independent contractor and is later reclassified as an employee for wage and hour purposes such Employee will be eligible as of the date of his reclassification to become a Participant, upon the completion of the eligibility requirements of Section 3.1, and will be credited with his Years of Service completed since the date as of which he became an employee for purposes of subsection 2.53(b) but not for purposes of subsection 2.53(a). If a Participant is reclassified for wage and hour purposes as an independent contractor or self-employed individual, any Accrued Benefit under the Plan attributable to service while the individual was improperly classified will be forfeited.

(c) Employees Hired after December 31, 2006. Anything else contained herein to the contrary notwithstanding, an Employee who was not employed by a Participating Employer under the Prior Plan on December 31, 2006, will not be an Eligible Employee, and will not become a Participant or accrue any benefit hereunder.

- 14 -

**2.18. "Employee"** means any person who is an employee of an Employer (as determined under the law of the relevant state or country) in active employment or on an approved leave of absence (including the period of Disability described in Section 4.4), including the period of time before which it became an Employer, but excluding the period of time after which it ceases to be an Employer. An individual who is considered a leased employee of an Employer under the provisions of Code Section 414(n)(2), as amended by the Small Business Job Protection Act of 1996, will be an Employee.

For purposes of the Plan, including paragraph 2.17(b)(v), "leased employee" means any person (other than a common-law employee of an Employer) who, under an agreement between an Employer and any other person (the "leasing organization"), has performed services for an Employer or for an Employer and related persons (determined in accordance with Code Section 414(n)(6)) on a substantially full-time basis for a period of at least one year, provided that the services are performed under the primary direction or control of an Employer. Contributions provided to a leased employee that are attributable to services performed for an Employer will be treated as provided by the Employer. The term "leased employee" will not include any person who would otherwise be a leased employee if (a) the person is covered by a money purchase pension plan providing (i) a nonintegrated employer contribution rate of at least ten percent (10%) of compensation, as defined in Code Section 415(c)(3), but including amounts contributed in accordance with a salary reduction agreement that are excludable from the person's gross income under Code Section 125, 402(e)(3), 402(h), or 403(b), (ii) immediate participation, and (iii) full and immediate vesting; and (b) leased employees do not constitute more than twenty percent (20%) of the workforce of the Employer who are not Highly Compensated Employees.

Notwithstanding any provision of the Plan to the contrary, an Employer's classification as to whether an individual constitutes an Employee will be determinative for purposes of an individual's eligibility under the Plan. An individual who is classified as an independent contractor (or other non-employee classification) will not be considered an Employee and will not be eligible for participation in the Plan, regardless of any subsequent reclassification of such individual as an Employee, or an employee of an Employer, by an Employer, any government agency, court or other third-party. Any such reclassification will not have a retroactive effect for purposes of the Plan.

**2.19. "Employer"** means:

(a) Controlled Group. A Participating Employer and any corporation, trade or business, if it and the Participating Employer are members of a controlled group of corporations as defined in Code Section 414(b) or under common control as defined in Code Section 414(c); provided, however, that, solely for purposes of the provisions pertaining to maximum pensions set forth in Section 13.12, the standard of control under Code Sections 414(b) and 414(c) will be deemed to be "more than fifty percent (50%)" rather than "at least eighty percent (80%)";

(b) Affiliated Service Group. A Participating Employer and an organization, if it and the Participating Employer are members of an affiliated service group as defined in Code Section 414(m); or

- 15 -

(c) Other Related Organizations. A Participating Employer and any other organization described in applicable regulations issued under Code Section 414(o).

**2.20. "Employment Date"** means the day a person is credited with his first Hour of Service, or in the case of an Employee who loses his prior Years of Eligibility Service, the first day on which the Employee is credited with an Hour of Service upon his rehire as an Employee.

**2.21. "Entry Date"** means January 1 and July 1 of each Plan Year, except as provided in paragraph 3.3(a)(ii).

**2.22. "ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**2.23. "Excluded Division"** means a division or unit of a Participating Employer, the Employees of which are not Eligible Employees. Excluded Divisions are all divisions or units excluded from the Plan pursuant to Supplement B.

**2.24. "Freeze Date"** means December 31, 2022.

**2.25. "Highly Compensated Employee"** refers to an Employee if, for a Plan Year:

(a) The Employee was a five-percent (5%) owner (as defined in Code Section 416(i)) of the Employer at any time during that Plan Year or the preceding Plan Year; and

(b) For the preceding year, the Employee had Compensation in excess of $120,000 (as adjusted pursuant to Code Section 414(q)(1)).

For purposes of this Section, non-resident aliens with no U.S.-source income are not considered Employees.

**2.26. "Hour of Service"** means:

(a) Duty Hours. Each hour for which an Employee is directly or indirectly paid or entitled to payment by an Employer for the performance of duties.

(b) Non-Duty Hours (Paid). Each hour for which an Employee is directly or indirectly paid or entitled to payment by an Employer for reasons (such as vacation, holidays, sickness, short-term disability, long-term disability, medical leave, family medical leave or jury duty) other than the performance of duties.

(c) Non-Duty Hours (Unpaid). Each hour for which an Employee is not paid due to medical leave, family medical leave, approved leave of absence or on layoff. Up to a total of 501 Hours of Service will be credited under this subsection (c) to an Employee in a Computation Period on account of any single continuous period during which the Employee performs no duties; provided, however, that if such continuous period extends into the next Computation Period, up to 501 additional

Hours of Service will be credited in such next Computation Period; and further provided that no Hours of Service will be credited under this subsection (c) for any period of time after the Employee's Termination of Employment.

(d) Back-Pay Hours. Each hour for which no credit has been given under subsections (a), (b) or (c) above, but for which back pay, irrespective of mitigation of damages, has been either awarded or agreed to by an Employer.

(e) Military Service Hours. To the extent not taken into account under another subsection of this Section, each hour of the normally scheduled work week during a period when the Employee is absent from employment with an Employer for voluntary or involuntary military service with the armed forces of the United States, provided that either such Employee is receiving Compensation from the Employer representing the differential between the Employee's normal Compensation and the amount paid to the Employee by the armed forces, or that the Employee returns to work within 90 days after his discharge date or within such longer period of time as may be prescribed by USERRA.

(f) Worker's Compensation. No Hours of Service will be credited if payment is made solely to comply with applicable workers' compensation or disability insurance laws.

(g) Disability. For purposes of Section 2.53, Hours of Service will only be counted during a period for which a Participant receives payments on account of a Disability to the extent provided in Section 4.4.

(h) Intermittent Family Leave. An Employee will be credited with Hours of Service for each week in which he is on Intermittent Family Leave. Subsection (c) will not apply to such Employees. "Intermittent Family Leave" has the meaning given in the Employer's policies and procedures manual for an Employee who periodically needs time off for the treatment and care of himself or family members due to conditions which require ongoing medical treatment but which do not require the Employee to take an extended leave of absence to provide or obtain such care.

(i) Maternity/Paternity Absences and FMLA Leave. An Employee who is absent from work due to a Maternity/Paternity Absence (as hereinafter defined) or due to an unpaid leave of absence for which credit is required pursuant to the Family Medical Leave Act of 1993, as amended, to be given for purposes of avoiding a break in service will be treated as having completed certain Hours of Service for a limited period. The Employee will be treated as completing either (i) the number of Hours of Service that normally would have been credited but for the absence (i.e., 45 Hours of Service per week) or (ii) if the normal work hours are unknown, eight Hours of Service for each normal workday during the leave, to a maximum per Plan Year of 501 Hours of Service. The Hours of Service required to be credited under this subsection must be credited only to prevent a One-Year Break

- 17 -

in Service in the Plan Year in which the absence begins for one of the permitted reasons or, if crediting in such year is not necessary to prevent a One-Year Break in Service in the Plan Year, in the following Plan Year. For this purposes, a "Maternity/Paternity Absence" means a paid or unpaid absence from employment (including an unapproved leave of absence) with an Employer by reason of the pregnancy of the Employee; by reason of the birth of a child of the Employee; by reason of the placement of a child under age 18 in connection with the adoption of the child by the Employee (including a trial period prior to adoption); or for purposes of caring for a child immediately following birth or adoption. The Employee must prove to the satisfaction of the Administrative Committee that the absence meets the above requirements and must supply information concerning the length of the absence unless the Administrative Committee has access to relevant information without the Employee submitting it.

The number of Hours of Service to be credited to Employees will be calculated based on 45 hours for each week for which the Employee would be entitled to at least one Hour of Service. In the case of a payment which is made or due on account of a period during which an Employee performs no duties and which results in the crediting of Hours of Service under subsection (b), (c) or (e) above, or in the case of an award or agreement for back pay made with respect to a period described in subsection (d) above, the number of Hours of Service to be credited will be in accordance with the provisions of the Rules and Regulations for Minimum Standards for Employee Pension Benefit Plans, U.S. Department of Labor, 29 C.F.R. Section 2530.200b-2(b) which are hereby incorporated by reference. Such rules and regulations will apply to subsection (c) above as if absences described in such subsection were paid absences. Hours of Service will be credited to a Plan Year in accordance with the provisions of subsection (c) of the above-cited Department of Labor Regulations. Hours required to be credited for more than one reason under this Section which pertain to the same period of time will be credited only once.

For purposes of determining the Hours of Service for eligibility, Years of Service under subsection 2.53(b) and Points under Section 2.42, an Employee employed by a Non-Participating Employer outside of the United States (i.e., not on a U.S. payroll) will be credited with 190 Hours of Service for each month during which he is employed in such capacity.

**2.27. "Investment Committee"** means the committee which is responsible for directing the investment of the Trust Fund in accordance with Article VIII.

**2.28. "Investment Manager"** means a fiduciary who meets the requirements of ERISA Section 3(38) and to whom the Investment Committee has delegated the responsibility for investment of a portion of the assets of the Trust Fund.

**2.29. "Joint and 50 Percent Survivor Annuity"** means, except where specifically provided to the contrary in subsections 6.3(b) and 7.2(a), a reduced Pension Benefit payable monthly during the lifetime of the Participant with the provision that fifty percent (50%) of such monthly benefit will be payable to the Participant's surviving Spouse in monthly installments

- 18 -

commencing on the first day of the month following the month in which the Participant dies, and continuing thereafter on the first day of the month during the remaining lifetime of the Spouse.

**2.30. "Lump Sum"** means a lump sum payment in cash which is the Actuarial Equivalent of the Participant's Accrued Benefit.

**2.31. "Non-forfeitable"** means, with respect to a Participant's Accrued Benefit, one hundred percent (100%) of such Accrued Benefit, provided that the Participant:

(a) reached his Normal Retirement Date;

(b) completed five Years of Service ;

(c) is entitled to the American Merger Benefit described in paragraph 2.1(b)(i), (but such Non-forfeitable interest obtained by this subsection (c) will be limited to such American Merger Benefit); or

(d) is subject to accelerated vesting under Article V, but only with respect to the Accrued Benefit earned as of the date provided for in the resolution that grants full vesting of the Accrued Benefit.

**2.32. "Non-Participating Employer"** means any Employer which is not a Participating Employer.

**2.33. "Normal Retirement Date"** means the date on which a Participant attains age 65.

**2.34. "One-Year Break in Service"** means a Computation Period (other than the first Computation Period used to determine Eligibility Years of Service) in which an Employee has fewer than 501 Hours of Service.

**2.35. "Participant"** means a person who is participating in the Plan pursuant to the provisions of Article III.

**2.36. "Participating Employer"** means the Company or any Employer on and after the effective date of its adoption of the Plan (or the Prior Plan, as applicable) in accordance with Section 10.1. For all purposes of the Plan, an Employee who is employed by a Non-Participating Employer, but who is nevertheless eligible to participate in the Plan under a grandfather rule or similar action by the Administrative Committee, will be treated as employed by a Participating Employer.

**2.37. "Participating Employer Contributions"** means contributions by Participating Employers to the Trust under the terms of Section 9.8.

**2.38. "Payment Date"** means the date as of which the payment of a retirement or disability benefit commences as set forth in Sections 4.1 through 4.5. If a Participant is rehired by an Employer prior to his Normal Retirement Date, any Payment Date determined under Sections 4.3, 4.4 or 4.5 will be disregarded.

**2.39. "Pension Benefit"** means the benefit payable to a Participant under the provisions of Section 4.1, 4.2, 4.3, 4.4 or 4.5.

**2.40. "Plan"** means the Baxter International Inc. and Subsidiaries Pension Plan II (as amended), as set forth in this document and the attached Supplements.

**2.41. "Plan Year"** means the twelve consecutive month period beginning January 1 and ending December 31.

**2.42. "Points"** means, with respect to any Participant, a number which is equal to

(a) the sum of the number of full years of the Participant's attained age and the number of his Years of Service described in subsection 2.53(a); plus

(b) the Participant's service with Non-Participating Employer(s) that would have constituted Years of Service under subsection 2.53(a) if such Non-Participating Employer(s) were Participating Employer(s) and if the Participant's remuneration with such Non-Participating Employer(s) consisted of wages subject to the Federal Insurance Contributions Act while employed by such Non-Participating Employer; plus

(c) the Participant's service with an Employer after December 31, 2006, that would have constituted Years of Service if the Participant had not elected to cease accruing benefits as of December 31, 2006, pursuant to subsection 3.1(c); plus

(d) the Participant's Years of Service under subsection 2.53(b) after the earlier of: (i) the date on which he or she is reemployed after December 31, 2006, or (ii) the Freeze Date; minus

(e) any Years of Service under subsection 2.53(a) attributable to prior Lump Sums of $5,000 or less.

For purposes of subsection 2.42(b), above, a Participant will receive credit for 190 Hours of Service for each calendar month in which he is employed by a Non-Participating Employer outside of the United States. For avoidance of doubt, on and after the Freeze Date, a Participant will continue to earn Points based on additional years of attained age prior to commencement of his Pension Benefit and Years of Service under subsection 2.53(b).

**2.43. "Primary Social Security Benefit"** means the benefit amount specified in subsection (a) below, subject to the provisions of subsections (b), (c), (d) and (e) below:

(a) General Rule. The estimated monthly primary insurance amount that a Participant is or would be entitled to receive commencing at age 65, or at Termination of Employment, if later, under the Social Security Act, whether or not he applies for or actually receives such benefit. For purposes of the Plan, such estimated amount will be determined as of the last date that he receives Compensation ("Date of Determination") on the following basis.

- 20 -

(i) Social Security Act. The calculation is based on the provisions of the Social Security Act as in effect on the Date of Determination (regardless of any retroactive changes made by legislation enacted after said date). The factors for indexing wages, if any, and the table or formula that would be used to compute the Participant's benefit upon his attaining age 65, or his Date of Determination if later, will remain unchanged from those in effect on the Date of Determination.

(ii) Wages in Past Years. If submitted by the Participant as described in subsection (c) below, the Participant's actual wages under Code Section 3121 for Past Years; otherwise wages in Past Years are determined by projecting the Pivot Wage backwards from the Pivot Year by six percent (6%) per year.

(iii) Wages in Future Years. Wages in all Future Years are assumed to equal the Pivot Wage.

(iv) Definitions.

(A) "Pivot Year" is the calendar year preceding the calendar year of the Date of Determination. For Participants who incur a Termination of Employment after the Freeze Date, the Pivot Year will be 2021.

(B) "Past Years" are those calendar years equal to or before the Pivot Year and equal to or after the later of the calendar year 1951 or the calendar year of the Participant's 22nd birthday.

(C) "Future Years" are those calendar years after the Pivot Year and before the later of the calendar year of the Date of Determination or the calendar year of the Participant's 65th birthday.

(D) "Annualized Compensation" for a calendar year is the actual Compensation received in the calendar year multiplied by a fraction, the numerator of which is the number of days in the calendar year and the denominator or which is the number of days in the calendar year included in the period or periods for which the Participant received Compensation.

(E) "Pivot Wage" is the Participant's Annualized Compensation for the Pivot Year if the Participant received any Compensation in the Pivot Year; otherwise it is the Annualized Compensation for the calendar year of the Date of Determination discounted by six percent (6%).

- 21 -

(b) **Disability Exception.** The Primary Social Security Benefit for a Participant eligible to receive a disability retirement benefit under Section 4.4 will be calculated as described in subsection (a) above except that:

(i) The Date of Determination will be the earliest of (A) the date he ceases accruing an Accrued Benefit under Section 4.4, (B) his Normal Retirement Date, or (C) the Freeze Date; and

(ii) The Participant's Pivot Year will be the calendar year next preceding the year in which his Disability arose for which a full year of such wages were paid.

(c) **Proof of Actual Benefit Amounts.** Notwithstanding any provision of the Plan to the contrary, for purposes of determining a Participant's Primary Social Security Benefit, the Participant may submit his actual wage history on such forms, in such manner and at such times as the Administrative Committee will require for the purpose of determining wages through the Participant's Termination of Employment. In addition, a Participant who has attained age 65 may submit an actual award letter from the Social Security Administration. In no case will the submission of a Participant's actual wage history or award letter cause him to receive a smaller benefit than he would have been entitled to using estimated earnings. A Participant may not submit his actual wage history or award letter, as applicable, later than 30 days prior to his Payment Date; provided, however, that a Participant who incurs a Termination of Employment on or after age 65 may submit his actual wage history or award letter within 60 days of his Termination of Employment. The date payments commence under such award letter (or the date of such award letter if there is no commencement date) must be no earlier than twelve months prior to the Participant's Payment Date.

(d) **Limitation on Offset.** Notwithstanding the provisions of subsection (a), (b), or (c) above, where it can be demonstrated that the dollar amount of a Participant's Primary Social Security Benefit determined above and offset by this Plan exceeds the amount permitted to be offset for the Plan to remain qualified under Code Section 401(a), based on the Participant's actual detailed earnings history under Code Section 3121, such offset will be accordingly reduced.

**2.44. "Prior Plan"** means the Baxter International Inc. and Subsidiaries Pension Plan. Any reference herein to a period of participation in the Plan will include a period of participation in the Prior Plan, except as the context otherwise requires.

**2.45. "Projected Benefit Service"** means, as of the earlier of: (a) the Freeze Date or (b) the date on which a Participant incurs a Termination of Employment, the Participant's actual Years of Service plus the additional Years of Service he would have expected to earn if he continued in employment as an Eligible Employee who performs at least 1,000 Hours of Service each Plan Year until his Normal Retirement Date.

- 22 -

**2.46. "Single Life Annuity"** means the form of payment of a Participant's Pension Benefit described in subsection 7.2(b).

**2.47. "Spouse"** means the person who is married to the Participant at the relevant time. If a Participant was lawfully married under the laws of the state or other jurisdiction in which the marriage ceremony was performed (including a marriage to a person of the same gender), or if a Participant entered into a common law marriage that was valid in the state or other jurisdiction in which the Participant resided at the time, the person to whom the Participant was married will continue to be considered the Participant's Spouse regardless of the laws of the state or other jurisdiction in which the Participant currently resides. The Administrative Committee is entitled to rely on a Participant's representation of his marital status. A Participant whose records indicate that he is married may establish that he was subsequently divorced or abandoned upon delivery of a court order evidencing the same to the Administrative Committee.

**2.48. "Termination of Employment"** occurs when a person ceases to be an Employee. The Termination of Employment of an Employee incurring a separation from service after April 30, 1996 will occur as of the date of such separation, regardless of whether any post-separation pay is owed to such Participant or included in such Participant's Compensation. The date of a Participant's Termination of Employment is subject to the provisions of Supplement C. The foregoing provisions also are subject to the following rules:

(a) Transfers. A transfer of employment from a Participating Employer to any other Employer within the controlled group as defined in subsection 2.19(a) will not constitute a Termination of Employment.

(b) Disability. Effective for disabilities determined by the Social Security Administration to have occurred after September 30, 1996, a Participant's Termination of Employment, for purposes of determining whether an Employee is entitled to a Disability Pension Benefit under Section 4.4, occurs as of the end of the six-month period immediately following his separation from service with an Employer during which he is receiving disability pay. If no disability date is indicated by the Social Security Administration's award letter, then the disability date will be deemed to occur after September 30, 1996, as long as the Social Security award letter is dated after March 31, 1997. For purposes of determining his Accrued Benefit under subsection 4.4(b), subject to subsection 4.4(d), a disabled Participant's Termination of Employment is the earliest of (i) the date he elects to commence his Disability Pension Benefit under subsection 4.4(c), (ii) his Normal Retirement Date, and (iii) the Freeze Date.

**2.49. "Trust"** means the legal entity resulting from the Trust Agreements entered into by or on behalf of the Participating Employers and the Trustee pursuant to which assets of the Plan are received, held, invested and distributed to or for the benefit of Participants, Spouses, and Beneficiaries.

**2.50. "Trust Agreement"** means the agreements entered into by or on behalf of the Participating Employers and the Trustee establishing the Trust, as amended.

- 23 -

**2.51. "Trust Fund"** means all assets held by the Trustee, Investment Managers and insurance institutions in accordance with the Trust Agreement and the Plan.

**2.52. "Trustee"** means any individual(s) or corporation(s) designated in the Trust Agreement to execute the duties of the Trustee as set forth in the Trust Agreement.

**2.53. "Year of Service"** means each Computation Period during which an Employee earns at least 1,000 Hours of Service.

(a) Benefit Accrual. For purposes of determining a Participant's Accrued Benefit and Projected Benefit Service, a Year of Service means a Year of Service (including periods of Disability to the extent provided in Section 4.4) earned while a Participant in this Plan or the Prior Plan, excluding:

(i) Non-Participating Employer Service. All Years of Service due to employment with (a) an Employer prior to the date as of which it became a Participating Employer under this Plan or the Prior Plan, as applicable (except as otherwise agreed to by the Administrative Committee or its delegate in connection with such adoption); (b) a Non-Participating Employer; and (c) an Excluded Division of a Participating Employer.

(ii) Service Prior to Participation in the Prior Plan. All Years of Service with a Participating Employer prior to becoming a Prior Plan Participant except that the following service prior to becoming a Prior Plan Participant will be recognized:

(A) Effective January 1, 1987, if an Eligible Employee became a Participant in the Prior Plan at any time during a Plan Year, his Hours of Service earned from January through the date participation commenced in such Plan Year will count in determining whether a Year of Service is earned.

(B) Prior to January 1, 1986, the Prior Plan was only applicable to Eligible Employees of American and its participating units. Effective as of such date, the Prior Plan was extended to employees of the Company and its participating units. Accordingly, all Participants employed by the Company on or after January 1, 1986 will be credited with any Years of Service with respect to their employment with a Participating Employer under the Prior Plan prior to January 1, 1986, beginning with the January 1 or July 1 following the date such Participants attained age 18 and completed one Year of Service. Such Participants need not have been employed by the Company as of the date American was merged into the Company in order to receive such credit. Participants will receive credit for 190 Hours of Service for each month prior to January 1, 1986 during which the Eligible

- 24 -

Employee was employed by a Participating Employer under the Prior Plan in lieu of the 45 Hours of Service equivalency set forth in Section 2.26.

(C) Effective for Participants who have not commenced their Pension Benefit as of January 1, 1986 but who became a Prior Plan Participant under the Prior Plan's prior eligibility rules (age 30 and two Years of Service prior to January 1, 1976 and age 25 and one Year of Service between January 1, 1976 and January 1, 1985) such Participants are credited with Years of Service beginning on the January 1 or July 1 next following the date on which they attained the age and completed the service set forth in paragraphs 3.1(b)(i) and (ii).

(iii) Service Prior to Divestiture. In the case of a Participant who was rehired under the Prior Plan after ceasing to participate in the Prior Plan as the result of a sale or other divestiture of the business that employed the Participant, in which the Participant's Accrued Benefit under the Prior Plan and the assets attributable to such Accrued Benefit were transferred to another plan in connection with the transaction, all Years of Service earned prior to such transaction unless the Accrued Benefit and attributable assets were transferred back to the Prior Plan, in which event the rules generally applicable to a rehired former Participant will apply.

(iv) Freeze. A Participant will not be credited with additional Years of Service under subsection 2.53(a) after the Freeze Date.

(b) Vesting and Entitlement to Benefits. For purposes of determining (i) a Participant's Non-forfeitable interest in his Accrued Benefit, and (ii) entitlement to benefits under Articles IV and VI, a Year of Service includes a Year of Service as an Employee of an Employer. The following Years of Service will be recognized for purposes of this subsection (b):

(i) Years of Service earned with an entity prior to its becoming an Employer under this Plan or the Prior Plan, as applicable, will be recognized only if the Employee was employed on the date the entity became an Employer. For purposes of this paragraph (i), an Employee will receive 190 Hours of Service per month from the most recent date of hire until the date of acquisition.

(ii) Prior to January 1, 1986, the Prior Plan was only applicable to Eligible Employees of American. Effective as of such date, the Prior Plan was extended to Eligible Employees of the Company. Accordingly, for all Participants whose Terminations of Employment occur after January 1, 1986, such Participants will be credited with Years of Service with respect to their employment with an Employer under the Prior Plan prior

- 25 -

to January 1, 1986. In determining such Years of Service, Participants will receive credit for 190 Hours of Service for each month prior to January 1, 1986 during which the Eligible Employee was employed by an Employer under the Prior Plan in lieu of the 45 Hours of Service equivalency set forth in Section 2.26.

(c) Eligibility to Participate. For purposes of determining an Employee's eligibility to participate in the Prior Plan, a Year of Service (sometimes referred to as a Year of Eligibility Service) was calculated in the same manner as in subsection (b), except that the first Computation Period was the twelve month period commencing on the Employment Date rather than the Plan Year in which the Employment Date occurs.

(d) Years of Service Disregarded. If an Employee does not have a Non-forfeitable interest in the Plan and incurs a One-Year Break in Service and thereafter returns to employment with an Employer on or after January 1, 1985, his prior Years of Service for vesting, eligibility and benefit service will be disregarded only if he has five consecutive One-Year Breaks in Service and if the number of One-Year Breaks in Service equals or exceeds his Years of Service for vesting purposes prior to the One-Year Break in Service.

(e) Special Rule for Certain Rehired Participants. In the case of a Participant who was rehired by the Company after ceasing to participate in the Prior Plan as the result of the Company's spin-off of the Caremark and Dade divisions that employed the Participant, in which the Participant's Accrued Benefit under the Prior Plan and the assets attributable to such Accrued Benefit were transferred to another plan in connection with such transaction, all Years of Service earned prior to the spin-off will be included for purposes of determining the Participant's total number of Points under Section 2.7; provided, however, that such Participant has a Termination of Employment on or after January 1, 2003.

- 26 -

**ARTICLE III.**

**Participation**

    **1.1. Participation.** Participation in the Plan is closed. An Eligible Employee became a Participant in accordance with the following requirements:

(a) Plan Participation. Each Eligible Employee who was a Prior Plan Participant and employed by an Employer under the Prior Plan on January 1, 2018 became a Participant in the Plan on January 1, 2018. Each such Participant who was a Participant in the Plan immediately prior to the Effective Date will continue to participate in the Plan on and after the Effective Date until his participation ceases in accordance with the Plan.

(b) Initial Participation in the Prior Plan. Prior to January 1, 2007, each Eligible Employee became a Prior Plan Participant on the first Entry Date coincident with or next following the date he satisfied the following requirements:

    (i) He completed one Year of Service; and

    (ii) He attained age 21.

(c) Prior Plan Participation Closure. Participation in the Prior Plan was closed effective December 31, 2006, and no Employees became Prior Plan Participants after such date, subject to the following:

    (i) No Employee who was not employed by a Participating Employer under the Prior Plan on December 31, 2006, will be eligible to participate in the Prior Plan or this Plan.

    (ii) An Eligible Employee who was employed by a Participating Employer under the Prior Plan on December 31, 2006, but who had not satisfied the requirements of subsection (b) on such date, became a Prior Plan Participant on the first Entry Date after he satisfied such requirements, unless he elected not to become a participant as provided in paragraph (c)(iii) below.

    (iii) Each Participant or Eligible Employee under the Prior Plan who either (A) was employed by a Participating Employer under the Prior Plan on December 31, 2006, and would not have been entitled to a Deferred Vested Benefit if he incurred a Termination of Employment on such date, or (B) is described in paragraph (c)(ii) above, could have irrevocably elected to either cease accruing benefits as of December 31, 2006, or not to become a Participant, in the Prior Plan. The Accrued Benefit of a Prior Plan Participant who elected to cease accruing benefits is thereafter equal to his Accrued Benefit as of December 31, 2006, which will not be

- 27 -

adjusted for subsequent changes in Average Monthly Compensation, Years of Service, Projected Benefit Service, or Primary Social Security Benefit, but such Participant will continue to earn Years of Service for purposes of vesting, and Points, and his Accrued Benefit will be payable upon retirement or other Termination of Employment as provided herein. An Eligible Employee who elected not to become a Prior Plan Participant will thereafter be ineligible to become a Prior Plan Participant or a Participant in this Plan. Such election was made in accordance with rules and procedures established by the Administrative Committee, which rules and procedures specified the manner in which the election was made. A Participant or Eligible Employee in the Prior Plan who failed to affirmatively make the election described above continued to accrue benefits, or became a Participant, as applicable, in the Prior Plan in accordance with the remaining terms of the Prior Plan.

**1.2. Ceasing to Be a Participant**. Once an Eligible Employee has become a Participant in accordance with Section 3.1, he will remain a Participant in the Plan until the later of the date such Participant ceases to be an Eligible Employee (or elected to cease accruing benefits pursuant to paragraph 3.1(c)(iii)) or the date that all of the benefits to which the Participant is entitled under the Plan, if any, have been distributed for his benefit in accordance with the Plan.

**1.3. Reemployment.** A Participant who has ceased accruing benefits under the Plan will not subsequently be eligible to resume accruing benefits under the Plan. A Participant who incurs a Termination of Employment, and is subsequently rehired by a Participating Employer, will not be eligible to resume accruing benefits under the Plan. If a Prior Plan Participant incurred a Termination of Employment prior to January 1, 2018 and is subsequently rehired by a Participating Employer after January 1, 2018, he will not become a Participant in this Plan. His Accrued Benefit under the Prior Plan, if any, will be payable solely by the Prior Plan.

(a) Reemployment prior to January 1, 2007 under the Prior Plan.

   a. Eligible Employee and Prior Participant. An Eligible Employee who was a Prior Plan Participant prior to his Termination of Employment automatically became a Prior Plan Participant on the date he again earned an Hour of Service as an Eligible Employee.

   b. Eligible Employee with One or More Years of Service. An Eligible Employee who previously satisfied the requirements of subsection 3.1(b) of the Prior Plan but incurred a Termination of Employment before the next Entry Date, and who was rehired as an Eligible Employee with one Year of Eligibility Service, automatically became a Prior Plan Participant on the later of (i) the Entry Date that would have applied without a Termination of Employment or (ii) the date he again earned an Hour of Service as an Eligible Employee.

- 28 -

c. Eligible Employee without One or More Years of Service. An Eligible Employee who did not have a Year of Eligibility Service when he incurred a Termination of Employment became a Prior Plan Participant if he earned a Year of Eligibility Service based on the eligibility Computation Period described in Section 2.12 of the Prior Plan.

(b) Reemployment after December 31, 2006 under the Prior Plan. Notwithstanding the foregoing, a Prior Plan Participant who incurred a Termination of Employment, and is subsequently re-employed by a Participating Employer after December 31, 2006, will not be eligible to resume accruing benefits under the Prior Plan or this Plan. His Accrued Benefit under the Prior Plan will be fixed as of the date on which he incurred the Termination of Employment. An Eligible Employee under the Prior Plan who incurred a Termination of Employment prior to having become a Prior Plan Participant, and who is subsequently re-employed after December 31, 2006, will not be an Eligible Employee and will not become a Participant under either this Plan or the Prior Plan.

**1.4. Change of Job Status**. An Employee who satisfied the service requirement of paragraph 3.1(b)(i) but who was not a Participant because he was not an Eligible Employee became a Participant on the later of (a) the Entry Date that would have applied had he been an Eligible Employee or (b) the date he became an Eligible Employee.

**1.5. Transfers**. A Participant who transfers to a Non-Participating Employer will continue to accrue Years of Service (as defined in subsection 2.53(a)) after such transfer, unless the Non-Participating Employer is located outside of the United States, in which case he will not accrue any additional Years of Service after such transfer. If a Participant transferred to a Non-Participating Employer outside of the United States and is transferred back to a Participating Employer after December 31, 2006, he will not accrue any additional Years of Service, and his Accrued Benefit will be fixed as of the date of the original transfer. For purposes of this Section 3.5, a Non-Participating Employer located in Puerto Rico will be considered to be located outside of the United States.

**1.6. International Employees.** A Participant who becomes eligible to accrue benefits under the Company's pension plan for international employees will cease accruing any additional Years of Service (defined in subsection 2.53(a)) effective as of the date he becomes a participant in such pension plan. If such a Participant ceases to accrue benefits under the pension plan for international employees after December 31, 2006, he will not accrue any additional Years of Service, and his Accrued Benefit will be fixed as of the date he originally became eligible to accrue benefits under the pension plan for international employees.

**1.7. Reemployment of Veterans.** Notwithstanding any provision of this Plan to the contrary, benefit and service credit with respect to qualified military service was provided in accordance with Code Section 414(u). If an Eligible Employee's or Participant's military service began prior to January 1, 2007, and Code Section 414(u) applied upon his re-employment after December 31, 2006, he resumed or commenced participation as required by Code Section 414(u), and if he would have been eligible to make the election described in paragraph 3.1(c)(iii)

- 29 -

had he been employed on December 31, 2006, he was permitted to make the election upon his re-employment in accordance with rules and procedures established by the Administrative Committee. If he so elected, his Accrued Benefit will thereafter be determined as of December 31, 2006, as if he had been employed through such date, in accordance with the requirements of Code Section 414(u). Effective January 1, 2009, the provisions of this Section will also apply to a Participant who dies or incurs a Disability while performing qualified military service, as if such Participant had returned to employment on the day prior to the day on which he died or incurred such Disability.

- 30 -

# ARTICLE IV.

**Eligibility for and Amount of Pension Benefits**

    **2.1. Normal Retirement.** A Participant who incurs a Termination of Employment in the month in which he attains his Normal Retirement Date is entitled to his Pension Benefit.

    (a) Amount. The amount of the Participant's Pension Benefit will be his Accrued Benefit, or the Actuarial Equivalent of his Accrued Benefit if paid in one of the other forms of payment described in Article VII.

    (b) Commencement. A Participant will begin receiving his Pension Benefit in the form provided for in Article VII commencing effective as of the Payment Date. The Payment Date is the first day of the second month next following his Normal Retirement Date. However, if a Participant notifies the Administrative Committee of his intent to retire at least 30 days prior to his Normal Retirement Date, the Payment Date is the first day of the month following his Normal Retirement Date. In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed.

    **2.2. Late Retirement**. A Participant who incurs a Termination of Employment during any month after the month in which his Normal Retirement Date occurs is entitled to a Pension Benefit.

    (a) Amount. The amount of the Participant's Pension Benefit will be his Accrued Benefit, or the Actuarial Equivalent of his Accrued Benefit if paid in one of the other forms of payment described in Article VII.

    (b) Commencement. A Participant will begin receiving his Pension Benefit in the form provided for in Article VII commencing effective as of the Payment Date. The Payment Date is the first day of the second month next following his Termination of Employment. However, if a Participant notifies the Administrative Committee of his intent to retire at least 30 days prior to his Termination of Employment, the Payment Date is the first day of the month following his Termination of Employment. In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed.

    **2.3. Early Retirement.** A Participant who incurs a Termination of Employment on or after his Early Retirement Date is entitled to a Pension Benefit.

- 31 -

(a) Amount. The amount of the Participant's Pension Benefit will be his Accrued Benefit determined as of his Early Retirement Date, or the Actuarial Equivalent of his Accrued Benefit, if paid in one of the other forms of payment described in Article VII. If the Participant elects to receive his Pension Benefit prior to his Normal Retirement Date, his Accrued Benefit will be reduced to the extent required by the Early Pension Benefit Reduction Factors applicable to such Participant as described in Section 2.7.

(b) Commencement. A Participant will begin receiving his Pension Benefit in the form provided for in Article VII commencing effective as of the Payment Date. The Payment Date is the first day of the month following his Normal Retirement Date. The Participant may designate an earlier Payment Date which will be the first day of any month which is at least 30 days after the Participant delivers notice of such designation on such form, in such manner and at such times as the Administrative Committee will require. In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed.

## 2.4. Disability Retirement.

(a) A Participant is entitled to a Disability Pension Benefit if he incurs a Termination of Employment described in subsection 2.48(b)

    (i) after he has been credited with five Years of Service under subsection 2.53(b) and has been credited with 65 Points, or

    (ii) after he has been credited with ten Years of Service under subsection 2.53(b) if he became a Participant prior to January 1, 1990.

(b) Amount of Benefit. The amount of the Disability Pension Benefit will be the Participant's Accrued Benefit, or the Actuarial Equivalent of the Accrued Benefit if paid in one of the other forms of benefit described in Article VII. If the Participant elects to receive his Disability Pension Benefit prior to his Normal Retirement Date, his Accrued Benefit will be determined as if the Payment Date was the date of the Participant's Termination of Employment and will be reduced to the extent required by the Early Pension Benefit Reduction Factors applicable to such Participant as described in Section 2.7. The Accrued Benefit payable under this Section 4.4 will be determined by using the Participant's Years of Service earned at the time of his Disability, plus the Years of Service that he would have earned had he continued in employment as an Eligible Employee from the time of his Disability until the earliest of (i) his Termination of Employment, (ii) his Normal Retirement Date, or (iii) the Freeze Date, provided that such Participant is actually receiving disability payments from the Social Security Administration. The Accrued Benefit will be calculated using the

Participant's Compensation in the Plan Year preceding the date as of which he is determined to be disabled by the Social Security Administration for the first year of Disability and for each year thereafter up to the earliest of (i) the Participant's Termination of Employment, (ii) the first day of the month following his Normal Retirement Date, or (iii) the Freeze Date in order to calculate the Participant's Average Monthly Compensation; provided, however, that for Participant's who are determined to be disabled on or after August 20, 2010, the Participant's Compensation for the Plan Year preceding the date as of which payment of disability benefits commences will be used if it results in a higher Average Monthly Compensation.

(a) Commencement of Benefits. Payment of the Accrued Benefit described in this Section 4.4 will commence effective on the Payment Date, in the form provided for under Article VII. The Payment Date is the first day of the month coincident with or next following the Participant's Normal Retirement Date. However, a Participant may elect an earlier Payment Date which may be the first day of any month following the Participant's accumulation of 65 Points if the Participant provides notice of such election to the Administrative Committee at least 30 days prior to such month. In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed.

A Participant eligible for a Disability Pension Benefit also may elect to receive a Lump Sum payment of his Accrued Benefit at any time when the Lump Sum value of such Accrued Benefit is $5,000 or less, and, for purposes of determining such Lump Sum, the Participant will be deemed to have incurred a Termination of Employment on the Payment Date for such Lump Sum. Payment of any such Lump Sum will be subject to the provisions of Section 7.3.

(b) Recovery. If a Participant who is earning an Accrued Benefit under this Section 4.4 recovers from his Disability prior to his Normal Retirement Date, such Participant will be deemed to have incurred a Termination of Employment as of the date of recovery. If such Participant is not reemployed by an Employer, he will become entitled to his Accrued Benefit under Section 4.3 or 4.5 depending upon his Points, Years of Service or age at the time of such Termination of Employment. The Participant's Accrued Benefit will be based on his Years of Service and his Average Monthly Compensation as determined under subsection 4.4(b). Subject to subsection 2.43(b), the Participant's Primary Social Security Benefit will be calculated based upon his Termination of Employment at the time of his recovery. For purposes of this subsection, a Participant will be deemed to be recovered from his Disability if he is no longer receiving disability payments from the Social Security Administration.

- 33 -

**2.5. Deferred Vested Benefit.** A Participant who incurs a Termination of Employment for any reason other than Disability or death before his Early Retirement Date, but after completing at least five Years of Service as defined in subsection 2.53(b), is entitled to a Pension Benefit.

(a) Amount. The amount of the Participant's Pension Benefit will be his Accrued Benefit determined at his Termination of Employment, or the Actuarial Equivalent of his Accrued Benefit, if paid in one of the other forms of payment described in Article VII. If the Participant elects to receive his Pension Benefit prior to his Normal Retirement Date, his Accrued Benefit will be reduced to the extent required by the Early Pension Benefit Reduction Factors applicable to such Participant as described in Section 2.7.

(b) Commencement. Payment of the Accrued Benefit described in this Section 4.5 will commence effective on the Payment Date, in the form provided for under Article VII. The Payment Date is the first day of the month following his Normal Retirement Date. However, such Participant may designate an earlier Payment Date which may be the first day of any month following the date on which he attains an age which causes his Points to equal or exceed 65 if the Participant provides notice of such election to the Administrative Committee at least 30 days prior to such date. Such election will be made on such form, in such manner and at such times as the Administrative Committee will require. In order to receive a Pension Benefit by the applicable Payment Date, the Administrative Committee must have received from the Participant a complete and accurate application by the later of 55 days from the date the application is generated or the requested Payment Date, or the Payment Date may be delayed.

A Participant entitled to a minimum Accrued Benefit under an applicable Supplement is fully vested in the portion of the Participant's Accrued Benefit, if any, which is described in such Supplement. Such Participant may request, after he attains age 55 but prior to his Normal Retirement Date, on such form, in such manner and at such times as the Administrative Committee will require, to begin receiving his Accrued Benefit commencing effective as of the first day of any month after he attains age 55. In such event, the amount of the benefit which would be paid beginning on his Normal Retirement Date will be reduced according to the Deferred Vested Benefit Reduction Factors described in Table 2 of Supplement A.

**2.6. Deferral of Payment Date**. Notwithstanding the foregoing, a Participant who is entitled to a benefit under any of the foregoing provisions of this Article IV may elect to defer the Payment Date to not later than the latest date permitted by subsection 7.5(c). A Participant who does not file a retirement application electing to retire on the Payment Date specified in the applicable provision of this Article IV will be deemed to have elected to defer his Payment Date until the date specified on an application that he subsequently files, and if he does not file a

- 34 -

subsequent application, he will be deemed to have elected to defer his Payment Date until the latest date permitted by subsection 7.5(c).

- 35 -

- 36 -

# ARTICLE V.

**Special Vesting Provisions for Divested Employees**

    **3.1. Accelerated Vesting.** In the event of a sale by the Company on or after the Effective Date of the stock or substantially all of the assets of a Participating Employer, or a separate business unit of a Participating Employer, so that the Participating Employer, or such business unit, ceases to be an Employer, the Administrative Committee, in its sole discretion, may determine that all or a portion of the affected Participants of said Participating Employer will be fully vested in their Accrued Benefit, determined on the date as of which the Participating Employer is no longer an Employer. If such employment ceases prior to the accumulation of 65 Points (or age 55 in the case of Participants who first became Prior Plan Participants prior to January 1, 1990), the Participant is entitled to the forms of payment and early commencement reduction factors applicable to a terminated Participant entitled to a deferred vested benefit under Section 4.5. If his employment ceases on or after accumulation of 65 Points (or age 55 in the case of Participants who first became Prior Plan Participants prior to January 1, 1990), the Participant is entitled to the forms of payment and early commencement reduction factors applicable to a terminated Participant entitled to an early retirement benefit under Section 4.3.

    **3.2. Re-employment.** If a Participant who fully vested under Section 5.1 was later rehired as an Eligible Employee, and that Participant received a distribution of his Accrued Benefit, his prior Years of Service for vesting purposes were reinstated but no prior Years of Service for purposes of determining his Accrued Benefit were reinstated. A repayment of the distribution was not required or permitted. The Pension Benefit to which the rehired Participant is entitled at his subsequent Termination of Employment will be paid under the terms and conditions applicable to all other Participants. If a Participant would have been eligible for accelerated vesting under Section 5.1 if he was not rehired, and such Participant was rehired by the Employer before any benefit payments were made by the Plan, no such payment was made and the Participant was not entitled to the special vesting of Section 5.1. Such Participant was instead subject to the regular vesting provisions as if no divestiture and Termination of Employment had ever occurred. The provisions of this Section 5.2 also apply to a Participant whose Accrued Benefit, and the assets attributable thereto, were transferred to another plan in connection with the divestiture as if such Participant had received a distribution of his Accrued Benefit, unless such Accrued Benefit was transferred back to the Plan upon rehire.

- 36 -

<div align="center">**ARTICLE VI.**</div>

**Benefits after Death**

    **4.1. Death after Payment Date.** The Death Benefit, if any, of a Participant who dies after his Payment Date under the Plan are those specified under the form in which his benefits were being paid at the time of his death.

    **4.2. Death before Payment Date.** Except as otherwise provided in this Article, no benefits are payable on behalf of a Participant who dies before his Payment Date. Death Benefits that have been paid under a prior version of the Plan or which are currently being paid under such prior version will not be affected by the provisions of this Article.

    **4.3. Death Benefits Payable to Spouses.** A pre-retirement lifetime Death Benefit is payable under either subsection (a) or (b) below to the surviving Spouse of a Participant who incurred a Termination of Employment after December 31, 1989 and who dies with a Non-forfeitable Accrued Benefit prior to the commencement of his Pension Benefits under the Plan.

    (a) Deferred Annuity. A deferred pre-retirement lifetime Death Benefit is payable to the surviving Spouse of a Participant who dies prior to attaining his 65th Point. The Death Benefit will commence effective as of the first day of the month following the month in which the Participant would have attained an age that, when combined with his Years of Service credited as Points would have credited him with his 65th Point. Such Death Benefit is based upon the assumption that the Participant had elected a Joint and 50 Percent Survivor Annuity form of payment and, if he had not previously incurred a Termination of Employment, that he had incurred a Termination of Employment immediately prior to his death. The amount of the monthly Death Benefit paid to such surviving Spouse is based on an Accrued Benefit determined under subsection 2.1(a) as of the date such payment commences and is not actuarially reduced for commencement prior to age 65.

    (b) Immediate Annuity. An immediate pre-retirement lifetime Death Benefit is payable to the surviving Spouse of a Participant who dies after attaining an age which, when combined with his Years of Service credited as Points as of the date of his death, equals or exceeds 65 Points. Such Benefit commences effective as of the first day of the month following the date of the Participant's death. The Death Benefit payable to the Participant's surviving Spouse is based upon the assumption that the Participant had elected a Joint and 100 Percent Survivor Annuity form of payment and, if he had not previously incurred a Termination of Employment, that he had incurred a Termination of Employment immediately prior to his death. The Death Benefit paid to the Participant's surviving Spouse is based on an Accrued Benefit determined under subsection 2.1(a) as of the date of payment and is not actuarially reduced for early commencement prior to age 65.

(c) Compliance with Code Section 417. Death Benefits under subsections 6.3(a) and (b) are based on the Accrued Benefit described in subsection 2.1(a) only, even if the Participant has a frozen Accrued Benefit under subsection 2.1(b) that would have paid a greater retirement benefit at age 65. In most cases, the Death Benefit, with the Points-based Early Retirement Date and full subsidy for early commencement will begin earlier and in greater amounts than partially subsidized or unsubsidized Death Benefits based on a frozen Accrued Benefit and an early retirement age of 55. However, for some married Participants with a frozen Accrued Benefit, the minimum qualified pre-retirement annuity required under Code Section 417 based on such Accrued Benefit may be greater in value, or may commence earlier than the Death Benefit in subsection 6.3(a) or (b). In such a case, the surviving Spouse's benefit described in subsection 6.3(a) or (b) will be paid at such earlier times and in such minimum amounts as are necessary to satisfy Code Section 417. For purposes of determining the minimum qualified pre-retirement survivor annuity based on a frozen Accrued Benefit, the Benefit Reduction Factors of subsection 2.7(d) apply (with the ¼ percent (0.25%) monthly reduction factor applicable if the Participant incurred a Termination of Employment after attaining age 55).

**4.4. Survivor Benefits Payable to Non-Spouse Beneficiaries.** A pre-retirement Death Benefit is payable to the Beneficiary of a Participant with a Non-forfeitable Accrued Benefit who incurred a Termination of Employment after December 31, 1989 and dies without a surviving Spouse or who dies with a surviving Spouse who has consented to the designation of a non-Spouse Beneficiary as provided in Section 6.7. Such Benefit will commence effective as of the first day of the month following the date of the Participant's death under (a) or (b) below.

(a) Calculation of Benefit. The pre-retirement Death Benefit payable under this Section 6.4 will be the survivorship pension payable to his Beneficiary under a Ten-Year Certain and Life Annuity described in subsection 7.2(c) (or an Actuarially Equivalent lump sum), calculated as if the Participant had

    (i) incurred a Termination of Employment on his date of death if he had not already incurred a Termination of Employment prior to his death,

    (ii) begun receiving the Annuity immediately if he had attained 65 Points at the time of his death, or, if he had not yet attained 65 Points, survived to the date he would have attained an age that, when combined with his Years of Service credited as Points, would have credited him with his 65th Point, and then begun receiving the annuity, in either case unreduced for early commencement, and

    (iii) Died immediately after payment commenced.

(b) Form of Payment. The Beneficiary of a Participant who had not yet attained 65 Points at the time of his death will receive a lump sum payment that is the Actuarial Equivalent of the annuity described in subsection 6.4(a), which will be

- 38 -

paid not later than the last day of the year that includes the fifth anniversary of the Participant's death. The Beneficiary of a Participant who had attained 65 Points at the time of his death will also receive a lump sum payment, unless the Beneficiary elects to survivorship benefit payable under the Ten Year and Certain Life Annuity. Such election must be made, in accordance with procedures established by the Administrative Committee, in sufficient time to allow the first annuity payment to be paid not later than the last day of the year that includes the first anniversary of the Participant's death, and if no such election is made by such date the Beneficiary will instead receive the lump sum payment described above.

**4.5. Death Benefits for Disability Retirees.** The surviving Spouse or Beneficiary of a Participant who incurred a Disability and who was accruing additional Benefit Service at his death under the provisions of Section 4.4 is entitled to a Death Benefit determined in accordance with Section 6.3 or 6.4, as applicable. If the Participant incurred a Disability, accrued additional benefits under Section 4.4, recovered from his Disability, did not return to employment with the Employer, and died before his Payment Date, his surviving Spouse or Beneficiary is entitled to a Death Benefit determined in accordance with Section 6.3 or 6.4, as applicable.

**4.6. Pre-Retirement Death Benefits Payable in a Lump Sum.** If the present value of a Death Benefit payable in a form other than a Lump Sum is $5,000 or less at the earliest date such Death Benefit may commence, such Death Benefit will be paid in a Lump Sum at such time, notwithstanding any provision of the Plan or election by the Participant or Beneficiary to the contrary. Any Lump Sum payable in accordance with this Section 6.5 to a Spouse is subject to the direct rollover provisions of Section 7.3.

**4.7. Designation of Beneficiary.** Subject to subsection 7.4(d) and Section 13.4, a Participant's surviving Spouse is entitled to the Death Benefit, if any, which is payable with respect to the Participant. A Participant may designate a Beneficiary who is not the Participant's surviving Spouse, provided that such surviving Spouse consents to the designation. The designation of such Beneficiary can be made only after the notice required by Code Section 417(a)(3)(B) is provided to the Participant during the time periods specified in Code Section 417 and will be effective only if the consent of the surviving Spouse:

(i) is in writing;

(ii) acknowledges the effect of the Participant's designation of a Beneficiary other than the Spouse and the identity of such Beneficiary; and

(iii) is witnessed by a notary public; provided, however, such consent will be deemed to have been granted where it is established to the satisfaction of the Administrative Committee that the consent of the Spouse cannot be obtained because (1) there is no surviving Spouse, (2) the surviving Spouse cannot be located, or (3) there exist such other circumstances as may be prescribed by regulations under ERISA or the Code. Consent of the surviving Spouse to a designated Beneficiary and any contingent Beneficiary is irrevocable. Each change from one non-Spouse

- 40 -

Beneficiary to another, or change of contingent Beneficiary, requires a new consent from the surviving Spouse.

If the Participant dies leaving no surviving Spouse and either (a) the Participant failed to file a valid beneficiary designation form, or (b) all persons designated on the beneficiary designation form have predeceased the Participant, the Participant's Death Benefit described in Section 6.4 will be paid in a lump sum to the Participant's estate. If an estate is not opened on behalf of the Participant, then the Participant's Death Benefit described in Section 6.4 will be distributed in a lump sum to the duly authorized individual properly designated by any applicable small estate affidavit or similar documentation issued pursuant to applicable state law.

Notwithstanding any provision of the Plan to the contrary, with respect to the death of any Participant, if such Participant had designated his or her Spouse as his or her Beneficiary, then a subsequent divorce decree or a Qualified Domestic Relations Order (as defined in Section 13.4) that relates to such Spouse will be deemed to have revoked the Participant's designation of the Spouse as his or her Beneficiary unless a subsequent Beneficiary designation form naming the Spouse as a Beneficiary is filed with the Plan. In addition, to be entitled to receive any benefit of a Participant, a Beneficiary must be alive or in existence at the time of the Participant's death. In the event that the order of the deaths of the Participant and any Beneficiary cannot be determined or have occurred within 120 hours of each other, the Participant will be deemed to have survived. In the event that the death of the Participant or any Beneficiary is the result of a criminal act involving any other Beneficiary, a person convicted of such criminal act will not be entitled to receive any benefit under the Plan. In accordance with rules and procedures established by the Administrative Committee, a Beneficiary may disclaim all or any portion of the benefit payable to him or her under the Plan, provided that such disclaimer meets the requirements of a "qualified disclaimer" under Code Section 2518 and the Treasury Regulations and other guidance issued thereunder, and the requirements of applicable state law.

**4.8. Incapacitated Participants or Beneficiaries.** If a Participant or Beneficiary is incompetent or a minor, and a conservator, guardian, or other person legally charged with his care has been appointed, any benefits to which such Participant or Beneficiary is entitled is payable to such conservator, guardian, or other person legally charged with his care. The decision of the Administrative Committee in such matters is final, binding, and conclusive upon all affected or interested parties. Neither the Plan nor any representative of the Plan has any duty to see to the proper application of such payments.

**4.9. Death During Military Service.** Notwithstanding any other provision of the Plan to the contrary, the death benefit payable to the surviving spouse or Beneficiary of a Participant who dies on or after January 1, 2007, while performing qualified military service as defined in Section 3.7, will not be less than the death benefit that would have been payable had the Participant resumed employment immediately prior to his death and died while employed. Such Participant will be credited with Hours of Service as if employed through the date of his death for purposes of vesting and entitlement to benefits pursuant to subsection 2.53(b), but will only be credited with any additional Accrued Benefit to the extent provided in Section 3.7.

**ARTICLE VII.**

**Form and Payment of Pension Benefits and Death Benefits**

**5.1. Normal Form of Payment.** Pension Benefits under the Plan will commence effective as of the Payment Date and will be payable as follows:

(a) Joint and 50 Percent Survivor Annuity. A Participant who has a Spouse on his Payment Date will receive his Pension Benefit in the form of a Joint and 50 Percent Survivor Annuity (covering the Participant and his Spouse) unless the Participant elects not to receive such Joint and 50 Percent Survivor Annuity by electing in lieu thereof to receive payment under an available option described in Section 7.2.

(b) Life Annuity. A Participant who does not have a Spouse on his Payment Date will receive his Pension Benefit in the form of a Single Life Annuity unless he has properly elected to have his Pension Benefit paid in an optional form of payment under Section 7.2 in accordance with the procedures set forth in Section 7.4.

**5.2. Optional Forms of Payment.** A Participant who is entitled to receive a Pension Benefit may elect to receive such Pension Benefit in one of the optional forms of payment described in this Section 7.2. All optional forms of payment will be the Actuarial Equivalent of the Participant's Pension Benefit. As of the Effective Date, the following optional forms of payment are available:

(a) Joint and 100 Percent, 75 Percent or 50 Percent Survivor Annuity. A reduced Pension Benefit payable monthly during the lifetime of the Participant with the provision that 100 percent, 75 percent or 50 percent (as elected by the Participant) of such monthly benefit will be payable to the Participant's Beneficiary in monthly installments commencing effective on the first day of the month following the month in which the Participant dies and continuing thereafter on the first day of each month during the remaining lifetime of such Beneficiary.

(b) Single Life Annuity. A Pension Benefit payable monthly during the lifetime of the Participant through the last monthly payment on or prior to such Participant's death.

(c) Ten-Year Certain and Life Annuity. A reduced Pension Benefit payable monthly during the lifetime of the Participant with the provision that if the Participant dies before receiving 120 payments, his Beneficiary will receive the same monthly payment as the Participant until a total of 120 payments have been made in the aggregate to the Participant and Beneficiary. If such Beneficiary should die prior to the aggregate payment of 120 payments, a lump sum which is Actuarially Equivalent to the remaining payments will be paid to the Beneficiary's estate.

(d) Special Lump Sum Option for Clintec Transferees. If the Plan received a transfer from the trustee of the Clintec Pension Plan on behalf of a Participant, such Participant may elect to receive a Lump Sum payment if the Lump Sum value of his Accrued Benefit is not greater than $10,000 at the time of the distribution from the Plan. The Lump Sum option under this subsection (d) will be subject to the provisions of subsections 7.3(a) and (b) and subsection 7.4(d) (if the Lump Sum value of the benefit is greater than $5,000).

**5.3. Lump Sum Cash-Out.** Except as provided below, any Participant with a Non-forfeitable interest in the Plan having a Lump Sum value of $5,000 or less on the Payment Date will receive a Lump Sum payment of the portion of his Accrued Benefit that is Non-forfeitable as soon as practicable. For purposes of this Section 7.3, if the Participant does not have a Non-forfeitable interest in his Accrued Benefit, such Participant will be deemed to have received a distribution of his entire Accrued Benefit of zero. Such Lump Sum payments will be subject to the following:

(a) Reemployment prior to Payment. If such a Participant is rehired by the Employer before any benefit payment is made by the Plan, no such payment will be made.

(b) Direct Rollovers of Lump Sums. Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Administrative Committee, to have a Lump Sum paid directly to an eligible retirement plan specified by the distributee in a direct rollover. The following definitions will apply for purposes of this paragraph (b):

(i) Eligible Retirement Plan. An "Eligible Retirement Plan" is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), an annuity plan described in Code Section 403(a), or a qualified trust described in Code Section 401(a), that accepts the Distributee's eligible rollover distribution, an annuity contract described in Code Section 403(b), an eligible plan under Code Section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from the Plan and, effective January 1, 2008, a Roth IRA as defined in Code Section 408A. The definition of Eligible Retirement Plan will also apply in the case of a distribution to a surviving Spouse, or to a Spouse or former Spouse who is the alternate payee under a qualified domestic relation order, as defined in Code Section 414(p).

(ii) Distributee. A "Distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving Spouse and the Employee's or former Employee's Spouse or former Spouse who is the alternate payee under a Qualified Domestic Relations Order are

- 42 -

distributees with regard to the interest of the Spouse or former Spouse. Effective January 1, 2007, any Beneficiary who is a "designated beneficiary" for purposes of Code Section 401(a)(9) and the regulations thereunder (or, to the extent provided in regulations, that is a trust established for the benefit of one or more designated beneficiaries), will also be a Distribute; provided that in the case of a Distributee who is not the Participant's Spouse or an alternate payee the term Eligible Retirement Plan will mean only an individual retirement account or an individual retirement annuity that is treated as an inherited account or annuity under Code Section 408(c)(3) (B).

(iii) Direct Rollover. A "direct rollover" is a payment by the Plan of an "Eligible Rollover Distribution" to the eligible retirement plan specified by a Distributee. An Eligible Rollover Distribution is the distribution of all or any portion of the present value of the Participant's Accrued Benefit, except that an Eligible Rollover Distribution does not include: (a) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Participant or the joint lives (or joint life expectancies) of the Participant and the Participant's designated beneficiary, or for a specified period of 10 years or more; (b) any distribution to the extent such distribution is required under Code Section 401(a)(9); or (c) any portion of any distribution that is not included in the recipient's gross income; provided that effective January 1, 2002, the portion that is not included in the recipient's gross income will be considered part of an eligible rollover distribution to the extent transferred to an eligible retirement plan that is described in paragraph (b)(i), or that is a defined contribution plan that agrees to separately account for the non-taxable portion of the distribution and the income attributable thereto.

In the event the amount of an Eligible Rollover Distribution payable to a Distributee who is an Employee or former Employee (but not to a surviving Spouse or alternate payee) prior to the Distributee's Normal Retirement Date exceeds $1,000, if the Distributee does not elect to have such distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a direct rollover or to receive the distribution directly, then the Plan will pay the distribution in a direct rollover to an Eligible Retirement Plan that is an individual retirement account described in Code Section 408(a) designated by the Administrative Committee.

**5.4. Rules as to Election and Discontinuance of Optional Forms of Payment**. A Participant's election of an optional form of payment specified in Section 7.2 will be subject to the following rules, to the extent appropriate:

- 43 -

(a) Written Elections. An election of an optional form of payment must be made on such forms, in such manner and at such times as the Administrative Committee will require.

(b) Election Period. A Participant may elect an optional form of payment any time during the 180-day period ending on his Payment Date. The Administrative Committee will provide each Participant with a written explanation of the normal form of benefit under Section 7.1. Such explanation will advise such Participant:

   (A) of the circumstances in which the normal form of benefit will be provided unless the Participant has elected not to have benefits provided in that form;

   (B) of the availability of such election;

   (C) of the rights of the Spouse, if any; and

   (D) of the financial effect on a Participant's annuity of such election.

Such written notice will be provided at least 30, but not more than 180 days before the Payment Date. However, the written notice may be provided less than 30 days prior to the Payment Date (and may be provided after the Payment Date for Terminations of Employment occurring after December 31, 1996) provided that (i) the Participant is notified in writing of his right to a 30 day period to consider whether to waive the normal form of benefit and consent to a form of distribution other than the normal form of benefit; (ii) the Participant is permitted to revoke his election at any time prior to the Payment Date, or if later, the eighth day following the date he receives the written notice and (iii) no distribution is made to the Participant prior to the Payment Date, or if later, the eighth day following the date he receives the written notice. A Participant may elect to waive in writing (with the applicable spousal consent described in (d), below) his right to a full 30 days to consider whether to elect an optional form of benefit. If the Administrative Committee does not receive the Participant's election to waive the normal form of benefit by the first business day following the expiration of the 30 day period (or, if later, the Payment Date) then the Participant will be deemed to have consented to the normal form of benefit.

(c) Revocation. Any election to receive an optional form of benefit pursuant to Section 7.2 may be revoked by a Participant by notifying the Administrative Committee in such manner as the Administrative Committee may require at any time during the 180-day period ending on the Payment Date. However, if the written explanation required in subsection (b) is provided less than 30 days before the Payment Date or after the Payment Date, a Participant may revoke his election any time up to the Payment Date, or if later, the eighth day following the date the written explanation is received by the Participant. Once revoked, an election for

an optional form of benefit may again be made by submitting a new election to the Administrative Committee within the times specified in subsection (b).

(d) Spousal Consent. Any election by a married Participant of an optional form of benefit described in Section 7.2 (other than subsection 7.2(a) where the Spouse is the designated Beneficiary) must be consented to by the Participant's Spouse unless an optional form of payment is elected that provides a benefit to the Spouse that is equal to or greater than the Joint and 50 Percent Survivor Annuity. The consent of a Participant's Spouse required under this subsection (d) will be effective only if such consent:

(i) is in writing;

(ii) acknowledges the effect of the Participant's designation of a Beneficiary other than the Spouse and the identity of such Beneficiary; and

(iii) is witnessed by a notary public; provided, however, such consent will be deemed to have been granted where it is established to the satisfaction of the Administrative Committee that the consent of the Spouse cannot be obtained because (1) there is no Spouse, (2) the Spouse cannot be located, or (3) there exist such other circumstances as may be prescribed by regulations under ERISA or the Code. Consent of the Spouse to a designated Beneficiary and any contingent Beneficiary is irrevocable. Each change from one non-Spouse Beneficiary to another, or change of contingent Beneficiary, requires a new consent from the Spouse.

(e) Death before Retirement. If a Participant who had elected an optional form of payment providing for a greater Death Benefit than would otherwise be paid under Article VI dies before his Payment Date, such optional form of payment will be in effect and any Death Benefit under Article VI will be canceled.

(f) Death of Beneficiary before Payment Date. If the Beneficiary of a Participant who has elected an optional form of payment dies before the Participant's Payment Date, the optional form of payment will automatically be canceled and the Participant's Pension Benefit will be paid to him in the normal form unless a new election can be and is made by the Participant pursuant to the foregoing provisions of this Section.

(g) Change of Form or Beneficiary after Option Effective. Except as otherwise provided below, a Participant may not change his form of payment or designate a new Beneficiary after his Payment Date (or, if later, after the last day on which he is permitted to revoke his election pursuant to subsection (c)), even if his Beneficiary dies or he is divorced from his Beneficiary. However, a Participant may designate a new Beneficiary to receive any unpaid portion of a Ten-Year Certain and Life Annuity option described in subsection 7.2(c). If no Beneficiary

- 45 -

is designated on the Participant's death, such unpaid portion will be payable to the Beneficiary specified under Section 6.7.

(h) Special Rules for Retroactive Payment Dates. Effective January 1, 2004, if a Participant does not receive the written election described in subsection (a) until after the date that would otherwise be his Payment Date, he may elect (in accordance with procedures established by the Administrative Committee) to receive his benefit calculated as of the original Payment Date, provided that (A) the Participant receives a supplemental payment equal to the monthly annuity payments that would have been received had payment actually commenced on the retroactive Payment Date, with an appropriate interest adjustment; (B) the person who is the Participant's Spouse on the date payment actually commences (if different from the person who is his Spouse on his Payment Date) consents to any optional form of benefit in accordance with subsection (d) (including an optional form described in subsection 7.2(a) unless the survivorship payments to be received by the Spouse under such form are at least equal to the survivorship payments that would be received under one of the optional forms described in subsection 7.2(a) with a Payment Date after the date the explanation was furnished; and (C) if the date on which payments commence is more than one year after the Payment Date, the benefit payments satisfy Section 13.12 based both upon the Payment Date and the date on which payments actually commence, in the latter case treating the supplemental payments (including the interest adjustment) as an additional benefit payment in the year of commencement.

**5.5. Special Payment Limitations**. Unless a Participant otherwise elects (or is deemed to elect pursuant to Section 4.6), payment of benefits under the Plan to a Participant will commence not later than the sixtieth day after the end of the Plan Year in which the Participant attains his Normal Retirement Date or incurs a Termination of Employment, whichever occurs later. The following provisions will supersede any other provisions of this Plan:

(a) Maximum Payment Period. No optional form of payment will be permitted that causes the Pension Benefit to be paid over a period extending beyond the life or life expectancy of the Participant or the combined lives or life expectancies of the Participant and his Beneficiary as determined in accordance with applicable mortality tables contained in applicable federal regulations.

(b) Five-Year Limit. If the Participant dies without a Spouse and prior to commencement of benefits, no form of payment under the Plan will permit payments to continue beyond five years after the Participant's death except to the extent permitted by Code Section 401(a)(9).

(c) Age 70½ Benefit Payments. A Participant's Pension Benefit will commence as of the April 1 following the later of the Plan Year in which he attained age 70½ or the Plan Year in which he incurs a Termination of Employment; provided that if the Participant owned five percent (5%) or more of the outstanding voting stock of the Company or five percent (5%) or more of the value of all classes of

outstanding stock at any time during the Plan Year in which he attained age 70½ his Pension Benefit will commence as of the following April 1 regardless of whether he is an Employee as of such date.

Notwithstanding anything in the Plan or this Section to the contrary, the provisions of the Plan will be interpreted, construed and administered in a manner that complies with, and benefits will be paid in accordance with the requirements of Code Section 401(a)(9) and regulations thereunder, including the minimum distribution incidental benefit requirement of Code Section 401(a)(9)(G). Minimum distributions will be determined in accordance with Treasury Regulations Section 1.401(a)(9)-2 through Section 1.401(a)(9)-6, which are incorporated herein by reference. The provisions of such final regulations will control over any provision of the Plan to the contrary.

(d) Each Participant, alternate payee and Beneficiary must file with the Administrative Committee from time to time his or her post office address and each change of post office address. Any communication, statement or notice addressed to a Participant, alternate payee or Beneficiary at his or her last post office address filed with the Administrative Committee, or if no address is filed with the Administrative Committee then, in the case of a Participant, at the Participant's last post office address as shown on the Employer's records, will be considered a notification for purposes of the Plan and will be binding on the Participant, alternate payee and Beneficiary for all purposes of the Plan. If the Administrative Committee notifies a Participant, alternate payee or Beneficiary that he or she is entitled to a benefit under the Plan, and the Participant, alternate payee or Beneficiary fails to claim his or her benefit or make his or her whereabouts known to the Administrative Committee within a reasonable time after the notification; or if payment of a benefit is made to a Participant, alternate payee or Beneficiary and such payment remains unclaimed; the Administrative Committee will make reasonable efforts to locate the Participant, alternate payee or Beneficiary. Such measures may include:

(i) Searching Plan and related plan and publicly-available records or directories for alternative contact information;

(ii) Utilizing a commercial locator service, credit reporting agency, or proprietary internet search service;

(iii) Attempting contact with the Participant, alternate payee or Beneficiary via email and/or telephone; and

(iv) Sending a registered letter, return receipt requested, to the last known address of such Participant, alternate payee or Beneficiary.

In the event that the Administrative Committee is unable after a reasonable effort to locate a Participant, alternate payee or Beneficiary to whom a benefit is due by the date as of which payment is required to commence pursuant to the applicable

- 47 -

provision of this Section 7.5, such benefit will be forfeited in accordance with rules and procedures established by the Administrative Committee; provided, however, that if such Participant or Beneficiary subsequently makes an application for such benefit, the forfeited benefit will be restored, with appropriate adjustments. Nothing contained herein will be construed to preclude the Administrative Committee from using any other method permitted by applicable law to satisfy the Plan's obligations to a missing Participant, alternate payee or Beneficiary, including use of the Pension Benefit Guaranty Corporation Missing Participant Program, if applicable. Checks that are not cashed, deposited or otherwise negotiated will be handled (including the forfeiture and reinstatement of such amounts) in accordance with rules and procedures established by the Administrative Committee, including those rules and procedures described above.

**5.6. Effect of Prior Lump Sums on Pension Benefits.** Except as otherwise provided in an applicable Supplement, a Participant who is rehired after receiving his Pension Benefit in a Lump Sum will be entitled to a Pension Benefit upon Termination of Employment equal to his Accrued Benefit (taking into account all of his Years of Service), reduced by the portion of such Accrued Benefit represented by such Lump Sum. Such reduction will occur prior to any reductions for commencement of the Pension Benefit prior to the Participant's Normal Retirement Date and prior to the conversion of the Accrued Benefit into a form other than a Single Life Annuity. If the Lump Sum was not more than $5,000, only Years of Service after rehire will be taken into account and no reduction will be made to the Accrued Benefit based on such Years of Service.

**5.7. Effect of Participant Resuming Employment after Benefits Commence.** If a Participant whose Pension Benefit has commenced is rehired by the Employer, the following rules will apply:

(a) Resumption of Employment prior to Age 65. If a Participant is rehired by Employer before his 65th birthday, his Pension Benefit payments will be discontinued and will not be paid or accrued during the period of such reemployment, his previous election of form of payment will be canceled, and he will have all Years of Service he had at the time of his Termination of Employment reinstated. Upon his subsequent Termination of Employment, his eligibility for a benefit and the amount of the benefit will be determined, calculated and paid as if he then first incurred a Termination of Employment based upon both reinstated Years of Service and any additional Years of Service credited, but such benefit will be actuarially reduced to recognize any Pension Benefit payments he received prior to his suspension. In no event will a Participant's Pension Benefit at his subsequent Termination of Employment be less than his benefit at his earlier Termination of Employment. However, if a Participant who is rehired as described above subsequently reaches his 65th birthday and is employed at a rate of fewer than ten hours per week, he is entitled to receive a Pension Benefit determined under Section 4.1. Such payments will continue every month thereafter until his rate of employment equals or exceeds

- 48 -

ten hours per week, at which time his Pension Benefit payments will be suspended under the terms and conditions described below.

(b) Resumption of Employment after Age 65. If a participant is rehired by the Employer after his 65th birthday, at a rate of at least ten hours per week, his Pension Benefit payments will be discontinued and will not be paid and no payment obligation will accrue during the period of such reemployment. Such suspension of benefits will be done in accordance with Department of Labor Regulations Section 2530.203-3 and will include the notice described below. Such Participant will thereafter continue to accrue further benefits, and his previous election of form of payment will remain in effect and will determine what Death Benefit, if any, is payable under the Plan. Upon the Participant's subsequent Termination of Employment, he will resume receiving payments in the same form as he elected at his earlier Termination of Employment, but such benefit amount will be increased to reflect the value of any additional Accrued Benefit. If a Participant who has his benefits suspended under this subsection (b) elected a Ten-Year Certain and Life Annuity, payments that are not made due to the suspension do not count against the 120-payment guarantee. If a Participant is rehired by the Employer after his 65th birthday and his rate of employment is fewer than ten hours per week, he will receive the same type and amount of his benefit payment which he was entitled to receive preceding his reemployment during such period of reemployment. Such payments will continue every month thereafter until his rate of employment equals or exceeds ten hours per week, at which time his Pension Benefit payments will be suspended as described above. If a Participant continues in employment with the Employer after his 65th birthday at a rate of at least ten hours per week, his Pension Benefit payments will not commence during the period of such employment. Such suspension of benefits will be done in accordance with Department of Labor Regulations Section 2530.203-3 and will include the notice described below. Such Participant will continue to accrue further benefits under the Plan. During such employment the Provisions of Article VI will remain in effect and will determine what Death Benefit is payable under the Plan. If a Participant continues in employment with the Employer after his 65th birthday and his rate of employment is fewer than ten hours per week, he will receive a Pension Benefit under Section 4.1 under the same terms and conditions as a Participant who incurred a Termination of Employment. Such payments will continue every month thereafter until his rate of employment equals or exceeds ten hours per week, at which time his Pension Benefit payments will be suspended as described above.

(c) Notice of Benefit Suspension. If a Participant's benefits are to be suspended after age 65 due to either reemployment or continued employment, the Administrative Committee will notify the Participant by personal delivery or first class mail during the first calendar month in which the Plan withholds payments, that benefits are suspended. The notice will contain the following information:

- 49 -

(i) a general description of the reasons why payments are suspended;

(ii) a general description of Plan provisions relating to the suspension of benefits;

(iii) a copy of such Plan provisions;

(iv) a statement that applicable Department of Labor Regulations may be found in Section 2530.203-3 of the Code of Federal Regulations;

(v) a statement that a review of the suspension may be requested under the Plan's claims procedure; and

(vi) if the Plan requires a benefit resumption notice or verification by the Participant that his benefits should not be suspended, the procedure and forms for such purposes.

The Plan will adopt a procedure whereby a Participant may request a determination of whether specific contemplated employment after age 65 will result in the suspension of benefits.

- 50 -

<div align="center">

**ARTICLE VIII.**

</div>

**Plan Committees**

**6.1. Membership of Administrative and Investment Committees.** The Administrative Committee, consisting of at least three persons, will be appointed by the Compensation Committee of the Board of Directors. The Investment Committee, consisting of at least three persons, will be appointed by the Board of Directors or its delegate. The Secretary of the Company will certify to the Trustee from time to time the appointment to (and termination from) office of each member of the Administrative Committee and the Investment Committee and the persons, if any, who are selected as secretaries of the Administrative Committee and the Investment Committee by the members of such committees. The appointment of a member of either Committee and acceptance of such appointment by any person constitutes an agreement by and between the Company and such Committee member that the member, acting in concert with the other Committee members, will have and will exercise the powers and duties described herein, including, with respect to the Administrative Committee, the power and duty to interpret this Plan and determine the benefits to which Participants are entitled hereunder.

**6.2. Administrative Committee Powers and Duties.** The Administrative Committee will be the "plan administrator" for purposes of Code Section 414(g) and the "administrator" for purposes of ERISA Section 3(16)(A) and will have such powers and duties necessary to discharge its duties hereunder, including, but not limited to, the following:

    (a) Within its complete and unfettered discretion to construe and interpret the Plan and Trust Agreement provisions and to resolve all questions arising under the Plan including questions of Plan participation, eligibility for Benefits and the rights of Employees, Participants, Beneficiaries and other persons to benefits under the Plan and to determine the amount, manner and time of payment of any benefits hereunder;

    (b) To prescribe procedures, rules and regulations to be followed by Employees, Participants, Beneficiaries and other persons or to be otherwise utilized in the efficient administration of the Plan consistent with the Trust;

    (c) To make determinations as to the rights of Employees, Participants, Beneficiaries and other persons to benefits under the Plan and to afford any Participant or Beneficiary dissatisfied with such determination with rights pursuant to a claims procedure adopted by the Administrative Committee;

    (d) To settle or compromise claims against the Plan by Participants, Beneficiaries and other persons;

    (e) To enforce the Plan in accordance with the terms of the Plan and the Trust and to enforce its procedures, rules and regulations;

<div align="center">

- 51 -

</div>

(f) To be responsible for the preparation and maintenance of records necessary to determine the rights and benefits of Employees, Participants and Beneficiaries or other persons under the Plan and the Trust and to request and receive from the Participating Employers such information necessary to prepare such records;

(g) To prepare and distribute in such manner as it deems appropriate and to prepare and file with appropriate government agencies information, disclosures, descriptions and reporting documents regarding the Plan, and in the preparation and review of such reports the Administrative Committee is entitled to rely upon information supplied to it by the Employees, accountants, counsel, actuaries, the Investment Managers and any insurance institutions described in the Trust Agreement;

(h) To appoint or employ individuals to assist in the administration of the Plan and other agents (corporate or individual) that the Administrative Committee deems advisable, including legal counsel and such clerical, medical, accounting, auditing, actuarial and other services as the Administrative Committee may require in carrying out the provisions of the Plan. However, no agent except an Investment Manager or fiduciary named in the Plan will be appointed or employed in a position that would require or permit him: (i) to exercise discretionary authority or control over the acquisition, disposition or management of Trust assets; (ii) to render investment advice for a fee; or (iii) to exercise discretionary authority or responsibility for Plan administration;

(i) To cause to be prepared and to cause to be distributed, in such manner as the Administrative Committee determines to be appropriate, information explaining the Plan and Trust;

(j) To furnish to the Participating Employers upon request such annual or other reports with respect to the administration of the Plan as are reasonable and appropriate;

(k) To receive, review and keep on file (as it deems convenient or proper) reports of the financial condition, receipts and disbursements, and assets of the Trust;

(l) To determine the method by which all notices and other documents required or permitted to be given to a Participant, Beneficiary or other person under the Plan or any applicable law will be given, and the method by which Participants and Beneficiaries may exercise any elections permitted by the Plan, which methods may include the use of e-mail, interactive internet sites, voice response systems, and other electronic media to the extent permitted by applicable regulations;

(m) To amend the Plan to the extent provided in subsection 11.1(d); and

(n) To discharge all other duties set forth in the Plan.

Except as otherwise specifically provided herein, the Administrative Committee has no power to add to, subtract from or modify any of the terms of the Plan, nor to change or add to any benefits provided by the Plan, nor to waive or fail to apply any requirements of eligibility for benefits under the Plan; provided, however, that nothing contained herein will be construed to limit the Administrative Committee's authority to interpret and construe the Plan. Procedures and policies adopted by the Administrative Committee may be inconsistent with any provision of the Plan that is ministerial or administrative in nature, and will be deemed an amendment to the Plan to the extent of the inconsistency. The authority of the Administrative Committee may also be exercised in routine matters by the Corporate Vice President-Human Resources of the Company or persons acting under his authority, and any action taken by any such person within the apparent scope of his authority will be presumed authorized and binding on all Participants, subject to the review of the Administrative Committee.

**6.3. Investment Committee Powers and Duties.** The Investment Committee has such powers necessary to discharge its duties hereunder, including but not limited to the following:

(a) To establish and from time to time revise the investment policy of the Plan, to communicate and consult with the Company, the Administrative Committee and the Trustee and any Investment Manager or insurance institution regarding the investment policy applicable to the Plan as a whole or as to any individual investment fund;

(b) To supervise the performance by the Trustee and any Investment Manager or insurance institution regarding their responsibilities under the Plan and Trust. The Investment Committee will review and analyze performance information supplied by the Trustee and the Investment Managers or insurance institutions to the Investment Committee and/or any such performance information obtained independently by the Investment Committee and will report the results of such analysis to the Board of Directors or its delegate from time to time in such form and with such degree of frequency as the Investment Committee will determine proper. Such responsibilities of the Investment Committee with respect to supervision, review and analysis will be performed no less frequently than once each Plan Year and will ordinarily not be required more frequently than once each calendar quarter. The Trustee, Investment Managers and insurance institutions have been allocated the responsibility for day-to-day investment management of the Plan and Trust, and the responsibilities of the Investment Committee hereunder are not intended to relieve the Trustee, Investment Managers or insurance institutions of such ongoing investment management responsibilities;

(c) To instruct the Trustee, the Investment Managers and insurance institutions with respect to the proper application of contributions made under the Plan;

(d) To determine the proper allocation of investment responsibilities with respect to the assets of the Plan between the Trustee and any Investment Manager or

- 53 -

insurance institution acting hereunder or under the terms of the Trust and to allocate fiduciary responsibilities among these parties;

(e) To the extent not provided to the contrary in the Trust Agreement, to appoint the Trustee and any Investment Managers or insurance institutions, to direct the establishment of any investment fund and to remove the Trustee and any Investment Managers or insurance institutions or appoint additional Trustees, Investment Managers or insurance institutions;

(f) To review any accounts submitted by the Trustee and any Investment Managers or insurance institutions and to report to the Board of Directors or its delegate with respect to any such accounts;

(g) Following the Administrative Committee's determination of the benefit rights of any Participant or Beneficiary, to collect information concerning such benefits and authorize and direct the Trustee with respect to the commencement, modification or cessation of such benefit payments;

(h) To supervise the performance of fiduciary responsibilities by others, including the Trustee and any Investment Managers;

(i) To appoint and utilize the services of administrative staff employees of the Company and the other Participating Employers for the performance of duties delegated to the Investment Committee hereunder and to rely upon information received from such staff employees; provided that in both cases the Investment Committee reasonably believes the performance of such services and the preparation of such information is within the competence of such staff employees;

(j) To furnish to the Participating Employers, upon reasonable request, such annual or other reports as the Participating Employers deem necessary regarding the administration of the Plan; and

(k) To employ reputable agents and to delegate to them any of the administrative powers or duties imposed upon the Investment Committee or the Participating Employers.

**6.4. Conflicts of Interest.** No member of the Administrative Committee or the Investment Committee will participate in any action on matters involving solely such member's rights or benefits as a Participant under the Plan.

**6.5. Compensation; Reimbursement.** No member of the Administrative Committee or the Investment Committee will receive compensation for his services, but the Participating Employers will reimburse him for any necessary expenses incurred in the discharge of his duties.

**6.6. Standard of Care.** The Administrative Committee and the Investment Committee will perform their duties under this Plan in accordance with the terms of this

- 54 -

document and the Trust Agreement solely in the interest of the Participants and for the exclusive purposes of providing retirement benefits to Participants and defraying the reasonable expenses of Plan administration and operation. The Administrative Committee and the Investment Committee will also perform their duties under this Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims.

**6.7. Action by Committees.** Action by each Plan Committee (i.e., the Administrative Committee and the Investment Committee) is subject to the following special rules:

(a) Each Committee may act by meeting or by document signed without meeting and documents may be signed through the use of a single document or concurrent documents;

(b) Each Committee will act by a majority, and such action will be as effective as if such action had been taken by all Committee members, provided that by majority action one or more Committee members or other persons may be authorized to act with respect to particular matters on behalf of all Committee members;

(c) Each Committee may, but is not required to, select a secretary, who may but need not be a Committee member, and the certificate of such secretary that the Committee has taken or authorized any action will be conclusive in favor of any person relying upon such certificate; and

(d) Each Committee may act through agents or other delegates and may retain legal counsel, auditors or other specialists to aid in the Committee's performance of its responsibilities.

**6.8. Resignation or Removal of Committee Member.** Any person serving as an Administrative Committee member may resign from such Committee at any time by written notice to the Compensation Committee of the Board of Directors or may be removed by the Compensation Committee at any time by written notice to such member. Any person serving as an Investment Committee member may resign from such Committee at any time by written notice to the Board of Directors or its delegate or may be removed by the Board of Directors or its delegate at any time by written notice to such member. The Compensation Committee will fill any vacancy in the membership of the Administrative Committee as soon as practicable. The Board of Directors or its delegate will fill any vacancy in the membership of the Investment Committee as soon as practicable. Until any such vacancy is filled, the remaining members of the applicable Committee may exercise all of the powers, rights and duties conferred on such Committee.

**6.9. Uniform Application of Rules by Administrative Committee.** The Administrative Committee will apply all rules, regulations, procedures and decisions uniformly and consistently to all Employees and Participants similarly situated. Any ruling, regulation, procedure or decision of the Administrative Committee which is consistent with the provisions of

the Plan or the Trust will be conclusive and binding upon all persons affected by it. There will be no appeal of any ruling by the Administrative Committee which is within its authority, except as provided in Section 8.10 below. When making a determination or a calculation, the Administrative Committee is entitled to rely on information supplied by the Participating Employer, Trustee, Investment Managers, insurance institutions, accountants and other professionals including legal counsel for the Company.

**6.10. Claims Procedure.** Each person entitled to benefits under the Plan (the "Applicant") must submit a written claim for benefits to the Administrative Committee (or its delegate, as the Administrative Committee may direct). Such claim shall be filed not more than one year after the Applicant knows (or with the exercise of reasonable diligence would know) of the existence of a basis for a claim; provided that nothing herein shall be construed to permit the forfeiture of a Participant's benefit for failure to file a timely application for such benefit; and provided further that the Administrative Committee may waive or extend such requirement in its sole discretion. If a claim for benefits by the Applicant is denied, in whole or in part, the Administrative Committee will cause the Applicant to be furnished, within 90 days after receipt of such claim (or within 180 days after receipt if special circumstances require an extension of time), a written notice which specifies the reason for the denial, refers to the pertinent provisions of the Plan on which the denial is based, describes any additional material or information necessary for properly completing the claim and explains why such material or information is necessary, and explains the claim review procedures of this Section 8.10. Such notice will further describe that the Applicant has a right to bring a civil action under Section 502 of ERISA if his claim is denied after an appeal and review. Any Applicant whose claim is denied under the provisions described above may request a review of the denied claim by written request to the Administrative Committee within 60 days after receiving notice of the denial. In connection with such request, the Applicant or his authorized representative may review pertinent documents and may submit issues and comments in writing. If such a request is made, the Administrative Committee will make a full and fair review of the denial of the claim and will make a decision not later than 60 days after receipt of the request, unless special circumstances (such as the need to hold a hearing) require an extension of time, in which case a decision will be made as soon as possible but not later than 120 days after receipt of the request for review, and written notice of the extension will be given to the Applicant before the commencement of the extension. The decision on review must be in writing and must include specific reasons for the decision and specific references to the pertinent provisions of the Plan on which the decision is based. Such notice will further describe that the Applicant has a right to bring a civil action under ERISA Section 502 if his claim is denied after an appeal and review. No person entitled to benefits under the Plan has any right to seek review of a denial of benefits, or to bring any action to enforce a claim for benefits, in any court prior to his filing a claim for benefits and exhausting all of his rights under this Section 8.10, or more than six months after receipt of the decision on review. Although not required to do so, an Applicant may choose to state the reason or reasons he believes he is entitled to benefits, and may choose to submit written evidence, during the initial claim process or review of claim denial process. However, failure to state any such reason or submit such evidence during the initial claim process or review of claim denial process, or by written notice to the Administrative Committee within 60 days of the date of the decision on the review of the claim denial, will permanently bar the Applicant, and his successors in interest,

from raising such reason or submitting such evidence in any forum at any later date. An Applicant whose claim is denied initially or on review is entitled to receive, on request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to such claim for benefits.

**6.11. Correction of Errors**. In the event that the Administrative Committee discovers that an error has been made in the calculation of a benefit, it will correct the error as soon as is administratively feasible. In the event of an underpayment, the Administrative Committee will either pay the amount of the underpayment in a single sum or will increase future monthly payments to the extent necessary to pay the underpayment within a reasonable period of time, with interest at a reasonable rate not less than the interest rate specified in paragraph 2.2(a)(ii). If an overpayment was made, the Committee will reduce future monthly payments, either to the Participant or his Beneficiary or both, to the extent necessary to recover the overpayment within a reasonable period of time. If an overpayment cannot be recovered in a reasonable period of time through offsetting future benefits, including without limitation an overpayment made in a Lump Sum or a payment erroneously made after the death of a Participant or Beneficiary where no further benefits are payable, the Administrative Committee may exercise such other legal or equitable remedies as the Plan may have, including filing suit for reimbursement of the overpayment; provided, that if the Administrative Committee determines that the expense or burden of seeking recovery would be greater than the likely recovery, it may exercise discretion in determining not to pursue a recovery. Each Participant, Beneficiary or other person who receives an overpayment will be deemed to hold such overpayment in trust for the Plan, and the Plan may recover such overpayment by an appropriate action in law or equity to the maximum extent permitted by law or equity.

- 57 -

## ARTICLE IX.

**Trust, the Trustee and Plan Financing**

**7.1. Establishment of Trust; Trust Agreement.** Benefits under the Plan will be provided exclusively by the Trust. The Trust Fund will initially consist of the assets transferred from the trust of the Prior Plan allocable to the Accrued Benefits of the Participants. The Trust Agreement, which provides for the administration of the Trust, will be deemed to form a part of this Plan, and any and all rights or benefits which may accrue to any person under this Plan will be subject to all the terms and provisions of the Trust Agreement.

**7.2. Selection of Trustee.** As provided in the Trust Agreement, the Investment Committee will have the power to remove the Trustee and to appoint a successor Trustee.

**7.3. Trustee's Duties.** The powers, duties and responsibilities of the Trustee will be as stated in the Trust Agreement, and nothing contained in the Plan either expressly or by implication will be deemed to impose any additional powers, duties or responsibilities upon the Trustee. The foregoing notwithstanding, the Trustee will have no investment authority not specifically granted to the Trustee by the terms of the Trust and the Trustee will be bound by the instructions of the Investment Committee or Investment Manager as provided in Article VIII. All Participating Employer Contributions will be paid into the Trust and all benefits payable under the Plan will be paid from the Trust. No Participating Employer will have any rights or claims of any nature in or to the assets of the Trust Fund except the right to require the Trustee to hold, use, apply and pay such assets in its possession, in accordance with the directions of the Investment Committee for the exclusive benefit of the Participants, Spouses and Beneficiaries, except as otherwise provided in the Plan.

**7.4. Trust Income.** The net income derived from the Trust will be accumulated and will from time to time be invested as a part of the Trust Fund.

**7.5. Expenses.** Unless paid by the Participating Employers, all costs and expenses incurred in connection with the general administration of the Plan and Trust will be paid by the Trust.

**7.6. Trust Entity.** The Trust will be a separate entity aside and apart from the Participating Employers or their assets. The Trust and the corpus and income thereof will in no event and in no manner whatsoever be subject to the rights or claims of any creditor of any Participating Employer.

**7.7. Funding Policy.** The Investment Committee will establish and direct the implementation of a funding policy and method for the Plan which will be consistent with the objectives of the Plan and with the minimum funding standards established under Code Section 412.

**7.8. Participating Employer Contributions.** Each Participating Employer will make contributions to the Trust to fund benefits of the Plan in such amounts and at such times as the

- 58 -

Investment Committee, in accordance with the funding policy and method of the Plan, will from time to time direct; provided that any such contribution will be made not later than the due date for the Participating Employer's federal income tax return (including extensions) for the taxable year and Plan Year for which such contribution is made. All Participating Employer Contributions are conditioned upon the qualification of the Plan under Code Section 401(a) and upon the deductibility of such contributions by the Participating Employer under Code Section 404. Participating Employer Contributions can be made in cash or in securities of the Company; provided that in no case will the Plan acquire or hold securities of the Company if the aggregate fair market value of the securities exceeds ten percent (10%) of the fair market value of the Plan assets or if the securities fail to qualify as "Qualifying Participating Employer Securities" under ERISA Section 407.

**7.9. Forfeitures.** Forfeitures of benefits under the Plan arising for any reason will be applied to reduce the cost of the Plan and will not be used to increase the benefits under the Plan otherwise payable to or on behalf of Participants.

**7.10. Exclusive Benefit of Participants.** Except to the extent provided below, all Participating Employer Contributions under the Plan will be paid to the Trustee and deposited in the Trust Fund and will be held, managed and distributed solely in the interest of the Participants, their Spouses and Beneficiaries for the exclusive purposes of providing benefits to such persons and paying all costs and expenses incurred in connection with the general administration of the Plan and Trust, to the extent such costs and expenses are not paid by the Participating Employers. Notwithstanding the foregoing, Participating Employer Contributions and the earnings thereon may be applied as follows:

(a) Non-Deductible Contribution Reversion. Participating Employer contributions are conditioned upon the deductibility of such contributions and if, and to the extent, deduction of a Participating Employer Contribution under Code Section 404 is disallowed, such Participating Employer Contributions, adjusted for any investment losses, will be returned to the Participating Employers within one year after the disallowance of the deduction, provided that this reversion provision will not be applicable to the extent that it is determined by the Administrative Committee that such reversion will adversely affect the qualified status of the Plan;

(b) Mistake of Fact Reversions. If, and to the extent, a Participating Employer Contribution is made through mistake of fact, such Participating Employer Contribution and any earnings on such contributions will be returned to the Participating Employers within one year of the payment of the contribution;

(c) Excess Assets Reversions. If any amounts arising out of the variation between expected actuarial requirements and actual requirements remain in the Trust Fund after termination of the Plan and if all liabilities of the Plan to persons entitled to benefits under the Plan have been satisfied in accordance with applicable law, such remaining amounts will be distributed to the Participating Employers in such

- 59 -

amounts as the Investment Committee in its sole discretion will determine, provided such distribution is in accordance with applicable law.

(d) Exercise of Plan Sponsor or Settlor Authority. Notwithstanding the foregoing, the provisions of this Section 9.10 will not be applicable with respect to Plan design decisions including decisions made pursuant to Section 1.3, Article VII or Article VIII, or with respect to exercises of any other Plan sponsor or settlor authority.

**7.11. Benefits Payable Only from Trust Fund.** All benefits provided by the Plan will be paid solely from the Trust Fund, and neither any Participating Employer nor any agent or representative of a Participating Employer will be liable in any manner for any such benefits.

- 60 -

- 61 -

**ARTICLE X.**

**Adoption and Withdrawal from Plan**

**8.1. Procedure for Adoption.** Any Participating Employer may adopt the Plan for the benefit of its Employees as of a date specified. Any Employer that employs Participants will be deemed to have adopted the Plan unless otherwise determined by the Administrative Committee. Notwithstanding any term or provision of the Plan to the contrary (including, but not limited to, terms and conditions concerning Years of Service, Compensation and amount of Pension Benefits), the terms and provisions as may be imposed with respect to such Employees in an applicable Supplement will govern. A partnership, limited liability company, or other noncorporate entity may be a Participating Employer, subject to such conditions as may be required by the Administrative Committee.

**8.2. Procedure for Withdrawal.** Any Participating Employer may, with the consent of the Company, and subject to such conditions as may be imposed by the Company, terminate its adoption of the Plan.

- 61 -

# ARTICLE XI.

**Amendment and Termination**
### 9.1. Amendments.

(a) Power to Amend. The Company will have the right at any time to amend in whole or in part any or all of the provisions of the Plan except as expressly set forth below:

(i) no amendment will increase the duties or liabilities of the Trustee without its written consent;

(ii) no amendment will have the effect of vesting in any Employer any interest in any funds, securities or other property subject to the terms of the Plan and Trust;

(iii) no amendment will authorize or permit at any time any part of the corpus or income of the Trust Fund to be used for or diverted to purposes other than for the purposes specified in the Plan, except as permitted by Section 11.14;

(iv) no amendment will reduce a Participant's Accrued Benefit, or the Non-forfeitable portion thereof, subject to subsection 11.1(c);

(v) effective January 1, 2008, no amendment will increase the Plan's liabilities in violation of subsection 13.13(b).

The Company's authority to amend the Plan has been delegated to the Administrative Committee to the extent provided in subsection 11.1(d). The authority to amend the Plan in any respect (whether or not such amendment is within the authority delegated to the Administrative Committee) may also be exercised by the Board of Directors or any other person to whom the Board delegates such authority.

(b) Effect of Amendment. If a person is not an Eligible Employee on or after the effective date of any amendment to the Plan, the amendment will be deemed as having no effect on the amount of such person's benefits unless the amendment specifically provides otherwise.

(c) Restriction on Amendment. Except as otherwise permitted by Code Section 411 or regulations or other administrative guidance issued thereunder,

(i) no amendment to the Plan will reduce a Participant's Accrued Benefit as of the effective date of the amendment.

(ii) any amendment that affects the determination of the Non-forfeitable portion of a Participant's Accrued Benefit will apply to a Participant who

- 62 -

as of the date that is sixty days after the effective date of the amendment has completed at least three Years of Vesting Service only if the effect of the amendment is to increase the Non-forfeitable portion of the Participant's Accrued Benefit (including the portion accrued after the effective date of the amendment). The preceding language concerning an amendment to the Plan's vesting schedule will also apply when a Plan with different requirements for non-forfeitability is merged into the Plan.

(iii) the Plan will not be amended so as to eliminate or reduce an early retirement benefit or a retirement-type subsidy, or eliminate an optional form of payment, with respect to a Participant's Accrued Benefit as of the effective date of the Amendment; provided, however, the retirement-type subsidy need only be preserved for those Participants who before or after the date of the amendment (but before incurring a Termination of Employment) satisfy the eligibility requirements for the subsidy prior to the amendment. The foregoing limitations do not apply to benefit accrual occurring after the date of the amendment.

(d) Authority of Administrative Committee. The Administrative Committee has been delegated the authority of the Company to adopt any amendments to the Plan as the Administrative Committee may determine to be necessary or appropriate, except that no amendment will be made to any Plan without approval of the Board of Directors unless the Administrative Committee determines that such amendment will not significantly change the overall level of benefits provided by such Plan; significantly change the requirements for eligibility for participation in the Plan; or add any material new benefit that would significantly increase the cost of the Plan. In illustration but not limitation of the foregoing, the Administrative Committee is authorized to adopt any amendment to a Plan that it determines to be:

(i) an amendment that provides for the Plan to be adopted by any business entity acquired by the Company, including providing any special rules applicable to the employees of such business entity;

(ii) an amendment that the Administrative Committee determines to be of an administrative, ministerial or technical nature only;

(iii) an amendment that the Administrative Committee determines to be necessary or appropriate to carry out any amendment approved by, or other resolution adopted by, the Board;

(iv) an amendment that the Administrative Committee determines to be necessary or appropriate to comply with any applicable law, including without limitation any amendment required by the Internal Revenue Service as a condition to the issuance of a favorable determination letter

with respect to the Plan, or necessary to conform the terms of the Plan to established administrative practices or procedures; or

(v) an amendment that the Administrative Committee determines to be necessary or appropriate to clarify or to resolve any inconsistency or ambiguity in the terms of the Plan.

The adoption by the Administrative Committee of any amendment to the Plan will constitute conclusive evidence that the Administrative Committee has determined such amendment to be authorized under the terms of the foregoing resolution, which determination will be conclusive and binding on all employees, participants, beneficiaries and other persons claiming any benefit under the Plan.

**9.2. Termination.** It is the expectation of the Company that it will continue the Plan and the payment of contributions hereunder indefinitely, but the continuation of the Plan and the payment of Participating Employer Contributions hereunder is not assumed as a contractual obligation of the Company or any other Participating Employer; and the right is reserved by the Company or any Participating Employer at any time to reduce, suspend or discontinue its contributions hereunder; provided, however, that the Participating Employer Contributions for any Plan Year accrued or determined prior to the end of such Plan Year will not after the end of such Plan Year be retroactively reduced, suspended or discontinued except as may be permitted by law. The Plan will terminate upon the occurrence of any of the following events:

(a) Business Form. Legal adjudication of the Company as bankrupt, a general assignment by the Company to or for the benefit of its creditors, or dissolution of the Company other than by form of or as a result of a reorganization where the business of the Company is continued; or

(b) Board of Directors Action. Termination of the Plan by the Board of Directors at any time when, in its judgment, business, financial or other good causes make such termination advisable, to become effective upon the execution and delivery by the Company to the Administrative Committee and Investment Committee and to the Trustee of a written resolution signed on its behalf by an officer of the Company and stating the fact of such termination and the date as of which it is to be effective.

Upon the termination of the Plan or partial termination of the Plan, the rights of affected persons to the benefits provided under the Plan which are not vested and Non-forfeitable as of the date of such termination or partial termination will be fully vested and Non-forfeitable to the extent then funded; provided, however, notwithstanding any other provision of the Plan, the rights of all persons entitled to vested and Non-forfeitable benefits under the Plan will be limited to the assets of the Trust Fund, and to the extent benefits are guaranteed by the PBGC, and no Participating Employer or Employer will have any obligation to make any contributions to pay any benefits under the Plan subsequent to a termination or partial termination of the Plan.

- 64 -

**9.3. Disposition of Fund on Termination.** Subject to the provisions of Section 9.10, upon an entire termination of the Plan the Trust Fund will be liquidated by making provisions (if not already so provided) for payments, after providing for the costs and expenses of the Plan and Trust Fund, to the extent the assets in the Trust Fund are sufficient therefor, in the order of precedence established under ERISA Section 4044; provided however, in the event the Plan terminates or there is a spin-off of part of the Plan (other than a de minimis spin-off permitted under Treasury Regulations Section 1.414(1)-(n)(2)) within five years of the effective date of any de minimis merger of any defined benefit plan (the "Smaller Plan") into the Plan (the "Larger Plan") as permitted by Treasury Regulations Section 1.414(1)-1(h), there will be payable to Participants, on whose behalf assets and liabilities were transferred from the Smaller Plan to the Larger Plan, a special schedule of benefits (consisting of all the benefits that would be provided by the Smaller Plan on a termination basis just prior to the merger) in a priority category higher than the highest priority category payable under ERISA Section 4044. Plan assets will be allocated to that schedule in accordance with the allocation of assets to scheduled benefits in Treasury Regulations Section 1.414(1)-1(f)(3). The preceding provisions for payments will be made regardless of whether the Participant has incurred a Termination of Employment and regardless of the Participant's age.

**9.4. Disposition Medium.** The allocations, referred to in Section 11.3, may be implemented through the continuance of the Trust Fund (as a wasting trust), through a new Trust Fund, through the purchase of insurance company annuity contracts or by a combination of these methods. Notwithstanding the previous sentence, every Participant with an Accrued Benefit in excess of $5,000 (or such higher amount permitted by applicable law) is entitled to receive his Accrued Benefit in the form of an insurance company annuity contract (with such contract including all optional forms of payment available under the Plan at plan termination, any retirement-type subsidy and qualified joint and survivor and pre-retirement survivor annuity features as are required by Code Section 411(d)(6) or Treasury Regulations thereunder) unless such Participant elects a different form of payment. Any election by a married Participant of a form of payment other than an annuity contract with joint and survivor and pre-retirement survivor annuity features (with the Spouse designated as the survivor) must be consented to by the Participant and, to the extent applicable, the Spouse.

- 65 -

## ARTICLE XII.

**Special Top-Heavy Rules**

     **10.1. Application**. Notwithstanding any provisions of the Plan to the contrary, the provisions of this Article XII will apply and be effective for any Plan Year for which the Plan will be determined to be a "Top-Heavy Plan" as provided and defined herein.

     **10.2. Special Terms.** For purposes of this Article XII, the following terms will have the following meanings:

(a) "Active Participant" means an Eligible Employee who is a Participant in the Plan at the time of reference.

(b) "Aggregate Benefit" means the sum of:

     (i) the present value of the accrued benefit under each and all defined benefit plans in the Aggregation Group determined on each plan's individual Determination Date as if there were a termination of employment on the most recent date the plan is valued by an actuary for purposes of computing plan costs under Code Section 412 within the 12-month period ending on the Determination Date of each such plan, but with respect to the first plan year of any such plan determined by taking into account the estimated accrued benefit as of the Determination Date; provided, the actuarial assumptions to be applied for purposes of this paragraph (i) will be the same assumptions as those applied for purposes of determining the actuarial equivalents of optional benefits under the particular plan, except that the interest rate assumption will be five percent (5%); nonproportional subsidies will be valued as required under Treasury Regulations Section 1.416-1;

     (ii) the present value of the accrued benefit (i.e., account balances) under each and all defined contribution plans in the Aggregation Group, valued as of the valuation date coinciding with or immediately preceding the Determination Date of each such plan, including (A) contributions made after the valuation date but on or prior to the Determination Date, (B) with respect to the first plan year of any plan, any contribution made subsequent to the Determination Date but allocable as of any date in the first plan year, or (C) with respect to any defined contribution plan subject to Code Section 412, any contribution made after the Determination Date that is allocable as of a date on or prior to the Determination Date; and

     (iii) the sum of each and all amounts distributed (other than a rollover or plan-to-plan transfer) from any Aggregation Group Plan, plus a rollover or plan-to-plan transfer initiated by the Employee and made to a plan which

- 66 -

is not an Aggregation Group Plan within the Current Plan Year or within the preceding four plan years of any such plan, provided such amounts are not already included in the present value of the accrued benefits as of the valuation date coincident wither immediately preceding the Determination Date. Effective January 1, 2002, the present value of the accrued benefits and amounts of account balances of an Employee as of the Determination Date will be increased by the distributions made with respect to the Employee under the Plan, and any plan aggregated with the Plan under Code Section 416(g)(2), during the one-year period ending on the determination date. The preceding sentence will also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i). In the case of a distribution made for reason other than severance from employment, death, or disability, this provision will be applied by substituting "five-year period" for "one-year period". The accrued benefits of any individual who has not performed an hour of service for an Employer during the one-year period ending on the Determination Date will not be taken into account.

The Aggregate Benefit will not include the value of any rollover or plan-to-plan transfer, the contribution or transfer of which to an Aggregation Group Plan was initiated by a Participant, was from a plan which was not an Aggregation Group Plan and was made after December 31, 1983, nor will the Aggregate Benefit include the value of employee contributions which are deductible pursuant to Code Section 219.

(c) "Aggregate Compensation" means one-twelfth of the average of an Active Participant's Compensation from a Participating Employer, as defined in Code Section 415, earned during the five-consecutive-Plan-Year period in which the Active Participant's compensation is the highest and during which the Plan is a Top-Heavy Plan, and during which the Active Participant earns a Year of Aggregate Service. If a person has less than five consecutive Plan Years of compensation, or if the Plan is not a Top-Heavy Plan during five consecutive Plan Years, "Aggregate Compensation" will mean one-twelfth of the average of the Active Participant's compensation earned during the Plan Years the Plan was a Top-Heavy Plan and during which the Active Participant earned a Year of Aggregate Service, divided by the number of such Plan Years. An Active Participant's Aggregate Compensation will exclude all compensation earned prior to January 1, 1984 or during any Plan Year the Plan is not a Top-Heavy Plan.

(d) "Aggregation Group" means the Plan and one or more plans (including plans that terminated) which are described in Code Section 401(a), is an annuity contract described in Code Section 403(a) or is a simplified employee pension described in Code Section 408(k) maintained or adopted by the Employer in the Current Plan

- 67 -

Year or one of the four preceding Plan Years which is either a "Required Aggregation Group" or a "Permissive Aggregation Group":

(i) A "Required Aggregation Group" means all Aggregation Group Plans in which either (A) a Key Employee participates or (B) which enable any Aggregation Group Plan in which a Key Employee participates to satisfy the requirements of Code Section 401(a)(4) or Code Section 410.

(ii) A "Permissive Aggregation Group" means Aggregation Group Plans included in the Required Aggregation Group, plus one or more other Aggregation Group Plans, as designated by the Board of Directors of the Company in its sole discretion, which satisfy the requirements of Code Sections 401(a)(4) and 410 when considered with the other component plans of the Required Aggregation Group.

(e) "Aggregation Group Plan" means the Plan and each other plan in the Aggregation Group.

(f) "Current Plan Year" means (i) with respect to the Plan, the Plan Year in which the Determination Date occurs, and (ii) with respect to each other Aggregation Group Plan, the plan year of such other plan in which occurs the Determination Date of such other plan.

(g) "Determination Date" means (i) with respect to the Plan and its Plan Year, the last day of the preceding Plan Year; or (ii) with respect to any other Aggregation Group Plan in any calendar year during which the Plan is not the only component plan of an Aggregation Group, the determination date of each plan in such Aggregation Group to occur during the calendar year as determined under the provisions of each such plan.

(h) "Former Key Employee" means an Employee (including a terminated Employee) who is not a Key Employee in the Current Plan Year but who was a Key Employee at any time prior to the four preceding Plan Years.

(i) "Key Employee" means an Employee or former terminated Employee (including any deceased Employee) who at any time during the Plan Year that includes the Determination Date is:

(i) An officer of the Employer whose compensation from a Participating Employer and an Employer during the Plan Year is greater than $175,000 (as adjusted under Code Section 416(i)(1)); provided, however, that no more than the lesser of (A) 50 Employees, or (B) the greater of (1) three Employees or (2) ten percent (10%) (rounded to the next whole integer) of the greatest number of Employees during the Plan Year will be considered as officers for this purpose. Such officers considered will be

- 68 -

those with the greatest annual compensation as an officer during the Plan Year;

    (ii) A person who owns more than five percent (5%) of the value of outstanding stock of the Company or of any Employer or more than five percent (5%) of the total combined voting power of all stock of the Company or any Employer (considered separately); or

    (iii) A person who owns more than one percent (1%) of the value of the outstanding stock of a Participating Employer or of any Employer or more than one percent (1%) of the total combined voting power of all stock of a Participating Employer or of any Employer (considered separately) and whose total annual compensation from a Participating Employer and an Employer is in excess of $150,000.

For the purposes of this Section, compensation will mean compensation as defined in Code Section 415(c)(3). The determination of who is a Key Employee will be made in accordance with Code Section 416(i)(1) and the applicable regulations and other guidance of general applicability issued thereunder. Any person who is a Key Employee under more than one of the three paragraphs of this subsection 12.2(i) will have his Aggregate Benefit under the Aggregate Group Plans counted only once with respect to computing the Aggregate Benefit if Key Employees as of any Determination Date."

(j) "Top-Heavy Plan" means the Plan with respect to any Plan Year if the Aggregate Benefit of all Key Employees or the Beneficiaries of Key Employees determined on the Determination Date is an amount in excess of 60 percent (60%) of the Aggregate Benefit of all persons who are Employees within the Current Plan Year (excluding Former Key Employees), plus the Aggregate Benefit of persons who have been Employees (but are not Former Key Employees) within the four preceding Plan Years, but who are not Employees in the Current Plan Year. With respect to any calendar year during which the Plan is not the only Aggregation Group Plan, the ratio determined under the preceding sentence will be computed based on the sum of the Aggregate Benefits of each Aggregation Group Plan totaled as of the last Determination Date of any Aggregation Group Plan to occur during the calendar year.

(k) "Year of Aggregate Service" means a Plan Year in which an Active Participant earns at least 1,000 Hours of Service, provided that any Plan Year when the Plan is not a Top-Heavy Plan will be disregarded.

**10.3. Vested Percentage.** For any Plan Year that the Plan is a Top-Heavy Plan, the Non-forfeitable percentage of the Accrued benefit of any person who is an Employee for such Plan Year will be determined under the following table, where the first column is the Employee's Years of Service and the second column is the Employee's Non-forfeitable percentage in such Accrued benefit:

- 69 -

| Years of Service | Vesting Percentage |
|---|---|
| Less than 2 years | 0% |
| 2 years but less than 3 years | 20% |
| 3 years but less than 4 years | 40% |
| 4 years but less than 5 years | 60% |
| 5 years or more | 100% |

For any Plan Year following a Plan Year in which the Plan was a Top-Heavy Plan but during which Plan Year the Plan is not a Top-Heavy Plan, the Employee's Non-forfeitable percentage in his accrued Benefit will be not less than the Non-forfeitable percentage as of the date the Plan was last a Top-Heavy Plan; provided that any Employee who has accrued not less than three Years of Service as of the first day of the Plan Year following the Plan Year the Plan was last determined to be a Top-Heavy Plan will have his Non-forfeitable percentage for future benefits as well as accrued benefits determined under this Section 12.3. For purposes of this Section 12.3, only Employees who perform an Hour of Service after the Plan becomes a Top-Heavy Plan are entitled to the special vesting provisions.

**10.4. Minimum Benefit.** Notwithstanding any provision of the Plan to the contrary, for any Plan Year that the Plan will be a Top-Heavy Plan, the Accrued Benefit under the Plan for an Active participant who has completed a Year of Aggregate Service during such Plan Year (regardless of whether he is still employed on the last day of the Plan Year) but who is neither a Key Employee nor a Former Key Employee will be not less than a monthly benefit payable to the Employee in the form of a Single Life Annuity commencing at his Normal Retirement Date or the attained age, if later, were the person to have a Termination of Employment on the Determination Date, considering his Aggregate Compensation and Years of Aggregate Service earned prior to the Determination Date in an amount equal to (a) reduced by (b):

(a) Is an amount equal to two percent (2%) of the Participant's Aggregate Compensation multiplied by the Participant's Years of Aggregate Service not to exceed ten such Years of Aggregate Service.

(b) Is the monthly benefit payable to the Participant in the form of a Single Life Annuity commencing at his Normal Retirement Date or the attained age, if later, were the person to have a Termination of Employment on the Determination Date, such monthly benefit being the Actuarial Equivalent of the accrued benefit of the Participant under any other Aggregation Group Plan, plus the additional amount, if any, of any distribution from the other Aggregation Group Plan which has not been recontributed to the other plan as of the Determination Date.

Any benefit paid under the Plan which satisfies the requirements of this Section 12.4 will be paid at such time, in such form, and subject to such conditions as benefits are otherwise payable under the Plan, except that any such benefit payable commencing after the person's Normal Retirement Date will be the Actuarial Equivalent of the person's benefit at his Normal Retirement Date.

- 70 -

For purposes of satisfying the minimum benefit requirements of Code Section 416(c)(1) and the Plan, in determining Years of Service, any Service with an Employer will be disregarded to the extent that such Service occurs during a Plan Year when the Plan benefits (within the meaning of Code Section 410(b)) no Key Employee or former Key Employee.

**10.5. Maximum Benefit Accrual.** For any Plan Year that the Plan is a Top-Heavy Plan, the denominator of the "Defined Benefit Plan Fraction" and the denominator of the "Defined Contribution Plan Fraction" (as defined in Section 13.11) will be determined by substituting "1.0" for "1.25." The preceding sentence will not apply with respect to any Plan Year that the Plan is a Top-Heavy Plan if (a) Section 12.4 is applied by substituting "three percent (3%)" for "two percent (2%)" and (b) the Plan would not be a Top-Heavy Plan if "90 percent (90%)" were substituted for "60 percent (60%)" in subsection 12.2(j). The first sentence of this Section 12.5 will not apply with respect to an Employee for any Plan Year during which he accrues no benefit under any plan of the Aggregation Group.

**10.6. Termination of Top-Heavy Status.** If the Plan has been determined to be a Top-Heavy Plan for one or more Plan Years and thereafter ceases to be a Top-Heavy Plan, the provisions of this Article XII will cease to apply to the Plan effective as of the Determination Date on which the Plan is not a Top-Heavy Plan.

- 71 -

## ARTICLE XIII.

**Miscellaneous Provisions**

**11.1. Company Merger.** In the event any successor corporation to the Company by merger, consolidation, purchase or otherwise, will elect to adopt the Plan, such successor corporation will be substituted hereunder for the Company upon filing in writing with the Trustee its election to do so.

**11.2. Plan Merger.** The Plan will not merge or consolidate with, or transfer any assets or liabilities to, any other plan, unless each person entitled to benefits would receive a benefit immediately after the merger, consolidation or transfer (if the Plan were then terminated) which is equal to or greater than the benefit he would have been entitled to immediately before the merger, consolidation or transfer (if the Plan were then terminated).

**11.3. Nonalienation of Benefits.** Except as provided in Section 13.4, no benefit payable at any time under the Plan will be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment, or other legal proceeding or processes, or encumbrance of any kind. Any attempt to alienate, sell, transfer, assign, pledge, attach or otherwise encumber any such benefits, whether currently or thereafter payable, will be void. No benefit, nor any fund which may be established for the payment of such benefits, will, in any manner, be liable for or subject to the debts or liabilities of any person entitled to such benefits. If any person will attempt to, or will, alienate, sell, transfer, assign, pledge or otherwise encumber his benefits under the Plan or, if by reason of his bankruptcy or other event happening at any time, such benefits would devolve upon any other person or would not be enjoyed by the person entitled thereto under the Plan, then the Administrative Committee, in its discretion, may terminate the interest in any such benefits of the person entitled thereto under the Plan and hold or apply them to or for the benefit of such person entitled thereto under the Plan in such manner as the Administrative Committee may deem proper.

**11.4. Qualified Domestic Relations Orders.** Notwithstanding the provisions of Article VI or Article VII, if a former Spouse, child or other dependent of a Participant (an "alternate payee" for purposes of this Section 13.4) is entitled to receive all or a portion of a Participant's Accrued Benefit pursuant to a Qualified Domestic Relations Order (as defined below), then the Participant's Accrued Benefit will be payable pursuant to such Qualified Domestic Relations Order and consistent with the Plan procedures identified below. The Participant's Accrued Benefit will be reduced to the extent necessary to reflect the time, manner and amount of such payments to such alternate payee(s) pursuant to a Qualified Domestic Relations Order. A "Qualified Domestic Relations Order" is a judgment, decree or order (including approval of a property settlement agreement) relating to the provision of child support, alimony payments or marital property rights to an alternate payee which is made pursuant to a state domestic relations law (including a community property law), which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to such Participant under the Plan, and which satisfies the other requirements of Code Section 414(p). The Administrative

Committee will establish procedures to determine the qualified status of domestic relations orders and to administer distributions pursuant to Qualified Domestic Relations Orders.

**11.5. No Employment Guarantee.** Neither the establishment of the Plan nor any modification thereof, nor the creation of any fund or benefit, nor the payment of any benefits will be construed as giving to any Participant or any other person any legal or equitable right against the Participating Employers, the Administrative Committee, the Investment Committee, the Trustee or any Plan representative except as herein provided. Under no circumstances will the terms of employment with the Participating Employer of any Participant be modified or in any way affected hereby. The maintenance of this Plan will not constitute a contract of employment with the Participating Employer, nor will anything contained in the Plan be construed as such a contract. Participation in the Plan will not give any Participant a right to be retained as an Employee of the Participating Employer.

**11.6. Termination of Employment.** When a person incurs a Termination of Employment, his right to benefits from the Plan will be determined only by the terms of the Plan.

**11.7. Limitation on Vesting.** No person will have any vested right to benefits under the Plan until all of the applicable requirements for such benefits set forth in Article IV or V have been fulfilled, and then any such rights will be subject to the limitation of Section 11.2.

**11.8. No Duplication of Benefits.** No benefits will be paid to any person under more than one provision of the Plan for the same period of time.

**11.9. Source of Benefits.** All benefits payable under the Plan will be paid or provided for solely from the Trust, and the Participating Employers assume no liability or responsibility therefor.

**11.10. Reduction for Overpayment.** The Administrative Committee will, whenever it determines that a person has received benefit payments under the Plan in excess of the amount to which the person is entitled under the terms of the Plan, make reasonable attempts to collect such overpayment from the person. If the person to whom such overpayments were made does not, within a reasonable time, make the requested repayment to the Administrative Committee, and if the overpayment was due to an error by the Plan that the Participant would have no reasonable way of knowing was an error, the overpayment will be considered as an advance payment of benefits and the Administrative Committee will direct the Trustee to reduce future benefits until the overpayment has been recouped. Nothing contained herein will be construed to limit the authority of the Administrative Committee to recover any overpayment by any method otherwise available at law or equity. Any payment made to a person in error will be considered a separate fund held by such person in trust for the benefit of the Plan.

**11.11. Limitations on Pension Benefits Payable to Highly Compensated Participants.** In the event of Plan termination for any reason other than the failure to obtain Internal Revenue Service approval, the benefit of any highly compensated active or former Employee of the Participating Employer or any Related Participating Employer is limited to a benefit that is nondiscriminatory under Code Section 401(a)(4). In any other event, benefits

- 73 -

distributed to any Participant who is one of the 25 most highly compensated active and former highly compensated Employees are restricted such that the annual payments are no greater than an amount equal to the payment that would be made on behalf of the Participant under a single life annuity that is the Actuarial Equivalent of the sum of the Participant's Accrued Benefit and the Participant's other benefits under the Plan. The preceding sentence will not apply if:

(a) after payment of the benefit to the Participant, the value of Plan assets equals or exceeds 110 percent (110%) of the value of current liabilities, as defined in Code Section 412(1)(7), or

(b) the value of the benefits for the Participant is less than 1 percent (1%) of the value of current liabilities.

The limitations in this Section will automatically become inoperative and of no effect upon a ruling by the Internal Revenue Service that they are not required. If regulations are issued modifying the limitations described in this Section, the Plan will be amended in a timely fashion to incorporate such modified regulations; and, prior to such amendment, the Plan will be administered in accordance with the modified regulations. For purposes of this Section 13.11, the term "benefit" includes loans in excess of the amount set forth in Code Section 72(p)(2)(A), any periodic income, and any Death Benefits not provided for by insurance on the Participant's life.

**11.12. Maximum Pensions.** Notwithstanding any provisions of the Plan to the contrary, the Benefit to which a person is entitled at any time during any Plan Year will be subject to the provisions of Code Section 415, which are hereby incorporated by reference. If a Participant has an accrued benefit under a defined contribution plan or a defined benefit plan (other than this Plan) which is intended to meet the requirements of Code Section 401(a) and which is maintained by an Employer, benefits will be reduced under this Plan in order to satisfy the requirements of Code Sections 415(b)(1) or 415(e). For limitation years beginning on and after January 1, 2008, the limitations of Code Section 415 will be applied in accordance with the final Treasury Regulations issued April 5, 2007, which are incorporated herein by this reference.

Benefit increases resulting from the increase in the limitations under Code Section 415(b) will be provided to all current and former Participants with benefits limited by Code Section 415(b) who (a) have an Accrued Benefit under the Plan immediately prior to January 1, 2002, and (b) have not then commenced receiving benefit payments from the Plan. Notwithstanding any other Plan provisions to the contrary, for purposes of adjusting any benefit or limitation under Code Section 415(b)(2)(B), (C), or (D), the "applicable mortality table" for distributions with an annuity start date on or after December 31, 2002, is the mortality table prescribed by the Secretary of the Treasury as set forth in Revenue Ruling 2001-62.

**11.13. Funding-Based Limitations on Benefits**. Notwithstanding any other provision of the Plan to the contrary, effective January 1, 2008, the following limitations will apply, as and to the extent required by the Pension Protection Act of 2006. This Section will be interpreted and applied consistently with Code Section 436, Treasury Regulations Section 1.436-1 and any other guidance issued thereunder.

(a) Unpredictable Contingent Event Benefits

In accordance with Code Section 436(b), an "unpredictable contingent event benefit" (hereinafter defined) to which a Participant would otherwise be entitled during any Plan Year will not be provided to such Participant if the Plan's AFTAP for any Plan Year:

(i) is less than sixty percent (60%); or

(ii) would be less than sixty percent (60%) taking into account the event for which such benefit is payable.

The preceding sentence will cease to apply with respect to any Plan Year, effective as of the first day of such Plan Year, upon payment by the Company of a contribution (in addition to any minimum required contribution under Code Section 430) equal to: (A) in the case of subparagraph (i), the amount of the increase in the funding target of the Plan (under Code Section 430) for the Plan Year attributable to the event for which such benefit is payable; or (B) in the case of subparagraph (ii), the amount sufficient to result in a AFTAP of sixty percent (60%).

Notwithstanding the foregoing, any payments restricted under this paragraph will not automatically resume upon the date on which such payments are no longer restricted, but will resume only upon adoption of a Plan amendment that otherwise meets the requirements of this Section.

For purposes of this Section 13.13, an unpredictable contingent event benefit means any benefit or increase in benefits to the extent the benefit or increase would not be payable but for the occurrence of an unpredictable contingent event. For this purpose, an unpredictable contingent event means a plant shutdown (whether full or partial) or similar event, or an event (including the absence of an event) other than the attainment of any age, performance of any service, receipt or derivation of any compensation, or the occurrence of death or disability, as more fully set forth in Treasury Regulations Section 1.436-1(j)(9).

(b) Plan Amendments Increasing Liability for Benefits

In accordance with Code Section 436(c), an amendment to the Plan which would have the effect of increasing the Plan's liabilities by increasing benefits, establishing new benefits, changing the rate of benefit accrual or changing a vesting formula, may not take effect during any Plan Year in which the Plan's AFTAP:

(i) is less than eighty percent (80%); or

(ii) would be less than eighty percent (80%) taking into account such amendment.

The preceding sentence will cease to apply with respect to any Plan Year, effective as of the first day of such Plan Year (or if later, the effective date of the amendment), upon payment by the Company of a contribution (in addition to any minimum required contribution under Code Section 430)) equal to: (A) in the case of subparagraph (i), the amount of the increase in the funding target of the Plan (under Code Section 430) for the Plan Year attributable to the amendment; or (B) in the case of subparagraph (ii), the amount sufficient to result in an AFTAP of eighty percent (80%). Notwithstanding the foregoing, this paragraph will not apply to an amendment providing for an increase in benefits under a formula which is not based on a Participant's Compensation, but only if the rate of such increase is not in excess of the contemporaneous rate of increase in average wages of all Participants subject to the amendment.

Notwithstanding the foregoing, any amendments restricted under this paragraph will not automatically take effect upon the date on which such amendments are no longer restricted, but will resume only upon the adoption of an additional Plan amendment that otherwise meets the requirements of this Section.

(c) Accelerated Benefit Distributions

(i) In accordance with Code Section 436(d)(1), in any case in which the Plan's AFTAP for a Plan Year is less than sixty percent (60%), the Plan may not pay any "prohibited payment" (as defined in subparagraph (iv) below) after the valuation date for the Plan Year.

(ii) In accordance with Code Section 436(d)(2), during any period in which the Company is a debtor in a case under Title 11 of the United States Code, or similar Federal or State law, the Plan will not pay any prohibited payment. The preceding sentence will not apply on or after the date on which the enrolled actuary of the Plan certifies that the AFTAP of such Plan (determined by not taking into account any adjustment of segment rates pursuant to Code Section 430(h)(2)(C)(iv)) is not less than one hundred percent (100%).

(iii) In accordance with Code Section 436(d)(3), in any case in which the Plan's AFTAP for a Plan Year is sixty percent (60%) or greater but less than eighty percent (80%), the Plan will not pay any prohibited payment after the valuation date for the Plan Year to the extent the amount of the payment exceeds the lesser of: (A) fifty percent (50%) of the amount of the payment which could be made without regard to the limits in Code Section 436(d)); or (B) the present value (determined under guidance prescribed by the Pension Benefit Guaranty Corporation, using the interest and mortality assumptions under Code Section 417(e)) of the maximum

- 76 -

guarantee with respect to the Participant under ERISA Section 4022. In addition to the foregoing restriction as to payment amount, only one prohibited payment meeting the requirements of this paragraph may be made with respect to any Participant during any period of consecutive Plan Years to which the limitations under subparagraph (i) or (ii) of this paragraph apply. For purposes of the foregoing, a Participant and any Beneficiary on his behalf (including an alternate payee, as defined in Code Section 414(p)(8)) is treated as one Participant. As a result, if the Participant's Accrued Benefit is allocated to an alternate payee and one or more other persons, the amount under this subparagraph will be allocated among such persons in the same manner as the Accrued Benefit is allocated, unless a QDRO provides otherwise.

A Participant or Beneficiary who elects an optional form of benefit that is not available as of the Participant's Annuity Starting Date (as defined for all purposes of this Section 13.13 pursuant to Treasury Regulations Section 1.436-1(j)(2)) due to the application of this subparagraph will have the option either (A) to defer payment to a later date (to the extent permitted under the Plan); or (B) to bifurcate the benefit into restricted and unrestricted portions. If the Participant elects to bifurcate payment of the benefit, with respect to the unrestricted portion, the Participant may elect any optional form of benefit then available under the Plan and, with respect to the restricted portion, the Participant may elect any optional form of benefit then available under the Plan that is not a prohibited payment. For purposes of this subparagraph, the "unrestricted portion" of the benefit is the lesser of (A) fifty percent (50%) of the benefit; or (B) the portion of the benefit that has a present value equal to the Pension Benefit Guaranty Corporation guarantee amount described in Treasury Regulations Section 1.436-(1)(d)(3)(iii)(C). Notwithstanding the foregoing, the form of a Participant's benefit that had commenced while the restriction under this paragraph applied will not be adjusted to another form of payment on or after the date on which such payments are no longer restricted.

(iv) For purposes of this paragraph, a "prohibited payment" will mean (A) any amount that the Participant elects to have paid in a lump sum pursuant to subsection 7.2(d) or any Supplement (but not any amount paid as a lump sum pursuant to Section 7.3)), (B) any other payment in excess of the monthly amount paid under a life only annuity (plus any social security supplements paid in accordance with Code Section 411(a)(9)) to any Participant or Beneficiary whose annuity starting date (as defined in Code Section 417(f)(2)) occurs during a limitation period described in subparagraph (i) or (ii); (C) any payment for the purchase of an irrevocable commitment from an insurer to pay benefits; or (D) any other

- 77 -

payment specified in the Treasury Regulations, all as set forth in Treasury Regulations Section 1.436-1(j)(6).

(d) Future Benefit Accruals

In accordance with Code Section 436(e), in any case in which the Plan's AFTAP for a Plan Year is less than sixty percent (60%), benefit accruals under the Plan will cease as of the valuation date for the Plan Year. The preceding sentence will cease to apply with respect to any Plan Year, effective as of the first day of such Plan Year, upon payment by the Company of a contribution (in addition to any minimum required contributions under Code Section 430) equal to the amount sufficient to result in an AFTAP of sixty percent (60%) or more. Notwithstanding the foregoing, benefit accruals will not automatically resume upon the date on which benefit accruals are no longer restricted, but will resume only upon adoption of a Plan amendment that otherwise meets the requirements of this Section.

(e) Notice Requirement. The Administrative Committee or its delegate will provide written notice to all Participants and Beneficiaries in accordance with ERISA Section 101(j) within 30 days after the Plan becomes subject to the limitations described in subsection 13.13(a) or (c) or if the limitation described in subsection 13.13(d) applies, within 30 days the date on which the AFTAP is determined (or presumed) to be less than sixty percent (60%).

(f) Definition and Calculation of AFTAP. For all purposes of this Section 13.13:

(i) "AFTAP" for a Plan Year will mean the fraction (expressed as a percentage), the numerator of which is the adjusted plan assets for the Plan Year and the denominator of which is the adjusted funding target for the Plan Year, calculated in accordance with Treasury Regulations Section 1.436-1(j)(1).

(ii) A "436 measurement date" will mean the date used to determine the dates as of which certain of the restrictions set forth in this Section 13.13 begin or cease to apply, as determined under Treasury Regulations Section 1.436-1(j)(8).

(iii) The Plan's AFTAP for each Plan Year will be certified by the Plan's enrolled actuary in accordance with Treasury Regulations Section 1.436-1(h)(4). During certain periods, the Plan's presumed AFTAP will be determined using the following presumptions, all as determined pursuant to Treasury Regulations Section 1.436-1(h):

(A) The Plan's AFTAP for one Plan Year will be presumed to be its AFTAP for the following Plan Year until the AFTAP is certified for the following Plan Year, except as provided below.

- 78 -

(B) If the Plan's AFTAP has not been certified for a Plan Year by April 1 of such Plan Year, then its AFTAP will be presumed to be its AFTAP for the preceding Plan Year reduced by 10 percentage points until its AFTAP for the current Plan Year is certified.

(C) If the Plan's AFTAP has not been certified by October 1 of a Plan Year, it will be presumed to be less than sixty percent (60%).

(D) During any period during which a presumed AFTAP is in effect, this Section 13.13 will be applied as if the presumed AFTAP were the Plan's actual AFTAP, subject to the special rules set forth in Treasury Regulations Section 1.436-1(g).

(iv) Notwithstanding the foregoing, pursuant to Section 203(a)(2) of the Preservation of Access to Care for Medicare Beneficiaries and Pension Relief Act of 2010 ("PRA 2010"), for purposes of (A) the limitation on benefit accruals under subsection 13.13(d) and (B) the application of the limitations on prohibited payments under subsection 13.13(c) to payments under a social security leveling option, the AFTAP for a Plan Year beginning on or after October 1, 2008, and before October 1, 2010, is the greater of the AFTAP for that Plan Year, determined without regard to section 203(a)(2) of PRA 2010, or the AFTAP for the Plan Year beginning after October 1, 2007, and before October 1, 2008.

(g) Special Rules.

(i) In the event of a termination of the Plan, any restrictions that were in effect immediately prior to the termination will continue to apply, except that the limitations on prohibited payments pursuant to subsection 13.13(c) will not apply to prohibited payments that are made to carry out the termination of the Plan in accordance with applicable law.

(ii) In any Plan Year in which one of the limitations set forth in this Section 13.13 would otherwise apply, the Company may avoid such limitations either by electing to reduce the Plan's prefunding balance or funding standard carryover balance, or by making additional contributions, in accordance with and subject to Treasury Regulations Section 1.436-1(f).

**11.14. Indemnity**. To the extent permitted by applicable law, and to the extent that they are not indemnified or saved harmless under any liability insurance contracts, any present or former Administrative Committee or Investment Committee members, officers, Employees or directors of the Participating Employers or their subsidiaries or affiliates, if any, and each of them will be indemnified and saved harmless by the Participating Employers from and against any and all liabilities or allegations of liability to which they may be subjected by reason of any act done or omitted to be done in good faith in the administration of the Plan and Trust, including

all expenses reasonably incurred in their defense in the event that the Participating Employers fail to provide such defense after having been requested to do so.

**11.15. Gender and Number.** Words denoting the masculine gender will include the feminine and neuter genders and the singular will include the plural and the plural will include the singular wherever required by the context.

**11.16. Severability.** If any provision of the Plan is held illegal or invalid for any reason, such illegal or invalid provision will not affect the remaining provisions of the Plan, and the Plan will be construed and enforced as if such illegal or invalid provisions had never been contained in the Plan.

**11.17. Headings.** The headings or articles are included solely for convenience of reference, and if there is any conflict between such headings and the text of the Plan, the text will control.

**11.18. Uniform and Nondiscriminatory Treatment.** Except with respect to the Plan design decisions, including decisions made pursuant to Section 1.3, Article VII or Article VIII, or with respect to exercises of any other Plan sponsor or settlor authority, any discretion exercisable hereunder by the Company, a Participating Employer, or either Committee will be exercised in a uniform and nondiscriminatory manner.

**11.19. Applicable Law.** The Plan and Trust will be construed in accordance with the provisions of ERISA and other applicable federal laws. To the extent not inconsistent with such laws, this Plan will be construed in accordance with the laws of Illinois.

**11.20. Action by the Participating Employer.** Action required or permitted to be taken by a Participating Employer may be taken by action of the board of directors (or the person or body exercising authority similar to that of a board of directors in the case of a noncorporate Participating Employer) of that Participating Employer or by a person or committee of persons authorized to act by said board. The Company's powers may be exercised by its Board of Directors or a person or committee of persons authorized to act by said Board or by a committee of said Board or by the Company's authorized officers or their delegates. The Company reserves the right to delegate a portion or all of its reserved authority as Plan sponsor or settlor of the Plan to any person, persons, committee or committees, including, but not limited to, its Compensation Committee, the Administrative Committee or the Investment Committee. Notwithstanding the other duties or responsibilities any such person or committee may have under this Plan or the Trust when acting in another capacity, any such delegated authority exercised by such person or committee will constitute the exercise of reserved Plan sponsor or settlor powers.

**11.21. Participant Litigation.** In any action or proceeding regarding the Plan, Employees, Participants, Spouses or any other persons having or claiming to have an interest in this Plan will not be necessary parties and will not be entitled to any notice or process. Any final judgment which is not appealed or appealable and may be entered in any such action or proceeding will be binding and conclusive on the parties hereto and all persons having or claiming to have any interest in this Plan. To the extent permitted by law, if a legal action is

- 80 -

begun against the Company, any Participating Employer, the Administrative or Investment Committee or any member thereof, or any of their directors, officers, partners, members, managers, shareholders, employees, or agents, by or on behalf of any person and such action results adversely to such person or if a legal action arises because of conflicting claims to a Participant's or other person's benefits, the costs to such person of defending the action will be charged to the amounts, if any, which were involved in the action or were payable to the Participant or other person concerned. To the extent permitted by applicable law, acceptance of participation in this Plan will constitute a release of the Company, any Participating Employer, the Administrative and Investment Committees and all members thereof, or their respective directors, officers, partners, members, managers, shareholders, employees, or agents, from any and all liability and obligation not involving willful misconduct or gross neglect.

- 81 -

**SUPPLEMENT A**

**Early Payment Factors**
**Percentage of Age 65 Accrued Benefit Payable for Commencement from Ages 44-65**

<u>TABLE 1</u> **This table applies to the benefit under subsection 2.1(a) for all Employees who incur a Termination of Employment after December 31, 1989 after accumulating at least 65 points (age plus benefit service)**

| Age | Points | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 |
| 41 | 7 | | | | | | | | | | | | | | | | | | | | |
| 42 | 7 | 12 | 17 | | | | | | | | | | | | | | | | | | |
| 43 | 8 | 13 | 17 | 22 | 26 | | | | | | | | | | | | | | | | |
| 44 | 9 | 13 | 18 | 23 | 27 | 32 | 36 | | | | | | | | | | | | | | |
| 45 | 10 | 14 | 19 | 23 | 28 | 32 | 37 | 41 | 46 | | | | | | | | | | | | |
| 46 | 11 | 15 | 20 | 24 | 29 | 33 | 38 | 42 | 47 | 51 | 56 | | | | | | | | | | |
| 47 | 12 | 17 | 21 | 25 | 30 | 34 | 39 | 43 | 47 | 52 | 56 | 60 | 65 | | | | | | | | |
| 48 | 14 | 18 | 22 | 27 | 31 | 35 | 40 | 44 | 48 | 52 | 57 | 61 | 65 | 70 | 74 | | | | | | |
| 49 | 15 | 19 | 24 | 28 | 32 | 36 | 41 | 45 | 49 | 53 | 58 | 62 | 66 | 70 | 75 | 79 | 83 | | | | |
| 50 | 17 | 21 | 25 | 29 | 33 | 38 | 42 | 46 | 50 | 54 | 58 | 63 | 67 | 71 | 75 | 79 | 83 | 88 | 92 | | |
| 51 | 19 | 23 | 27 | 31 | 35 | 39 | 43 | 47 | 51 | 55 | 59 | 63 | 67 | 72 | 76 | 80 | 84 | 88 | 92 | 96 | 100 |
| 52 | 21 | 25 | 29 | 33 | 37 | 41 | 45 | 49 | 53 | 56 | 60 | 64 | 68 | 72 | 76 | 80 | 84 | 88 | 92 | 96 | 100 |
| 53 | 23 | 27 | 31 | 35 | 39 | 43 | 46 | 50 | 54 | 58 | 62 | 66 | 69 | 73 | 77 | 81 | 85 | 89 | 92 | 96 | 100 |
| 54 | 26 | 30 | 33 | 37 | 41 | 45 | 48 | 52 | 56 | 59 | 63 | 67 | 70 | 74 | 78 | 82 | 85 | 89 | 93 | 96 | 100 |
| 55 | 29 | 33 | 36 | 40 | 43 | 47 | 51 | 54 | 58 | 61 | 65 | 68 | 72 | 75 | 79 | 82 | 86 | 89 | 93 | 96 | 100 |
| 56 | 33 | 36 | 40 | 43 | 46 | 50 | 53 | 56 | 60 | 63 | 66 | 70 | 73 | 77 | 80 | 83 | 87 | 90 | 93 | 97 | 100 |
| 57 | 37 | 40 | 43 | 46 | 50 | 53 | 56 | 59 | 62 | 65 | 68 | 72 | 75 | 78 | 81 | 84 | 87 | 91 | 94 | 97 | 100 |
| 58 | 42 | 44 | 47 | 50 | 53 | 56 | 59 | 62 | 65 | 68 | 71 | 74 | 77 | 80 | 82 | 85 | 88 | 91 | 94 | 97 | 100 |
| 59 | 47 | 49 | 52 | 55 | 57 | 60 | 63 | 65 | 68 | 71 | 73 | 76 | 7 | 81 | 84 | 87 | 89 | 92 | 95 | 97 | 100 |
| 60 | 53 | 55 | 58 | 60 | 62 | 65 | 67 | 69 | 72 | 74 | 76 | 79 | 81 | 83 | 86 | 88 | 91 | 93 | 95 | 98 | 100 |
| 61 | 60 | 62 | 64 | 66 | 68 | 70 | 72 | 74 | 76 | 78 | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 |
| 62 | 68 | 69 | 71 | 73 | 74 | 76 | 77 | 79 | 81 | 82 | 84 | 85 | 87 | 89 | 90 | 92 | 94 | 95 | 97 | 98 | 100 |
| 63 | 77 | 78 | 79 | 80 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 90 | 91 | 92 | 93 | 94 | 95 | 96 | 98 | 99 | 100 |
| 64 | 88 | 88 | 89 | 89 | 90 | 91 | 91 | 92 | 93 | 93 | 94 | 94 | 95 | 96 | 96 | 97 | 98 | 98 | 99 | 99 | 100 |
| 65 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

**TABLE 2** **This table applies to the benefit under paragraphs 2.1(b)(v) and 2.1(b)(vi) for all Employees who incur a Termination of Employment before attaining age 55.**

| AGE AT PAYMENT DATE | BENEFIT REDUCED* TO FOLLOWING PERCENTAGE OF AGE 65 BENEFIT |
|---|---|
| 64 | 87.56% |
| 63 | 76.88% |
| 62 | 67.67% |
| 61 | 59.71% |
| 60 | 52.80% |
| 59 | 46.78% |
| 58 | 41.52% |
| 57 | 36.92% |
| 56 | 32.88% |
| 55 | 29.32% |

*Reduction will be interpolated to the nearest month

- 83 -

**TABLE 3** This table applies to the benefit under paragraph 2.1(b)(i) for all Employees who did not attain age 55 as of November 25, 1985.

| AGE AT PAYMENT DATE | BENEFIT REDUCED* TO FOLLOWING PERCENTAGE OF AGE 65 BENEFIT |
|---|---|
| 64 | 88.58% |
| 63 | 78.68% |
| 62 | 70.07% |
| 61 | 62.55% |
| 60 | 55.96% |
| 59 | 50.16% |
| 58 | 45.05% |
| 57 | 40.53% |
| 56 | 36.52% |
| 55 | 32.96% |

*Reduction will be interpolated to the nearest month

- 84 -

**TABLE 4** This table applies to the benefit under subsection 2.1(a) for all Employees who incur a Termination of Employment after December 31, 1989 before accumulating at least 65 points (age plus benefit service)

| Age at Payment Date | Benefit Reduced* to Following Percentage of Age 65 Benefit | Age at Payment Date | Benefit Reduced* to Following Percentage of Age 65 Benefit |
|---|---|---|---|
| 64 | 86.7% | 41 | 6.6% |
| 63 | 76.7% | 40 | 5.9% |
| 62 | 67.7% | 39 | 5.4% |
| 61 | 59.7% | 38 | 4.8% |
| 60 | 52.8% | 37 | 4.4% |
| 59 | 46.8% | 36 | 4.0% |
| 58 | 41.5% | 35 | 3.6% |
| 57 | 36.9% | 34 | 3.3% |
| 56 | 32.9% | 33 | 2.9% |
| 55 | 29.3% | 32 | 2.7% |
| 54 | 26.1% | 31 | 2.4% |
| 53 | 23.4% | 30 | 2.2% |
| 52 | 20.9% | 29 | 2.0% |
| 51 | 18.7% | 28 | 1.8% |
| 50 | 16.8% | 27 | 1.6% |
| 49 | 15.1% | 26 | 1.5% |
| 48 | 13.6% | 25 | 1.3% |
| 47 | 12.2% | 24 | 1.2% |
| 46 | 11.0% | 23 | 1.1% |
| 45 | 9.9% | 22 | 1.0% |
| 44 | 8.9% | 21 | 0.9% |
| 43 | 8.1% | 20 | 0.8% |
| 42 | 7.3% | | |

*Reduction will be interpolated to the nearest month.

- 85 -

## SUPPLEMENT B

**Excluded Divisions**

The following corporations are Excluded Divisions under the Plan as of the date indicated:

| | |
|---|---|
| **Perfusion Services of Baxter Healthcare Corporation (including the entities formerly known as SETA, Inc. and Psicor, Inc. excluded as of January 1, 1995 and January 1, 1996, respectively.)** | **January 1, 1995** |
| **Nextran** | **January 1, 1995** |
| **Hourly Employees of American Cytoscope Makers Division** | **January 1, 1985** |
| **Hourly Employees of Medi-Vac facility in Jacksonville, TX and the former Airlife facility in Montclair, California** | **January 1, 1985** |
| **Alpine Perfusion Associates Inc.** | **8/31/98** |
| **Research Medical Inc.** | **3/14/97** |
| **Immuno-U.S., Inc.** | **6/19/97 until December 31, 2003\*** |
| **Community Bio Resources** | **6/19/97** |
| **Tera Pharmaceuticals** | **3/14/97** |
| **BioLife Plasma Services/Sera-Tec Biologicals** | **\*\*** |

**\* Immuno-U.S., Inc. became part of Baxter Healthcare Corporation on 1/1/99 but continued to be an Excluded Division until December 31, 2003 when the Immuno-U.S., Inc. Defined Benefit Plan was merged into the Plan.**

**\*\* Except for employees participating in the Plan when transferred from Baxter to BioLife**

**SUPPLEMENT C**

- 86 -

**Provisions Applicable to Participants Transferred to Allegiance**

The provisions of the Plan will apply to Participants transferred to Allegiance pursuant to the Company's plan to spin off its medical supply business ("Transferees"), on or after October 1, 1996 (the "Allegiance Spin-Off Date"), subject to the following terms and conditions:

1. "Average Monthly Compensation" will include Average Monthly Compensation as set forth in the Plan; provided, however, that, for purposes of Section 2.5 only, a Transferee will be treated as if he was still an Eligible Employee and a Participant under this Plan until the earlier of (i) his Termination of Employment from Allegiance or (ii) December 31, 1996. If such Transferee has a Termination of Employment from Allegiance on or after December 7, 1996, the 1996 Plan Year and Compensation for the 1996 Plan Year will be included in determining such Transferee's Average Monthly Compensation. A Transferee's Average Monthly Compensation will not include any Compensation paid for service with Allegiance after December 31, 1996.

2. "Compensation" will not include any Compensation paid by Allegiance with respect to services rendered by Transferees after December 31, 1996.

3. "Hours of Service" will not include Hours of Service with respect to Transferees after September 30, 1996.

4. "Termination of Employment" will mean, with respect to Transferees who terminate employment from Allegiance prior to January 1, 1997, such date of termination. All Transferees employed by Allegiance as of January 1, 1997 will be deemed to have incurred a Termination of Employment as of December 31, 1996.

5. A former Employee of the Company who is hired by Allegiance prior to December 31, 1996 will not be treated as a Transferee and will not be permitted to again become a Participant in the Plan.

6. Transferees will accrue no Years of Service with respect to their employment with Allegiance. All Transferees will have a Non-forfeitable interest in their Accrued Benefits upon transfer to Allegiance.

7. Transferees who have incurred a Termination of Employment on or after December 7, 1996 will be eligible for Pension Benefits described under Article IV (provided all of the conditions for benefit entitlement under such Sections are met). Such Pension Benefits are payable as follows:

*(a) Transferees Who Have Attained Age 65.* Transferees eligible for Normal and Late Retirement Pension Benefits or Transferees eligible for a Disability Pension Benefit under Section 4.4 who attain age 65 on or before December 31, 1996 will commence receiving their Pension Benefits as of January 1, 1997.

*(b) Transferees Who Have Not Attained Age 65.* Transferees eligible for Early Retirement, Disability Retirement and Deferred Vested Retirement under Sections 4.3, 4.4 and

- 87 -

4.5 who have not attained age 65 will commence their Pension Benefits as of January 1, 1997, provided they return their benefit election forms to the Administrative Committee during the Notice Period. Transferees who do not return their election forms during the Notice Period will be deemed to have elected not to receive their Pension Benefit as of January 1, 1997. Such Transferees may commence their Pension Benefit as of any later date in accordance with the provisions of the Plan, provided that they notify the Administrative Committee at least 45 days prior to such date.

 *(c) Notice Period.* Transferees will receive a benefit statement and a notice of their right to elect alternative forms of benefit under Article VII of the Plan, and will have at least 30, but no more than 90, days after they receive such statement and notice to make such elections (the "Notice Period"). Transferees may not commence receiving their Pension Benefits any time before the expiration of the first 30 days of the Notice Period.

 8. The provisions of Article V will not apply to Transferees on or after October 1, 1996. No transaction described in Article V and initiated by Allegiance after October 1, 1996 will be subject to Article V.

 9. If a Participant incurred a Termination of Employment in 1996 and was rehired prior to the Allegiance Spin-Off Date and then became a Transferee, his Average Monthly Compensation will include Compensation earned in the 1996 Plan Year, and the full and partial months during 1996 when he was a terminated Employee will be disregarded for purposed of calculating his Average Monthly Compensation.

 10. The provisions of this Supplement C supersede any contrary provisions of the Plan.

- 88 -

- 89 -

**SUPPLEMENT D**
**Entitlement Codes for Non-Resident Aliens with U.S.-Source Income Excluded from Participation in the Plan**

Non-resident aliens with U.S.-source income are not Eligible Employees:

- 89 -

**SUPPLEMENT E**

**Regression Factors**

•      For distributions commencing on or after the Effective Date, gaps in Compensation history (not gaps in employment) will be determined by linearly interpolating between the next available full Plan Years of Compensation.

• If prior earnings history is missing altogether, the following regression factors will be used:

> Years before 1972: 3%
> 1972-1984  7%
> 1985-1989  5%
> 1990-1996  3%
> 1997-2000  5%

• The Administrative Committee may adjust the regression rate prospectively, but only in a manner that does not cause a reduction in Accrued Benefits.

**SUPPLEMENT F**

**Average Monthly Compensation for Participants Incurring Termination of Employment Prior to January 1, 1998**

"**Average Monthly Compensation**" means, for Participants whose Termination of Employment occurs prior to January 1, 1998, the sum of a Participant's Compensation paid while an Eligible Employee and Compensation paid while a Participant during the five consecutive Plan Years during the Participant's compensation history which produce the largest amount, divided by 60. A Participant's compensation history includes the ten consecutive Plan Years preceding his most recent Termination of Employment. However, if a Participant's Termination Date is on or after December 7 of a Plan Year, such Plan Year will be included in the averaging period and the Compensation for such Plan Year will be included in determining Average Monthly Compensation. Except as provided in subparagraph 2.11(a)(i)(A)(20), and subject to other provisions of the Plan, Compensation for any Plan Year will not include Compensation paid more than 30 days after the Participant's Termination of Employment. For these purposes the following special rules will apply:

(b) **Participants with Less Than Five Years of Compensation.** If a Participant has less than five consecutive Plan Years of Compensation while both an Eligible Employee and while a Participant, Average Monthly Compensation will mean the sum of the Participant's Compensation paid for all Plan Years (including the first but excluding the last partial Plan Year of Compensation) prior to the Plan Year in which the Participant's Termination of Employment occurred, divided by the number of months in such Plan Years. The Plan Year during which the Participant's Termination of Employment occurs and Compensation for such Plan Year will be included if the Participant's Termination Date falls on or after December 7 of such Plan Year.

(c) **Disabled Participants.** The Average Monthly Compensation of a Participant entitled to disability retirement benefits will be subject to the modification described in subsection 4.4(b).

(d) **Imputed Compensation and Service.** Participants transferred to Allegiance Corporation on or about September 30, 1996 who consequently did not receive a full year of Compensation during the 1996 Plan Year will have their Average Monthly Compensation adjusted as set forth in Supplement C.

(e) **Transfers to/from Puerto Rico.** A Participant's Average Monthly Compensation will include any Compensation while on the payroll of a Non-Participating Employer doing business in the Commonwealth of Puerto and will be determined as of the Participant's final Termination of Employment from the Company and any such Non-Participating Employer doing business in the Commonwealth of Puerto Rico. For purposes of this Section, an Eligible Employee's transfer to or from such Non-Participating Employer doing business in the Commonwealth of Puerto Rico is deemed to be a continuation of his service

- 91 -

and does not, by itself, result in the commencement of a new averaging period for determining Average Monthly Compensation.

(f) **Rehired Participants.** A rehired Participant's prior earnings history is disregarded for purposes of determining his Average Monthly Compensation. Such Participant's Average Monthly Compensation is determined under subsections (a)-(d) above as if he were a new Eligible Employee, except that any first partial Plan Year of Compensation will be excluded from his Compensation history and the determination of his Average Monthly Compensation. However, if a Participant is rehired in the Plan Year in which he incurred his last Termination of Employment, and remains an Eligible Employee on or after December 7 of such Plan Year, his Average Monthly Compensation will include compensation earned in such Plan Year, averaged over the full and partial months during which he was an Eligible Employee.

Effective December 31, 1996, if a rehired Participant's Compensation during his prior period of employment as an Eligible Employee cannot be ascertained and the Participant incurs a Termination of Employment before he completes a full Plan Year as an Eligible Employee after he is rehired, his Average Monthly Compensation will be determined by annualizing his Compensation for such Plan Year based on the full and partial months of the Plan Year in which the Participant was employed as an Eligible Employee. The preceding sentence supersedes the rule that disregards Compensation for the Plan Year in which the Participant incurs a Termination of Employment.

**SUPPLEMENT G**

- 92 -

**Transfer of Assets from BOC Group Cash Balance Retirement Plan**

This Supplement G provides for the transfer of assets from the BOC Group Cash Balance Retirement Plan, which was amended and restated effective January 1, 1989 (the "BOC Plan") to the Plan and for the participation of each participant in the BOC Plan who became an Eligible Employee as of the date Ohmeda was acquired by the Company (a "BOC Participant"). The provisions of the Plan will apply to each BOC Participant, subject to the following terms and conditions, which supersede the terms of the Plan:

**I. Definitions**

The following definitions are applicable to this Supplement G:

a. **"Actuarial Equivalent"** means, with respect to any specified annuity or benefit set forth in Section VII of this Supplement G, another annuity or benefit set forth in Section VII of this Supplement G which commences at a different date and/or is payable in a different form than that specified annuity or benefit but which has the same present value as the specified annuity or benefit, when measured on the basis of the interest rate, mortality table and other factors, if any, which are applicable to such other annuity or benefit, and are specified in Section VIII, below.

b. **"BOC Minimum Benefit"** means that portion of a BOC Participant's Accrued Benefit, as determined under subsection 2.1(a) of the Plan, which is equal to the amount obtained by dividing the Projected to Age 65 CASH Balance by the applicable factor from Section VIII(a) of this Supplement G. Notwithstanding the foregoing, the BOC Minimum Benefit will never be greater than the amount obtained by dividing the Projected to Age 65 CASH Balance by the immediate single life annuity at age 65 factor, based on the applicable mortality table and applicable interest rate from Section VIII(d) of this Supplement G.

Notwithstanding the above, if a BOC Participant's "grandfathered benefit" under Section 3.7 of the BOC Plan was greater than the value of his accounts under the BOC Plan as of the date assets were transferred from the BOC Plan to the Plan, then the value of such "grandfathered benefit" was transferred to the Plan in place of the value of the BOC Participant's accounts and the value of such "grandfathered benefit" will be his BOC Minimum Benefit.

c. **"CASH Balance"** means the current value of the accounts transferred on the BOC Participant's behalf from the BOC Plan to the Plan, as adjusted by the Periodic Adjustment Percentage.

d. **"Employment Date"** means, for purposes of a BOC Participant, his hire date with Ohmeda.

- 93 -

e. **"Periodic Adjustment Percentage"**. The value of each BOC Minimum Benefit will be automatically increased during the Plan Year by the Periodic Adjustment Percentage, which is equal to the least of:

i. The percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (as published by the U.S. Department of Labor, Bureau of Labor Statistics), measured from October 1 of the second year preceding the applicable Plan Year to September 30 of the year immediately preceding the applicable Plan Year. If the index has decreased, the percentage increase will be deemed to be zero. If the percentage increase is not a multiple of 1/4 percent (0.25%), then the closest lower percentage increase which is a multiple of 1/4 percent (0.25%) will be used.

ii. The 12 month average of one year Treasury Constant Maturities as published in the Federal Reserve Statistical Release H15(519) of the Board of Governors of the Federal Reserve System, measured from October 1 of the second year preceding the applicable Plan Year and ending on September 30 of the year immediately preceding the applicable Plan Year. If the average is not a multiple of 1/4 percent (0.25%), the closest lower interest rate which is a multiple of 1/4 percent (0.25%) will be used.

iii. The monthly average of the third segment rate under Code Section 430(h) for the August preceding the applicable Plan Year.

Until his Payment Date, each BOC Participant's CASH Balance will be adjusted at the end of each calendar quarter by an amount equal to a factor multiplied by the balance at the beginning of the quarter. The factor is that which when compounded quarterly would produce the Periodic Adjustment Percentage for the applicable Plan Year.

f. **"Projected to Age 65 CASH Balance"** means the CASH Balance, projected to the date the Participant attains age 65, using the current "Periodic Adjustment Percentage" at a level rate. When a Participant commences distribution of the CASH Balance portion of his Accrued Benefit, the "Periodic Adjustment Percentage" is set as of the payment date of the CASH Balance.

## II. Participation in the Plan

For purposes of accruing benefits under the Plan, each BOC Participant will become a Participant in the Plan effective as of the first Entry Date coincident with or next following the date he satisfies the initial participation requirements set forth in subsection 3.1(b) of the Plan. For all other purposes under the Plan, each BOC Participant will become a Participant in the Plan effective as of April 5, 1998.

## III. Crediting Service

A BOC Participant is credited with Years of Service in accordance with the provisions of Section 2.53 of the Plan. For purposes of determining a BOC Participant's Years of Service, his service will be counted from his Employment Date, as defined above. For purposes of determining a BOC Participant's Hours of Service, Years of Service and Points, he will be credited with 190 Hours of Service for each month during which he was employed by Ohmeda. In addition, this 190 Hours of Service per month equivalency will be used for purposes of determining each BOC Participant's Hours of Service, Years of Service and Points earned with the Company in 1998. In no event will there be any duplication of the Years of Service of any BOC Participant attributable to the same period of time.

## IV. Vesting

Each BOC Participant will be vested in his Accrued Benefit, as that term is defined in subsection 2.1(a) of the Plan, in accordance with Section 2.31 of the Plan. However, the following vesting schedule will apply to each BOC Participant who completed three or more Years of Service prior to April 5, 1998:

| Years of Service | Vested Percentage |
|---|---|
| Less than 3 | 0% |
| 3 but less than 4 | 20% |
| 4 but less than 5 | 40% |
| 5 or more | 100% |

Notwithstanding the above, each BOC Participant will at all times be one hundred percent (100%) vested in his BOC Minimum Benefit.

## V. Eligibility for Pension Benefit

a. <u>Normal Retirement</u>. Effective as of his Normal Retirement Date, a BOC Participant is entitled to his Pension Benefit (including that portion which is his BOC Minimum Benefit) payable as set forth in Section 4.1 of the Plan. However, such BOC Participant may elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit paid in one of the forms of payment described in Section VII of this Supplement G.

b. <u>Late Retirement</u>. Effective as of any month after the month in which his Normal Retirement Date occurs, a BOC Participant is entitled to his Pension Benefit (including that portion which is his BOC Minimum Benefit) payable as set forth in Section 4.2 of the Plan. However, such BOC Participant may elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit paid in one of the forms of payment described in Section VII of this Supplement G.

c. <u>Early Retirement Date</u>. Effective as of his Early Retirement Date, a BOC Participant is entitled to his Pension Benefit (including that portion which is his BOC Minimum Benefit) payable as set forth in Section 4.3 of the Plan. However, such BOC Participant may elect to receive his Pension Benefit after he has accumulated 65 Points and five Years of Service or, if earlier, attained age 55 and accrued ten Years of Service. A BOC Participant may elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit paid in one of the forms of payment described in Section VII of this Supplement G.

d. <u>Disability Retirement</u>. A BOC Participant will be entitled to receive his Accrued Benefit (including that portion which is his BOC Minimum Benefit) payable as set forth in Section 4.4 of the Plan. However, such BOC Participant may elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit in accordance with the following:

As of the date of his Disability, the BOC Participant is entitled to receive his BOC Minimum Benefit commencing at his Normal Retirement Date. However, he may elect to receive a lump sum payment of such BOC Minimum Benefit as of the first day of any month on or after his retirement due to Disability and before his Normal Retirement Date.

e. <u>Deferred Vested Benefit</u>. A BOC Participant who incurs a Termination of Employment for any reason other than Disability or death before his Early Retirement Date, but after completing five Years of Service as defined in subsection 2.53(b) of the Plan, is entitled to receive his Accrued Benefit (including that portion which is his BOC Minimum Benefit) payable as set forth in Section 4.5 of the Plan. However, such BOC Participant may elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit paid in one of the forms of payment described in Section VII of this Supplement G. A BOC Participant who has three or more Years of Service at his Termination of Employment may elect to commence receiving his BOC Minimum Benefit as of the first day of any month before his Normal Retirement Date, payable only in the form of a Joint and 50% Survivor Annuity if the BOC Participant is married, or a Straight Life Annuity if single.

## VI. Benefits After Death

a. <u>Death After Payment Date</u>. The benefits payable after death, if any, of a BOC Participant who dies after his Payment Date under the Plan, are those specified under the form in which his benefits were being paid at the time of his death.

b. <u>Death Before Payment Date</u>. The benefits payable after death, if any, of a BOC Participant who dies before his Payment Date under the Plan, are those specified in Article VI of the Plan. However, that portion of a BOC Participant's Accrued Benefit which is his BOC Minimum Benefit, will be payable in accordance with the following:

The BOC Participant's Beneficiary may elect lump sum payment. The Payment Date will be the first day of the month following the month in which occurs the later of the BOC Participant's death or the date on which he would have attained age 65 except that, if the BOC Participant is not yet age 65 at the time of his death, the Beneficiary may elect that the Payment Date is the first day of any future month between the date of the BOC Participant's death and the date he would have reached age 65.

## VII. Form and Payment of Pension Benefits and Death Benefits

The Normal Form of payment of a BOC Participant's Accrued Benefit (including that portion which is his BOC Minimum Benefit) is set forth in Section 7.1 of the Plan, except that, in the case of an unmarried BOC Participant, the Normal Form of that portion of his Accrued Benefit which represents his BOC Minimum Benefit will be a life annuity with a provision that if the Participant dies before 60 monthly annuity payments have been paid, the remaining guaranteed payment will be paid to his beneficiary, without actuarial reduction to the monthly amount of his BOC Minimum Benefit. A BOC Participant may elect to receive his entire Accrued Benefit in accordance with the terms of Sections 7.1 and 7.2 of the Plan. However, a BOC Participant may instead elect to receive only his Accrued Benefit minus his BOC Minimum Benefit (his "Baxter residual benefit") in accordance with Sections 7.1 and 7.2 of the Plan. Such BOC Participant may then separately elect to receive that portion of his Accrued Benefit which is his BOC Minimum Benefit paid in one of the optional forms applicable to the BOC Participant, as set forth below (provided, however, that if the BOC Participant's Accrued Benefit is valued at $5,000 or less, it will be distributed in accordance with Section 7.3 of the Plan):

a. <u>Increasing Annuity</u>. An unmarried BOC Participant may elect an increasing annuity. The monthly amount of a BOC Participant's increasing annuity in the first Plan Year of payment will equal the sum of the vested portion of the BOC Participant's Basic Account and Prior Service Account value as of his Payment Date divided by the applicable annuity value, based on the BOC Participant's age as of his commencement date. If the Payment Date is the first of the month in which occurs the BOC Participant's 65th birthday, the applicable annuity value is 210. Otherwise, the applicable annuity value is 210 plus (or minus) 0.50 for each month that the Payment Date is before (or after) the first of the month of the BOC Participant's 65th birthday.

The monthly payment in the following Plan Year will equal the amount determined in the paragraph above, increased by 1/12 of the Periodic Adjustment Percentage for that Plan Year times the number of monthly payments made in the preceding Plan Year. The monthly payment in each subsequent Plan Year is equal to the monthly amount payable in the preceding Plan Year increased by the Periodic Adjustment Percentage for the applicable Plan Year.

If a BOC Participant dies after commencement of benefit payments under this option and before sixty monthly payments have been made, payments will

- 97 -

continue to be made to his beneficiary until a total of sixty monthly payments have been made.

b. <u>Joint and 50% Survivor Increasing Annuity</u>. A BOC Participant who is married at his Payment Date may elect a joint and 50% survivor increasing annuity, which will be the actuarial equivalent (using Joint and 50% Survivor Income Factors) of the increasing annuity form described in subsection (a), above.

If payments are being made under this option and the BOC Participant and his surviving Spouse both die before sixty monthly payments have been made, payments will continue to be made to his beneficiary until a total of sixty monthly payments have been made.

c. <u>Level Life Annuity</u>. A BOC Participant may elect a level life annuity payable on or after the first day of the first month following the BOC Participant's attainment of age 55 determined in accordance with Section VIII(b) of this Supplement G.

If a BOC Participant dies after commencement of benefit payments under this option and before sixty monthly payments have been made, payments will continue to be made to his beneficiary until a total of sixty monthly payments have been made.

d. <u>Joint and 50% or 100% Contingent Annuity</u>. A BOC Participant can elect either a joint and 50% or 100% contingent annuity, which is the BOC Actuarial Equivalent (using Joint and 50% or 100% Survivor Income Factors from Table I of the BOC Plan) of a level annuity for the life of the BOC Participant commencing on his Payment Date.

If payments are being made under this option and the BOC Participant and his contingent annuitant both die before sixty monthly payments have been made, payments will continue to be made to his beneficiary until a total of sixty monthly payments have been made.

e. <u>Lump Sum</u>. A BOC Participant can elect to receive a lump-sum payment equal to the amount of his CASH Balance as of his Payment Date.

## VIII. Factors for Converting Annuities

a. <u>Factors to Convert to Increasing Life Annuity</u>. If the Payment Date is the first of the month in which occurs the BOC Participant's 65th birthday, the applicable annuity value is 210. Otherwise, the applicable annuity value is 210 plus (or minus) 0.50 for each month that the Payment Date is before (or after) the first of , the month of the BOC Participant's 65th birthday.

b. <u>Level Life Annuity</u>. A BOC Participant's Level Life Annuity at Normal Retirement Date will equal the BOC Participant's CASH Balance (or "Projected

- 98 -

to Age 65 CASH Balance" if Participant is less than Age 65) divided by the "applicable annuity value." The applicable annuity value is based on the interest rate and mortality table set forth in (d), below.

For Early Commencement, the Age 65 Level Life Annuity is adjusted by the applicable factor from either Table 1 or Table 4 of Supplement A of the Plan.

c. <u>Joint and Survivor Income Factors</u>. The joint and 50% survivor factors used under the Plan is to be applied to the BOC Participant's increasing annuity benefit determined in accordance with Section VIII(a) of this Supplement G for purposes of determining the joint and 50% surviving spouse increasing annuity.

The applicable joint and survivor factors used under the Plan are to be applied to the BOC Participant's level life annuity determined in accordance with Section VIII(b) of this Supplement G for purposes of determining the joint and 50% or 100% contingent annuity.

d. <u>Mortality Table and Interest Rate</u>. Actuarial equivalence will be determined on the following basis:

i. <u>Mortality Table</u>: the applicable mortality table used to calculate a Lump Sum payment under subsection 2.2(b) of the Plan.

ii. <u>Interest Rate</u>: the applicable interest rate used to calculate a Lump Sum payment under paragraph 2.2(a)(ii) of the Plan. Effective December 1, 2012, the applicable interest rate will be based on the rate in effect for August of the year prior to the Plan Year in which the Participant's benefit hereunder is paid; provided, however, that, prior to January 1, 2014, the applicable rate of interest will be the rate for either October or August of the year prior to the Plan Year in which the benefit is paid, whichever produces the smaller BOC Minimum Benefit.

## IX. Compensation and Average Monthly Compensation

For purposes of determining Compensation for a BOC Participant, 1998 Compensation will be annualized. In addition, with regard to a BOC Participant whose Termination of Employment occurs during 1998, 1998 Compensation will be counted for purposes of determining Average Monthly Compensation regardless of the date within 1998 as of which the Participant terminates employment.

## X. Primary Social Security Benefit

For purposes of calculating the Primary Social Security Benefit of a BOC Participant who terminates employment in 1998 or 1999, as set forth in paragraph 2.42(a)(ii) of the Plan, the BOC Participant's annualized wages for 1998 will be projected backwards at the rate

- 99 -

of six percent (6%) per year to 1951 or the year the BOC Participant reached age 21, whichever is later.

- 100 -

**SUPPLEMENT H**

**Transfer of Assets from the Clintec Pension Plan**

This Supplement H sets forth Plan provisions relating to the transfer of assets from the Clintec Pension Plan, which was adopted April 1, 1990 (the "Clintec Plan") to the Plan and the participation of certain former participants in the Clintec Plan who have since become Eligible Employees under the Plan. In general, this Supplement H only applies to individuals who were employed by Clintec on or after April 1, 1990. However, this Supplement H also will apply to individuals who terminated employment with Clintec before April 1, 1990 on whose behalf assets were transferred from the Plan to the Clintec Plan.

The provisions of the Plan will apply to Clintec Transferred Employees and Clintec Terminated Employees, as defined below, subject to the following terms and conditions, which supersede the terms of the Plan:

## I. Definitions

The following definitions are applicable to this Supplement H:

a. **"Actuarial Equivalent"** means Actuarial Equivalent as defined in subsections 2.2(a) and 2.2(b) of the Plan.

Notwithstanding the above, with regard to a Participant's Clintec Minimum Benefit, actuarial equivalence will be determined on the basis of the mortality table and interest rates specified in Section VIII, below.

b. **"Average Monthly Compensation"** means Average Monthly Compensation as calculated under Section 2.5 of the Plan.

Notwithstanding the above, for purposes of calculating Average Monthly Compensation, service with Clintec will count as Years of Service for purposes of determining whether a Participant has incurred a Termination of Employment.

For purposes of determining Average Monthly Compensation, a Clintec Transferred Participant (including one who transferred directly from Clintec to the Company and one who was receiving severance from Clintec at the time of hire by the Company) would not incur a Termination of Employment as of the date of transfer from Clintec to the Company.

c. **"Clintec"** means, for purposes of this Supplement H, the aggregation of businesses which:

1. were the result of a joint venture between the Company and Nestle S.A. effective as of October 16, 1986;

- 101 -

2. were separated from the Company effective as of March 30, 1990 to form Clintec Nutrition Company; and

3. were acquired by the Company effective as of October 1, 1996 following the dissolution of Clintec Nutrition Company.

d. **"Clintec Employment Date"** means, for purposes of a Clintec Transferred Employee or a Clintec Terminated Employee, his original hire date with Clintec.

e. **"Clintec Minimum Benefit"** is that portion of a Clintec Transferred Employee's total Baxter Accrued Benefit which is equal to the amount transferred to the Plan from the Clintec Plan on behalf of such Clintec Transferred Employee. The additional benefits, rights and features described in this Supplement H apply to such Clintec Minimum Benefit.

Notwithstanding anything in the Plan to the contrary, a Clintec Transferred Employee's Accrued Benefit will not be less than his Clintec Minimum Benefit.

f. **"Clintec Terminated Employee"** means a Clintec employee who was hired by the Company after terminating employment with Clintec and whose benefits in the Clintec Plan were transferred to the Plan. Clintec Terminated Employees include:

1. each Clintec employee whose employment was involuntarily terminated on or after March 30, 1990, who was hired by the Company after his Clintec severance payments ended, and on whose behalf assets were not transferred from the Clintec Plan to the Plan; and

2. each Clintec employee who voluntarily terminated employment on or after March 30, 1990, who was later hired by the Company and on whose behalf assets were not transferred from the Clintec Plan to the Plan.

g. **"Clintec Transferred Employee"** means a Clintec employee who was hired by the Company after terminating employment with Clintec and whose vested benefits in the Clintec Plan were transferred to the Plan. Clintec Transferred Employees include:

1. each Clintec employee who transferred directly to Baxter and on whose behalf assets were transferred from the Clintec Plan to the Plan;

2. each Clintec employee whose: (i) employment was involuntarily terminated; (ii) Baxter hire date was within 12 months of his Clintec termination date; (iii) severance had not ended as of his Baxter hire date; and (iv) whose Clintec Plan benefits were transferred to the Plan; and

3. each Clintec employee who remained employed by Nestle after the dissolution of Clintec Nutrition Company for purposes of winding up the

dissolved business but who later was hired by Baxter and on whose behalf assets were transferred from the Clintec Plan to the Plan.

## II. Participation in the Plan

Each Clintec Transferred Employee and each Clintec Terminated Employee will become a Participant in the Plan effective as of the first Entry Date coincident with or next following the date he satisfies the initial participation requirements set forth in subsection 3.1(b) of the Plan.

For purposes of eligibility to participate in the Plan, Years of Service with Clintec will be credited as Years of Service under the Plan. The Plan's provisions regarding One-Year Breaks in Service, as set forth in subsection 2.53(c), will be applied to disregard service earned prior to five consecutive One-Year Breaks in Service.

The date a Clintec Transferred Employee or Clintec Terminated Employee's participation in the Plan commences will in no event be prior to the date Clintec adopted the Plan. However, he will be provided with credit for Years of Service, as described below, for service earned with Clintec prior to his participation date.

## III. Crediting Service

a. <u>For Purposes of Vesting and Eligibility</u>

For purposes of vesting and eligibility for benefits under the Plan, a Clintec Transferred Employee and a Clintec Terminated Employee is credited with Years of Service in accordance with the provisions of subsection 2.53(b) of the Plan.

Years of Service will be counted from Clintec Employment Date, as defined above. However, the Plan's provisions regarding One-Year Breaks in Service, as set forth in subsection 2.53(c), will be applied to disregard service earned prior to five consecutive One-Year Breaks in Service.

b. <u>For Purposes of Benefit Accrual</u>

For purposes of benefit accrual, a Clintec Transferred Employee and a Clintec Terminated Employee will be credited with Years of Service in accordance with the provisions of subsection 2.53(a).

Notwithstanding the above, for purposes of benefit accrual, a Clintec Transferred Employee will be credited with Years of Service based on his service with the Company and with Clintec from his Clintec Employment Date, as defined above.

If assets were transferred from the Plan to the Clintec Plan on behalf of a Clintec Terminated Employee, then Years of Service under the Plan which relate to the transferred assets will not be credited for purposes of determining his Accrued Benefit under the Plan.

- 103 -

For purposes of this Supplement H, where service with Clintec is credited as Years of Service and/or Hours of Service, such service will be credited at a rate of 190 Hours of Service for each month of employment with Clintec. In no event will there be any duplication of Years of Service attributable to the same period of time.

## IV. Vesting

Each Clintec Transferred Employee and Clintec Terminated Employee will be vested in his Accrued Benefit, as that term is defined in subsection 2.1(a) of the Plan, in accordance with subsection 2.31 of the Plan.

Notwithstanding the above, a Clintec Transferred Employee or a Clintec Terminated Employee who was fully vested in a benefit under the Plan effective as of March 30, 1990, will be fully vested in his current Accrued Benefit under the Plan.

## V. Eligibility for Pension Benefit

    a. <u>Normal Retirement</u>. Effective as of his Normal Retirement Date, a Clintec Transferred Employee or a Clintec Terminated Employee is entitled to his Pension Benefit payable as set forth in Section 4.1 of the Plan.

    b. <u>Late Retirement</u>. Effective as of any month after the month in which his Normal Retirement Date occurs, a Clintec Transferred Employee or a Clintec Terminated Employee is entitled to his Pension Benefit payable as set forth in Section 4.2 of the Plan.

    c. <u>Early Retirement Date</u>. Effective as of his Early Retirement Date, a Clintec Transferred Employee or a Clintec Terminated Employee is entitled to his Pension Benefit payable as set forth in Section 4.3 of the Plan.

        Notwithstanding the above, a Clintec Transferred Employee may elect to receive that portion of his Accrued Benefit which is his Clintec Minimum Benefit as of the first day of any month if his employment is terminated on or after his 45th birthday and his Points equal or exceed 65. Such benefit will be reduced to reflect early retirement.

    d. <u>Deferred Vested Benefit</u>. A Clintec Transferred Employee or a Clintec Terminated Employee who Incurs a Termination of Employment for any reason other than Disability or death before his Early Retirement Date, but after completing Nonforfeitable Years of Service as defined in Section 2.53 of the Plan, is entitled to receive his Accrued Benefit payable as set forth in Section 4.5 of the Plan.

        Notwithstanding the above, a Clintec Transferred Employee may elect to receive that portion of his Accrued Benefit which is his Clintec Minimum Benefit as of

- 104 -

the first day of any month on or after attaining age 45 and earning five Years of Service. Such benefit will be reduced to reflect early payment.

## VI. Supplemental Early Retirement Pension

A Clintec Transferred Employee who meets the following requirements will be paid an additional monthly pension supplement:

a. he retires on or after age 55 and prior to age 62;

b. his age plus Years of Service for purposes of benefit accrual equal at least 65; and

c. his monthly early retirement benefit (based on his total Accrued Benefit under the Plan) is less than $2,500.

Such Clintec Transferred Employee will receive a supplement payable until he attains age 62. The amount of the monthly supplement will be $500 reduced by $0.50 for each dollar of his regular monthly pension in excess of $1,500. The supplement is further reduced if the Clintec Transferred Employee's Points are less than 85 by applying a pro rata reduction of one-twentieth (1/20) for each integer difference between the Points and 85.

## VII. Form and Payment of Pension Benefits

The Normal Form of payment of a Clintec Transferred Participant or Clintec Terminated Participant's Accrued Benefit is set forth in Section 7.1 of the Plan.

A Clintec Transferred Participant may elect to receive his entire Accrued Benefit in accordance with the terms of Sections 7.1 and 7.2 of the Plan or he may instead elect to receive only his Accrued Benefit minus his Clintec Minimum Benefit (his "Baxter residual benefit") in accordance with Sections 7.1 and 7.2 of the Plan. Such Clintec Transferred Participant may then separately elect to receive that portion of his Accrued Benefit which is his Clintec Minimum Benefit paid in accordance with the terms of this Supplement H.

If the present value of such Clintec Transferred Employee's total Accrued Benefit is $10,000 or less, then he may elect to receive his Accrued Benefit in a single, lump-sum payment, as set forth in subsection 7.2(d) of the Plan.

## VIII. Factors for Converting Annuities

a. <u>Mortality Table and Interest Rate</u>. With regard to a Participant's Clintec Minimum Benefit, actuarial equivalence will be determined on the following basis:

1. <u>Mortality Table</u>: the applicable mortality table used to calculate a Lump Sum payment under subsection 2.2(b) of the Plan.

- 105 -

2. <u>Interest Rate</u>:

    A. the applicable the applicable interest rate used to calculate a Lump Sum payment under paragraph 2.2(a)(ii) of the Plan. Effective December 1, 2012, the applicable interest rate will be based on the rate in effect for August of the year prior to the Plan Year in which the Participant's benefit hereunder is paid; provided, however, that, prior to January 1, 2014, the applicable rate of interest will be the rate for either October or August of the year prior to the Plan Year in which the benefit is paid, whichever produces the greater annuity amount; or

    B. with respect to determinations of actuarial equivalence for installment payouts of the Clintec Minimum Benefit, seven percent (7%) per annum.

## VIII. Points

With respect to any Clintec Transferred Employee, Points will be determined as set forth in Section 2.42 of the Plan. However, "$5,000" will be replaced with "$10,000" in subsection 2.42(c) of the Plan.

## IX. Disabled Participants

Benefits for disabled Clintec Transferred Participants are calculated under the terms of the Baxter Plan as amended by this Supplement H.

- 106 -

**SUPPLEMENT I**

**Merger of the Immuno-U.S., Inc. Defined Benefit Plan**

This Supplement I sets forth Plan provisions relating to the determination of Plan benefits as the result of the merger of Immuno-U.S., Inc. Defined Benefit Plan into the Plan effective December 31, 2003.

The provisions of the Plan will apply to Immuno Participants, as defined below, subject to the following terms and conditions, which supersede the terms of the Plan:

**I. Definitions**

The following definitions are applicable to this Supplement I:

(a) **"Immuno"** means Immuno-U.S., Inc.

(b) **"Immuno Frozen Benefit"** means an Immuno Participant's accrued benefit determined in accordance with the provisions of the Immuno Plan on December 31, 2003, taking into consideration compensation received on or before the Merger Date.

(c) **"Immuno Active Participant"** means an Immuno Participant who was actively participating in the Immuno Plan on the date immediately before the Merger Date and who began actively participating in the Plan in accordance with Section II of this Supplement I on the Merger Date.

(d) **"Immuno Participant"** means a Participant who had an accrued benefit in the Immuno Plan on December 31, 2003.

(e) **"Immuno Plan"** means the Immuno-U.S., Inc. Defined Benefit Plan, as in effect on December 31, 2003.

(f) **"Immuno Terminated Participant"** means an Immuno Participant who was hired by the Company after his Immuno Termination Date, and became a Participant in the Plan before December 31, 2003.

(g) **"Immuno Termination Date"** means the date an Immuno Plan Participant ceased accruing benefits under the Immuno Plan before December 31, 2003.

(h) **"Merger Date"** means December 31, 2003.

**II. Participation in the Plan**

Each Immuno Participant will become a Participant in the Plan on the Merger Date.

- 107 -

Each other Employee of Immuno will become a Participant in the Plan in accordance with the provisions of Plan Section 3.1, except that an Eligible Employee who would have become a participant in the Immuno Plan on January 1, 2004 if the Immuno Plan had not merged into the Plan, will become a Participant in the Plan on January 1, 2004. Notwithstanding any provision of the Plan to the contrary, no individual hired at the Community Bio Resources facility of Bio Science Laboratories on or after January 1, 2002 may become a Participant in the Plan.

## III. Crediting Service

### a. Eligibility

For purposes of determining an Eligible Employee's eligibility to participate in the Plan, the Eligible Employee's Years of Service will include his Eligibility Service, as defined in the Immuno Plan, accrued on or before December 31, 2003, subject to the provisions of Plan subsection 2.53(c).

### b. Vesting

For purposes of determining a Participant's non-forfeitable interest in his Accrued Benefit under the Plan, the Participant's Years of Service will include his Vesting Service, as defined in the Immuno Plan, accrued on or before December 31, 2003, subject to the provisions of Plan subsection 2.53(c).

### c. Benefit Accrual and Points

For purposes of determining a Participant's Accrued Benefit and Points, the Participant's Years of Service will include his Accrual Service, as defined in the Immuno Plan, accrued on or before December 31, 2003, subject to the provisions of Plan subsection 2.53(c).

For purposes of this Supplement I, where service with Immuno is credited as Years of Service and/or Hours of Service, such service will be credited at a rate of 190 Hours of Service for each month of employment with Immuno. In no event will there be any duplication of Years of Service attributable to the same period of time.

## IV. Compensation

For purposes of determining a Participant's Immuno Frozen Benefit, the Participant's compensation will include only his compensation, as defined in the Immuno Plan, received prior to January 1, 2004.

For purposes of determining a Participant's Accrued Benefit in accordance with Plan subsection 2.1(a), the Participant's Compensation will include only his Compensation received on or after January 1, 2004.

- 108 -

## V. Accrued Benefit

The Accrued Benefit of each Immuno Active Participant will be the greater of (i) his Accrued Benefit determined in accordance with the provisions of Plan subsection 2.1(a), as modified by the provisions of this Supplement I, or (ii) his Immuno Frozen Benefit.

## VI. Actuarial Equivalent

The Actuarial Equivalent of an Immuno Frozen Benefit for purposes of determining an optional form of payment other than a lump sum distribution will be determined by applying an interest rate of seven percent (7%) and the U.P. 1984 Mortality Table.

## VII. Optional Form of Payment

In addition to the optional forms of payment provided in the Plan, if the present value of an Immuno Participant's Accrued Benefit on his Payment Date is less than or equal to $12,500, the Participant may elect to receive his Accrued Benefit in the form of a single lump sum payment.

## VIII. Normal Retirement Date

For an Immuno Participant who was a participant in the Immuno Plan on December 31, 1984, his Normal Retirement Date will not be later than the date on which such Participant attains age 62 and completes five Years of Service, with the amount of his benefit determined based on his benefit accrued as of December 31, 1984 in accordance with the terms of the Immuno Plan in effect on such date.

## IX. Early Retirement Date

The Early Retirement Date of an Immuno Participant will be the earlier of the Early Retirement Date provided in Plan Section 2.15 or the date on which such Participant attains age 55 and completes five Years of Service, as defined in Plan subsection 2.53(b).

## X. Deferred Vested Annuity Starting Date

An Immuno Participant who incurs a Termination of Employment before his Early Retirement Date, but after December 31, 2003, for any reason other than Disability or death will be entitled to commence payment of his Accrued Benefit on the earlier of the Payment Date provided in Plan subsection 4.5(b) or the first day of the month following such Participant's attainment of age 55 and completion of five Years of Service, as defined in Plan subsection 2.53(b). Notwithstanding the foregoing, if the present value of such a participant's Accrued Benefit does not exceed $12,500, payment of the participant's Accrued Benefit may commence as of the first day of the month following the date of the participant's termination of employment, or any month thereafter.

An Immuno Participant, other than an Immuno Terminated Participant, who incurred a termination of employment prior to December 31, 2003 will be entitled to commence

payment of his Accrued Benefit in accordance with the provisions of the Immuno Plan as in effect at the time of termination.

## XI. Benefit Reduction Factors for Early Commencement

An Immuno Participant whose Payment Date precedes his Normal Retirement Date and whose Accrued Benefit is his Immuno Frozen Benefit will have his benefit reduced for early commencement in accordance with the following factors:

| Years That Early Retirement Date Precedes Normal Retirement Date | Percentage of Earned Benefit |
|---|---|
| 1 | 92.3 % |
| 2 | 84.6 % |
| 3 | 76.9 % |
| 4 | 73.0 % |
| 5 | 69.2 % |
| 6 | 65.3 % |
| 7 | 61.5 % |
| 8 | 57.6 % |
| 9 | 52.9 % |
| 10 | 48.6 % |

The above factors will be prorated for a partial year (counting a partial month as a complete month.)

An Immuno Participant whose Payment Date precedes his Normal Retirement Date by more than ten years and whose Accrued Benefit is his Immuno Frozen Benefit will have his benefit reduced for early commencement in accordance with the above factors for the first ten years and then using the Actuarial Equivalent basis as specified in the provisions of Plan Section 2.2.

## XII. Determination of Accrued Benefit for Immuno Terminated Participants

The Accrued Benefit of an Immuno Terminated Participant will be the greater of (a) or (b) as follows:

(a) The addition of the following (i) plus (ii):

(i) The Immuno Terminated Participant's accrued benefit as of December 31, 2003 determined in accordance with the provisions of the Immuno Plan in effect as of December 31, 2003; plus

(ii) The Immuno Terminated Participant's Accrued Benefit under the Plan determined on March 1, 2004; or

- 110 -

- 111 -

(b) The Immuno Terminated Participant's Accrued Benefit determined in accordance with the provisions of Plan subsection 2.1(a) as modified by this Supplement I.

- 111 -

**EXHIBIT 21**

**BAXTER INTERNATIONAL INC.**

The following is a list of subsidiaries of Baxter International Inc. as of December 31, 2019, omitting some subsidiaries which, when considered in the aggregate, would not constitute a significant subsidiary. Where ownership is less than 100% by Baxter International Inc. or a Baxter International Inc. subsidiary, such has been noted by designating the percentage of ownership.

| Domestic Subsidiary | Incorporation | |
|---|---|---|
| Baxter Corporation Englewood | Colorado | |
| Baxter Healthcare Corporation | Delaware | |
| Baxter Pharmaceutical Solutions LLC | Delaware | |
| Baxter Sales and Distribution LLC | Delaware | |
| Cheetah Medical, Inc. | Delaware | |
| Gambro Renal Products, Inc. | Colorado | |
| Laboratorios Baxter S.A. | Delaware | |
| Synovis Life Technologies, Inc. | Minnesota | |
| Synovis Micro Companies Alliance, Inc. | Minnesota | |

| Foreign Subsidiary | Incorporation | |
|---|---|---|
| Baxter Healthcare Pty Ltd | Australia | |
| Baxter Belgium SPRL | Belgium | |
| Baxter Distribution Center Europe SA | Belgium | |
| Baxter R and D Europe SPRL | Belgium | |
| Baxter SA | Belgium | |
| Baxter Services Europe SA | Belgium | |
| Baxter Hospitalar Ltda. | Brazil | |
| Baxter Corporation (Canada) | Canada | |
| Baxter (China) Investment Co., Ltd | China | |
| Baxter Healthcare (Guangzhou) Company Ltd | China | 88 % |
| Baxter Healthcare (Shanghai) Company Ltd. | China | |
| Baxter Healthcare (Suzhou) Company Ltd | China | |
| Baxter Healthcare (Tianjin) Co., Ltd. | China | 70 % |
| Baxter Healthcare Trading (Shanghai) Co., Ltd. | China | |
| RTS Colombia SAS | Colombia | |
| Baxter Productos Medicos, Ltda. | Costa Rica | |
| Baxter S.A.S. | France | |
| Gambro Industries SAS | France | |
| Baxter Deutschland GmbH | Germany | |
| Baxter Oncology GmbH | Germany | |
| Gambro Dialysatoren GmbH | Germany | |
| Baxter (Hellas) EPE | Greece | |
| Baxter de Guatemala, Sociedad Anonima | Guatemala | |
| Baxter Healthcare Limited (Hong Kong, China) | Hong Kong | |
| Baxter (India) Private Limited | India | |
| Baxter Pharmaceuticals India Pvt Ltd. | India | |

| | | |
|---|---|---|
| Baxter Innovations & Business Solutions Private Limited (India) | India | |
| Baxter Shared Services & Competencies Limited | Ireland | |
| Cheetah Medical (Israel), Ltd. | Israel | |
| Baxter S.p.A. | Italy | |
| Bieffe Medital S.p.A. | Italy | |
| Gambro Dasco S.p.A. | Italy | |
| Baxter Limited | Japan | |
| Baxter S.A. de C.V. | Mexico | |
| Baxter Healthcare Limited | New Zealand | |
| Baxter Polska Sp. z o.o. | Poland | |
| Baxter AO | Russian Federation | |
| Baxter Company Ltd | Saudi Arabia | 51 % |
| Baxter Healthcare SA (Singapore Woodlands Branch) | Singapore | |
| Baxter Pharmaceuticals (Asia) Pte Ltd. | Singapore | |
| Baxter Incorporated | South Korea | |
| Baxter, S.L. | Spain | |
| Baxter Medical AB | Sweden | |
| Gambro AB | Sweden | |
| Gambro Lundia AB | Sweden | |
| Baxter AG | Switzerland | |
| Baxter Healthcare SA | Switzerland | |
| Baxter Healthcare Limited (Taiwan) | Taiwan | |
| Baxter Healthcare (Thailand) Company Limited | Thailand | |
| Baxter Manufacturing, (Thailand) Co., Ltd. | Thailand | |
| Baxter Holding B.V. | The Netherlands | |
| ApaTech Limited | United Kingdom | |
| Baxter Healthcare Limited | United Kingdom | |
| Cheetah Medical (UK) Limited | United Kingdom | |

**EXHIBIT 23**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 33-28428, 33-54069, 333-10520, 333-43563, 333-47019, 333-71553, 333-80403, 333-88257, 333-48906, 333-62820, 333-102140, 333-104420, 333-104421, 333-105032, 333-143063, 333-174400, 333-174401, 333-206700 and 333-206701) of Baxter International Inc. of our report dated March 17, 2020 relating to the financial statements and financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP
Chicago, Illinois
March 17, 2020

**EXHIBIT 31.1**

**Certification of Chief Executive Officer**
**Pursuant to Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as Amended**

I, José E. Almeida, certify that:

1. I have reviewed this Annual Report on Form 10-K of Baxter International Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ José E. Almeida
_____

José E. Almeida
Chairman of the Board and
Chief Executive Officer

Date: March 17, 2020

**EXHIBIT 31.2**

**Certification of Chief Financial Officer**
**Pursuant to Rules 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, as Amended**

I, James K. Saccaro, certify that:

1. I have reviewed this Annual Report on Form 10-K of Baxter International Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ James K. Saccaro

James K. Saccaro
Executive Vice President and
Chief Financial Officer

Date: March 17, 2020

**EXHIBIT 32.1**

**Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350,
as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

José E. Almeida, as Chairman of the Board and Chief Executive Officer of Baxter International Inc. (the "Company"), certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) the Company's Annual Report on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.


/s/ José E. Almeida
_____

José E. Almeida
Chairman of the Board and
Chief Executive Officer

March 17, 2020

**EXHIBIT 32.2**

**Certification of Chief Financial Officer Pursuant to 18 U.S.C. Section 1350,**

**as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

James K. Saccaro, as Executive Vice President and Chief Financial Officer of Baxter International Inc. (the "Company"), certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)      the Company's Annual Report on Form 10-K for the year ended December 31, 2019 as filed with the Securities and Exchange Commission on the date hereof (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ James K. Saccaro

James K. Saccaro

Executive Vice President and

Chief Financial Officer

March 17, 2020