## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| IN RE BAXTER INTERNATIONAL INC. SECURITIES LITIGATION | Case No. 1:19-cv-07786<br><br>District Judge Sara L. Ellis<br><br>Magistrate Judge Jeffrey I. Cummings |

**JOINT DECLARATION OF JAMES A. HARROD AND SHARAN NIRMUL IN
SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S
<u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

## <u>TABLE OF CONTENTS</u>

GLOSSARY OF TERMS ................................................................................................. iii

I.      INTRODUCTION ............................................................................................ 1

II.     PROSECUTION OF THE ACTION ................................................................. 6

        A.      Background .......................................................................................... 6

        B.      Appointment of Lead Plaintiffs and Lead Counsel................................ 8

        C.      Lead Plaintiffs' Investigation and Preparation and Filing of the Complaint ............ 8

        D.      Defendants' Motion to Dismiss the Complaint, the Court's MTD Order,
                and Lead Plaintiffs' Preparation of a Second Amended Complaint ......................... 9

III.    MEDIATION AND SETTLEMENT ............................................................... 12

IV.     LEAD COUNSEL CONDUCT DISCOVERY ................................................ 15

        A.      The Need for Due Diligence Discovery................................................ 16

        B.      The Due Diligence Discovery Conducted by Lead Counsel ................. 17

V.      RISKS OF CONTINUED LITIGATION ........................................................ 19

        A.      The Risks of Prosecuting Securities Actions in General ....................... 20

        B.      The Court's Dismissal of the Complaint .............................................. 22

        C.      The Substantial Risks of Proving Defendants' Liability
                and Damages in This Case ................................................................... 23

                1.      Risks of Proving Scienter ........................................................ 24

                2.      Risks of Proving Loss Causation and Damages .......................... 24

                3.      Risks of Proving Falsity and Materiality.................................... 25

                4.      Risks After Trial ..................................................................... 26

VI.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF
       THE POTENTIAL RECOVERY IN THE ACTION ........................................................ 28

VII.   ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE SETTLEMENT CLASS
       AND THE REACTION OF THE SETTLEMENT CLASS TO DATE........................... 29

VIII.  PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ............. 32

IX.    THE FEE AND LITIGATION EXPENSE APPLICATION ........................................... 35

       A.    The Fee Application.................................................................................... 36

             1.    Lead Plaintiffs Have Authorized and Support the Fee Application................ 36

             2.    The Time and Labor Devoted to the Action by Lead Counsel ........................ 37

             3.    The Experience and Standing of Lead Counsel ................................................ 39

             4.    The Standing and Caliber of Defendants' Counsel ........................................... 39

             5.    The Risks of the Litigation and the Need to Ensure the Availability of
                   Competent Counsel in High-Risk Contingent Securities Cases ...................... 39

             6.    The Reaction of the Settlement Class to the Fee Application........................... 41

       B.    The Litigation Expense Application ........................................................ 42

X.     CONCLUSION................................................................................................................ 46

## GLOSSARY OF TERMS

All capitalized terms used in this declaration and the accompanying memoranda of law that are not otherwise defined have the meanings set forth in the Stipulation and Agreement of Settlement dated April 1, 2021, previously filed with the Court (ECF No. 57-1). For the Court's convenience, some of the most frequently used terms are set forth here.

| | |
|---|---|
| **Almeida** | José Almeida, Baxter's Chief Executive Officer |
| **Baxter** or the **Company** | Baxter International Inc. |
| **Class Period** | The period from February 21, 2019 through October 23, 2019, inclusive |
| **Complaint** | Lead Plaintiffs' Class Action Complaint and Demand for Jury Trial (ECF No. 34), filed June 25, 2020 |
| **FX** | Foreign exchange |
| **Individual Defendants** | José Almeida and James Saccaro |
| **Lead Counsel** | Bernstein Litowitz Berger & Grossmann LLP and Kessler Topaz Meltzer & Check, LLP |
| **Lead Plaintiffs** | Court-appointed Lead Plaintiffs LAMPERS and Varma |
| **LAMPERS** | Lead Plaintiff Louisiana Municipal Police Employees' Retirement System |
| **MTD Order** | The Court's January 12, 2021 Opinion and Order granting Defendants' motion to dismiss |
| **Saccaro** | James Saccaro, Baxter's Chief Financial Officer |
| **Settlement Class** | All persons and entities who, during the Class Period, purchased or otherwise acquired Baxter common stock, and were damaged thereby. Excluded from the Settlement Class are Defendants, any person who was an executive officer or director of Baxter during the Class Period, their Immediate Family members, any affiliates of Baxter, and any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court. |
| **Stipulation** | Stipulation and Agreement of Settlement dated April 1, 2021 (ECF No. 57-1) |

| **Varma** | Lead Plaintiff Varma Mutual Pension Insurance Company |

JAMES A. HARROD and SHARAN NIRMUL declare as follows:

## I.  INTRODUCTION

1.      I, James A. Harrod, am a member of the bars of the State of New York, the U.S. District Courts for the Southern and Eastern Districts of New York, and the U.S. Courts of Appeals for the Second, Third, Sixth, and Seventh Circuits.  I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), one of the Court-appointed Lead Counsel in the above-captioned action (the "Action").  BLB&G represents one of the Court-appointed Lead Plaintiffs, Louisiana Municipal Police Employees' Retirement System ("LAMPERS").

2.      I, Sharan Nirmul, am a member of the bars of Pennsylvania, New Jersey, New York, and Delaware, the U.S. District Courts of the Eastern District of Pennsylvania, Southern District of New York, District of New Jersey, and District of Delaware, and the U.S. Courts of Appeals for the Second, Third, and Seventh Circuits.  I am a partner in the law firm of Kessler Topaz Meltzer & Check, LLP ("KTMC"), one of the Court-appointed Lead Counsel in the Action.  KTMC represents one of the Court-appointed Lead Plaintiffs, Varma Mutual Pension Insurance Company ("Varma").  LAMPERS and Varma are collectively referred to herein as "Lead Plaintiffs" and BLB&G and KTMC are collectively referred to as "Lead Counsel."

3.      We have personal knowledge of the matters stated in this declaration based on our active supervision of and participation in the prosecution and settlement of the Action.  We respectfully submit this declaration in support of Lead Plaintiffs' motion, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action with Defendant Baxter International Inc. ("Baxter" or the "Company"), and Defendants José E. Almeida and James K. Saccaro (the "Individual Defendants," and together with Baxter, "Defendants"), for $16 million in cash (the "Settlement").  The Court preliminarily approved the Settlement in its Minute Order dated April 20, 2021, and set August 10, 2021 as the date for the

hearing on final approval of the Settlement. *See* ECF No. 58; *see also* ECF No. 59 (entering the Parties' agreed-upon order preliminarily approving the Settlement).

4. We also respectfully submit this declaration in support of: (i) Lead Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation" or "Plan") and (ii) Lead Counsel's motion for an award of attorneys' fees in the amount of 22% of the Settlement Fund; payment of litigation expenses incurred by Lead Counsel in the amount of $96,538.37; and payment of $6,648.75 in reimbursement for the costs of Lead Plaintiffs directly related to their representation of the Settlement Class (the "Fee and Expense Application").[1]

5. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $16 million for the benefit of the Settlement Class. This beneficial Settlement was achieved as a direct result of Lead Plaintiffs' and Lead Counsel's efforts to diligently investigate, prosecute, and negotiate a settlement of the Action against highly skilled opposing counsel. As discussed in more detail below, Lead Counsel's efforts in the Action included, among other things: (a) conducting a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions made by Defendants, including performing an extensive review and analysis of public filings, transcripts of Baxter's earnings calls and industry conferences, Company presentations, media reports, and financial analyst research reports concerning the Company, conducting numerous interviews with former Baxter employees, and consulting with experts regarding key accounting and financial issues in the Action, as well as the

---

[1] In conjunction with this declaration, Lead Plaintiffs and Lead Counsel are submitting the Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum").

issues of loss causation and damages; (b) drafting and filing the initial complaint and the detailed amended complaint filed on June 25, 2020 (ECF No. 34) (the "Complaint"); (c) briefing and opposing Defendants' motion to dismiss the Complaint; (d) conducting additional investigation, research, and analysis in connection with preparing a second amended complaint that would have been filed absent the Settlement; (e) engaging in intensive, arm's-length settlement negotiations with Defendants, including preparing and submitting a detailed mediation statement concerning liability and damages and participating in a full-day mediation session before Gregory P. Lindstrom, Esq. of Phillips ADR ("Mr. Lindstrom" or the "Mediator"), an experienced mediator of class actions and other complex litigation; (f) negotiating for and conducting significant due diligence discovery to confirm the reasonableness of the proposed Settlement, including reviewing and analyzing more than 10,000 pages of highly relevant documents produced by Defendants and interviewing the Chairman of Baxter's Audit Committee on subjects relevant to the Action (the "Due Diligence Discovery"); and (g) drafting and negotiating the Stipulation and related settlement documentation.

6.      The Settlement was reached after the aforementioned full-day mediation session before Mr. Lindstrom on February 17, 2021 and was made subject to the successful completion of Due Diligence Discovery.  Stipulation ¶¶ 4-8.

7.      Lead Plaintiffs and Lead Counsel believe that the proposed Settlement represents a very favorable result for the Settlement Class, considering the significant risks in the Action and the amount of the potential recovery.  While Lead Plaintiffs and Lead Counsel believe their claims against Defendants are meritorious, they also recognize that, in the absence of settlement, they faced significant risks that continued litigation might have resulted in no recovery.  At the time the Settlement was reached, Lead Plaintiffs' Complaint had been dismissed in its entirety.  If Lead

Plaintiffs had been unable to sufficiently address the issues identified in the Court's order dismissing the Complaint and overcome a second motion to dismiss, the Action would have been dismissed with prejudice and the Settlement Class would have recovered nothing. Moreover, even if Lead Plaintiffs were able to survive the pleading stage, there would be considerable further challenges in proving that the accounting misstatements at issue regarding Baxter's foreign exchange ("FX") transactions were the product of intentional manipulation of Baxter's financial results and that Baxter's senior management was aware of that manipulation.

8.      Lead Plaintiffs would also have faced difficulties in proving that the decline in the price of Baxter common stock on October 24, 2019, following the announcement of the internal investigation into its FX accounting, was caused by the revelation of the alleged misstatements. In their motion-to-dismiss briefing, Defendants argued that later disclosures, in which Baxter actually restated its historical FX accounting, caused the price of the stock to rebound, and that the restated transactions totaled less than 1% of Baxter's total net income over the period at issue. Lead Plaintiffs expect that Defendants would make this same argument at later stages in the case, including at class certification and summary judgment. In sum, these significant risks, and the substantial additional time and expenses that would be necessary to secure a judgment through litigation, strongly support the reasonableness of the Settlement.

9.      The close attention paid and oversight provided by the Lead Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors, and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at

*34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Here, Lead Plaintiffs were actively involved in overseeing the litigation and settlement negotiations and have endorsed the Settlement as fair and reasonable. *See* Declaration of Ben Huxen, Executive Director and General Counsel for LAMPERS ("Huxen Decl."), attached as Exhibit 1; Declaration of Esa-Ville Ylätupa, Chief Legal Counsel for Varma ("Ylätupa Decl."), attached as Exhibit 2.

10. In addition to seeking final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. The Plan of Allocation, which was developed in consultation with Lead Plaintiffs' damages consultant, provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Settlement Class Members who submit Claim Forms that are approved for payment by the Court. Each Claimant's share of the Net Settlement Fund will be calculated based on his, her, or its losses attributable to the alleged fraud.

11. Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Lead Counsel prosecuted this case on a fully contingent basis, incurred significant litigation expenses, and bore all the risk of an unfavorable result. For their efforts in prosecuting the case and negotiating the Settlement, Lead Counsel are applying for an award of attorneys' fees in the amount of 22% of the Settlement Fund (or $3,520,000, plus interest earned at the same rate as the Settlement Amount). The 22% fee request is based on retainer agreements entered into with Lead Plaintiffs at the outset of the Action and, as discussed in the Fee Memorandum, the 22% fee request is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries. Moreover, the requested fee represents a multiplier of approximately 1.5 on Lead Counsel's total lodestar, which is well within the range of multipliers typically awarded in class actions with

significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the requested fee.

12.     Lead Counsel's Fee and Expense Application also seeks payment of litigation expenses incurred by Lead Counsel in connection with the institution, prosecution, and settlement of the Action totaling $96,538.37, plus reimbursement of $6,648.75 to Lead Plaintiffs for their costs directly related to their representation of the Settlement Class, as authorized by the PSLRA.

13.     For all of the reasons discussed in this declaration and in the accompanying supporting memoranda and declarations, including the result obtained and the significant litigation risks discussed fully below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e)(2).  For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

14.     Baxter is an Illinois-based corporation that provides a broad range of healthcare products to hospitals, kidney dialysis centers, nursing homes, rehabilitation centers, doctors' offices, and patients throughout the world.  This securities class action asserts claims on behalf of all persons and entities who, during the period from February 21, 2019 through October 23, 2019, inclusive (the "Class Period"), purchased or otherwise acquired Baxter common stock, and were damaged thereby (the "Settlement Class").[2]

---

[2] Excluded from the Settlement Class are Defendants, any person who was an executive officer or director of Baxter during the Class Period, their Immediate Family members, any affiliates of

15.     Baxter operates its business through more than 50 subsidiaries in over twenty counties and sells its products in over 100 countries.  As a result of its global footprint, a substantial portion of Baxter's transactions are denominated in currencies other than U.S. dollars, which must be converted to U.S. dollars for purposes of Baxter's financial reporting.

16.     On October 24, 2019, Baxter announced that it had recently begun an internal investigation into certain intra-Company transactions that had been undertaken to generate FX gains or losses.  Complaint ¶ 7.  The Company announced that these transactions "used a foreign exchange rate convention historically applied by" Baxter that "was not in accordance with generally accepted accounting principles" and that enabled the transactions "to be undertaken after the related exchange rates were already known."  *Id.*  These transactions, Baxter announced, "resulted in certain misstatements in [its] previously reported non-operating income related to net foreign exchange gains."  *Id.* ¶ 82.  Baxter's share price fell by 10% on the date of that announcement.  *Id.* ¶ 85.

17.     Specifically, in converting non-U.S. dollar transactions to be booked in U.S. dollars, Baxter was obligated under generally accepted accounting principles ("GAAP") to use the FX rates that were ***current*** as of the day of the measurement.  Complaint ¶ 9.  Instead, Baxter had routinely applied a stale FX rate—from the middle of the previous month—and had then engaged in certain FX transactions with its own subsidiaries, once that FX rate was already known, solely in order to generate FX gains or avoid FX losses.  *Id.*  ¶¶ 10-13.

18.     Baxter ultimately admitted that "certain intra-company transactions were undertaken, after the related exchange rates were already known, ***solely for the purpose of***

---

Baxter, and any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

*generating non-operating foreign exchange gains or avoiding foreign-exchange losses*." *Id.* ¶ 49. Baxter issued a restatement of its previously released financial results for fiscal years 2017 and 2018, and for the first half of 2019, which indicated that the FX transactions conducted in violation of GAAP had inflated Baxter's income from 2017 through the second quarter of 2019 by nearly $200 million. *Id.* ¶ 8.

### B. Appointment of Lead Plaintiffs and Lead Counsel

19. On November 25, 2019, BLB&G and KTMC filed an initial complaint against Baxter, José E. Almeida, and James K. Saccaro, among others, on behalf of plaintiff Ethan E. Silverman. ECF No. 1. The initial complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

20. On January 24, 2020, LAMPERS and Varma filed a motion for appointment as Lead Plaintiffs and appointment of BLB&G and KTMC as Lead Counsel, along with supporting papers. ECF Nos. 13-16.

21. On January 29, 2020, the Court appointed LAMPERS and Varma as Lead Plaintiffs, and BLB&G and KTMC as Lead Counsel. ECF No. 18.

### C. Lead Plaintiffs' Investigation, Preparation and Filing of the Complaint

22. In preparing the Complaint, Lead Counsel conducted a comprehensive factual investigation and detailed analysis of the potential claims that could be asserted on behalf of investors in Baxter securities related to its disclosures concerning the accounting for its FX transactions. This investigation included, among other things, a detailed review and analysis of information relating to Baxter, including (a) Baxter's public SEC filings; (b) research reports by securities and financial analysts; (c) transcripts of Baxter's earnings conference calls and industry conferences; (d) other publicly available material, such as news articles and Baxter's historical stock price information, as well as similar information concerning Baxter's competitors and the

market as a whole; and (e) economic analyses of Baxter's stock trading and pricing data.

23. In addition to undertaking this extensive review and analysis of documents, Lead Counsel engaged subject-matter experts to consult on certain key issues in the case, including the application of GAAP for the FX transactions at issue, loss causation, and damages.

24. Throughout the course of the investigation, Lead Counsel and their in-house investigators also located and contacted more than 135 individuals believed to potentially have information about the claims at issue in the Action, including former Baxter employees, and ultimately interviewed 69 of these individuals.

25. On June 25, 2020, Lead Plaintiffs filed the 72-page Complaint, alleging claims under Section 10(b) of the Exchange Act against all Defendants and under Section 20(a) against the Individual Defendants. ECF No. 34. These claims arose from Lead Plaintiffs' allegations that Defendants made materially false and misleading statements and omissions with scienter concerning: (i) Baxter's income related to FX fluctuations, as well as other financial metrics reflecting that income item; (ii) Baxter's compliance with GAAP; and (iii) Baxter's internal controls over financial reporting. The Complaint further alleged that the price of Baxter common stock was artificially inflated during the Class Period as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed on October 24, 2019.

**D.  Defendants' Motion to Dismiss the Complaint, the Court's MTD Order, and Lead Plaintiffs' Preparation of a Second Amended Complaint**

26. On August 24, 2020, Defendants filed and served their motion to dismiss the Complaint and accompanying declaration, which attached exhibits totaling over 1,100 pages. ECF Nos. 39-41.

27. In their motion, Defendants argued principally that the Court should dismiss the Complaint because Lead Plaintiffs failed to allege facts establishing a strong inference of scienter.

In particular, Defendants argued (among other things) that Lead Plaintiffs did not allege any specific facts showing that Individual Defendants Almeida and Saccaro knew (or were reckless in not knowing) about the errors in accounting for the FX transactions at issue. To this end, Defendants argued that Lead Plaintiffs had not adequately alleged that the Individual Defendants knew: (i) that the intra-Company transactions at issue had occurred; (ii) the allegedly manipulative purpose of the transactions; (iii) how Baxter was calculating the FX gains or losses on the transactions; or (iv) the appropriate accounting treatment under GAAP for those transactions.

28.    Defendants further argued that Lead Plaintiffs could not establish a strong inference of scienter based on allegations about the Individual Defendants' potential access to information about the accounting for the FX transactions, their positions at the Company, the importance of the transactions to Baxter's financial performance, or the departure of Baxter's Treasurer during the Class Period, and that allegations concerning Almeida's and Saccaro's motives to inflate Baxter's performance in order to meet Wall Street estimates and secure larger bonuses and stock awards were generic and unpersuasive.

29.    In addition to arguing for dismissal on scienter grounds, Defendants argued that Lead Plaintiffs failed to adequately allege that Defendants' statements about Baxter's compliance with GAAP and its internal controls over financial reporting were materially false or misleading, and that Lead Plaintiffs failed to adequately plead control-person liability under Section 20(a) because the Complaint failed to plead a primary violation of Section 10(b).

30.    On October 8, 2020, Lead Plaintiffs filed and served their opposition to Defendants' motion to dismiss. ECF No. 43. Lead Plaintiffs' opposition primarily argued that the Complaint adequately alleged scienter as to Individual Defendants Almeida and Saccaro because it included sufficient allegations of fact that the GAAP violations were blatant, widespread, and materially

overstated key financial results, and that the Individual Defendants were closely familiar with the topic at issue—including because the Treasurer (who oversaw the department primarily responsible for the improper accounting) reported to Almeida and Saccaro and that position was previously filled by Saccaro during the period in which Baxter was violating GAAP.

31.     In addition, Lead Plaintiffs argued that an inference of scienter was supported by the magnitude and duration of the accounting misconduct and the nearly uniform FX gains that resulted from the accounting manipulation.  Lead Plaintiffs also argued that the Individual Defendants' motivation to meet earnings-per-share targets so that Almeida and Saccaro would be eligible for enhanced compensation supported a strong inference of scienter.  Lead Plaintiffs further argued that Baxter's corporate scienter was established both through the Individual Defendants' scienter and through the knowledge of other senior management, including former Treasurer Scott Bohaboy.

32.     In their opposition brief, Lead Plaintiffs also argued that the Complaint adequately alleged that Defendants misled investors by falsely representing that Baxter prepared its financial statements in conformity with GAAP, and that Defendants' representations about the quality of Baxter's internal controls over its financial reporting were misstatements of fact, not opinions.

33.     On November 9, 2020, Defendants filed and served their reply in further support of their motion to dismiss the Complaint.  ECF No. 44.  Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiffs' opposition brief.

34.     On January 12, 2021, the Court issued an Opinion and Order granting Defendants' motion to dismiss ("MTD Order").  ECF No. 47.  In the MTD Order, the Court concluded that Lead Plaintiffs had not adequately alleged facts establishing a strong inference of scienter, because

they had not adequately established that Almeida and Saccaro knew (or had recklessly disregarded) (i) that Baxter's method of accounting for FX transactions violated GAAP or (ii) that individuals at Baxter were using its FX accounting convention to execute transactions, once the exchange rates to be applied were already known, solely for the purpose of generating FX gains or avoiding FX losses.

35.     In the MTD Order, the Court provided Lead Plaintiffs twenty-one (21) days to amend the Complaint.  The Court subsequently extended this deadline to February 26, 2021.  ECF No. 49.

36.     Following the Court's issuance of its MTD Order in January 2021, Lead Counsel spent substantial time and resources evaluating the perceived pleading deficiencies that the Court discussed in the MTD Order and potential ways in which Lead Plaintiffs could cure those deficiencies.  This included reopening their investigation, conducting additional interviews with former Baxter employees, extensive discussions with consultants retained by Lead Plaintiffs, and further analysis of publicly available and relevant materials, particularly as they related to the accounting aspects of this case and the restatement.  Lead Counsel had substantially prepared a second amended complaint based on this further investigation and analysis, which they would have submitted to the Court if the Settlement had not been reached.

## III.    MEDIATION AND SETTLEMENT

37.     After the Court issued its MTD Order on January 12, 2021, the Parties subsequently discussed whether to conduct a mediation session, and agreed to do so before Mr. Lindstrom on February 17, 2021.  In advance of the mediation, the Parties prepared and exchanged detailed mediation statements addressing liability and damages, which were submitted to the Mediator.  In preparing for the mediation and discussing their claims in private sessions with Mr. Lindstrom, Lead Plaintiffs also consulted with their retained consultant on damages and loss causation.

38.     The February 17, 2021 mediation, which was conducted using the Zoom videoconferencing platform, was attended by Lead Counsel, representatives of each of the Lead Plaintiffs, Defendants' Counsel, and representatives of Defendants' insurance carriers.   The mediation began at 10 a.m. Eastern time and concluded at approximately 8 p.m.  After a full-day session of intensive arm's-length negotiations, the Parties reached an agreement in principle to settle the Action at the Mediator's recommendation of $16 million, subject to successful completion of the Due Diligence Discovery described below.

39.     The Parties' agreement was memorialized in a Term Sheet executed on February 25, 2021.  The Term Sheet set forth the Parties' agreement to settle and release all claims against Defendants in return for a cash payment of $16 million to be paid or caused to be paid by Baxter, on behalf of all Defendants, for the benefit of the Settlement Class.[3]  The Term Sheet expressly stated that the Settlement was subject to the completion of certain discovery by Lead Plaintiffs (including both document discovery and a witness interview) for the purpose of assessing the reasonableness and adequacy of the Settlement, as well as other terms and conditions, including the execution of a formal stipulation and agreement of settlement and related papers.

40.     The Parties informed the Court on February 25, 2021 that they had reached an agreement in principle to settle the Action and requested a stay of all case filing deadlines pending the filing of the motion for preliminary approval of the Settlement.  ECF No. 52.  On March 1,

---

[3] The Parties have stipulated, for purposes of the Settlement, to a Settlement Class consisting of all persons and entities who purchased or otherwise acquired Baxter common stock during the Class Period, and were damaged thereby.  *See* Stipulation ¶ 1(ss).  Excluded from the Settlement Class are Defendants, any person who was an executive officer or director of Baxter during the Class Period, their Immediate Family members, any affiliates of Baxter, and any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court.

2021, the Court granted the stay and scheduled a hearing on the motion for preliminary approval of the Settlement for April 20, 2021.  ECF No. 53.

41.     After the Parties reached their agreement in principle to settle the Action on February 25, 2021, they negotiated the final terms of the Settlement, including the Stipulation (and the exhibits thereto) as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"),[4] and exchanged multiple drafts of these documents.

42.     During this same time, Lead Counsel requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these organizations.  As a result of this bidding process, Lead Counsel selected Epiq Class Action & Claims Solutions, Inc. ("Epiq") to serve as the Claims Administrator for the Settlement.  Lead Counsel also worked closely with Lead Plaintiffs' damages consultant to develop the proposed Plan of Allocation.  *See infra* Section VIII.

43.     On April 1, 2021, the Parties executed the Stipulation and Supplemental Agreement setting forth their binding agreement to settle the Action.

44.     Thereafter, on April 1, 2021, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement and Authorization to Disseminate Notice of Settlement (ECF Nos. 54-57), which included a copy of the Stipulation (ECF No. 57-1) and a memorandum in support (ECF No. 56).

---

[4] The Supplemental Agreement sets forth the conditions under which Baxter can exercise a right to withdraw from the Settlement in the event that requests for exclusion from the Settlement Class exceed certain agreed-upon conditions.  Pursuant to its terms, the Supplemental Agreement is not being made public but may be submitted to the Court *in camera* or under seal.

45.     On April 20, 2021, the Parties appeared before the Court on Lead Plaintiffs' motion for preliminary approval of the Settlement.  During that hearing, the Court approved Lead Plaintiffs' motion for preliminary approval of the Settlement, and set August 10, 2021 as the date for the final approval hearing.  ECF No. 58.  On April 21, 2020, the Court entered a Minute Order reflecting the same.

46.     On May 12, 2021, the Court entered the Parties' agreed-upon order preliminarily approving the Settlement and establishing a schedule for events related to the Settlement.  ECF No. 59.[5]  On or about May 4, 2021, the $16 million Settlement Amount was deposited into an escrow account.

## IV.     LEAD COUNSEL CONDUCT DISCOVERY

47.     As mentioned above, in negotiating the proposed Settlement, Lead Plaintiffs insisted on the right to conduct meaningful Due Diligence Discovery, along with the right to withdraw from the proposed Settlement prior to filing final approval papers if the Due Diligence Discovery revealed that the proposed Settlement was unfair, unreasonable, or inadequate.

48.     In accordance with these provisions, Lead Counsel undertook extensive Due Diligence Discovery, including negotiating for, obtaining and reviewing more than 10,000 pages of relevant documents from Defendants, including documents concerning Baxter's FX transactions, the Company's policies and procedures relating to FX transactions, and the restatement; documents that Baxter previously produced to the SEC related to the FX transactions, including from the custodial files of Individual Defendants Almeida and Saccaro, as well as former

---

[5] The Court's April 20, 2021 Minute Order (ECF No. 58) and the Order Preliminarily Approving Settlement and Providing for Notice entered May 12, 2021 (ECF No. 59) are collectively referred to herein as the "Preliminary Approval Order."

Baxter Treasurer Bohaboy; and documents concerning the internal investigation into the Company's FX accounting. Following the completion of their review of these documents, Lead Counsel conducted an extensive interview with the Chair of Baxter's Audit Committee at the time of the internal investigation. These efforts confirmed that the Settlement is fair, reasonable, and adequate for the Settlement Class.

49. We describe in greater detail below: (A) why this Due Diligence Discovery was necessary; and (B) the Due Diligence Discovery that Lead Counsel conducted.

**A.      The Need for Due Diligence Discovery**

50. Beginning from the start of the mediation, Lead Plaintiffs and Lead Counsel insisted that no settlement could be achieved without meaningful Due Diligence Discovery. Lead Plaintiffs demanded the right to discovery as part of the terms of the proposed Settlement in order to ensure that the Settlement reached was fair and reasonable before seeking final approval of the Settlement.

51. In Lead Counsel's professional judgment, the circumstances of the Action made Due Diligence Discovery particularly necessary in order to fully evaluate the Settlement. Among the key questions in the Action was whether the Individual Defendants had acted with scienter, including based on the connections that existed between the termination of Baxter's Class Period Treasurer Bohaboy, the alleged fraud, and the Individual Defendants' knowledge. The Company had published a number of disclosures, including the restatement and subsequent disclosures— including in the third quarter of 2020—that revealed a complete overhaul of the Company's controller functions with respect to FX and also indicated internal control weaknesses. In addition, the Company is subject to an ongoing SEC investigation, the results of which are not public.

52. While Lead Plaintiffs had conducted an extensive investigation into the claims prior to filing the Complaint and thereafter in preparation for a second amended complaint, there had

been no formal discovery conducted in the Action, and Lead Plaintiffs did not have access to Baxter's internal documents. Lead Counsel believed that obtaining information and internal Baxter documents sufficient to place investors agreeing to the Settlement on the same or similar informational footing as the SEC and the Company's board of directors was critical to evaluating whether a settlement of this size was fair and reasonable relative to the strengths and weaknesses of the claims at issue.

### B. The Due Diligence Discovery Conducted by Lead Counsel

53. Accordingly, in connection with their agreement to settle the Action, the Parties negotiated and agreed on the scope of the Due Diligence Discovery that Defendants would provide to Lead Plaintiffs. To this end, Lead Counsel engaged in vigorous negotiations with Defendants over the scope of documents to be produced in the Due Diligence Discovery, which process included numerous meet and confers. Lead Counsel returned to Defendants several times to discuss the productions to date and to seek additional documents that Lead Counsel believed were necessary to their evaluation of the Settlement's fairness, adequacy, and reasonableness, including email files from Individual Defendants Almeida and Saccaro. Similarly, Lead Counsel pushed for Defendants to produce (and ultimately obtained) documents that were sent to or from Bohaboy—not only the Individual Defendants. And Lead Counsel demanded an interview with a member of the Board who had been involved in the internal investigation into Baxter's FX accounting, and negotiated the extensive topics and certain specific, relevant questions for that interview with Defendants based on the document review conducted.

54. Defendants began producing documents on March 15, 2021, prior to the execution of the Stipulation, and continued to produce documents on a rolling basis through June 2021. In total, Defendants produced more than 10,000 pages of documents to Lead Plaintiffs, including: (a) documents concerning matters described in the restatement Baxter filed with the SEC;

(b) Baxter's policies and procedures relating to FX transactions, and documents concerning and reflecting those transactions; (c) documents that Baxter previously produced to the SEC, including documents sent or received by Almeida, Saccaro, or Bohaboy during the period from January 2017 through October 2019; and (d) Board-level documents concerning the internal investigation into Baxter's historical FX accounting. Defendants represented that the documents produced to the SEC and subsequently provided to Lead Plaintiffs in connection with Due Diligence Discovery were selected through a thorough manual review that identified the most relevant documents.

55. Lead Plaintiffs immediately set out to efficiently and thoroughly review this discovery record. To do so, Lead Counsel assigned a team of attorneys to undertake the time-sensitive and critical tasks of reviewing and analyzing the documents that Baxter produced. The reviewing attorneys escalated to the principal litigation team the key documents produced for further review and analysis. Lead Counsel made use of industry-standard technological tools to expedite the review of the documents produced.

56. As Lead Counsel reviewed the document production, they negotiated on a parallel track the topics they intended to explore during the witness interview. This process included preparing a detailed list of topics and sample questions for defense counsel to consider and utilize in determining the appropriate witness, as well as ensuring that Lead Plaintiffs could ascertain relevant information through the interview rather than be prevented from doing so by claims that key information was protected from disclosure as privileged.

57. Following several discussions with Defendants, Lead Counsel conducted an interview with Albert Stroucken, who is the Company's current Lead Director and was Chairman of the Company's Audit Committee, including at the time of Baxter's internal investigation into its FX accounting. Over the course of the approximately four-hour interview, Lead Counsel

questioned Mr. Stroucken about Baxter's FX policies and procedures; the FX transactions at issue; the investigation, its findings, and the support for those findings; and the Company's subsequent disclosures and remedial measures relating to the investigation and underlying relevant facts. These lines of questioning covered evidence about the knowledge, if any, of the Individual Defendants into the accounting violations at issue, and whether the Baxter Board of Directors had made any determinations with respect to any willful misconduct on the part of any Baxter employee.

58. In Lead Counsel's view, the Due Diligence Discovery confirmed that the Settlement Class would face significant obstacles to a recovery in excess of the Settlement Amount. Those risks are summarized in more detail below. Having considered these risks, and based on all proceedings and discovery performed in the Action, it is the informed judgment of Lead Plaintiffs and Lead Counsel that the proposed Settlement is fair, reasonable, and adequate and in the best interest of the Settlement Class.

## V. RISKS OF CONTINUED LITIGATION

59. With the Court having dismissed the Complaint, the Settlement came at a moment of substantial uncertainty in the Action. Although Lead Plaintiffs believe they could amend the Complaint to address the Court's concerns and ultimately withstand a second motion to dismiss, there was a serious risk that the Court would have ruled in Defendants' favor again, dismissing the Action with prejudice and eliminating any recovery for the Settlement Class.

60. Even if Lead Plaintiffs survived a second motion to dismiss, they would face significant further challenges from Defendants at class certification, summary judgment, and trial. In particular, Defendants would continue to vigorously argue that the Individual Defendants did not know (and were not reckless in not knowing) of the intra-Company transactions at issue in the

Action, the purpose of the transactions, the accounting treatment for the transactions, or that the accounting treatment deviated from GAAP at the time of the alleged misstatements.  And, even if liability could be established, Defendants would also assert substantial challenges to loss causation and damages.

### A.    The Risks of Prosecuting Securities Actions in General

61.    In recent years, securities class actions have become riskier and more difficult to prove, given changes in the law, including numerous United States Supreme Court decisions.  For example, data from Cornerstone Research shows that, in each year between 2011 and 2017, approximately half of all securities class actions filed were dismissed, and the percentage of dismissals was as high as 57% in 2013.  *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2020 YEAR IN REVIEW (2021), attached hereto as Exhibit 6, at 18.

62.    Even when they have survived motions to dismiss, securities class actions can be defeated in connection with *Daubert* motions or at summary judgment.  For example, multiple securities class actions also recently have been dismissed at the summary judgment stage.  *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, No. 09-01989 (S.D.N.Y.) (summary judgment granted on September 13, 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*,

2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1211 (S.D. Cal. 2010). And even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions. *See, e.g.*, *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

63.     Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, and have gone to trial, there are still real risks that there will be no recovery or substantially less recovery for class members. For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010. 2011 WL 1585605, at *6 (S.D. Fla. Apr. 25, 2011). In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id*. at *38. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

64.     There is also the risk that an intervening change in the law can result in the dismissal of a case even after significant effort has been expended. The Supreme Court has heard several securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Comcast Corp. v Behrend*, 569 U.S. 27 (2013); *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). As a result, many cases have been lost after thousands of hours have been invested in briefing and

discovery. For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs based on the determination that defendants acted recklessly with respect to 57 statements, the district court granted judgment for defendants following a change in the law announced in *Morrison*. *See* 765 F. Supp. 2d 512, 524, 533 (S.D.N.Y. 2011).

65. In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation.

### B. The Court's Dismissal of the Complaint

66. The current posture of this case highlights the significant risks to achieving a substantial, or any, recovery in the Action. The Court had dismissed the Complaint in its entirety based on its finding that Lead Plaintiffs did not set forth sufficient facts establishing a strong inference that the Individual Defendants acted with scienter and, in doing so, rejected inferences based on the nature, magnitude, and duration of the accounting misconduct (including that the misconduct was admittedly done to intentionally manipulate Baxter's financial results), which the Lead Plaintiffs had believed would adequately support an inference of scienter.

67. While the Court granted Lead Plaintiffs leave to replead—and Lead Plaintiffs were prepared to do so—Lead Plaintiffs faced a significant risk that the Court would once again dismiss the forthcoming second amended complaint and find that the amended allegations did not sufficiently address the purported issues identified in the MTD Order. While Lead Plaintiffs believe that the additional allegations that would have been incorporated—including more information concerning the types of data and information that Almeida and Saccaro had access to, and the inferences they believe arise from the Company's admission that it improperly engaged in transactions solely to boost the bottom line—would be sufficient to address the Court's reasons for dismissing the Complaint, it is very possible that the Court might have concluded the second amended complaint fails to adequately allege scienter for the same reasons as the initial Complaint.

68.     Further, the Court could also potentially dismiss the case in whole or part on other grounds that were not addressed in its prior MTD Order, including based on arguments that some or all of Defendants' challenged statements were not materially false or misleading.

69.     If the Court had dismissed the second amended complaint with prejudice, Lead Plaintiffs' only recourse would be to appeal that decision to the U.S. Court of Appeals for the Seventh Circuit.  While Lead Plaintiffs disagree with the Court's legal determination in the MTD Order and believe that they had properly alleged scienter (and would do so in the second amended complaint), it is far from clear that Lead Plaintiffs would be able to secure a reversal on appeal, especially in light of the fact that the MTD Order is lengthy, detailed, and engages thoroughly with key factual allegations in the Complaint.  Moreover, Defendants' motion to dismiss had relied on a number of Seventh Circuit cases that found scienter insufficiently established because of the lack of direct allegations that the named executive defendants had specific knowledge of the alleged fraud (such as through reviewing specific documents or attending meetings where the matter was discussed).  While Lead Plaintiffs believed these cases were distinguishable from the allegations and underlying facts in this Action, it was far from certain that a panel of the Seventh Circuit would agree.

**C.      The Substantial Risks of Proving Defendants' Liability and Damages in This Case**

70.     While Lead Plaintiffs and Lead Counsel believe they had advanced meritorious claims, Defendants vigorously contested their liability with respect to nearly every element of Lead Plaintiffs' claims.  Thus, even if Lead Plaintiffs had successfully addressed the deficiencies the Court identified in its MTD Order or achieved a reversal on appeal, Lead Plaintiffs would still have continued to face substantial risks at later stages in the case, including at class certification,

summary judgment, trial, or on appeal—thereby threatening to reduce or eliminate any recovery for the Settlement Class.

### 1. Risks of Proving Scienter

71.     At all stages of the litigation, Lead Plaintiffs faced substantial challenges in gathering admissible evidence of the Individual Defendants' knowledge of the FX accounting transactions at issue sufficient to prove the element of scienter at trial.  Lead Plaintiffs were not aware of any witnesses who would provide testimony as to the Individual Defendants' direct knowledge, and it was unlikely that any "smoking gun" document existed.

72.     To the contrary, Due Diligence Discovery, including documents sent or received by Almeida, Saccaro or Bohaboy, did not reveal evidence showing conclusively that the Individual Defendants were aware that the FX convention used by Baxter (which set FX rates for the entire month based on rates established at the middle of the prior month) violated GAAP, or that Baxter had engaged in intra-Company transactions solely for the purposes of creating FX gains or avoiding losses, in order to manipulate its earnings.  Moreover, because the alleged fraud arose from accounting violations and the purported misuse of accounting mechanisms that Defendants argued are complex and accordingly allow reasonable estimation rather than demanding exactitude, Lead Plaintiffs faced significant hurdles in establishing the scienter of the senior-most executives at Baxter through evidence of recklessness.

### 2. Risks of Proving Loss Causation and Damages

73.     Even assuming that Lead Plaintiffs overcame each of the above-described risks and successfully established scienter, they would still have faced substantial further risks in proving loss causation and damages.

74.     While the price of Baxter common stock responded immediately to the announcement of the internal investigation on October 24, 2019, Defendants still had potentially

meritorious arguments that Lead Plaintiffs would not be able to prove that the price decline that followed on October 24 and 25, 2019 was caused by the revelation of the FX accounting errors. Defendants would argue that the disclosure on October 24, 2019 revealed only the existence of an investigation and, when the results of that investigation were released and Baxter's financial statements were actually restated, the price of Baxter's common stock went up.

75. Lead Plaintiffs would have also faced challenges in proving the amount of damages, given the fact that the price of Baxter common stock rebounded shortly after the October 24, 2019 disclosure.

76. Defendants would also have argued that any damages to the Settlement Class must be offset by (or netted against) gains that Settlement Class Members received by selling pre-Class Period shares during the period when the price of the stock was allegedly inflated. If that argument was accepted, it would have substantially lowered the total damages that could be established for the Settlement Class.

### 3. Risks of Proving Falsity and Materiality

77. Had this case moved beyond the pleading stage, Lead Plaintiffs would also have faced significant risks with proving the falsity and materiality of alleged misrepresentations and omissions at issue.

78. With respect to materiality, Defendants would likely argue that the foreign-exchange transactions at issue were not material to investors, because the amounts that Baxter ultimately restated were not quantitatively material relative to Baxter's overall balance sheet. Specifically, Defendants could point to the fact that the amount of FX transactions ultimately restated by Baxter ultimately totaled approximately $200 million for 2017, 2018, and the first two quarters of 2019, which represented less than 1% of Baxter's total net income over that period. Based on those facts, Defendants would contend, including to a jury at trial, that the restatement

was not material.  Defendants could point to the fact that, following the restatement (which quantified the effect of the alleged fraud on Baxter's income), there was no negative reaction in the price of Baxter common stock.

79.     Moreover, it is likely that Defendants would have continued to challenge the falsity of alleged misstatements relating to Baxter's conformity with GAAP and certifications of Baxter's internal controls over financial reporting.  Defendants would also likely contend that these challenged statements were not actionable because the statements about Baxter's financial statements' compliance with GAAP and the quality of Baxter's internal controls were statements of opinion, not fact, or were too general to form the basis for a securities fraud claim.

### 4.     Risks After Trial

80.     Had Lead Plaintiffs prevailed at summary judgment and at trial, Defendants would likely have appealed the judgment—leading to many additional months, if not years, of further litigation.  On appeal, Defendants would have renewed their host of arguments as to why Lead Plaintiffs had failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiffs to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation.

81.     The risk that even a successful trial verdict could be overturned by a later appeal is very real in securities fraud class actions.  There are numerous instances across the country where jury verdicts for plaintiffs in securities class actions were overturned after appeal.  *See, e.g., Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 16, 2009), *aff'd*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) (granting summary judgment to defendants after eight years of litigation); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict after 19-day trial

and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co*., 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *In re Apple Comp. Sec. Litig*., No. C-84-20148, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict vacated on post-trial motions).

82.     Moreover, even if a judgment in Lead Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged reliance and damages as to each class member, including Lead Plaintiffs, in an extended series of individual proceedings.  That process could have taken multiple additional years, and could have severely reduced any recovery to the Settlement Class as Defendants "picked off" class members.  For example, in *In re Vivendi Universal SA Securities Litigation*, 765 F. Supp. 2d 520 (S.D.N.Y. 2011), the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members." 765 F. Supp. 2d at 583-584.  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.

83.     Thus, even if Lead Plaintiffs and the Settlement Class were to have prevailed at trial, the subsequent processes of an appeal and challenges to individual class members could have severely limited, or even eliminated, any recovery—and, at minimum, could have added several years of further delay.

*       *       *       *       *

84.     Based on all the factors summarized above, Lead Plaintiffs and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $16 million Settlement (as recommended by the Mediator),

instead of incurring the significant risk that the Settlement Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation. Indeed, there were serious risks that Lead Plaintiffs would not prevail in the Action through amendment of the Complaint (or on appeal from the Court's order dismissing the Complaint), or assuming the Action proceeded, at class certification, summary judgment, or trial. If Defendants had succeeded on any of their substantial defenses, Lead Plaintiffs and the Settlement Class would have recovered nothing at all or, at best, could have recovered less than the Settlement Amount.

## VI. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

85. The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiffs prevailed at trial, which was far from certain for all the reasons noted above. Lead Plaintiffs' damages consultant has estimated the Settlement Class's maximum aggregate damages in this Action to be approximately $208 million. Accordingly, the $16,000,000 Settlement represents approximately 8% of the *maximum* damages that could be established for the Settlement Class. This is significantly more than the median recovery obtained in recent securities class actions in which a similar damages amount was at issue. *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2020 REVIEW AND ANALYSIS, at 6 Fig. 5 (2021) (attached hereto as Exhibit 7) (the median settlement for securities cases from 2011 through 2019 with estimated damages between $150 and $249 million was 3.9% of estimated damages). Accordingly, the recovery obtained here would be a good recovery in any securities action, but is particularly favorable in the context of this case and considering the Court's dismissal of the Complaint.

86. Moreover, proving that level of damages assumes that Lead Plaintiffs would have prevailed on all their merits arguments about falsity, materiality, and scienter, which was far from

certain.  In addition, the calculation of loss causation and damages would be subject to substantial risk at trial, as they would be subject to a "battle of the experts."  Even if Lead Plaintiffs prevailed at trial, the amount of damages could have been substantially reduced based on arguments about the substance of the disclosure that purportedly dissipated the artificial inflation in the price of Baxter common stock; the extent to which the regression analysis Lead Plaintiffs' expert would present accurately captured the amount of dissipation in Baxter's share price on the alleged corrective disclosure date that declined in connection with the truth being revealed; and the need to offset class members' gains from their sales of pre-Class Period shares.

87.     For all these reasons, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement, instead of incurring the significant risk that the Settlement Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation.

## VII.   ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE SETTLEMENT CLASS AND THE REACTION OF THE SETTLEMENT CLASS TO DATE

88.     The Parties have stipulated to certification of the Settlement Class, for purposes of the Settlement only, consisting of "all persons or entities who purchased or otherwise acquired Baxter common stock during the Class Period, and were damaged thereby."  Stipulation ¶¶ 1(ss), 2.[6]  In its Preliminary Approval Order, the Court found, pursuant to Rule 23(e)(1)(B)(ii) of the Federal Rules of Civil Procedure, that it "will likely be able to certify the Settlement Class for

---

[6] "Excluded from the Settlement Class are Defendants, any person who was an executive officer or director of Baxter during the Class Period, their Immediate Family members, any affiliates of Baxter, and any persons or entities who or which exclude themselves by submitting a timely and valid request for exclusion that is accepted by the Court."  Stipulation ¶ 1(ss).

purposes of the proposed Settlement" and "will likely be able to certify Lead Plaintiffs as Class Representatives for the Settlement Class and appoint Lead Counsel as Class Counsel for the Settlement Class pursuant to Rule 23(g) of the Federal Rules of Civil Procedure."  ECF No. 59, at ¶¶ 2-3.  In connection with final approval of the Settlement, the Court will be asked to finally certify the Settlement Class and finally approve the appointment of Lead Plaintiffs LAMPERS and Varma as Class Representatives for the Settlement Class and the appointment of BLB&G and KTMC as Class Counsel for the Settlement Class.[7]

89.     The Court's Preliminary Approval Order directed that notice of the Settlement be provided to the Settlement Class, including mailing of the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form").  The Preliminary Approval Order set July 20, 2021 as the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set the final approval hearing for August 10, 2021.

90.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq, the Claims Administrator, to begin disseminating copies of the Notice and Claim Form (together, the

---

[7] Attached hereto as Exhibit 8 is a copy of an order in an unrelated action in which BLB&G served as Lead Counsel for a different client, SEB Investment Management AB, and as Class Counsel for the certified Class.  *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in the order, counsel for a competing lead plaintiff movant (which was not appointed) raised questions about BLB&G's hiring of a former employee of the lead plaintiff (SEB).  Following discovery and extensive briefing, the court found that the evidence did not establish any *quid pro quo*, and allowed BLB&G to continue as Class Counsel.  *See id.* at *1-2. The court in *Symantec* nevertheless ordered BLB&G to bring its order to the attention of any court in which BLB&G seeks appointment as class counsel, *see id.* at *2, so we are submitting the order to Your Honor's attention.

"Notice Packet") by mail.  The Notice contains, among other things, descriptions of the Action, the Settlement, the proposed Plan of Allocation and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund and for payment of Litigation Expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $200,000, which amount may include the reasonable costs and expenses incurred directly by Lead Plaintiffs related to their representation of the Settlement Class.  To disseminate the Notice, Epiq obtained information from Baxter and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Owen F. Sullivan Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Sullivan Decl."), attached hereto as Exhibit 3, at ¶¶ 3-9.

91.     Epiq began mailing copies of the Notice Packet to potential Settlement Class Members and nominees on May 19, 2021.  *See* Sullivan Decl. ¶¶ 4-6.  Through July 2, 2021, Epiq had disseminated a total of 183,254 Notice Packets to potential Settlement Class Members and nominees.  *Id.* ¶ 9.[8]

92.     In addition to mailed notice, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire* on June 1, 2021.  *See id*. ¶ 10.

---

[8] In accordance with the Stipulation, Defendants issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, on April 12, 2021.

93.     Lead Counsel also caused Epiq to establish a dedicated website for the Settlement, www.BaxterSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement, including important dates and deadlines in connection therewith, and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation and other relevant documents. *See id.* ¶ 14.[9] That website became operational on May 19, 2021. Additionally, Epiq maintains a toll-free telephone number and interactive voice-response system to respond to inquiries regarding the Settlement. *See id.* ¶¶ 11-13. Settlement Class Members can also contact Epiq by sending an e-mail to info@BaxterSecuritiesLitigation.com.

94.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or to request exclusion from the Settlement Class is July 20, 2021. To date, no objections and only eight requests for exclusion have been received. *See* Sullivan Decl. ¶ 15. Lead Counsel will file reply papers on August 3, 2021, after the deadline for submitting requests for exclusion and objections has passed, which will address any objections and all requests for exclusion received.

## VIII.   PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

95.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Amount (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court; (d) any attorneys' fees awarded by the Court; and (e) any other costs or fees approved by the Court) must submit a valid Claim Form with all

---

[9] Lead Counsel have also made copies of the Notice and Claim Form available on their own websites, www.blbglaw.com and www.ktmc.com.

required information postmarked (if mailed), or online through the Settlement website, no later than September 16, 2021. As set forth in the Notice, the Net Settlement Amount will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

96.     Lead Counsel consulted with Lead Plaintiffs' damages consultant in developing the Plan of Allocation (the "Plan"). Lead Counsel believe that the Plan provides a fair and reasonable method to equitably allocate the Net Settlement Amount among Settlement Class Members.

97.     The Plan is set forth at pages 13 to 16 of the Notice. *See* Sullivan Decl. Ex. A at pp. 13-16. As described in the Notice, calculations under the Plan are not intended to be estimates of the amounts that Settlement Class Members might have been able to recover at trial or the amounts that will be paid to Authorized Claimants pursuant to the Settlement. Plan ¶ 3. Instead, the calculations under the Plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Amount. *Id*.

98.     In developing the Plan, Lead Plaintiffs' damages consultant calculated the estimated amount of artificial inflation in the per-share price of Baxter common stock over the course of the Class Period that was allegedly proximately caused by Defendants' alleged materially false and misleading misrepresentations and omissions, as opposed to economic losses caused by market or industry factors or Company-specific factors unrelated thereto. Plan ¶ 2.

99.     Under the Plan, a "Recognized Loss Amount" will be calculated for each purchase or other acquisition of Baxter common stock during the Class Period that is listed in the Claim Form and for which adequate documentation is provided. The calculation of Recognized Loss

Amounts will depend upon several factors, including (a) when the Baxter common stock was purchased or otherwise acquired, and at what price; and (b) whether the Baxter common stock was sold or held through the end of the Class Period and, if the stock was sold, when and for what amounts. Plan ¶¶ 6-7. In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sale price of the stock, whichever is less. Plan ¶ 7.

100. Claimants who purchased and sold all their Baxter common stock before the alleged corrective disclosure on October 24, 2019, will have no Recognized Loss Amount under the Plan of Allocation with respect to those transactions because the level of artificial inflation is the same on the date of purchase and sale, and any loss suffered on those sales would not be the result of the alleged misstatements in the Action. Plan ¶ 7(a).

101. In accordance with the PSLRA, Recognized Loss Amounts for shares purchased during the Class Period and sold from October 24, 2019 through January 21, 2020 (known as the "90-day Look-Back Period") are further limited to the difference between the purchase price and the average closing price of the stock from October 24, 2019 to the date of sale. Plan ¶¶ 7(b)(ii), 7(c)(ii). For shares of Baxter common stock purchased or otherwise acquired during the Class Period that are still held as of the close of trading on January 21, 2020, the Recognized Loss Amount shall be the lesser of: (i) $10.81 per share, the amount of artificial inflation on the date of purchase; or (ii) the purchase price *minus* $82.65 (the average closing price during the 90-day Look-Back Period). Plan ¶ 7(d).

102. The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases/acquisitions of Baxter common stock during the Class Period is the Claimant's

"Recognized Claim." Plan ¶ 6. The Net Settlement Fund will be allocated to eligible Claimants on a *pro rata* basis, based on the relative size of their Recognized Claims. Plan ¶ 13.

103.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Amount among Settlement Class Members based on the losses they suffered on transactions in Baxter common stock that were attributable to Defendants' alleged misconduct. Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

104.    As noted above, through July 2, 2021, more than 183,000 copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members and nominees. S*ee* Sullivan Decl. ¶ 9. To date, no objections to the proposed Plan of Allocation have been received.

## IX.    THE FEE AND LITIGATION EXPENSE APPLICATION

105.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying to the Court for an award of attorneys' fees in the amount of 22% of the Settlement Fund, including any interest earned (the "Fee Application"). Lead Counsel also request payment for expenses that they incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $96,538.37 and reimbursement to Lead Plaintiffs in the aggregate amount of $6,648.75 for costs that LAMPERS and Varma incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

106.    The legal authorities supporting the requested fee and expenses are set forth in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses

are summarized below.

### A.    The Fee Application

107.    For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, and has been recognized as appropriate by the U.S. Supreme Court and the Seventh Circuit Court of Appeals for cases of this nature.

108.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved.  As discussed in the Fee Memorandum, a 22% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, particularly given the facts and circumstances of this case, as well as within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1.    Lead Plaintiffs Have Authorized and Support the Fee Application

109.    Lead Plaintiffs LAMPERS and Varma are sophisticated institutional investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action.  *See* Huxen Decl. ¶¶ 2-5; Ylätupa Decl. ¶¶ 2-5.

110.    Lead Plaintiffs have evaluated the Fee Application and fully support the fee requested.  Huxen Decl. ¶ 7; Ylätupa Decl. ¶ 7.  Both Lead Plaintiffs entered into retainer agreements with one of the Lead Counsel firms at the outset of the litigation, and the 22% fee

requested is consistent with or lower than the permissible rate under these two retainer agreements.

111.    Moreover, after reaching the Settlement, Lead Plaintiffs again reviewed and approved the requested fee and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Lead Counsel.  Huxen Decl. ¶ 7; Ylätupa Decl. ¶ 7.  Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.    The Time and Labor Devoted to the Action by Lead Counsel

112.    Lead Counsel devoted substantial time to the prosecution of the Action.  As described above in greater detail, the work that Lead Counsel performed in this Action included: (i) conducting an extensive investigation into the alleged fraud, which included a detailed review of publicly available documents such as SEC filings, analyst reports, conference call transcripts, press releases, Company presentations, and media reports, and interviews with 69 individuals, including former employees of Baxter and others believed to be knowledgeable about the facts alleged in the Complaint; (ii) drafting and filing an initial complaint and a detailed consolidated complaint based on this investigation; (iii) fully briefing and opposing Defendants' motion to dismiss; (iv) conducting additional investigation, research, and analysis in connection with preparing a second amended complaint that would have been filed absent the Settlement; (v) undertaking substantial due diligence discovery, which included negotiating for, obtaining and analyzing more than 10,000 pages of key documents produced by Defendants and conducting an interview with the chair of Baxter's audit committee; (vi) consulting extensively throughout the litigation with experts in accounting and financial economics; and (vii) engaging in extensive

arm's-length settlement negotiations to achieve the Settlement.

113.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead partners on the case, we personally monitored and maintained control of the work performed by other lawyers at BLB&G and KTMC throughout the litigation.  Other experienced attorneys at Lead Counsel were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations.  More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

114.    Attached hereto as Exhibits 4A and 4B are declarations on behalf of BLB&G and KTMC in support of Lead Counsel's motion for an award of attorneys' fees and litigation expenses (the "Fee and Expense Declarations").  Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred.  The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations based on their current hourly rates.  The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court.  The first page of Exhibit 4 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Lead Counsel firm, and gives totals for the numbers provided.

115.    As set forth in Exhibit 4, Lead Counsel collectively expended a total of 3,931.85 hours in the investigation and prosecution of the Action from its inception through June 30, 2021. The resulting lodestar is $2,302,494.50.

116.    The requested fee of 22% of the Settlement Fund is $3,520,000, plus interest accrued at the same rate as the Settlement Fund, and therefore represents a multiplier of approximately 1.5 on Lead Counsel's lodestar.  As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

### 3.    The Experience and Standing of Lead Counsel

117.    As demonstrated by the firm resumes included as Exhibits 4A-3 and 4B-3 hereto, BLB&G and KTMC are among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country.  We believe our firms' extensive experience in the field and the ability of our attorneys added valuable leverage during the settlement negotiations.

### 4.    The Standing and Caliber of Defendants' Counsel

118.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by experienced and extremely able counsel from Latham & Watkins LLP, which vigorously represented its clients.  In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to negotiate with Defendants to settle the case on terms that are favorable to the Settlement Class.

### 5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases

119.    This prosecution was undertaken by Lead Counsel on an entirely contingent basis. The risks assumed by Lead Counsel in prosecuting these claims to a successful conclusion are

described above.  Those risks are also relevant to an award of attorneys' fees.

120.    From the outset of their retention, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case such as this Action requires.  With an average lag time of several years for such cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action and have collectively incurred over $96,000 in litigation expenses in prosecuting the Action for the benefit of the Settlement Class.

121.    Lead Counsel also bore the risk that no recovery would be achieved.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have resulted in no recovery whatsoever.  Indeed, at the time of the Settlement, the Action was dismissed.

122.    Lead Counsel know from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

123.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties

of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

124. Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the excellent result achieved, we believe the requested fee is reasonable and should be approved.

### 6. The Reaction of the Settlement Class to the Fee Application

125. As stated above, through July 2, 2021, 183,254 Notice Packets had been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Fund. *See* Sullivan Decl. ¶ 9. In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on June 1, 2021. *Id.* ¶ 10. To date, no objections to the request for attorneys' fees has been received. Any objections received will be addressed in Lead Counsel's reply papers to be filed on August 3, 2021, after the deadline for submitting objections has passed.

126. In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submit that a fee

award of 22%, resulting in a multiplier of 1.5, is fair and reasonable, and is consistent with and supported by the fee awards that courts have granted in other comparable cases.

**B.      The Litigation Expense Application**

127.     Lead Counsel also seek payment from the Settlement Fund of $96,538.37 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

128.     From the outset of the Action, Lead Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved.  Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action.  Accordingly, Lead Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

129.     Lead Counsel have incurred a total of $96,538.37 in litigation expenses in connection with the prosecution of the Action.  These expenses are summarized in Exhibit 5, which identifies each category of expense, *e.g.*, expert/consultant fees, mediation costs, and on-line research, and the amount incurred for each category.  These expense items are billed separately by Lead Counsel, and such charges are not duplicated in Lead Counsel's hourly rates.

130.     The largest expense, $48,907.50, or approximately 51%, was expended for the retention of experts and consultants.  As noted above, Lead Counsel consulted with experts in the fields of accounting, loss causation, and damages during their investigation and the preparation of the Complaint, in preparation for mediation, and in connection with the development of the

proposed Plan of Allocation.

131. Another large component of Lead Counsel's litigation expenses was for online legal and factual research, which was necessary to conduct the factual investigation and identify potential witnesses, prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, and prepare Lead Plaintiffs' mediation submissions. The charges for on-line research amounted to $34,464.54, or 36% of the total amount of Lead Counsel's expenses. Lead Counsel also incurred $10,000.00, or 10% of their total expenses, for their share of the cost of mediation with Mr. Lindstrom.

132. The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, telephone costs, copying, and postage and delivery expenses.

133. All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. *See* Huxen Decl. ¶ 8; Ylätupa Decl. ¶ 8.

134. In addition, Lead Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 14-15. Lead Plaintiff LAMPERS seeks reimbursement of $4,050 for 45 hours expended in connection with the Action by its Executive Director and General Counsel, Ben Huxen, who spent time communicating with Lead Counsel and reviewing pleadings and motion papers. *See* Huxen Decl. ¶¶ 9-11. Lead Plaintiff Varma also seeks reimbursement of $2,598.75 for 35 hours expended in connection with the Action by its employees. *See* Ylätupa Decl. ¶¶ 9-

11.

135. The Notice informs potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $200,000. The total amount requested, $103,187.12 ($96,538.37 for Lead Counsel's expenses and $6,648.75 for Lead Plaintiffs' expenses), is significantly below the $200,000 that Settlement Class Members were advised could be sought. To date, no objections to the request for Litigation Expenses have been received.

136. In sum, the expenses incurred by Lead Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the application for payment of these expenses should be approved.

137. Attached hereto are true and correct copies of the following documents previously cited in this Declaration:

| | |
|---|---|
| Exhibit 1: | Declaration of Ben Huxen, Executive Director and General Counsel of the Louisiana Municipal Police Employee Retirement System, in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| Exhibit 2: | Declaration of Esa-Ville Ylätupa, Chief Legal Counsel for Varma Mutual Pension Insurance Company, in Support of: (A) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses |
| Exhibit 3: | Declaration of Owen F. Sullivan Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date |
| Exhibit 4: | Summary of Lead Counsel's Lodestar and Expenses |
| Exhibit 4A: | Declaration of James A. Harrod in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |

Exhibit 4B:     Declaration of Sharan Nirmul in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, Filed on Behalf of Kessler Topaz Meltzer & Check, LLP

Exhibit 5     Breakdown of Lead Counsel's Expenses by Category

Exhibit 6:     CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2020 YEAR IN REVIEW (2021)

Exhibit 7     CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2020 REVIEW AND ANALYSIS (2021)

Exhibit 8     *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021)

Also attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Exhibit 9:     *Ronge v. Camping World Holdings, Inc.*, No. 1:18-cv-07030, slip op. (N.D. Ill. Aug. 5, 2020), ECF No. 158

Exhibit 10:     *Sokolow v. LJM Funds Mgm't, Ltd.*, No. 1:18-cv-01039, slip op. (N.D. Ill. Dec. 18, 2019), ECF No. 216

Exhibit 11:     *Pension Trust Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 1:16-cv-05198, slip op. (N.D. Ill. Dec. 6, 2019), ECF No. 162

Exhibit 12:     *Rubinstein v. Gonzalez*, No. 1:14-cv-09465, slip op. (N.D. Ill. Oct. 22, 2019), ECF No. 296, and related brief excerpt

Exhibit 13:     *In re Impinj, Inc. Sec. Litig.*, No. 3:18-cv-05704-RSL, slip op. (W.D. Wash. Nov. 20, 2020), ECF No. 106

Exhibit 14:     *Palazzolo v. Fiat Chrysler Automobiles N.V.*, No. 4:16-cv-12803-LVP-SDD, slip op. (E.D. Mich. June 5, 2019), ECF No. 76

Exhibit 15:     *In re Quality Sys., Inc. Sec. Litig.*, No. 13-cv-01818-CJC-JPR, slip op. (C.D. Cal. Nov. 19, 2018), ECF No. 120

Exhibit 16:     *In re Novatel Wireless Sec. Litig.*, No. 08-cv-01689-AJB (RBB), slip op. (S.D. Cal. June 23, 2014), ECF No. 520, and related brief excerpt

Exhibit 17:     *Duncan v. Joy Global Inc., et al.*, No. 16-cv-1229-pp, slip op. (E.D. Wis. Dec. 27, 2018), ECF No. 79

## X.    CONCLUSION

138.    For all the reasons set forth above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable and adequate.   Lead Counsel further submit that the requested fee in the amount of 22% of the Settlement Fund should be approved as fair and reasonable, and the request for Lead Counsel's Litigation Expenses in the amount of $96,538.37 and Lead Plaintiffs' costs, in the amount of $6,648.75, should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Dated: July 6, 2021                              Respectfully submitted,


_____*/s/ James A. Harrod*_____          _____*/s/ Sharan Nirmul*_____
James A. Harrod                                   Sharan Nirmul

46