**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| IN RE BAXTER INTERNATIONAL INC. SECURITIES LITIGATION | Case No. 1:19-cv-07786<br><br>District Judge Sara L. Ellis<br><br>Magistrate Judge Jeffrey I. Cummings |

**DECLARATION OF ALEXANDER P. VILLANOVA IN SUPPORT OF LEAD PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF DISTRIBUTION PLAN**

I, Alexander P. Villanova, hereby declare and state as follows:

1.      I am a Senior Project Manager for Epiq Class Action and Claims Solutions, Inc. ("Epiq"). I am over 21 years of age and am not a party to the above-captioned class action (the "Action").[1] I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2.      Pursuant to the Court's May 12, 2021 Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 59) (the "Preliminary Approval Order"), Epiq was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the Action. As Claims Administrator, Epiq has, among other things: (i) mailed the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and the Proof of Claim and Release Form (the "Claim Form" or "Proof of Claim Form" and, together with the Notice, the "Notice Packet") to potential

---

[1] All terms capitalized terms used and not otherwise defined in this declaration have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated as of April 1, 2021 (ECF No. 57-1) (the "Stipulation"). The Settlement is contained in the Stipulation.

Settlement Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free telephone helpline for inquiries during the course of the administration; (iii) created and continues to maintain a website for the Settlement (the "Settlement Website") and posted case-specific documents on it; (iv) caused the Summary Notice to be published; (v) provided, upon request, additional copies of the Notice Packet to potential Settlement Class Members, brokers, and other nominees; and (vi) received and processed each Claim Form submitted to the Claims Administrator (a "Claim").

3.      On August 13, 2021, the Court granted final approval of the Plan of Allocation in its Order Approving Plan of Allocation of Net Settlement Fund (ECF No. 72) and entered the Judgment Approving Class Action Settlement (ECF No. 71). Epiq has completed processing all Claims received through July 5, 2022, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants. Epiq also presents this declaration in support of Lead Plaintiffs' Unopposed Motion for Approval of Distribution Plan.

**DISSEMINATION OF NOTICE**

4.      As more fully described in the Declaration of Owen F. Sullivan Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (ECF No. 66-3) (the "Mailing Decl.") and the Supplemental Declaration of Owen F. Sullivan Regarding: (A) Mailing of the Notice and Claim Form and (B) Report on Requests for Exclusion Received (ECF No. 68-1) (the "Supp. Mailing Decl."), as of August 2, 2021, Epiq had mailed 184,839 Notice Packets to potential Settlement Class Members and their nominees. Supp. Mailing Decl. ¶ 2. Since that date, 8,439 additional

Notice Packets have been disseminated. In total, Epiq has disseminated 193,278 Notice Packets to potential Settlement Class Members, brokers, and other nominees.

5.  Epiq established and continues to maintain the Settlement Website (www.BaxterSecuritiesLitigation.com) and a toll-free telephone helpline (855-654-0873) to assist potential Settlement Class Members. The Settlement Website, which provides access to important documents relevant to the Settlement, and the toll-free telephone helpline enable Settlement Class Members to obtain information about the Settlement. In connection with establishing and maintaining the Settlement Website and toll-free telephone helpline, Epiq, among other things, formulated a system to ensure that proper responses were provided to all telephone and electronic inquiries. That work included training telephone agents to respond to inquiries specific to the Settlement; developing a series of common questions and the answers thereto known as Frequently Asked Questions or "FAQs"; loading key documents onto the Settlement Website; and programming the Settlement Website to permit the viewing and downloading of those documents.

6.  In accordance with paragraph 7(d) of the Preliminary Approval Order, on June 1, 2021, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and released via *PR Newswire.* Mailing Decl. ¶ 10.

### PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.  Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net Settlement Fund was required to complete and submit to Epiq a properly executed Claim Form postmarked no later than September 16, 2021, together with adequate supporting documentation for the transactions and holdings reported in the Claim Form. Through July 5, 2022, Epiq has received and fully processed 141,003 Claims (the "Presented Claims").

8. In preparation for receiving and processing Claims, Epiq: (i) conferred with Lead Counsel to define the guidelines for processing Claims; (ii) created a unique database to store Claim details, images of Claims, and supporting documentation (the "Settlement Database"); (iii) trained staff in the specifics of the Settlement so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' identifying information and their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation of the Net Settlement Fund stated in the Notice.

9. Settlement Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a post office box address specifically designated for the Settlement. Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the database and Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

### PROCESSING CLAIMS

**A.** **Paper Claims and Claim Forms Submitted Via the Settlement Website**

10. Of the 141,003 Presented Claims, 3,105 are paper Claims. Once received, the paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is very laborious and time intensive. The paper Claims include 801 Claim Forms that were submitted via the online filing component of the Settlement Website.

Once prepared, paper Claims were scanned into the Settlement Database together with all submitted documentation. Each paper Claim, as well as each online Claim, was assigned a unique Claim number. Once scanned, the information from each Claim Form, including the Claimant's name, address, and account number/information from the supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into the Settlement Database. Each Claim was then reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of the Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form.

11. To process the transactions detailed in the Claims, Epiq utilized internal codes ("message codes") to identify and classify deficiency or ineligibility conditions existing within those Claims. Appropriate message codes were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in Baxter common stock during the Class Period (e.g., the Claimant purchased Baxter common stock only before or after the Class Period), that Claim would receive a message code that denoted ineligibility. Similar defect message codes were used to denote other ineligible conditions, such as duplicate Claims. These message codes would indicate to Epiq that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

- No Documentation Submitted for the Entire Claim

- Duplicate Claim Submitted

- No Eligible Purchase During the Class Period

- No Signature

- No Recognized Claim

12. Because a Claim may be deficient only in part, but otherwise acceptable, Epiq utilized message codes that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a defect message code. The message code indicated that although the transaction was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation. Thus, even if the deficiency were never cured, the Claim could still be partially accepted. Examples of transaction-specific message codes are as follows:

- Claim did not Balance/Trade Discrepancy

- Inadequate Documentation for Transaction

- Received Shares or Delivered Shares (i.e., shares transferred into or out of an account)

- No Proof of Unsold Holdings

### B. Electronic Claims

13. Of the 141,003 Presented Claims, 137,898 were filed electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors ("Electronic Claim Filers" or "E-Claim Filers") who may have hundreds or thousands of transactions during the Class Period. Rather than provide reams of paper requiring data entry, the E-Claim Filers either mail a computer disc or electronically submit a file to Epiq so that Epiq can upload all transactions to the Settlement Database.

14.     Epiq maintains an electronic filing operations team ("Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the E-Claim Filer. If the electronic file was deemed to be in an acceptable format, it was then loaded into the Settlement Database.

15.     Once each electronic file was loaded, the Electronic Claims were coded to denote any deficient or ineligible conditions that existed within them. These message codes are similar to those applied to paper Claims. In lieu of manually applying message codes, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

16.     The review process also included message coding any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by Epiq's Electronic Filing Team and, when appropriate, Epiq contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible to participate in the Settlement.

17.     Finally, at the end of the process, Epiq performed various targeted reviews of Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Claims and

7

other identified criteria to message code and reach out to a selection of E-Claim Filers and request that various sample purchases, sales, and holdings selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by Claimants does not contain inaccurate information.

## EXCLUDED PERSONS

18.     Epiq also reviewed all Claims to ensure that they were not submitted by or on behalf of "Excluded Persons" to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Notice and from the Claimants' certifications on the Claim Forms. Epiq also reviewed all Claims against the list of persons who were excluded from the Settlement Class pursuant to request.

## THE DEFICIENCY PROCESS

### A.     Paper Claims and Online Claims

19.     Approximately 61.5% of the paper Claims, i.e., 1,909 of the 3,105 Claim Forms submitted either as paper Claims or via the Settlement Website, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in Baxter common stock during the Class Period. The "Deficiency Process," which primarily involved mailing letters and sending emails to Claimants and responding to communications from Claimants by email and/or telephone, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

20.     If paper and online Claims were determined to be defective, a Notice of Deficient Claim Submission ("Deficiency Letter") was sent to the Claimants describing the defect(s) in the

Claims and what steps, if any, were necessary to cure the defect(s) in these Claims. The Deficiency Letter advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Letter or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Letter also advised Claimants of their right to contest these administrative determinations, and that Claimants were required to submit written statements to Epiq requesting Court review of their Claims and setting forth the basis for such requests. Epiq sent a total of 2,125 Deficiency Letters to Claimants who submitted paper or online Claims that Epiq determined to be defective. It is possible for a Claimant to be sent more than one Deficiency Letter for a Claim and thus the number of Deficiency Letters sent would exceed the number of deficient Claims discussed above in paragraph 19. Attached hereto as Exhibit A is an example of a Deficiency Letter.

21. Claimants' responses to Deficiency Letters were scanned into the Settlement Database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by Epiq's team of processors. If a Claimant's response corrected the defect(s) in a Claim, Epiq manually updated the Settlement Database to reflect the changes in the status of the Claim.

### B. Electronic Claims

22. For Electronic Claims, Epiq used the following process to contact the banks, brokers, nominees, and other E-Claim Filers to confirm receipt of their submissions and to notify the E-Claim Filers of any deficiencies or Electronic Claims that were ineligible. Each E-Claim Filer was sent an email to the email address included with the Claim Form(s) ("Status Email")

9

with an attached report containing detailed information associated with the Claim(s) and indicating which Claim(s) within the filing were deficient and/or rejected ("Transaction Report").

23. The Status Email sent to the email address of record provided with the Electronic Claim:

(a) Notified E-Claim Filers that any Claim(s) with deficiencies not corrected within twenty (20) days from the date of the Status Email may be rejected;

(b) Advised E-Claim Filers of their right to contest the rejection of the Claim(s) and request this Court's review of Epiq's administrative determination within twenty (20) days from the date of the Status Email; and

(c) Provided instructions for how to submit corrections.

24. The Transaction Report attached to the Status Email contained the following information:

(a) A listing of all Electronic Claims associated with the filing and their unique identification numbers;

(b) Identification of individual Electronic Claims that were found to be deficient or ineligible;

(c) Each Electronic Claim's current status in the Settlement Database; and

(d) The current Recognized Claim calculation associated with each Electronic Claim.

25. Epiq emailed a Status Email and Transaction Report(s) to 206 E-Claim Filers. Examples of a Status Email and Transaction Report are attached hereto as Exhibits B and C, respectively.

10

26.     The E-Claim Filers' responses were reviewed by the Electronic Filing Team, scanned and/or loaded into the Settlement Database, and associated with the corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim.

## NO DISPUTED CLAIMS

27.     As noted above, Claimants were advised that they had the right to contest Epiq's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the Deficiency Letter or Status Email that, if they disputed Epiq's determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the dispute concerning the Claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination.

28.     Epiq received two (2) requests for Court review. To resolve these disputes without necessitating the Court's intervention, Epiq reached out to each Claimant requesting Court review and attempted to answer all questions and fully explain Epiq's administrative determination of the Claim's status and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, the two Claimants resolved their deficiencies, withdrew their requests for Court review, and their Claims are now recommended for approval. There are, therefore, no disputed Claims requiring Court review.

11

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

29.     Of the 141,003 Presented Claims, 2,419 Claims were received or postmarked after September 16, 2021, the Claim submission deadline established by the Court. Epiq processed all late Claims received through July 5, 2022, and 783 Claims have been found to be otherwise eligible in whole or in part (the "Late But Otherwise Eligible Claims"). Epiq has not rejected any Claim received through July 5, 2022, solely based on its late submission, and Epiq believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended for payment.

30.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or adjustments to Claims during the finalization of the administration and the preparation of this declaration would necessarily require a delay in the distribution. Accordingly, Epiq also respectfully requests that this Court order that no Claim received after July 5, 2022, or Claim cured or adjusted after July 5, 2022, be eligible for payment for any reason whatsoever subject only to the provision of paragraph 39(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Lead Counsel have determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to warrant the processing of Claims received after July 5, 2022, these Claims will be processed and, if any would have been eligible if timely received, these Claimants may be paid their distribution amounts, to the extent permitted by the amount of remaining funds, on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks. *See* ¶ 39(f) below. With respect to previously submitted Claims that are cured or adjusted

after July 5, 2022, such Claims will be reevaluated upon receipt of the adjustment and, to the extent that they are found eligible for a distribution or additional distribution, they will be treated in the same manner as Claims received after July 5, 2022. However, should an adjustment result in a lower Recognized Claim, the Recognized Claim will be reduced accordingly prior to a distribution to that Claimant.

## **QUALITY ASSURANCE**

31.     An integral part of the claims administration process is the Quality Assurance review. Throughout the administration process, Epiq's Quality Assurance personnel worked to verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection message codes were assigned accurately, and deficiency and/or rejection notifications were sent appropriately. After all Claims were processed, deficiency and/or rejection notifications were sent, and Claimants' responses to the deficiency and/or rejection notifications were reviewed and processed, Epiq's Quality Assurance personnel performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this declaration and all Epiq's final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, Epiq:

(a)     Verified that all Claim Forms had signatures of authorized individuals;

(b)     Verified that true duplicate Claims were identified, verified, and rejected;

(c)     Verified that persons and entities excluded from the Settlement Class did not file Claims or their Claims were rejected upon review;

(d)     Performed a final Quality Assurance audit of Claims and all supporting documentation to ensure completeness of Claims;

13

(e)    Determined that all Claimants requiring deficiency and/or rejection notifications were sent such notification;

(f)    Performed an audit of deficient Claims;

(g)    Performed additional review of Claims with large Recognized Claims;

(h)    Audited Claims that were designated ineligible;

(i)    Audited Claims with a Recognized Claim equal to zero;

(j)    Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(k)    Re-tested the accuracy of the Recognized Claim calculation program.

32.    As part of its due diligence in processing the Claims, Epiq reviewed and compared the entire database for the Settlement against the "watch list" of known questionable filers that Epiq has developed throughout its years of experience as a claims administrator. Epiq performs searches based on names, aliases, addresses, and city/zip codes. In addition, Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by Claimants not previously captured in the "watch list." Processors are instructed to message code any claim that matches to a record on the "watch list" and escalate them to management for review. One (1) potentially fraudulent Claim was identified as having been submitted by someone on the "watch list." This Claim was then reviewed by management to consider the documentation submitted with the Claim in conjunction with other factors, including a review of the Claimant's website registration, address, and registration with the SEC or asset management organizations, and determined to be potentially fraudulent. Epiq sent the Claimant a Deficiency Notice notifying the Claimant that additional documentation was

14

required for the Claim to be eligible to participate in the Settlement. No additional documentation has been received supporting the Claim, and the Claim is recommended for rejection for failure to cure their conditions of ineligibility.

## RECOMMENDATIONS FOR APPROVAL AND REJECTION

33. As noted above, the number of Presented Claims in this motion is 141,003.

### A. Timely Submitted and Valid Claims

34. A total of 138,584 Claims were received or postmarked on or before September 16, 2021, the Court-approved Claim submission deadline, of which 63,023 Claims were determined by Epiq to be eligible to participate in the Settlement and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for the Timely Eligible Claims is $141,015,723.91.

### B. Late But Otherwise Eligible Claims

35. A total of 2,419 Claims were received or postmarked after September 16, 2021, the Court-approved Claim submission deadline, but received on or before July 5, 2022. Of those 2,419 late Claims, 783 were determined by Epiq to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for the Late But Otherwise Eligible Claims is $5,516,344.78.

### C. Rejected Claims

36. After the responses to Deficiency Letters and Status Emails were processed, a total of 77,197 Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

  (a) 29,404 Claims did not result in a Recognized Claim;

    (b)    44,542 Claims had no purchase(s) of Baxter common stock during the Class Period;

    (c)    232 Claims had uncured conditions of ineligibility;

    (d)    40 Claims were duplicates or replaced; and

    (e)    2,979 Claims were withdrawn by filer.

**D.    Lists of All Presented Claims**

37.    Attached hereto as Exhibits D through F are listings of all the Presented Claims:

    (a)    Exhibit D lists the Timely Eligible Claims and shows each Claimant's Recognized Claim;

    (b)    Exhibit E lists the Late But Otherwise Eligible Claims and shows each Claimant's Recognized Claim; and

    (c)    Exhibit F lists the Rejected Claims and the reasons for rejection.

## FEES AND DISBURSEMENTS

38.    Epiq agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Lead Counsel received reports on and invoices for the work Epiq performed with respect to the provision of notice and administration of the Settlement. Attached hereto as Exhibit G are copies of Epiq's invoices for its work performed on behalf of the Settlement Class as well as an estimate for the work that will be performed and the costs that will be incurred in connection with the initial distribution of the Net Settlement Fund. Should the estimate of fees and expenses to conduct an initial distribution of the Net Settlement Fund exceed the actual cost, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants. As set forth in these invoices, Epiq's total fees and expenses for this matter through May 31, 2022, are $950,742.15. Epiq anticipates that its fees and expenses

for the work performed in conjunction with the initial distribution of the Net Settlement Fund are $36,034.12. To date Epiq has not received any payment for its fees and expenses. Accordingly, there is an outstanding balance of $986,776.27 payable to Epiq, which includes the estimate for completing the initial distribution of the Net Settlement Fund.

## DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND

39.     Should the Court concur with Epiq's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, Epiq recommends the following distribution plan (the "Distribution Plan"):

(a)     Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, while maintaining a 5% reserve to address any tax liability and claims administration-related contingencies that may arise, as follows:

(1)     Epiq will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now. In accordance with the Court-approved Plan of Allocation, Epiq will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants. *See* Appendix A to Notice ¶ 13.

(2)     Epiq will, pursuant to the terms of the Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro*

*rata* share calculates to less than $10.00. *See id.* ¶¶ 8, 13. These Claimants will not receive any payment from the Net Settlement Fund and will be so notified by Epiq.

(3)    After eliminating Claimants who would have received less than $10.00, Epiq will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more. A "Distribution Amount" will be calculated for each of these Authorized Claimants, which shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants who would have received $10.00 or more, multiplied by the total amount in the Net Settlement Fund. *See id.* ¶ 13.

(4)    Authorized Claimants whose Distribution Amount calculates to less than $200.00 will be paid their full Distribution Amount in the Initial Distribution ("Claims Paid in Full"). These Authorized Claimants will receive no additional funds in subsequent distributions.

(5)    After deducting the payments to the Claims Paid in Full, 95% of the remaining balance of the Net Settlement Fund will be distributed *pro rata* based on their Distribution Amounts to Authorized Claimants whose Distribution Amount calculates to $200.00 or more. The remaining 5% of the Net Settlement Fund will be held in reserve (the "Reserve") to address any tax liability and claims administration-related contingencies that may arise following the

18

Initial Distribution. To the extent the Reserve is not depleted, the remainder will be distributed in the "Second Distribution" described in subparagraph (d) below.

(b)     To encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]." For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses through reasonable methods. Where a new address is located, Epiq will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event a distribution check is lost or damaged or otherwise requires reissuance, Epiq will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, Epiq will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, Epiq's outreach program shall end thirty (30) days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Initial Distribution checks within ninety (90) days of the mail date, or they do not cash check reissues within thirty (30) days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other

19

Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than forty-five (45) days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

(c) Authorized Claimants who do not cash their Initial Distribution checks within the time allotted or on the conditions set forth above will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for distribution to other Authorized Claimants in a second distribution. Similarly, Authorized Claimants who do not cash their distribution checks in the second distribution or subsequent distributions, should such distributions occur, within the time allotted or on the conditions set forth above will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d) Consistent with the Court-approved Plan of Allocation, after Epiq has made reasonable and diligent efforts to have Authorized Claimants cash their Initial Distribution checks, which efforts shall consist of the follow-up efforts described above, but not earlier than seven (7) months after the Initial Distribution, Epiq will, after consulting with Lead Counsel, conduct a second distribution of the Net Settlement Fund (the "Second Distribution"). *See id*. ¶ 14. Any amounts remaining in the Net Settlement Fund after the Initial Distribution, including from the Reserve and the funds allocated for

20

all void stale-dated checks, after deducting Epiq's unpaid fees and expenses incurred in connection with administering the Settlement, including Epiq's estimated costs of the Second Distribution, and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, any escrow fees, and appropriate reserves, will be distributed to all Authorized Claimants in the Initial Distribution who cashed their distribution checks and who would receive at least $10.00 in the Second Distribution based on their *pro rata* share of the remaining funds. *See id.* Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter in six (6)-month intervals until Lead Counsel, in consultation with Epiq, determine that further distribution is not cost-effective. *See id.*

(e) At such time as Lead Counsel, in consultation with Epiq, determine that further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Claims received after July 5, 2022, those Claims will be processed, and any otherwise valid Claims received after July 5, 2022, as well as any earlier-received Claims for which an adjustment was received after July 5, 2022, that resulted in an increased Recognized Claim, will be paid in accordance with subparagraph (f) below. If any funds remain in the Net Settlement Fund after payment of these late or late-adjusted Claims, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after

21

the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be contributed to the National Consumer Law Center ("NCLC"), a non-sectarian, not-for-profit 501(c)(3) organization. *See id.*

(f)     No new Claims may be accepted after July 5, 2022, and no further adjustments to Claims received on or before July 5, 2022, that would result in an increased Recognized Claim may be made for any reason after July 5, 2022, subject to the following exception. If Claims are received or modified after July 5, 2022, that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then at the time that Lead Counsel, in consultation with Epiq, determine that an additional distribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Lead Counsel and to the extent possible, may be paid the distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks.

(g)     Unless otherwise ordered by the Court, Epiq may destroy the paper copies of the Claims and all supporting documentation one (1) year after the Initial

22

Distribution, and one (1) year after all funds have been distributed may destroy the electronic copies of the same.

## CONCLUSION

40. Epiq respectfully requests that the Court enter the Class Distribution Order approving its administrative determinations accepting and rejecting the Claims submitted herein and approving the proposed Distribution Plan. Epiq further submits that its unpaid fees and expenses, as reflected on the invoices attached hereto as Exhibit G, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on July 7, 2022

_____

Alexander P. Villanova

23